UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.:  05 10596 NMG

THOMAS KELLEY,               )
        Plaintiff,           )
                             )
VS.                          )
                             )
TOWN OF PLYMOUTH and         )
ROBERT J. POMEROY, as Chief of the   )
Plymouth Police Department and   )
Individually,                )
        Defendants.          )

**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION
TO COMPEL PLAINTIFF TO FURNISH RECORDS, INFORMATION
AND TESTIMONY CONCERNING AN EXECUTIVE SESSION MEETING
OF THE TOWN OF PLYMOUTH RETIREMENT BOARD**

Now come the defendants in the above-captioned action and request this

Honorable Court to compel the plaintiff to furnish records, information and

testimony regarding an executive session meeting of the Town of Plymouth

Retirement Board, held on May 27, 2004.

I.    **Background:**

The plaintiff has filed the above-captioned action against the defendants

alleging violation of the State Whistle Blower Statute (M.G.L. ch. 148 sec. 185),

gross negligence (willful, wanton and reckless conduct), violation of the 14th

Amendment and 42 U.S.C. 1983; and denial of M.G.L. ch. 41 sec. 111F benefits.

On  June 21, 2006, the continued deposition of the plaintiff was conducted in this

matter.  [See Exhibit A, continued deposition of plaintiff, dated 6/21/06].

During the deposition, defense counsel questioned the plaintiff about an

interaction that had occurred between him and the Captain of the Plymouth

Police Department, Michael Botieri, on May 22, 2004. [See Exhibit A, p. 72]. As a result of this incident, Captain Botieri filed a formal complaint against the plaintiff with the Plymouth Retirement Board. [See Exhibit B, complaint dated May 26, 2004]. At that time, the plaintiff was the acting Chairman of the Retirement Board. [See Exhibit B]. During this incident, Captain Botieri alleges that the plaintiff became aggressive with him and threatened to use his position at the Retirement Board against Botieri. [See Exhibit B]. Captain Botieri further alleges other instances in which the plaintiff has threatened to use his position with the Retirement Board against others. [See Exhibit B].

As a result of this complaint, the Commonwealth of Massachusetts Public Employee Retirement Administration Commission informed the Retirement Board that it expected an immediate investigation of the allegations. [See Exhibit C, letter of PERAC dated 6/3/04]. However, an executive session of the Retirement Board had already been held on May 27, 2004 to discuss the allegations against the plaintiff. [See Exhibit D, executive session dated 5/27/04, unsigned]. The plaintiff testified that the matter was discussed by the Board and resolved in the executive session. [See Exhibit A, p. 89].

However, in response to questioning regarding the details of the executive session, the plaintiff refused to respond. [See Exhibit A, p. 88]. Plaintiff's counsel objected on the record to any questioning regarding the executive session and instructed the plaintiff not to answer any questions regarding the executive session. [See Exhibit A, pp. 84, 86-87]. Defense counsel suspended the plaintiff's deposition based upon these issues. [See Exhibit A, pp. 84-85 and 91-92].

II.    **Argument:**

The Massachusetts "Open Meeting Law" is contained within Mass. Gen. Laws c. 39 § 23B.  Pursuant to the statute, all meetings of a governmental body shall be open to the public and any person shall be permitted to attend any meeting except as otherwise provided in this section.  An executive session is "any meeting of a governmental body which is closed to certain persons for deliberation on certain matters."  Mass. Gen. Laws c. 39 § 23A.

An executive session may be held when the governmental body has first convened an open session for which notice has been given, a majority of the members have voted to go into executive session and the vote of each member is recorded on a roll call vote and entered into the minutes.  Mass. Gen. Laws c. 39 § 23B.  The presiding officer must cite the purpose for an executive session, and the presiding officer has to state before the executive session if the governmental body will reconvene after the executive session.  Mass. Gen. Laws c. 39 § 23B.  At this time, it is unclear as to whether these requirements were satisfied prior to convening the executive session at issue.

Executive sessions may be held for several purposes, including to consider the discipline or dismissal of, or to hear complaints or charges brought against, a public officer, employee, staff member, or individual, provided that the individual involved in such executive session pursuant to this clause has been notified in writing.  Mass. Gen. Laws c. 39 § 23B(2).  The statute further requires that the governmental body maintain accurate records of its meetings, "setting forth the date, time, place, members present or absent and each action taken at each meeting, including executive sessions."  These records shall become public record and be available to the public, but executive session records may remain

secret as long as the publication would defeat the lawful purpose of the executive session, *but no longer*. Mass. Gen. Laws c. 39 § 23B.

Based upon the limited information provided by the plaintiff during his deposition, it is unclear as to whether the Retirement Board complied with the statutory requirements set forth above prior to commencing the executive session. Specifically, there is no evidence that the presiding officer cited the purpose for the executive session, or stated before the executive session if the Board would reconvene after the executive session. The plaintiff himself, as Chairman of the Board, moved that the Board enter into an executive session. [See Exhibit D].

In <u>Porcaro v. Town of Hopkinton</u>, the Superior Court addressed this issue in deciding a motion to compel testimony regarding an executive session. 12 Mass. L. Rptr. 154, 2000 WL 1473038. The court held that the defendants violated the procedural requirements of the statute by holding the executive session one half hour prior to the scheduled open meeting. <u>Id.</u> at 3-4. In light of the substantive and procedural flaws attending the executive session, the court concluded that the defendants were not justified in claiming that the matters discussed and the session minutes were exempt from discovery. <u>Id.</u> at 4.

Accordingly, as there is no evidence that the executive session was held validly, and was called by the plaintiff himself to discuss allegations against him, the plaintiff should not be allowed to shield himself from providing information and testimony regarding the session.

Nonetheless, assuming the Board complied with the statutory prerequisites, the statute now requires that the records of the session be made a matter of public record. Secrecy of the executive session is not permitted by the

statute to continue indefinitely.  In <u>Foudy v. Amherst-Pelham Regional School Committee,</u> the Supreme Judicial Court noted that while the statute provided the school committee the authority and discretion to keep the minutes of its executive session secret, there is a limit placed upon the committee's power.  402 Mass. 179, 182 (1988).

In <u>Foudy,</u> an executive session was held to discuss the dismissal of the director and litigation that the committee was engaged in with the director.  <u>Id.</u> However, at the time the subject lawsuit was filed, the director had resigned and the litigation was terminated.  <u>Id.</u>  Accordingly, the Court held that the lawful purpose for which the executive session was held was no longer extant.  <u>Id.</u> at 182-183.  Further, the Court emphasized that the burden of showing a need for nondisclosure was on the committee, which had offered no evidence as to how the release of the executive session minutes would defeat the purpose of the executive session.  <u>Id.</u> at 184.

The plaintiff in the subject action testified that the allegations made against him by Captain Botieri were discussed by the Board and *resolved* in the executive session.  [See Exhibit A, p. 89].  Additionally, the unsigned record of the executive session at issue demonstrates that an agreement was reached as to a resolution of the allegations.  [See Exhibit D].  Accordingly, publication of the records would no longer defeat the purpose of the executive session.  The session should be considered a  matter of public record, and the plaintiff should be compelled to provide records, information and testimony regarding the session. "It is essential to a democratic form of government that the public have broad access to the decisions made by its elected officials and to the way in which the decisions are reached."  <u>Foudy</u> at 184.

III.    **Conclusion:**

Based upon the above-detailed grounds, the defendants respectfully request this Honorable Court to compel the plaintiff to furnish records, information and testimony regarding the executive session meeting of the Town of Plymouth Retirement Board, held on May 27, 2004.

Respectfully submitted,
DEFENDANTS,
ROBERT J. POMEROY and the
TOWN OF PLYMOUTH,
By their attorneys,

/s/ Jeremy I. Silverfine
Jeremy I. Silverfine, BBO#542779
Leonard H. Kesten, BBO# 542042
BRODY, HARDOON, PERKINS & KESTEN, LLP
One Exeter Plaza
Boston, MA 02116
(617) 880-7100

Dated: September 5, 2006

Volume II, pages 1-95

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. 1:05-cv-10596-NMG

```
--------------------------)
THOMAS M. KELLEY,         )
          Plaintiff      )
VS.                       )
                          )
TOWN OF PLYMOUTH, ET AL,  )
          Defendant      )
--------------------------)
```

CONTINUED DEPOSITION OF THOMAS M. KELLEY, a

witness called for examination by counsel for the

Defendant, taken pursuant to the applicable provisions of

the Massachusetts Rules of Civil Procedure, before

LINDA M. CORCORAN, a Court Reporter-Notary Public in and

for the Commonwealth of Massachusetts, at the Law Offices

of Joseph R. Gallitano & Associates, 34 Main Street

Extension, Suite 202, Plymouth, Massachusetts, on

Wednesday, June 21, 2006, commencing at 2:07 p.m.


**LINDA M. CORCORAN**
**CERTIFIED COURT REPORTER**
**P. O. Box 4**
**Kingston, Massachusetts   02364**
**(781) 585-8172**

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

A P P E A R A N C E S

On behalf of the plaintiff:

JOSEPH R. GALLITANO, ESQUIRE (partial)
JOSEPH R. GALLITANO & ASSOCIATES
34 Main Street Extension, Suite 202
Plymouth, MA   02360
(508) 746-1500; FAX (508) 747-1150

RICHARD D. ARMSTRONG, JR., P.C.
1400 Hancock Street
Third Floor
Quincy, MA   02169
(617) 471-4400; (617) 471-4404


On behalf of the defendant:

JEREMY I. SILVERFINE, ESQUIRE
BRODY HARDOON PERKINS & KESTEN, LLP
One Exeter Plaza
Boston, MA   02116
(617) 880-7100; FAX (617) 880-7171

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Page 3

I N D E X

TESTIMONY OF:   THOMAS M. KELLEY                          Page

Direct examination by Attorney Silverfine                 4

E X H I B I T S

Defendant's                                              Page

Exhibit No. 6        Letter dated May 10, 2001            18

Exhibit No. 7        E-mail dated September 2,
                     2000                                 23

Exhibit No. 8        E-mail dated May 8, 2001             23

Exhibit No. 9        E-mail dated May 30, 2001            39

Exhibit No. 10       E-mail dated July 3, 2003            45

Exhibit No. 11       Letter dated September 9,
                     2003                                 51

Exhibit No. 12       Findings of fact                     52

Exhibit No. 13       Letter dated January 14,
                     2004                                 61

Exhibit No. 14       Letter dated January 29,
                     2004                                 70

Exhibit No. 15       Letter dated May 26, 2004            72

Exhibit No. 16       Executive session minutes
                     dated May 27, 2004                   83

Exhibit No. 17       Letter dated June 1, 2004            85

Exhibit No. 18       Letter dated June 3, 2004            89

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-826-6313

1                    S T I P U L A T I O N S

2              IT WAS STIPULATED AND AGREED by and between

3      counsel for the respective parties that all objections,

4      except as to the form of the question, shall be reserved

5      until time of trial; that motions to strike shall be

6      reserved until time of trial; that the witness shall read

7      and sign the transcript of this deposition within 30

8      days; however, reading and signing of the deposition

9      transcript before a notary shall be waived.

10                    P R O C E E D I N G S

11             THOMAS M. KELLEY, a witness called for

12     examination by counsel for the defendant, having been

13     satisfactorily identified and having been duly sworn, on

14     oath deposes and continues to testify as follows:

15          DIRECT EXAMINATION BY ATTORNEY SILVERFINE

16        Q.   Good afternoon, Mr. Kelley.  This is a

17     continuation of the deposition we started on February 9,

18     2006, in my office, and as a courtesy to you, we're

19     continuing your deposition this afternoon.  Hopefully

20     we'll be able to finish.  If not, we'll finish on some

21     other portion of the afternoon.  I'm hoping to finish in

22     the next couple of hours.

23             Continuing on where we left off, same ground

24     rules apply.  If you don't understand a question, you

1    have to let me know.  If you need me to repeat something

2    again, please let me know.  If there's any reason you

3    need a break, also let me know.  If you need to speak to

4    your counsel, also please let me know, and of course,

5    we'll provide it.

6              (Mr. Gallitano enters the room.)

7              MR. SILVERFINE:  Mr. Gallitano has just joined

8         us.

9              MR. GALLITANO:  You just keep going, and I'm

10         going to be in in a few minutes.

11             MR. SILVERFINE:  Fair enough.

12   BY MR. SILVERFINE

13        Q.   Mr. Kelley, what I'm going to do is basically

14   jump in from where we left off last time.  Right before

15   we get there, are you on any medication today?

16        A.   Just my regular heart medicine.  I take those

17   five medications.

18        Q.   The same ones you mentioned last time?

19        A.   Yes, yes.  I take those daily.

20        Q.   Anything new?

21        A.   No.

22        Q.   Any change in your job status from the last

23   time we were there?

24        A.   No.

Page 6

1          Q.    Anything new?

2          A.    No, I'm still retired.

3          Q.    What I'm going to do is we had marked a number

4    of exhibits last time.  And I'm going to start off as to

5    where we were in our last deposition, where we ended,

6    which was we were referring to your answers to

7    interrogatories, which is marked as Exhibit 2.  So I'm

8    going to again -- I'm going to show you Exhibit 2, which

9    we've already marked on February 9, and refer you

10   specifically as to some of your answers.  And we left off

11   on Answer No. 7.

12               Do you see where I'm referring to?

13               (Hands to witness.)

14         A.    Yeah, yes.

15               MR. SILVERFINE:  Just give me a second.  One

16         second.  Just a moment.

17               (Pause.)

18         Q.    As far as your days as a police officer, is it

19   a supervisor's duty to monitor a particular shift?

20         A.    Well, the makeup of the department when I left

21   was you have a patrol supervisor possibly that worked

22   either in your area or there were two, depending on the

23   manning posture.  Then you would have a shift commander

24   who could be a sergeant or a lieutenant.

1       Q.   And who was your shift supervisor, or who

2    monitored your duties as a patrol officer?

3       A.   Most of the time Kevin Fahy was there and

4    Lieutenant Budge was the shift commander.

5       Q.   What were their duties as shift commanders as

6    it related to a patrol officer such as yourself?

7       A.   Well, they would make up the daily schedule.

8    They would bring any new directives or any new

9    information most of the time to the attention of the

10   officers or any new concerns, extra checks in various

11   areas for one reason.  Vandalism, public drinking, those

12   types of things would be brought to the attention

13   sometimes by the lieutenant, sometimes by the sergeant.

14   It depended on the activity of the day.

15      Q.   Are the supervisors, your supervisor also, in a

16   sense supposed to monitor not only yourself but other

17   patrol officers in their command?  Is that fair to say?

18      A.   Yes, they did.

19      Q.   What other police officers have served on the

20   Plymouth Retirement Board that you know of since you've

21   been on it?

22      A.   There's none.

23      Q.   During the past few years, have you heard of

24   any police officer who ever served on the Plymouth

Page 8

1    Retirement Board?  Are you aware of any?

2        A.    Not in the last ten years that I was there.  I

3    mean, it was just myself.  I don't remember anybody prior

4    to that.

5        Q.    You have heard discussion about other town

6    employees.  What other town employees who worked for

7    Plymouth also serve on the retirement board while you've

8    been serving there?

9        A.    You had the building commissioner, and he's

10   been the building inspector --

11       Q.    His name?

12       A.    Dick Manfredi.  He was from the inspection

13   services division.  By statute you have the treasurer as

14   designee, and then in the case of us, it's the chief

15   financial officer.

16       Q.    And who was that?

17       A.    At the time it was Mr. Dello Russo.  There was

18   a John Madden there temporarily for a couple of months.

19       Q.    What's John Madden's position with the town?

20       A.    He was an accountant at the time.  They were in

21   between two financial directors, and he took over while

22   they hired another guy temporarily.  So he had to sit up

23   there, come to the board.

24       Q.    Was he actually part of -- what department is

Page 9

1   he part of?

2       A.   He would have been a part of the department of

3   -- the finance department.

4       Q.   Anyone else you can think of?

5       A.   Right now presently a Bruce Miller, who's now

6   there.

7       Q.   Where's he from?

8       A.   He's now the finance director.  He replaced

9   Dello Russo.

10      Q.   Do you know when that was?

11      A.   Let's see.  Geez, I don't remember.  Maybe

12  around 2003, 2004, somewhere in that area.

13      Q.   Relative to the Columbine-like drill back on

14  May 25, 2003, prior to the drill itself, did you object

15  to participation in that drill?

16      A.   I was never made aware that an objection would

17  be entertained.

18      Q.   But the question is, did you?

19      A.   No, I didn't.

20      Q.   In other words, did you verbalize that you

21  yourself had an objection to participate for any reason?

22      A.   No, prior to that I --

23      Q.   All right.

24      A.   Excuse me.

Page 10

1    Q.    I'm sorry.  I thought you were finished.

2    A.    No, I wasn't.

3    Q.    Okay.

4    A.    Prior to that I did notify the town as a result

5    of receiving a letter from the chief regarding sick time

6    of two illnesses that I had been treated for with

7    doctors' notes.  I gave them to Botieri.  And one was for

8    Meniere's disease.  I was under Dr. Durante's care for

9    that as well as Lyme disease, and I was under the care of

10   Dr. Molloy for that.  And I brought in those doctors'

11   notes and gave them to Mr. Botieri in hand.

12   Q.    First of all, when did you do that?

13   A.    I would say that might have been -- I think the

14   letters come out like in March/April, in that area.

15   Around the April area.

16   Q.    And did you specifically object or make

17   reference to your not wanting to participate in that

18   drill?

19   A.    No, I never made any.

20   Q.    Either in writing or verbally?

21   A.    Never was aware of it.

22   Q.    Did you make any grievance as to participation

23   in the drill of May 25, 2003, prior to the drill?

24   A.    We were told it was mandatory.  We were subject

1   to discipline if we didn't participate.

2        Q.   So the question is, did you file a grievance?

3        A.   No.

4        Q.   And just so I understand -- and I think you may

5   have testified to this before and just briefly mentioned

6   -- what were your preexisting medical conditions as they

7   were right prior to May 25, 2003?

8        A.   As I just answered, they were Meniere's

9   disease.  I was under the care for Meniere's disease as

10  well as I was on -- I was under Dr. Molloy's care for

11  Lyme disease.

12       Q.   And you said you were taking medication for

13  both of them?

14       A.   Yes.

15       Q.   And you were able to perform the essential

16  functions of your job as a police officer in your daily

17  duties?

18       A.   There were times prior to the drill there that

19  I went home from work.  I was going to say home from

20  school.  Jesus, home from work because of symptoms that

21  were attributed to those two things.  I couldn't complete

22  my shift.  I had to be driven home several times.  I got

23  dizzy spells.  And the symptoms of those two type of

24  things -- you get dizzy spells.  Sometimes I would be so

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Page 12

1    dizzy I couldn't even drive home, and I would have to

2    take the medication and lay down.  A couple of times I

3    called Dr. Durante and met him.  My wife would drive me

4    to his office, and he would examine me.  He could tell

5    that you were having a Meniere's attack.

6        Q.    Referring to Exhibit 2, Interrogatory No. 10,

7    which states:  (Reading)  Please set forth all the facts

8    which rely on the alleged defendants were aware of your

9    preexisting medical condition and that the May 25, 2003,

10   drill would aggravate that medical condition (end

11   reading), you answered:  (Reading)  Based on the medical

12   notes on record in my personnel file (end reading).

13        Do you see that?

14        A.    Uh-huh.  Yes, I'm sorry.  Yes.

15        Q.    Besides what you've just referenced, are there

16   any medical notes that you say on record in your

17   personnel file that were present prior to May 25, 2003?

18        A.    Not that I'm aware of.

19        Q.    Are you aware of any obligation anyone from the

20   police department has to review medical notes in your

21   personnel file?

22        A.    Well, going back to my previous answer and your

23   question, I explained I believe earlier in the deposition

24   that on a yearly basis we are given a letter from the

1    chief who reviews everyone's file about the use of sick

2    time.   And at that point everybody gets a generic letter,

3    and it states you might have used five days, twelve days.

4    This particular year I believe I used twenty-three days.

5    Or it indicates how many full days you used and how many

6    half days you used, like if you got sick at 12 o'clock

7    and you went home sick type of thing.   And that was

8    signed by the chief.   That was a contractual item that

9    the chief was required to do on an annual basis, and it

10   was for the protection of both sides.

11          If you felt that the letter was not

12   representative of your sick time, you could produce

13   medical records that would say you have a legitimate

14   reason for these times, and I exercised that right.   And

15   I also then e-mailed the chief indicating that I gave him

16   -- and we have that, I believe, in the production of

17   documents.   I e-mailed him indicating that I gave those

18   medical records, those medical notes to Mr. Botieri, and

19   I was requesting him to review that and then retract his

20   letter from me because I felt that it was a legitimate

21   use of sick time.   I did that twice, and I never received

22   an answer back from him, and he never retracted his

23   letter.   He never responded to my request.

24          Q.    This amount of sick time you used, was that

1    twelve days prior to May 25, 2003?

2        A.    No, it would have been a cumulative of a year,

3    say, from, oh, April 30 to the previous April 30.  It's

4    like a calendar annual basis.  At some point they stop

5    and they say, okay, from this point back a year, use the

6    following days.  We had -- I believe there's a copy of it

7    in their documents as well.

8        Q.    Do you know what the date, that anniversary

9    date you were referring to is?

10       A.    I don't know, but it's in the documents that I

11   think you produced or we produced.  It is in there.

12       Q.    Other than what you've now testified, did you

13   do anything else to notify the chief or the town of your

14   medical condition prior to May 25, 2003?

15       A.    No, those -- like I said, the letter is signed

16   by the chief.  It is part of a contractual obligation

17   that he has to review, so he would have had knowledge of

18   it being there.  And I never received a response after I

19   justified my days.

20       Q.    Again, in Exhibit 2, your answer to

21   Interrogatory 11 says:  (Reading)  Please set forth all

22   communications you had with any union representative

23   prior to May 25, 2003, drill regarding your inability to

24   participate due to your preexisting medical condition

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1    (end reading).  And your answer was:  (Reading)  The

2    union president was to hold a membership meeting with the

3    chief on the issues and concerns about my preexisting

4    medical condition and inability to participate in the

5    drill (end reading).

6             Is that correct?

7        A.    I don't particularly remember it being written

8    like that, but I remember there was a question about

9    individuals that have had issues.  And I believe we just

10   found out this morning that there were two individuals

11   that were excused through some process that I don't know.

12       Q.    My first question is, that's what you wrote

13   back in Exhibit 2 on August 25, 2005, under oath?

14       A.    Right, right.

15       Q.    And my question is, if I could have it, do you

16   recall when that meeting you say with the chief was?

17       A.    I believe they had a discussion on the

18   Columbine issue and all the training program and some of

19   their concerns in their impact bargaining session with

20   the AR-15s prior to that.  It was maybe a month or month

21   and a half before.

22       Q.    And who was present at that meeting?

23       A.    I believe Paul Boyle was, Dana.  I believe the

24   chief was.

Page 16

1        Q.    Dana?

2        A.    Dana Goodwin.

3              And I believe the chief and Captain Botieri

4    were there.

5        Q.    And do you know what was discussed?

6        A.    I know they discussed that, and they discussed

7    the impact bargaining, I believe, on the use of the

8    AR-15s.

9        Q.    What information are you aware of that they

10   discussed your preexisting medical condition and your

11   inability to participate in the drill?

12       A.    I'm not aware of any -- I'm not aware of any

13   exact language.  I wasn't there.

14       Q.    I'm just trying to follow up on -- because what

15   you wrote in your answer was you were to bring up a

16   meeting -- concerns about preexisting medical condition

17   and inability to participate in the drill.

18             So what information, if any, are you aware of

19   that was brought up?

20       A.    I don't have any information of what

21   specifically because I don't have any notes of that

22   meeting or anything like that.  I just know that they did

23   discuss.  They had concerns as the union for individuals.

24       Q.    Do you know in your conversations with Paul

Page 17

1    Boyle and Dana Goodwin whether they mentioned

2    specifically that they brought up concerns about you and

3    any preexisting medical condition?

4       A.    I don't know if they brought -- I don't recall

5    if they said specifically, you know, but they did say

6    that they did speak with him or tried to speak with him

7    about the concerns that they had from other drills and

8    other towns, and they tried to address some of those

9    concerns.

10      Q.    In Interrogatory No. 15 on Exhibit 2, it

11   states:   (Reading)  Please set forth all facts on which

12   you rely where you allege Chief Pomeroy was aware that

13   you reported him to the Inspector General's office

14   regarding his compensation for educational benefits (end

15   reading), and you answered:   (Reading)  Town manager

16   Eleanor Beth told me in her office that Pomeroy was aware

17   of the Inspector General office investigator.  I wrote of

18   the harassment on the job (end reading).

19         Where did you write of the harassment on the

20   job?

21      A.    It's in the documents that we produced to you.

22      Q.    Do you know which documents particularly you're

23   referring to?

24      A.    If you want to go off the record, I can get it.

1    Q.   Can you remember --

2    A.   It's in the minutes.  I'd have -- you'd have to

3   go through the --

4    Q.   All right, that's fine.

5         MR. SILVERFINE:  We'll go off the record.

6         (Discussion off the record.)

7         MR. SILVERFINE:  Back on the record.

8         Mr. Kelley is just showing me a letter that

9        appears to be provided, Exhibit 3 of document

10       production and voluntary disclosure.  It's a letter

11       from -- it looks like from Mr. Kelley to Mrs. Beth

12       dated May 10, 2001.

13        And perhaps -- could I get a copy of this and

14       just mark it so it's clear on the record?

15        MR. GALLITANO:  Sure.  Do you want three

16       copies, you think?

17        MR. SILVERFINE:  That would be great.  Just so

18       it's clear on the record.

19        (Pause off the record.)

20        MR. SILVERFINE:  Why don't we mark this as

21       Exhibit 6.

22                        (Whereupon, a letter dated

23                         May 10, 2001, was marked as

24                         Exhibit No. 6 for the

Page 19

1                              defendant.)

2            MR. SILVERFINE:  Okay, we'll continue while Joe

3        is making copies.

4   BY MR. SILVERFINE

5        Q.   On Exhibit 6 this is a letter you wrote to

6   Eleanor Beth, who was then town administrator?

7        A.   She was the town manager.

8        Q.   Town manager.  And your complaints had to do

9   with harassment as it related to the discrepancy in pay

10  records as you saw it?

11       A.   What it was, as you can see from the letter --

12       Q.   Yeah.

13       A.   If you want to follow it down with me, we can

14  --

15       Q.   Yeah, go ahead.

16       A.   Follow this one right here.

17       Q.   Okay.

18       A.   I went to go see her prior to this letter being

19  written, discussing as being a member of the board

20  elected to the position in the fund as well as a town

21  meeting member.  There were some serious questions of the

22  personnel bylaw and how it relates in being employed in

23  the police department.  There was no provision for Quinn

24  Bill or holiday money or vacation money or overtime,

Page 20

1    which was an ongoing practice in it.  And having

2    experience in municipal finance and having experience

3    with collective bargaining, employees are paid in three

4    criteria.  They're paid pursuant to a personnel bylaw, if

5    they're a member of it; a collective bargaining

6    agreement; or a contractor relationship which they're

7    eligible.

8         In the case that I was bringing to her

9    attention, which involved town meeting monies and

10   retirement monies and disbursement of funds, there was no

11   mention of Quinn Bill, holiday money, vacation money, and

12   overtime that was being paid on an ongoing basis at the

13   police station in the bylaw that governed the employment

14   of the police captains and the police chief.  The bylaw

15   by the Town of Plymouth's adoption, the way they

16   establish their own bylaw, is pursuant to Chapter 41,

17   108A, which says in a city or town -- in a town by a vote

18   of the town meeting, they can establish a personnel

19   bylaw.  Town meeting had never seen these numbers, had

20   never seen these benefits.  It never went through the

21   personnel bylaw.  And come to find out it was ongoing for

22   over 15 years, and benefits were also being given without

23   authorization of the bylaw to members of the fire

24   department.  Those benefits and payroll numbers were

Page 21

1   given to the retirement board, which would then formulate

2   a benefit and calculation pursuant to the individual

3   member's group, age, and salary.  Pursuant to the

4   regulations generated by Chapter 32 CMRs specifically

5   indicate as well as the board policy that we will check

6   and back up every number that's in a computation with the

7   governing document.  And from the governing document in

8   this case, it would have been the personnel bylaw.  To

9   the payroll there was a 30 to 35 percent discrepancy.

10          At that point I spoke to Mr. Botieri with Mr.

11  Rooney present in his office and explained to him the

12  severity of this issue in the event that something

13  happened to one of them or anybody in that category.  I

14  had spoke to board counsel from the retirement board, and

15  he said, "Tom, you have to bring it to the attention of

16  the town in some form or fashion, but get it done"

17  because of the Needham issue where an auditor walked in

18  to the Needham Retirement Board.  There were mistakes

19  made by the Needham board for internal tabulations of

20  monies.  An auditor ordered the people to pay the money

21  back over -- it was like a 20-year period that this went

22  on for.  And the individuals that were out, the members,

23  didn't even realize this happened.  It wasn't their

24  mistake.

Page 22

1       Q.   Now, did you also file complaints about the

2  fire department to anyone?

3       A.   No, I didn't even know it was going on till we

4  went -- we dug into it deeper.

5       Q.   When was that?

6       A.   When Eleanor Beth looked into or -- when

7  Eleanor Beth finally -- how do I say this?  When Eleanor

8  Beth looked into it, she found that this practice was

9  going on in the fire department as well.

10      Q.   Do you remember when that was?

11      A.   That was just around the time that I wrote this

12 letter to her she started.

13      Q.   This was around May 10, 2001?

14      A.   This letter here.  After that she started to

15 look into it.

16      Q.   When you complained about the police

17 department, were you complaining about all the police

18 department or just about Chief Pomeroy?

19      A.   I was complaining about the actions of Captain

20 Botieri and Chief Pomeroy.

21      Q.   Anyone else?

22      A.   No.

23      Q.   Besides -- you were kind enough to give me

24 copies of --

Page 23

1          A.    We have other e-mails here as well.

2          Q.    The other e-mails in your production are the

3     examples of what you say you wrote about the harassment;

4     is that correct?

5          A.    Right, correct.

6          Q.    And just for the record, why don't we mark

7     these as Exhibit Nos. 7 and 8, which are -- looks like

8     an e-mail from you on September 2, 2000.  We'll mark that

9     as Exhibit 7.  And then an e-mail of May 8, 2001, from

10    you we'll mark as Exhibit 8.

11                              (Whereupon, e-mails dated

12                              September 2, 2000, and May

13                              8, 2001, were marked as

14                              Exhibit Nos. 7 and 8 for

15                              the defendant.)

16    BY MR. SILVERFINE

17         Q.    And when you were forwarding, for instance,

18    this e-mail in Exhibit 7, which is your September 2,

19    2000, e-mail --

20         A.    Which one are you on?  I'm on the second one.

21         Q.    This says meeting September 1, 9-month --

22         A.    Okay, I have that one.

23         Q.    Who did you send that to?  It says Kelley and

24    Goodwin.

Page 24

1      A.    I sent that to -- Dana Goodwin was present at

2   the meeting on the 1st.

3      Q.    Did you send that to Captain Botieri or Chief

4   Pomeroy or anyone else?

5      A.    No, but they have access to -- it's what they

6   call systems manager.  They can look into any e-mail at

7   any time.

8      Q.    My question is, did you send this -- did you

9   forward this to Botieri or Pomeroy or to Eleanor Beth?

10      A.    According to that format, no, I didn't.  I kept

11   it in my documentation.

12      Q.    And Exhibit 8, which looks like an e-mail from

13   you to -- it looks like yourself, Boyle, and Botieri, did

14   this have to do with the vacation time you were referring

15   to?  Is that right?  Why don't you take the original.

16           (Hands to witness.)

17      A.    Yes.

18      Q.    And that's what you were referring to when we

19   discussed a few minutes earlier about your decision with

20   the vacation time?

21      A.    In the e-mail I indicate that I had put in for

22   a month's vacation in June and a month's vacation for

23   July.  I had accrued time towards the end of the fiscal

24   year, which would be June, and accrued time starting in

Page 25

1    July 1.  And I had put in time for that over 60 days

2    prior to it.  I believe the date -- what's the date on

3    there?

4         Q.    May 8, 2001.

5         A.    Yeah, right.

6         Q.    Just so I'm clear, besides what we've marked

7    here, you've also indicated in your production would

8    include any and all notices or letters, e-mails you sent

9    as to any harassment that you thought you were

10   undergoing, right?

11        A.    To the best of my knowledge, that I had.  What

12   was available.

13        Q.    In other words, there's no other documents

14   other than --

15        A.    Not that I can think of.

16        Q.    -- what you've already produced to us?

17        A.    If I could find -- if I have something, I'd

18   gladly give you a copy of it.

19        Q.    In Interrogatory No. 16 on Exhibit 2, you make

20   a listing of all your treating physicians.  Is there

21   anyone else that's not --

22        A.    No.

23        Q.    -- listed there?

24        A.    No.  We went over this, believe me, before.

Page 26

1           MR. ARMSTRONG:  Well, there is.  I mean,

2      corrected in the first --

3           THE WITNESS:  I did correct that.

4    Q.   I'm just asking if there's anybody else.

5    A.   No more since then.  No more since then.

6    Q.   That's what I'm asking.  I just want to make

7 sure that we have all the medical providers.  Thank you.

8    A.   We do, right.

9    Q.   I don't know if I asked you this last time, and

10 if I did, forgive me, but I just want to understand.

11         Did the town have to hire or pay any other

12 police officer to cover your shift when you went to the

13 retirement board meeting?

14    A.   They never did.

15    Q.   To your understanding, how would they cover

16 your sector when you went to a retirement board meeting?

17 To your understanding.

18    A.   Another officer would be assigned my position

19 and have to cover two areas.  They would run short on the

20 shift.  I believe Captain -- I believe Lieutenant Fahy

21 indicated that as well the other day.

22    Q.   To your knowledge, did that ever create any

23 problems as far as coverage to your understanding?

24    A.   I can tell you that officers would have to

Page 27

1    cover two areas, and if it was a long meeting, they'd be

2    pretty upset that they'd have to cover my area.  Some of

3    them were sympathetic.  They realized that I was doing a

4    volunteer job for their best interest and elected to the

5    position.  Some of them really didn't care about

6    anything.  They were just upset, and it was difficult

7    sometimes reasoning with them, that I can't help it if

8    they're not going to hire somebody to cover the extra

9    position because I'm out.  They are getting a charge back

10    for it.

11        Q.    What's a charge back?

12        A.    They were charging back money from the

13    retirement system, and they indicated to people that they

14    did that for the purposes of coverage, but they never

15    covered me.

16        Q.    Did any of the officers express their, for lack

17    of a better word, anger or --

18        A.    Yes.

19        Q.    -- disappointment to you?

20        A.    Absolutely.  All the time.

21        Q.    Which officers?

22        A.    Anybody that was -- I mean, you could go back.

23    They'd have a multiple car accident and then have to go

24    to another one, and they'd be going all the time.   They

Page 28

1    never covered me, so it put the pressure on all the other

2    people.

3         Q.   Name some of the officers that you recall that

4    --

5         A.   It was day shift.  It would be the day shift.

6    I mean, I can't name specific names.  It's almost four

7    years ago or so or better, but it happened all the time

8    over my career there on the time.

9         Q.   Do you know if those complaints went up the

10   chain of command to --

11        A.   I remember Lieutenant Fahy and Captain Skip

12   Budge indicating to people that they never covered me and

13   "They should be covering you."  And that was a decision

14   made by the second floor, and they couldn't do anything

15   about it.

16        Q.   You had produced a note to the town after May

17   25, 2003, relative to your condition -- and I'm sure I'm

18   going to mispronounce this -- cardiomyopathy.  Do you

19   remember that?

20        A.   If you have the document, I'll look at it.  I

21   don't mean to be --

22        Q.   I have it somewhere.

23        A.   There are numbers of them.

24        Q.   Do you remember if the note indicated that the

1   condition that you were suffering was caused by the job

2   relative to cardiomyopathy?

3       A.   No.  If you'd show me a document, I'd be able

4   to specify exactly what you're talking about.

5       Q.   But do you have any independent recollection?

6       A.   No, I don't.  I'd have to see it in front of

7   me.  We've got 5-inch stacks of paper here.  I'm not

8   trying to be argumentative.  I just...

9       Q.   All right, I understand.

10      Were you angry that Chief Pomeroy was

11  scrutinizing your absence from work due to the retirement

12  board participation?

13      A.   I was annoyed because of -- no one else was

14  scrutinized like that.  I was constantly, you know --

15  people at work would be saying, "They're out to get you.

16  They're out to get you."  I had other people on the board

17  that turned around and ridiculed and were saying, "Oh,

18  you better get over there quick.  They're counting the

19  minutes."

20      I felt the whole thing was unnecessary because

21  they gave us a bill for those hours, and we wouldn't have

22  paid it if I wasn't there.  Number two is our minutes of

23  the meeting indicate when the meeting starts and when it

24  ends.  That charge back was handled by the administrator

1   who would be at the meeting.  So if they charged me -- if
2   they charged the retirement system for time that I wasn't
3   there or too much or too little, she would make that
4   change or she would object to paying it and bring it to
5   the board's attention.  That never happened.  I was at
6   every meeting that I was supposed to be at.

7       Q.   Were you angry that Captain Botieri --

8       A.   I wouldn't justify it as angry.  I justify it
9   as harassment in a sense.  No, not angry where it's
10  anger, a different meaning of the word.

11      Q.   Were you angry at Captain Botieri for
12  scrutinizing your absence from work due to retirement
13  board participation?

14      A.   I was annoyed by it.  I was embarrassed by it.
15  It was as if I was trying to put something over on them
16  when they had all the checks and balances already there.
17  I believe they did that purposely so that if I was ten
18  minutes late, they would say, "Oh, you must have been
19  doing this.  You must have been doing something else" and
20  try to...

21      Q.   While you were or have been on the retirement
22  board, has there ever been any allegations against you
23  that you misused funds in your position on the retirement
24  board?

1          A.    Absolutely not.

2          Q.    Did you as part of your retirement board work

3     take trips?

4          A.    We have conferences that we have to go to and

5     are required to.   I run over $100 million and nine

6     managers.

7          Q.    And approximately how many seminars do you

8     attend a year as a retirement board member?

9          A.    It varies.   It depends on -- it depends if

10    we're looking for a new manager for an international

11    fund.   It depends on market conditions.   It depends on a

12    number of factors.   I mean, if markets are good,

13    everybody's pretty happy just trying to make what you're

14    making.   If markets are bad, everybody's scrutinizing

15    things.   You know, there are new instruments financially

16    coming out every day.   There are new companies.

17    Companies change hands.   Individuals change hands.   All

18    our contracts on the board are manager specific.   They

19    have specific articulate conditions that have to be met

20    to meet a certain asset class.   Every one of those

21    conditions and contract is articulate.   There's nothing

22    ambiguous.   So if there's a change, we bring that manager

23    in.   We meet with them, or we go somewhere to meet with

24    them because each one of them have a substantial amount

1    of money.  And one change in an asset class can affect

2    our whole portfolio.

3         Q.   During the time period you've been on the

4    retirement board, how many seminars do you attend a year?

5         A.   Again, I said we have a state conference one

6    that we attend spring and fall.  Sometimes, depending on

7    -- one of the big issues lately has been the GASB 45

8    issue, which in this state the way the legislation is

9    being worked through the statehouse is going to end up

10   the responsibility of the retirement system.  I have been

11   following that issue for almost ten years now.  It's

12   going to be a major financial undertaking for our

13   retirement system.  I have attended seminars indicating

14   the impacts of GASB 45, which is your unfunded medical

15   for retirees, how it's being funded, how it's being

16   handled in different states so that we can be ahead of

17   the curve when this number comes into the -- when we have

18   to declare it, and it's in 2007.  There's a lot of work

19   to put that together.

20        Q.   What happened to your duties as a police

21   officer when you attended a trip on behalf of the

22   retirement --

23        A.   I would notify Mr. Botieri in an e-mail

24   indicating that I'd be on board business and I'd be at a

1   conference via e-mail.

2       Q.   And would they have to cover for you during

3   those periods?

4       A.   I don't know what they did.  I know it from

5   speaking to Kevin and speaking to Lieutenant Budge when I

6   was working.  They would say specifically -- and I asked

7   them many a time because I would hear guys saying that at

8   work.  I would say to them, "Did they cover me on that

9   day when I was at this conference or here for the day in

10  Boston or doing this, meeting managers?" and they would

11  say, "No, never did."  I believe Kevin put that on the

12  record the other day.

13      Q.   Are you still chairman of the retirement board?

14      A.   Yes, I am.

15      Q.   How long have you been chairman?

16      A.   I believe since 2003.

17      Q.   For instance, while you were chairman in 2004,

18  is it fair to say you attended trips for the retirement

19  board to Washington, D.C., Puerto Rico, Anaheim, Hyannis,

20  Danvers, and Florida?

21      A.   I can't remember exactly.  Did you get that out

22  of the Boston Globe?

23      Q.   Well, I can look for it, but is that accurate?

24      A.   I attended conferences, yes.  I don't know

1    exactly what years you're looking at there.

2        Q.    I said 2004.

3        A.    No, I don't think that would have been 2004.

4    It would have been over a number of three years, I

5    believe that was.  I believe that was two or three years.

6        Q.    We'll come back to that in a minute.

7            Last time when we had talked -- and I'm not

8    meaning to jump around.  I'm just looking at some notes

9    from talking to you last time.  We had discussed this

10   odometer where you had been disciplined for an odometer

11   abuse.  Do you recall that?

12       A.    I believe that was over 25 years ago.

13       Q.    I was going to ask you, do you remember what

14   year it was?

15       A.    I don't remember exactly when it was.  It was

16   supposed to by the present contract, the contract I was

17   under -- that information wasn't even supposed to be in

18   my personnel file.  It was supposed to be removed.

19       Q.    Was it removed from your file?

20       A.    Never.

21       Q.    It was never removed from your file?

22       A.    No, I don't know how it got there.  I don't

23   know how you would have got your hand into that lawfully.

24       Q.    Well, I think you told me about.

1      A.     You had a piece of paper you put in front of

2   me.

3      Q.     I thought I had -- I thought I --

4      A.     No, it was in the production of documents, and

5   it was a clear violation of the contract.  I don't know

6   how you would have got that information lawfully.

7   Somebody had to keep a secret file and throw it in there

8   after we filed suit.

9      Q.     Okay, but you're not denying that you were

10  disciplined for it, right?

11     A.     I believe it was something that happened in --

12  oh, it must have been '79 or '80, and I believe I did an

13  extra shift for it.

14     Q.     Now, during the active shooting drill of May

15  25, 2003, there were several departments present besides

16  yours?

17     A.     No, just Plymouth.

18     Q.     Just your department?

19     A.     Just Plymouth alone.

20     Q.     Along with the state police?

21     A.     State police.

22     Q.     And is it fair to say there were safety EMT

23  officers?

24     A.     I don't know exactly what their certification

1    was.  I never had first aid equipment.  They had oxygen.

2    I remember being dragged out and then placed under

3    oxygen, and then the ambulance came.

4         Q.   Do you remember that there were some 12 to 15

5    EMT or safety officers there?

6         A.   No, there wasn't no 12 or 15 EMTs there.

7         Q.   How many do you say there were?

8         A.   There were only, I believe, six instructors.

9         Q.   Were there separate EMT or safety officers

10   there that you know?

11        A.   No.  No, there wasn't.

12        Q.   You're saying there were none?

13        A.   There was not -- it was not a separate unit.

14   If you're saying there was a separate unit standing by,

15   that's not the case.

16        Q.   I'm not asking -- I'm asking, are you aware of

17   any other safety EMT officers present besides --

18        A.   The officers that were there were uniformed --

19   not uniformed, but they had the -- the overalls of the

20   state police strike team that they wear.  It's like a --

21   how do you want to say?  You see it on TV all the time.

22   They have that -- you know, I've seen them all the time.

23   It's like an overall.  It's like a suit that they wear.

24   It's like a work suit.  You know what I'm trying to say?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    How do I explain it other than --

2         MR. GALLITANO:   SWAT team.

3         A.    It was a SWAT team suit that they all wear, and

4    it's a standard.   They were all dressed in that.   It's

5    like a one-piece thing that they zip up, and it's heavy

6    material, and maybe it's fireproof.   I don't know.   I

7    never wore one.

8         Q.    In terms of the active shooter drill, that

9    Columbine drill, is it fair to say the department gave

10   you and the members at least a month's notice that the

11   drill was coming up?

12        A.    Not at all.

13        Q.    How much notice do you say you got?

14        A.    I came into work one day, and they said, "You

15   have to do it in a week."

16        Q.    Are you saying you got a week's notice?

17        A.    We got it on the board.   We don't get notices

18   like, "Come and talk to us."   We just get a piece of

19   paper stuck on the wall by Botieri, signed by Botieri

20   saying, "You have to go.   If you don't go -- you're

21   assigned this day -- you're subject to discipline."

22   That's in the rules and regulations.

23        Q.    Are you aware that there were several other

24   officers who were excused for participation for health

Page 38

1    reasons?

2         A.    I was never aware of that till today, till I

3    heard him testify.

4         Q.    Forgive me.   John Abbott, is that his name?

5         A.    Right.   I never knew that.

6         Q.    Dennis Govoni?

7         A.    Govoni.   Portuguese.   You've got to say it like

8    Govoni.

9         Q.    Fair enough.

10               Were you aware that he was excused?

11        A.    I never knew that till this morning.

12               MR. SILVERFINE:   Give me a second here.

13               (Pause.)

14        Q.    I'm going to ask you some questions about some

15    documents, some of which I believe you --

16        A.    What do we do with -- are these all -- okay,

17    I'm sorry.   Go ahead.

18        Q.    Just procedurally we take these.

19        A.    I thought you were --

20        Q.    No, no.   That's okay.   You're welcome to look

21    at them, but they're just documents that we mark that

22    become part of your deposition exhibits.   Your counsel

23    will have copies.

24               Back in May 30 of 2001, did you send an e-mail

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    -- and I'm going to show you a copy and give a copy to

2    your counsel -- to yourself, Officers Boyle, Budge, and

3    Botieri relating to a surgery that was scheduled for June

4    11, 2001?

5                (Hands to witness.)

6        A.    Yeah, I was injured.  I had -- this was -- I

7    remember this was Mother's Day.  As a matter of fact, the

8    injury report is in the file as well.  We arrested an

9    individual for assaulting his wife.  And myself and

10   Officer Kennedy went to the house, and we had a struggle

11   with him down a flight of stairs, and I got a hernia in

12   my stomach from it.

13       Q.    And when you say surgery, is this the surgery

14   you're referring to in this e-mail?

15       A.    Yeah, I went to the hospital that day, and then

16   I spoke to -- I contacted a surgeon, Dr. Zazzarino, who I

17   know, and he did the surgery, which was scheduled for the

18   11th.  I was working with a brace around me on my

19   stomach.

20           MR. SILVERFINE:  Let's just for the record mark

21       this as Exhibit 9.

22                           (Whereupon, the e-mail

23                           dated May 30, 2001, was

24                           marked as Exhibit No. 9 for

1                          the defendant.)

2     BY MR. SILVERFINE

3         Q.    And relative to Exhibit 9, second paragraph,

4     you indicated that you would be attending a retirement

5     conference?

6         A.    Uh-huh.

7         Q.    Do you see that?

8         A.    Yeah.

9         Q.    Where is that, do you recall?

10        A.    That would have been what they call the MACRS

11    conference, Massachusetts Association of Contributory

12    Retirement Systems.  That was an advocacy group that

13    represents all 106 retirement systems in the

14    Commonwealth, which I am a member of the executive board

15    from that.

16        Q.    Now, did you attend a conference for the

17    retirement board sometime in the fall of 2002?

18        A.    I could have.

19        Q.    Was there some discussion about filing or

20    preventing people from receiving their retirement

21    benefits if there was a criminal complaint or action

22    against them?

23        A.    I couldn't tell you the agendas of those.  I'd

24    have to look at the agendas.  There are all kinds of

Page 41

1    decisions.

2          Are you familiar with DALA, Division of

3    Administrative Law Appeals?  Are you familiar with that

4    agency?  Are you familiar with that?  I just want to

5    clarify my question.  If I can't --

6          Q.    I'm not familiar with it.

7          A.    Okay, what it is, it's -- in the administrative

8    process to retirement, okay, there is -- we make a

9    decision as a board.  If you're an aggrieved party and

10   you're a member, you can go and you appeal it to the

11   Division of Administrative Law Appeals.  It's your

12   administrative relief.  Then there is what they call --

13   after DALA there is CRAB, Contributory Appeals Board.

14   And then from that point we go into superior court on a

15   point of law, and then if you have another point of law,

16   you appeal to the appellate courts up the ladder.

17          Every time that we have a conference with

18   MACRS, spring and fall, we have the DALA magistrates

19   come.  Okay, we have Chris Connolly (phonetic), who's the

20   chief magistrate, as well as Kimberly Fletcher.  They

21   come and they discuss the recent decisions, the

22   precedent-setting decisions with all the boards, and they

23   bring everybody up to speed on how things are

24   interpreted, how new decisions are interpreted from the

1    SJC and all those things that affect the administration

2    of the board from a trustee point of view down to your

3    administrators.  It's a scheduled conference time.  I

4    don't know what the agenda is, to be honest with you.

5         Q.   So my question is, sometime in the fall of

6    2002, did you attend some kind of seminar where you heard

7    about denying people their retirement benefits if they

8    had a conviction or a criminal complaint against them?

9         A.   I couldn't -- I couldn't qualify the exact date

10   or time.  I know those issues have been brought up in the

11   courts.  We've just recently done one just last week

12   where they put no statute of limitations on that statute.

13   It was actually ten years old.  That was just last week.

14        Q.   And that's something if someone commits some

15   on-the-job fraud you can deny them retirement, words to

16   that effect?

17        A.   The way that statute's been -- I want to just

18   say interpreted through the SJC in this state the last

19   five years has been very broad-based.  It's very -- just

20   the limitations -- just the other day we had a meeting, a

21   week ago, last week, where our counsel, Mike Sacco,

22   brought to the attention a recent SJ decision that was

23   just passed down on the 10th of June that indicated that

24   there's no statute of limitations on that particular

1    statute.  And it was involving a case where an individual

2    -- he forfeits his pension, and it was over ten years ago

3    the incident happened, but they were able to somehow

4    adjudicate it.  And I didn't read it totally, but it

5    basically said there is no statute of limitations for

6    this statute where some people thought it was five years.

7    And the SJC said no, it's wide open.

8        Q.   Did you ever yourself bring this to the

9    retirement board that we have to crack down on these

10   kinds of cases where there's been --

11       A.   No.

12       Q.   -- a criminal complaint or --

13       A.   No, no.  We have an obligation.  For an

14   example, we had some individuals -- excuse me -- I have

15   to go off record for a minute.  I can answer that in a

16   minute because it involves two things.  There's a

17   conflict.

18       Q.   Well, there's a standing question in front of

19   you.

20       A.   Well, it's a conflict.  I don't want a conflict

21   on a question.

22       Q.   Well, if you have a standing question, you're

23   obligated to finish it.  Then if you need to talk to

24   counsel --

1    A.    There was a case before us on a forfeiture

2    issue, okay, that we had to hold a hearing regarding the

3    forfeiture issue, and we found that there was no crime

4    committed that was applicable to the individual's office,

5    and the individual was able to retire.

6         THE WITNESS:  Now I need to go off the record,

7    okay?

8         MR. SILVERFINE:  Okay.

9         (Short recess was taken.)

10   BY MR. SILVERFINE

11   Q.    Right before we broke I had asked you if you

12   had supplied any information.  How about do you know a

13   former officer named Furtado?

14   A.    Police officer now?

15   Q.    Yeah.

16   A.    Yeah, Daryl -- Daryl's dead.

17        MR. GALLITANO:  Daryl's dead.

18   A.    Kevin, Kevin Furtado.

19   Q.    Did you ever supply him with any information as

20   to crackdown on retirement benefits as they pertained to

21   applications for criminal complaints or convictions?

22   A.    No.

23   Q.    And in particular as it related to former town

24   manager Eleanor Beth?

Page 45

 1        A.    No.

 2        Q.    I'm going to show you another e-mail which I

 3    ask you if you recognize.

 4              (Hands to witness.)

 5        Q.    Do you recognize that?

 6        A.    Yes.

 7        Q.    And is that an e-mail that you authored?

 8        A.    Yes, I did.

 9              MR. SILVERFINE:   Let's mark as Exhibit No. 10.

10                                (Whereupon, an e-mail dated

11                                July 3, 2003, was marked as

12                                Exhibit No. 10 for the

13                                defendant.)

14    BY MR. SILVERFINE

15        Q.    Showing you what's been marked as Exhibit 10,

16    you sent this on -- it looks like July 3, 2003?

17              (Hands to witness.)

18        A.    Yes, that's the day that I used -- I had to use

19    Skippy Budge's -- Lieutenant Budge's computer because

20    mine for some reason wasn't working.  My access to it

21    wasn't working.

22        Q.    Just help me on this, if you would.  In the

23    e-mail itself, it says you requested -- I'm reading about

24    halfway down -- that vacation time that was scheduled on

1    July 1, 2003, should be changed to sick time.  Do you see

2    that in the middle of the second paragraph?

3         A.    Right, I had sick time -- I had vacation time

4    starting July 1, and I filed the application, and I put

5    in change that to sick time, correct.  I had a sick bank.

6         Q.    Up until that time from the point you went out

7    on May 25, 2003, were you using sick time?

8         A.    I went in one day, and I was just out of the

9    hospital.  I wasn't feeling well, and I said to Captain

10   Botieri or somebody up there -- I remember saying, "Just

11   put me on for vacation right now," and then I left the

12   place.

13        Q.    So as of May 25 when you left, you were on

14   vacation time?

15        A.    I believe that day there I was -- they charged

16   -- I don't know if they could charge me sick time -- or

17   they didn't pay me.  They actually didn't pay me the full

18   day.  They only paid me half a day, and then I was off,

19   and then I went in -- I think I spoke to someone on the

20   phone or I did something after.  I don't exactly

21   remember.

22        Q.    Help me clarify this.  When you went out on May

23   25, 2003, were you on sick time or vacation time?

24        A.    I was working.  I wasn't out.  I was working.

Page 47

1      Q.    No, May 25.  I'm assuming you --

2      A.    Oh, yeah, two days later.

3      Q.    I'm assuming you're sick.  You went to the

4    hospital, right?  That's your heart, right?

5      A.    Oh, yeah, yeah.

6      Q.    Right?

7      A.    Yes, yes, yes.  Okay, I'm getting -- you're

8    right.

9      Q.    May 25 you have the Columbine incident, right?

10     A.    Uh-huh.

11     Q.    When you went out May 25 from there, were you

12   on sick time at that point?

13     A.    Sick time, I believe -- I mean, vacation time,

14   I believe.

15     Q.    Vacation time?

16     A.    Right.

17     Q.    Did you ask to be put on vacation time so that

18   nobody would, you know, bother you, so to speak?

19     A.    No, when I came home from the hospital, I had

20   only preliminary reports from the doctors from there,

21   which were not anything that -- they were only attending

22   physicians.  I had made an appointment with my doctor.  I

23   believe I wrote a preliminary report that I gave to the

24   chief via fax from my house and my own computer

1    indicating to him that I would be seeing my doctor prior

2    to -- I think it was the 21st I saw my doctor of June.

3    And we had the complete file and the results of the

4    cardiac catheterization.  At that point I then determined

5    from talking in counsel with my doctor and my personal

6    friends and stuff that I have to put my papers in to

7    retire.

8         Q.   Back in June 25, 2003, did you speak to Captain

9    Botieri about this sick time and vacation time?

10        A.   All I said to him at that -- I saw him at the

11   town hall, like it says, and I said I just put in my

12   papers that day -- I believe a couple of days before

13   that, and then I wrote this to the chief.  I said, "Put

14   me in for sick time because I put my papers in as of this

15   date."

16        Q.   Back on June 25, 2003, did you request that

17   your use of sick time be changed to vacation time so you

18   would not be restricted in your activities?

19        A.   Not at that point, no.  I put in for sick time

20   then because I had additional time and I knew I'd have to

21   retire and I was putting my application in.

22        Q.   On June 25, 2003, did you speak to Captain

23   Botieri and state that you wanted to be able to be out

24   and about and be able to drink on your boat without

Page 49

1    repercussions or allegations of sick leave abuse?

2        A.    Absolutely not.  Emphatically not.

3        Q.    All right, I'm just asking.

4        A.    I never questioned -- I never received that

5    letter that you have in there ever till the production of

6    documents.

7        Q.    I'm not asking you if -- I'm asking you if you

8    --

9        A.    Well, I consider it a personal insult from that

10   department and that individual to say those things after

11   the event that I went through.

12       Q.    All right, I'm just asking you if you said

13   something.  Do you understand the question?

14       A.    I understand the question.  I never made that

15   remark to him.

16       Q.    That's what I'm asking.

17       A.    Okay.

18       Q.    And just so I'm clear, you did, however, change

19   in Exhibit 10 your request for vacation time be changed

20   to sick time, and then ultimately you put in your

21   retirement application, right?

22       A.    I put my retirement page in on the 25th, as it

23   states, okay, and after when I put my retirement in, it's

24   always been the policy of the town to use accrued sick

1    time for this type of retirement application till the

2    medical panel comes back with the appropriate language,

3    okay, because of a court decision in Brookline that they

4    could wait for a 111F.  There have been numerous

5    decisions in the court that say that's perfectly legal

6    for the town but then IOD is retroactively given as a

7    result of the medical panel's decision, and that's been

8    in statute law as well as case law.

9        Q.    Let's move on for a moment to the next

10    document, if we can.  I'm going to show you another piece

11    of paper which is dated September 9, 2003, and I believe

12    it's cc'd to you.

13            (Hands to witness.)

14        A.    Yeah.

15        Q.    Do you recognize this?

16        A.    Absolutely.

17        Q.    And this is a letter that Debra Sullivan, the

18    director of the Town of Plymouth's Contributory

19    Retirement Board, sent to the chief of police?

20        A.    Yeah, this is a standard letter sent by the

21    retirement board to the employer department head.  It is

22    required -- that letter is required by CMR under Chapter

23    32.

24            MR. SILVERFINE:  Let's mark this as Exhibit 11.

Page 51

1                              (Whereupon, the letter
2                              dated September 9, 2003,
3                              was marked as Exhibit No.
4                              11 for the defendant.)
5              MR. GALLITANO:  Can we go off the record for a
6        minute?
7              MR. SILVERFINE:  Absolutely.
8              (Discussion off the record.)
9    BY MR. SILVERFINE
10        Q.    Just showing you Exhibit 11, just help me on
11   this, if you would.  The first paragraph says:  (Reading)
12   Please be advised that on September 8, 2003, the
13   Commission of the Division of Public Employee Retirement
14   Administration granted accidental disability (end
15   reading).
16              Do you see that?
17        A.    Uh-huh.
18        Q.    You have to say for the record --
19        A.    Oh, yes.  I'm sorry.
20        Q.    This letter was written on September 9.  Was
21   this a particularly quick turnaround in your experience?
22        A.    No, no.
23        Q.    Why was this letter sent the next day, if you
24   know?

1      A.    All I can figure is, number one, when you have

2   a -- I mean, I had a unanimous medical panel in my case.

3   I had three cardiologists indicate that it was -- four

4   questions on the certificate were answered in the

5   affirmative.  I was on the job when it happened.  There

6   were no questions from the board.  The board sent it up

7   to the state.  The state looks at it.  Their final under

8   -- they're required to look at it under Chapter 32.  They

9   make the final determination if there are any

10  inadequacies, address any issues.  They can remand it

11  back to the board.  They look at it, and then they just

12  say okay.

13      Q.    And were you treated any differently than any

14  other retiree to your knowledge?

15      A.    No, I precluded myself entirely from the

16  procedure just so that that allegation that you just

17  stated would not be relevant.

18      Q.    Let's show you another document which is -- I

19  think you just referenced.

20          MR. SILVERFINE:  And it's been previously

21      marked as Exhibit 3 in the Attorney Sacco

22      deposition, but we'll mark it as Exhibit No. 12.

23                          (Whereupon, the findings

24                           of fact were marked as

1              Exhibit No. 12 for the

2              defendant.)

3         MR. GALLITANO:  Revisiting.

4         MR. SILVERFINE:  What's that?

5         THE WITNESS:  We already went over this.

6         MR. GALLITANO:  I think this is an old ground.

7         THE WITNESS:  We went over this.

8         MR. SILVERFINE:  I need to just ask a few

9    questions.

10        MR. GALLITANO:  Last time we went all through

11   this, though.

12        MR. SILVERFINE:  But I'm not going to be that

13   long.  You'll forgive me.  I'm just trying to be

14   thorough.  I'm not looking to bang him up more.

15        THE WITNESS:  You're not banging me up, believe

16   me.

17   BY MR. SILVERFINE

18        Q.   Showing you what's been marked as Exhibit 11 --

19        MR. GALLITANO:  12.

20        MR. SILVERFINE:  Is it 12?

21        MR. GALLITANO:  It's 12.

22        MR. SILVERFINE:  Sorry, I don't have my glasses

23   on.  Thank you.

24        Q.   -- Exhibit 12 -- and if I asked you this

Page 54

1    already, forgive me, but in Section 5 where it says

2    "Findings of Fact," the first day on July -- paragraph

3    numbered 5 on July 29, 2003, do you see that?

4                (Hands to witness.)

5         A.    Yes.

6         Q.    To your knowledge, did they review your entire

7    medical and nonmedical history or just as it related to

8    the May 25, 2003, incident?

9         A.    As part of the application to retire, which I

10   believe Debra explained that to you yesterday -- the

11   other day -- Debra Sullivan, you are required in the

12   application, which is quite extensive, to name all the

13   doctors that you've had and all your medical conditions

14   prior to this incident on the date of application.  Okay,

15   all those facts are given, reviewed by the board, the

16   board's attorney.  Then a medical panel gets the exact

17   same stuff.  They review it as well as the incident

18   involved and answer the four questions on the

19   certificate, which they did in my case in the

20   affirmative, all four questions.

21        Q.    Now, right below that in Section A it says you

22   passed a preemployment physical.  Do you see that?

23        A.    Yes, I did.

24        Q.    Did you have to at any time subsequent to that

1    take a physical?

2         A.    No.  You asked that question before.

3         Q.    Just bear with me.

4         A.    Okay.

5         Q.    And was there any evidence of hypertension or

6    heart disease once you began your employment with the

7    Town of Plymouth that you notified the town about?

8         A.    None.

9         Q.    Put that down.

10        A.    I just didn't know if you wanted to read the

11   rest of it.  That's all.  Part D is pretty pertinent.

12        Q.    No, no.  These guys are just making fun of me

13   for asking follow-up questions.

14        A.    Yeah, yeah.

15        Q.    As long as you want me to ask a question, on

16   Exhibit 12, just so I understand -- and just help me on

17   this -- Paragraph 12, when it says the board conducted an

18   evidentiary hearing, is that the same board that you

19   serve on?

20        A.    I precluded myself from that.  I wasn't a part

21   of that decision.

22        Q.    I'm just asking if it was the same board.

23        A.    Yes, it was the same board.

24        Q.    The same individuals who sit on the board with

1    you, right?

2         A.    Yes, the Town of Plymouth -- as a member of the

3    Town of Plymouth's retirement system, my application must

4    be submitted by statute to the Town of Plymouth

5    Retirement Board.  I cannot submit it to anybody else by

6    the town.  There are specific regulations in the

7    procedures in the CMRs that indicate if a board member is

8    in front of them for these type of reasons, they preclude

9    themselves from it, and those procedures were followed to

10    the T on advice of counsel.

11         Q.    And you're the director of the board?  Is that

12    the right term?

13         A.    I am the chairman.

14         Q.    The chairman, okay.  How long had you --

15         A.    I wasn't the chairman at this time.

16    Dello Russo was.

17         Q.    Back in 2003?

18         A.    No, Dello Russo was.

19         Q.    What years did you serve as chairman?

20         A.    When he left.  He left right after that.  I

21    think in August, September.

22         Q.    And you served as chairman ever since?

23         A.    Yes, I have.

24         Q.    We had talked a few minutes ago about the

1    vacation/sick time that you had changed after you had

2    gone out with your heart injury on May 25, 2003.  Okay,

3    remember that?

4         A.    We talked about it, yes.

5         Q.    Did you also send the captain an e-mail on --

6               MR. SILVERFINE:  Strike that.  Strike that

7         whole line of questioning.

8         Q.    Prior to this injury, had you raised the issue

9    during your employ both at the retirement board and a

10   police officer trying to persuade the town to adopt a

11   policy that if an employee used sick time while waiting

12   for the "Heart Law" retirement and the retirement was

13   approved, that the town would retroactively restore the

14   employee's sick time?

15        A.    I'm going to explain the statute now.  I

16   believe I answered this earlier in the deposition.  I can

17   actually point to the page.  It's in there.

18        Q.    Okay.

19        A.    What happens is there was a decision in 1987,

20   Brookline versus -- a Brookline decision.  I don't know

21   the exact officer's name.  Blair, Blair.  Brookline

22   versus Sergeant Blair.  In that case what they said is

23   that there was not an automatic triggering of 111F

24   benefits when it comes to issues around the heart bill.

1          At any point in time in an injury, the
2     department head -- in this case the police chief or the
3     town manager can issue someone 111F benefits.  It's at
4     their prerogative.  But in a heart application, what
5     happens is this.  And specifically there's a procedure.
6     The board -- if you were sent to a panel, there was only
7     so many heart physicians and panels in the state.  So we
8     were tracking the time it takes for an individual that
9     has an event, turns around and files an application, and
10     by the time you get all the paperwork together and he
11     gets in front of a medical panel because there might be a
12     backlog or where he lives and all that and getting
13     people, a panel to sit down in scheduling, we found as a
14     board a number of years it was taking 120 days.  And what
15     was happening is that individuals were using up accrued
16     benefits and then running out of them.  If they didn't
17     have enough sick time to cover 120 days, they would go
18     without a paycheck.  Now, some communities in an effort
19     not to financially destroy their police and firefighters
20     have adopted a policy to say if there's an application in
21     front of a board and the person uses up accrued time and
22     they're going to go without a paycheck, they have a
23     certain amount of -- the town will give them 111F till
24     the medical panel comes back with a contrary evidence or

Page 59

1    the medical panel affirms that it's job related.  This

2    was something that we did as five individuals trying to

3    be decent because the town's policy was there were people

4    who would use up accrued sick time and run out.  And I

5    had firefighters and police/firefighters come to me and

6    say, "Kelley, I'm losing my house as well as losing my

7    job because I ran out of sick time and I haven't got an

8    answer from the state yet on the medical panels."

9         And the medical panel would come back -- and I

10   haven't had one rejected -- where it was job related, and

11   they retroactively would back pay them all their accrued

12   sick time and monies from the day that they filed

13   application or the date of the event.  We were trying to

14   show Mrs. Beth how they were hurting police and

15   firefighters and that simply by adopting a change till

16   there was contrary evidence that you wouldn't be

17   penalizing guys for risking their lives, and they took no

18   interest in it.

19        Q.   How long had you attempted to push this?

20        A.   I didn't push anything.  We just tried to point

21   it out in a matter of exchanging ideas from employer to a

22   retirement board that is faced with the problem that the

23   employer is hurting its own employees, and they just

24   didn't want to recognize what they were doing in their

Page 60

1    practice.

2         Q.   How long did you attempt to discuss this with

3    the town?

4         A.   Oh, we discussed it a number of times over the

5    years.  I don't know how many times.

6         Q.   About how many?

7         A.   I couldn't put a number on it.  Five or six.  I

8    had cases.

9         Q.   You mean five or six years did you talk about

10   it?

11        A.   No, I had cases.  And I would show them -- we

12   have a case right now.  I had a number of cases tracked

13   by the administrators to say, "This is the date it

14   started, and this is the date we finally adjudicated."

15   On average it was 121 days.

16        Q.   Back in September of 2003, do you remember who

17   later counsel for the town was, by any chance?

18        A.   I don't know.  It could have been Hesse, Toomey

19   & Lehane.  It could have been what's his name there.

20   Harold Kowal.  I think it might have -- I don't know.  I

21   don't know.  They use different ones for different

22   people.  Then they use Kopelman and Paige for different

23   things too.

24        Q.   Were you aware at the time back in September of

Page 61

1   2003 at least when you were putting in for this that

2   labor counsel recommended the town not adopt this policy

3   that you're referring to?  Are you aware of that?

4       A.    I was aware that they spoke in on it.  And what

5   was kind of interesting because I believe the department

6   head at the time said there was a financial -- it was the

7   end of the world, and the financial director said, "Where

8   is it the end of the world?  We're going to retroactively

9   pay these people back anyway."

10          So I didn't see anything in labor counsel

11  recommending anything.

12      Q.    Let me show you another letter which is dated

13  January 14, 2004.  Do you recognize that?

14          (Hands to witness.)

15      A.    Yes, I do.

16      Q.    And that's a letter to you from Paul Boyle, the

17  president of --

18      A.    That's correct.

19      Q.    -- the Plymouth Brotherhood?

20      A.    Uh-huh.

21      Q.    Dated January 14, 2004?

22      A.    Yes, it is.

23          MR. SILVERFINE:  Let's mark this as Exhibit 13.

24                          (Whereupon, the letter

Page 62

1                    dated January 14, 2004, was

2                    marked as Exhibit No. 13

3                    for the defendant.)

4    BY MR. SILVERFINE

5        Q.   Showing you now what's been marked as 13, did

6    you have conversations with Paul Boyle, the Brotherhood

7    president prior to him going in to speak to Chief Pomeroy

8    relative to your injury-on-duty loss compensation?

9        A.   Right, what I do is after -- after I got

10   everything back from the state and it was approved, I had

11   all the documentation from the medical panel, all the

12   documentation from the retirement board.   The

13   certificate, which is evidenced from the doctors' panel,

14   unanimous.   I gave those to Dana Goodwin, okay, and

15   Rooney, and I asked them to look at these, sit down with

16   the chief and explain -- and show him what I had for

17   evidence.   I documented everything that we are required

18   to do for injury-on-duty status and would he reconsider

19   his claim.

20       Q.   And did Mr. Goodwin talk to you after he talked

21   to the chief?

22       A.   I spoke to him on the phone, and he also gave

23   me an e-mail of a conversation that Larry Rooney had with

24   the chief indicating the chief said, "I disagree with the

1   medical panel.  I'm not paying him."  We had that

2   evidence.  I believe that's in the documents we produced

3   to you as well.

4        Q.   Was there some discussion about the fact that

5   -- with Officer Goodwin that you had never provided the

6   information requested by the chief earlier as to certain

7   medical records --

8        A.   Prior -- excuse me.  I'm sorry.  Go ahead.

9        Q.   -- that he had asked from you back when you

10  first were submitting this stuff?

11       A.   When we first had it, I had the preliminary

12  stuff, which I believe I showed you before the last time

13  we were speaking.  I only had those two things.  I mean,

14  part of the injury-on-duty statute clearly says on a

15  specific date and time an individual suffers an injury.

16  Well, let's take the facts in front of us.  I was at a

17  mandated training program.  111F says you must be on

18  duty.  Well, I was on duty.  There's no argument there.

19  If anybody thinks I wasn't, then the chairman's a liar

20  and everybody else is a liar.  I collapsed onto Mr.

21  Chandler.  He and two other officers dragged me out.  I

22  must have been faking then because they dragged me out

23  unconscious.  I was taken there to the hospital.

24            I'm trying to explain something to you.

Page 64

1          Q.    No, no.  I'm just trying to ask you a question.

2     Nobody here is disputing --

3          A.    Let me finish then.

4          Q.    Fine, okay.

5               MR. GALLITANO:  Wait a minute.  Let's go off

6          the record.

7               (Discussion off the record.)

8               MR. SILVERFINE:  Back on the record.

9     BY MR. SILVERFINE

10          Q.    My question -- and if you don't understand my

11    question, please let me know.  Just my question -- and if

12    you don't understand, I'll rephrase it.  My question is,

13    when you talked to Dana Goodwin sometime in October of

14    2003, did he say to you words to the effect "The chief

15    asked for some supplemental records, medical records,

16    which he says he never got"?

17          A.    That's not incorrect (sic).  Dana never said

18    that.  What I did is that when I got my information and

19    he went into that meeting and Rooney went into that

20    meeting in November in there, he had all the records that

21    you just produced in front of us.  He had -- and the

22    certificate from the hospital and the certificate from

23    the medical panel.  He had all those records to make his

24    determination.

Page 65

1      Q.   All right, let me just follow up.  So Goodwin

2   did not tell you "The chief says you didn't supplement

3   the earlier records," which we indicated through your

4   deposition Exhibits 3 and 4 that he never received

5   supplementation on the medical records you initially

6   provided?

7      A.   That's not correct.  He did.  Larry Rooney gave

8   it to him, and he had those in his possession.  I gave

9   them to Larry Rooney prior to his meeting with the chief.

10     Q.   But my question was, did Dana Goodwin come back

11  to you --

12     A.   He never said that to me, no.

13     Q.   -- and say, "The chief says he never got

14  supplementation"?

15     A.   No.  No, he didn't.

16     Q.   Did you yourself outside of Goodwin, Rooney

17  ever send to the chief supplementation of Exhibits 3 and

18  4 that we've already marked and talked about?

19     A.   What I did is, when I got my paperwork back, I

20  spoke to Larry Rooney at the station.  I gave him a copy

21  of everything and requested him to go up to the chief.

22  The chief also, as the employer, has a complete copy or

23  has access at the town hall to my personnel file, a

24  complete copy of my personnel file, which would have the

Page 66

1    same documentation that I have that I gave to Larry

2    Rooney.  He would have had access to the day I retired,

3    and it was certified because all that information is

4    given to them, hand-delivered up there.

5        Q.   Who does that, do you know?

6        A.   The administrators, the town -- Mrs. Flynn, Sue

7    Turner when they were there.  That letter that you showed

8    me earlier is a notification, and all records are

9    exchanged back and forth from personnel.

10       Q.   So let me stop you right here.  We talked about

11   this last time, Exhibit 5, which was a letter back in --

12       A.   June of 2003.

13       Q.   Okay, just bear with me.

14            And he had requested -- "he," meaning the chief

15   -- additional documentation.  Is there any other

16   additional documentation that you say you submitted

17   besides Exhibits 3 and 4 other than the application for

18   retirement that was approved in early September?  Do you

19   see what I'm saying?

20       A.   Okay, these documents here I gave him on a

21   preliminary level.  I would not have had the other

22   documents which I gave to him before the request was

23   made, as you see in Exhibit 13, on this date.  On this

24   date and on this date, the chief had the entire package,

Page 67

1    and I gave Larry Rooney in his hand all the documents

2    that I just spoke to.  He had those documents in his

3    possession given to him by Larry Rooney on this date and

4    that date.

5         Q.   And how do you know that?

6         A.   Because they told me they did it.

7         Q.   So are you saying --

8         A.   Larry Rooney told me he gave the documents to

9    him because I spoke to him on the phone.  He called me

10   after the meeting, and he said, "The chief said --" -- I

11   told him, "Did you give him all those documents I gave

12   you?"  He said, "Yes, I did," and Larry Rooney told me

13   emphatically the chief said, "I'm not paying him because

14   I disagree with the medical panel."

15        Q.   And do you recall when the conversation you had

16   with Rooney which you've just related took place?

17        A.   It was probably about 5:30 in the afternoon.

18        Q.   What date?

19        A.   Oh, I don't remember exactly the date.  It was

20   in the fall sometime.

21        Q.   The fall of 2003?

22        A.   Yes.

23        Q.   In the fall of 2003, November 25, 2003, did you

24   come into the police station and have a conversation with

Page 68

1   Captain Botieri where you gave him this package of

2   material and said, "Give this to the chief if he wants to

3   stay out of superior court"?

4       A.   Never did.  Never did.  That's a bonafide lie,

5   L-I-E.

6       Q.   Just bear with me for a second.

7       A.   Okay, I agree.  Go ahead.  I'm bearing with

8   you.

9       Q.   Did you say that to anyone else on the police

10  department or the town?

11      A.   The only time I went into the station is I

12  spoke to Larry Rooney because he was the assistant

13  prosecutor.  I called him.  I met him at the station.  I

14  went in there at the end of the day.  I believe it was

15  like 3:30 for him.  He was up from court.  I gave him all

16  the documentation because he was scheduled to sit down

17  with the chief and have a meeting and discuss my issue.

18  I never spoke to Captain Botieri.

19      Q.   Did you speak to anyone else and say something

20  like that --

21      A.   No.

22      Q.   -- similar back in November of 2003?

23      A.   No, I didn't.

24      Q.   Whether it be Chief Pomeroy or anyone else?

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Page 69

1    A.    No.

2    Q.    A secretary?  Anyone?

3    A.    (Shakes head.)

4    Q.    You just have to answer for the record.

5    A.    No, never did.

6    Q.    Did you ever in your position as chairman of

7    the retirement board threaten to halt someone's

8    retirement process because of your position on the

9    retirement board?

10    A.    Absolutely not.

11    Q.    And did that include Captain Botieri?

12    A.    Absolutely never made that statement to Captain

13    Botieri.

14    Q.    Now, prior to May 25, 2003, had you been

15    suffering from tension and stress and being medically

16    treated for it?

17    A.    No, I wasn't.

18    Q.    Were you suffering from any physical or

19    emotional distress or stress since December 2002?

20    A.    I was on -- like I said, I indicated with the

21    doctors' notes that I gave them in the spring of 2003 --

22    I was under the care for Meniere's disease as well as

23    Lyme disease.

24    Q.    Were you under care with a Dr. Moore prior to

1    December -- May 25, 2003, for stress?

2        A.   No.

3        Q.   Let me show you another page.

4             MR. SILVERFINE:  And let's mark this Exhibit

5        14.

6                              (Whereupon, a letter dated

7                              January 29, 2004, was

8                              marked as Exhibit No. 14

9                              for the defendant.)

10   BY MR. SILVERFINE

11       Q.   I ask you if you recognize that letter, Mr.

12   Kelley.

13            (Hands to witness.)

14       A.   Yes, I remember this letter.  Yes.

15       Q.   What's been marked as Exhibit 14, why did you

16   request this letter?  It says in the first paragraph at

17   your request.

18       A.   I just wanted documentation of what had

19   transpired in the -- on the board.

20       Q.   Were you already looking to file suit in this

21   action as of January 29, 2004?

22       A.   No.

23       Q.   So what purpose did you request this letter

24   from Debra Sullivan, the director of the retirement board

1    of Plymouth?

2         A.    I wanted it for my files.

3         Q.    And when had you requested this, if you recall?

4         A.    I don't remember the date when I requested it.

5         Q.    What is your relationship with Debra Sullivan?

6         A.    She's been the administrator and works there

7    for the ten years I've been on the board.

8         Q.    Were you the boss of Ms. Sullivan under the --

9         A.    The board is the boss.  The chairman just

10   facilitates some of the day-to-day operations, but all

11   decisions are brought back to the board.

12        Q.    You have no direction over Ms. Sullivan?

13        A.    No, the board does, the board as a whole.

14        Q.    But you as a member of the board also do?

15        A.    Yes.

16        Q.    And how long have you directed Ms. Sullivan?

17   Is that since you've been on the board itself or since

18   you've been as director -- chairman?

19        A.    I've been on the board for ten years, and I've

20   worked with her.

21        Q.    For those ten years?

22        A.    Yes, right.

23        Q.    Let's go to the next letter.

24              MR. SILVERFINE:  We'll mark this Exhibit 15.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Page 72

1              (Whereupon, a letter dated

2              May 26, 2004, was marked as

3              Exhibit No. 15 for the

4              defendant.)

5    BY MR. SILVERFINE

6         Q.   Showing you what's been marked Exhibit 15, do

7    you recognize that?

8              (Hands to witness.)

9         A.   I recognize that.

10        Q.   Okay, I think this was referred earlier today

11   as a three-page letter, but you'll agree with me it's a

12   two-page letter from Michael Botieri?

13        A.   Uh-huh.

14        Q.   You have to answer for the record.

15        A.   Yes.  Yes, yes.

16        Q.   And this is dated May 26, 2004?

17        A.   Uh-huh, yes.

18        Q.   Did you, in fact, have an interaction with

19   Michael Botieri on May 22, 2004?

20        A.   May 26.  May 26 was the retirement meeting -- I

21   mean, retirement party at the Pinehills.

22        Q.   And was that for you?

23        A.   That was for myself and two other individuals.

24        Q.   All right, tell me in your own words what

Page 73

1    happened between you and Michael Botieri on -- you said

2    May 26, 2004.

3        A.    Well, it's on the date of the letter.

4        Q.    I'm sorry.  It's --

5        A.    Oh, yeah, the 22nd.  You're right.  Forgive me.

6    You're right.  You're right.  I was just looking at the

7    letter here.  I thought you were saying the letter date,

8    okay.

9            At the end of the night, I was leaving with my

10   wife and Bobby Hicks, and Chuckie Warnock called me over

11   and said -- from a distance he said Captain Botieri

12   wanted to speak to me.  So I said in jest, "Oh, Mike

13   wants to speak to little old me."  I said, "Okay," and I

14   walked over with that, and he turned around, and he told

15   me to go fuck myself.

16       Q.    I'm sorry.  Who did?

17       A.    Mike Botieri.

18       Q.    That's the first thing he said?

19       A.    The first thing he said.  He turned around and

20   told me to go fuck myself.

21       Q.    Okay, what happened next?

22       A.    I told him -- I said, "No, Mike, you go fuck

23   yourself."  And at that point he had a coffee cup in his

24   hand, and he had a little coffee in it.  And he was ready

Page 74

1    to throw it in my face, and Officer Warnock stopped him

2    from doing that.  And then I left.  My wife, myself, and

3    Bobby Hicks, we left the place.

4         Q.   Prior to you say him saying those words to you,

5    had you said or done anything to him?

6         A.   Nothing.  Never spoke to him the whole night

7    before.  I hadn't spoke to him in months.

8         Q.   Had he approached you and extended his hand to

9    shake your hand?

10        A.   No, he didn't.

11        Q.   Did you discuss with him your opposition in an

12   upcoming election?

13        A.   No, I didn't.  Not that night.  I never did.

14        Q.   Never did?

15        A.   Never did.

16        Q.   You never discussed with Mr. Botieri any

17   discussion relative to an election you were undergoing at

18   that point?

19        A.   Didn't.  I wasn't working.  Remember, I was out

20   of the station.  I was not working anymore.

21        Q.   I understand.

22        A.   Well, I wasn't in the station to see him.  I

23   was home.  That's all.

24        Q.   But you live in Plymouth?

Page 75

1          A.    Yes, I never discussed it.

2          Q.    So just follow along with me, and if the answer

3     is --

4          A.    Okay.

5          Q.    Whatever it is, just tell me.  I'm not assuming

6     anything.  I need your answers.

7          A.    Okay, I never discussed it.

8          Q.    So my question is, whether it be this night or

9     any prior incident, had you had any discussion with Mr.

10    Botieri relative to some opposition in an election you

11    were facing at that time?

12         A.    Never.

13         Q.    Were you running for retirement board again at

14    that time?

15         A.    That was a reelection year.  Yes, it was.

16         Q.    And when was the election coming up?

17         A.    I don't know if it was the end of the month or

18    something like that.  Maybe it might have been the end of

19    June or beginning of -- maybe the middle of June

20    sometime.

21         Q.    And who was your opposition running for one of

22    the seats, if you remember?

23         A.    I believe it was the chief's secretary, Lynn

24    Fortini.

Page 76

1    Q.    And what was your relationship with Lynn

2    Fortini?

3    A.    I had no problem with Lynn.

4    Q.    And she was directly contesting your seat

5    against you?

6    A.    No, she was contesting -- there were two seats,

7    and she was contesting one of the two seats.

8    Q.    Who else was running for that seat?

9    A.    Mr. Manfredi.

10    Q.    Mr. Manfredi is the same gentleman you

11    mentioned earlier today?

12    A.    Yes, yes.

13    Q.    Were you angry that you were facing opposition

14    in the election?

15    A.    I wasn't angry.  I just -- from what I had

16    heard because I was out of the station, that the chief

17    instructed her to run against me and Dick and that --

18    Q.    I'm sorry.  Who's Dick?

19    A.    Dick Manfredi.

20    Q.    Okay.

21    A.    And that basically I had heard through the

22    grapevine of different individuals that the chief went

23    around telling people to sign her papers and that she

24    went around telling people, "I'm not running against

Page 77

1    those guys.  There are five positions."

2            So she misrepresented herself to a lot of

3    people, and a lot of people were angry with her for doing

4    that because they didn't realize that the makeup of the

5    board is not just five members.  It's only two elected

6    from the membership.  And they were angry that she did

7    that.

8        Q.    Did you have discussion with Mr. Botieri

9    relative to his signing Ms. Fortini's nomination papers

10   --

11       A.    No, I didn't.

12       Q.    Let me just finish.

13            -- for a position on the Plymouth Retirement

14   Board on that night?

15       A.    No.

16       Q.    At any time did you have discussion with Mr.

17   Botieri about his signing nomination papers?

18       A.    No.

19       Q.    How about with anyone else that was involved in

20   the Town of Plymouth or the Plymouth Police Department?

21       A.    Well, if you mention Viella here in the letter

22   here, I was down the town hall looking to check on my

23   nomination papers for town meeting member at the time to

24   see when I was up.  And I ran into Steve, and I said,

1    "Jesus, I'm glad that you're supporting me" in all of the

2    things that I did for Steve, helping him out with

3    different retirement issues and different issues that he

4    personally needed help with. And he -- you know, he

5    basically said, "The chief told me to sign it," and I

6    said, "Well, you're under one of the -- you're appointed

7    by the chief to the detective division, so if you don't

8    sign it, I guess they throw you out on the street because

9    you're not one of the boys." And I said, "Well, Steve, I

10   thought you had -- I thought you were a little bit more

11   loyal than that to be intimidated to doing something like

12   that," but that's Mr. Viella.

13        Q.   Did you swear at Mr. Viella?

14        A.   No, I didn't swear at him. I was in a public

15   building, and I left.

16        Q.   Did Mr. Viella indicate he was signing Ms.

17   Fortini's nomination papers?

18        A.   No, he had already done it.

19        Q.   But it's fair to say you were angry and upset

20   at him for --

21        A.   I wasn't angry and upset with him. I was

22   disappointed at him and disappointed at his lack of --

23   how would you want to say it? -- credibility and lack of

24   -- you know, in one breath he's throwing the chief under

1    the bus.  In the next breath, he's his best boy, kissing

2    his fanny.

3        Q.  Did you ever tell Mr. Viella words to the

4    effect "I hope you don't need the retirement board's help

5    someday"?

6        A.  No, Steve has a -- Steve has a real problem of

7    telling the truth or telling, you know, in times --

8    lacking in what they call intestinal fortitude.

9        Q.  Did you ever say that to anyone?

10       A.  To him?

11       Q.  To anyone.

12       A.  No, everybody knows that.  I didn't say that to

13    him.  I just left.

14       Q.  Try my -- I'm not trying to trick you.

15       A.  No, I know you're not.  I know you're not.

16       Q.  Just try my question.  My question is, did you

17    ever say that to any town employee, police officer, or

18    otherwise --

19       A.  Oh, no.

20       Q.  -- words to the effect "I hope you don't need

21    the retirement board's --" --

22       A.  No, no.

23       Q.  -- "-- help someday"?

24       A.  I've got a volume of people that I've helped.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Page 80

1          MR. GALLITANO:  Excuse me.  You've got to let

2      him finish the whole question --

3          THE WITNESS:  Okay, okay.

4          MR. GALLITANO:  -- so that you answer the

5      question completely.

6          THE WITNESS:  Okay.

7          MR. SILVERFINE:  And also so the stenographer

8      --

9          MR. GALLITANO:  Right.  I mean, you've cut him

10     off --

11         THE WITNESS:  Okay, well, I --

12         MR. GALLITANO:  I'm trying to finish --

13         THE WITNESS:  I know.  I know.  I appreciate

14     it.  I'm sorry.

15         MR. SILVERFINE:  Just off the record for one

16     second.

17         (Discussion off the record.)

18         MR. SILVERFINE:  Back on the record.

19  BY MR. SILVERFINE

20     Q.   Did Officer Viella have to order you to leave

21  the polling place when he saw you on May 8, 2004?

22     A.   No.

23     Q.   Did anyone have to order you to leave the

24  polling place on or about May 8, 2004?

1    A.    No.

2    Q.    Relative to -- I think you mentioned his

3  name earlier -- or somebody did mention his name --

4  Sergeant Michael Peddell, was he your supervisor at one

5  point?

6    A.    Sometimes he was the day shift supervisor.

7    Q.    At one point in time, did he have to admonish

8  you on some issue?

9    A.    Never.

10    Q.    Did you ever tell him, "Sergeant Peddell, I

11  hope you never have to come in front of the retirement

12  board" or words to that effect?

13    A.    Never did.  If I had done anything that this

14  letter indicates, I would have had a reprimand or a

15  suspension in my file.

16    Q.    Okay.

17    A.    Mike Peddell is in the same position, under the

18  thumb and the appointment of Botieri and Mr. Pomeroy.

19  His job and his duties, where he sits can be changed in a

20  minute.

21    Q.    Did you ever make public statements before the

22  Insurance Advisory Committee meeting wherein you stated,

23  "We don't need a woman on the retirement board"?

24    A.    Absolutely did not.  I believe there's a record

1    and a letter there to Mr. Botieri from the chairman of

2    the Insurance Advisory Committee, Dale Webber, who

3    clearly refutes that argument, who was present at a

4    meeting, and that I believe you were -- that letter was

5    given to Mr. Botieri, and I believe he has a copy of that

6    in his possession.  They checked the minutes of the

7    meeting, and the minutes of the meeting, any of those are

8    all taped.

9        Q.   Let me get back to the night of May 22, 2004,

10    this retirement ceremony.

11             Did you at all physically touch Mr. Botieri

12    during that night?

13        A.   No, I didn't.

14        Q.   Did you grab him by his left arm?

15        A.   I only spoke to him briefly at the end of the

16    night.  Never said a word to him the whole night, never

17    went near him.

18        Q.   Did you ever say to him, "I hope you never have

19    a heart attack and come before the retirement board" or

20    words to that effect?

21        A.   As I previously stated, I never made that

22    statement.

23        Q.   Did you say that to anyone that night or any

24    other night?

Page 83

1      A.    No.

2      Q.    Any other police officer that night?

3      A.    No.

4      Q.    Did you use any profanity as it related to Mr.

5    Botieri -- to Mr. Botieri on the night of May 22, 2004?

6      A.    We both exchanged niceties.

7      Q.    So that's the words you told us earlier?

8      A.    Yes.

9      Q.    Anything else that you recall saying to him?

10     A.    No.

11     Q.    I'm trying to move along here.  I'm going to

12   show you another document.

13           MR. SILVERFINE:  We'll mark it.  I believe

14           these are Plymouth Retirement Board executive

15           session minute meetings, and we'll mark this as

16           Exhibit 16.

17                              (Whereupon, executive

18                              session minutes were marked

19                              as Exhibit No. 16 for the

20                              defendant.)

21           MR. GALLITANO:  Can we go off the record for a

22           minute?

23           MR. SILVERFINE:  Go ahead.

24           (Discussion off the record.)

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1          MR. SILVERFINE:  The Plymouth Retirement Board

2     executive session -- I'll just identify it by date

3     presently -- May 27, 2004, it's Exhibit 16.

4     Counsel would like to note an objection, and then

5     I'll come back.

6          MR. GALLITANO:  As counsel for the deponent,

7     Mr. Kelley, I'm objecting to any questioning

8     regarding these minutes because they are executive

9     session minutes from the retirement board upon which

10    he is a member, and under the terms of his oath of

11    office, he's not supposed to disclose anything

12    that's in executive session.  This is an unsigned

13    copy, undated copy of an executive session.  There's

14    been no presentation of any vote authorizing the

15    release of these minutes.  Therefore, we object to

16    any line of questioning relating thereto, and my

17    client is instructed not to respond to any questions

18    should they be posed.

19         MR. SILVERFINE:  For the record, I'm going to

20    reserve on this and both check on whether or not

21    there has been a release, to see if they are

22    released.  That's one.  And two, based upon the

23    subject matter of this particular case and

24    specifically the relevancy as based upon Mr.

1        Kelley's claims, I may move to have this -- for the

2        defendants to be able to use this.  So I'm going to

3        reserve on this at the end of this deposition, but

4        we'll move on for the moment.

5             All right, let's move on and mark this as the

6        next exhibit, No. 17.

7                                (Whereupon, a letter dated

8                                June 1, 2004, was marked as

9                                Exhibit No. 17 for the

10                               defendant.)

11   BY MR. SILVERFINE

12        Q.   I'm showing you that.  Do you recognize that?

13             (Hands to witness.)

14        A.   Yes, I do.

15        Q.   Fair to say this was a letter from Debra

16   Sullivan, the director of the retirement board, to

17   Captain Botieri, cc'd to the retirement board of which

18   you were a member back on June 1, 2004?

19        A.   Yes, it is.

20        Q.   And this related to a complaint that he had

21   filed as it related to you?

22        A.   That previous letter that we discussed, Exhibit

23   -- I don't know if it's 13 or -- one of them was.

24        Q.   Relative to acknowledging the complaint -- and

1    we'll get to it in a minute -- what is your understanding

2    of what, if anything, the retirement board once they

3    received the complaint as we've now marked as Exhibit 15?

4        A.   The complaint was an issue that was nonboard

5    business.  It was a personal exchange of words, and Mr.

6    Botieri took the opportunity to trump it up to make it

7    more than it ever was.

8        Q.   Is it fair to say, at least from the

9    allegations that Mr. Botieri made, they may have related

10   to the board because of his allegation that you were

11   going to somehow influence any retirement decision that

12   may be made on his application?

13       A.   Well, I look at in the respect of if I -- in

14   Exhibit 13 there you state that he states that I

15   assaulted him -- I believe he said that this morning --

16   and I grabbed him.  If I had assaulted a captain of the

17   police department, I can assure you he would have taken

18   out complaints against me.  And with that, that's the

19   credibility I give his -- this issue.

20       Q.   Let me ask you this.  Relative to the

21   retirement board, did they undertake any investigation as

22   to the allegation as Captain Botieri described in Exhibit

23   15?

24               MR. GALLITANO:  Objection.  I'm also going to

1    advise my client that considering his position on

2    the board, he should really -- before he answers

3    that, he should have advice of the retirement board

4    counsel as to whether he would be disclosing

5    something, again, that would be part of an executive

6    session.

7         MR. SILVERFINE:  Well, I think I hear your

8    objection, but I believe -- I believe there is

9    public information that indicates that -- and we can

10   get to it in a minute.

11        MR. GALLITANO:  Well, there may be indications

12   that there was an investigation.  What I'm saying is

13   you're asking him what the outcome of that

14   investigation is.

15        MR. SILVERFINE:  No, no.  I asked him if they

16   undertook an investigation.  That's my first

17   question.

18   BY MR. SILVERFINE

19        Q.   My first question is, do you know whether or

20   not an investigation was undertaken?

21        A.   The issue that you're addressing is an

22   executive session issue, number one.  Number two, I have

23   very severe reservations on the fact of how you lawfully

24   got that information.  That information is in our

1   lockbox.  There is a procedure for people to get it.  And

2   how you got a copy of that and place it in evidence

3   lawfully is that, but I'm not going to speak to an

4   executive session minutes or the surrounding issue other

5   than the fact an executive session was issued on the unit

6   on that issue.

7          MR. GALLITANO:  But in answer to his question

8          of whether an investigation took place and you --

9          A.   The board looked into the matter.

10         MR. GALLITANO:  You can answer the question, is

11         what I'm saying.

12         Q.   Did you participate in the matter that was

13  brought before the board?

14         A.   I'm not going to speak to executive session.

15         MR. SILVERFINE:  Okay, I'm going to reserve on

16         all these because -- I'm reserving on these.  Any

17         question relative to what the retirement board did

18         or did not do as to certain allegations that Captain

19         Botieri brought I believe directly related to this

20         lawsuit.  So I'm going to reserve on that.

21         MR. GALLITANO:  And for the record, I request

22         that you give notice to counsel for the retirement

23         board regarding that so they may be present at any

24         -- if it goes to a motion before the superior court,

1        they can represent their point of view.

2    BY MR. SILVERFINE

3        Q.    You're aware, Mr. Kelley, that this allegation

4    as described in Exhibit 15 was at least brought before or

5    addressed to PERAC, are you not, sir?

6        A.    I believe there was a written -- a letter

7    written there to PERAC by Mr. Botieri.

8        Q.    And you're aware that PERAC then ordered the

9    retirement board which you were participating to do

10   something about it?

11       A.    They didn't order us to do anything.

12       Q.    What is your memory of what PERAC did in

13   relation to Mr. Botieri's complaint as evidence in

14   Exhibit 15?

15       A.    We had already held an executive session and

16   discussed the matter prior, and it was resolved.  And

17   PERAC was given a copy of the formal letter that Mr.

18   Botieri wrote.

19           MR. SILVERFINE:  Well, let me -- so I'm not

20       misstating something, we'll mark this as the next

21       exhibit.

22                           (Whereupon, a letter dated

23                           June 3, 2004, was marked as

24                           Exhibit No. 18 for the

Page 90

1                              defendant.)

2              MR. SILVERFINE:   Just off the record for one

3         second.

4              (Discussion off the record.)

5    BY MR. SILVERFINE

6         Q.   I'm going to show you what's been marked as

7    Exhibit 18.   Is it fair to say you've seen this letter

8    before?

9              (Hands to witness.)

10        A.   Oh, yeah, yeah.

11        Q.   It was addressed to the retirement board of

12   which you were a member back in June of 2004?

13        A.   I have seen this letter.

14        Q.   Would you agree with me that this letter,

15   Exhibit 18, the second paragraph, Joseph Connarton, the

16   executive director of PERAC says, "We expect the board

17   will immediately investigate the matters discussed in

18   this letter and advise the commission within 30 days"?

19        A.   I believe we did that, and I was very

20   forthcoming and told --

21        Q.   All right.   I'm sorry.   I interrupted you.

22        A.   I had no problem with it.   Put it up there and

23   we fulfilled every obligation that we felt was necessary,

24   the board did.

1      Q.    But up until that day when he wrote this

2   letter, you had not investigated this matter and reported

3   back to the board at least as far as PERAC, correct?

4      A.    The dates -- when was the executive session?

5   Let's look at the executive session for a minute.

6          MR. GALLITANO:  It's not dated.

7      A.    It's not dated.

8          MR. GALLITANO:  May 27 is the date on the top

9       of this document that's in question.

10     A.    The one here, is that it?  Oh, yeah, yeah.

11   Okay, it was the next day.  We had already addressed it.

12   I volunteered that.  I said we need to address something,

13   and we did.  And this letter is dated after it.

14     Q.    All right.  And just --

15     A.    And then we responded back to them, which I

16   believe Botieri got.  And you have a copy of that.

17     Q.    And that's a letter that you referenced earlier

18   today, which was a letter written on July 28, 2004 --

19     A.    Yes, I believe --

20     Q.    -- signed by three members of the board?

21     A.    Right.

22     Q.    And cc'd to Michael Botieri?

23     A.    Yeah.

24          MR. SILVERFINE:  I'm going to just suspend for

FORM CSR - LASER REPORTERS PAPER & MFG. CO.  800-626-6313

Page 92

1          today based on our conversation.  We're going to

2          revisit some of these issues, and I'm going to

3          finish hopefully my deposition next time.

4                    MR. GALLITANO:  That's agreed.  That's fine.

5                    (Whereupon, at 4:01 p.m. the taking of the

6          deposition was suspended.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 93

ACKNOWLEDGMENT OF DEPONENT

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. 1:05-cv-10596-NMG

I, Thomas M. Kelley, do hereby acknowledge that

I have read and examined pages 1 through 92, inclusive,

of the transcript of my deposition, as taken in Plymouth,

Massachusetts, on Wednesday, June 21, 2006, and that:

_____ the same is a true, correct, and complete
transcription of the answers given by me to the questions
therein recorded.

_____ except for the changes noted in the
attached errata sheet, the same is a true, correct, and
complete transcription of the answers given by me to the
questions therein recorded.


                              _____
                                          Signature

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Page 94

## ERRATA SHEET

Page:_____ Line:_____ Reads:_____
Should Read:_____

Page:_____ Line:_____ Reads:_____
Should Read:_____

Page:_____ Line:_____ Reads:_____
Should Read:_____

Page:_____ Line:_____ Reads:_____
Should Read:_____

Page:_____ Line:_____ Reads:_____
Should Read:_____

Page:_____ Line:_____ Reads:_____
Should Read:_____

Page:_____ Line:_____ Reads:_____
Should Read:_____

Page:_____ Line:_____ Reads:_____
Should Read:_____

Page:_____ Line:_____ Reads:_____
Should Read:_____

Page:_____ Line:_____ Reads:_____
Should Read:_____

Page:_____ Line:_____ Reads:_____
Should Read:_____

Page:_____ Line:_____ Reads:_____
Should Read:_____

Page:_____ Line:_____ Reads:_____
Should Read:_____

Page:_____ Line:_____ Reads:_____
Should Read:_____

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

Page 95

C E R T I F I C A T E

PLYMOUTH, SS

I, <u>Linda M. Corcoran</u>, a Court Reporter and Notary Public, in and for the Commonwealth of Massachusetts, do hereby certify that:

<u>Thomas M. Kelley</u>, having been satisfactorily identified and having been duly sworn by me to testify upon his oath, did so testify, and that this transcript is a full, true, and accurate record to the best of my knowledge, skill, and ability of the testimony taken at the Law Offices of Joseph R. Gallitano & Associates, 34 Main Street Extension, Suite 202, Plymouth, Massachusetts, on Wednesday, June 21, 2006, commencing at 2:07 p.m.

I further certify that I am a disinterested person to the action in which this deposition is taken.

IN WITNESS WHEREOF, I have hereunto set my hand and notarial seal this 31st day of July, 2006.

_Linda M. Corcoran_ - Court Reporter
My commission expires:
October 6, 2006



TOWN OF PLYMOUTH

# POLICE DEPARTMENT

20 Long Pond Road
Plymouth, Massachusetts 02360
FAX (508) 830-4227
(508) 830-4218

EXHIBIT _15_
_KELLEY_
_6-21-06_
LINDA M. CORCORAN
CERTIFIED COURT REPORTER

Plymouth Retirement Board
11 Lincoln Street
Plymouth, MA 02360

May 26, 2004

Dear Sirs:

Unfortunately, I must write to file a formal complaint regarding the actions of Mr. Thomas Kelley, acting Chairman of the Plymouth Retirement Board.

As you know, a Plymouth Retirement Board election for two seats is scheduled for June 24, 2004. The two incumbents and one other Town employee, Ms. Lynn Fortini, are running for the two seats. It is well known that Mr. Kelley (a recently retired Plymouth Police officer) is very angry that he is facing opposition in the election. His anger is clearly demonstrated by his outrageous conduct that is the subject of this complaint.

On the evening of May 22, 2004, the Plymouth Police Relief Association hosted a dinner and awards ceremony at the Pinehills Country Club. Later in the evening, at approximately 11: 30pm, Mr. Kelley approached me as he was leaving the function. At that time, I was speaking with Detective Charles Warnock. I extended my hand in order to congratulate Mr. Kelley on his recent retirement. Mr. Kelley shook my hand as he began to question my signing of Ms. Fortini's nomination papers for a position on the Plymouth Retirement Board. I informed Mr. Kelley that I did in fact sign Ms. Fortini's nomination papers. Mr. Kelley became very aggressive as he called me different names using expletives. I then attempted to walk away from Mr. Kelley as I spoke with another retired officer. At this time Mr. Kelley physically grabbed me by the left arm and attempted to pull me towards him saying, *"I hope you never have a heart attack and come before the Retirement Board."* Detective Charles Warnock quickly intervened and was able to hold Mr. Kelley back from assaulting me further. With the assistance of other officers, Mr. Kelley was eventually removed from the room as he continued his yelling and swearing towards me. I took Kelley's threat very seriously.

This is not the first time that Mr. Kelley has used his position on the Plymouth Retirement Board to make threats against those that disagree with him. On May 8, 2004, during the annual Town election, Mr. Kelley went to the voting precinct located at Town Hall. Mr. Kelley initiated conversation with Officer Stephen Viella, who was on duty during the election. Kelley, very angry and upset, swore at Viella for signing Ms. Fortini's nomination papers. He then threatened Viella by saying *"I hope you don't need the*

*Retirement Boards help some day".* Officer Viella had to order Kelley to leave the polling place.

This type of threatening behavior and abuse of his position on the Plymouth Retirement Board is not new to Mr. Kelley. I have just learned that almost one year ago, his supervisor, Sergeant Michael Peddell, admonished Kelley. Kelley, angry and upset, threatened Peddell by saying *"I hope you never come in front of the Retirement Board."*

Understandably, many of those thirty-two individuals that have signed Ms. Fortini's nomination papers believe that they have been identified by Mr. Kelley as "targets" and that, given the opportunity, Mr. Kelley will exact revenge if these individuals have a matter that appears before the Plymouth Retirement Board.

Mr. Kelley's conduct is despicable, outrageous, and an abuse of his position as an elected official on the Plymouth Retirement Board. Kelley's recent public comments at the Insurance Advisory Committee meeting wherein he was heard to say *"we don't need a woman on the Retirement Board"* further demonstrates his abusive, harassing demeanor.

In order to maintain the integrity of the Plymouth Retirement Board, Mr. Kelley has but one choice - he must immediately resign from the Plymouth Retirement Board and withdraw from the pending election.

I request that you keep me informed as to what action the Plymouth Retirement Board takes regarding this formal complaint.

Michael E. Botieri
Captain of Police


CC: Public Employee Retirement Administration Commission
    Commonwealth of Massachusetts – Ethics Commission
    Attorney General Thomas Reilly
    Town Manager Pamela Nolan
    Board of Selectmen

# PERAC

EXHIBIT 18
KELLEY
6-21-06
LINDA M. CORCORAN
CERTIFIED COURT REPORTER

**COMMONWEALTH OF MASSACHUSETTS | PUBLIC EMPLOYEE RETIREMENT ADMINISTRATION COMMISSION**

DOMENIC J. F. RUSSO, *Chairman* | A. JOSEPH DeNUCCI, *Vice Chairman*
KENNETH J. DONNELLY | ERIC A. KRISS | JAMES M. MACHADO | DONALD R. MARQUIS

JOSEPH E. CONNARTON, *Executive Director*

June 3, 2004

RECEIVED
JUN 0 9 2004
TOWN MANAGER'S OFFICE
PLYMOUTH, MA

Plymouth Retirement Board
11 Lincoln Street
Plymouth, MA 02360

Dear Retirement Board Members:

I am in receipt of a letter dated May 26, 2004 addressed to the Board from Captain Botieri regarding the conduct of Board Member Kelley. The assertions in the letter are very serious, and if supported could have an actual or perceived impact on the ability of the Plymouth Retirement Board to act fairly or to function in accordance with the provisions of G.L. c. 32, and in accordance with the pertinent regulations, most specifically 840 CMR 17.00.

We expect that the Board will immediately investigate the matters discussed in the letter, and advise the Commission within 30 days of the Board's findings and the outcome of investigation.

It is vital that Retirement Boards and the individual Board Members not only act in a fair and prudent manner in the exclusive interest of the System's members and beneficiaries, but also be perceived by others as acting in a fair and prudent manner. The Board is directed to act on this matter as soon as possible, but no later than 30 days from the receipt of this letter.

If you have questions, please contact me.

Sincerely,

Joseph E. Connarton

Joseph E. Connarton
Executive Director

JEC/sfc
p:\legal\bphillips\plymouth re kelley.doc

cc:     Captain Michael E. Botieri
        Attorney General Thomas Reilly
        State Ethics Commission
        Plymouth Town Manager, Pamela Nolan
        Town of Plymouth Board of Selectmen





EXHIBIT 16
KELLEY
6-21-06
LINDA M. CORCORAN
CERTIFIED COURT REPORTER

PLYMOUTH RETIREMENT BOARD
Executive Session
May 27, 2004
Town Hall, Mayflower I & II

Mr. Kelley moved the Board go into Executive Session at 9:05 a.m. UNANIMOUSLY APPROVED.

| | |
|---|---|
| Mr. Duhamel | Yes |
| Mr. Murphy | Yes |
| Mr. Kelley | Yes |
| Mr. Manfredi | Yes |
| Mr. Madden | Yes |

Attorney Michael Sacco was also in attendance to discuss allegations against Mr. Kelley made by Michael Botieri of the Plymouth Police Department. Attorney Sacco summarized the incidents in the order as they occurred. A letter from Captain Botieri was received in the Retirement Board Office on Wednesday, May 26, 2004. This letter was also sent to the Town Manager, Board of Selectmen, PERAC, State Ethics Commission and the Attorney General. In this letter Mr. Botieri states that he had a run-in with Mr. Kelley at a Plymouth Police Relief Association retirement party on the evening of May 22, 2004 at the Pinehills Country Club. Capt. Botieri alleges that Mr. Kelley approached him in an aggressive manner and questioned him about signing Ms. Lynn Fortini's Retirement Board election nomination papers. Capt. Botieri states that Mr. Kelley also used several expletives and attempted to grab his arm as he walked away from him, when Detective Charles Warnock intervened and held Mr. Kelley back. He also states that another officer intervened, but made no mention of that officers' name in his letter. He stated in his letter that Mr. Kelley also made remarks to other officers threatening retaliation from the Retirement Board. In addition, Capt. Botieri states that during a recent Insurance Advisory Committee meeting, Mr. Kelly remarked "we don't need a woman on the Retirement Board".

The Board is in receipt of a letter from Mr. Dale Webber, Chairman of the Insurance Advisory Committee, sent directly to Capt. Botieri. This letter, dated June 7, 2004, disputes the allegation made by Capt. Botieri regarding Mr. Kelley's public comment at the above referenced IAC meeting, which took place on May 20, 2004. Mr. Webber states in his letter that he has checked the records with the committees' recording secretary and has found no evidence of such comments, nor does anyone at the meeting remember any such comments being made. Mr. Webber requested that Capt. Botieri retract these allegations immediately, in writing. To date, Mr. Webber has received no response from Capt. Botieri.

The Board is also in receipt of a letter from Officer Robert Hicks. Officer Hicks was also at the Retirement party, was mentioned above in Capt. Botieri's letter and is the second officer that he makes reference to as restraining Mr. Kelley. In his letter, Officer Hicks

states that Mr. Kelley was called away from a conversation with himself, his wife and Mr. Kelley's wife, by Officer Charles Warnock. He states that a verbal argument ensued between Capt. Botieri and Mr. Kelley and he witnessed Officer Warnock step in between the two men. Officer Hicks states that at this time, he also stepped in, stating "Forget it, it's time to leave", at which time Mr. Kelley left the party with his wife and daughters.

Atty. Sacco explained that the Board has no disciplinary authority against fellow Board members, nor is there anything in the statute that allows or requires the Board to take any action against another Board member. He did state that he felt it was very important to have Mr. Kelley talk about these issues with the Board. Atty Sacco will provide PERAC with an explanation of the issues, as they have asked for an investigation into this matter. He told the Board that he felt it was not necessary to send an explanation to any of the other recipients of the original letter, unless the Board thought it was necessary.

Atty. Sacco stated that this issue was very troublesome for him, as he has always found the members of the Board to be very above-board and hardworking for their membership and found it unfortunate that somebody would make allegations like this against any one of the Members.

Mr. Kelley spoke to the Board regarding the incidents alleged by Capt. Botieri. For the record, he wanted the Board to be aware that he has filed a formal lawsuit against the Town regarding his 111(f) benefits. He explained that he had not been in contact with the Police Department regarding this lawsuit, as Capt. Botieri would be a defendant in this suit. Atty. Sacco asked Mr. Kelley to tell the Board why Capt. Botieri would be a defendant. Mr. Kelley stated that there had been an investigation regarding overtime pay, which Capt. Botieri had received, along with other officers.

Mr. Kelley went on to tell the Board his view of the events on the evening of May 22, 2004. He stated that at the Retirement party referred to by Capt. Botieri, he was called over by Officer Charles Warnock. Mr. Kelley went over and he and Capt. Botieri exchanged words with each other. Mr. Kelley states that Capt. Botieri raised his arm, which was holding a coffee cup, towards him in an attempt to hit Mr. Kelley. Mr. Kelley states that at that moment Officer Warnock, as well as Officer Hicks, stepped in between the two men. Mr. Kelley stated that he left the party at that time with his wife and daughters.

Regarding the allegation Capt. Botieri made of an incident with Officer Stephen Viella, Mr. Kelley stated that the two men briefly exchanged words, but added that Officer Viella never ordered him out of the building, as alleged in Capt. Botieri's letter.

Capt. Botieri stated in his letter that Mr. Kelley was admonished by his supervisor, Sergeant Michael Peddell, almost one year ago. Mr. Kelley stated that he was never admonished by Sgt. Peddell and was in possession of his entire personnel folder, which contained nothing of the sort. Mr. Kelley told the Board that they were welcome to review his file, which he had on hand at the meeting.

Mr. Kelley stated to the Board that he believes that these allegations serve as revenge by Capt. Botieri for the Board's dismissal of the Involuntary Retirement Application filed by the Police Department for Officer Michael Ferazzi. He states that the day after the Board dismissed this application, nomination papers were taken out by another Police Department employee, Ms. Lynn Fortini.

Regarding the alleged comment made at the IAC Meeting, Mr. Kelley stated that there was a room full of people present, including IAC and PREA members, all of whom have have stated that they did not hear any negative comments made by Mr. Kelley, as alleged by Capt. Botieri. Mr. Kelley stated that he never made any statements of that sort, and that this all comes down to two men who have a difference in opinion.

Mr. Murphy asked Atty. Sacco whether or not the Board is required to send a response to PERAC. Mr. Kelley stated that he wanted something sent in order to clear his name and Atty. Sacco agreed that since PERAC has asked for a statement in writing from the Board on this matter, that it would be the proper thing to do.

Atty. Sacco asked the other four Board members if they felt alright about Mr. Kelley's explanation. Atty. Sacco added that his impression of this matter is that of a retaliatory act done by Capt. Botieri.

Mr. Duhamel stated that he was at the IAC meeting in questions, along with the legislative delegation, and that no such comment was made by Mr. Kelley. He noted that he felt it was important that the response to PERAC strongly state that there is absolutely no evidence of Capt. Botieri's allegations. In his opinion, Capt. Botieri was trying to influence the election by making these allegations just weeks prior to the election date of June 24, 2004.

Mr. Kelley felt that he was set up by Capt. Botieri the night of the Retirement party and strongly denies any aggressive acts were made.

Mr. Manfredi asked Atty. Sacco if anybody else needs to be notified of the Board's investigation on this matter. Atty. Sacco suggested sending a copy of the response to PERAC to Capt. Botieri only.

Atty. Sacco stated that he will draft a letter to PERAC for the Board to review at their next meeting. He will also call Joseph Connarton of PERAC and let him know that a response will be forthcoming. Mr. Duhamel added that he would like the other four Board members to sign the letter.

Mr. Manfredi made motion for Atty. Sacco to draft letter for PERAC for the other four members to review and sign. Seconded by Mr. Duhamel.

UNANIMOUSLY APPROVED. Mr. Kelley abstained from vote.

DEC.21'2004 03:38 5088304140              TOWN OF PLYMOUTH                    #4605 P.004/004

Mrs. Sullivan asked for a roll call vote to come out of Executive Session.

| | |
|---|---|
| Mr. Kelley | yes |
| Mr. Manfredi | yes |
| Mr. Murphy | yes |
| Mr. Madden | yes |
| Mr. Duhamel | yes |

Mr. Duhamel made motion to adjourn. Mr. Murphy seconded. UNANIMOUSLY APPROVED.

The meeting adjourned at 9:44 a.m.

Respectfully submitted,

Wendy Cherry, Assistant Director

Board of Retirement

_____          Dated: _____
Thomas Kelley, Chairman

_____
Richard Manfredi

_____
John Murphy, Jr.

_____
Shawn Duhamel

_____
John Madden