UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

THOMAS M. KELLEY,
                    Plaintiff,

v.                                          Civil Action No. 05-10596-NMG

TOWN OF PLYMOUTH, et al
                    Defendants.

**MEMORANDUM IN SUPPORT OF
PLAINTIFF'S MOTION FOR PROTECTIVE ORDER
AND IN OPPOSITION OF THE DEFENDANTS' MOTION TO
COMPEL THE PLAINTIFF TO FURNISH RECORDS, INFORMATION,
TESTIMONY CONCERNING EXECUTIVE SESSION OF THE TOWN
OF PLYMOUTH RETIREMENT BOARD**

Now comes the Plaintiff in the above-captioned action and requests this

Honorable Court to issue a Protective Order for the Plaintiff preventing him from having

to furnish records, information, and testimony regarding an executive session meeting of

the Town of Plymouth Retirement Board allegedly held on May 27, 2004.

**I.      SUMMARY OF CIRCUMSTANCES**

The Plaintiff herein filed a complaint in the above-captioned action against the

Defendants alleging violation of Mass. Chapter General Laws 148 Section 185, the so-

called Whistle Blower Statute, a separate count for gross negligence, willful wanton and

reckless conduct, a separate count for violation of his 14th Amendment Rights and 42

U.S.C. 1983, and a count for denial of benefits due him under Mass. General Law

Chapter 41, Section 111F.  (See a true copy of the Verified Complaint annexed hereto

and made a part hereof as Exhibit A).

At a continued deposition of the Plaintiff conducted on June 21, 2006, the Plaintiff was questioned regarding alleged minutes of an executive session of the Plymouth Retirement Board.  (A true copy of the executive session minutes are marked Exhibit B and made a part hereof).

At the Deposition, Defense counsel began to question the Plaintiff about an interaction that occurred between the Plaintiff and Captain Michael Botieri (hereinafter "Botieri") of the Plymouth Police Department on May 22, 2004 at the retirement party for the Plaintiff.  Boteiri at said retirement party picked a fight at the end of the evening with the Plaintiff in order to antagonize him and create an incident about two weeks prior to Plaintiff's re-election for his seat on the Plymouth Retirement Board.  Boteiri was at the time backing an opposing candidate to seek the same seat held by the Plaintiff herein.

Botieri made a number of allegations all of which proved to be unsubstantiated and no action of any disciplinary kind was taken against the Plaintiff by any agency, state or municipal.  As a result of the complaint made and an inquiry formerly made by the Commonwealth of Massachusetts Public Employee and Retirement Administration Commission (hereinafter "PERAC"), the Retirement Board investigated the matter.  An investigation was conducted and said board responded to PERAC in June of 2004.

The Plymouth Retirement Board had conducted a meeting and had investigated and reviewed statements from other parties regarding allegations made by Boteiri.  The matter was held in Executive Session.  The minutes of said Executive Session have not been released since the allegations made by Boteiri proved to be groundless and that the release of said Executive Session minutes would only provide further embarrassment for all parties concerned, which is grounds for not releasing and keeping confidential said

Executive Session minutes.  There is no public good to be served by the release of said minutes.

Further, most importantly in the Defendants responsive pleadings there was no mention of this particular incident or any relevancy of this incident in any way as part of Defendants responsive pleading.  Further, Boteiri is not an individual party defendant in the complaint brought by the Plaintiff Kelley.  While he is an agent of the Town, and may have participated in certain actions under the direction of the Defendant, Pomeroy, the Plaintiff has not filed an action against Boteiri as an individual.  Further, Boteiri has not filed an action against Kelley.  Nor is there any counterclaim by either Defendant, Town of Plymouth or Pomeroy, based upon the incident covered by the alleged executive session minutes; nor would there be any relevancy to any counterclaim based on said alleged incident on May 22, 2004.

The interaction between Kelley and Boteiri was off duty, it had no basis in any municipal business or police action.  It is not related to the subject suit action in any form.  Kelley did not allege this incident as any retaliation against him by Chief Pomeroy or the Town.  However, the attempt to now embarrass him with this incident is further proof of the Town's and the Defendant Pomeroy's continued retaliation against Mr. Kelley to try to publicly embarrass him by the release of the executive session minutes that have nothing to do with this case whatsoever.

## II.    <u>ARGUMENT</u>

Under Rule 30 Section D(4), "at any time during a deposition, on a motion of a party or of the deponent and upon a showing that the examination is being conducted in bad faith or in such a manner as unreasonably to annoy, embarrass or oppress the

deponent or party, the court in which the action is pending or the court in the district where the deposition is being taken may order the officer conducting the examination to cease forthwith of taking the deposition or may limit the scope and manner of the taking of the deposition as provided by Rule 26(c)."

As previously stated Boteiri is not a party to this action as an individual plaintiff. He is not a party to this action as a defendant in any sense. He has no counterclaim in this matter nor does the Town. The Defendant Pomeroy, who has been pleaded individually into this case, did not file any counterclaim for any type of claim against Kelley. Therefore there is neither basis nor relevancy to the request for the Motion to Compel the production of these documents as well as testimony by the Plaintiff.

Further the Defendants, in the pleadings presented before the court in support of their Motion to Compel, fail in any way to plead the relevancy or importance of this documentation and testimony as it relates to their defense. They have not provided any legitimate purpose for the production of the requested document and testimony from the Plaintiff. While they cite the open meeting law for the public good, with which quite frankly the Plaintiff has no disagreement, they still have to state some reason to necessitate an order to compel the production of documents. They have to show some relation to the case presently before the Court. In fact, the incident, which is the subject of the alleged executive session meeting of the Town of Plymouth Retirement Board, has absolutely no bearing on the case before the Court whatsoever.

It was ruled in the case of <u>Pedraza v. Holliday Housewares, Inc., et al</u>, 203 F.R.D. 40, 2001 U.S. District Court, (see Exhibit C, Case # 1 attached hereto and made a part hereof), that "discovery should be limited if the court determines (1) that the discovery

sought is unreasonable, cumulative or duplicative, or obtainable from some other source that is more convenience, less burdensome or less expensive; (2) the parties seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (3) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the party's resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues."  Fed. R. Civ. P. 26(b)(2).

In conferencing the Plaintiff's Motion for a Protective Order, counsel advised defense counsel that the Plaintiff not only did not have the subject minutes in his possession nor did he have control over any activities that could release the minutes, and that he recused himself from the original executive session since he was the subject of the investigation and questioning by the Retirement Board of a complaint made against him by Botieri.  Mr. Kelley did not even participate in any votes relating to the said executive session other then the vote to go into executive session.  Once in executive session as the sitting chairman, Mr. Kelley relinquished the chair to another member of the Board. Therefore he has absolutely no say or control over whether these minutes are ever released.  (See Affidavit of Plaintiff marked Exhibit D and made a part hereof).  Further, the minutes were never voted upon or put in final form.

The copy of the alleged minutes presented by the Defendants, were obtained by the Defendants by improper means since they have never been officially released by the Plymouth Retirement Board.   An examination of the alleged minutes clearly shows them to be defective on their face.  The minutes are dated May 27, 2004, yet the second paragraph sets forth "the Board is in receipt of a letter from Mr. Dale Webber, Chairman

of the Insurance Advisory Board sent directly to Captain Botieri. This letter dated June 7, 2004, disputes the allegation made by Captain Botieri regarding Mr. Kelley's public comment at the above-referenced IAC meeting which took place on May 20, 2004". If the Retirement Board received a letter dated June 7, 2004, how could it possibly be reviewed by the retirement board on May 27, 2004, over ten days prior to the writing of said letter.

In addition, my client has a right to privacy. That in an executive session where he was the subject of the complaint ruled to be groundless by the Retirement Board. It could only do him harm by releasing the actual minutes once they are compiled and asking him questions about something that is totally unrelated to the case at hand. The sole purpose for doing this is to publicly embarrass him and to get these minutes into public record so they can be reissued to newspapers again as opposed to being improperly leaked previously in order to again publicly embarrass the Plaintiff. It is also oppressive in that it has caused the Plaintiff to incur additional legal fees by having to file for a Motion for Protective Order, as well as a needless and time consuming delay of his case and causing him additional attorneys' fees.

In the case of Woodburyville Heights Condominium Trust v. John Magill, et al, (see Exhibit E, Case # 2 attached hereto and made a part hereof), the court said "a trial court considers the following factors in balancing the public and private interests to decide whether a protective order is necessary: (1) whether disclosure will violate any privacy interests; (2) whether the information is being sought for a legitimate purpose or for improper purpose; (3) whether disclosure of the information will cause a party embarrassment; (4) whether confidentiality is being sought over information important to

public health and safety; (5) whether the sharing of information among litigants will promote fairness and efficiency; (6) whether a party benefiting from the order of confidentiality is a public entity or official; and (7) whether the case involves issues important to the public."   In reviewing said standard, it is clear that the disclosure of these minutes will violate the privacy interest of the Plaintiff, the information being sought is not for a legitimate purpose and is for an improper purpose.  Further, the disclosure of the information will cause Mr. Kelley public embarrassment.  Once again it will raise false issues that will then see the light of day, be printed and publicized, or will naturally be negative towards Mr. Kelley.  Anytime an allegation is made, once the allegation is dismissed as false, very few people ever read the correction of a wrongfully made accusation.  The confidentiality being sought over the information is not important to the public health and safety.  It is only important to the personal reputation of the Plaintiff and the sharing of the information is not going to promote fairness or efficiency, it is going to promote unfairness and oppressive embarrassment and oppressive costs to the Plaintiff.

The party benefiting from the confidentiality is a public official since he is a member of the Retirement Board, but it relates to an incident having nothing to do with any public interest of the Town of Plymouth.  The information sought does not involve an important public issue in that the information in this instance is not related to the case in hand, which does involve important public issue, the injury of a police officer in the line of duty due to negligence; as well as the issue of a person providing information to an investigative agency body and then being retaliated against by his employer.

The Plymouth Retirement Board executive session minutes have no bearing on the civil action between the Plaintiff and the Defendants. (See Affidavit of Attorney Michael Sacco, Plymouth Retirement Board legal counsel marked Exhibit F and made a part hereof).

## III.    <u>CONCLUSION</u>

As a result of the above-stated reasoning and law, as well as the basic facts concerning the demand by the Defendant for the aforesaid records, the documents and testimony has absolutely no bearing on the case before the Court. That if they truly want the records, the Defendants' have already deposed the administrator for the Plymouth Retirement Board and during said deposition never asked her about any minutes of an executive session. Nor did the Defendants issue a subpoena to the Retirement Board for any records. They also never asked the administrator who is the keeper of the records to produce any minutes at that time.

If the Defendant, Town of Plymouth and the Defendant, Pomeroy truly want these minutes, then they should issue a Subpoena Duces Tecum to the Plymouth Retirement Board and seek a court order for a motion to compel against the Plymouth Retirement Board who has actual authority over said minutes and can defendant itself as to whether it is going to relinquish its control over executive session minutes and what laws and rights protect the Plymouth Retirement Board as a separate legal entity. The Plymouth Retirement Board is not part of the Town of Plymouth's Municipal government.

Therefore, the Defendant has sought a motion to compel against the wrong party and should be directed to issue the appropriate request to the appropriate authority that

has control over the records they seek, and if said records are made public, the Plaintiff

would still request this court issue a protective order from making him testify regarding

minutes to a meeting regarding an incident, which has no relevancy, no legitimate

purpose in the defense or prosecution of the case before the court.


Respectfully Submitted,
The Plaintiff,
by his attorneys,


*/s/ Joseph R. Gallitano*
Joseph R. Gallitano, Esq.
 BBO # 183700
 34 Main Street Ext., Suite 202
 Plymouth MA  02360
 (508) 746-1500


*/s/ Richard D. Armstrong*
Richard D. Armstrong, Jr., PC
BBO # 021580
1400 Hancock Street
3rd Floor
Quincy, MA  02169
(617) 471-4400

Dated:  September 29, 2006

EXHIBIT A

COMMONWEALTH OF MASSACHUSETTS

PLYMOUTH, ss.                                       SUPERIOR COURT
                                                   C.A. NO. 05-0278B

THOMAS M. KELLEY,                        )
              Plaintiff,                 )
v.                                       )
                                         )
THE TOWN OF PLYMOUTH, and ROBERT J.      )
POMEROY, as Chief of the Plymouth Police )
Department and Individually,             )
              Defendants.                )

```
FILED
COMMONWEALTH OF MASSACHUSETTS
SUPERIOR COURT DEPT. OF THE TRIAL COURT
PLYMOUTH COUNTY

MAR - 9 2005

Curt R Power
                    CLERK
```

## VERIFIED COMPLAINT

1.     The Plaintiff, Thomas M. Kelley (hereinafter "Kelley"), is an individual residing at

119 Arlington Rd., Plymouth, Plymouth County, MA 02360.

2.     The Defendant, Town of Plymouth (hereinafter "Plymouth"), is a duly

incorporated municipality in the Commonwealth of Massachusetts, with a usual place of

business at Plymouth Town Hall, 11 Lincoln Street, Plymouth, MA.

3.     Mark Silvia, is the Town Manager and Chief Executive Officer for the Town of

Plymouth, with a place of business at Plymouth Town Hall, 11 Lincoln Street, Plymouth,

MA, and Eleanor Beth was serving as Town Manager at the time of the alleged incident

set forth herein and Lawrence Pizer serves as Town Clerk for the Defendant, Plymouth,

with offices at 11 Lincoln Street, Plymouth, MA and is the authorized officer for receipt

of service of process in matters of litigation, involving the Town of Plymouth, and

Kenneth A. Tavares as Chairman of the Board of Selectman and Chief Elected Officer of

Plymouth, with a place of business at Plymouth Town Hall, 11 Lincoln Street, Plymouth

MA.

1

4.      The Defendant, Chief Robert J. Pomeroy (hereinafter "Pomeroy"), individually, who resides at 244 Valley Road, Plymouth, Plymouth County, MA, and in his official capacity as Chief of Police, Plymouth Police Department, who at all times relevant to the Complaint was the Chief of Police for the Plymouth Police Department, with a usual place of business at 20 Long Pond Road, Plymouth, MA  02360.

## FACTS

5.      Kelley, was appointed as a Police Officer in the Town of Plymouth on September 19, 1977.

6.      On May 25, 2003, Pomeroy ordered members of the Plymouth police force to participate in an extremely rigorous and physically demanding drill situation, simulating the Columbine hostage incident in Colorado, in which students in a high school held various parties as hostage and were heavily armed at the time.

7.      The drill situation was conducted at the Plymouth North High School on the aforesaid date and Kelley was required to participate in the drill.

8.      Previous to May 25, 2003, there had been a substantial record of Kelley's physical impairment.  He had already contracted Lyme Disease, and he was suffering from Meniere's Disease.  Kelley was taking medication for both conditions.

9.      Pomeroy and Plymouth were well aware of Kelley's medical condition at the time that Kelley was ordered to participate in the drill.

10.      During the drill on May 25, 2003, Kelley experienced a heart incident similar to a heart attack, causing him to collapse and requiring him to be hospitalized.

11.      Kelley was taken to the Jordan Hospital for emergency treatment and then transferred to Beth Israel Hospital in Boston for treatment, where he underwent heart

2

surgery on May 26, 2003.  As a result of said injury, Kelley was forced to accept a disability retirement.

12.     Kelley's retirement was approved by the Plymouth Retirement Board on the basis of an Independent Medical Panel, appointed and assigned by the State Retirement System that concluded that the cardiac incident he suffered, was a direct result of the May 25, 2003, Columbine drill. This left Kelley with a permanent disability, making it impossible for him to serve as a police officer any longer in Plymouth.

13.     The Independent Medical Panel also determined that Kelley's injury suffered on May 25, 2003, was an injury in the line of duty under Chapter 41, Section 111F, and thus he was entitled to any medical benefits related thereto as well as to his disability retirement.

14.     Prior to the May 25, 2003, drill, the Plymouth Police Union ("Union"), through its president and other representatives, approached Pomeroy and requested that he institute a protocol to review members of the force who might not be physically able to undergo such a rigorous and stressful drill situation.

15.     The Union advised Pomeroy that there were members of the force who had existing medical conditions that could possibly put them at risk for injury, some of which could even be life threatening.

16.     Pomeroy refused to establish or institute any type of protocol and insisted that all members of the force would take part in the drill regardless of their medical situation or previous medical history.

17.     After he was approved for disability retirement, Kelley submitted a request for reimbursement for vacation time he had to use before he was relieved of duty and put officially on disability.  Under Mass. General Laws Ch. 41, Section 111F, Kelley was

3

entitled to reimbursement of $2,000.00 for vacation days he had to use for sick leave, after May 25, 2003.

18.    Pomeroy refused to reimburse Kelley as requested.  Moreover, the Personnel Board of the Town of Plymouth refused to authorize the reimbursement because Pomeroy refuted that Kelley's injury was a result of the May 25, 2003, Columbine-like drill.

19.    Pomeroy maintained that Kelley's use of vacation benefits as sick time was not related in any way to an injury on duty.

20.    Pomeroy made this determination in bad faith because he had been informed that the Independent Medical Panel had in fact ruled Kelley's injury was on duty and directly related to the May 25, 2003, drill.

21.    About a year before the drill, Kelley in his capacity as a Town Meeting Member and a member of the Plymouth Retirement Board, raised an issue regarding Pomeroy's use of funds to reimburse himself for benefits that were not included as part of his income and should have been shown as income to him in his departmental budget.  Kelley alleged Pomeroy was accepting compensation and not showing it in his budget in a manner that was prohibited by statute.

22.    Kelley reported this situation to the Inspector General's Office of the Commonwealth of Massachusetts.  The Office investigated the matter and reported to the Town that the manner in which Pomeroy was compensating himself for educational benefits without declaring it under the line item budget area for compensation to him for income and without authorization per a by-law or written agreement with the Town was inappropriate and in violation of state law, and required Town Meeting action to correct the situation.

4

23.    Subsequently, Town Meeting voted to ratify the past inappropriate compensation and authorization of funds to Pomeroy to make said payment in compliance with state regulations.

24.    Pomeroy was well aware that Kelley had reported him to the Inspector General's Office.

25.    When Pomeroy insisted that Kelley be included in the Columbine-like drill on May 25, 2003, he knew that Kelley had reported him to the Inspector General's Office, and he knew Kelley's medical conditions were preexisting and would place him in harm.

26.    Further, Pomeroy was well aware that Kelley's cardiac incident on May 25, 2003, was a result of the drill, and was well aware of the report of the Independent Medical Panel, which reviewed Kelley's injury on two points, one as an application for disability retirement and one as an injury on duty, and concluded that his condition was the result of an injury on duty on May 25, 2003, and directly related to the Columbine-like drill, which was the proximate cause of Kelley's injury.

27.    Despite this information, Pomeroy refused to compensate Kelley for vacation time, which he legitimately had to use and was entitled to have reimbursed under Chapter 41, Section 111F.

## CAUSES OF ACTION

**COUNT I:    VIOLATION OF THE STATE WHISTLE BLOWER STATUTE**
**M.G. L.  Chap.  149, Sec. 185**

28.    Kelley repeats and reavers paragraphs 1 through 27 as if expressly set forth fully

herein.

29.    Kelley is an employee under M.G.L. 149, Section185, and his activities in

reporting violations and improprieties of other employees and supervisors was an activity

protected by the statute.

30.    Pomeroy's failure to pay for Kelley's vacation time under a Chapter 41, Section

111F, the failure to screen members of the police force and prevent Kelley in particular

from participating in the aforesaid strenuous and stressful drill, were retaliatory in nature.

31.    Said retaliation by Pomeroy was because Kelley reported Pomeroy to the

Inspector General's Office.

32.    Pomeroy's denial and the denial by the Plymouth Town Manager at that time,

Pamela Nolan, of Chapter 41 Section 111F funds due Kelley was also retaliatory.

33.    All aforesaid actions were in violation of Chapter 149, Section 185, which

prohibits retaliatory actions against employees who have reported wrongdoing to a

disciplinary body/office or public policy-making body such as the Inspector General's

Office.

34.    As a result of the actions taken by Plymouth through its Town Manager and

Pomeroy, Kelley is entitled to triple damages, attorney's fees and reasonable court costs.

35.    Kelley's claims include the payment of all vacation time as well as payment for

loss of all salary and benefits for the sixteen years he would have served to his normal

retirement date, all in an amount of approximately $220,000.00.

6

**Wherefore**, Kelley demands a judgment for treble damages, both compensatory and punitive, against the Defendants in an amount this Court deems just and appropriate with interest, and cost of this action including attorney's fees.

## COUNT II: GROSS NEGLIGENCE ,WILLFUL, WANTON AND RECKLESS CONDUCT

36.    The Plaintiff repeats and reavers paragraphs 1 through 35 as if expressly set forth fully herein.

37.    The actions of the Town of Plymouth and the Plymouth Police Department, through Pomeroy, by failing to screen the members of the Department who would be taking part in the drill, in which the men were to be put through a rigorous, physically demanding, and stressful drill involving a hostage situation similar to the Columbine incident, resulted in Kelley suffering a cardiac incident and life-altering injury.

38.    It was well known by Pomeroy and other supervisory members of the Police Department, and well documented in Kelley's personnel file, that he had several physical illnesses for which he was being treated and being medicated; and therefore, that his participation in such an activity would place him at great risk.

39.    The Defendants owed Kelley a duty of care not to expose him needlessly to a dangerous exercise considering his pre-existing conditions.

40.    The decisions to make all members of the Department, regardless of their physical condition, participate in this exercise was willful, wanton, and reckless conduct by Plymouth, its Police Department, and in particular Pomeroy.

41.    Specifically, the Town, through Pomeroy, was negligent by failing to institute a protocol to screen members of the department who would be at risk due to existing medical conditions known to the department.

7

42.     The aforesaid negligence of the Defendants was the proximate cause of Kelley's injuries.

43.     Said acts were also intentional in nature, constituting retaliation against a whistle blower.

44.     The Defendants' action forced Kelley into an early disability retirement, which was not his choice and denied him another sixteen years of service, depriving him of 20% of his salary over the next sixteen years, as well as benefits and contribution to his normal retirement, resulting in a loss of income to him in excess of $200,000.00.

**Wherefore**, Kelley demands a judgment for damages, both compensatory and punitive, against the Defendants in an amount this Court deems just and appropriate with interest, and cost of this action including attorney's fees.

**Count III:     VIOLATION OF PLAINTIFF'S RIGHTS UNDER THE 14TH  AMENDMENT EQUAL PROTECTION UNDER THE LAW AND HIS RIGHTS UNDER 42 USC, SECTION 1983**

45.     Kelley repeats and reavers paragraphs 1 through 44 as if expressly set forth fully herein.

46.     Kelley's constitutional rights were violated in that no other member in a similar position of the Department or any other employee in the Town of Plymouth in a similar position, has been treated in such fashion and therefore the actions of the Town were in violation of his 14th Amendment Rights, as well as federal statutes protecting him from such treatment and providing for equal protection under the law.

47.     Kelley was routinely harassed by Pomeroy and treated differently then other officers in the Plymouth Police Department by monitoring his every movement on a daily

basis. See Affidavit of Kevin Fahey, annexed hereto and made a part hereof and marked as Exhibit A.

48.    Kelley served on the Plymouth Retirement Board, as did other Town employees. But, contrary to standard operating procedures, Plymouth and Pomeroy insisted upon reimbursement by the Retirement Board of any salary time Kelley spent on Retirement Board business. Kelley was the only Town employee who was serving or who had served on the Retirement Board subjected to such scrutiny and reimbursement policy. See Affidavit of Contributory Retirement Board Director, Debra J. Sullivan, annexed hereto and made a part hereof and marked as Exhibit B.

49.    By denying Kelley the use of vacation time and reimbursement of same for sick leave under Chapter 41, Section 111F, he was subjected to different treatment then any other police officer or other Town employee in similar circumstances.

50.    Further, by denying Kelley the reimbursement of funds, as aforesaid, and more importantly knowingly and intentionally forcing Kelley to take part in a drill any reasonably prudent person would have known would be a dangerous situation physically for Kelley, Pomeroy violated 42 U.S.C. 1983, because Pomeroy sought to harm Kelley and maliciously took action against him, exposing Kelley to treatment different from other officers on the force with the intent of causing Kelley harm.

51.    Although Pomeroy ordered all police personnel to take part in the aforesaid Columbine like drill, he did so as a pretext to cover his true intentions to harm Kelley by forcing him to take part in an exercise that would be hazardous to him. Pomeroy did so fully knowing of Kelley's pre-existing medical conditions.

52.    Pomeroy used the drill exercise as one more method to further harass Kelley in an effort to force him out of the Police Department and to retaliate against Kelley for reporting him to the State Inspector General.

9

**Wherefore**, Kelley demands a judgment for damages, both compensatory and punitive, against the Defendants in an amount this Court deems just and appropriate with interest, and cost of this action including attorney's fees.

## COUNT IV:  DENIAL OF PLAINTIFF'S RIGHTS UNDER
## M.G.L. CHAP. 41, SEC. 111F.

53.    The Plaintiff repeats and reavers paragraphs 1 through 53 as if expressly set forth fully herein.

54.    As a result of having to take time to seek medical treatment, Kelley had to use some vacation time, which should have been reimbursed to him in the approximate amount of $2,000.00.  Kelley was entitled to reimbursement pursuant to Mass. Gen. Laws Chapter 41, Section 111F.

55.    Kelley made numerous requests and demands for reimbursement for said days of vacation time to the Defendants, but was denied by Pomeroy and Plymouth through its Town Manager.

56.    Kelley is specifically entitled to reimbursement of any benefits and rights as set forth in M.G.L. Chapter 41, Section 111F and refusal to compensate Kelley accordingly by the Defendants is a violation of Mass. Gen. Laws Chapter 41, Section 111F.

**Wherefore**, Kelley demands a judgment for damages, both compensatory and punitive, against the Defendants in an amount this Court deems just and appropriate with interest, and cost of this action including attorney's fees.

**THE PLAINTIFF DEMANDS A TRIAL BY JURY.**

THOMAS M. KELLEY, the Plaintiff,

By his attorney,

Joseph R. Gallitano, BBO # 183700
Gallitano & Associates
34 Main St. Ext., Suite 202
Plymouth, MA  02360
(508) 746-1500

Dated:  March 9, 2005

11

COMMONWEALTH OF MASSACHUSETTS

PLYMOUTH, ss.                                      SUPERIOR COURT
                                                  C.A. NO.


THOMAS M. KELLEY,                                 )
              Plaintiff,                          )
v.                                                )
                                                  )
THE TOWN OF PLYMOUTH, ROBERT J.                   )
POMEROY, as Chief of the Plymouth Police          )
Department and Individually,                      )
              Defendants.                         )


## **VERIFICATION OF COMPLAINT**


I, Thomas M. Kelley, being first duly sworn, state that I am the Plaintiff in the

above-entitled action, that I have read the foregoing complaint and know the contents

thereof, and that the same is true to my own knowledge and belief.


_____
THOMAS M. KELLEY


Dated:  March 7, 2005

# EXHIBIT A

## Affidavit of Kevin P. Fahy

1.  I, Kevin P. Fahy, of Hedges Pond Rd., Plymouth, MA, am the 8 to 4 Shift Supervisor for the Plymouth Police Department in Plymouth, MA.

2.  For over 18 years I was Officer Thomas Kelley's (Tom) supervisor, shift commander and friend.

3.  While working for me on the 8 to 4 shift Tom was elected to the Plymouth Retirement Board.

4.  A short time later Tom questioned Chief Robert Pomeroy's (Pomeroy) right to receive "incentive pay" and this signaled the beginning of Tom's every movement being scrutinized by Pomeroy and Captain Botieri (Botieri).

5.  Botieri came into the lieutenant's office and he stated, "the chief doesn't like his money being fucked with".

6.  I was told that when Tom went to his retirement board meetings he was to be logged off duty in the daily log.

7.  If Botieri went by and found Tom at the Town Hall he wanted to know from me why he was there; the time he went off and the time he got back out on the road.

8.  Tom was the only officer that I know of who was monitored everywhere he went.

Subscribed and sworn to under the pains and penalties of perjury this 23rd day of June 2004.

_____
Kevin P. Fahy

1

# <u>EXHIBIT B</u>



TOWN OF PLYMOUTH
OFFICE OF THE
# CONTRIBUTORY RETIREMENT BOARD
11 Lincoln Street
Plymouth, Massachusetts 02360-3325
FAX (508) 830-4019
(508) 830-4170

January 29, 2004

Mr. Thomas Kelley
41 Arlington Rd.
Plymouth, MA 02360

      RE:  Retirement Board Expense

Dear Mr. Kelley:

      At your request, please accept this letter as verification that your service to the Town of Plymouth Retirement System, as its elected member, began in December 18, 1996.

      During this time period, if you were scheduled to work your position as a full time police officer, and those hours conflicted with your service to the Retirement System, the Retirement System was required to reimburse the Town of Plymouth for those earnings by way of a charge back through payroll.

      It has been my experience since 1991, as the Board Director, to have this be the practice in only your position.  It is also noted, that there are other Board members who serve the Town as well as the System.

      Yours truly,

      Debra J. Sullivan
      Director

Printed on recycled paper.

**EXHIBIT B**

09/18/2006  19:56    5088304019              TWM PLYMOUTH RETMT                    PAGE  01

## PLYMOUTH RETIREMENT BOARD
### Executive Session
### May 27, 2004
### Town Hall, Mayflower I & II

Mr. Kelley moved the Board go into Executive Session at 9:05 a.m. UNANIMOUSLY APPROVED.

| | |
|---|---|
| Mr. Duhamel | Yes |
| Mr. Murphy | Yes |
| Mr. Kelley | Yes |
| Mr. Manfredi | Yes |
| Mr. Madden | Yes |

Attorney Michael Sacco was also in attendance to discuss allegations against Mr. Kelley made by Michael Botieri of the Plymouth Police Department. Attorney Sacco summarized the incidents in the order as they occurred. A letter from Captain Botieri was received in the Retirement Board Office on Wednesday, May 26, 2004. This letter was also sent to the Town Manager, Board of Selectmen, PERAC, State Ethics Commission and the Attorney General. In this letter Mr. Botieri states that he had a run-in with Mr. Kelley at a Plymouth Police Relief Association retirement party on the evening of May 22, 2004 at the Pinehills Country Club. Capt. Botieri alleges that Mr. Kelley approached him in an aggressive manner and questioned him about signing Ms. Lynn Fortini's Retirement Board election nomination papers. Capt. Botieri states that Mr. Kelley also used several expletives and attempted to grab his arm as he walked away from him, when Detective Charles Warnock intervened and held Mr. Kelley back. He also states that another officer intervened, but made no mention of that officers' name in his letter. He stated in his letter that Mr. Kelley also made remarks to other officers threatening retaliation from the Retirement Board. In addition, Capt. Botieri states that during a recent Insurance Advisory Committee meeting, Mr. Kelly remarked "we don't need a woman on the Retirement Board".

The Board is in receipt of a letter from Mr. Dale Webber, Chairman of the Insurance Advisory Committee, sent directly to Capt. Botieri. This letter, dated June 7, 2004, disputes the allegation made by Capt. Botieri regarding Mr. Kelley's public comment at the above referenced IAC meeting, which took place on May 20, 2004. Mr. Webber states in his letter that he has checked the records with the committees' recording secretary and has found no evidence of such comments, nor does anyone at the meeting remember any such comments being made. Mr. Webber requested that Capt. Botieri retract these allegations immediately, in writing. To date, Mr. Webber has received no response from Capt. Botieri.

The Board is also in receipt of a letter from Officer Robert Hicks. Officer Hicks was also at the Retirement party, was mentioned above in Capt. Botieri's letter and is the second officer that he makes reference to as restraining Mr. Kelley. In his letter, Officer Hicks

states that Mr. Kelley was called away from a conversation with himself, his wife and Mr. Kelley's wife, by Officer Charles Warnock. He states that a verbal argument ensued between Capt. Botieri and Mr. Kelley and he witnessed Officer Warnock step in between the two men. Officer Hicks states that at this time, he also stepped in, stating "Forget it, it's time to leave", at which time Mr. Kelley left the party with his wife and daughters.

Atty. Sacco explained that the Board has no disciplinary authority against fellow Board members, nor is there anything in the statute that allows or requires the Board to take any action against another Board member. He did state that he felt it was very important to have Mr. Kelley talk about these issues with the Board. Atty Sacco will provide PERAC with an explanation of the issues, as they have asked for an investigation into this matter. He told the Board that he felt it was not necessary to send an explanation to any of the other recipients of the original letter, unless the Board thought it was necessary.

Atty. Sacco stated that this issue was very troublesome for him, as he has always found the members of the Board to be very above-board and hardworking for their membership and found it unfortunate that somebody would make allegations like this against any one of the Members.

Mr. Kelley spoke to the Board regarding the incidents alleged by Capt. Botieri. For the record, he wanted the Board to be aware that he has filed a formal lawsuit against the Town regarding his 111(f) benefits. He explained that he had not been in contact with the Police Department regarding this lawsuit, as Capt. Botieri would be a defendant in this suit. Atty. Sacco asked Mr. Kelley to tell the Board why Capt. Botieri would be a defendant. Mr. Kelley stated that there had been an investigation regarding overtime pay, which Capt. Botieri had received, along with other officers.

Mr. Kelley went on to tell the Board his view of the events on the evening of May 22, 2004. He stated that at the Retirement party referred to by Capt. Botieri, he was called over by Officer Charles Warnock. Mr. Kelley went over and he and Capt. Botieri exchanged words with each other. Mr. Kelley states that Capt. Botieri raised his arm, which was holding a coffee cup, towards him in an attempt to hit Mr. Kelley. Mr. Kelley states that at that moment Officer Warnock, as well as Officer Hicks, stepped in between the two men. Mr. Kelley stated that he left the party at that time with his wife and daughters.

Regarding the allegation Capt. Botieri made of an incident with Officer Stephen Viella, Mr. Kelley stated that the two men briefly exchanged words, but added that Officer Viella never ordered him out of the building, as alleged in Capt. Botieri's letter.

Capt. Botieri stated in his letter that Mr. Kelley was admonished by his supervisor, Sergeant Michael Peddell, almost one year ago. Mr. Kelley stated that he was never admonished by Sgt. Peddell and was in possession of his entire personnel folder, which contained nothing of the sort. Mr. Kelley told the Board that they were welcome to review his file, which he had on hand at the meeting.

Mr. Kelley stated to the Board that he believes that these allegations serve as revenge by Capt. Botieri for the Board's dismissal of the Involuntary Retirement Application filed by the Police Department for Officer Michael Ferazzi. He states that the day after the Board dismissed this application, nomination papers were taken out by another Police Department employee, Ms. Lynn Fortini.

Regarding the alleged comment made at the IAC Meeting, Mr. Kelley stated that there was a room full of people present, including IAC and PREA members, all of whom have have stated that they did not hear any negative comments made by Mr. Kelley, as alleged by Capt. Botieri. Mr. Kelley stated that he never made any statements of that sort, and that this all comes down to two men who have a difference in opinion.

Mr. Murphy asked Atty. Sacco whether or not the Board is required to send a response to PERAC. Mr. Kelley stated that he wanted something sent in order to clear his name and Atty. Sacco agreed that since PERAC has asked for a statement in writing from the Board on this matter, that it would be the proper thing to do.

Atty. Sacco asked the other four Board members if they felt alright about Mr. Kelley's explanation. Atty. Sacco added that his impression of this matter is that of a retaliatory act done by Capt. Botieri.

Mr. Duhamel stated that he was at the IAC meeting in questions, along with the legislative delegation, and that no such comment was made by Mr. Kelley. He noted that he felt it was important that the response to PERAC strongly state that there is absolutely no evidence of Capt. Botieri's allegations. In his opinion, Capt. Botieri was trying to influence the election by making these allegations just weeks prior to the election date of June 24, 2004.

Mr. Kelley felt that he was set up by Capt. Botieri the night of the Retirement party and strongly denies any aggressive acts were made.

Mr. Manfredi asked Atty. Sacco if anybody else needs to be notified of the Board's investigation on this matter. Atty. Sacco suggested sending a copy of the response to PERAC to Capt. Botieri only.

Atty. Sacco stated that he will draft a letter to PERAC for the Board to review at their next meeting. He will also call Joseph Connarton of PERAC and let him know that a response will be forthcoming. Mr. Duhamel added that he would like the other four Board members to sign the letter.

Mr. Manfredi made motion for Atty. Sacco to draft letter for PERAC for the other four members to review and sign. Seconded by Mr. Duhamel.

UNANIMOUSLY APPROVED. Mr. Kelley abstained from vote.

Mrs. Sullivan asked for a roll call vote to come out of Executive Session.

| | |
|---|---|
| Mr. Kelley | yes |
| Mr. Manfredi | yes |
| Mr. Murphy | yes |
| Mr. Madden | yes |
| Mr. Duhamel | yes |

Mr. Duhamel made motion to adjourn. Mr. Murphy seconded. UNANIMOUSLY APPROVED.

The meeting adjourned at 9:44 a.m.

Respectfully submitted,

Wendy Cherry, Assistant Director

Board of Retirement

_____
Thomas Kelley, Chairman

_____
Richard Manfredi

_____
John Murphy, Jr.

_____
Shawn Duhamel

_____
John Madden

Dated: _____

Case 1:05-cv-10596-MBB     Document 30-4     Filed 09/29/2006     Page 1 of 10

# EXHIBIT C

Source:   My Sources > Massachusetts > Cases > MA Federal & State Cases, Combined ⓘ
Terms:    **protective order issued by court pursuant to rule 30 (d)(4) to limit deposition because documents and
testimonby sought were oppresive , expensive and...** (Edit Search | Suggest Terms for My Search)

✦Select for FOCUS™ or Delivery
☐

*203 F.R.D. 40, \*; 2001 U.S. Dist. LEXIS 23169, \*\**

Luis A. Pedraza, Plaintiff v. Holiday Housewares, Inc., Douglas Bingham, Marco Arguilla, Cindy
Mohan, William Sakkinen and Dennis DeMuelle, Defendants.

Civil Action No. 99-40030-NMG

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

203 F.R.D. 40; 2001 U.S. Dist. LEXIS 23169

September 20, 2001, Decided

**DISPOSITION:** **[\*\*1]** Plaintiff's discovery motions were denied. Plaintiff's "Emergency
Motion to Amend Complaint, Dismiss Federal Counts and Remand Entire Action to Worcester
Superior Court" was allowed, with respect to the amendment of the complaint and the dismissal
of counts, and denied with respect to the request for remand.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Defendant employee alleged that defendants discriminated
against him on the basis of his national origin and perceived sexual orientation. He also
claimed retaliation. Before the court were the employee's motion for leave to take more than
12 **depositions** and defendants' cross-motion for a **protective order,** the employee's
motion to compel answers to interrogatories, and his motion to amend.

**OVERVIEW:** The employee's motion to take additional **depositions** was denied, since the
employee failed to argue how evidence of discriminatory conduct against other employees
might be admissible. Also, the employee's motion to compel answers to interrogatories in
order to be able to calculate punitive damages was denied. The incursion into the
defendants' privacy that would stem from the production of their tax returns was unjustified
given (1) the tenuous link between the returns and the purpose to which the employee
would put them and (2) the availability of similar information through alternative means
(such as credit reporting agencies). However, the employee's motion to amend to dismiss all
federal claims was granted. Such an amendment, in and of itself, would not prejudice the
defendants because claims were merely being removed, not added. The motion to remand
the action to state court was denied, since the litigation had matured well beyond its nascent
stages, discovery had closed, the summary judgment record was complete, the federal and
state claims were interconnected, and powerful interests in both judicial economy and
fairness tugged in favor of retaining jurisdiction.

**OUTCOME:** The employee's motion for leave to take more than 12 **depositions** was denied,
defendants' cross-motion for a **protective order** was denied as moot, the employee's
motion to compel answers to interrogatories was denied, and the employee's motion to
amend the complaint, was allowed with respect to the amendment of the complaint and the
dismissal of the federal counts, and denied with respect to the request for remand to state
court.

**CORE TERMS:** discovery, deposition, amend, subject matter jurisdiction, protective order,
supplemental jurisdiction, punitive damages, entire action, interrogatory, judicial economy,

state law, state-law, original jurisdiction, federal question, federal claim, net worth, foundational, convenience, disclosure, obtainable, removal, divest, comity, information contained, pretrial conference, national origin, income tax, decision-makers, cross-motion, burdensome

### LexisNexis(R) Headnotes ♦ Hide Headnotes

Civil Procedure > Discovery > Methods > Oral Depositions

**HN1** See Fed. R. Civ. P. 30(a).

Civil Procedure > Discovery > Methods > General Overview

Civil Procedure > Discovery > Undue Burdens

Constitutional Law > The Judiciary > Case or Controversy > Standing > General Overview

**HN2** Discovery should be limited if the court determines that: (1) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less **expensive;** (2) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (3) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the party's resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues. Fed. R. Civ. P. 26(b)(2).  More Like This Headnote

Civil Procedure > Discovery > Methods > Oral Depositions

**HN3** See U.S. Dist. Ct., D. Mass., R. 26.1(C).

Civil Procedure > Remedies > Damages > General Overview

Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > Remedies > Punitive Damages

Torts > Damages > Punitive Damages > Conduct Supporting Awards

**HN4** The Massachusetts Anti-Discrimination Law, Mass. Gen. Laws ch. 151B, §§ 1 et seq. (Chapter 151B), provides for punitive damages where a defendant's conduct warrants condemnation and deterrence because (1) it is outrageous, (2) results from defendant's evil motive or (3) connotes his reckless indifference to the rights of others. Moreover, individual agents of an employer may be personally liable for violations of Chapter 151B.  More Like This Headnote

Civil Procedure > Discovery > Disclosures > Mandatory Disclosures

Tax Law > Federal Tax Administration & Procedure > Audits & Investigations > Disclosure of Information (IRC secs. 6103-6104, 6108-6110, 6713, 7213, 7216, 7431, 7435) > Disclosure of Returns & Return Information

**HN5** The United States Court of Appeals for the Second Circuit has established a two-prong test regarding the discoverability of tax returns: (1) they must be relevant to the action and (2) the information contained therein must be otherwise unobtainable. The burden to show relevancy lies on the party seeking the returns; the party resisting disclosure bears the burden of establishing alternative sources for the information. The District of Massachusetts approaches requests for disclosure of income tax returns in the same

spirit. Where a party has put in issue the amount of his income, that party's tax returns or reasonable substitutes are discoverable.  More Like This Headnote

Civil Procedure > Remedies > Damages > Punitive Damages 

Torts > Damages > Punitive Damages > General Overview 

**HN6** None of the purposes served by awarding punitive damages depends critically on proof that the defendant's income or wealth exceeds some specified level.  More Like This Headnote

Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview 

Civil Procedure > Removal > Postremoval Remands > General Overview

**HN7** See 28 U.S.C.S. § 1447(c).

Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview

Civil Procedure > Removal > Postremoval Remands > Jurisdictional Defects

**HN8** Under 28 U.S.C.S. § 1447(c), a plaintiff is entitled to a remand only if the federal court lacks subject matter jurisdiction. However, that section applies to the testing of jurisdiction as of the time of removal, not later.  More Like This Headnote |
*Shepardize:* Restrict By Headnote

Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Supplemental Jurisdiction > General Overview 

Civil Procedure > Removal > Postremoval Remands > General Overview 

**HN9** Dismissal of a plaintiff's federal claims does not automatically divest the federal court of jurisdiction.  More Like This Headnote

Civil Procedure > Jurisdiction > Jurisdictional Sources > General Overview 

Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Supplemental Jurisdiction > General Overview 

Civil Procedure > Removal > Postremoval Remands > General Overview 

**HN10** See 28 U.S.C.S. § 1367(c).

Civil Procedure > Jurisdiction > Jurisdictional Sources > General Overview 

Governments > Courts > Authority to Adjudicate

Governments > Courts > Judicial Comity

**HN11** In a federal question case, the termination of the foundational federal claim does not divest the district court of power to exercise supplemental jurisdiction, but, rather, sets the stage for an exercise of the court's informed discretion. 28 U.S.C.S. § 1367(c)(3). When making the decision to decline supplemental jurisdiction, the trial court must take into account concerns of comity, judicial economy, convenience, fairness, and the like.  More Like This Headnote

Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Supplemental Jurisdiction > General Overview 

Civil Procedure > Dismissals > General Overview 🔖

**HN1** While dismissal may sometimes be appropriate if the federal question is eliminated early in the proceedings, each case must be gauged on its own facts. The preferred approach is pragmatic and case-specific. Thus, in an appropriate situation, a federal court may retain jurisdiction over state-law claims notwithstanding the early demise of all foundational federal claims. Therefore, as a general principle, the unfavorable disposition of a plaintiff's federal claims at the early stages of a suit, well before the commencement of trial, will trigger the dismissal without prejudice of any supplemental state-law claims. More Like This Headnote

Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Supplemental Jurisdiction > General Overview 🔖
Governments > Courts > Judicial Comity 🔖

**HN2** In the usual case in which all federal law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine--judicial economy, convenience, fairness, and comity--will point toward declining to exercise jurisdiction over the remaining state-law claims. More Like This Headnote

**COUNSEL:** For LUIS A. PEDRAZA, Plaintiff: Hector E. Pineiro, Worcester, MA.

For HOLIDAY HOUSEWARES, INC., Defendant: William F. Joy, Jr., Joseph McConnell, Morgan, Brown & Joy, Boston, MA.

For HOLIDAY HOUSEWARES, INC., DOUGLAS BINGHAM, MARCO ARGUILLA, CINDY MOHAN, WILLIAM SAKKINEN, DENNIS DEMUELLE, Defendants: Joseph P. McConnell, Morgan and Brown, Boston, MA.

**JUDGES:** Nathaniel M. Gorton, United States District Judge.

**OPINION BY:** Nathaniel M. Gorton

**OPINION:** [*41]

**MEMORANDUM & ORDER**

**GORTON, J.**

In the present action, Luis Pedraza ("Pedraza") alleges, inter alia, that his employer, Holiday Housewares, Inc. ("Holiday [**2] Housewares") and the individual defendants discriminated against him on the basis of his national origin and perceived sexual orientation, and that Holiday Housewares retaliated against him for filing a complaint with the Massachusetts Commission Against Discrimination ("the MCAD") by firing him.

The following motions are currently pending before this Court:

1) Pedraza's Motion For Leave of Court to Take More than Twelve **Depositions** (Docket No. 25),

2) Defendants' Cross-Motion for a **Protective Order** (Docket No. 28),

3) Pedraza's Motion to Compel Answers to Interrogatories in order to be able to Calculate Punitive Damages (Docket No. 30) and

4) Pedraza's "Emergency Motion to Amend Complaint, Dismiss Federal Counts and Remand

Entire Action to Worcester Superior Court" (Docket No. 34).

## I. Pedraza's Motion For Leave of Court to Take More than Twelve Depositions (Docket No. 25)

According to Pedraza, "revelations" made at recent **depositions** suggest that there is a pattern and practice of discrimination at Holiday Housewares and Plastican, Inc. ("Plastican"), a company not party to this litigation. According to Pedraza, Holiday Housewares and Plastican **[**3]** have a common president and some common management and at least five other lawsuits have been brought against those entities for discrimination based on national origin and/or sexual harassment.

Pedraza wishes to conduct **depositions** of at least some of these other complainants to show a pervasive pattern and practice of discrimination by the defendants in this lawsuit. Pedraza seeks to learn the basis of the other complainants' cases, who their alleged "tormentors" were, whether the "tormentors" were punished and whether the allegations of discrimination are sufficiently similar to Pedraza's such that they bolster his credibility. Pedraza states that six additional **depositions** need to be taken to prove such pattern and practice. n1

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 As of the date the motion was filed, Pedraza asserts, in different pleadings, that 12 or 15 **depositions** have been taken, while the defendants recall 13.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*42]**

The defendants oppose Pedraza's motion on the grounds that further **depositions** would be unduly burdensome and irrelevant to the **[**4]** present suit. They point out that Pedraza has failed to allege or show that the decision-makers regarding his employment were in any way connected to the decision-makers involved in the other MCAD charges of discrimination filed against Plastican.

Rule 30(a) of the **Federal Rules** of Civil Procedure, provides, in pertinent part:

> **HN1**(2) A party must obtain leave of court, which shall be granted to the extent consistent with the principles stated in Rule 26(b)(2)...if, without the written stipulation of the parties,

>> (A) a proposed **deposition** would result in more than ten **depositions** being taken under this rule... by the plaintiffs, or by the defendants, or by third-party defendants.

Fed. R. Civ. P. 30(a). Rule 26(b)(2) provides, in applicable part, that **HN2**discovery should be limited if the Court determines that:

> (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less **expensive;** (ii) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (iii) the burden or expense of the proposed discovery **[**5]** outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the party's resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.

Fed. R. Civ. P. 26(b)(2). Local Rule 26.1(C) of the Local Rules of the United States District Court for the District of Massachusetts provides, in pertinent part:

> *HN3*(C) Discovery Event Limitations. Unless the judicial officer orders otherwise, the number of discovery events shall be limited to each side (or group of parties with a common interest) to ten (10) **depositions...**

In this case, Pedraza's motion bespeaks of a possible fishing expedition into what appear to be largely irrelevant issues of discrimination complaints made against a third party. Pedraza has failed to allege a connection between the defendants in this case and Plastican, other than his blanket statement that Plastican and Holiday Housewares have a common president and some common management. See Joslin Dry Goods Co. v. EEOC, 483 F.2d 178, 183-84 (10th Cir. 1973)("A vague possibility that loose and sweeping discovery might turn up something **[**6]** suggesting that the structuring of the [layoffs were] discriminatorily motivated does not show particularized need and likely relevance that would require moving discovery beyond the natural focus of the inquiry."). Moreover, even assuming that such a connection exists, Pedraza has failed even to argue how evidence of discriminatory conduct against other employees might be admissible in this case. Therefore, the motion to take additional **depositions** will be denied.

## II. Defendants' Cross-Motion for Protective Order (Docket No. 28)

In conjunction with their opposition to Pedraza's motion to take additional **depositions,** the defendants have filed a "Cross-Motion for a **Protective Order**" (Docket No. 28). They seek such an order to prevent Pedraza from conducting further discovery regarding MCAD charges of discrimination filed against Plastican. Because the Court has just informed the parties of its ruling on the converse motion, the defendants' cross-motion for **protective order** will be denied as moot.

## III. Pedraza's Motion to Compel Answers to Interrogatories in order to be able to Calculate Punitive Damages (Docket No. 30)

Pedraza seeks the schedules of **[**7]** the income tax returns and W-2 forms of the individual defendants from 1995 to the present. He contends he is entitled to such information because there is a factual basis for a punitive damage claim under Title VII. n2 He also asks **[*43]** for sanctions to be imposed against the defendants because of their refusal to answer his initial interrogatory seeking that information.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 Although Pedraza no longer seeks relief under Title VII, see Emergency Motion to Amend Complaint, infra, *HN4*the Massachusetts Anti-Discrimination Law, M.G.L. c. 151B, §§ 1 et seq. ("Chapter 151B") provides for punitive damages where a defendant's conduct warrants condemnation and deterrence because (1) it is outrageous, (2) results from defendant's evil motive or (3) connotes his reckless indifference to the rights of others. Dartt v. Browning-Ferris Industries, Inc., 427 Mass. 1, 16-17, 691 N.E.2d 526 (Mass. 1998). Moreover, individual agents of an employer may be personally liable for violations of Chapter 151B. See Ruffino v. State Street Bank and Trust Co., 908 F. Supp. 1019, 1048 (D. Mass. 1995).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[**8]**

The defendants contend that state tax returns are privileged and normally not subject to

admission into evidence. They also argue that Pedraza has failed to show that the tax returns are relevant to this action or that the information contained in those returns is not otherwise obtainable.

The Second Circuit Court of Appeals has frequently followed the logic of <u>United States v. Bonanno Organized Crime Family of La Cosa Nostra, 119 F.R.D. 625 (E.D.N.Y. 1988).</u> That case **HN5** established a two-prong test regarding the discoverability of tax returns: (1) they must be relevant to the action and (2) the information contained therein must be otherwise unobtainable. The burden to show relevancy lies on the party seeking the returns; the party resisting disclosure bears the burden of establishing alternative sources for the information. <u>Id. at 627.</u> The District of Massachusetts approaches requests for disclosure of income tax returns in the same spirit. See <u>Buntzman v. Springfield Redevelopment Authority, 146 F.R.D. 30, 32 (D. Mass. 1993),</u> citing <u>Pogharian v. Croce, 1985 U.S. Dist. LEXIS 17411,</u> C.A. 81-1307-F (D. Mass. 1985)("where a party has put in issue the amount **[**9]** of [his] income, that party's tax returns or reasonable substitutes are discoverable").

In <u>Kemezy v. Peters, 79 F.3d 33 (7th Cir. 1996),</u> Judge Posner concluded that **HN6** "none of [the purposes served by awarding punitive damages] depends critically on proof that the defendant's income or wealth exceeds some specified level" and, in upholding a jury award of compensatory and punitive damages, went on to find that the plaintiff was not required to introduce evidence of the defendant's net worth. <u>Kemezy, 79 F.3d at 34.</u>

In this case, Pedraza ostensibly seeks information regarding the individual defendants' net worth so as to inform the jury's consideration of punitive damages. The incursion into the defendants' privacy that would stem from the production of their tax returns is unjustified given (1) the tenuous link between the returns and the purpose to which Pedraza would put them and (2) the availability of similar information through alternative means (such as credit reporting agencies). Therefore, Pedraza's motion to compel will be denied.

### IV. Pedraza's "Emergency Motion to Amend Complaint, Dismiss Federal Counts and Remand Entire Action **[**10]** to Worcester Superior Court" (Docket No. 34)

Pursuant to <u>Fed. R. Civ. P. 15,</u> Pedraza moves to amend his complaint to dismiss voluntarily all federal claims for the violation of Title VII. He also seeks remand of the matter to state court for lack of subject matter jurisdiction under <u>28 U.S.C. § 1447</u>(c). The defendants oppose the amendment (and remand) on the grounds that Pedraza has already twice amended his complaint and has proffered no reason for the proposed current amendment other than a desire to avoid the federal forum.

### A. Whether Pedraza should be permitted to amend his complaint in order to dismiss all of his federal claims

This motion marks Pedraza's second attempt to amend the complaint since it has been in this Court. Pedraza initially filed suit in Worcester Superior Court on January 13, 1999. He amended the complaint the next day to correct a scrivener's error in the numeration of paragraphs. The defendants subsequently removed the case to this Court on February 19, 1999 and, more than one year later, Pedraza filed an Assented-To Motion to Amend to add pendent state claims **[**44]** for violations of <u>M.G.L. c. 214, § 1B,</u> which prohibits **[**11]** unreasonable, substantial or serious interference with a person's privacy. That motion was allowed by endorsement on May 2, 2000.

Pedraza now seeks to amend his complaint in order to dismiss all pending federal claims. Such an amendment, in and of itself, would not prejudice the defendants because claims are merely being removed, not added. Therefore, Pedraza will be allowed to so amend and all of his federal claims will be dismissed with prejudice.

### B. Whether the case should be remanded to state court

Citing 28 U.S.C. § 1447(c) as support, Pedraza contends that once his federal claims are dismissed, this Court lacks subject matter jurisdiction and "must" remand the case to state court. Section 1447(c) provides, in relevant part, that

> HN7⚓if at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded...

28 U.S.C. § 1447(c). HN8⚓Under that statute, a plaintiff is entitled to a remand only if this Court lacks subject matter jurisdiction. However, that section applies to the testing of jurisdiction as of the time of removal, not later. See Naragon v. Dayton Power & Light Co., 934 F. Supp. 899, 901 (S.D. Ohio 1996); [**12] Wright, Miller, and Cooper, Federal Practice and Procedure: Jurisdiction 2d, § 3739.

In this case, at the time of removal, this Court acquired subject matter jurisdiction over the entire action due to the well-pleaded federal questions raised by the Title VII discrimination claims. This Court also gained supplemental jurisdiction over the related state law claims under 28 U.S.C. § 1367(a). HN9⚓Dismissal of Pedraza's federal claims does not, however, automatically divest this Court of jurisdiction. Section 1367(c) of Title 28 states, in relevant part, that

> HN10⚓the district courts *may decline* to exercise supplemental jurisdiction over a claim...if...the district court has dismissed all claims over which it has original jurisdiction.

28 U.S.C. § 1367(c) (emphasis added). Hence, although Pedraza is not entitled to a mandatory remand and his citation to § 1447(c) is unavailing, he may be entitled to remand under 28 U.S.C. § 1367(c).

Case law in the First Circuit Court of Appeals establishes that

> HN11⚓in a federal question case, the termination of the foundational federal claim does not divest [**13] the district court of power to exercise supplemental jurisdiction, but, rather, sets the stage for an exercise of the court's informed discretion.

Roche v. John Hancock Mutual Life Ins. Co., 81 F.3d 249, 256-257 (1st Cir. 1996), citing 28 U.S.C. § 1367(c)(3). When making the decision to decline supplemental jurisdiction, the trial court "must take into account concerns of comity, judicial economy, convenience, fairness, and the like". Roche, 81 F.3d at 257.

> HN12⚓While dismissal may sometimes be appropriate if the federal question is eliminated early in the proceedings, each case must be gauged on its own facts. The preferred approach is pragmatic and case-specific. Thus, in an appropriate situation, a federal court may retain jurisdiction over state-law claims notwithstanding the early demise of all foundational federal claims.

Id. (citations and quotation marks omitted).

Therefore, as a general principle, the "unfavorable disposition of a plaintiff's federal claims at the early stages of a suit, well before the commencement of trial, will trigger the dismissal without prejudice of any supplemental **[\*\*14]** state-law claims". Rodriguez v. Doral Mortg. Corp., 57 F.3d 1168, 1177 (1st Cir. 1995). This result is not compelled by a lack of judicial power, as demonstrated by the discretionary language in § 1367(c). It signifies only that,

> **HN13** in the usual case in which all federal law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine--judicial economy, convenience, fairness, and comity--will point toward declining to exercise **[\*45]** jurisdiction over the remaining state-law claims.

Carnegie-Mellon University v. Cohill, 484 U.S. 343, 350, n. 7, 98 L. Ed. 2d 720, 108 S. Ct. 614 (1988).

In Roche, the First Circuit affirmed the decision of the district court to retain state law claims after the federal claims had been dismissed. Roche, 81 F.3d at 256-257. In finding that the district court properly considered those state law claims despite the fact that it had disposed of the federal claim supporting original jurisdiction, the Roche court emphasized the following:

> The litigation had matured well beyond its nascent stages, discovery had closed, the summary judgment **[\*\*15]** record was complete, the federal and state claims were interconnected, and powerful interests in both judicial economy and fairness tugged in favor of retaining jurisdiction.

Id. at 257.

This case is analogous to Roche. It was filed in Worcester Superior Court on January 13, 1999, more than 30 months ago. Substantial discovery has occurred, including document production and more than 12 **depositions,** and this Court has dealt with several motions relating to discovery disputes. A pretrial conference originally scheduled for February 8, 2001 was cancelled just before the scheduled date and will be rescheduled promptly given this Court's resolution of the pending motions.

## ORDER

For the foregoing reasons,

(1) Pedraza's Motion For Leave of Court to Take More than Twelve **Depositions** (Docket No. 25) is **DENIED**,

(2) Defendants' Cross-Motion for a **Protective Order** (Docket No. 28) is **DENIED as moot,**

(3) Pedraza's Motion to Compel Answers to Interrogatories in order to be able to Calculate Punitive Damages (Docket No. 30) is **DENIED**, and

(4) Pedraza's "Emergency Motion to Amend Complaint, Dismiss Federal Counts and Remand **[\*\*16]** Entire Action to Worcester Superior Court" (Docket No. 34) is **ALLOWED**, with respect to the amendment of the complaint and the dismissal of counts and **DENIED**, with respect to the request for remand.

The parties are directed to contact the Deputy Clerk promptly to reschedule the final pretrial conference.

**So ordered.**

Nathaniel M. Gorton

United States District Judge

Dated: September 20, 2001

Source:  My Sources > Massachusetts > Cases > **MA Federal & State Cases, Combined** ⓘ
Terms:  **protective order issued by court pursuant to rule 30 (d)(4) to limit deposition because documents and testimonby sought were opresive , expensive and...** (Edit Search | Suggest Terms for My Search)
View:  Full
Date/Time:  Monday, September 25, 2006 - 4:29 PM EDT

* Signal Legend:
● -  Warning: Negative treatment is indicated
Ⓠ -  Questioned: Validity questioned by citing refs
▲ -  Caution: Possible negative treatment
◆ -  Positive treatment is indicated
Ⓐ -  Citing Refs. With Analysis Available
ⓘ -  Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

 LexisNexis®    About LexisNexis  |  Terms & Conditions
Copyright © 2006 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

EXHIBIT D

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

THOMAS M. KELLEY,
                        Plaintiff,

v.                                              Civil Action No. 05-10596-NMG

TOWN OF PLYMOUTH, et al
                        Defendants.

**AFFIDAVIT OF THOMAS M. KELLEY IN SUPPORT
OF PLAINTIFF'S MOTION FOR A PROTECTIVE ORDER
AND OPPOSITION TO THE DEFENDANTS' MOTION
TO COMPEL PRODUCTION OF DOCUMENTS AND
TESTIMONY RELATED TO SAME**

I, Thomas M. Kelley here by state as follows:

1.      I am the Plaintiff in the above-entitled action and submit this Affidavit in

support of Plaintiff's Motion for a Protective Order and in Opposition to the Defendants'

Motion to Compel seeking an order directing me to produce for inspection minutes of an

executive session of the Plymouth Retirement Board allegedly held on May 27, 2004 and

to give testimony regarding aforesaid meeting.

2.      I do not have in possession, custody or control, nor do I have the authority,

to order in any way the release of said minutes of an executive session of the Town of

Plymouth Retirement Board.

3.      The executive session of said meeting was held regarding a complaint

made against me. Therefore after going into executive session, I excused myself as

chairman and recused myself from voting on any matter brought before the Board

regarding this alleged complaint made by Captain Michael Botieri.

4.      The Board conducted its own investigation in response to the complaint

made by Mr. Botieri.

5.      The Plymouth Retirement Board found the complaint groundless as a result of other statements and testimony from other parties who were present at the time of the alleged incident by Mr. Botieri.

6.      To my knowledge the Board has never released said minutes nor have they signed off and approved any minutes. The alleged minutes in the possession of the Defendants had to be obtained by improper means.

7.      I do not have a copy of any minutes. As a result of it still considered to be an executive session, I am not allowed to testify in anyway about said minutes.

8.      In any event, I do not have them in my possession nor do I have the authority to issue them in any form, an action which would commonly be taken by a vote of the full Retirement Board and authorized by the Retirement Board to be conducted by its administrative officer. Such action by said Board has not taken place to the best of my knowledge.

9.      It is my belief that the Defendants' request is for the sole purpose of causing me public embarrassment. Since I have no suit action against Captain Botieri, nor does he have one against me, this particular incident was off duty and not related to the causes of action brought by me against the Town of Plymouth and Chief Pomeroy. The incident arose prior to my re-election to the Plymouth Retirement Board and was an attempt to smear my reputation prior to the election campaign in which Mr. Botieri was backing another candidate.

10.      To my knowledge, my attorneys have not included any reference to this incident nor any allegations against Mr. Botieri based upon this incident. Mr. Botieri is not named as an individual defendant in the within action. Further, to the best of my

knowledge after reviewing the document and in filing my complaint and Defendants' answer to said Complaint, the defendants did not plead any counterclaim involving Mr. Botieri. Mr. Botieri has not filed a separate claim against me related to the alleged incident upon which his complaint to the Retirement Board was based.

11.    Wherefore the production of this documents and further examining of me by way of deposition, requesting testimony from me about said executive session is only meant to cause me further expense, embarrassment, and expenses in having counsel represent me at a deposition for which I have already had two long sessions. I have been under direct examination by the Defendant's Counsel on February 9, 2006 for 4 ½ hours and on June 21, 2006 for 2 hours.

12.    I respectfully request the Court to issue a protective order limiting further deposition by excluding the material and testimony requested by said Defendants in their Motion to Compel.

Subscribed and sworn to under the pains and penalties of perjury this 27th day of September, 2006.

THOMAS M. KELLEY

# EXHIBIT E

Source:  My Sources > Massachusetts > Cases > MA Federal & State Cases, Combined ⓘ
Terms:   **protective order issued by court pursuant to rule 30 (d)(4) to limit deposition because documents and testimony sought were oppresive , expensive and...**  (Edit Search | Suggest Terms for My Search)

✔Select for FOCUS™ or Delivery
☐

*20 Mass. L. Rep. 721; 2006 Mass. Super. LEXIS 169, \**

Trustees, Woodburyville Heights Condominium Trust v. John Magill et al.

Opinion No.: 92999, Docket Number: 02-01027

SUPERIOR COURT OF MASSACHUSETTS, AT WORCESTER

20 Mass. L. Rep. 721; 2006 Mass. Super. LEXIS 169

March 22, 2006, Decided
March 23, 2006, Filed

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff trustees of a condominium trust filed suit in the trial court (Massachusetts) against defendants, a developer and his company, for repair and maintenance costs incurred of the common areas of the condominium complex based upon theories of breach of contract and breach of warranty. The developer moved for a **protective order** striking the trustees' Mass. R. Civ. P. 30(b)(6) **deposition** subpoena of a defense expert witness.

**OVERVIEW:** The developer argued that certain documents requested by the trustees were privileged or constituted information prepared in anticipation of litigation. They also claimed that some of the items were public information, equally accessible to the trustees. The trial court held that the developer's expert was hired in anticipation of litigation. The trustees had been given generous access to the expert via interrogatories. The developer's answers to interrogatories complied with Mass. R. Civ. P. 26(b). They outlined what the expert would testify about and that the opinions were based upon various specific building codes and industry standards and his background, education, and training as a professional engineer. The answers were adequate and complete. The trustees had not indicated that they were unable to obtain equivalent information through other means. Permitting a **deposition** of the expert would be contrary to the public policy considerations underlying Rule 26(b). Extensive discovery was costly. The developer had shown that it would suffer harm if it was required to produce particular documents. The public policy arguments favored the allowance of a **protective order** as well.

**OUTCOME:** The developer's request for a **protective order** was allowed.

**CORE TERMS:** discovery, protective order, deposition, interrogatory, anticipation of litigation, subject matter, good cause, subpoena, expert testimony, public policy, particularized, incomplete, disclosure, allowance, objected, excerpts, supplemental answer, expert witness, moving papers, undue burden, protective, attorney-client, confidentiality, embarrassment, one-half, titled

## LexisNexis(R) Headnotes ◆ Hide Headnotes

Civil Procedure > Discovery > Protective Orders 🔳

***HN1*** See Mass. R. Civ. P. 26(c).
⤓

Civil Procedure > Discovery > Methods > Expert Witness Discovery 📑

***HN2*** See Mass. R. Civ. P. 26(b)(4).
⤓

Civil Procedure > Judicial Officers > Judges > Discretion 📑

Civil Procedure > Discovery > Protective Orders 📑

Evidence > Procedural Considerations > Rulings on Evidence 📑

Evidence > Testimony > Experts > Admissibility 📑

***HN3*** It is well settled that the conduct and scope of discovery and **protective orders** are
⤓ issues within the sound discretion of the motion or trial judge, as is the admission of
evidence, particularly expert testimony.  More Like This Headnote

Civil Procedure > Discovery > Protective Orders 📑

***HN4*** See Mass. R. Civ. P. 26(c).
⤓

Civil Procedure > Discovery > Protective Orders 📑

Evidence > Procedural Considerations > Burdens of Proof > Allocation 📑

***HN5*** For good cause to exist for the issuance of a **protective order,** the party seeking
⤓ protection bears the burden of showing specific prejudice or harm will result if no
**protective order** is granted. Broad allegations of harm, unsubstantiated by specific
examples or articulated reasoning, do not satisfy the Mass. R. Civ. P. 26(c) test. To gain
a **protective order** the party must make particularized showing of good cause with
respect to any individual document. Additionally, in some instances, if a court finds that
a particularized harm would result from disclosure of information to the public, then it
balances the public and private interests to decide whether a **protective order** is
necessary.  More Like This Headnote

Civil Procedure > Discovery > Protective Orders 📑

***HN6*** A trial court considers the following factors in balancing the public and private interests
⤓ to decide whether a **protective order** is necessary: (1) whether disclosure will violate
any privacy interests; (2) whether the information is being sought for a legitimate
purpose or for improper purpose; (3) whether disclosure of the information will cause a
party embarrassment; (4) whether confidentiality is being sought over information
important to public health and safety; (5) whether the sharing of information among
litigants will promote fairness and efficiency; (6) whether a party benefiting from the
order of confidentiality is a public entity or official; and (7) whether the case involves
issues important to the public.  More Like This Headnote

Civil Procedure > Discovery > Methods > Expert Witness Discovery 📑

***HN7*** The parties in litigation may have access to each expert's name, the subject matter on
⤓ which the expert is expected to testify, and the substance of the facts and opinions to
which the expert is expected to testify and a summary of the grounds for each opinion
according to the rule. Mass. R. Civ. P. 26(b). Only when the expert's answers are

inadequate, incomplete, inconsistent, or when the discovering party is unable to obtain equivalent information through other means, should a court permit a **deposition** of an expert witness to be taken. After review of the more liberal Fed. R. Civ. P. 26(b)(4) it has been held that Mass. R. Civ. P. 26(b) is more restrictive with respect to the allowance of expert **depositions.** More Like This Headnote

Civil Procedure > Discovery > Methods > Expert Witness Discovery 

**HN8** It is unfair to all parties, when experts comprise a portion of the action, to require the opposing party to submit its expert to exhaustive scrutiny. Mass. R. Civ. P. 26(b) does not call for a party to show all of its cards when disclosing its intentions to use expert testimony at trial but it certainly comes close. The rule, if respected and complied with by the party answering the interrogatory, allows for a great deal of insight as to the upcoming testimony. More Like This Headnote

**JUDGES: [*1]** Peter W. Agnes, Jr., Associate Justice of the Superior Court.

**OPINION BY:** Peter W. Agnes

**OPINION:** MEMORANDUM AND ORDER ON THE DEFENDANTS' MOTION FOR A **PROTECTIVE ORDER**

*Introduction*

The plaintiffs, the Trustees of Woodburyville Heights Condominium Trust (hereinafter the "Trustees"), have filed this action against the defendants, John Magill and Magill Associates, Inc. (hereinafter and collectively "Magill"), for repair and maintenance costs incurred since 2001 of the common areas of the Woodburyville Heights Condominium (hereinafter "WHC") complex based upon theories of breach of contract and breach of warranty. Magill developed and built WHC located in Sutton, Massachusetts. The Trustees are seeking damages after their investigation and determination that Magill's negligence and failure to supervise subcontractors and workers led to the poor quality of the relatively new complex.

The defendants have motioned this court for a **protective order** striking the plaintiffs' Mass.R.Civ.P. 30(b)(6) **deposition** subpoena of a defense expert witness. For the reasons set forth below, the motion is allowed.

*Background*

This action began in 2002. Since that time, discovery **[*2]** has been progressing slowly. In early June 2005, the defendants served the plaintiffs with their Second Supplemental Answer to Plaintiff's Interrogatories wherein the defendants first identified George G. Byl, P.E. (hereinafter "Byl") of ReStructure Company, Inc. as a liability expert. See *Defendants' Motion for a Protective Order,* p. 2. In the defendants' supplemental answer, which is seven and one-half pages in length--single spaced, the subject matter on which Byl is expected to testify, the substance of the facts and opinions to which Byl is expected to testify, and a summary of the grounds for each opinion are offered by Byl. *Id.* The supplemental answer indicated that Byl reviewed various documents identified on a "List of Document Reviewed" titled "Exhibit A." *Id.*, citing the *Defendants' Second Supplemental Answer Number 3.*

In mid-September 2005, the plaintiffs served ReStructure with a Mass.R.Civ.P. 30(b)(6) subpoena, seeking either 1) all excerpts of these documents which contain handwriting by Mr. Byl or any of his assistants *and* excerpts of these documents on which Mr. Byl specifically relied for his opinion or 2) full and **[*3]** complete copies of twenty-four (24) enumerated documents records identified in "Schedule A." n1 (Original emphasis.) *Id.* The defendants objected to the subpoena and informed the plaintiffs that they [the defendants] had directed ReStructure to not

produce any information requested on "Schedule A." *Id.*, p. 2-3.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 The list of documents, originally titled "Exhibit A" in the defendants' supplemental answers, was pared down to become the plaintiffs' "Schedule A."

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

In mid-November 2005, the defendants agreed to produce documents, Nos. 21 and 22 from Schedule A. n2 Otherwise, the defendants have objected to the remaining "Schedule A" documents as those which are protected by the attorney-client or work product privilege or information prepared in anticipation of litigation. The defendants also claim that they have either already produced some of the Schedule A items or that the items are public information and thereby equally accessible to the plaintiffs.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 No. 21: Limited Warranty, dated 6/30/98 and No. 22: Numerous photographs collected during four inspections of the property. The plaintiffs requested that these two documents be "full and complete copies" of the original.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[*4]**

### *Protective* Orders: Pertinent Portions of *Mass.R.Civ.P. 26(c)*

**HN1**⚓"Upon motion by a party . . . and for good cause shown, the court . . . may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: (1) that the discovery not be had; (2) that the discovery may be had only on specified terms and conditions, including a designation of the time or place; (3) that the discovery may be had only by a method of discovery other than that selected by the party seeking discovery; (4) that certain matters not be inquired into, or that the scope of the discovery be limited to certain matters; . . . (7) that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way . . ."

### *Expert Discovery: Pertinent Portions of Mass.R.Civ.P. 26(b)(4)*

**HN2**⚓"Discovery of facts known and opinions held by experts, otherwise discoverable . . . and acquired or developed in anticipation of litigation or for trial, may be obtained only as follows: (A)(I) **[*5]** A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion . . ."

### *Discussion*

**HN3**⚓It is well settled that "the conduct and scope of discovery and **protective orders** are issues within the sound discretion of the motion or trial judge," *Hanover Ins. Co. v. Sutton*, 46 Mass.App.Ct. 153, 159, 705 N.E.2d 279 (1999), as is "the admission of evidence, particularly expert testimony." *Beaupre v. Cliff Smith & Assocs.,* 50 Mass.App.Ct. 480, 485, 738 N.E.2d 753 (2000). **HN4**⚓"Where good cause is shown, the Court 'may make any order which justice

requires to protect a party . . . from undue burden or expense.' " _Stanley Realty Holdings v. Watertown Zoning Bd. of Appeals,_ 18 Mass. L. Rep. 468 (Mass.Super.Ct. 2004), quoting Mass.R.Civ.P. 26(c).

_HN5_ ✦For good cause to exist, the party seeking protection bears the burden of showing specific prejudice or harm **[*6]** will result if no **protective order** is granted. See _Beckman Indus., v. International Ins. Co.,_ 966 F.2d 470, 476 (9th Cir. 1992) (holding that "broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test"); See also _San Jose Mercury News, Inc.,_ 187 F.3d 1096, 1102 (9th Cir. 1999) (holding that to gain a **protective order** the party must make "particularized showing of good cause with respect to any individual document"). Additionally, in some instances, if a court were to find that a particularized harm would result from disclosure of information to the public, n3 then it balances the public and private interests to decide whether a **protective order** is necessary. See _Glenmede Trust Co. v. Thompson,_ 56 F.3d 476, 483 (3d Cir. 1995) (citing factors). n4

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n3 This court recognizes that documentation exchanged during discovery does not automatically become part of the court record. However, on a motion for summary judgment, the adverse party would be entitled to incorporate sensitive or private information in its moving papers, which do become part of the public record. **[*7]**

n4 _HN6_ ✦"Whether disclosure will violate any privacy interests; (2) whether the information is being sought for a legitimate purpose or for improper purpose; (3) whether disclosure of the information will cause a party embarrassment; (4) whether confidentiality is being sought over information important to public health and safety; (5) whether the sharing of information among litigants will promote fairness and efficiency; (6) whether a party benefitting [sic] from the order of confidentiality is a public entity or official; and (7) whether the case involves issues important to the public."

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

It is clear that Byl is an expert who was hired in anticipation of litigation. He is a liability expert; by design, he is in the arsenal of weapons employed to defend this action. The plaintiffs have been allowed generous access to Byl via interrogatories as guided by Mass.R.Civ.P. 26(b)(4). _HN7_ ✦They may have access to each expert's name, the subject matter on which the expert is expected to testify, the substance of the facts and opinions to which the expert is expected to testify **[*8]** and a summary of the grounds for each opinion according to the rule. See Mass.R.Civ.P. 26(b). Only when the expert's answers are inadequate, incomplete, inconsistent, or when the discovering party is unable to obtain equivalent information through other means, that a court should permit a **deposition** of an expert witness to be taken. _Denzer v. Barck,_ 18 Mass. L. Rptr. 709, *2 (Mass.Super.Ct. 2005) quoting _Lozoraitis v. Lachman,_ 16 Mass. L. Rptr. 809, *2 (Mass.Super.Ct. 2003) (holding, after review of the more liberal Fed.R.Civ.P. 26(b)(4), that the Massachusetts Rule is more restrictive with respect to allowance of expert **depositions.**).

The moving papers included seven and one-half pages which are responsive to the interrogatory regarding experts. n5 The twenty-eight (28) separate paragraphs appear to be in compliance with the rule insofar as they outline what Byl will testify about and that these opinions are based upon specifically, various specific building codes and industry standards and generally, his background, education, and training as a professional engineer. The answers **[*9]** do not appear inadequate, incomplete, or inconsistent; nor have the plaintiffs indicated that they are



unable to obtain equivalent information through other means.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n5 The interrogatory reads, "identify each expert, or opinion witness the defendant will call by stating his or her name, address, employment position, and a summary of his or her qualifications as an expert; state the subject matter on which he or she is expected to testify, the substance of all facts and opinions to which he or she is expected to testify, and a summary of the grounds for each opinion he or she will give."

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Permitting a **deposition** of Byl would be not only contrary to the factual averments made by the plaintiffs in response to the defendant's motion for a **protective order** but also to the public policy considerations underlying the rule itself. Extensive discovery, such as that proposed by the plaintiffs in their attempt to obtain various documents and through a notice for **deposition,** is costly. As this court has already noted, "if taking **[\*10] depositions** of an adverse party's experts became a matter of routine practice, it could lead to problems that could produce additional delays and costs in an already slow and **expensive** civil litigation system including the potential need for parties to return to court for **protective orders,** and the potential for further discovery requests as a result of issues that arise during the **deposition."** _Lozoraitis_, 16 Mass. L. Rptr. at 809, \*2.

_HN8_ It is unfair to all parties, when experts comprise a portion of the action, to require the opposing party to submit its expert to exhaustive scrutiny. The rule does not call for a party to show all of its cards when disclosing its intentions to use expert testimony at trial but it certainly comes close. The rule, if respected and complied with by the party answering the interrogatory--here, the defendant, allows for a great deal of insight as to the upcoming testimony.

_Conclusion_

Magill has successfully shown how it would suffer harm if it is requested to produce particular documents protected by the attorney-client and the work product privileges and information prepared in anticipation of litigation. As discussed above, the **[\*11]** public policy arguments favor the allowance of a **protective order** in this case as well.

Therefore, in this case, good cause has been shown to justify the issuance of a **protective order.**

_ORDER_

For the foregoing reasons, the defendants' request for a **protective order** is _ALLOWED_.

Peter W. Agnes, Jr.

Associate Justice of the Superior Court

Dated: March 22, 2006

Source:  My Sources > Massachusetts > Cases > MA Federal & State Cases, Combined i
Terms:  **protective order issued by court pursuant to rule 30 (d)(4) to limit deposition because documents and testimony sought were oppresive , expensive and...** (Edit Search | Suggest Terms for My Search)
View:  Full

Case 1:05-cv-10990-MDB   Document 306   Filed 09/29/2006   Page 7 of 7

Date/Time: Monday, September 25, 2006 - 4:20 PM EDT

 LexisNexis®

About LexisNexis | Terms & Conditions
Copyright © 2006 LexisNexis, a division of Reed Elsevier Inc. All rights
reserved.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05 10596 NMG

THOMAS KELLEY,                                    )
                          Plaintiff,              )
                                                  )
v.                                                )
                                                  )
TOWN OF PLYMOUTH and                              )
ROBERT J. POMEROY, as Chief of                    )
The Plymouth Police Department and                )
Individually,                                     )
                          Defendants.             )
                                                  )

## AFFIDAVIT OF MICHAEL SACCO

I, Michael Sacco, do depose and state the following under oath:

1.      I am the principal and sole owner of The Law Offices of Michael Sacco and serve

as counsel to the Plymouth Retirement Board ("Board"). I have served as counsel to the Board

since November, 1994 and as such, I have personal knowledge of the records and documents

maintained by the Board in the ordinary course of business. I make this Affidavit as a member

in good standing of the Massachusetts Bar and with respect to the above-captioned matter

currently pending before the United States District Court, District of Massachusetts.

2.      On or about June 1, 2004, the Board received a formal complaint from Michael E.

Botieri ("Botieri") dated May 26, 2004, alleging that Board member Thomas Kelley exhibited

conducted described as "despicable, outrageous and an abuse of his position as an elected official

on the Plymouth Retirement Board" relating to an incident which allegedly occurred between

Kelly and Botieri on or about May 22, 2004, as well as comments allegedly made by Kelley on

or about May 8, 2004 at an annual town election and comments allegedly made by Kelley at an

Insurance Advisory Committee meeting at some unspecified time and date. The complaint was

filed in his capacity as a Captain in the Plymouth Police Department, notwithstanding the fact that the allegations set forth therein did not appear to have any relation to Botieri in his official capacity.

3.      On June 3, 2004, the Board received a letter from its oversight authority, the Public Employee Retirement Administration Commission ("PERAC"), indicating that it had received a copy of Botieri's complaint, directing the Board to investigate the allegations set forth in the complaint, and replying to PERAC within thirty (30) days.

4.      On June 14, 2004, I wrote a letter to PERAC indicating that it was the Board's intent on discussing the allegations contained in Botieri's complaint at its next regularly scheduled meeting on June 21, 2004, and that upon fully and fairly investigating the matter, the Board would advise PERAC of the outcome.

5.      On June 21, 2004, the Board met first in open session, and then in executive session to discuss the Botieri complaint and the allegations set forth therein regarding Kelley's alleged conduct. I do not recall which Board member made the motion to move into executive session, but my recollection is that Kelley neither made the motion nor seconded it. Kelley recused himself from participating as a Board member for the purpose of the executive session, but he was permitted to stay and participate in the executive session as the complaints were lodged against him, and he had the right to remain in the meeting and respond to the allegations. In addition to the complaint filed by Botieri, the Board had in its possession an eyewitness statement from an individual who was present on May 22, 2004, which refuted the claims made by Botieri, as well as a memorandum from a member of the Plymouth Insurance Advisory Committee, who had apparently received a copy of Botieri's May 26, 2004 letter to the Board, and refuted Botieri's claim regarding Kelley's alleged comments at an Insurance Advisory

Committee meeting, stating that Kelley never made any such comments which were attributed to him.

6.      Executive session minutes are permitted to remain private, and not subject to public disclosure, as long as the publication of such records may defeat the lawful purposes of any executive session. M.G.L. c. 39, § 23B. To my knowledge, the Board has not released these minutes, and only a formal vote of the Board can compel the release of the minutes.

7.      In my opinion, executive session minutes which draw into question the character of the individual who is the subject of the executive session, or witnesses who provide testimonial or documentary evidence pertaining to any allegation of wrongdoing or misconduct, should remain private indefinitely, particularly in cases in which the Board has not found any merit to the allegations, in which case the release of the minutes would only serve to further besmirch the reputation and character of the individual who was the subject of the executive session.

8.      In light of the foregoing, I believe it is inappropriate for me to comment on what occurred during the executive session.

SIGNED UNDER THE PAINS AND PENALITIES OF PERJURY THIS 25th DAY OF September, 2006.

_____
Michael Sacco