UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 05 10596 NMG

| | |
|---|---|
| THOMAS KELLEY,<br>        Plaintiff, | )<br>)<br>) |
| VS. | )<br>) |
| TOWN OF PLYMOUTH and<br>ROBERT J. POMEROY, as Chief of the<br>Plymouth Police Department and<br>Individually,<br>        Defendants. | )<br>)<br>)<br>)<br>)<br>) |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR A PROTECTIVE ORDER TO LIMIT THE EXAMINATION OF THE DEPOSITION OF THE PLAINTIFF, THOMAS M. KELLEY

Now come the Defendants in the above-referenced matter and hereby oppose the Plaintiff's Motion for a Protective Order to Limit the Examination of the Deposition of the Plaintiff, Thomas M. Kelley (hereinafter "Kelley").

### I.    Background

On May 25, 2003 Kelley, a Plymouth police officer, was participating in mandatory police training session when he experienced chest pains. (See copy of memorandum from Police Chief Robert Pomeroy to the Plymouth town manager, attached hereto as "Exhibit 1"). He was transported to Jordan Hospital. (Exhibit 1). Kelley was placed on sick leave during his absence. (Exhibit 1). Kelley's doctors wrote that he could return to work two weeks from his hospital discharge date and he should stay out of work "for the rest of his vacation time, or about a month." (Exhibit 1).

Thereafter on June 25, 2003, Kelley spoke to Captain Michael Botieri (hereinafter "Botieri") and requested that his use of sick time be changed to vacation time so that he would not be restricted in his activities. (Exhibit 1).

On July 3, 2003 Kelley sent Chief Robert Pomeroy (hereinafter "Pomeroy") notice that he was filing a retirement application pursuant to the "Heart Law". (Exhibit 1). Kelley advised Botieri that he wanted to change his vacation time back to sick time. (Exhibit 1).

On September 8, 2003 Kelley was granted an accidental disability retirement. (Exhibit 1).

Thereafter, Kelley claimed that ten vacation days he used should be changed to injury on duty ("IOD") days. (Exhibit 1). The town denied same, as while Kelley was entitled to the "Heart Law" disability retirement, he was not eligible for 111F benefits (IOD benefits). (Exhibit 1). Kelley's own doctors had written, *inter alia*, "the patient is being treated by his physician for cardiomyopathy, the cause of which remains unclear." (Exhibit 1). Further, Kelley's doctors reported, "that this is a condition which is likely to have progression because the cause is not known…" (Exhibit 1). Another medical report indicated that Kelley "…has had substernal chest pain with physical and emotional stress since December 2002." (Exhibit 1). Another doctor stated that Kelley had been under his care for years and that more recently he had an incident but that Kelley's "…experience during this training exercise could recur at any time during stress." (Exhibit 1).

On May 26, 2004, Botieri filed a complaint with the Plymouth Retirement Board alleging that Kelley had misused his position on the Plymouth Retirement Board by threatening him. (See copy of letter from Botieri to Plymouth Retirement Board dated May 26, 2004, attached hereto as "Exhibit 2").

The next day the Plymouth Retirement Board for which Kelley was chairman, at Kelley's behest, moved to go into executive session to discuss Botieri's complaint. (See copy of Plymouth Retirement Board Executive Session Minutes dated May 27, 2004, attached hereto as "Exhibit 3").

Kelley filed this suit on March 9, 2005, claiming, *inter alia*, that the denial of 111F benefits was in retaliation for his reporting to the Inspector General's Office that Pomeroy, Botieri, and other superior officers in Plymouth were not entitled to receive certain overtime benefits. (Document 30, *inter alia*, paragraphs no. 48-49).

The defendants have attempted to inquire into the Plymouth Retirement Board's executive session discussions of May 27, 2004 with Kelley. (See copy of Kelley's deposition of June 21, 2006, Volume II, attached hereto as "Exhibit 4", p. 83-89). Kelley has refused to answer these questions at his deposition. (Exhibit 4, p. 83-89).

## II. **Argument**

Federal Rules of Civil Procedure Rule 26(b)(1) allows parties to obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or the claim or defense of any other party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. The information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence. Fed.R.Civ.P. Rule 26(b)(1).

The Advisory Committee notes for Federal Rule 26 described the purpose of discovery "to allow a broad search for facts, the names of witnesses, or any other matters which may aid a party in the preparation or presentation of this case."

In the case at bar, Kelley's verified complaint alleges, *inter alia,* that as a member of the Plymouth Retirement Board, he was subjected to different treatment than other similarly situated police officers or town employees by the Defendants. (Document 30). Kelley further alleges interference with his activities on the retirement board by the Defendants. (Document 30). At the same time it appears that Kelley may have misused the Plymouth Retirement Board's Executive Session to manipulate an investigation of himself. (See copy of PERAC request to Plymouth Retirement Board for investigation, dated June 3, 2004, attached hereto as "Exhibit 5"). At the very least, the Defendants should be able to explore, through discovery, if this is so.

The Open Meeting Law, M.G.L. c. 39 sec. 23B, provides that executive sessions of governmental bodies may be held for only the limited purposes specifically set out in the section. Porcaro v Hopkinton, 2000 WL 1473038 (Mass. Super.). (Copy of Porcaro case, attached hereto as "Exhibit 6"). This includes consideration of complaints brought against a staff member. M.G.L. c. 39 sec. 23B. The records of each meeting shall become a public record and be available to the public; provided, however, that the records of any executive session may remain secret as long as publication may defeat the lawful purposes of the executive session *but no longer*. (**emphasis in the original**). Foudy v Amherst –Pelham Regional School Committee, 402 Mass. 179, 182 (1988). In fact, there is no lawful purpose to keep this executive session secret.

Kelley maintains that the Defendants desire to query him on the discussions held in executive session on Boteiri's allegations is "groundless". In fact, the Defendants seek testimony from Kelley not to annoy, embarrass, or oppress him but to fully examine Kelley's role on the Plymouth Retirement Board and their collective conduct towards Botieri. *De minimus*, Botieri is a key witness in this case. According to Kelley, Botieri is also a potential defendant. (Exhibit 3, p. 2).

The questions for Kelley and his responses are important because part of Kelley's argument is that the Retirement Board activities are completely separate from his police duties. Additionally, Kelley's complaint alleges that Pomeroy, Botieri, and other superior officers circumvented the Town of Plymouth's By-laws by receiving certain benefits for which they were not entitled. (Document 30). Kelley maintains that because he reported this allegation to the Inspector General's Office he was denied benefits. (Document 30). Yet, at the same time, Kelley, as the Chairman of the Retirement Board, moved to enter executive session to investigate Botieri's complaint against him without hearing from any other witnesses. (Exhibit 3. See also copy of PERAC letter to State Ethics Commission, dated August 11, 2004, attached hereto as "Exhibit 7"). This executive session "investigation" involved a complaint by one of the superior officers (Botieri) Kelley had accused of misappropriating funds.

Kelley's argument that he did not participate in this particular Executive Session is belied by the fact that his presence is noted on the Executive Session Minutes of May 27, 2004. (Exhibit 3). What Kelley apparently did not participate in was the vote to exonerate himself. (Exhibit 3). This goes to the heart of the credibility of the Plaintiff.

Further questions about Kelley's use of executive session are significant in terms of this retirement board. This same retirement board was noted in various newspapers for having spent more money than any other area retirement boards and taking trips for "retirement" seminars in out-of-state venues. (See copy of *Boston Globe* article of November 17, 2005, attached hereto as "Exhibit 8". See also Exhibit 4, p 33). The Plymouth Retirement Board approves its own expenses and travel. (See copy of Plymouth Retirement Board director Debra Sullivan's deposition, attached hereto as "Exhibit 9", p. 37). This same board approved the retirement for Kelley. (Exhibit 4, p. 55-56).

The executive session minutes also indicate that Kelley and the Plymouth Retirement Board may have violated the procedural requirements of M.G.L. c. 23B for holding an executive session. Porcaro v Hopkinton, 2000 WL 1473038 (Mass. Super.). M.G.L. c.23B. 23B mandates that the presiding officer has to cite the purpose for the executive session and the presiding officer has to state before the executive session that if the governmental body will reconvene after the executive session. Porcaro v Hopkinton, 2000 WL 1473038 (Mass. Super.). M.G.L. c.23B. This clearly was not done. (Exhibit 3).

As to Kelley's argument relative to his right to privacy, the Defendants submit that it is groundless. First, *The Boston Globe* has already run a story, including references to the apparently previously released executive session minutes of May 27, 2004. (See copy of *Boston Globe* article of November 13, 2005, attached hereto as "Exhibit 10"). Secondly, Kelley may have used a public forum to attempt to quash an investigation. (Exhibits 7, 10). There were no witnesses called. (Exhibits 7, 10). There is no independent testimony. (Exhibits 7, 10). This potential sham "investigation" should not be allowed to be buried under the

guise of an executive session. As noted, executive sessions also do not remain private forever. <u>Foudy v Amherst –Pelham Regional School Committee</u>, 402 Mass. 179, 182 (1988).

If, as Kelley maintains, the Botieri complaint relates to an incident having nothing to do with any public interests of the Town of Plymouth, then why in the world is Kelley calling for an executive session (public body) on the public's expenditure.

The Plaintiff's Motion for a protective order should not be allowed in an effort to prevent Kelley from responding to questions that have a direct bearing on this case.

III. **Conclusion**

For the reasons set forth hereinabove, the **Plaintiff's Motion for a Protective Order should be denied**.

> Respectfully submitted,
> DEFENDANTS,
> ROBERT J. POMEROY and the
> TOWN OF PLYMOUTH,
> By their attorneys,
>
>
> /s/ Jeremy I. Silverfine
> Jeremy I. Silverfine, BBO#542779
> Leonard H. Kesten, BBO# 542042
> BRODY, HARDOON, PERKINS & KESTEN, LLP
> One Exeter Plaza
> Boston, MA 02116
> (617) 880-7100

Dated: 10.30.06

# EXHIBIT 1



TOWN OF PLYMOUTH
# POLICE DEPARTMENT
20 Long Pond Road
Plymouth, Massachusetts 02360
FAX (508) 830-4227
(508) 830-4218


To:     Pamela Nolan, Town Manager

From: Robert J. Pomeroy, Chief of Police

Date:   January 9, 2004

Re:     Officer Thomas Kelley


I am responding to your memo of January 8, 2004 in which you attached a letter from Officer Thomas Kelley.

On May 25, 2003, Officer Kelley was participating in a Police training session when he experienced chest pains. He was transported to the Jordan Hospital. On May 26, 2003, he was transported to Beth Israel Hospital in Boston for further treatment.

Officer Kelley was placed on sick leave during his absence. Office Kelley provided the Police Department with two medical certificates from his physicians. The first note, from Dr. Lydia Bazzano of Beth Israel, is attached. Dr. Bazzano stated only that Kelley may return to work two weeks from his hospital discharge date. The second note, from Dr. Donald Moore, (attached) stated that Kelley had a mild cardiac condition and that he should stay out of work *for the rest of his vacation time, or about a month.*" Dr. Moore also stated that Kelley's prognosis was good and that he should be able to return to work.

On June 19, 2003, Kelley submitted a notice of injury form and sent an email inquiring if his sick time usage during the incident would be changed to Injury on Duty. Both Captains Chandler and Botieri had already spoken to Kelley and informed him that he would need to submit more medical documentation to support his claim that his illness was job related.

On June 24, 2003, I sent Kelley a letter (attached) explaining the difference between the "Injury on Duty" law and the "Heart Law". I specifically advised Kelley that he must provide the Department with sufficient medical documentation that included a specific diagnosis that clearly indicated that the medical condition was work related. I advised Pat Flynn, Director of Human Resources, of the issue regarding Kelley and faxed her a copy of the letter I sent to Kelley.

On June 25, 2003, Kelley spoke to Captain Botieri. Kelley requested that his use of sick time be changed to vacation time so that he would not be restricted in his activities. Specifically, Kelley stated that he wanted to be able to be out and about and to be able to drink on his boat with repercussions or allegations of sick leave abuse.

On July 3, 2003, Kelley sent me an email (attached) advising me that he was filing a retirement application with the Retirement Board pursuant to the "Heart Law". He now advised Captain Botieri he wanted to change his scheduled vacation time changed back to use of sick time.

On September 8, 2003, Kelley was granted an accidental disability retirement.

On September 29, 2003, Pat Flynn sent you an email (attached) regarding Kelley's claim that ten of the vacation days that he had used should be changed to Injury on Duty days. I reminded Ms. Flynn that for several years, Kelley has tried to persuade the Town to adopt a policy that, if an employee used sick time while waiting for a "heart law" retirement, and if the retirement was approved, that he Town would retroactively restore the employee's sick time and change the sick time to Injury on Duty status. Labor counsel weighed in on this issue and recommended that the Town not adopt such a policy.

On October 28, 2003, Officer Dana Goodwin of the Plymouth Police Brotherhood asked me about Kelley's issue. I later met with Goodwin and gave him a copy of the June 24, 2003 letter that I had sent to Kelley. I advised Goodwin that Kelley has never provided the information requested in the letter.

On November 14, 2003, Kelley came to see me. I advised Kelley that he never provided the documentation required pursuant to the June 24, 2003 letter. Kelley claimed he never received the letter but that he had provided all the necessary paperwork to Pat Flynn. Kelley stated that he would provide me with the paperwork.

On November 19, 2003, Officer Lawrence Rooney of the Plymouth Police Brotherhood gave me the packet of information from Kelley.

On November 20, 2003, I sent Officer Rooney an email asking him to see me regarding the material he submitted on behalf of Kelley.

On November 21, 2001, Kelley went to see Mark Sylvia, Assistant Town Manager, and advised Sylvia that the Chief now had the necessary paperwork and was reviewing it.

On November 24, 2004, I met with Officer Rooney. I advised Rooney that I had reviewed the medical paperwork submitted by Kelley. I advised Rooney that the paperwork indicated the following:

- Dr Moore states that Kelley has been under his care for years and that more recently he *"had an incident"* while at a training exercise. He also stated *"his experience during this training exercise could recur at any time during stress."* Dr. Moore concludes that Kelley's disability is work related but failed to be specific.
- Dr's. Thakur, Ellison and Philippides report states: *"The patient is being treated by his physician for cardiomyopathy, the cause of which remains unclear."* Additionally, the doctors stated, *"that this is a condition which is likely to have progression because the cause of this is not known..."*
- Beth Israel Cardiac Catherization report: *"He has had substernal chest pain with physical and emotional stress since December 2002."* (some five months before the claimed injury). The doctor states that Kelley has continued with the same

symptoms and on May 25 (during the training exercise) he experienced a severe episode.

I advised Rooney that Kelley may very well be eligible for retirement under the Heart Law presumption but that there was insufficient evidence to place Kelley on Injury on Duty status.

On November 25, 2003, Kelley came to the station and spoke with Captain Botieri. Kelley gave Captain Botieri another package of material with the message *"Give this to the Chief if he wants to stay out of Superior Court."*

On November 26, 2003, Officer Goodwin advised me that he had spoken to Officer Rooney about my conversation with Rooney on November 24 and that he would advise me of further developments.

On December 1, 2003, Rooney again saw me and said the Union was going to discuss this issue further internally. I also received a call from Patrick DelloRusso, Retirement Board Chairman who stated that Kelley had been to see him about this issue. He stated that he advised Kelley that the issue was not a retirement board matter.

On December 3, 2003, I spoke with Pat Flynn again regarding this issue. Ms. Flynn stated that she spoke with you regarding this issue and that you would not support Kelley's claims.

On January 8, 2004, I was informed that Kelley has hired Attorney Joseph Gallitano to represent him and that he will be filing suit in Superior Court regarding this issue.

# EXHIBIT 2



TOWN OF PLYMOUTH
# POLICE DEPARTMENT
20 Long Pond Road
Plymouth, Massachusetts 02360
FAX (508) 830-4227
(508) 830-4218


Plymouth Retirement Board
11 Lincoln Street
Plymouth, MA 02360

May 26, 2004

Dear Sirs:

Unfortunately, I must write to file a formal complaint regarding the actions of Mr. Thomas Kelley, acting Chairman of the Plymouth Retirement Board.

As you know, a Plymouth Retirement Board election for two seats is scheduled for June 24, 2004. The two incumbents and one other Town employee, Ms. Lynn Fortini, are running for the two seats. It is well known that Mr. Kelley (a recently retired Plymouth Police officer) is very angry that he is facing opposition in the election. His anger is clearly demonstrated by his outrageous conduct that is the subject of this complaint.

On the evening of May 22, 2004, the Plymouth Police Relief Association hosted a dinner and awards ceremony at the Pinehills Country Club. Later in the evening, at approximately 11: 30pm, Mr. Kelley approached me as he was leaving the function. At that time, I was speaking with Detective Charles Warnock. I extended my hand in order to congratulate Mr. Kelley on his recent retirement. Mr. Kelley shook my hand as he began to question my signing of Ms. Fortini's nomination papers for a position on the Plymouth Retirement Board. I informed Mr. Kelley that I did in fact sign Ms. Fortini's nomination papers. Mr. Kelley became very aggressive as he called me different names using expletives. I then attempted to walk away from Mr. Kelley as I spoke with another retired officer. At this time Mr. Kelley physically grabbed me by the left arm and attempted to pull me towards him saying, *"I hope you never have a heart attack and come before the Retirement Board."* Detective Charles Warnock quickly intervened and was able to hold Mr. Kelley back from assaulting me further. With the assistance of other officers, Mr. Kelley was eventually removed from the room as he continued his yelling and swearing towards me. I took Kelley's threat very seriously.

This is not the first time that Mr. Kelley has used his position on the Plymouth Retirement Board to make threats against those that disagree with him. On May 8, 2004, during the annual Town election, Mr. Kelley went to the voting precinct located at Town Hall. Mr. Kelley initiated conversation with Officer Stephen Viella, who was on duty during the election. Kelley, very angry and upset, swore at Viella for signing Ms. Fortini's nomination papers. He then threatened Viella by saying *"I hope you don't need the*

*Retirement Boards help some day"*. Officer Viella had to order Kelley to leave the polling place.

This type of threatening behavior and abuse of his position on the Plymouth Retirement Board is not new to Mr. Kelley. I have just learned that almost one year ago, his supervisor, Sergeant Michael Peddell, admonished Kelley. Kelley, angry and upset, threatened Peddell by saying *"I hope you never come in front of the Retirement Board."*

Understandably, many of those thirty-two individuals that have signed Ms. Fortini's nomination papers believe that they have been identified by Mr. Kelley as "targets" and that, given the opportunity, Mr. Kelley will exact revenge if these individuals have a matter that appears before the Plymouth Retirement Board.

Mr. Kelley's conduct is despicable, outrageous, and an abuse of his position as an elected official on the Plymouth Retirement Board. Kelley's recent public comments at the Insurance Advisory Committee meeting wherein he was heard to say *"we don't need a woman on the Retirement Board"* further demonstrates his abusive, harassing demeanor.

In order to maintain the integrity of the Plymouth Retirement Board, Mr. Kelley has but one choice - he must immediately resign from the Plymouth Retirement Board and withdraw from the pending election.

I request that you keep me informed as to what action the Plymouth Retirement Board takes regarding this formal complaint.

Michael E. Botieri
Captain of Police

CC: Public Employee Retirement Administration Commission
Commonwealth of Massachusetts – Ethics Commission
Attorney General Thomas Reilly
Town Manager Pamela Nolan
Board of Selectmen

# EXHIBIT 3

PLYMOUTH RETIREMENT BOARD
Executive Session
May 27, 2004
Town Hall, Mayflower I & II

Mr. Kelley moved the Board go into Executive Session at 9:05 a.m.  UNANIMOUSLY
APPROVED.

| | |
|---|---|
| Mr. Duhamel | Yes |
| Mr. Murphy | Yes |
| Mr. Kelley | Yes |
| Mr. Manfredi | Yes |
| Mr. Madden | Yes |

Attorney Michael Sacco was also in attendance to discuss allegations against Mr. Kelley
made by Michael Botieri of the Plymouth Police Department.  Attorney Sacco
summarized the incidents in the order as they occurred.  A letter from Captain Botieri
was received in the Retirement Board Office on Wednesday, May 26, 2004.  This letter
was also sent to the Town Manager, Board of Selectmen, PERAC, State Ethics
Commission and the Attorney General.  In this letter Mr. Botieri states that he had a run-
in with Mr. Kelley at a Plymouth Police Relief Association retirement party on the
evening of May 22, 2004 at the Pinehills Country Club.  Capt. Botieri alleges that Mr.
Kelley approached him in an aggressive manner and questioned him about signing Ms.
Lynn Fortini's Retirement Board election nomination papers.  Capt. Botieri states that
Mr. Kelley also used several expletives and attempted to grab his arm as he walked away
from him, when Detective Charles Warnock intervened and held Mr. Kelley back.  He
also states that another officer intervened, but made no mention of that officers' name in
his letter.  He stated in his letter that Mr. Kelley also made remarks to other officers
threatening retaliation from the Retirement Board.  In addition, Capt. Botieri states that
during a recent Insurance Advisory Committee meeting, Mr. Kelly remarked "we don't
need a woman on the Retirement Board".

The Board is in receipt of a letter from Mr. Dale Webber, Chairman of the Insurance
Advisory Committee, sent directly to Capt. Botieri.  This letter, dated June 7, 2004,
disputes the allegation made by Capt. Botieri regarding Mr. Kelley's public comment at
the above referenced IAC meeting, which took place on May 20, 2004.  Mr. Webber
states in his letter that he has checked the records with the committees' recording
secretary and has found no evidence of such comments, nor does anyone at the meeting
remember any such comments being made.  Mr. Webber requested that Capt. Botieri
retract these allegations immediately, in writing.  To date, Mr. Webber has received no
response from Capt. Botieri.

The Board is also in receipt of a letter from Officer Robert Hicks.  Officer Hicks was also
at the Retirement party, was mentioned above in Capt. Botieri's letter and is the second
officer that he makes reference to as restraining Mr. Kelley.  In his letter, Officer Hicks

states that Mr. Kelley was called away from a conversation with himself, his wife and Mr. Kelley's wife, by Officer Charles Warnock. He states that a verbal argument ensued between Capt. Botieri and Mr. Kelley and he witnessed Officer Warnock step in between the two men. Officer Hicks states that at this time, he also stepped in, stating "Forget it, it's time to leave", at which time Mr. Kelley left the party with his wife and daughters.

Atty. Sacco explained that the Board has no disciplinary authority against fellow Board members, nor is there anything in the statute that allows or requires the Board to take any action against another Board member. He did state that he felt it was very important to have Mr. Kelley talk about these issues with the Board. Atty Sacco will provide PERAC with an explanation of the issues, as they have asked for an investigation into this matter. He told the Board that he felt it was not necessary to send an explanation to any of the other recipients of the original letter, unless the Board thought it was necessary.

Atty. Sacco stated that this issue was very troublesome for him, as he has always found the members of the Board to be very above-board and hardworking for their membership and found it unfortunate that somebody would make allegations like this against any one of the Members.

Mr. Kelley spoke to the Board regarding the incidents alleged by Capt. Botieri. For the record, he wanted the Board to be aware that he has filed a formal lawsuit against the Town regarding his 111(f) benefits. He explained that he had not been in contact with the Police Department regarding this lawsuit, as Capt. Botieri would be a defendant in this suit. Atty. Sacco asked Mr. Kelley to tell the Board why Capt. Botieri would be a defendant. Mr. Kelley stated that there had been an investigation regarding overtime pay, which Capt. Botieri had received, along with other officers.

Mr. Kelley went on to tell the Board his view of the events on the evening of May 22, 2004. He stated that at the Retirement party referred to by Capt. Botieri, he was called over by Officer Charles Warnock. Mr. Kelley went over and he and Capt. Botieri exchanged words with each other. Mr. Kelley states that Capt. Botieri raised his arm, which was holding a coffee cup, towards him in an attempt to hit Mr. Kelley. Mr. Kelley states that at that moment Officer Warnock, as well as Officer Hicks, stepped in between the two men. Mr. Kelley stated that he left the party at that time with his wife and daughters.

Regarding the allegation Capt. Botieri made of an incident with Officer Stephen Viella, Mr. Kelley stated that the two men briefly exchanged words, but added that Officer Viella never ordered him out of the building, as alleged in Capt. Botieri's letter.

Capt. Botieri stated in his letter that Mr. Kelley was admonished by his supervisor, Sergeant Michael Peddell, almost one year ago. Mr. Kelley stated that he was never admonished by Sgt. Peddell and was in possession of his entire personnel folder, which contained nothing of the sort. Mr. Kelley told the Board that they were welcome to review his file, which he had on hand at the meeting.

Mr. Kelley stated to the Board that he believes that these allegations serve as revenge by Capt. Botieri for the Board's dismissal of the Involuntary Retirement Application filed by the Police Department for Officer Michael Ferazzi. He states that the day after the Board dismissed this application, nomination papers were taken out by another Police Department employee, Ms. Lynn Fortini.

Regarding the alleged comment made at the IAC Meeting, Mr. Kelley stated that there was a room full of people present, including IAC and PREA members, all of whom have stated that they did not hear any negative comments made by Mr. Kelley, as alleged by Capt. Botieri. Mr. Kelley stated that he never made any statements of that sort, and that this all comes down to two men who have a difference in opinion.

Mr. Murphy asked Atty. Sacco whether or not the Board is required to send a response to PERAC. Mr. Kelley stated that he wanted something sent in order to clear his name and Atty. Sacco agreed that since PERAC has asked for a statement in writing from the Board on this matter, that it would be the proper thing to do.

Atty. Sacco asked the other four Board members if they felt alright about Mr. Kelley's explanation. Atty. Sacco added that his impression of this matter is that of a retaliatory act done by Capt. Botieri.

Mr. Duhamel stated that he was at the IAC meeting in questions, along with the legislative delegation, and that no such comment was made by Mr. Kelley. He noted that he felt it was important that the response to PERAC strongly state that there is absolutely no evidence of Capt. Botieri's allegations. In his opinion, Capt. Botieri was trying to influence the election by making these allegations just weeks prior to the election date of June 24, 2004.

Mr. Kelley felt that he was set up by Capt. Botieri the night of the Retirement party and strongly denies any aggressive acts were made.

Mr. Manfredi asked Atty. Sacco if anybody else needs to be notified of the Board's investigation on this matter. Atty. Sacco suggested sending a copy of the response to PERAC to Capt. Botieri only.

Atty. Sacco stated that he will draft a letter to PERAC for the Board to review at their next meeting. He will also call Joseph Connarton of PERAC and let him know that a response will be forthcoming. Mr. Duhamel added that he would like the other four Board members to sign the letter.

Mr. Manfredi made motion for Atty. Sacco to draft letter for PERAC for the other four members to review and sign. Seconded by Mr. Duhamel.

UNANIMOUSLY APPROVED. Mr. Kelley abstained from vote.

Mrs. Sullivan asked for a roll call vote to come out of Executive Session.

| | |
|---|---|
| Mr. Kelley | yes |
| Mr. Manfredi | yes |
| Mr. Murphy | yes |
| Mr. Madden | yes |
| Mr. Duhamel | yes |

Mr. Duhamel made motion to adjourn. Mr. Murphy seconded. UNANIMOUSLY APPROVED.

The meeting adjourned at 9:44 a.m.

Respectfully submitted,

Wendy Cherry, Assistant Director

Board of Retirement


Thomas Kelley, Chairman                          Dated: _____


Richard Manfredi


John Murphy, Jr.


Shawn Duhamel


John Madden

# EXHIBIT 4A

Page 3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. 1:05-cv-10596-NMG

```
--------------------------)
THOMAS M. KELLEY,         )
        Plaintiff        )
VS.                       )
                          )
TOWN OF PLYMOUTH, ET AL,  )
        Defendant         )
--------------------------)
```

CONTINUED DEPOSITION OF THOMAS M. KELLEY, a
witness called for examination by counsel for the
Defendant, taken pursuant to the applicable provisions of
the Massachusetts Rules of Civil Procedure, before
LINDA M. CORCORAN, a Court Reporter-Notary Public in and
for the Commonwealth of Massachusetts, at the Law Offices
of Joseph R. Gallitano & Associates, 34 Main Street
Extension, Suite 202, Plymouth, Massachusetts, on
Wednesday, June 21, 2006, commencing at 2:07 p.m.

LINDA M. CORCORAN
CERTIFIED COURT REPORTER
P. O. Box 4
Kingston, Massachusetts  02364
(781) 585-8172

---

I N D E X

TESTIMONY OF:  THOMAS M. KELLEY

| | Page |
|---|---|
| Direct examination by Attorney Silverfine | 4 |

E X H I B I T S

| Defendant's | | Page |
|---|---|---|
| Exhibit No. 6 | Letter dated May 10, 2001 | 18 |
| Exhibit No. 7 | E-mail dated September 2, 2000 | 23 |
| Exhibit No. 8 | E-mail dated May 8, 2001 | 23 |
| Exhibit No. 9 | E-mail dated May 30, 2001 | 39 |
| Exhibit No. 10 | E-mail dated July 3, 2003 | 45 |
| Exhibit No. 11 | Letter dated September 9, 2003 | 51 |
| Exhibit No. 12 | Findings of fact | 52 |
| Exhibit No. 13 | Letter dated January 14, 2004 | 61 |
| Exhibit No. 14 | Letter dated January 29, 2004 | 70 |
| Exhibit No. 15 | Letter dated May 26, 2004 | 72 |
| Exhibit No. 16 | Executive session minutes dated May 27, 2004 | 83 |
| Exhibit No. 17 | Letter dated June 1, 2004 | 85 |
| Exhibit No. 18 | Letter dated June 3, 2004 | 89 |

---

Page 2

A P P E A R A N C E S

On behalf of the plaintiff:

JOSEPH R. GALLITANO, ESQUIRE (partial)
JOSEPH R. GALLITANO & ASSOCIATES
34 Main Street Extension, Suite 202
Plymouth, MA  02360
(508) 746-1500; FAX (508) 747-1150

RICHARD D. ARMSTRONG, JR., P.C.
1400 Hancock Street
Third Floor
Quincy, MA  02169
(617) 471-4400; (617) 471-4404

On behalf of the defendant:

JEREMY I. SILVERFINE, ESQUIRE
BRODY HARDOON PERKINS & KESTEN, LLP
One Exeter Plaza
Boston, MA  02116
(617) 880-7100; FAX (617) 880-7171

---

Page 4

1          S T I P U L A T I O N S
2          IT WAS STIPULATED AND AGREED by and between
3   counsel for the respective parties that all objections,
4   except as to the form of the question, shall be reserved
5   until time of trial; that motions to strike shall be
6   reserved until time of trial; that the witness shall read
7   and sign the transcript of this deposition within 30
8   days; however, reading and signing of the deposition
9   transcript before a notary shall be waived.
10          P R O C E E D I N G S
11          THOMAS M. KELLEY, a witness called for
12  examination by counsel for the defendant, having been
13  satisfactorily identified and having been duly sworn, on
14  oath deposes and continues to testify as follows:
15          DIRECT EXAMINATION BY ATTORNEY SILVERFINE
16      Q.   Good afternoon, Mr. Kelley.  This is a
17  continuation of the deposition we started on February 9,
18  2006, in my office, and as a courtesy to you, we're
19  continuing your deposition this afternoon.  Hopefully
20  we'll be able to finish.  If not, we'll finish on some
21  other portion of the afternoon.  I'm hoping to finish in
22  the next couple of hours.
23          Continuing on where we left off, same ground
24  rules apply.  If you don't understand a question, you

Page 5

1    have to let me know.  If you need me to repeat something
2    again, please let me know.  If there's any reason you
3    need a break, also let me know.  If you need to speak to
4    your counsel, also please let me know, and of course,
5    we'll provide it.
6              (Mr. Gallitano enters the room.)
7              MR. SILVERFINE:  Mr. Gallitano has just joined
8    us.
9              MR. GALLITANO:  You just keep going, and I'm
10   going to be in in a few minutes.
11             MR. SILVERFINE:  Fair enough.
12   BY MR. SILVERFINE
13        Q.   Mr. Kelley, what I'm going to do is basically
14   jump in from where we left off last time.  Right before
15   we get there, are you on any medication today?
16        A.   Just my regular heart medicine.  I take those
17   five medications.
18        Q.   The same ones you mentioned last time?
19        A.   Yes, yes.  I take those daily.
20        Q.   Anything new?
21        A.   No.
22        Q.   Any change in your job status from the last
23   time we were there?
24        A.   No.

Page 6

1        Q.   Anything new?
2        A.   No, I'm still retired.
3        Q.   What I'm going to do is we had marked a number
4    of exhibits last time.  And I'm going to start off as to
5    where we were in our last deposition, where we ended,
6    which was we were referring to your answers to
7    interrogatories, which is marked as Exhibit 2.  So I'm
8    going to again -- I'm going to show you Exhibit 2, which
9    we've already marked on February 9, and refer you
10   specifically as to some of your answers.  And we left off
11   on Answer No. 7.
12             Do you see where I'm referring to?
13             (Hands to witness.)
14        A.   Yeah, yes.
15             MR. SILVERFINE:  Just give me a second.  One
16   second.  Just a moment.
17             (Pause.)
18        Q.   As far as your days as a police officer, is it
19   a supervisor's duty to monitor a particular shift?
20        A.   Well, the makeup of the department when I left
21   was you have a patrol supervisor possibly that worked
22   either in your area or there were two, depending on the
23   manning posture.  Then you would have a shift commander
24   who could be a sergeant or a lieutenant.

Page 7

1        Q.   And who was your shift supervisor, or who
2    monitored your duties as a patrol officer?
3        A.   Most of the time Kevin Fahy was there and
4    Lieutenant Budge was the shift commander.
5        Q.   What were their duties as shift commanders as
6    it related to a patrol officer such as yourself?
7        A.   Well, they would make up the daily schedule.
8    They would bring any new directives or any new
9    information most of the time to the attention of the
10   officers or any new concerns, extra checks in various
11   areas for one reason.  Vandalism, public drinking, those
12   types of things would be brought to the attention
13   sometimes by the lieutenant, sometimes by the sergeant.
14   It depended on the activity of the day.
15        Q.   Are the supervisors, your supervisor also, in a
16   sense supposed to monitor not only yourself but other
17   patrol officers in their command?  Is that fair to say?
18        A.   Yes, they did.
19        Q.   What other police officers have served on the
20   Plymouth Retirement Board that you know of since you've
21   been on it?
22        A.   There's none.
23        Q.   During the past few years, have you heard of
24   any police officer who ever served on the Plymouth

Page 8

1    Retirement Board?  Are you aware of any?
2        A.   Not in the last ten years that I was there.  I
3    mean, it was just myself.  I don't remember anybody prior
4    to that.
5        Q.   You have heard discussion about other town
6    employees.  What other town employees who worked for
7    Plymouth also serve on the retirement board while you've
8    been serving there?
9        A.   You had the building commissioner, and he's
10   been the building inspector --
11        Q.   His name?
12        A.   Dick Manfredi.  He was from the inspection
13   services division.  By statute you have the treasurer as
14   designee, and then in the case of us, it's the chief
15   financial officer.
16        Q.   And who was that?
17        A.   At the time it was Mr. Dello Russo.  There was
18   a John Madden there temporarily for a couple of months.
19        Q.   What's John Madden's position with the town?
20        A.   He was an accountant at the time.  They were in
21   between two financial directors, and he took over while
22   they hired another guy temporarily.  So he had to sit up
23   there, come to the board.
24        Q.   Was he actually part of -- what department is

Page 9

1   he part of?

2       A.   He would have been a part of the department of

3   -- the finance department.

4       Q.   Anyone else you can think of?

5       A.   Right now presently a Bruce Miller, who's now

6   there.

7       Q.   Where's he from?

8       A.   He's now the finance director.  He replaced

9   Dello Russo.

10      Q.   Do you know when that was?

11      A.   Let's see.  Geez, I don't remember.  Maybe

12  around 2003, 2004, somewhere in that area.

13      Q.   Relative to the Columbine-like drill back on

14  May 25, 2003, prior to the drill itself, did you object

15  to participation in that drill?

16      A.   I was never made aware that an objection would

17  be entertained.

18      Q.   But the question is, did you?

19      A.   No, I didn't.

20      Q.   In other words, did you verbalize that you

21  yourself had an objection to participate for any reason?

22      A.   No, prior to that I --

23      Q.   All right.

24      A.   Excuse me.

Page 10

1       Q.   I'm sorry.  I thought you were finished.

2       A.   No, I wasn't.

3       Q.   Okay.

4       A.   Prior to that I did notify the town as a result

5   of receiving a letter from the chief regarding sick time

6   of two illnesses that I had been treated for with

7   doctors' notes.  I gave them to Botieri.  And one was for

8   Meniere's disease.  I was under Dr. Durante's care for

9   that as well as Lyme disease, and I was under the care of

10  Dr. Molloy for that.  And I brought in those doctors'

11  notes and gave them to Mr. Botieri in hand.

12      Q.   First of all, when did you do that?

13      A.   I would say that might have been -- I think the

14  letters come out like in March/April, in that area.

15  Around the April area.

16      Q.   And did you specifically object or make

17  reference to your not wanting to participate in that

18  drill?

19      A.   No, I never made any.

20      Q.   Either in writing or verbally?

21      A.   Never was aware of it.

22      Q.   Did you make any grievance as to participation

23  in the drill of May 25, 2003, prior to the drill?

24      A.   We were told it was mandatory.  We were subject

Page 11

1   to discipline if we didn't participate.

2       Q.   So the question is, did you file a grievance?

3       A.   No.

4       Q.   And just so I understand -- and I think you may

5   have testified to this before and just briefly mentioned

6   -- what were your preexisting medical conditions as they

7   were right prior to May 25, 2003?

8       A.   As I just answered, they were Meniere's

9   disease.  I was under the care for Meniere's disease as

10  well as I was on -- I was under Dr. Molloy's care for

11  Lyme disease.

12      Q.   And you said you were taking medication for

13  both of them?

14      A.   Yes.

15      Q.   And you were able to perform the essential

16  functions of your job as a police officer in your daily

17  duties?

18      A.   There were times prior to the drill there that

19  I went home from work.  I was going to say home from

20  school.  Jesus, home from work because of symptoms that

21  were attributed to those two things.  I couldn't complete

22  my shift.  I had to be driven home several times.  I got

23  dizzy spells.  And the symptoms of those two type of

24  things -- you get dizzy spells.  Sometimes I would be so

Page 12

1   dizzy I couldn't even drive home, and I would have to

2   take the medication and lay down.  A couple of times I

3   called Dr. Durante and met him.  My wife would drive me

4   to his office, and he would examine me.  He could tell

5   that you were having a Meniere's attack.

6       Q.   Referring to Exhibit 2, Interrogatory No. 10,

7   which states:  (Reading)  Please set forth all the facts

8   which rely on the alleged defendants were aware of your

9   preexisting medical condition and that the May 25, 2003,

10  drill would aggravate that medical condition (end

11  reading), you answered:  (Reading)  Based on the medical

12  notes on record in my personnel file (end reading).

13           Do you see that?

14      A.   Uh-huh.  Yes, I'm sorry.  Yes.

15      Q.   Besides what you've just referenced, are there

16  any medical notes that you say on record in your

17  personnel file that were present prior to May 25, 2003?

18      A.   Not that I'm aware of.

19      Q.   Are you aware of any obligation anyone from the

20  police department has to review medical notes in your

21  personnel file?

22      A.   Well, going back to my previous answer and your

23  question, I explained I believe earlier in the deposition

24  that on a yearly basis we are given a letter from the

Page 13

1 chief who reviews everyone's file about the use of sick
2 time. And at that point everybody gets a generic letter,
3 and it states you might have used five days, twelve days.
4 This particular year I believe I used twenty-three days.
5 Or it indicates how many full days you used and how many
6 half days you used, like if you got sick at 12 o'clock
7 and you went home sick type of thing. And that was
8 signed by the chief. That was a contractual item that
9 the chief was required to do on an annual basis, and it
10 was for the protection of both sides.
11 If you felt that the letter was not
12 representative of your sick time, you could produce
13 medical records that would say you have a legitimate
14 reason for these times, and I exercised that right. And
15 I also then e-mailed the chief indicating that I gave him
16 -- and we have that, I believe, in the production of
17 documents. I e-mailed him indicating that I gave those
18 medical records, those medical notes to Mr. Botieri, and
19 I was requesting him to review that and then retract his
20 letter from me because I felt that it was a legitimate
21 use of sick time. I did that twice, and I never received
22 an answer back from him, and he never retracted his
23 letter. He never responded to my request.
24 Q. This amount of sick time you used, was that

Page 14

1 twelve days prior to May 25, 2003?
2 A. No, it would have been a cumulative of a year,
3 say, from, oh, April 30 to the previous April 30. It's
4 like a calendar annual basis. At some point they stop
5 and they say, okay, from this point back a year, use the
6 following days. We had -- I believe there's a copy of it
7 in their documents as well.
8 Q. Do you know what the date, that anniversary
9 date you were referring to is?
10 A. I don't know, but it's in the documents that I
11 think you produced or we produced. It is in there.
12 Q. Other than what you've now testified, did you
13 do anything else to notify the chief or the town of your
14 medical condition prior to May 25, 2003?
15 A. No, those -- like I said, the letter is signed
16 by the chief. It is part of a contractual obligation
17 that he has to review, so he would have had knowledge of
18 it being there. And I never received a response after I
19 justified my days.
20 Q. Again, in Exhibit 2, your answer to
21 Interrogatory 11 says: (Reading) Please set forth all
22 communications you had with any union representative
23 prior to May 25, 2003, drill regarding your inability to
24 participate due to your preexisting medical condition

Page 15

1 (end reading). And your answer was: (Reading) The
2 union president was to hold a membership meeting with the
3 chief on the issues and concerns about my preexisting
4 medical condition and inability to participate in the
5 drill (end reading).
6 Is that correct?
7 A. I don't particularly remember it being written
8 like that, but I remember there was a question about
9 individuals that have had issues. And I believe we just
10 found out this morning that there were two individuals
11 that were excused through some process that I don't know.
12 Q. My first question is, that's what you wrote
13 back in Exhibit 2 on August 25, 2005, under oath?
14 A. Right, right.
15 Q. And my question is, if I could have it, do you
16 recall when that meeting you say with the chief was?
17 A. I believe they had a discussion on the
18 Columbine issue and all the training program and some of
19 their concerns in their impact bargaining session with
20 the AR-15s prior to that. It was maybe a month or month
21 and a half before.
22 Q. And who was present at that meeting?
23 A. I believe Paul Boyle was, Dana. I believe the
24 chief was.

Page 16

1 Q. Dana?
2 A. Dana Goodwin.
3 And I believe the chief and Captain Botieri
4 were there.
5 Q. And do you know what was discussed?
6 A. I know they discussed that, and they discussed
7 the impact bargaining, I believe, on the use of the
8 AR-15s.
9 Q. What information are you aware of that they
10 discussed your preexisting medical condition and your
11 inability to participate in the drill?
12 A. I'm not aware of any -- I'm not aware of any
13 exact language. I wasn't there.
14 Q. I'm just trying to follow up on -- because what
15 you wrote in your answer was you were to bring up a
16 meeting -- concerns about preexisting medical condition
17 and inability to participate in the drill.
18 So what information, if any, are you aware of
19 that was brought up?
20 A. I don't have any information of what
21 specifically because I don't have any notes of that
22 meeting or anything like that. I just know that they did
23 discuss. They had concerns as the union for individuals.
24 Q. Do you know in your conversations with Paul

Page 17

1  Boyle and Dana Goodwin whether they mentioned
2  specifically that they brought up concerns about you and
3  any preexisting medical condition?
4        A.  I don't know if they brought -- I don't recall
5  if they said specifically, you know, but they did say
6  that they did speak with him or tried to speak with him
7  about the concerns that they had from other drills and
8  other towns, and they tried to address some of those
9  concerns.
10       Q.  In Interrogatory No. 15 on Exhibit 2, it
11  states:  (Reading)  Please set forth all facts on which
12  you rely where you allege Chief Pomeroy was aware that
13  you reported him to the Inspector General's office
14  regarding his compensation for educational benefits (end
15  reading), and you answered:  (Reading)  Town manager
16  Eleanor Beth told me in her office that Pomeroy was aware
17  of the Inspector General office investigator.  I wrote of
18  the harassment on the job (end reading).
19            Where did you write of the harassment on the
20  job?
21       A.  It's in the documents that we produced to you.
22       Q.  Do you know which documents particularly you're
23  referring to?
24       A.  If you want to go off the record, I can get it.

Page 18

1        Q.  Can you remember --
2        A.  It's in the minutes.  I'd have -- you'd have to
3  go through the --
4        Q.  All right, that's fine.
5            MR. SILVERFINE:  We'll go off the record.
6            (Discussion off the record.)
7            MR. SILVERFINE:  Back on the record.
8            Mr. Kelley is just showing me a letter that
9  appears to be provided, Exhibit 3 of document
10  production and voluntary disclosure.  It's a letter
11  from -- it looks like from Mr. Kelley to Mrs. Beth
12  dated May 10, 2001.
13            And perhaps -- could I get a copy of this and
14  just mark it so it's clear on the record?
15            MR. GALLITANO:  Sure.  Do you want three
16  copies, you think?
17            MR. SILVERFINE:  That would be great.  Just so
18  it's clear on the record.
19            (Pause off the record.)
20            MR. SILVERFINE:  Why don't we mark this as
21  Exhibit 6.
22                        (Whereupon, a letter dated
23                        May 10, 2001, was marked as
24                        Exhibit No. 6 for the

Page 19

1                        defendant.)
2            MR. SILVERFINE:  Okay, we'll continue while Joe
3  is making copies.
4  BY MR. SILVERFINE
5        Q.  On Exhibit 6 this is a letter you wrote to
6  Eleanor Beth, who was then town administrator?
7        A.  She was the town manager.
8        Q.  Town manager.  And your complaints had to do
9  with harassment as it related to the discrepancy in pay
10  records as you saw it?
11       A.  What it was, as you can see from the letter --
12       Q.  Yeah.
13       A.  If you want to follow it down with me, we can
14  --
15       Q.  Yeah, go ahead.
16       A.  Follow this one right here.
17       Q.  Okay.
18       A.  I went to go see her prior to this letter being
19  written, discussing as being a member of the board
20  elected to the position in the fund as well as a town
21  meeting member.  There were some serious questions of the
22  personnel bylaw and how it relates in being employed in
23  the police department.  There was no provision for Quinn
24  Bill or holiday money or vacation money or overtime,

Page 20

1  which was an ongoing practice in it.  And having
2  experience in municipal finance and having experience
3  with collective bargaining, employees are paid in three
4  criteria.  They're paid pursuant to a personnel bylaw, if
5  they're a member of it; a collective bargaining
6  agreement; or a contractor relationship which they're
7  eligible.
8            In the case that I was bringing to her
9  attention, which involved town meeting monies and
10  retirement monies and disbursement of funds, there was no
11  mention of Quinn Bill, holiday money, vacation money, and
12  overtime that was being paid on an ongoing basis at the
13  police station in the bylaw that governed the employment
14  of the police captains and the police chief.  The bylaw
15  by the Town of Plymouth's adoption, the way they
16  establish their own bylaw, is pursuant to Chapter 41,
17  108A, which says in a city or town -- in a town by a vote
18  of the town meeting, they can establish a personnel
19  bylaw.  Town meeting had never seen these numbers, had
20  never seen these benefits.  It never went through the
21  personnel bylaw.  And come to find out it was ongoing for
22  over 15 years, and benefits were also being given without
23  authorization of the bylaw to members of the fire
24  department.  Those benefits and payroll numbers were

Page 21

```
 1    given to the retirement board, which would then formulate
 2    a benefit and calculation pursuant to the individual
 3    member's group, age, and salary.  Pursuant to the
 4    regulations generated by Chapter 32 CMRs specifically
 5    indicate as well as the board policy that we will check
 6    and back up every number that's in a computation with the
 7    governing document.  And from the governing document in
 8    this case, it would have been the personnel bylaw.  To
 9    the payroll there was a 30 to 35 percent discrepancy.
10              At that point I spoke to Mr. Botieri with Mr.
11    Rooney present in his office and explained to him the
12    severity of this issue in the event that something
13    happened to one of them or anybody in that category.  I
14    had spoke to board counsel from the retirement board, and
15    he said, "Tom, you have to bring it to the attention of
16    the town in some form or fashion, but get it done"
17    because of the Needham issue where an auditor walked in
18    to the Needham Retirement Board.  There were mistakes
19    made by the Needham board for internal tabulations of
20    monies.  An auditor ordered the people to pay the money
21    back over -- it was like a 20-year period that this went
22    on for.  And the individuals that were out, the members,
23    didn't even realize this happened.  It wasn't their
24    mistake.
```

Page 22

```
 1         Q.   Now, did you also file complaints about the
 2    fire department to anyone?
 3         A.   No, I didn't even know it was going on till we
 4    went -- we dug into it deeper.
 5         Q.   When was that?
 6         A.   When Eleanor Beth looked into or -- when
 7    Eleanor Beth finally -- how do I say this?  When Eleanor
 8    Beth looked into it, she found that this practice was
 9    going on in the fire department as well.
10         Q.   Do you remember when that was?
11         A.   That was just around the time that I wrote this
12    letter to her she started.
13         Q.   This was around May 10, 2001?
14         A.   This letter here.  After that she started to
15    look into it.
16         Q.   When you complained about the police
17    department, were you complaining about all the police
18    department or just about Chief Pomeroy?
19         A.   I was complaining about the actions of Captain
20    Botieri and Chief Pomeroy.
21         Q.   Anyone else?
22         A.   No.
23         Q.   Besides -- you were kind enough to give me
24    copies of --
```

Page 23

```
 1         A.   We have other e-mails here as well.
 2         Q.   The other e-mails in your production are the
 3    examples of what you say you wrote about the harassment;
 4    is that correct?
 5         A.   Right, correct.
 6         Q.   And just for the record, why don't we mark
 7    these as Exhibit Nos. 7 and 8, which are -- looks like
 8    an e-mail from you on September 2, 2000.  We'll mark that
 9    as Exhibit 7.  And then an e-mail of May 8, 2001, from
10    you we'll mark as Exhibit 8.
11                        (Whereupon, e-mails dated
12                         September 2, 2000, and May
13                         8, 2001, were marked as
14                         Exhibit Nos. 7 and 8 for
15                         the defendant.)
16    BY MR. SILVERFINE
17         Q.   And when you were forwarding, for instance,
18    this e-mail in Exhibit 7, which is your September 2,
19    2000, e-mail --
20         A.   Which one are you on?  I'm on the second one.
21         Q.   This says meeting September 1, 9-month --
22         A.   Okay, I have that one.
23         Q.   Who did you send that to?  It says Kelley and
24    Goodwin.
```

Page 24

```
 1         A.   I sent that to -- Dana Goodwin was present at
 2    the meeting on the 1st.
 3         Q.   Did you send that to Captain Botieri or Chief
 4    Pomeroy or anyone else?
 5         A.   No, but they have access to -- it's what they
 6    call systems manager.  They can look into any e-mail at
 7    any time.
 8         Q.   My question is, did you send this -- did you
 9    forward this to Botieri or Pomeroy or to Eleanor Beth?
10         A.   According to that format, no, I didn't.  I kept
11    it in my documentation.
12         Q.   And Exhibit 8, which looks like an e-mail from
13    you to -- it looks like yourself, Boyle, and Botieri, did
14    this have to do with the vacation time you were referring
15    to?  Is that right?  Why don't you take the original.
16              (Hands to witness.)
17         A.   Yes.
18         Q.   And that's what you were referring to when we
19    discussed a few minutes earlier about your decision with
20    the vacation time?
21         A.   In the e-mail I indicate that I had put in for
22    a month's vacation in June and a month's vacation for
23    July.  I had accrued time towards the end of the fiscal
24    year, which would be June, and accrued time starting in
```

**Page 25**

1  July 1. And I had put in time for that over 60 days
2  prior to it. I believe the date -- what's the date on
3  there?
4     Q.  May 8, 2001.
5     A.  Yeah, right.
6     Q.  Just so I'm clear, besides what we've marked
7  here, you've also indicated in your production would
8  include any and all notices or letters, e-mails you sent
9  as to any harassment that you thought you were
10  undergoing, right?
11    A.  To the best of my knowledge, that I had.  What
12  was available.
13    Q.  In other words, there's no other documents
14  other than --
15    A.  Not that I can think of.
16    Q.  -- what you've already produced to us?
17    A.  If I could find -- if I have something, I'd
18  gladly give you a copy of it.
19    Q.  In Interrogatory No. 16 on Exhibit 2, you make
20  a listing of all your treating physicians.  Is there
21  anyone else that's not --
22    A.  No.
23    Q.  -- listed there?
24    A.  No.  We went over this, believe me, before.

**Page 26**

1     MR. ARMSTRONG:  Well, there is.  I mean,
2  corrected in the first --
3     THE WITNESS:  I did correct that.
4     Q.  I'm just asking if there's anybody else.
5     A.  No more since then.  No more since then.
6     Q.  That's what I'm asking.  I just want to make
7  sure that we have all the medical providers.  Thank you.
8     A.  We do, right.
9     Q.  I don't know if I asked you this last time, and
10  if I did, forgive me, but I just want to understand.
11    Did the town have to hire or pay any other
12  police officer to cover your shift when you went to the
13  retirement board meeting?
14    A.  They never did.
15    Q.  To your understanding, how would they cover
16  your sector when you went to a retirement board meeting?
17  To your understanding.
18    A.  Another officer would be assigned my position
19  and have to cover two areas.  They would run short on the
20  shift.  I believe Captain -- I believe Lieutenant Fahy
21  indicated that as well the other day.
22    Q.  To your knowledge, did that ever create any
23  problems as far as coverage to your understanding?
24    A.  I can tell you that officers would have to

**Page 27**

1  cover two areas, and if it was a long meeting, they'd be
2  pretty upset that they'd have to cover my area.  Some of
3  them were sympathetic.  They realized that I was doing a
4  volunteer job for their best interest and elected to the
5  position.  Some of them really didn't care about
6  anything.  They were just upset, and it was difficult
7  sometimes reasoning with them, that I can't help it if
8  they're not going to hire somebody to cover the extra
9  position because I'm out.  They are getting a charge back
10  for it.
11    Q.  What's a charge back?
12    A.  They were charging back money from the
13  retirement system, and they indicated to people that they
14  did that for the purposes of coverage, but they never
15  covered me.
16    Q.  Did any of the officers express their, for lack
17  of a better word, anger or --
18    A.  Yes.
19    Q.  -- disappointment to you?
20    A.  Absolutely.  All the time.
21    Q.  Which officers?
22    A.  Anybody that was -- I mean, you could go back.
23  They'd have a multiple car accident and then have to go
24  to another one, and they'd be going all the time.  They

**Page 28**

1  never covered me, so it put the pressure on all the other
2  people.
3     Q.  Name some of the officers that you recall that
4  --
5     A.  It was day shift.  It would be the day shift.
6  I mean, I can't name specific names.  It's almost four
7  years ago or so or better, but it happened all the time
8  over my career there on the time.
9     Q.  Do you know if those complaints went up the
10  chain of command to --
11    A.  I remember Lieutenant Fahy and Captain Skip
12  Budge indicating to people that they never covered me and
13  "They should be covering you."  And that was a decision
14  made by the second floor, and they couldn't do anything
15  about it.
16    Q.  You had produced a note to the town after May
17  25, 2003, relative to your condition -- and I'm sure I'm
18  going to mispronounce this -- cardiomyopathy.  Do you
19  remember that?
20    A.  If you have the document, I'll look at it.  I
21  don't mean to be --
22    Q.  I have it somewhere.
23    A.  There are numbers of them.
24    Q.  Do you remember if the note indicated that the

Page 29

```
1    condition that you were suffering was caused by the job
2    relative to cardiomyopathy?
3         A.   No.  If you'd show me a document, I'd be able
4    to specify exactly what you're talking about.
5         Q.   But do you have any independent recollection?
6         A.   No, I don't.  I'd have to see it in front of
7    me.  We've got 5-inch stacks of paper here.  I'm not
8    trying to be argumentative.  I just...
9         Q.   All right, I understand.
10             Were you angry that Chief Pomeroy was
11   scrutinizing your absence from work due to the retirement
12   board participation?
13        A.   I was annoyed because of -- no one else was
14   scrutinized like that.  I was constantly, you know --
15   people at work would be saying, "They're out to get you.
16   They're out to get you."  I had other people on the board
17   that turned around and ridiculed and were saying, "Oh,
18   you better get over there quick.  They're counting the
19   minutes."
20             I felt the whole thing was unnecessary because
21   they gave us a bill for those hours, and we wouldn't have
22   paid it if I wasn't there.  Number two is our minutes of
23   the meeting indicate when the meeting starts and when it
24   ends.  That charge back was handled by the administrator
```

Page 30

```
1    who would be at the meeting.  So if they charged me -- if
2    they charged the retirement system for time that I wasn't
3    there or too much or too little, she would make that
4    change or she would object to paying it and bring it to
5    the board's attention.  That never happened.  I was at
6    every meeting that I was supposed to be at.
7         Q.   Were you angry that Captain Botieri --
8         A.   I wouldn't justify it as angry.  I justify it
9    as harassment in a sense.  No, not angry where it's
10   anger, a different meaning of the word.
11        Q.   Were you angry at Captain Botieri for
12   scrutinizing your absence from work due to retirement
13   board participation?
14        A.   I was annoyed by it.  I was embarrassed by it.
15   It was as if I was trying to put something over on them
16   when they had all the checks and balances already there.
17   I believe they did that purposely so that if I was ten
18   minutes late, they would say, "Oh, you must have been
19   doing this.  You must have been doing something else" and
20   try to...
21        Q.   While you were or have been on the retirement
22   board, has there ever been any allegations against you
23   that you misused funds in your position on the retirement
24   board?
```

Page 31

```
1         A.   Absolutely not.
2         Q.   Did you as part of your retirement board work
3    take trips?
4         A.   We have conferences that we have to go to and
5    are required to.  I run over $100 million and nine
6    managers.
7         Q.   And approximately how many seminars do you
8    attend a year as a retirement board member?
9         A.   It varies.  It depends on -- it depends if
10   we're looking for a new manager for an international
11   fund.  It depends on market conditions.  It depends on a
12   number of factors.  I mean, if markets are good,
13   everybody's pretty happy just trying to make what you're
14   making.  If markets are bad, everybody's scrutinizing
15   things.  You know, there are new instruments financially
16   coming out every day.  There are new companies.
17   Companies change hands.  Individuals change hands.  All
18   our contracts on the board are manager specific.  They
19   have specific articulate conditions that have to be met
20   to meet a certain asset class.  Every one of those
21   conditions and contract is articulate.  There's nothing
22   ambiguous.  So if there's a change, we bring that manager
23   in.  We meet with them, or we go somewhere to meet with
24   them because each one of them have a substantial amount
```

Page 32

```
1    of money.  And one change in an asset class can affect
2    our whole portfolio.
3         Q.   During the time period you've been on the
4    retirement board, how many seminars do you attend a year?
5         A.   Again, I said we have a state conference one
6    that we attend spring and fall.  Sometimes, depending on
7    -- one of the big issues lately has been the GASB 45
8    issue, which in this state the way the legislation is
9    being worked through the statehouse is going to end up
10   the responsibility of the retirement system.  I have been
11   following that issue for almost ten years now.  It's
12   going to be a major financial undertaking for our
13   retirement system.  I have attended seminars indicating
14   the impacts of GASB 45, which is your unfunded medical
15   for retirees, how it's being funded, how it's being
16   handled in different states so that we can be ahead of
17   the curve when this number comes into the -- when we have
18   to declare it, and it's in 2007.  There's a lot of work
19   to put that together.
20        Q.   What happened to your duties as a police
21   officer when you attended a trip on behalf of the
22   retirement --
23        A.   I would notify Mr. Botieri in an e-mail
24   indicating that I'd be on board business and I'd be at a
```

**Page 33**

1  conference via e-mail.

2  Q.  And would they have to cover for you during

3  those periods?

4  A.  I don't know what they did.  I know it from

5  speaking to Kevin and speaking to Lieutenant Budge when I

6  was working.  They would say specifically -- and I asked

7  them many a time because I would hear guys saying that at

8  work.  I would say to them, "Did they cover me on that

9  day when I was at this conference or here for the day in

10  Boston or doing this, meeting managers?" and they would

11  say, "No, never did."  I believe Kevin put that on the

12  record the other day.

13  Q.  Are you still chairman of the retirement board?

14  A.  Yes, I am.

15  Q.  How long have you been chairman?

16  A.  I believe since 2003.

17  Q.  For instance, while you were chairman in 2004,

18  is it fair to say you attended trips for the retirement

19  board to Washington, D.C., Puerto Rico, Anaheim, Hyannis,

20  Danvers, and Florida?

21  A.  I can't remember exactly.  Did you get that out

22  of the Boston Globe?

23  Q.  Well, I can look for it, but is that accurate?

24  A.  I attended conferences, yes.  I don't know

**Page 34**

1  exactly what years you're looking at there.

2  Q.  I said 2004.

3  A.  No, I don't think that would have been 2004.

4  It would have been over a number of three years, I

5  believe that was.  I believe that was two or three years.

6  Q.  We'll come back to that in a minute.

7  Last time when we had talked -- and I'm not

8  meaning to jump around.  I'm just looking at some notes

9  from talking to you last time.  We had discussed this

10  odometer where you had been disciplined for an odometer

11  abuse.  Do you recall that?

12  A.  I believe that was over 25 years ago.

13  Q.  I was going to ask you, do you remember what

14  year it was?

15  A.  I don't remember exactly when it was.  It was

16  supposed to by the present contract, the contract I was

17  under -- that information wasn't even supposed to be in

18  my personnel file.  It was supposed to be removed.

19  Q.  Was it removed from your file?

20  A.  Never.

21  Q.  It was never removed from your file?

22  A.  No, I don't know how it got there.  I don't

23  know how you would have got your hand into that lawfully.

24  Q.  Well, I think you told me about.

**Page 35**

1  A.  You had a piece of paper you put in front of

2  me.

3  Q.  I thought I had -- I thought I --

4  A.  No, it was in the production of documents, and

5  it was a clear violation of the contract.  I don't know

6  how you would have got that information lawfully.

7  Somebody had to keep a secret file and throw it in there

8  after we filed suit.

9  Q.  Okay, but you're not denying that you were

10  disciplined for it, right?

11  A.  I believe it was something that happened in --

12  oh, it must have been '79 or '80, and I believe I did an

13  extra shift for it.

14  Q.  Now, during the active shooting drill of May

15  25, 2003, there were several departments present besides

16  yours?

17  A.  No, just Plymouth.

18  Q.  Just your department?

19  A.  Just Plymouth alone.

20  Q.  Along with the state police?

21  A.  State police.

22  Q.  And is it fair to say there were safety EMT

23  officers?

24  A.  I don't know exactly what their certification

**Page 36**

1  was.  I never had first aid equipment.  They had oxygen.

2  I remember being dragged out and then placed under

3  oxygen, and then the ambulance came.

4  Q.  Do you remember that there were some 12 to 15

5  EMT or safety officers there?

6  A.  No, there wasn't no 12 or 15 EMTs there.

7  Q.  How many do you say there were?

8  A.  There were only, I believe, six instructors.

9  Q.  Were there separate EMT or safety officers

10  there that you know?

11  A.  No.  No, there wasn't.

12  Q.  You're saying there were none?

13  A.  There was not -- it was not a separate unit.

14  If you're saying there was a separate unit standing by,

15  that's not the case.

16  Q.  I'm not asking -- I'm asking, are you aware of

17  any other safety EMT officers present besides --

18  A.  The officers that were there were uniformed --

19  not uniformed, but they had the -- the overalls of the

20  state police strike team that they wear.  It's like a --

21  how do you want to say?  You see it on TV all the time.

22  They have that -- you know, I've seen them all the time.

23  It's like an overall.  It's like a suit that they wear.

24  It's like a work suit.  You know what I'm trying to say?

Page 37

1   How do I explain it other than --
2               MR. GALLITANO:  SWAT team.
3         A.    It was a SWAT team suit that they all wear, and
4   it's a standard.  They were all dressed in that.  It's
5   like a one-piece thing that they zip up, and it's heavy
6   material, and maybe it's fireproof.  I don't know.  I
7   never wore one.
8         Q.    In terms of the active shooter drill, that
9   Columbine drill, is it fair to say the department gave
10  you and the members at least a month's notice that the
11  drill was coming up?
12        A.    Not at all.
13        Q.    How much notice do you say you got?
14        A.    I came into work one day, and they said, "You
15  have to do it in a week."
16        Q.    Are you saying you got a week's notice?
17        A.    We got it on the board.  We don't get notices
18  like, "Come and talk to us."  We just get a piece of
19  paper stuck on the wall by Botieri, signed by Botieri
20  saying, "You have to go.  If you don't go -- you're
21  assigned this day -- you're subject to discipline."
22  That's in the rules and regulations.
23        Q.    Are you aware that there were several other
24  officers who were excused for participation for health

Page 38

1   reasons?
2         A.    I was never aware of that till today, till I
3   heard him testify.
4         Q.    Forgive me.  John Abbott, is that his name?
5         A.    Right.  I never knew that.
6         Q.    Dennis Govoni?
7         A.    Govoni.  Portuguese.  You've got to say it like
8   Govoni.
9         Q.    Fair enough.
10              Were you aware that he was excused?
11        A.    I never knew that till this morning.
12              MR. SILVERFINE:  Give me a second here.
13              (Pause.)
14        Q.    I'm going to ask you some questions about some
15  documents, some of which I believe you --
16        A.    What do we do with -- are these all -- okay,
17  I'm sorry.  Go ahead.
18        Q.    Just procedurally we take these.
19        A.    I thought you were --
20        Q.    No, no.  That's okay.  You're welcome to look
21  at them, but they're just documents that we mark that
22  become part of your deposition exhibits.  Your counsel
23  will have copies.
24              Back in May 30 of 2001, did you send an e-mail

Page 39

1   -- and I'm going to show you a copy and give a copy to
2   your counsel -- to yourself, Officers Boyle, Budge, and
3   Botieri relating to a surgery that was scheduled for June
4   11, 2001?
5               (Hands to witness.)
6         A.    Yeah, I was injured.  I had -- this was -- I
7   remember this was Mother's Day.  As a matter of fact, the
8   injury report is in the file as well.  We arrested an
9   individual for assaulting his wife.  And myself and
10  Officer Kennedy went to the house, and we had a struggle
11  with him down a flight of stairs, and I got a hernia in
12  my stomach from it.
13        Q.    And when you say surgery, is this the surgery
14  you're referring to in this e-mail?
15        A.    Yeah, I went to the hospital that day, and then
16  I spoke to -- I contacted a surgeon, Dr. Zazzarino, who I
17  know, and he did the surgery, which was scheduled for the
18  11th.  I was working with a brace around me on my
19  stomach.
20              MR. SILVERFINE:  Let's just for the record mark
21        this as Exhibit 9.
22                          (Whereupon, the e-mail
23                          dated May 30, 2001, was
24                          marked as Exhibit No. 9 for

Page 40

1                          the defendant.)
2   BY MR. SILVERFINE
3         Q.    And relative to Exhibit 9, second paragraph,
4   you indicated that you would be attending a retirement
5   conference?
6         A.    Uh-huh.
7         Q.    Do you see that?
8         A.    Yeah.
9         Q.    Where is that, do you recall?
10        A.    That would have been what they call the MACRS
11  conference, Massachusetts Association of Contributory
12  Retirement Systems.  That was an advocacy group that
13  represents all 106 retirement systems in the
14  Commonwealth, which I am a member of the executive board
15  from that.
16        Q.    Now, did you attend a conference for the
17  retirement board sometime in the fall of 2002?
18        A.    I could have.
19        Q.    Was there some discussion about filing or
20  preventing people from receiving their retirement
21  benefits if there was a criminal complaint or action
22  against them?
23        A.    I couldn't tell you the agendas of those.  I'd
24  have to look at the agendas.  There are all kinds of

Page 41

1    decisions.

2           Are you familiar with DALA, Division of

3    Administrative Law Appeals? Are you familiar with that

4    agency? Are you familiar with that? I just want to

5    clarify my question. If I can't --

6       Q.   I'm not familiar with it.

7       A.   Okay, what it is, it's -- in the administrative

8    process to retirement, okay, there is -- we make a

9    decision as a board. If you're an aggrieved party and

10   you're a member, you can go and you appeal it to the

11   Division of Administrative Law Appeals. It's your

12   administrative relief. Then there is what they call --

13   after DALA there is CRAB, Contributory Appeals Board.

14   And then from that point we go into superior court on a

15   point of law, and then if you have another point of law,

16   you appeal to the appellate courts up the ladder.

17          Every time that we have a conference with

18   MACRS, spring and fall, we have the DALA magistrates

19   come. Okay, we have Chris Connolly (phonetic), who's the

20   chief magistrate, as well as Kimberly Fletcher. They

21   come and they discuss the recent decisions, the

22   precedent-setting decisions with all the boards, and they

23   bring everybody up to speed on how things are

24   interpreted, how new decisions are interpreted from the

Page 42

1    SJC and all those things that affect the administration

2    of the board from a trustee point of view down to your

3    administrators. It's a scheduled conference time. I

4    don't know what the agenda is, to be honest with you.

5       Q.   So my question is, sometime in the fall of

6    2002, did you attend some kind of seminar where you heard

7    about denying people their retirement benefits if they

8    had a conviction or a criminal complaint against them?

9       A.   I couldn't -- I couldn't qualify the exact date

10   or time. I know those issues have been brought up in the

11   courts. We've just recently done one just last week

12   where they put no statute of limitations on that statute.

13   It was actually ten years old. That was just last week.

14      Q.   And that's something if someone commits some

15   on-the-job fraud you can deny them retirement, words to

16   that effect?

17      A.   The way that statute's been -- I want to just

18   say interpreted through the SJC in this state the last

19   five years has been very broad-based. It's very -- just

20   the limitations -- just the other day we had a meeting, a

21   week ago, last week, where our counsel, Mike Sacco,

22   brought to the attention a recent SJ decision that was

23   just passed down on the 10th of June that indicated that

24   there's no statute of limitations on that particular

Page 43

1    statute. And it was involving a case where an individual

2    -- he forfeits his pension, and it was over ten years ago

3    the incident happened, but they were able to somehow

4    adjudicate it. And I didn't read it totally, but it

5    basically said there is no statute of limitations for

6    this statute where some people thought it was five years.

7    And the SJC said no, it's wide open.

8       Q.   Did you ever yourself bring this to the

9    retirement board that we have to crack down on these

10   kinds of cases where there's been --

11      A.   No.

12      Q.   -- a criminal complaint or --

13      A.   No, no. We have an obligation. For an

14   example, we had some individuals -- excuse me -- I have

15   to go off record for a minute. I can answer that in a

16   minute because it involves two things. There's a

17   conflict.

18      Q.   Well, there's a standing question in front of

19   you.

20      A.   Well, it's a conflict. I don't want a conflict

21   on a question.

22      Q.   Well, if you have a standing question, you're

23   obligated to finish it. Then if you need to talk to

24   counsel --

Page 44

1       A.   There was a case before us on a forfeiture

2    issue, okay, that we had to hold a hearing regarding the

3    forfeiture issue, and we found that there was no crime

4    committed that was applicable to the individual's office,

5    and the individual was able to retire.

6           THE WITNESS: Now I need to go off the record,

7    okay?

8           MR. SILVERFINE: Okay.

9           (Short recess was taken.)

10   BY MR. SILVERFINE

11      Q.   Right before we broke I had asked you if you

12   had supplied any information. How about do you know a

13   former officer named Furtado?

14      A.   Police officer now?

15      Q.   Yeah.

16      A.   Yeah, Daryl -- Daryl's dead.

17          MR. GALLITANO: Daryl's dead.

18      A.   Kevin, Kevin Furtado.

19      Q.   Did you ever supply him with any information as

20   to crackdown on retirement benefits as they pertained to

21   applications for criminal complaints or convictions?

22      A.   No.

23      Q.   And in particular as it related to former town

24   manager Eleanor Beth?

Page 45

1     A.    No.

2     Q.    I'm going to show you another e-mail which I

3  ask you if you recognize.

4           (Hands to witness.)

5     Q.    Do you recognize that?

6     A.    Yes.

7     Q.    And is that an e-mail that you authored?

8     A.    Yes, I did.

9           MR. SILVERFINE:  Let's mark as Exhibit No. 10.

10                      (Whereupon, an e-mail dated

11                      July 3, 2003, was marked as

12                      Exhibit No. 10 for the

13                      defendant.)

14  BY MR. SILVERFINE

15    Q.    Showing you what's been marked as Exhibit 10,

16  you sent this on -- it looks like July 3, 2003?

17          (Hands to witness.)

18    A.    Yes, that's the day that I used -- I had to use

19  Skippy Budge's -- Lieutenant Budge's computer because

20  mine for some reason wasn't working.  My access to it

21  wasn't working.

22    Q.    Just help me on this, if you would.  In the

23  e-mail itself, it says you requested -- I'm reading about

24  halfway down -- that vacation time that was scheduled on

Page 46

1  July 1, 2003, should be changed to sick time.  Do you see

2  that in the middle of the second paragraph?

3     A.    Right, I had sick time -- I had vacation time

4  starting July 1, and I filed the application, and I put

5  in change that to sick time, correct.  I had a sick bank.

6     Q.    Up until that time from the point you went out

7  on May 25, 2003, were you using sick time?

8     A.    I went in one day, and I was just out of the

9  hospital.  I wasn't feeling well, and I said to Captain

10  Botieri or somebody up there -- I remember saying, "Just

11  put me on for vacation right now," and then I left the

12  place.

13    Q.    So as of May 25 when you left, you were on

14  vacation time?

15    A.    I believe that day there I was -- they charged

16  -- I don't know if they could charge me sick time -- or

17  they didn't pay me.  They actually didn't pay me the full

18  day.  They only paid me half a day, and then I was off,

19  and then I went in -- I think I spoke to someone on the

20  phone or I did something after.  I don't exactly

21  remember.

22    Q.    Help me clarify this.  When you went out on May

23  25, 2003, were you on sick time or vacation time?

24    A.    I was working.  I wasn't out.  I was working.

Page 47

1     Q.    No, May 25.  I'm assuming you --

2     A.    Oh, yeah, two days later.

3     Q.    I'm assuming you're sick.  You went to the

4  hospital, right?  That's your heart, right?

5     A.    Oh, yeah, yeah.

6     Q.    Right?

7     A.    Yes, yes, yes.  Okay, I'm getting -- you're

8  right.

9     Q.    May 25 you have the Columbine incident, right?

10    A.    Uh-huh.

11    Q.    When you went out May 25 from there, were you

12  on sick time at that point?

13    A.    Sick time, I believe -- I mean, vacation time,

14  I believe.

15    Q.    Vacation time?

16    A.    Right.

17    Q.    Did you ask to be put on vacation time so that

18  nobody would, you know, bother you, so to speak?

19    A.    No, when I came home from the hospital, I had

20  only preliminary reports from the doctors from there,

21  which were not anything that -- they were only attending

22  physicians.  I had made an appointment with my doctor.  I

23  believe I wrote a preliminary report that I gave to the

24  chief via fax from my house and my own computer

Page 48

1  indicating to him that I would be seeing my doctor prior

2  to -- I think it was the 21st I saw my doctor of June.

3  And we had the complete file and the results of the

4  cardiac catheterization.  At that point I was determined

5  from talking in counsel with my doctor and my personal

6  friends and stuff that I have to put my papers in to

7  retire.

8     Q.    Back in June 25, 2003, did you speak to Captain

9  Botieri about this sick time and vacation time?

10    A.    All I said to him at that -- I saw him at the

11  town hall, like it says, and I said I just put in my

12  papers that day -- I believe a couple of days before

13  that, and then I wrote this to the chief.  I said, "Put

14  me in for sick time because I put my papers in as of this

15  date."

16    Q.    Back on June 25, 2003, did you request that

17  your use of sick time be changed to vacation time so you

18  would not be restricted in your activities?

19    A.    Not at that point, no.  I put in for sick time

20  then because I had additional time and I knew I'd have to

21  retire and I was putting my application in.

22    Q.    On June 25, 2003, did you speak to Captain

23  Botieri and state that you wanted to be able to be out

24  and about and be able to drink on your boat without

LINDA M. CORCORAN, CVR  (781) 585-0172

Page 49

1    repercussions or allegations of sick leave abuse?

2        A.    Absolutely not.  Emphatically not.

3        Q.    All right, I'm just asking.

4        A.    I never questioned -- I never received that

5    letter that you have in there ever till the production of

6    documents.

7        Q.    I'm not asking you if -- I'm asking you if you

8    --

9        A.    Well, I consider it a personal insult from that

10   department and that individual to say those things after

11   the event that I went through.

12       Q.    All right, I'm just asking you if you said

13   something.  Do you understand the question?

14       A.    I understand the question.  I never made that

15   remark to him.

16       Q.    That's what I'm asking.

17       A.    Okay.

18       Q.    And just so I'm clear, you did, however, change

19   in Exhibit 10 your request for vacation time be changed

20   to sick time, and then ultimately you put in your

21   retirement application, right?

22       A.    I put my retirement page in on the 25th, as it

23   states, okay, and after when I put my retirement in, it's

24   always been the policy of the town to use accrued sick

Page 50

1    time for this type of retirement application till the

2    medical panel comes back with the appropriate language,

3    okay, because of a court decision in Brookline that they

4    could wait for a 111F.  There have been numerous

5    decisions in the court that say that's perfectly legal

6    for the town but then IOD is retroactively given as a

7    result of the medical panel's decision, and that's been

8    in statute law as well as case law.

9        Q.    Let's move on for a moment to the next

10   document, if we can.  I'm going to show you another piece

11   of paper which is dated September 9, 2003, and I believe

12   it's cc'd to you.

13              (Hands to witness.)

14       A.    Yeah.

15       Q.    Do you recognize this?

16       A.    Absolutely.

17       Q.    And this is a letter that Debra Sullivan, the

18   director of the Town of Plymouth's Contributory

19   Retirement Board, sent to the chief of police?

20       A.    Yeah, this is a standard letter sent by the

21   retirement board to the employer department head.  It is

22   required -- that letter is required by CMR under Chapter

23   32.

24              MR. SILVERFINE:  Let's mark this as Exhibit 11.

Page 51

1              (Whereupon, the letter

2              dated September 9, 2003,

3              was marked as Exhibit No.

4              11 for the defendant.)

5              MR. GALLITANO:  Can we go off the record for a

6    minute?

7              MR. SILVERFINE:  Absolutely.

8              (Discussion off the record.)

9    BY MR. SILVERFINE

10       Q.    Just showing you Exhibit 11, just help me on

11   this, if you would.  The first paragraph says:  ( Reading)

12   Please be advised that on September 8, 2003, the

13   Commission of the Division of Public Employee Retirement

14   Administration granted accidental disability (end

15   reading).

16              Do you see that?

17       A.    Uh-huh.

18       Q.    You have to say for the record --

19       A.    Oh, yes.  I'm sorry.

20       Q.    This letter was written on September 9.  Was

21   this a particularly quick turnaround in your experience?

22       A.    No, no.

23       Q.    Why was this letter sent the next day, if you

24   know?

Page 52

1        A.    All I can figure is, number one, when you have

2    a -- I mean, I had a unanimous medical panel in my case.

3    I had three cardiologists indicate that it was -- four

4    questions on the certificate were answered in the

5    affirmative.  I was on the job when it happened.  There

6    were no questions from the board.  The board sent it up

7    to the state.  The state looks at it.  Their final under

8    -- they're required to look at it under Chapter 32.  They

9    make the final determination if there are any

10   inadequacies, address any issues.  They can remand it

11   back to the board.  They look at it, and then they just

12   say okay.

13       Q.    And were you treated any differently than any

14   other retiree to your knowledge?

15       A.    No, I precluded myself entirely from the

16   procedure just so that allegation that you just

17   stated would not be relevant.

18       Q.    Let's show you another document which is -- I

19   think you just referenced.

20              MR. SILVERFINE:  And it's been previously

21       marked as Exhibit 3 in the Attorney Sacco

22       deposition, but we'll mark it as Exhibit No. 12.

23              (Whereupon, the findings

24              of fact were marked as

Page 53

1                    Exhibit No. 12 for the
2                    defendant.)
3         MR. GALLITANO:  Revisiting.
4         MR. SILVERFINE:  What's that?
5         THE WITNESS:  We already went over this.
6         MR. GALLITANO:  I think this is an old ground.
7         THE WITNESS:  We went over this.
8         MR. SILVERFINE:  I need to just ask a few
9    questions.
10        MR. GALLITANO:  Last time we went all through
11   this, though.
12        MR. SILVERFINE:  But I'm not going to be that
13   long.  You'll forgive me.  I'm just trying to be
14   thorough.  I'm not looking to bang him up more.
15        THE WITNESS:  You're not banging me up, believe
16   me.
17   BY MR. SILVERFINE
18   Q.    Showing you what's been marked as Exhibit 11 --
19        MR. GALLITANO:  12.
20        MR. SILVERFINE:  Is it 12?
21        MR. GALLITANO:  It's 12.
22        MR. SILVERFINE:  Sorry, I don't have my glasses
23   on.  Thank you.
24   Q.    -- Exhibit 12 -- and if I asked you this

Page 54

1    already, forgive me, but in Section 5 where it says
2    "Findings of Fact," the first day on July -- paragraph
3    numbered 5 on July 29, 2003, do you see that?
4         (Hands to witness.)
5    A.    Yes.
6    Q.    To your knowledge, did they review your entire
7    medical and nonmedical history or just as it related to
8    the May 25, 2003, incident?
9    A.    As part of the application to retire, which I
10   believe Debra explained that to you yesterday -- the
11   other day -- Debra Sullivan, you are required in the
12   application, which is quite extensive, to name all the
13   doctors that you've had and all your medical conditions
14   prior to this incident on the date of application.  Okay,
15   all those facts are given, reviewed by the board, the
16   board's attorney.  Then a medical panel gets the exact
17   same stuff.  They review it as well as the incident
18   involved and answer the four questions on the
19   certificate, which they did in my case in the
20   affirmative, all four questions.
21   Q.    Now, right below that in Section A it says you
22   passed a preemployment physical.  Do you see that?
23   A.    Yes, I did.
24   Q.    Did you have to at any time subsequent to that

Page 55

1    take a physical?
2    A.    No.  You asked that question before.
3    Q.    Just bear with me.
4    A.    Okay.
5    Q.    And was there any evidence of hypertension or
6    heart disease once you began your employment with the
7    Town of Plymouth that you notified the town about?
8    A.    None.
9    Q.    Put that down.
10   A.    I just didn't know if you wanted to read the
11   rest of it.  That's all.  Part D is pretty pertinent.
12   Q.    No, no.  These guys are just making fun of me
13   for asking follow-up questions.
14   A.    Yeah, yeah.
15   Q.    As long as you want me to ask a question, on
16   Exhibit 12, just so I understand -- and just help me on
17   this -- Paragraph 12, when it says the board conducted an
18   evidentiary hearing, is that the same board that you
19   serve on?
20   A.    I precluded myself from that.  I wasn't a part
21   of that decision.
22   Q.    I'm just asking if it was the same board.
23   A.    Yes, it was the same board.
24   Q.    The same individuals who sit on the board with

Page 56

1    you, right?
2    A.    Yes, the Town of Plymouth -- as a member of the
3    Town of Plymouth's retirement system, my application must
4    be submitted by statute to the Town of Plymouth
5    Retirement Board.  I cannot submit it to anybody else by
6    the town.  There are specific regulations in the
7    procedures in the CMRs that indicate if a board member is
8    in front of them for these type of reasons, they preclude
9    themselves from it, and those procedures were followed to
10   the T on advice of counsel.
11   Q.    And you're the director of the board?  Is that
12   the right term?
13   A.    I am the chairman.
14   Q.    The chairman, okay.  How long had you --
15   A.    I wasn't the chairman at this time.
16   Dello Russo was.
17   Q.    Back in 2003?
18   A.    No, Dello Russo was.
19   Q.    What years did you serve as chairman?
20   A.    When he left.  He left right after that.  I
21   think in August, September.
22   Q.    And you served as chairman ever since?
23   A.    Yes, I have.
24   Q.    We had talked a few minutes ago about the

Page 57

1  vacation/sick time that you had changed after you had
2  gone out with your heart injury on May 25, 2003. Okay,
3  remember that?
4      A.  We talked about it, yes.
5      Q.  Did you also send the captain an e-mail on --
6          MR. SILVERFINE:  Strike that. Strike that
7  whole line of questioning.
8      Q.  Prior to this injury, had you raised the issue
9  during your employ both at the retirement board and a
10 police officer trying to persuade the town to adopt a
11 policy that if an employee used sick time while waiting
12 for the "Heart Law" retirement and the retirement was
13 approved, that the town would retroactively restore the
14 employee's sick time?
15     A.  I'm going to explain the statute now. I
16 believe I answered this earlier in the deposition. I can
17 actually point to the page. It's in there.
18     Q.  Okay.
19     A.  What happens is there was a decision in 1987,
20 Brookline versus -- a Brookline decision. I don't know
21 the exact officer's name. Blair, Blair. Brookline
22 versus Sergeant Blair. In that case what they said is
23 that there was not an automatic triggering of 111F
24 benefits when it comes to issues around the heart bill.

Page 58

1          At any point in time in an injury, the
2  department head -- in this case the police chief or the
3  town manager can issue someone 111F benefits. It's at
4  their prerogative. But in a heart application, what
5  happens is this. And specifically there's a procedure.
6  The board -- if you were sent to a panel, there was only
7  so many heart physicians and panels in the state. So we
8  were tracking the time it takes for an individual that
9  has an event, turns around and files an application, and
10 by the time you get all the paperwork together and he
11 gets in front of a medical panel because there might be a
12 backlog or where he lives and all that and getting
13 people, a panel to sit down in scheduling, we found as a
14 board a number of years it was taking 120 days. And what
15 was happening is that individuals were using up accrued
16 benefits and then running out of them. If they didn't
17 have enough sick time to cover 120 days, they would go
18 without a paycheck. Now, some communities in an effort
19 not to financially destroy their police and firefighters
20 have adopted a policy to say if there's an application in
21 front of a board and the person uses up accrued time and
22 they're going to go without a paycheck, they have a
23 certain amount of -- the town will give them 111F till
24 the medical panel comes back with a contrary evidence or

Page 59

1  the medical panel affirms that it's job related. This
2  was something that we did as five individuals trying to
3  be decent about the town's policy was there were people
4  who would use up accrued sick time and run out. And I
5  had firefighters and police/firefighters come to me and
6  say, "Kelley, I'm losing my house as well as losing my
7  job because I ran out of sick time and I haven't got an
8  answer from the state yet on the medical panels."
9          And the medical panel would come back -- and I
10 haven't had one rejected -- where it was job related, and
11 they retroactively would back pay them all their accrued
12 sick time and monies from the day that they filed
13 application or the date of the event. We were trying to
14 show Mrs. Beth how they were hurting police and
15 firefighters and that simply by adopting a change till
16 there was contrary evidence that you wouldn't be
17 penalizing guys for risking their lives, and they took no
18 interest in it.
19     Q.  How long had you attempted to push this?
20     A.  I didn't push anything. We just tried to point
21 it out in a matter of exchanging ideas from employer to a
22 retirement board that is faced with the problem that the
23 employer is hurting its own employees, and they just
24 didn't want to recognize what they were doing in their

Page 60

1  practice.
2      Q.  How long did you attempt to discuss this with
3  the town?
4      A.  Oh, we discussed it a number of times over the
5  years. I don't know how many times.
6      Q.  About how many?
7      A.  I couldn't put a number on it. Five or six. I
8  had cases.
9      Q.  You mean five or six years did you talk about
10 it?
11     A.  No, I had cases. And I would show them -- we
12 have a case right now. I had a number of cases tracked
13 by the administrators to say, "This is the date it
14 started, and this is the date we finally adjudicated."
15 On average it was 121 days.
16     Q.  Back in September of 2003, do you remember who
17 later counsel for the town was, by any chance?
18     A.  I don't know. It could have been Hesse, Toomey
19 & Lehane. It could have been what's his name there.
20 Harold Kowal. I think it might have -- I don't know. I
21 don't know. They use different ones for different
22 people. Then they use Kopelman and Paige for different
23 things too.
24     Q.  Were you aware at the time back in September of

Page 61

1    2003 at least when you were putting in for this that
2    labor counsel recommended the town not adopt this policy
3    that you're referring to?  Are you aware of that?
4         A.   I was aware that they spoke in on it.  And what
5    was kind of interesting because I believe the department
6    head at the time said there was a financial -- it was the
7    end of the world, and the financial director said, "Where
8    is it the end of the world?  We're going to retroactively
9    pay these people back anyway."
10        So I didn't see anything in labor counsel
11   recommending anything.
12        Q.   Let me show you another letter which is dated
13   January 14, 2004.  Do you recognize that?
14             (Hands to witness.)
15        A.   Yes, I do.
16        Q.   And that's a letter to you from Paul Boyle, the
17   president of --
18        A.   That's correct.
19        Q.   -- the Plymouth Brotherhood?
20        A.   Uh-huh.
21        Q.   Dated January 14, 2004?
22        A.   Yes, it is.
23             MR. SILVERFINE:  Let's mark this as Exhibit 13.
24             (Whereupon, the letter

Page 62

1                         dated January 14, 2004, was
2                         marked as Exhibit No. 13
3                         for the defendant.)
4    BY MR. SILVERFINE
5         Q.   Showing you now what's been marked as 13, did
6    you have conversations with Paul Boyle, the Brotherhood
7    president prior to him going in to speak to Chief Pomeroy
8    relative to your injury-on-duty loss compensation?
9         A.   Right, what I do is after -- after I got
10   everything back from the state and it was approved, I had
11   all the documentation from the medical panel, all the
12   documentation from the retirement board.  The
13   certificate, which is evidenced from the doctors' panel,
14   unanimous.  I gave those to Dana Goodwin, okay, and
15   Rooney, and I asked them to look at these, sit down with
16   the chief and explain -- and show him what I had for
17   evidence.  I documented everything that we are required
18   to do for injury-on-duty status and would he reconsider
19   his claim.
20        Q.   And did Mr. Goodwin talk to you after he talked
21   to the chief?
22        A.   I spoke to him on the phone, and he also gave
23   me an e-mail of a conversation that Larry Rooney had with
24   the chief indicating the chief said, "I disagree with the

Page 63

1    medical panel.  I'm not paying him."  We had that
2    evidence.  I believe that's in the documents we produced
3    to you as well.
4         Q.   Was there some discussion about the fact that
5    -- with Officer Goodwin that you had never provided the
6    information requested by the chief earlier as to certain
7    medical records --
8         A.   Prior -- excuse me.  I'm sorry.  Go ahead.
9         Q.   -- that he had asked from you back when you
10   first were submitting this stuff?
11        A.   When we first had it, I had the preliminary
12   stuff, which I believe I showed you before the last time
13   we were speaking.  I only had those two things.  I mean,
14   part of the injury-on-duty statute clearly says on a
15   specific date and time an individual suffers an injury.
16   Well, let's take the facts in front of us.  I was at a
17   mandated training program.  111F says you must be on
18   duty.  Well, I was on duty.  There's no argument there.
19   If anybody thinks I wasn't, then the chairman's a liar
20   and everybody else is a liar.  I collapsed onto Mr.
21   Chandler.  He and two other officers dragged me out.  I
22   must have been faking then because they dragged me out
23   unconscious.  I was taken there to the hospital.
24        I'm trying to explain something to you.

Page 64

1         Q.   No, no.  I'm just trying to ask you a question.
2    Nobody here is disputing --
3         A.   Let me finish then.
4         Q.   Fine, okay.
5              MR. GALLITANO:  Wait a minute.  Let's go off
6         the record.
7              (Discussion off the record.)
8              MR. SILVERFINE:  Back on the record.
9    BY MR. SILVERFINE
10        Q.   My question -- and if you don't understand my
11   question, please let me know.  Just my question -- and if
12   you don't understand, I'll rephrase it.  My question is,
13   when you talked to Dana Goodwin sometime in October of
14   2003, did he say to you words to the effect "The chief
15   asked for some supplemental records, medical records,
16   which he says he never got"?
17        A.   That's not incorrect (sic).  Dana never said
18   that.  What I did is that when I got my information and
19   he went into that meeting and Rooney went into that
20   meeting in November in there, he had all the records that
21   you just produced in front of us.  He had -- and the
22   certificate from the hospital and the certificate from
23   the medical panel.  He had all those records to make his
24   determination.

Page 65

1    Q.  All right, let me just follow up.  So Goodwin
2  did not tell you "The chief says you didn't supplement
3  the earlier records," which we indicated through your
4  deposition Exhibits 3 and 4 that he never received
5  supplementation on the medical records you initially
6  provided?
7    A.  That's not correct.  He did.  Larry Rooney gave
8  it to him, and he had those in his possession.  I gave
9  them to Larry Rooney prior to his meeting with the chief.
10    Q.  But my question was, did Dana Goodwin come back
11  to you --
12    A.  He never said that to me, no.
13    Q.  -- and say, "The chief says he never got
14  supplementation"?
15    A.  No.  No, he didn't.
16    Q.  Did you yourself outside of Goodwin, Rooney
17  ever send to the chief supplementation of Exhibits 3 and
18  4 that we've already marked and talked about?
19    A.  What I did is, when I got my paperwork back, I
20  spoke to Larry Rooney at the station.  I gave him a copy
21  of everything and requested him to go up to the chief.
22  The chief also, as the employer, has a complete copy or
23  has access at the town hall to my personnel file, which would have the
24  complete copy of my personnel file, which would have the

Page 66

1  same documentation that I have that I gave to Larry
2  Rooney.  He would have had access to the day I retired,
3  and it was certified because all that information is
4  given to them, hand-delivered up there.
5    Q.  Who does that, do you know?
6    A.  The administrators, the town -- Mrs. Flynn, Sue
7  Turner when they were there.  That letter that you showed
8  me earlier is a notification, and all records are
9  exchanged back and forth from personnel.
10    Q.  So let me stop you right here.  We talked about
11  this last time, Exhibit 5, which was a letter back in --
12    A.  June of 2003.
13    Q.  Okay, just bear with me.
14      And he had requested -- "he," meaning the chief
15  -- additional documentation.  Is there any other
16  additional documentation that you say you submitted
17  besides Exhibits 3 and 4 other than the application for
18  retirement that was approved in early September?  Do you
19  see what I'm saying?
20    A.  Okay, these documents here I gave him on a
21  preliminary level.  I would not have had the other
22  documents which I gave to him before the request was
23  made, as you see in Exhibit 13, on this date.  On this
24  date and on this date, the chief had the entire package,

Page 67

1  and I gave Larry Rooney in his hand all the documents
2  that I just spoke to.  He had those documents in his
3  possession given to him by Larry Rooney on this date and
4  that date.
5    Q.  And how do you know that?
6    A.  Because they told me they did it.
7    Q.  So are you saying --
8    A.  Larry Rooney told me he gave the documents to
9  him because I spoke to him on the phone.  He called me
10  after the meeting, and he said, "The chief said --" -- I
11  told him, "Did you give him all those documents I gave
12  you?"  He said, "Yes, I did," and Larry Rooney told me
13  emphatically the chief said, "I'm not paying him because
14  I disagree with the medical panel."
15    Q.  And do you recall when the conversation you had
16  with Rooney which you've just related took place?
17    A.  It was probably about 5:30 in the afternoon.
18    Q.  What date?
19    A.  Oh, I don't remember exactly the date.  It was
20  in the fall sometime.
21    Q.  The fall of 2003?
22    A.  Yes.
23    Q.  In the fall of 2003, November 25, 2003, did you
24  come into the police station and have a conversation with

Page 68

1  Captain Botieri where you gave him this package of
2  material and said, "Give this to the chief if he wants to
3  stay out of superior court"?
4    A.  Never did.  Never did.  That's a bonafide lie,
5  L-I-E.
6    Q.  Just bear with me for a second.
7    A.  Okay, I agree.  Go ahead.  I'm bearing with
8  you.
9    Q.  Did you say that to anyone else on the police
10  department or the town?
11    A.  The only time I went into the station is I
12  spoke to Larry Rooney because he was the assistant
13  prosecutor.  I called him.  I met him at the station.  I
14  went in there at the end of the day.  I believe it was
15  like 3:30 for him.  He was up from court.  I gave him all
16  the documentation because he was scheduled to sit down
17  with the chief and have a meeting and discuss my issue.
18  I never spoke to Captain Botieri.
19    Q.  Did you speak to anyone else and say something
20  like that --
21    A.  No.
22    Q.  -- similar back in November of 2003?
23    A.  No, I didn't.
24    Q.  Whether it be Chief Pomeroy or anyone else?

Page 69

1    A.   No.

2    Q.   A secretary?  Anyone?

3    A.   (Shakes head.)

4    Q.   You just have to answer for the record.

5    A.   No, never did.

6    Q.   Did you ever in your position as chairman of

7   the retirement board threaten to halt someone's

8   retirement process because of your position on the

9   retirement board?

10   A.   Absolutely not.

11   Q.   And did that include Captain Botieri?

12   A.   Absolutely never made that statement to Captain

13  Botieri.

14   Q.   Now, prior to May 25, 2003, had you been

15  suffering from tension and stress and being medically

16  treated for it?

17   A.   No, I wasn't.

18   Q.   Were you suffering from any physical or

19  emotional distress or stress since December 2002?

20   A.   I was on -- like I said, I indicated with the

21  doctors' notes that I gave them in the spring of 2003 --

22  I was under the care for Meniere's disease as well as

23  Lyme disease.

24   Q.   Were you under care with a Dr. Moore prior to

Page 70

1   December -- May 25, 2003, for stress?

2    A.   No.

3    Q.   Let me show you another page.

4         MR. SILVERFINE:  And let's mark this Exhibit

5   14.

6                        (Whereupon, a letter dated

7                         January 29, 2004, was

8                         marked as Exhibit No. 14

9                         for the defendant.)

10  BY MR. SILVERFINE

11   Q.   I ask you if you recognize that letter, Mr.

12  Kelley.

13        (Hands to witness.)

14   A.   Yes, I remember this letter.  Yes.

15   Q.   What's been marked as Exhibit 14, why did you

16  request this letter?  It says in the first paragraph at

17  your request.

18   A.   I just wanted documentation of what had

19  transpired in the -- on the board.

20   Q.   Were you already looking to file suit in this

21  action as of January 29, 2004?

22   A.   No.

23   Q.   So what purpose did you request this letter

24  from Debra Sullivan, the director of the retirement board

Page 71

1   of Plymouth?

2    A.   I wanted it for my files.

3    Q.   And when had you requested this, if you recall?

4    A.   I don't remember the date when I requested it.

5    Q.   What is your relationship with Debra Sullivan?

6    A.   She's been the administrator and works there

7   for the ten years I've been on the board.

8    Q.   Were you the boss of Ms. Sullivan under the --

9    A.   The board is the boss.  The chairman just

10  facilitates some of the day-to-day operations, but all

11  decisions are brought back to the board.

12   Q.   You have no direction over Ms. Sullivan?

13   A.   No, the board does, the board as a whole.

14   Q.   But you as a member of the board also do?

15   A.   Yes.

16   Q.   And how long have you directed Ms. Sullivan?

17  Is that since you've been on the board itself or since

18  you've been as director -- chairman?

19   A.   I've been on the board for ten years, and I've

20  worked with her.

21   Q.   For those ten years?

22   A.   Yes, right.

23   Q.   Let's go to the next letter.

24        MR. SILVERFINE:  We'll mark this Exhibit 15.

Page 72

1                        (Whereupon, a letter dated

2                         May 26, 2004, was marked as

3                         Exhibit No. 15 for the

4                         defendant.)

5   BY MR. SILVERFINE

6    Q.   Showing you what's been marked Exhibit 15, do

7   you recognize that?

8         (Hands to witness.)

9    A.   I recognize that.

10   Q.   Okay, I think this was referred earlier today

11  as a three-page letter, but you'll agree with me it's a

12  two-page letter from Michael Botieri?

13   A.   Uh-huh.

14   Q.   You have to answer for the record.

15   A.   Yes.  Yes, yes.

16   Q.   And this is dated May 26, 2004?

17   A.   Uh-huh, yes.

18   Q.   Did you, in fact, have an interaction with

19  Michael Botieri on May 22, 2004?

20   A.   May 26.  May 26 was the retirement meeting -- I

21  mean, retirement party at the Pinehills.

22   Q.   And was that for you?

23   A.   That was for myself and two other individuals.

24   Q.   All right, tell me in your own words what

Page 73

1  happened between you and Michael Botieri on -- you said
2  May 26, 2004.
3      A.   Well, it's on the date of the letter.
4      Q.   I'm sorry.  It's --
5      A.   Oh, yeah, the 22nd.  You're right.  Forgive me.
6  You're right.  You're right.  I was just looking at the
7  letter here.  I thought you were saying the letter date,
8  okay.
9           At the end of the night, I was leaving with my
10 wife and Bobby Hicks, and Chuckie Warnock called me over
11 and said -- from a distance he said Captain Botieri
12 wanted to speak to me.  So I said in jest, "Oh, Mike
13 wants to speak to little old me."  I said, "Okay," and I
14 walked over with that, and he turned around, and he told
15 me to go fuck myself.
16     Q.   I'm sorry.  Who did?
17     A.   Mike Botieri.
18     Q.   That's the first thing he said?
19     A.   The first thing he said.  He turned around and
20 told me to go fuck myself.
21     Q.   Okay, what happened next?
22     A.   I told him -- I said, "No, Mike, you go fuck
23 yourself."  And at that point he had a coffee cup in his
24 hand, and he had a little coffee in it.  And he was ready

Page 74

1  to throw it in my face, and Officer Warnock stopped him
2  from doing that.  And then I left.  My wife, myself, and
3  Bobby Hicks, we left the place.
4      Q.   Prior to you say him saying those words to you,
5  had you said or done anything to him?
6      A.   Nothing.  Never spoke to him the whole night
7  before.  I hadn't spoke to him in months.
8      Q.   Had he approached you and extended his hand to
9  shake your hand?
10     A.   No, he didn't.
11     Q.   Did you discuss with him your opposition in an
12 upcoming election?
13     A.   No, I didn't.  Not that night.  I never did.
14     Q.   Never did?
15     A.   Never did.
16     Q.   You never discussed with Mr. Botieri any
17 discussion relative to an election you were undergoing at
18 that point?
19     A.   Didn't.  I wasn't working.  Remember, I was out
20 of the station.  I was not working anymore.
21     Q.   I understand.
22     A.   Well, I wasn't in the station to see him.  I
23 was home.  That's all.
24     Q.   But you live in Plymouth?

Page 75

1      A.   Yes, I never discussed it.
2      Q.   So just follow along with me, and if the answer
3  is --
4      A.   Okay.
5      Q.   Whatever it is, just tell me.  I'm not assuming
6  anything.  I need your answers.
7      A.   Okay, I never discussed it.
8      Q.   So my question is, whether it be this night or
9  any prior incident, had you had any discussion with Mr.
10 Botieri relative to some opposition in an election you
11 were facing at that time?
12     A.   Never.
13     Q.   Were you running for retirement board again at
14 that time?
15     A.   That was a reelection year.  Yes, it was.
16     Q.   And when was the election coming up?
17     A.   I don't know if it was the end of the month or
18 something like that.  Maybe it might have been the end of
19 June or beginning of -- maybe the middle of June
20 sometime.
21     Q.   And who was your opposition running for one of
22 the seats, if you remember?
23     A.   I believe it was the chief's secretary, Lynn
24 Fortini.

Page 76

1      Q.   And what was your relationship with Lynn
2  Fortini?
3      A.   I had no problem with Lynn.
4      Q.   And she was directly contesting your seat
5  against you?
6      A.   No, she was contesting -- there were two seats,
7  and she was contesting one of the two seats.
8      Q.   Who else was running for that seat?
9      A.   Mr. Manfredi.
10     Q.   Mr. Manfredi is the same gentleman you
11 mentioned earlier today?
12     A.   Yes, yes.
13     Q.   Were you angry that you were facing opposition
14 in the election?
15     A.   I wasn't angry.  I just -- from what I had
16 heard because I was out of the station, that the chief
17 instructed her to run against me and Dick and that --
18     Q.   I'm sorry.  Who's Dick?
19     A.   Dick Manfredi.
20     Q.   Okay.
21     A.   And that basically I had heard through the
22 grapevine of different individuals that the chief went
23 around telling people to sign her papers and that she
24 went around telling people, "I'm not running against

Page 77

1   those guys.  There are five positions."
2          So she misrepresented herself to a lot of
3   people, and a lot of people were angry with her for doing
4   that because they didn't realize that the makeup of the
5   board is not just five members.  It's only two elected
6   from the membership.  And they were angry that she did
7   that.
8      Q.   Did you have discussion with Mr. Botieri
9   relative to his signing Ms. Fortini's nomination papers
10  --
11     A.   No, I didn't.
12     Q.   Let me just finish.
13          -- for a position on the Plymouth Retirement
14  Board on that night?
15     A.   No.
16     Q.   At any time did you have discussion with Mr.
17  Botieri about his signing nomination papers?
18     A.   No.
19     Q.   How about with anyone else that was involved in
20  the Town of Plymouth or the Plymouth Police Department?
21     A.   Well, if you mention Viella here in the letter
22  here, I was down the town hall looking to check on my
23  nomination papers for town meeting member at the time to
24  see when I was up.  And I ran into Steve, and I said,

Page 78

1   "Jesus, I'm glad that you're supporting me" in all of the
2   things that I did for Steve, helping him out with
3   different retirement issues and different issues that he
4   personally needed help with.  And he -- you know, he
5   basically said, "The chief told me to sign it," and I
6   said, "Well, you're under one of the -- you're appointed
7   by the chief to the detective division, so if you don't
8   sign it, I guess they throw you out on the street because
9   you're not one of the boys."  And I said, "Well, Steve, I
10  thought you had -- I thought you were a little bit more
11  loyal than that to be intimidated to doing something like
12  that," but that's Mr. Viella.
13     Q.   Did you swear at Mr. Viella?
14     A.   No, I didn't swear at him.  I was in a public
15  building, and I left.
16     Q.   Did Mr. Viella indicate he was signing Ms.
17  Fortini's nomination papers?
18     A.   No, he had already done it.
19     Q.   But it's fair to say you were angry and upset
20  at him for --
21     A.   I wasn't angry and upset with him.  I was
22  disappointed at him and disappointed at his lack of --
23  how would you want to say it? -- credibility and lack of
24  -- you know, in one breath he's throwing the chief under

Page 79

1   the bus.  In the next breath, he's his best boy, kissing
2   his fanny.
3      Q.   Did you ever tell Mr. Viella words to the
4   effect "I hope you don't need the retirement board's help
5   someday"?
6      A.   No, Steve has a -- Steve has a real problem of
7   telling the truth or telling, you know, in times --
8   lacking in what they call intestinal fortitude.
9      Q.   Did you ever say that to anyone?
10     A.   To him?
11     Q.   To anyone.
12     A.   No, everybody knows that.  I didn't say that to
13  him.  I just left.
14     Q.   Try my -- I'm not trying to trick you.
15     A.   No, I know you're not.  I know you're not.
16     Q.   Just try my question.  My question is, did you
17  ever say that to any town employee, police officer, or
18  otherwise --
19     A.   Oh, no.
20     Q.   -- words to the effect "I hope you don't need
21  the retirement board's --" --
22     A.   No, no.
23     Q.   -- "-- help someday"?
24     A.   I've got a volume of people that I've helped.

Page 80

1          MR. GALLITANO:  Excuse me.  You've got to let
2   him finish the whole question --
3          THE WITNESS:  Okay, okay.
4          MR. GALLITANO:  -- so that you answer the
5   question completely.
6          THE WITNESS:  Okay.
7          MR. SILVERFINE:  And also so the stenographer
8   --
9          MR. GALLITANO:  Right.  I mean, you've cut him
10  off --
11         THE WITNESS:  Okay, well, I --
12         MR. GALLITANO:  I'm trying to finish --
13         THE WITNESS:  I know.  I know.  I appreciate
14  it.  I'm sorry.
15         MR. SILVERFINE:  Just off the record for one
16  second.
17         (Discussion off the record.)
18         MR. SILVERFINE:  Back on the record.
19  BY MR. SILVERFINE:
20     Q.   Did Officer Viella have to order you to leave
21  the polling place when he saw you on May 8, 2004?
22     A.   No.
23     Q.   Did anyone have to order you to leave the
24  polling place on or about May 8, 2004?

# EXHIBIT 4 B

Page 81

1    A.   No.
2    Q.   Relative to -- I think you mentioned his
3    name earlier -- or somebody did mention his name --
4    Sergeant Michael Peddell, was he your supervisor at one
5    point?
6    A.   Sometimes he was the day shift supervisor.
7    Q.   At one point in time, did he have to admonish
8    you on some issue?
9    A.   Never.
10    Q.   Did you ever tell him, "Sergeant Peddell, I
11    hope you never have to come in front of the retirement
12    board" or words to that effect?
13    A.   Never did.  If I had done anything that this
14    letter indicates, I would have had a reprimand or a
15    suspension in my file.
16    Q.   Okay.
17    A.   Mike Peddell is in the same position, under the
18    thumb and the appointment of Botieri and Mr. Pomeroy.
19    His job and his duties, where he sits can be changed in a
20    minute.
21    Q.   Did you ever make public statements before the
22    Insurance Advisory Committee meeting wherein you stated,
23    "We don't need a woman on the retirement board"?
24    A.   Absolutely did not.  I believe there's a record

Page 82

1    and a letter there to Mr. Botieri from the chairman of
2    the Insurance Advisory Committee, Dale Webber, who
3    clearly refutes that argument, who was present at a
4    meeting, and that I believe you were -- that letter was
5    given to Mr. Botieri, and I believe he has a copy of that
6    in his possession.  They checked the minutes of the
7    meeting, and the minutes of the meeting, any of those are
8    all taped.
9    Q.   Let me get back to the night of May 22, 2004,
10    this retirement ceremony.
11         Did you at all physically touch Mr. Botieri
12    during that night?
13    A.   No, I didn't.
14    Q.   Did you grab him by his left arm?
15    A.   I only spoke to him briefly at the end of the
16    night.  Never said a word to him the whole night, never
17    went near him.
18    Q.   Did you ever say to him, "I hope you never have
19    a heart attack and come before the retirement board" or
20    words to that effect?
21    A.   As I previously stated, I never made that
22    statement.
23    Q.   Did you say that to anyone that night or any
24    other night?

Page 83

1    A.   No.
2    Q.   Any other police officer that night?
3    A.   No.
4    Q.   Did you use any profanity as it related to Mr.
5    Botieri -- to Mr. Botieri on the night of May 22, 2004?
6    A.   We both exchanged niceties.
7    Q.   So that's the words you told us earlier?
8    A.   Yes.
9    Q.   Anything else that you recall saying to him?
10    A.   No.
11    Q.   I'm trying to move along here.  I'm going to
12    show you another document.
13         MR. SILVERFINE:  We'll mark it.  I believe
14    these are Plymouth Retirement Board executive
15    session minute meetings, and we'll mark this as
16    Exhibit 16.
17              (Whereupon, executive
18              session minutes were marked
19              as Exhibit No. 16 for the
20              defendant.)
21         MR. GALLITANO:  Can we go off the record for a
22    minute?
23         MR. SILVERFINE:  Go ahead.
24         (Discussion off the record.)

Page 84

1         MR. SILVERFINE:  The Plymouth Retirement Board
2    executive session -- I'll just identify it by date
3    presently -- May 27, 2004, it's Exhibit 16.
4    Counsel would like to note an objection, and then
5    I'll come back.
6         MR. GALLITANO:  As counsel for the deponent,
7    Mr. Kelley, I'm objecting to any questioning
8    regarding these minutes because they are executive
9    session minutes from the retirement board upon which
10    he is a member, and under the terms of his oath of
11    office, he's not supposed to disclose anything
12    that's in executive session.  This is an unsigned
13    copy, undated copy of an executive session.  There's
14    been no presentation of any vote authorizing the
15    release of these minutes.  Therefore, we object to
16    any line of questioning relating thereto, and my
17    client is instructed not to respond to any questions
18    should they be posed.
19         MR. SILVERFINE:  For the record, I'm going to
20    reserve on this and both check on whether or not
21    there has been a release, to see if they are
22    released.  That's one.  And two, based upon the
23    subject matter of this particular case and
24    specifically the relevancy as based upon Mr.

Page 85

1  Kelley's claims, I may move to have this -- for the
2  defendants to be able to use this. So I'm going to
3  reserve on this at the end of this deposition, but
4  we'll move on for the moment.
5      All right, let's move on and mark this as the
6  next exhibit, No. 17.
7                      (Whereupon, a letter dated
8                      June 1, 2004, was marked as
9                      Exhibit No. 17 for the
10                     defendant.)
11 BY MR. SILVERFINE
12     Q.   I'm showing you that. Do you recognize that?
13          (Hands to witness.)
14     A.   Yes, I do.
15     Q.   Fair to say this was a letter from Debra
16 Sullivan, the director of the retirement board, to
17 Captain Botieri, cc'd to the retirement board of which
18 you were a member back on June 1, 2004?
19     A.   Yes, it is.
20     Q.   And this related to a complaint that he had
21 filed as it related to you?
22     A.   That previous letter that we discussed, Exhibit
23 -- I don't know if it's 13 or -- one of them was.
24     Q.   Relative to acknowledging the complaint -- and

Page 86

1  we'll get to it in a minute -- what is your understanding
2  of what, if anything, the retirement board once they
3  received the complaint as we've now marked as Exhibit 15?
4      A.   The complaint was an issue that was nonboard
5  business. It was a personal exchange of words, and Mr.
6  Botieri took the opportunity to trump it up to make it
7  more than it ever was.
8      Q.   Is it fair to say, at least from the
9  allegations that Mr. Botieri made, they may have related
10 to the board because of his allegation that you were
11 going to somehow influence any retirement decision that
12 may be made on his application?
13     A.   Well, I look at in the respect of if I -- in
14 Exhibit 13 there you state that he states that I
15 assaulted him -- I believe he said that this morning --
16 and I grabbed him. If I had assaulted a captain of the
17 police department, I can assure you he would have taken
18 out complaints against me. And with that, that's the
19 credibility I give his -- this issue.
20     Q.   Let me ask you this. Relative to the
21 retirement board, did they undertake any investigation as
22 to the allegation as Captain Botieri described in Exhibit
23 15?
24          MR. GALLITANO: Objection. I'm also going to

Page 87

1  advise my client that considering his position on
2  the board, he should really -- before he answers
3  that, he should have advice of the retirement board
4  counsel as to whether he would be disclosing
5  something, again, that would be part of an executive
6  session.
7          MR. SILVERFINE: Well, I think I hear your
8  objection, but I believe -- I believe there is
9  public information that indicates that -- and we can
10 get to it in a minute.
11         MR. GALLITANO: Well, there may be indications
12 that there was an investigation. What I'm saying is
13 you're asking him what the outcome of that
14 investigation is.
15         MR. SILVERFINE: No, no. I asked him if they
16 undertook an investigation. That's my first
17 question.
18 BY MR. SILVERFINE
19     Q.   My first question is, do you know whether or
20 not an investigation was undertaken?
21     A.   The issue that you're addressing is an
22 executive session issue, number one. Number two, I have
23 very severe reservations on the fact of how you lawfully
24 got that information. That information is in our

Page 88

1  lockbox. There is a procedure for people to get it. And
2  how you got a copy of that and place it in evidence
3  lawfully is that, but I'm not going to speak to an
4  executive session minutes or the surrounding issue other
5  than the fact an executive session was issued on the unit
6  on that issue.
7          MR. GALLITANO: But in answer to his question
8  of whether an investigation took place and you --
9      A.   The board looked into the matter.
10         MR. GALLITANO: You can answer the question, is
11 what I'm saying.
12     Q.   Did you participate in the matter that was
13 brought before the board?
14     A.   I'm not going to speak to executive session.
15         MR. SILVERFINE: Okay, I'm going to reserve on
16 all these because -- I'm reserving on these. Any
17 question relative to what the retirement board did
18 or did not do as to certain allegations that Captain
19 Botieri brought I believe directly related to this
20 lawsuit. So I'm going to reserve on that.
21         MR. GALLITANO: And for the record, I request
22 that you give notice to counsel for the retirement
23 board regarding that so they may be present at any
24 -- if it goes to a motion before the superior court,

Page 89

1    they can represent their point of view.
2    BY MR. SILVERFINE
3        Q.  You're aware, Mr. Kelley, that this allegation
4    as described in Exhibit 15 was at least brought before or
5    addressed to PERAC, are you not, sir?
6        A.  I believe there was a written -- a letter
7    written there to PERAC by Mr. Botieri.
8        Q.  And you're aware that PERAC then ordered the
9    retirement board which you were participating to do
10   something about it?
11       A.  They didn't order us to do anything.
12       Q.  What is your memory of what PERAC did in
13   relation to Mr. Botieri's complaint as evidence in
14   Exhibit 15?
15       A.  We had already held an executive session and
16   discussed the matter prior, and it was resolved.  And
17   PERAC was given a copy of the formal letter that Mr.
18   Botieri wrote.
19            MR. SILVERFINE:  Well, let me -- so I'm not
20       misstating something, we'll mark this as the next
21       exhibit.
22                           (Whereupon, a letter dated
23                           June 3, 2004, was marked as
24                           Exhibit No. 18 for the

Page 90

1                           defendant.)
2            MR. SILVERFINE:  Just off the record for one
3       second.
4            (Discussion off the record.)
5    BY MR. SILVERFINE
6        Q.  I'm going to show you what's been marked as
7    Exhibit 18.  Is it fair to say you've seen this letter
8    before?
9            (Hands to witness.)
10       A.  Oh, yeah, yeah.
11       Q.  It was addressed to the retirement board of
12   which you were a member back in June of 2004?
13       A.  I have seen this letter.
14       Q.  Would you agree with me that this letter,
15   Exhibit 18, the second paragraph, Joseph Connarton, the
16   executive director of PERAC says, "We expect the board
17   will immediately investigate the matters discussed in
18   this letter and advise the commission within 30 days"?
19       A.  I believe we did that, and I was very
20   forthcoming and told --
21       Q.  All right.  I'm sorry.  I interrupted you.
22       A.  I had no problem with it.  Put it up there and
23   we fulfilled every obligation that we felt was necessary,
24   the board did.

Page 91

1        Q.  But up until that day when he wrote this
2    letter, you had not investigated this matter and reported
3    back to the board at least as far as PERAC, correct?
4        A.  The dates -- when was the executive session?
5    Let's look at the executive session for a minute.
6            MR. GALLITANO:  It's not dated.
7        A.  It's not dated.
8            MR. GALLITANO:  May 27 is the date on the top
9       of this document that's in question.
10       A.  The one here, is that it?  Oh, yeah, yeah.
11   Okay, it was the next day.  We had already addressed it.
12   I volunteered that.  I said we need to address something,
13   and we did.  And this letter is dated after it.
14       Q.  All right.  And just --
15       A.  And then we responded back to them, which I
16   believe Botieri got.  And you have a copy of that.
17       Q.  And that's a letter that you referenced earlier
18   today, which was a letter written on July 28, 2004 --
19       A.  Yes, I believe --
20       Q.  -- signed by three members of the board?
21       A.  Right.
22       Q.  And cc'd to Michael Botieri?
23       A.  Yeah.
24            MR. SILVERFINE:  I'm going to just suspend for

Page 92

1    today based on our conversation.  We're going to
2    revisit some of these issues, and I'm going to
3    finish hopefully my deposition next time.
4            MR. GALLITANO:  That's agreed.  That's fine.
5            (Whereupon, at 4:01 p.m. the taking of the
6    deposition was suspended.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 93

ACKNOWLEDGMENT OF DEPONENT

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. 1:05-cv-10596-NMG

I, Thomas M. Kelley, do hereby acknowledge that

I have read and examined pages 1 through 92, inclusive,

of the transcript of my deposition, as taken in Plymouth,

Massachusetts, on Wednesday, June 21, 2006, and that:

_____ the same is a true, correct, and complete
transcription of the answers given by me to the questions
therein recorded.

_____ except for the changes noted in the
attached errata sheet, the same is a true, correct, and
complete transcription of the answers given by me to the
questions therein recorded.


_____
                    Signature


Page 95

C E R T I F I C A T E

PLYMOUTH, SS

I, Linda M. Corcoran, a Court Reporter and

Notary Public, in and for the Commonwealth of

Massachusetts, do hereby certify that:

Thomas M. Kelley, having been satisfactorily

identified and having been duly sworn by me to testify

upon his oath, did so testify, and that this transcript

is a full, true, and accurate record to the best of my

knowledge, skill, and ability of the testimony taken at

the Law Offices of Joseph R. Gallitano & Associates, 34

Main Street Extension, Suite 202, Plymouth,

Massachusetts, on Wednesday, June 21, 2006, commencing at

2:07 p.m.

I further certify that I am a disinterested

person to the action in which this deposition is taken.

IN WITNESS WHEREOF, I have hereunto set my hand

and notarial seal this 31st day of July, 2006.


_____
Linda M. Corcoran - Court Reporter
My commission expires:
October 6, 2006


Page 94

ERRATA SHEET

Page:_____ Line:_____ Reads:_____
Should Read:_____

Page:_____ Line:_____ Reads:_____
Should Read:_____

Page:_____ Line:_____ Reads:_____
Should Read:_____

Page:_____ Line:_____ Reads:_____
Should Read:_____

Page:_____ Line:_____ Reads:_____
Should Read:_____

Page:_____ Line:_____ Reads:_____
Should Read:_____

Page:_____ Line:_____ Reads:_____
Should Read:_____

Page:_____ Line:_____ Reads:_____
Should Read:_____

Page:_____ Line:_____ Reads:_____
Should Read:_____

Page:_____ Line:_____ Reads:_____
Should Read:_____

Page:_____ Line:_____ Reads:_____
Should Read:_____

Page:_____ Line:_____ Reads:_____
Should Read:_____

Page:_____ Line:_____ Reads:_____
Should Read:_____

Page:_____ Line:_____ Reads:_____
Should Read:_____

# KELLEY.WPD

| Word | Page:Line | Word | Page:Line | Word | Page:Line | Word | Page:Line |
|---|---|---|---|---|---|---|---|

1:05-cv-10596-nmg(2) 1:6 93:6
20-year(1) 21:21
5-inch(1) 29:7
9-month(1) 23:21
a.(shakes)(1) 69:3
a.absolutely(7) 27:20 31:1 49:2 50:16 69:10 69:12 81:24

a.according(1) 24:10
a.again(1) 32:5
a.all(2) 48:10 52:1
a.another(1) 26:18
a.anybody(1) 27:22
a.as(2) 54:9 82:21
a.because(1) 67:6
a.dick(1) 76:19
a.didn't(1) 74:19
a.govoni(1) 38:7
a.he(1) 65:12
a.i(52) 19:18 22:19 24:1 26:24 28:11 29:13 30:8 30:14 32:23 33:4 33:16 33:21 33:24 34:12 34:15 35:11 35:24 37:14 38:2 38:11 38:19 40:18 40:23 42:9 46:24 49:4 49:14 49:22 55:20 56:13 56:15 59:20 60:7 60:18 61:4 62:22 69:20 70:18 71:2 71:4 72:9 73:22 75:17 75:23 76:3 76:15 78:21 82:15 89:6 90:13 90:19 90:22

a.i'm(2) 57:15 88:14
a.i've(2) 71:19 79:24
a.if(3) 19:13 25:17 28:20
a.in(1) 24:21
a.it(4) 28:5 31:9 37:3 67:17
a.it's(1) 91:7
a.june(1) 66:12
a.just(1) 35:19
a.kevin(1) 44:18
a.larry(1) 67:8
a.may(1) 72:20
a.mike(2) 73:17 81:17
a.mr(1) 76:9
a.never(6) 34:20 68:4 74:15 75:12 81:9 81:13

a.no(52) 5:24 22:3 22:22 24:5 25:22 25:24 26:5 29:3 29:6 34:3 34:22 35:4 35:17 36:6 36:11 43:11 43:13 44:22 45:1 47:19 51:22 52:15 55:2 56:18 60:11 65:15 68:21 68:23 69:1 69:5 69:17 70:2 70:22 71:13 74:10 74:13 76:6 77:11 77:15 77:18 78:14 78:18 79:6 79:12 79:15 79:22 80:22 81:1 82:13 83:1 83:3 83:10

a.not(3) 25:15 37:12 48:19
a.nothing(1) 74:6
a.oh(8) 47:2 47:5 51:19 60:4 67:19 73:5 79:19 90:10

a.okay(7) 23:22 41:7 49:17 66:20 68:7 75:4 75:7

a.police(1) 44:14
a.prior(2) 10:4 63:8
a.right(5) 23:5 38:5 47:16 62:9 91:21
a.she(1) 19:7
a.she's(1) 71:6
a.sick(1) 47:13
a.sometimes(1) 81:6
a.state(1) 35:21
a.that(5) 22:11 40:10 72:23 75:15 85:22
a.that's(2) 61:18 65:7

a.the(11) 36:18 42:17 66:6 68:11 71:9 73:19 86:4 87:21 88:9 91:4 91:10

a.there(4) 28:23 36:8 36:13 44:1
a.they(2) 26:14 27:12 89:11
a.this(1) 22:14
a.to(2) 25:11 79:10
a.uh-huh(4) 40:6 47:10 51:17 61:20 72:13 72:17

a.we(7) 23:1 26:8 31:4 37:17 57:4 83:6 89:15

a.well(6) 43:20 49:9 73:3 74:22 77:21 86:13

a.what(3) 38:16 57:19 65:19
a.when(3) 22:6 56:20 63:11
a.which(1) 23:20
a.yeah(8) 25:5 39:15 40:8 44:16 50:14 50:20 55:14 91:23

a.yes(25) 24:17 27:18 33:14 45:6 45:8 45:18 47:7 54:5 54:23 55:23 56:2 56:23 61:15 61:22 67:22 70:14 71:15 71:22 72:15 75:1 76:12 83:8 85:14 85:19 91:19

a.you(1) 35:1
abbott(1) 38:4
ability(1) 95:11
able(8) 4:20 11:15 29:3 43:3 44:5 48:23 48:24 85:2

about(37) 8:5 13:1 15:3 15:8 16:16 17:2 17:7 22:1 22:16 22:17 22:18 22:19 23:3 24:19 27:5 28:15 29:4 34:24 38:14 40:19 42:7 44:12 45:23 48:9 48:24 55:7 56:24 57:4 60:9 63:4 65:18 66:10 67:17 77:17 77:19 80:24 89:10

absence(2) 29:11 30:12
absolutely(1) 51:7
abuse(2) 34:11 49:1
access(4) 24:5 45:20 65:23 66:2
accident(1) 27:23
accidental(1) 51:14
accountant(1) 8:20
accrued(7) 24:23 24:24 49:24 58:15 58:21 59:4 59:11

accurate(2) 33:23 95:10
acknowledge(1) 93:8
acknowledging(1) 85:24
action(3) 40:21 70:21 95:17
actions(1) 22:19
active(2) 35:14 37:8
activities(1) 48:18
activity(1) 7:14
actually(4) 8:24 42:13 46:17 57:17
additional(3) 48:20 66:15 66:16
address(3) 17:8 52:10 91:12
addressed(3) 89:5 90:11 91:11
addressing(1) 87:21
adjudicate(1) 43:4
adjudicated(1) 60:14
administration(4) 42:1 51:14
administrative(4) 41:3 41:7 41:11 41:12
administrator(3) 19:6 29:24 71:6
administrators(3) 42:3 60:13 66:6
admonish(1) 81:7
adopt(2) 57:10 61:2
adopted(1) 58:20
adopting(1) 59:15

adoption(1) 20:15
advice(2) 56:10 87:3
advise(2) 87:1 90:18
advised(1) 51:12
advisory(2) 81:22 82:2
advocacy(1) 40:12
affect(2) 32:1 42:1
affirmative(2) 52:5 54:20
affirms(1) 59:1
after(15) 14:18 22:14 28:16 35:8 41:13 46:20 49:10 49:23 56:20 57:1 62:9 62:9 62:20 67:10 91:13

afternoon(4) 4:16 4:19 4:21 67:17
again(5) 5:2 6:8 14:20 75:13 87:5
against(9) 30:22 40:22 42:8 76:5 76:17 76:24 86:18

age(1) 21:3
agency(1) 41:4
agenda(1) 42:4
agendas(2) 40:23 40:24
aggravate(1) 12:10
aggrieved(1) 41:9
ago(5) 28:7 34:12 42:21 43:2 56:24
agree(3) 68:7 72:11 90:14
agreed(2) 4:2 92:4
agreement(1) 20:6
ahead(6) 19:15 32:16 38:17 63:8 68:7 83:23

aid(1) 36:1
all(53) 4:3 9:23 10:12 12:7 14:21 15:18 17:11 18:4 22:17 25:8 25:20 26:7 27:20 27:24 28:1 28:7 30:16 31:17 36:21 36:22 37:3 37:4 37:12 38:16 40:13 40:24 41:22 42:1 53:10 54:12 54:13 54:15 54:20 55:11 58:10 58:12 59:11 62:11 62:11 64:20 64:23 66:3 66:8 67:1 67:18 68:15 71:10 74:23 78:1 82:8 82:11 85:5 88:16

allegation(4) 52:16 86:10 86:22 89:3
allegations(4) 30:22 49:1 86:9 88:18
allege(1) 17:12
alleged(1) 12:8
almost(2) 28:6 32:11
alone(1) 35:19
along(2) 75:2 83:11
already(10) 6:9 25:16 30:16 53:5 54:1 65:18 70:20 78:18 89:15 91:11

also(14) 5:3 5:4 7:15 8:7 13:15 20:22 22:1 25:7 57:5 62:22 65:22 71:14 80:7 86:24

always(1) 49:24
ambiguous(1) 31:22
ambulance(1) 36:3
amount(3) 13:24 31:24 58:23
anaheim(1) 33:19
anger(2) 27:17 30:10
angry(11) 29:10 30:7 30:8 30:9 30:11 76:13 76:15 77:3 77:6 78:19 78:21

anniversary(1) 14:8
annoyed(2) 29:13 30:14
annual(2) 13:9 14:2
another(9) 8:22 27:24 41:15 45:2 50:10 52:18 61:12 70:3 83:12

answer(15) 6:11 12:22 13:22 14:20 15:1 16:15 43:15 54:18 59:8 69:4 72:14 75:2 80:4 88:7 88:10

answered(5) 11:8 12:11 17:15 52:4 57:16

answers(6) 6:6 6:10 75:6 87:2 93:13 93:18

any(58) 5:2 5:15 5:22 7:8 7:8 7:10 7:24 8:1 9:21 10:19 10:22 12:16 12:19 14:22 16:12 16:18 16:20 16:21 17:3 24:6 24:7 25:8 25:9 26:11 26:22 27:16 29:5 30:22 36:17 44:12 44:19 52:9 52:10 52:13 52:13 54:24 55:5 58:1 60:17 66:15 69:18 74:16 75:9 75:9 77:16 79:17 82:7 82:23 83:4 84:7 84:14 84:16 84:17 86:11 86:21 88:16 88:23

anybody(5) 8:3 21:13 26:4 56:5 63:19
anymore(1) 74:20
anyone(14) 9:4 12:19 22:2 24:4 25:21 68:9 68:19 68:24 69:2 77:19 79:9 79:11 80:23 82:23

anything(15) 5:20 14:13 16:22 27:6 28:14 47:21 59:20 61:10 61:11 74:5 75:6 81:13 84:11 86:2 89:11

anyway(1) 61:9
appeal(2) 41:10 41:16
appeals(3) 41:3 41:11 41:13
appears(1) 18:9
appellate(1) 41:16
applicable(2) 1:25 44:4
application(14) 46:4 48:21 49:21 50:1 54:9 54:12 54:14 56:3 58:4 58:9 58:20 59:13 66:17 86:12

applications(1) 44:21
apply(1) 4:24
appointed(1) 78:6
appointment(2) 47:22 81:18
appreciate(1) 80:13
approached(1) 74:8
appropriate(1) 50:2
approved(3) 57:13 62:10 66:18
approximately(1) 31:7
april(3) 10:15 14:3 14:3
ar-15s(1) 15:20
area(5) 6:22 9:12 10:14 10:15 27:2
areas(3) 7:11 26:19 27:1
argument(2) 63:18 82:3
argumentative(1) 29:8
arm(1) 82:14
armstrong(2) 2:12 26:1
around(13) 9:12 10:15 22:11 22:13 29:17 34:18 39:18 57:24 58:9 73:14 73:19 76:23 76:24

arrested(1) 39:8
articulate(2) 31:19 31:21
ask(9) 34:13 38:14 45:3 47:17 53:8 55:15 64:1 70:11 86:20
asked(9) 26:9 33:6 44:11 53:24 55:2 62:15 63:9 64:15 87:15
asking(12) 26:4 26:6 36:16 36:16 49:3 49:7 49:7 49:12 49:16 55:13 55:22 87:13

assaulted(2) 86:15 86:16
assaulting(1) 39:9
asset(2) 31:20 32:1

# KELLEY.WPD

| Word | Page:Line | Word | Page:Line | Word | Page:Line | Word | Page:Line |
|---|---|---|---|---|---|---|---|

assigned(2) 26:18 37:21
assistant(1) 68:12
associates(3) 1:33 2:7 95:12
association(1) 40:11
assuming(3) 47:1 47:3 75:5
assure(1) 86:17
attached(1) 93:17
attack(2) 12:5 82:19
attempt(1) 60:2
attempted(1) 59:19
attend(5) 31:8 32:4 32:6 40:16 42:6
attended(4) 32:13 32:21 33:18 33:24
attending(2) 40:4 47:21
attention(6) 7:9 7:12 20:9 21:15 30:5 42:22

attorney(4) 3:5 4:15 52:21 54:16
attributed(1) 11:21
auditor(2) 21:17 21:20
august(2) 15:13 56:21
authored(1) 45:7
authorization(1) 20:23
authorizing(1) 84:14
automatic(1) 57:23
available(1) 25:12
average(1) 60:15
aware(21) 8:1 9:16 10:21 12:8 12:18 12:19 16:9 16:12 16:12 16:18 17:12 17:16 36:16 37:23 38:2 38:10 60:24 61:3 61:4 89:3 89:8

back(38) 9:13 12:22 13:22 14:5 15:13 18:7 21:6 21:21 27:9 27:11 27:12 27:22 29:24 34:6 38:24 50:2 52:1 58:24 59:9 59:11 60:24 61:9 62:10 63:9 64:8 65:10 65:19 66:9 66:11 68:22 71:11 80:18 82:9 84:5 85:18 90:12 91:3 91:15

backlog(1) 58:12
bad(1) 31:14
balances(1) 30:16
bang(1) 53:14
banging(1) 53:15
bank(1) 46:5
bargaining(4) 15:19 16:7 20:3 20:5
based(4) 12:11 84:22 84:24 92:1
basically(4) 5:13 43:5 76:21 78:5
basis(4) 12:24 13:9 14:4 20:12
bear(3) 55:3 66:13 68:6
bearing(1) 68:7
because(32) 11:20 13:20 16:14 16:21 21:17 27:9 29:13 29:20 31:24 33:7 43:16 45:19 48:14 48:20 50:3 58:11 59:3 59:7 61:5 63:22 66:3 67:9 67:13 68:12 68:16 69:8 76:16 77:4 78:8 84:8 86:10 88:16

become(1) 38:22
before(20) 1:27 4:9 5:14 11:5 15:21 25:24 44:1 44:11 48:12 55:2 63:12 66:22 74:7 81:21 82:19 87:2 88:13 88:24 89:4 90:8

began(1) 55:6
beginning(1) 75:19
behalf(3) 2:4 2:19 32:21

believe(50) 12:23 13:4 13:16 14:6 15:9 15:17 15:23 15:23 16:3 16:7 25:2 25:24 26:20 26:20 30:17 33:11 33:16 34:5 34:5 34:12 35:11 35:12 36:8 38:15 46:15 47:13 47:14 47:23 48:12 50:11 53:15 54:10 57:16 61:5 63:2 63:12 68:14 75:23 81:24 82:4 82:5 83:13 86:15 87:8 87:8 88:19 89:6 90:19 91:16 91:19

below(1) 54:21
benefit(1) 21:2
benefits(10) 17:14 20:20 20:22 20:24 40:21 42:7 44:20 57:24 58:3 58:16

besides(5) 12:15 25:6 35:15 36:17 66:17
best(4) 25:11 27:4 79:1 95:10
beth(9) 17:16 18:11 19:6 22:6 22:7 22:8 24:9 44:24 59:14

better(3) 27:17 28:7 29:18
between(3) 4:2 8:21 73:1
big(1) 32:7
bill(4) 19:24 20:11 29:21 57:24
bit(1) 78:10
blair(3) 57:21 57:21 57:22
board(90) 7:20 8:1 8:7 8:23 19:19 21:1 21:5 21:14 21:14 21:18 21:19 26:13 26:16 29:12 29:16 30:13 30:22 30:24 31:2 31:8 31:18 32:4 32:24 33:13 33:19 37:17 40:14 40:17 41:9 41:13 42:2 43:9 50:19 50:21 52:6 52:6 52:11 54:15 55:17 55:18 55:22 55:23 55:24 56:5 56:7 56:11 57:9 58:6 58:14 58:21 59:22 62:12 69:7 69:9 70:19 70:24 71:7 71:9 71:11 71:13 71:13 71:14 71:17 71:19 71:23 77:5 77:14 81:12 81:23 82:19 83:14 84:1 84:9 85:16 85:17 86:2 86:10 86:21 87:2 87:3 88:9 88:13 88:17 88:23 89:9 90:11 90:16 90:24 91:3 91:20

board's(4) 30:5 54:16 79:4 79:21
boards(1) 41:22
boat(1) 48:24
bobby(2) 73:10 74:3
bonafide(1) 68:4
boss(2) 71:8 71:9
boston(3) 2:24 33:10 33:22
both(5) 11:13 13:10 57:9 83:6 84:20
bother(1) 47:18
botieri(46) 10:7 10:11 13:18 16:3 21:10 22:20 24:3 24:9 24:13 30:7 32:18 32:23 37:19 37:19 39:3 46:10 48:9 48:23 68:1 68:18 69:11 69:13 72:12 72:19 73:1 73:11 73:17 74:16 75:10 77:8 77:17 81:18 82:1 82:5 82:11 83:5 83:5 85:17 86:6 86:9 86:22 88:19 89:7 89:18 91:16 91:22

botieri's(1) 89:13
box(1) 1:44
boy(1) 79:1
boyle(5) 15:23 17:1 24:13 39:2 61:16 62:6

boys(1) 78:9
brace(1) 39:18
break(1) 5:3
breath(2) 78:24 79:1
briefly(1) 11:5 82:15
bring(7) 7:8 16:15 21:15 30:4 31:22 41:23 43:8

bringing(1) 20:8

broad-based(1) 42:19
brody(1) 2:22
broke(1) 44:11
brookline(5) 50:3 57:20 57:20 57:21
brotherhood(2) 61:19 62:6
brought(11) 7:12 10:10 16:19 17:2 17:4 42:10 42:22 71:11 88:13 88:19 89:4
bruce(1) 9:5
budge(4) 7:4 28:12 33:5 39:2
budge's(2) 45:19 45:19
building(3) 8:9 8:10 78:15
bus(1) 79:1
business(2) 32:24 86:5
bylaw(9) 19:22 20:4 20:13 20:14 20:16 20:19 20:21 20:23 21:8

c.a(2) 1:6 93:6
calculation(1) 21:2
calendar(1) 14:4
call(24) 6 40:10 41:12 79:8
called(6) 1:23 4:11 12:3 67:9 68:13 73:10

came(3) 36:3 37:14 47:19
can't(4) 27:7 28:6 33:21 41:5
cannot(1) 56:5
captain(20) 16:3 22:19 24:3 26:20 28:11 30:7 30:11 46:9 48:8 48:22 57:5 68:1 68:18 69:11 69:12 73:11 85:17 86:16 86:22 88:18

captains(1) 20:14
car(1) 27:23
cardiac(1) 48:4
cardiologists(1) 52:3
cardiomyopathy(2) 28:18 29:2
care(7) 10:8 10:9 11:9 11:10 27:5 69:22 69:24

career(1) 28:8
case(13) 8:14 20:8 21:8 36:15 43:1 44:1 50:8 52:2 54:19 57:22 58:2 60:12 84:23
cases(4) 43:10 60:8 60:11 60:12
category(1) 21:13
catheterization(1) 48:4
caused(1) 29:1
cc'd(3) 50:12 85:17 91:22
ceremony(1) 82:10
certain(4) 21:20 58:23 63:6 88:18
certificate(5) 52:4 54:19 62:13 64:22 64:22

certification(1) 35:24
certified(1) 1:43 66:3
certify(5) 95:6 95:16
chain(1) 28:10
chairman(12) 33:13 33:15 33:17 56:13 56:14 56:15 56:19 56:22 69:6 71:9 71:18 82:1

chairman's(1) 63:19
chance(1) 60:17
chandler(1) 63:21
change(9) 5:22 30:4 31:17 31:17 31:22 32:1 46:5 49:18 59:15

changed(5) 46:1 48:17 49:19 57:1 81:19
changes(1) 79:3
chapter(4) 20:16 21:4 50:22 52:8
charge(4) 27:9 27:11 29:24 46:16
charged(3) 30:1 30:2 46:15
charging(1) 27:12

check(3) 21:5 77:22 84:20
checked(1) 82:6
checks(2) 7:10 30:16
chief(48) 8:14 10:5 13:1 13:8 13:9 13:15 14:13 14:16 15:3 15:16 15:24 16:3 17:12 20:14 22:18 22:20 24:3 29:10 41:20 47:24 48:13 50:19 58:2 62:7 62:16 62:21 62:24 62:24 63:6 64:14 65:2 65:9 65:13 65:17 65:21 65:22 66:14 66:24 67:10 67:13 68:2 68:17 68:24 76:16 76:22 78:5 78:7 78:24

chief's(1) 75:23
chris(1) 41:19
chuckie(1) 2:19
city(1) 20:17
civil(1) 1:27
cknowledgment(1) 93:1
claim(1) 62:19
claims(1) 85:1
clarify(2) 41:5 46:22
class(2) 31:20 32:1
clear(5) 18:14 18:18 25:6 35:5 49:18
clearly(2) 63:14 82:3
client(2) 84:17 87:1
cmr(1) 50:22
cmrs(2) 21:4 56:7
coffee(1) 73:23 73:24
collapsed(1) 63:20
collective(2) 20:3 20:5
columbine(3) 15:18 37:9 47:9
columbine-like(1) 9:13
come(14) 8:23 10:14 20:21 34:6 37:18 41:19 41:21 59:5 59:9 65:10 67:24 81:11 82:19 84:5

comes(4) 32:17 50:2 57:24 58:24
coming(3) 31:16 37:11 75:16
command(2) 7:17 28:10
commander(2) 6:23 7:4
commanders(1) 7:5
commencing(2) 1:37 95:14
commission(3) 51:13 90:18 95:23
commissioner(1) 8:9
commits(1) 42:14
committed(1) 44:4
committee(2) 81:22 82:2
commonwealth(1) 1:31 40:14 95:5
communications(1) 14:22
communities(1) 58:18
companies(2) 31:16 31:17
compensation(2) 17:14 62:8
complained(1) 22:16
complaining(2) 22:17 22:19
complaint(8) 40:21 42:8 43:12 85:20 85:24 86:3 86:4 89:13

complaints(5) 19:8 22:1 28:9 44:21 86:18

complete(6) 11:21 48:3 65:22 65:24 93:12 93:18

completely(1) 80:5
computation(1) 21:6
computer(2) 45:19 47:24
concerns(8) 7:10 15:3 15:19 16:16 16:23 17:2 17:7 17:9

condition(10) 12:9 12:10 14:14 14:24 15:4 16:10 16:16 17:3 28:17 29:1

# KELLEY.WPD

| Word | Page:Line | Word | Page:Line | Word | Page:Line | Word | Page:Line |
|---|---|---|---|---|---|---|---|
| conditions(5) 11:6 31:11 31:19 31:21 54:13 | | cut(1) 80:9 | | detective(1) 78:7 | | don't(47) 4:24 8:3 9:11 14:10 15:7 15:11 16:20 16:21 17:4 17:4 18:20 | |
| | | d.c(1) 33:19 | | determination(2) 52:9 64:24 | | 23:6 24:15 26:9 28:21 29:6 33:4 33:24 | |
| conducted(1) 55:17 | | daily(5) 5:19 7:7 11:16 | | determined(1) 48:4 | | 34:3 34:15 34:22 34:22 35:5 35:24 | |
| conference(8) 32:5 33:1 33:9 40:5 | | dala(2) 41:12 41:13 41:18 | | dick(3) 8:12 76:17 76:18 | | 37:6 37:17 37:20 42:4 43:20 46:16 | |
| 40:11 40:16 41:17 42:3 | | dale(1) 82:2 | | didn't(25) 9:19 11:1 21:23 22:3 24:10 | | 46:20 53:22 57:20 60:5 60:18 60:20 | |
| | | dana(9) 15:23 16:1 16:2 17:1 24:1 | | 34:4 46:17 46:17 55:10 58:16 | | 60:21 64:10 64:12 67:19 71:4 75:17 | |
| conferences(2) 31:4 33:24 | | 62:14 64:13 64:17 65:10 | | 59:20 59:24 61:10 65:2 65:15 68:23 | | 78:7 79:4 79:20 81:23 85:23 | |
| conflict(3) 43:17 43:20 43:20 | | | | 74:10 74:13 77:4 77:11 78:14 79:12 | | | |
| connarton(1) 90:15 | | danvers(1) 33:20 | | 82:13 89:11 | | down(12) 12:2 19:13 39:11 42:2 42:23 | |
| connolly(1) 41:19 | | daryl(1) 44:16 | | | | 43:9 45:24 55:9 58:13 62:15 68:16 | |
| consider(1) 49:9 | | daryl's(2) 44:16 44:17 | | different(8) 30:10 32:16 60:21 60:21 | | 77:22 | |
| considering(1) 87:1 | | date(23) 14:8 14:9 25:2 25:2 42:9 | | 60:22 76:22 78:3 78:3 | | | |
| constantly(1) 29:14 | | 48:15 54:14 59:13 60:13 60:14 63:15 | | | | dragged(3) 36:2 63:21 63:22 | |
| contacted(1) 39:16 | | 66:23 66:24 66:24 67:3 67:4 67:18 | | differently(1) 52:13 | | dressed(1) 37:4 | |
| contesting(3) 76:4 76:6 76:7 | | 67:19 71:4 73:3 73:7 84:2 91:8 | | difficult(1) 27:6 | | drill(16) 9:13 9:14 9:15 10:18 10:23 | |
| continuation(1) 4:17 | | | | direct(2) 3:5 4:15 | | 10:23 11:18 12:10 14:23 15:5 16:11 | |
| continue(1) 19:2 | | dated(29) 3:16 3:18 3:21 3:23 3:25 | | directed(1) 71:16 | | 16:17 35:14 37:8 37:9 37:11 | |
| continued(1) 1:21 | | 3:27 3:32 3:35 3:38 3:41 3:43 3:45 | | direction(1) 71:12 | | | |
| continues(1) 4:14 | | 18:12 18:22 23:11 39:23 45:10 50:11 | | directives(1) 7:8 | | drills(1) 17:7 | |
| continuing(2) 4:19 4:23 | | 51:2 61:12 62:1 70:6 72:1 72:16 85:7 | | directly(2) 76:4 88:19 | | drink(1) 48:24 | |
| contract(4) 31:21 34:16 34:16 35:5 | | 89:22 91:6 91:7 91:13 | | director(8) 9:8 50:18 56:11 61:7 70:24 | | drinking(1) 7:11 | |
| contractor(1) 20:6 | | | | 71:18 85:16 90:16 | | drive(2) 12:1 12:3 | |
| contracts(1) 31:18 | | dates(1) 91:4 | | | | driven(1) 11:22 | |
| contractual(2) 13:8 14:16 | | day(29) 7:14 26:21 28:5 28:5 31:16 | | directors(1) 8:21 | | due(3) 14:24 29:11 30:12 | |
| contrary(2) 58:24 59:16 | | 33:9 33:9 33:12 37:14 37:21 39:7 | | disability(1) 51:14 | | dug(1) 22:4 | |
| contributory(3) 40:11 41:13 50:18 | | 39:15 42:20 45:18 46:8 46:15 46:18 | | disagree(2) 62:24 67:14 | | duly(2) 4:13 95:8 | |
| conversation(4) 62:23 67:15 67:24 92:1 | | 46:18 48:12 51:23 54:2 54:11 59:12 | | disappointed(2) 78:22 78:22 | | durante(1) 12:3 | |
| conversations(2) 16:24 62:6 | | 66:2 68:14 81:6 91:1 91:11 95:19 | | disappointment(1) 27:19 | | durante's(1) 10:8 | |
| conviction(1) 42:8 | | | | disbursement(1) 20:10 | | during(5) 7:23 33:2 35:14 57:9 82:12 | |
| convictions(1) 44:21 | | day-to-day(1) 71:10 | | discipline(2) 11:1 37:21 | | duties(5) 7:2 7:5 11:17 32:20 81:19 | |
| copies(4) 18:16 19:3 22:24 38:23 | | days(17) 4:8 6:18 13:3 13:3 13:4 13:5 | | disciplined(2) 34:10 35:10 | | duty(3) 6:19 63:18 63:18 | |
| copy(14) 14:6 18:13 25:18 39:1 39:1 | | 13:6 14:1 14:6 14:19 25:1 47:2 48:12 | | disclose(1) 84:11 | | e-mail(22) 3:18 3:21 3:23 3:25 23:8 | |
| 65:20 65:22 65:24 82:5 84:13 84:13 | | 58:14 58:17 60:15 90:18 | | disclosing(1) 87:4 | | 23:9 23:18 23:19 24:6 24:22 24:21 | |
| 88:2 89:17 91:16 | | | | disclosure(1) 78:10 | | 32:23 33:1 38:24 39:14 39:22 45:2 | |
| | | dead(2) 44:16 44:17 | | discrepancy(2) 19:9 21:9 | | 45:7 45:10 45:23 57:5 62:23 | |
| corcoran(4) 1:29 1:42 95:4 95:22 | | debra(6) 50:17 54:10 54:11 70:24 71:5 | | discussed(13) 16:5 16:6 16:6 16:10 | | | |
| correct(10) 15:6 23:4 23:5 26:3 46:5 | | 85:15 | | 24:19 34:9 60:4 74:16 75:1 75:7 85:22 | | e-mailed(2) 13:15 13:17 | |
| 61:18 65:7 91:3 93:12 93:17 | | | | 89:16 90:17 | | e-mails(4) 23:1 23:2 23:11 25:8 | |
| | | december(1) 69:19 70:1 | | | | each(1) 31:24 | |
| corrected(1) 26:2 | | decent(1) 59:3 | | discussing(1) 19:19 | | earlier(11) 12:23 24:19 57:16 63:6 65:3 | |
| couldn't(7) 11:21 12:1 12:1 28:14 40:23 | | decision(10) 24:19 28:13 41:9 42:22 | | discussion(14) 8:5 15:17 18:6 40:19 | | 66:8 72:10 76:11 81:3 83:7 91:17 | |
| 42:9 42:9 60:7 | | 50:3 50:7 55:21 57:19 57:20 86:11 | | 51:8 63:4 64:7 74:17 75:9 77:8 77:16 | | | |
| | | | | 80:17 83:24 90:4 | | early(1) 66:18 | |
| counsel(18) 1:23 4:3 4:12 5:4 21:14 | | decisions(6) 41:1 41:21 41:22 41:24 | | | | educational(1) 17:14 | |
| 38:22 39:2 42:21 43:24 48:5 56:10 | | 50:5 71:11 | | disease(8) 10:8 10:9 11:9 11:9 11:11 | | effect(6) 42:16 64:14 79:4 79:20 81:12 | |
| 60:17 61:2 61:10 84:4 84:6 87:4 88:22 | | | | 55:6 69:22 69:23 | | 82:20 | |
| | | declare(1) 32:18 | | | | | |
| counting(1) 29:18 | | deeper(1) 22:4 | | disinterested(1) 95:16 | | effort(1) 58:18 | |
| couple(4) 4:22 8:18 12:2 48:12 | | defendant(16) 1:14 1:25 2:19 4:12 19:1 | | disputing(1) 64:2 | | either(2) 6:22 10:20 | |
| course(1) 5:4 | | 23:15 40:15 44:15 51:4 53:2 62:3 70:9 | | distance(1) 73:11 | | eleanor(7) 17:16 19:6 22:6 22:7 22:7 | |
| court(12) 1:3 1:29 1:43 41:14 50:3 | | 72:4 83:20 85:10 90:1 | | distress(1) 69:19 | | 24:9 44:24 | |
| 50:5 68:3 68:15 88:24 93:3 95:4 95:22 | | | | district(4) 1:4 1:4 93:3 93:4 | | elected(3) 19:20 27:4 77:5 | |
| | | defendant's(1) 3:14 | | division(5) 8:13 41:2 41:11 51:13 78:7 | | election(5) 74:12 74:17 75:10 75:16 | |
| courtesy(1) 41:18 | | defendants(2) 12:8 85:2 | | dizzy(3) 11:23 11:24 12:1 | | 76:14 | |
| courts(2) 41:16 42:11 | | dello(4) 8:17 9:9 56:16 56:18 | | doctor(4) 47:22 48:1 48:2 48:5 | | | |
| cover(9) 26:12 26:15 26:19 27:1 27:2 | | deny(1) 42:15 | | doctors(6) 10:7 10:10 47:20 54:13 | | eligible(1) 20:7 | |
| 27:8 33:2 33:8 58:17 | | denying(2) 35:9 42:7 | | 62:13 69:21 | | else(16) 9:4 14:13 22:21 24:4 25:21 | |
| | | department(20) 6:20 8:24 9:2 9:3 | | | | 26:4 29:13 30:19 56:5 63:20 68:9 | |
| coverage(2) 26:23 27:14 | | 12:20 19:23 20:24 22:2 22:9 22:17 | | document(9) 18:9 21:7 21:7 28:20 29:3 | | 68:19 68:24 76:8 77:19 83:9 | |
| covered(3) 27:15 28:1 28:12 | | 22:18 35:18 37:9 40:9 50:21 58:2 | | 50:10 52:18 83:12 91:9 | | | |
| covering(1) 28:13 | | 61:5 68:10 77:20 86:17 | | | | embarrassed(1) 30:14 | |
| crab(1) 41:13 | | | | documentation(8) 24:11 62:11 62:12 | | emotional(1) 69:19 | |
| crack(1) 43:9 | | departments(1) 35:15 | | 66:1 66:15 66:16 68:16 70:18 | | emphatically(2) 49:2 67:13 | |
| crackdown(1) 44:20 | | depended(1) 7:14 | | | | employ(1) 57:9 | |
| create(1) 26:22 | | depending(2) 6:22 32:6 | | documented(1) 62:17 | | employed(1) 19:22 | |
| credibility(2) 78:23 86:19 | | depends(4) 31:9 31:9 31:11 31:11 | | documents(17) 13:17 14:7 14:10 17:21 | | employee(3) 51:13 57:11 79:17 | |
| crime(1) 44:3 | | deponent(2) 84:6 93:1 | | 17:22 25:13 35:4 38:15 38:21 49:6 | | employee's(1) 57:14 | |
| criminal(4) 40:21 42:8 43:12 44:21 | | deposes(1) 4:14 | | 63:2 66:20 66:22 67:1 67:2 67:8 67:11 | | employees(4) 8:6 8:6 20:3 59:23 | |
| criteria(1) 20:4 | | deposition(16) 1:21 1:4 4:8 4:17 4:19 | | | | employer(4) 50:21 59:21 59:23 65:22 | |
| cumulative(1) 14:2 | | 6:5 12:23 38:22 52:22 57:16 65:4 85:3 | | | | employment(2) 20:13 55:6 | |
| cup(1) 73:23 | | 92:3 92:6 93:10 95:17 | | | | emt(4) 35:22 36:5 36:9 36:17 | |
| curve(1) 32:17 | | | | | | emts(1) 36:6 | |
| | | described(2) 86:22 89:4 | | | | | |
| | | designee(1) 8:14 | | | | | |
| | | destroy(1) 58:19 | | | | | |

# KELLEY.WPD

| Word | Page:Line | Word | Page:Line | Word | Page:Line | Word | Page:Line |
|---|---|---|---|---|---|---|---|
| end(17) 12:10 12:12 15:1 15:5 17:14 17:18 24:23 32:9 51:14 61:7 61:8 68:14 73:9 75:17 75:18 82:15 85:3 | | express(1) 27:16 extended(1) 74:8 extension(3) 1:35 2:8 95:13 extensive(1) 54:12 | | forfeiture(2) 44:1 44:3 forgive(4) 26:10 53:13 54:1 73:5 form(2) 4:4 21:16 | | gone(1) 57:2 good(2) 4:16 31:12 goodwin(11) 16:2 17:1 23:24 24:1 62:14 62:20 63:5 64:13 65:1 65:10 65:16 | |
| ended(1) 6:5 ends(1) 29:24 enough(4) 5:11 22:23 38:9 58:17 enters(1) 5:6 entertained(1) 9:17 entire(2) 54:6 66:24 entirely(1) 52:15 equipment(1) 36:1 errata(2) 93:17 94:1 esquire(2) 2:6 2:21 essential(1) 11:15 establish(2) 20:16 20:18 even(4) 12:1 21:23 22:3 34:17 event(4) 21:12 49:11 58:9 59:13 ever(16) 7:24 26:22 30:22 43:8 44:19 49:5 56:22 65:17 69:6 79:3 79:9 79:17 81:10 81:21 82:18 86:7 | | face(1) 74:1 faced(1) 59:22 facilitates(1) 71:10 facing(2) 75:11 76:13 fact(8) 3:30 39:7 52:24 54:2 63:4 72:18 87:23 88:5 factors(1) 31:12 facts(4) 12:7 17:11 54:15 63:16 fahy(3) 7:3 26:20 28:11 fair(8) 5:11 7:17 33:18 35:22 37:9 78:19 86:8 90:7 faking(1) 63:22 fall(7) 32:6 40:17 41:18 42:5 67:20 67:21 67:23 | | formal(1) 89:17 format(1) 24:10 former(2) 44:13 44:23 formulate(1) 21:1 forth(4) 12:7 14:21 17:11 66:9 forthcoming(1) 90:20 fortini(2) 75:24 76:2 fortini's(2) 77:9 78:17 fortitude(1) 79:8 forward(1) 24:9 forwarding(1) 23:17 found(4) 26:8 44:8 44:3 58:13 four(4) 28:6 52:3 54:18 54:20 fraud(1) 42:15 friends(1) 48:6 front(9) 29:6 35:1 43:18 56:8 58:11 58:21 63:16 64:21 81:11 | | got(22) 11:22 13:6 29:7 34:22 34:23 35:6 37:13 37:16 37:17 38:7 39:11 59:7 62:9 64:16 64:18 65:13 65:19 79:24 80:1 87:24 88:2 91:16 governed(1) 20:13 governing(2) 21:7 21:7 govoni(2) 38:6 38:8 grab(1) 82:14 grabbed(1) 86:16 granted(1) 51:14 grapevine(1) 76:22 great(1) 18:17 grievance(2) 10:22 11:2 ground(2) 4:23 53:6 group(2) 21:3 40:12 guess(1) 78:8 guy(1) 8:22 | |
| every(6) 21:6 30:6 31:16 31:20 41:17 90:23 everybody(4) 13:2 41:23 63:20 79:12 everybody's(2) 31:13 31:14 everyone's(1) 13:1 everything(3) 62:10 62:17 65:21 evidence(7) 55:5 58:24 59:16 62:17 63:2 88:2 89:13 | | familiar(4) 41:2 41:3 41:4 41:6 fanny(1) 79:2 far(3) 6:18 26:23 91:3 fashion(1) 21:16 fax(3) 2:10 2:25 47:24 february(2) 4:17 6:9 feeling(1) 46:9 felt(4) 13:11 13:20 29:20 90:23 few(5) 5:10 7:23 24:19 53:8 56:24 | | fuck(3) 73:15 73:20 73:22 fulfilled(1) 90:23 full(3) 13:5 46:17 95:10 fun(1) 55:12 functions(1) 11:16 fund(2) 19:20 31:11 funded(1) 32:15 funds(2) 20:10 30:23 furtado(2) 44:13 44:18 further(1) 95:16 | | guys(4) 33:7 55:12 59:17 77:1 hadn't(1) 74:7 half(3) 13:6 15:21 46:18 halfway(1) 45:24 hall(3) 48:11 65:23 77:22 halt(1) 69:7 hancock(1) 2:13 hand(7) 10:11 34:23 67:1 73:24 74:8 74:9 95:18 | |
| evidenced(1) 62:13 evidentiary(1) 55:18 exact(4) 16:13 42:9 54:16 57:21 exactly(7) 29:4 33:21 34:1 34:15 35:24 46:20 67:19 | | figure(1) 52:1 file(16) 11:2 12:12 12:17 12:21 13:1 22:1 34:18 34:19 34:21 35:7 39:8 48:3 65:23 65:24 70:20 81:15 filed(4) 35:8 46:4 59:12 85:21 | | gallitano(31) 1:33 2:6 2:7 5:6 5:7 5:9 18:15 37:22 44:17 51:5 53:3 53:6 53:10 53:19 53:21 64:5 80:1 80:4 80:9 80:12 83:21 84:6 86:24 87:11 88:7 88:10 88:21 91:6 91:8 92:4 95:12 | | hand-delivered(1) 66:4 handled(2) 29:24 32:16 hands(11) 6:13 24:16 31:17 31:17 39:5 45:4 45:17 50:13 54:4 61:14 70:13 72:8 85:13 90:9 | |
| examination(4) 1:23 3:5 4:12 4:15 examine(1) 12:4 examined(1) 93:9 example(1) 43:14 examples(1) 23:3 except(2) 4:4 93:16 exchange(1) 86:5 exchanged(2) 66:9 83:6 exchanging(1) 59:21 excuse(4) 9:24 43:14 63:8 80:1 excused(3) 15:11 37:24 38:10 executive(17) 3:40 40:14 83:14 83:17 84:2 84:8 84:12 84:13 87:5 87:22 88:4 88:5 88:14 89:15 90:16 91:4 91:5 | | files(2) 58:9 71:2 filing(1) 40:19 final(2) 52:7 52:9 finally(2) 22:7 60:14 finance(3) 9:3 9:8 20:2 financial(5) 8:15 8:21 32:12 61:6 61:7 financially(2) 31:15 58:19 find(2) 20:21 25:17 findings(3) 3:30 52:23 54:2 fine(3) 18:4 64:4 92:4 finish(9) 4:20 4:20 4:21 43:23 64:3 77:12 80:2 80:12 92:3 | | gasb(2) 32:7 32:14 gave(21) 10:7 10:11 13:15 13:17 29:21 37:9 47:23 62:14 62:22 65:7 65:8 65:20 66:1 66:20 66:22 67:1 67:8 67:11 68:1 68:15 69:21 geez(1) 9:11 general(1) 17:17 general's(1) 17:13 generated(1) 21:4 generic(1) 13:2 | | happened(10) 21:13 21:23 28:7 30:5 32:20 35:11 43:3 52:5 73:1 73:21 happening(1) 58:15 happens(2) 57:19 58:5 happy(1) 31:13 harassment(6) 17:18 17:19 19:9 23:3 25:9 30:9 hardoon(1) 2:22 | |
| exercised(1) 13:14 exeter(1) 2:23 exhibit(71) 3:16 3:18 3:21 3:23 3:25 3:27 3:30 3:32 3:35 3:38 3:40 3:43 3:45 6:7 6:8 12:6 14:20 15:13 17:10 18:9 18:21 18:24 19:5 23:7 23:9 23:10 23:14 23:18 24:12 25:19 39:21 39:24 40:3 45:9 45:12 45:15 49:19 50:24 51:3 51:10 52:21 52:22 53:1 53:18 53:24 55:16 61:23 62:2 66:11 66:23 70:4 70:8 70:15 71:24 72:3 72:6 83:16 83:19 84:3 85:6 85:9 85:22 86:3 86:14 86:22 89:4 89:14 89:21 89:24 90:7 90:15 | | finished(1) 10:1 fire(3) 20:23 22:2 22:9 firefighters(3) 58:19 59:5 59:15 fireproof(1) 37:6 first(13) 10:12 15:12 26:2 36:1 51:11 54:2 63:10 63:11 70:16 73:18 73:19 87:16 87:19 fiscal(1) 24:23 five(9) 5:17 13:3 42:19 43:6 59:2 60:7 60:9 77:1 77:5 fletcher(1) 41:20 flight(1) 39:11 floor(2) 2:14 28:14 florida(1) 33:20 flynn(1) 66:6 follow(3) 16:14 19:13 19:16 65:1 75:2 follow-up(1) 55:13 | | gentleman(1) 76:10 get(16) 5:15 11:24 17:24 18:13 21:16 29:15 29:16 29:18 33:21 37:17 37:18 58:10 82:9 86:1 87:10 88:1 gets(3) 13:2 54:16 58:11 getting(3) 27:9 47:7 58:12 give(10) 6:15 22:23 25:18 38:12 39:1 58:23 67:11 68:2 86:19 88:22 given(11) 12:24 20:22 21:1 50:6 54:15 66:4 67:3 82:5 89:17 93:13 93:18 glad(1) 78:1 gladly(1) 53:22 glasses(1) 53:22 globe(1) 33:22 goes(1) 88:24 going(39) 5:9 5:10 5:13 6:3 6:4 6:8 6:8 11:19 12:17 22:3 22:9 27:8 27:24 28:18 32:9 32:12 34:13 38:14 39:1 45:2 50:10 53:12 57:15 58:22 61:8 62:7 83:11 84:19 85:2 86:11 86:24 88:3 88:14 88:15 88:20 90:6 91:24 92:1 92:2 | | harold(1) 60:20 haven't(7) 42:9 57:9 59:10 having(7) 4:12 4:13 12:5 20:1 20:2 95:7 95:8 he's(5) 8:9 9:8 78:24 79:1 84:11 head(4) 50:21 58:2 61:6 69:3 health(1) 37:24 hear(2) 33:7 87:7 heard(6) 7:23 8:5 38:3 42:6 76:16 hearing(4) 44:2 55:18 heart(9) 5:16 47:4 55:6 57:2 57:12 57:24 58:4 58:7 82:19 heavy(1) 37:5 held(1) 89:15 help(7) 27:7 45:22 51:10 55:16 78:4 79:4 79:23 | |
| exhibits(5) 6:4 38:22 65:4 65:17 66:17 expect(1) 90:16 experience(3) 20:22 20:2 51:21 expires(1) 95:23 explain(4) 37:1 57:15 62:16 63:24 explained(3) 12:23 21:11 54:10 | | followed(1) 56:9 following(2) 14:6 32:11 follows(1) 4:14 forfeits(1) 43:2 | | | | helped(1) 79:24 helping(1) 78:2 her(8) 17:16 19:18 20:8 22:12 71:20 76:17 76:23 77:3 hereby(2) 93:8 95:6 | |

# KELLEY.WPD

| Word | Page:Line | Word | Page:Line | Word | Page:Line | Word | Page:Line |
|---|---|---|---|---|---|---|---|

hereunto(1) 95:18

hernia(1) 39:11

herself(1) 77:2

hesse(1) 60:18

hicks(2) 73:10 74:3

him(65) 12:3 13:15 13:17 13:19 13:22
17:6 17:6 17:13 21:11 38:3 39:11
44:19 48:1 48:10 48:10 49:15 53:14
62:7 62:16 62:22 63:1 65:8 65:20
65:21 66:20 66:22 67:3 67:9 67:9
67:11 67:11 67:13 68:1 68:13 68:13
68:15 68:15 73:22 74:1 74:4 74:5 74:6
74:7 74:11 74:22 78:2 78:14 78:20
78:21 78:22 79:10 79:13 80:2 80:9
81:10 82:14 82:15 82:16 82:17 82:18
83:9 86:15 86:16 87:13 87:15

hire(2) 26:11 27:8

hired(1) 8:22

his(36) 8:11 12:4 13:19 13:22 17:14
21:11 38:4 39:9 43:2 60:19 62:19
64:23 65:8 65:9 67:1 67:2 73:8 74:8
77:9 77:17 78:22 79:1 79:2 81:2 81:3
81:19 81:19 82:6 82:14 84:10 86:10
86:12 86:19 87:11 88:7 95:9

history(1) 54:7

hold(2) 51:2 44:2

holiday(2) 19:24 20:11

home(8) 11:19 11:19 11:20 11:22 12:1
13:7 47:19 74:23

honest(1) 42:4

hope(4) 79:4 79:20 81:11 82:18

hopefully(2) 4:19 92:3

hoping(1) 4:21

hospital(6) 39:15 46:9 47:4 47:19
63:23 64:22

hours(2) 4:22 29:21

house(3) 39:10 47:24 59:6

however(2) 4:8 49:18

hurting(2) 59:14 59:23

hyannis(1) 33:19

hypertension(1) 55:5

i'd(8) 18:2 25:17 29:3 29:6 32:24
32:24 40:23 48:20

i'll(4) 28:20 64:12 84:2 84:5

i'm(70) 4:21 5:9 5:13 6:2 6:3 6:4 6:7
6:8 6:12 10:1 12:14 12:18 16:12 16:12
16:14 23:20 25:6 26:6 27:9 28:17
28:17 29:7 34:7 34:8 36:16 36:24
38:17 39:1 45:23 47:1 47:7 49:3 49:7
49:12 49:16 49:18 50:10 51:19 53:12
53:13 53:14 59:6 63:1 63:8 63:24 64:1
66:19 67:13 68:7 75:5 76:24 78:1
79:14 80:12 80:14 83:11 84:7 84:19
85:2 86:24 87:12 88:3 88:11 88:15
88:16 88:20 89:19 90:21 91:24 92:2

i've(4) 36:22 71:7 71:19 79:24

ideas(1) 59:21

identified(2) 4:13 95:8

identify(1) 84:2

illnesses(1) 10:6

immediately(1) 90:17

impact(2) 15:19 16:7

impacts(1) 32:14

inability(4) 14:23 15:4 16:11 16:17

inadequacies(1) 52:10

incident(6) 43:3 47:9 54:8 54:14 54:17
75:9

include(2) 25:8 69:11

inclusive(1) 93:9

incorrect(1) 64:17

independent(1) 29:5

indicate(6) 21:5 24:21 29:23 52:3 56:7
78:16

indicated(8) 25:7 26:21 27:13 28:24
40:4 42:23 65:3 69:20

indicates(3) 13:5 81:14 87:9

indicating(7) 13:15 13:17 28:12 32:13
32:24 48:1 62:24

indications(1) 87:11

individual(7) 21:2 39:9 43:1 44:5
49:10 58:8 63:15

individual's(1) 44:4

individuals(11) 15:9 15:10 16:23 21:22
31:17 43:14 55:24 58:15 59:2 72:23
76:22

influence(1) 86:11

information(14) 7:9 16:9 16:18 16:20
34:17 35:6 44:12 44:19 63:6 64:18
66:3 87:9 87:24 87:24

initially(1) 65:5

injured(1) 39:6

injury(5) 39:8 57:2 57:8 58:1 63:15

injury-on-duty(3) 62:8 62:18 63:14

inspection(1) 8:12

inspector(3) 8:10 17:13 17:17

instance(2) 23:17 33:17

instructed(2) 76:17 84:17

instructors(1) 36:8

instruments(1) 31:15

insult(1) 49:9

insurance(2) 81:22 82:2

interaction(1) 72:18

interest(2) 27:4 59:18

interesting(1) 61:5

internal(1) 21:19

international(1) 31:10

interpreted(3) 41:24 41:24 42:18

interrogatories(1) 6:7

interrogatory(4) 12:6 14:21 17:10 25:19

interrupted(1) 90:21

intestinal(1) 79:8

intimidated(1) 78:11

into(15) 22:4 22:6 22:8 22:15 24:6
32:17 34:23 37:14 41:14 64:19 64:19
67:24 68:11 77:24 88:9

investigate(1) 90:17

investigated(1) 91:2

investigation(6) 86:21 87:12 87:14
87:16 87:20 88:8

investigator(1) 17:17

involved(3) 20:9 54:18 77:19

involves(1) 43:16

involving(1) 43:1

iod(1) 50:6

issue(17) 15:18 21:12 21:17 32:8 32:11
44:2 44:3 57:8 58:3 68:17 81:8 86:4
86:19 87:21 87:22 88:4 88:6

issued(1) 88:5

issues(9) 15:3 15:9 32:7 42:10 52:10
57:24 78:3 78:3 92:2

it's(44) 8:14 14:3 14:10 17:21 18:2
18:10 18:14 18:18 24:5 28:6 30:9
32:11 32:15 32:15 32:18 36:20 36:23
36:23 36:24 37:4 37:4 37:5 37:6 41:7
41:11 42:3 42:19 43:7 43:20 49:23
50:12 52:20 52:21 57:17 58:3 59:1
72:11 73:3 73:4 77:5 78:19 84:3 85:23
91:6

item(1) 13:8

itself(3) 9:14 45:23 71:17

january(7) 3:32 3:35 61:13 61:21 62:1
70:7 70:21

jeremy(1) 2:21

jest(1) 73:12

jesus(2) 11:20 78:1

job(11) 5:22 11:16 17:18 17:20 27:4
29:1 52:5 59:1 59:7 59:10 81:19

joe(1) 19:2

john(3) 8:18 8:19 38:4

joined(1) 5:7

joseph(5) 1:33 2:6 2:7 90:15 95:12

july(11) 3:25 24:23 25:1 45:11 45:16
46:1 46:4 54:2 54:3 91:18 95:19

jump(2) 5:14 34:8

june(19) 1:37 3:43 3:45 24:22 24:24
39:3 42:23 48:2 48:8 48:16 48:22
75:19 75:19 85:8 85:18 89:23 90:12
93:11 95:14

just(81) 5:7 5:9 5:16 6:15 6:16 8:3
11:4 11:15 11:8 12:15 15:9 16:14 16:22
18:8 18:14 18:17 22:11 22:18 23:6
26:4 26:6 26:10 27:6 31:13 34:8 35:17
37:18 38:21 39:20 41:4 42:11 42:11
42:13 42:17 42:19 42:20 42:23 46:8
46:10 48:11 49:3 49:12 49:18 51:10
52:11 52:16 52:16 52:19 53:8 53:13
54:7 55:3 55:10 55:12 55:16 55:16
55:22 59:20 59:23 64:1 64:11 64:21
65:1 66:13 67:2 67:16 69:4 70:18 71:9
73:6 75:2 75:5 76:15 77:5 77:12 79:13
80:15 84:2 90:21 91:14 91:24

just.(1) 29:8

justified(1) 14:19

justify(2) 30:8 30:8

keep(2) 5:9 35:7

kelley(15) 1:9 1:21 3:3 4:11 4:16 5:13
18:8 18:11 23:23 59:6 70:12 84:7 89:3
93:8 95:7

kelley's(1) 85:1

kennedy(1) 39:10

kept(1) 24:10

kesten(1) 2:22

kevin(4) 7:3 33:5 33:11 44:18

kimberly(1) 41:20

kind(3) 22:23 42:6 61:5

kinds(2) 40:24 43:10

kingston(1) 1:45

kissing(1) 79:1

knew(3) 38:5 38:11 48:20

know(58) 5:1 5:2 5:3 5:4 7:20 9:10
14:8 14:10 15:11 16:5 16:6 16:22
16:24 17:4 17:5 17:22 22:3 26:9 28:9
29:14 31:13 33:4 33:4 33:24 34:22
34:23 35:5 35:24 36:10 36:22 36:24
37:6 39:17 42:4 42:10 44:12 46:16
47:18 51:24 55:10 57:20 60:5 60:18
60:20 60:21 64:11 66:5 67:5 75:17
78:4 78:24 79:7 79:15 79:15 80:13
80:13 85:23 87:19

knowledge(6) 14:17 25:11 26:22 52:14
54:6 95:11

knows(1) 79:12

kopelman(1) 60:22

kowal(1) 60:20

l-i-e(1) 68:5

labor(2) 61:2 61:10

lack(3) 27:16 78:22 78:23

lacking(1) 79:8

ladder(1) 61:16

language(2) 16:13 50:2

larry(9) 62:23 65:7 65:9 65:20 66:1
67:1 67:3 67:12 68:12

last(16) 5:14 5:18 5:22 6:4 6:5 8:2
26:9 34:7 34:9 42:11 42:11 42:13 42:18
42:21 53:10 63:12 66:11

late(1) 30:18

lately(1) 32:7

later(2) 47:2 60:17

law(9) 1:31 41:3 41:11 41:15 41:15
50:8 50:8 57:12 95:12

lawfully(4) 34:23 35:6 87:23 88:3

lawsuit(1) 88:20

lay(1) 12:2

least(5) 37:10 61:1 86:8 89:4 91:3

leave(3) 49:1 80:20 80:23

leaving(1) 73:9

left(15) 4:23 5:14 6:10 6:20 46:11
46:13 56:20 56:20 74:2 74:3 78:15
79:13 82:14

legal(1) 50:5

legislation(1) 32:8

legitimate(2) 13:13 13:20

lehane(1) 60:19

let(10) 5:1 5:2 5:3 5:4 64:3 64:11 65:1
66:10 80:1 89:19

let's(10) 9:11 39:20 45:9 50:24 61:23
63:16 64:5 70:4 85:5 91:5

letter(64) 3:16 3:27 3:32 3:35 3:38
3:43 3:45 10:5 12:24 13:2 13:11 13:20
13:23 14:15 18:8 18:10 18:22 19:5
19:11 19:18 22:12 22:14 49:5 50:17
50:20 50:22 51:1 51:20 51:23 61:12
61:16 61:24 66:7 66:11 70:6 70:11
70:14 70:16 70:23 71:23 72:1 72:11
72:12 73:3 73:7 73:7 77:21 81:14 82:1
82:4 85:7 85:15 85:22 89:6 89:17
89:22 90:7 90:13 90:14 90:18 91:2
91:13 91:17 91:18

letters(2) 10:14 25:8

level(1) 66:21

liar(2) 63:19 63:20

lie(1) 68:4

lieutenant(7) 6:24 7:4 7:13 26:20 28:11
33:5 45:19

like(27) 10:14 13:6 14:4 14:15 15:8
16:22 18:11 21:21 23:7 24:12 24:13
29:14 36:20 36:23 36:23 36:24 37:5
37:18 38:7 45:16 48:11 68:15 68:20
69:20 75:18 78:11 84:4

limitations(4) 42:12 42:20 42:24 43:5

linda(4) 1:29 1:42 95:4 95:22

line(2) 57:7 84:16

# KELLEY.WPD

| Word | Page:Line |
|------|-----------|
| line:___(14) 94:3 94:6 94:9 94:12 94:15 94:18 94:21 94:24 94:27 94:30 94:33 94:36 94:39 94:42 | |
| listed(1) 25:23 | |
| listing(1) 25:20 | |
| little(4) 30:3 73:13 73:24 78:10 | |
| live(1) 74:24 | |
| lives(2) 58:12 59:17 | |
| llp(1) 2:22 | |
| lockbox(1) 88:1 | |
| long(8) 27:1 33:15 53:13 55:15 56:14 59:19 60:2 71:16 | |
| look(11) 22:15 24:6 28:20 33:23 38:20 40:24 52:8 52:11 62:15 86:13 91:5 | |
| looked(3) 22:6 22:8 88:9 | |
| looking(7) 31:10 34:1 34:8 53:14 70:20 73:6 77:22 | |
| looks(6) 18:11 23:7 24:12 24:13 45:16 52:7 | |
| losing(2) 59:6 59:6 | |
| loss(1) 62:8 | |
| lot(3) 32:18 77:2 77:3 | |
| loyal(1) 78:11 | |
| lyme(3) 10:9 11:11 69:23 | |
| lynn(3) 75:23 76:1 76:3 | |
| macrs(2) 40:10 41:18 | |
| madden(1) 8:18 | |
| madden's(1) 8:19 | |
| made(11) 9:16 10:19 21:19 28:14 47:22 49:14 66:23 69:12 82:21 86:9 86:12 | |
| magistrate(1) 41:20 | |
| magistrates(1) 41:18 | |
| main(3) 1:33 2:8 95:13 | |
| major(1) 32:12 | |
| make(12) 7:7 10:16 10:22 25:19 26:6 30:3 31:13 41:8 52:9 64:23 81:21 86:6 | |
| makeup(2) 6:20 77:4 | |
| making(3) 19:3 31:14 55:12 | |
| manager(9) 17:15 19:7 19:8 24:6 31:10 31:18 31:22 44:24 58:3 | |
| managers(2) 31:6 33:10 | |
| mandated(1) 63:17 | |
| mandatory(1) 10:24 | |
| manfredi(4) 8:12 76:9 76:10 76:19 | |
| manning(1) 6:23 | |
| many(9) 13:5 13:5 31:7 32:4 33:7 36:7 58:7 60:5 60:6 | |
| march/april(1) 10:14 | |
| mark(17) 18:14 18:20 23:6 23:8 23:10 38:21 39:20 45:9 50:24 72:23 73:21 70:4 71:24 83:13 83:15 85:5 89:20 | |
| marked(25) 6:3 6:7 6:9 18:23 23:13 25:6 39:24 45:11 45:15 51:3 52:21 52:24 53:18 62:2 62:5 65:18 70:8 70:15 72:2 72:6 83:18 85:8 86:3 89:23 90:6 | |
| market(1) 31:11 | |
| markets(3) 31:12 31:14 | |
| massachusetts(10) 1:4 1:27 1:31 1:35 1:45 40:11 93:4 93:11 95:6 95:14 | |
| material(2) 37:6 68:2 | |

| Word | Page:Line |
|------|-----------|
| matter(7) 39:7 59:21 84:23 88:9 88:12 89:16 91:2 | |
| matters(1) 90:17 | |
| maybe(5) 9:11 15:20 37:6 75:18 75:19 | |
| mean(12) 8:3 26:1 27:22 28:6 28:21 31:12 47:13 52:2 60:9 63:13 72:21 80:9 | |
| meaning(3) 30:10 34:8 66:14 | |
| medical(35) 11:6 12:9 12:10 12:11 12:16 12:20 13:13 13:18 13:18 14:14 14:24 15:4 16:10 16:16 17:3 26:7 32:14 50:2 50:7 52:2 54:7 54:13 54:16 58:11 58:24 59:1 59:8 59:9 62:11 63:1 63:7 64:15 64:23 65:5 67:14 | |
| medically(1) 69:15 | |
| medication(3) 5:15 11:12 12:2 | |
| medications(1) 5:17 | |
| medicine(1) 5:16 | |
| meet(3) 31:20 31:23 31:23 | |
| meeting(31) 15:2 15:16 15:22 16:16 16:22 19:21 20:9 20:18 20:19 23:21 24:2 26:13 26:16 27:1 29:23 29:23 30:1 30:6 33:10 42:20 64:19 64:20 65:9 67:10 68:17 72:20 77:23 81:22 82:4 82:7 82:7 | |
| meetings(1) 83:15 | |
| member(13) 19:19 19:21 20:5 31:8 40:14 41:10 56:2 56:7 71:14 77:23 84:10 85:18 90:12 | |
| member's(1) 21:3 | |
| members(5) 20:23 21:22 37:10 77:5 91:20 | |
| membership(2) 15:2 77:6 | |
| memory(1) 89:12 | |
| meniere's(5) 10:8 11:8 11:9 12:5 69:22 | |
| mention(3) 20:11 77:21 81:3 | |
| mentioned(5) 1:18 11:5 17:1 76:11 81:2 | |
| met(3) 12:3 31:19 68:13 | |
| michael(5) 72:12 72:19 73:1 81:4 91:22 | |
| middle(2) 46:2 75:19 | |
| might(5) 10:13 13:3 58:11 60:20 75:18 | |
| mike(3) 42:21 73:12 73:22 | |
| miller(1) 9:5 | |
| million(1) 31:5 | |
| mine(1) 45:20 | |
| minute(11) 34:6 43:15 43:16 51:6 64:5 81:20 83:15 83:22 86:1 87:10 91:5 | |
| minutes(15) 3:40 5:10 18:2 24:19 29:19 29:22 30:18 56:24 82:6 82:7 83:18 84:8 84:9 84:15 88:4 | |
| mispronounce(1) 28:18 | |
| misrepresented(1) 77:2 | |
| misstating(1) 89:20 | |
| mistake(1) 21:24 | |
| mistakes(1) 21:18 | |
| misused(1) 30:23 | |
| molloy(1) 10:10 | |
| molloy's(1) 11:10 | |
| moment(3) 6:16 50:9 85:4 | |
| money(7) 19:14 19:24 20:11 20:11 21:20 27:12 32:1 | |
| monies(4) 20:9 20:10 21:20 59:12 | |
| monitor(2) 6:19 7:16 | |
| monitored(1) 7:2 | |
| month(3) 15:20 15:20 75:17 | |
| month's(3) 24:22 24:22 37:10 | |

| Word | Page:Line |
|------|-----------|
| months(2) 8:18 74:7 | |
| moore(1) 69:24 | |
| more(5) 26:5 26:5 53:14 78:10 86:7 | |
| morning(3) 15:10 38:11 86:15 | |
| most(2) 7:3 7:9 | |
| mother's(1) 39:7 | |
| motion(1) 88:24 | |
| motions(1) 4:5 | |
| move(5) 50:9 83:11 85:1 85:4 85:5 | |
| mrs(3) 18:11 59:14 66:6 | |
| much(2) 30:3 37:13 | |
| multiple(1) 27:23 | |
| municipal(1) 20:2 | |
| must(6) 30:18 30:19 35:12 56:3 63:17 63:22 | |
| myself(8) 8:3 39:9 52:15 55:20 72:23 73:15 73:20 74:2 | |
| name(8) 8:11 28:6 38:4 54:12 57:21 60:19 81:3 81:3 | |
| named(1) 44:13 | |
| names(1) 28:3 | |
| near(1) 82:17 | |
| necessary(1) 90:23 | |
| need(11) 5:1 5:3 5:3 43:23 44:6 53:8 75:6 79:4 79:20 81:23 91:12 | |
| needed(1) 78:4 | |
| needham(3) 21:17 21:18 21:19 | |
| never(45) 9:16 10:19 10:21 13:21 13:22 13:23 14:18 20:19 20:20 20:20 26:14 27:14 28:1 28:12 30:5 33:11 34:21 36:1 37:7 38:2 38:5 38:11 49:4 49:4 49:14 63:5 64:16 64:17 65:4 65:12 65:13 68:4 68:18 69:5 69:12 74:6 74:13 74:16 75:1 75:7 81:11 82:16 82:16 82:18 82:21 | |
| new(9) 5:20 6:1 7:8 7:8 7:10 31:10 31:15 31:16 41:24 | |
| next(10) 4:22 50:9 51:23 71:23 73:21 79:1 85:6 89:20 91:11 92:3 | |
| niceties(1) 83:6 | |
| night(13) 73:9 74:6 74:13 75:8 77:14 82:9 82:12 82:16 82:16 82:23 82:24 83:2 83:5 | |
| nine(1) 31:5 | |
| nobody(2) 47:18 64:2 | |
| nomination(4) 77:9 77:17 77:23 78:17 | |
| nonboard(1) 86:4 | |
| none(1) 7:22 36:12 55:8 | |
| nonmedical(1) 54:7 | |
| nos(2) 23:7 23:14 | |
| notarial(1) 95:19 | |
| notary(2) 4:9 95:5 | |
| note(3) 28:16 28:24 84:4 | |
| noted(1) 93:16 | |
| notes(9) 10:7 10:11 12:12 12:16 12:20 13:18 16:21 34:8 69:21 | |
| nothing(1) 31:21 | |
| notice(4) 37:10 37:13 37:16 88:22 | |
| notices(2) 25:8 37:17 | |
| notification(1) 66:8 | |
| notified(1) 55:9 | |
| notify(3) 10:4 14:13 32:23 | |
| november(3) 64:20 67:23 68:22 | |

| Word | Page:Line |
|------|-----------|
| now(13) 9:5 9:5 9:8 14:12 32:11 44:6 44:14 46:11 57:15 58:18 60:12 62:5 86:3 | |
| number(13) 6:3 21:6 29:22 31:12 32:17 34:4 52:1 58:14 60:4 60:7 60:12 87:22 87:22 | |
| numbered(1) 54:3 | |
| numbers(3) 20:19 20:24 28:23 | |
| numerous(1) 50:4 | |
| o'clock(1) 13:6 | |
| oath(4) 4:14 15:13 84:10 95:9 | |
| object(4) 9:14 10:16 30:4 84:15 | |
| objecting(1) 84:7 | |
| objection(5) 9:16 9:21 84:4 86:24 87:8 | |
| objections(1) 4:3 | |
| obligated(1) 43:23 | |
| obligation(4) 12:19 14:16 43:13 90:23 | |
| october(2) 64:13 95:24 | |
| odometer(2) 34:10 34:10 | |
| off(22) 4:23 5:14 6:4 6:10 17:24 18:5 18:6 18:19 43:15 44:6 46:18 51:5 51:8 64:5 64:7 80:10 80:15 80:17 83:21 83:24 90:2 90:4 | |
| office(4) 4:18 12:4 17:13 17:16 17:17 21:11 44:4 84:11 | |
| officer(18) 6:18 7:2 7:6 7:24 8:15 11:16 26:12 26:18 32:21 39:10 44:13 44:14 57:10 63:5 74:1 79:17 80:20 83:2 | |
| officer's(1) 57:21 | |
| officers(15) 7:10 7:17 7:19 26:24 27:16 27:21 28:3 35:23 36:5 36:9 36:17 36:18 37:24 39:2 63:21 | |
| offices(2) 1:31 95:12 | |
| okay(27) 14:5 19:2 38:16 38:20 41:8 41:19 44:2 44:7 44:8 47:7 49:23 50:3 52:12 54:14 55:4 56:14 57:2 62:14 64:4 73:8 73:13 80:3 80:3 80:6 80:11 88:15 91:11 | |
| old(3) 42:13 53:6 73:13 | |
| on-the-job(1) 42:15 | |
| once(2) 55:6 86:2 | |
| one(35) 2:23 6:15 7:11 10:7 19:16 21:13 23:20 23:20 23:22 27:24 29:13 31:20 31:24 32:1 32:5 32:7 37:7 37:14 42:11 46:8 52:1 59:10 75:21 76:7 78:6 78:9 78:24 80:15 81:4 81:7 84:22 85:23 87:22 90:2 90:11 | |
| one-piece(1) 37:5 | |
| ones(2) 5:18 60:21 | |
| ongoing(3) 20:1 20:12 20:21 | |
| only(10) 7:16 36:8 46:18 47:20 47:21 58:6 63:13 68:11 77:5 82:15 | |
| onto(1) 63:20 | |
| open(1) 43:7 | |
| operations(1) 71:10 | |
| opportunity(1) 86:6 | |
| opposition(4) 74:11 75:10 75:21 76:13 | |
| order(3) 80:20 80:23 89:11 | |
| ordered(2) 21:20 89:8 | |
| original(1) 24:15 | |
| other(33) 4:21 7:16 7:19 8:5 8:6 9:20 14:12 17:7 17:8 23:1 23:2 25:13 25:13 25:14 26:11 26:21 28:1 29:16 33:12 36:17 37:1 37:23 42:20 54:11 59:14 63:21 66:15 66:17 66:21 72:23 82:24 83:2 88:4 | |

# KELLEY.WPD

| Word | Page:Line | Word | Page:Line | Word | Page:Line | Word | Page:Line |
|---|---|---|---|---|---|---|---|
| otherwise(1) 79:18 | | peddell(3) 81:4 81:10 81:17 | | position(11) 8:19 19:20 26:18 27:5 | | q.all(7) 29:9 49:3 49:12 65:1 72:24 |
| our(8) 6:5 29:22 31:18 32:2 32:12 42:21 87:24 92:1 | | penalizing(1) 59:17 | | 27:9 30:23 69:6 69:8 77:13 81:17 87:1 | | 90:21 91:14 |
| | | pension(1) 43:2 | | positions(1) 77:1 | | q.along(1) 35:20 |
| out(29) 10:14 15:10 20:21 21:22 27:9 | | people(19) 21:20 27:13 28:2 28:12 | | possession(2) 65:8 67:3 82:6 | | q.and(34) 23:6 23:17 24:12 24:18 31:7 |
| 29:15 29:16 31:16 31:16 33:21 36:4 46:6 | | 29:15 29:16 40:20 42:7 43:6 58:13 | | possibly(1) 6:21 | | 33:2 35:22 39:13 40:3 42:14 44:23 |
| 46:8 46:22 46:24 47:11 48:23 57:2 | | 59:3 60:22 61:9 76:23 76:24 77:3 77:3 | | posture(1) 6:23 | | 45:7 49:18 50:17 52:13 56:11 56:22 |
| 58:16 59:4 59:7 59:21 63:21 63:22 | | 79:24 88:1 | | practice(2) 20:1 22:8 60:1 | | 61:16 62:20 67:5 67:15 69:11 71:3 |
| 68:3 74:19 76:16 78:2 78:8 86:18 | | perac(7) 89:5 89:7 89:8 89:12 89:17 | | precedent-setting(1) 41:22 | | 71:16 72:16 72:22 75:16 75:21 76:1 |
| outcome(1) 87:13 | | 90:16 91:3 | | preclude(1) 56:8 | | 76:4 85:20 89:8 91:17 91:22 |
| outside(1) 65:16 | | percent(1) 21:9 | | precluded(2) 52:15 55:20 | | q.any(1) 83:2 |
| over(18) 8:21 20:22 21:21 25:1 25:24 | | perfectly(1) 50:5 | | preemployment(1) 54:22 | | q.anyone(1) 22:21 |
| 28:8 29:18 30:15 31:5 34:4 34:12 43:2 | | perform(1) 11:15 | | preexisting(7) 11:6 12:9 14:24 15:3 | | q.anything(2) 6:1 83:9 |
| 53:5 53:7 60:4 71:12 73:10 73:14 | | perhaps(1) 18:13 | | 16:10 16:16 17:3 | | q.are(3) 33:13 37:16 37:23 |
| overall(1) 36:23 | | period(2) 21:21 32:3 | | preliminary(4) 47:20 47:23 63:11 66:21 | | q.as(1) 55:15 |
| overalls(1) 36:19 | | periods(1) 33:3 | | prerogative(1) 19:18 | | q.at(2) 77:16 81:7 |
| overtime(2) 19:24 20:12 | | perkins(1) 2:22 | | present(9) 12:17 15:22 21:11 24:1 | | q.back(4) 48:8 48:16 56:17 60:16 |
| own(4) 20:16 47:24 59:23 72:24 | | person(2) 58:21 95:17 | | 34:16 35:15 36:17 82:3 88:23 | | q.besides(1) 22:23 |
| oxygen(2) 36:1 36:3 | | personal(3) 48:5 49:9 86:5 | | | | q.but(6) 29:5 65:10 71:14 74:24 78:19 |
| p.c(1) 2:12 | | personally(1) 78:4 | | presentation(1) 84:14 | | 91:1 |
| p.m(3) 1:37 92:5 95:15 | | personnel(12) 12:12 12:17 12:21 19:22 | | presently(2) 9:5 84:3 | | q.dated(1) 61:21 |
| package(2) 66:24 68:1 | | 20:4 20:18 20:21 21:8 34:18 65:23 | | president(3) 15:2 61:17 62:7 | | q.dennis(1) 38:6 |
| page(5) 3:3 3:14 49:22 57:17 70:3 | | 65:24 66:9 | | pressure(1) 28:1 | | q.did(28) 24:3 27:16 31:2 43:8 44:19 |
| page:___(14) 94:3 94:6 94:9 94:12 | | persuade(1) 57:10 | | pretty(3) 27:2 31:13 55:11 | | 47:17 54:24 57:5 65:16 68:9 68:19 |
| 94:15 94:18 94:21 94:24 94:27 94:30 | | pertained(1) 44:20 | | preventing(1) 40:20 | | 69:6 72:18 74:11 77:8 78:13 78:16 |
| 94:33 94:36 94:39 94:42 | | pertinent(1) 55:11 | | previous(2) 12:22 14:3 85:22 | | 79:3 79:9 80:20 80:23 81:10 81:21 |
| pages(1) 93:9 | | phone(3) 46:20 62:22 67:9 | | previously(2) 52:20 82:21 | | 82:14 82:18 82:23 83:4 88:12 |
| paid(5) 20:3 20:4 20:12 29:22 46:18 | | phonetic(1) 41:19 | | prior(21) 8:3 9:14 9:22 10:23 11:7 | | q.do(7) 22:10 28:9 28:24 36:4 40:7 |
| paige(1) 60:22 | | physical(3) 54:22 55:1 69:18 | | 11:18 12:17 14:1 14:14 14:23 15:20 | | 45:5 50:15 |
| panel(14) 50:2 52:2 54:16 58:6 58:11 | | physically(1) 82:11 | | 19:18 25:2 48:1 54:14 62:7 65:9 69:14 | | q.during(1) 32:3 |
| 58:13 58:24 59:1 59:9 62:11 62:13 | | physicians(3) 25:20 47:22 58:7 | | 69:24 75:9 89:16 | | q.fair(2) 38:9 85:15 |
| 63:1 64:23 67:14 | | piece(3) 35:1 37:18 50:10 | | probably(1) 67:17 | | q.for(2) 33:17 71:21 |
| panel's(1) 50:7 | | pinehills(1) 72:21 | | problem(4) 59:22 76:3 79:6 90:22 | | q.forgive(1) 38:4 |
| panels(2) 58:7 59:8 | | place(7) 46:12 67:16 74:3 80:21 80:24 | | problems(1) 26:23 | | q.had(1) 74:8 |
| paper(4) 29:7 35:1 37:19 50:11 | | 88:2 88:8 | | procedurally(1) 38:18 | | q.help(1) 46:22 |
| papers(8) 48:6 48:12 48:14 76:23 77:9 | | placed(1) 36:2 | | procedure(4) 1:27 52:16 58:5 88:1 | | q.how(6) 33:15 36:7 37:13 59:19 60:2 |
| 77:17 77:23 78:17 | | plaintiff(2) 1:10 2:4 | | procedures(2) 56:7 56:9 | | 77:19 |
| paperwork(2) 58:10 65:19 | | plaza(1) 2:23 | | process(3) 15:11 41:8 69:8 | | q.i(7) 26:9 28:22 34:2 34:13 35:3 |
| paragraph(7) 40:3 46:2 51:11 54:2 | | please(7) 5:2 5:4 12:7 14:21 17:11 | | produce(1) 13:12 | | 70:11 74:21 |
| 55:17 70:16 90:15 | | 51:12 64:11 | | produced(7) 14:11 14:11 17:21 25:16 | | q.i'm(14) 26:4 36:16 38:14 41:6 45:2 |
| part(11) 8:24 9:1 9:2 14:16 31:2 38:22 | | plymouth(22) 1:13 1:35 2:9 7:20 7:24 | | 28:16 63:2 64:21 | | 47:3 49:7 55:22 73:4 73:16 76:18 |
| 54:9 55:11 55:20 63:14 87:5 | | 8:7 35:17 35:19 55:7 56:2 56:4 61:19 | | production(6) 13:16 18:10 23:2 25:7 | | 83:11 85:12 90:6 |
| partial(1) 2:6 | | 71:1 74:24 77:13 77:20 77:20 83:14 | | 35:4 49:5 | | q.in(4) 25:13 25:19 37:8 67:23 |
| participate(8) 9:21 10:17 11:1 14:24 | | 84:1 93:10 95:2 95:13 | | profanity(1) 83:4 | | q.is(1) 86:8 |
| 15:4 16:11 16:17 88:12 | | plymouth's(3) 20:15 50:18 56:3 | | program(2) 15:18 63:17 | | q.it(2) 34:21 90:11 |
| participating(1) 89:9 | | point(20) 13:2 14:4 14:5 21:10 41:14 | | prosecutor(1) 68:13 | | q.just(7) 25:6 35:18 38:18 45:22 51:10 |
| participation(5) 9:15 10:22 29:12 30:13 | | 41:15 41:15 42:2 46:6 47:12 48:4 | | protection(1) 13:10 | | 68:6 79:16 |
| 37:24 | | 48:19 57:17 58:1 59:20 73:23 74:18 | | provide(1) 5:5 | | q.let(5) 61:12 70:3 77:12 82:9 86:20 |
| particular(5) 6:19 13:4 42:24 44:23 | | 81:5 81:7 89:1 | | provided(3) 18:9 63:5 65:6 | | q.let's(3) 50:9 52:18 71:23 |
| 84:23 | | police(27) 6:18 7:19 7:24 11:16 12:20 | | providers(1) 26:7 | | q.may(2) 25:4 47:9 |
| particularly(3) 15:7 17:22 51:21 | | 19:23 20:13 20:14 22:16 22:16 22:17 | | provision(1) 19:23 | | q.mr(1) 76:10 |
| parties(1) 4:3 | | 26:12 32:20 35:20 35:21 36:20 50:19 | | provisions(1) 1:25 | | q.my(2) 24:8 87:19 |
| party(2) 41:9 72:21 | | 57:10 58:2 58:19 59:14 67:24 68:9 | | public(7) 1:29 7:11 51:13 78:14 81:21 | | q.name(1) 28:3 |
| passed(2) 42:23 54:22 | | 77:20 79:17 83:2 86:17 | | 87:9 95:5 | | q.never(1) 74:14 |
| past(1) 7:23 | | police/firefighters(1) 59:5 | | puerto(1) 33:19 | | q.no(3) 38:20 47:1 64:1 |
| patrol(4) 6:21 7:2 7:6 7:17 | | policy(6) 21:5 49:24 57:11 58:20 59:3 | | purpose(1) 70:23 | | q.now(5) 22:1 35:14 40:16 54:21 69:14 |
| paul(4) 15:23 16:24 61:16 62:6 | | 61:2 | | purposely(1) 30:17 | | q.okay(9) 10:3 19:17 35:9 57:18 66:13 |
| pause(3) 6:17 18:19 38:13 | | polling(2) 80:21 80:24 | | purposes(1) 27:14 | | 72:10 73:21 76:20 81:16 |
| pay(7) 19:9 21:20 26:11 46:17 46:17 | | pomeroy(10) 17:12 17:16 22:18 22:20 | | pursuant(5) 1:25 20:4 20:16 21:2 21:3 | | q.on(1) 48:22 |
| 59:11 61:9 | | 24:4 24:9 29:10 62:7 68:24 81:18 | | push(3) 59:19 59:20 | | q.prior(2) 57:8 74:4 |
| paycheck(2) 58:18 58:22 | | portfolio(1) 32:2 | | put(22) 24:21 25:1 28:1 30:15 32:19 | | q.relative(2) 81:2 85:24 |
| paying(3) 30:4 63:1 67:13 | | portion(1) 4:21 | | 33:11 35:1 42:12 46:4 46:11 47:17 | | q.right(2) 44:11 47:6 |
| payroll(2) 20:24 21:9 | | portuguese(1) 38:7 | | 48:6 48:11 48:13 48:14 49:18 49:20 | | q.showing(4) 45:15 53:18 62:5 72:6 |
| | | posed(1) 84:18 | | 49:22 49:23 55:9 60:7 90:22 | | |
| | | | | putting(2) 48:21 61:1 | | |
| | | | | q.a(1) 69:2 | | |
| | | | | q.about(1) 60:6 | | |

# KELLEY.WPD

| Word | Page:Line | Word | Page:Line | Word | Page:Line | Word | Page:Line |
|---|---|---|---|---|---|---|---|
| q.so(7) 42:5 66:10 67:7 70:23 75:2 75:8 83:7 | | recall(8) 15:16 17:4 28:3 34:11 40:9 67:15 71:3 83:9 | | represent(1) 89:1 representative(2) 13:12 14:22 represents(1) 40:13 | | running(5) 58:16 75:13 75:21 76:8 russo(4) 8:17 9:9 56:16 56:18 sacco(2) 42:21 52:21 |

q.that's(3) 26:6 49:16 73:18
q.the(4) 23:2 55:24 56:14 67:21
q.this(3) 22:13 23:21 51:20
q.to(4) 26:15 26:22 54:6 79:11
q.try(1) 79:14
q.vacation(1) 47:15
q.was(3) 34:19 40:19 63:4
q.we(1) 56:24
q.we'll(1) 34:6
q.well(4) 33:23 34:24 43:18 43:22
q.were(10) 30:7 30:11 36:9 60:24 69:18 69:24 70:20 71:8 75:13 76:13

q.what(5) 32:20 56:19 67:18 71:5 89:12
q.what's(2) 27:11 70:15
q.whatever(1) 75:5
q.when(3) 22:5 22:16 47:11
q.where(1) 40:9
q.whether(1) 68:24
q.which(1) 27:21
q.while(1) 30:21
q.who(3) 23:23 66:5 76:8
q.why(1) 51:23
q.would(1) 90:14
q.yeah(3) 19:12 19:15 44:15
q.you(7) 28:16 51:18 60:9 69:4 71:12 72:14 74:16

q.you're(2) 36:12 89:3
qualify(1) 42:9
question(35) 4:4 4:24 9:18 11:2 12:23 15:8 15:12 15:15 24:8 41:5 42:5 43:18 43:21 43:22 49:13 49:14 53:2 55:15 64:1 64:10 64:11 64:11 64:12 65:10 75:8 79:16 79:16 80:2 80:5 87:17 87:19 88:7 88:10 88:17 91:9

questioned(1) 49:4
questioning(3) 57:7 84:7 84:16
questions(11) 19:21 38:14 52:4 52:6 53:9 54:18 54:20 55:13 84:17 93:13 93:19
quick(2) 29:18 51:21
quincy(1) 2:15
quinn(2) 19:23 20:11
quite(1) 57:8
r-15s(1) 16:8
raised(1) 57:8
ran(2) 59:7 77:24
read(4) 4:6 43:4 55:10 93:9
read:
94:13 94:16 94:19 94:22 94:25 94:28 94:31 94:34 94:37 94:40 94:43

reading(16) 4:8 12:7 12:11 12:11 12:12 14:21 15:1 15:1 15:5 17:11 17:15 17:15 17:18 45:23 51:11 51:15

reads:
94:18 94:21 94:24 94:27 94:30 94:33 94:36 94:39 94:42

ready(1) 73:24
real(1) 79:6
realize(2) 21:23 77:4
realized(1) 27:3
really(2) 27:5 87:2
reason(5) 5:2 7:11 9:21 13:14 45:20
reasoning(1) 27:7
reasons(2) 38:1 56:8

received(5) 13:21 14:18 49:4 65:4 86:3
receiving(1) 10:5 40:20
recent(2) 41:21 42:22
recently(1) 42:11
recess(1) 44:9
recognize(9) 45:3 45:5 50:15 59:24 61:13 70:11 72:7 72:9 85:12

recollection(1) 29:5
recommended(1) 61:2
recommending(1) 61:11
reconsider(1) 62:18
record(33) 12:12 12:16 17:24 18:5 18:16 18:7 18:14 18:18 18:19 23:6 33:12 39:20 43:15 44:6 51:5 51:8 51:18 64:6 64:7 64:8 69:4 72:14 80:15 80:17 80:18 81:24 83:21 83:24 84:19 88:21 90:2 90:4 95:10

recorded(2) 93:14 93:19
records(11) 13:13 13:18 19:10 63:7 64:15 64:15 64:20 64:23 65:3 65:5 66:8

reelection(1) 75:15
refer(1) 6:9
reference(1) 10:17
referenced(2) 12:15 52:19 91:17
referred(1) 72:10
referring(9) 6:6 6:12 12:6 14:9 17:23 24:14 24:18 39:14 61:3

refutes(1) 82:3
regarding(6) 10:5 14:23 17:14 44:2 84:8 88:23

regular(1) 5:16
regulations(3) 21:4 37:22 56:6
rejected(1) 59:10
related(12) 7:6 19:9 44:23 54:7 59:1 59:10 67:16 83:4 85:20 85:21 86:9 88:19
relates(1) 19:22
relating(2) 39:3 84:16
relation(1) 89:13
relationship(3) 20:6 71:5 76:1
relative(10) 9:13 28:17 29:2 40:3 62:8 74:17 75:10 77:9 86:20 88:17

release(2) 84:15 84:21
released(1) 84:22
relevancy(1) 84:24
relevant(1) 52:17
relief(1) 41:12
rely(2) 12:8 17:12
remand(1) 52:10
remark(1) 49:15
remember(24) 8:3 9:11 15:7 15:8 18:1 22:10 28:11 28:19 28:24 33:21 34:13 34:15 36:2 36:4 39:7 46:10 46:21 57:3 60:16 67:19 70:14 71:4 74:19 75:22
removed(3) 34:18 34:19 34:21
repeat(1) 5:1
repercussions(1) 49:1
rephrase(1) 64:12
replaced(1) 9:8
report(2) 39:8 47:23
reported(2) 17:13 91:2
reporter(3) 1:43 95:4 95:22
reporter-notary(1) 1:29
reports(1) 47:20

reprimand(1) 81:14
request(8) 13:23 48:16 49:19 66:22 70:16 70:17 70:23 88:21

requested(6) 45:23 63:6 65:21 66:14 71:3 71:4

requesting(1) 13:19
required(7) 13:9 31:5 50:22 50:22 52:8 54:11 62:17

reservations(1) 87:23
reserve(4) 84:20 85:3 88:15 88:20
reserved(2) 4:4 4:6
reserving(1) 88:16
resolved(1) 89:16
respect(1) 86:13
respective(1) 4:3
respond(1) 84:17
responded(2) 13:23 91:15
response(1) 14:18
responsibility(1) 32:10
rest(1) 55:11
restore(1) 57:13
restricted(1) 48:18
result(2) 10:4 50:7
results(1) 48:3
retire(4) 44:5 48:7 48:21 54:9
retired(2) 6:2 66:2
retiree(1) 52:14
retirees(1) 32:15
retirement(76) 7:20 8:1 8:7 20:10 21:1 21:14 21:18 26:13 26:16 27:13 29:11 30:2 30:12 30:21 30:23 31:2 31:8 32:4 32:10 32:13 32:22 33:13 33:18 40:4 40:12 40:13 40:17 40:20 41:8 42:7 42:15 43:9 44:20 49:21 49:22 49:23 50:1 50:19 50:21 51:13 56:3 56:5 57:9 57:12 57:12 59:22 62:12 66:18 69:7 69:8 69:9 70:24 72:20 72:23 75:13 77:13 78:3 79:4 79:21 81:11 81:23 82:10 82:19 83:14 84:1 84:9 85:16 85:17 86:2 86:11 86:21 87:3 88:17 88:22 89:9 90:11

retract(1) 13:19
retracted(1) 13:22
retroactively(4) 50:6 57:13 59:11 61:8
review(5) 12:20 13:19 14:17 54:6 54:17
reviewed(1) 54:15
reviews(1) 13:1
revisit(1) 92:2
revisiting(1) 53:3
richard(1) 2:12
rico(1) 33:19
ridiculed(1) 29:17
right(40) 5:14 9:5 9:23 11:7 13:14 15:14 15:14 18:4 19:16 24:15 25:5 25:10 26:8 29:9 35:10 46:3 46:11 47:4 47:4 47:8 47:9 49:3 49:12 49:21 54:21 56:1 56:12 56:20 60:12 65:1 66:10 71:22 72:24 73:5 73:6 73:6 80:9 85:5 90:21 91:14

risking(1) 59:17
room(1) 5:6
rooney(15) 21:11 62:15 62:23 64:19 65:7 65:9 65:16 65:20 66:2 67:1 67:3 67:8 67:12 67:16 68:12

rules(3) 1:27 4:24 37:22
run(4) 26:19 31:5 59:4 76:17

safety(4) 35:22 36:5 36:9 36:17
said(42) 11:12 14:15 17:5 21:15 32:5 34:2 37:14 43:5 43:7 46:9 48:10 48:11 48:13 49:12 57:22 61:6 61:7 62:24 64:17 65:12 67:10 67:10 67:12 67:13 68:2 69:20 73:1 73:11 73:11 73:12 73:13 73:18 73:19 73:22 74:5 77:24 78:5 78:6 78:9 82:16 86:15 91:12

salary(1) 21:3
same(12) 4:23 5:18 54:17 55:18 55:22 55:23 55:24 66:1 76:10 81:17 93:12 93:17
satisfactorily(2) 4:13 95:7
say(48) 7:17 10:13 11:19 12:16 13:13 14:3 14:5 15:16 17:5 22:7 23:3 30:18 33:6 33:8 33:11 33:18 35:22 36:7 36:21 36:24 37:9 37:13 38:7 39:13 42:18 49:10 50:5 51:18 52:12 58:20 59:6 60:13 64:14 65:13 66:16 68:9 68:19 74:4 78:19 78:23 79:9 79:12 79:17 82:18 82:23 85:15 86:8 90:7

saying(15) 29:15 29:17 33:7 36:12 36:14 37:16 37:20 46:10 66:19 67:7 73:7 74:4 83:9 87:12 88:11

says(17) 14:21 20:17 23:21 23:23 45:23 48:11 51:11 54:1 54:21 55:17 63:14 63:17 64:16 65:2 65:13 70:16 90:16

schedule(1) 7:7
scheduled(5) 39:3 39:17 42:3 45:24 68:16

scheduling(1) 58:13
school(1) 11:20
scrutinized(1) 29:14
scrutinizing(3) 29:11 30:12 31:14
seal(1) 95:19
seat(2) 76:4 76:8
seats(3) 75:22 76:6 76:7
second(11) 6:15 6:16 23:20 28:14 38:12 40:3 46:2 68:6 80:16 90:3 90:15

secret(1) 35:7
secretary(2) 69:2 75:23
section(2) 54:1 54:21
sector(1) 26:16
seeing(1) 48:1
seminar(1) 42:6
seminars(3) 31:7 32:4 32:13
send(6) 23:23 24:3 24:8 38:24 57:5 65:17

sense(2) 7:16 30:9
sent(8) 24:1 25:8 45:16 50:19 50:20 51:23 52:6 58:6

separate(3) 36:9 36:13 36:14
september(14) 3:18 3:27 23:8 23:12 23:18 23:21 50:11 51:2 51:12 51:20 56:21 60:16 60:24 66:18

sergeant(5) 6:24 7:13 57:22 81:4 81:10
serious(1) 19:21
serve(3) 8:7 55:19 56:19
served(3) 7:19 7:24 56:22
services(1) 8:13
serving(1) 8:8

| Word | Page:Line | Word | Page:Line | Word | Page:Line | Word | Page:Line |
|---|---|---|---|---|---|---|---|
| session(16) 3:40 15:19 83:15 83:18 84:2 84:9 84:12 84:13 87:6 87:22 88:4 88:5 88:14 89:15 91:4 91:5 | | something(18) 5:1 21:12 25:17 30:15 30:19 35:11 42:14 46:20 49:13 59:2 63:24 68:19 75:18 78:11 87:5 89:10 89:20 91:12 | | substantial(1) 31:24 | | that's(29) 15:12 18:4 21:6 24:18 25:21 35:15 37:22 38:20 42:14 45:18 47:4 50:5 50:7 55:11 61:16 63:2 64:17 68:4 74:23 78:12 83:7 84:12 84:22 86:18 87:16 91:9 91:17 92:4 92:4 | |
| set(4) 12:7 14:21 17:11 95:18 | | | | such(1) 7:6 | | | |
| several(3) 11:22 35:15 37:23 | | | | sue(1) 66:6 | | | |
| severe(1) 87:23 | | sometime(5) 40:17 42:5 64:13 67:20 75:20 | | suffering(3) 29:1 69:15 69:18 | | their(19) 7:5 7:17 14:7 15:19 15:19 20:16 21:23 27:4 27:16 35:24 40:20 42:7 52:7 58:4 58:19 59:11 59:17 59:24 89:1 | |
| severity(1) 21:12 | | | | suffers(3) 63:15 | | | |
| shake(1) 74:9 | | | | suit(5) 35:8 36:23 36:24 37:3 70:20 | | | |
| shall(4) 4:4 4:5 4:6 4:9 | | sometimes(5) 7:13 7:13 11:24 27:7 32:6 | | suite(3) 1:35 2:8 95:13 | | | |
| sheet(2) 93:17 94:1 | | somewhere(3) 9:12 28:22 31:23 | | sullivan(8) 50:17 54:11 70:24 71:5 71:8 71:12 71:16 85:16 | | themselves(1) 56:9 | |
| shift(12) 6:19 6:23 7:1 7:4 7:5 11:22 26:12 26:20 28:5 28:5 35:13 81:6 | | sorry(11) 10:1 12:14 38:17 51:19 53:22 63:8 73:4 73:16 76:18 80:14 90:21 | | superior(3) 41:14 68:3 88:24 | | there's(17) 5:2 7:22 14:6 25:13 26:4 31:21 31:22 32:18 42:24 43:10 43:16 43:18 58:5 58:20 63:18 81:24 84:13 | |
| | | | | supervisor(5) 6:21 7:1 7:15 81:4 81:6 | | | |
| shooter(1) 37:8 | | | | supervisor's(1) 6:19 | | | |
| shooting(1) 35:14 | | speak(12) 5:3 17:6 17:6 47:18 48:8 48:22 62:7 68:19 73:12 73:13 88:3 88:14 | | supervisors(1) 7:15 | | therefore(1) 84:15 | |
| short(2) 26:19 44:9 | | | | supplement(1) 65:2 | | therein(2) 93:14 93:19 | |
| should(19) 28:13 46:1 84:18 87:2 87:3 94:4 94:7 94:10 94:13 94:16 94:19 94:22 94:25 94:28 94:31 94:34 94:37 94:40 94:43 | | | | supplemental(1) 64:15 | | thereto(1) 84:16 | |
| | | speaking(3) 33:5 33:5 63:13 | | supplementation(3) 65:5 65:14 65:17 | | they'd(4) 27:1 27:2 27:23 27:24 | |
| | | specific(5) 28:6 31:18 31:19 56:6 63:15 17:5 21:4 33:6 58:5 84:24 | | supplied(1) 44:12 | | they're(10) 20:4 20:5 20:6 27:8 29:15 29:16 29:18 38:21 52:8 58:22 | |
| | | | | supply(1) 44:19 | | | |
| | | specify(1) 29:4 | | supporting(1) 78:1 | | | |
| show(13) 6:8 29:3 39:1 45:2 50:10 52:18 59:14 60:11 61:12 62:16 70:3 83:12 90:6 | | speed(1) 41:23 | | supposed(6) 7:16 30:6 34:16 34:17 34:18 84:11 | | thing(5) 13:7 29:20 37:5 73:18 73:19 | |
| | | spells(2) 11:23 11:24 | | | | things(11) 7:12 11:21 11:24 31:15 41:23 42:1 43:16 49:10 60:23 63:13 78:2 | |
| showed(2) 63:12 66:7 | | spoke(14) 21:10 21:14 39:16 46:19 61:4 62:22 65:20 67:2 67:9 68:12 68:18 74:6 74:7 82:15 | | sure(3) 18:15 26:7 28:17 | | | |
| showing(3) 18:8 51:10 85:12 | | | | surgeon(1) 39:16 | | | |
| sic(1) 64:17 | | | | surgery(4) 39:3 39:13 39:13 39:17 | | think(17) 9:4 10:13 11:4 14:11 18:16 25:15 34:3 34:24 46:19 48:2 52:9 53:6 56:21 60:20 72:10 81:2 87:7 | |
| sick(29) 10:5 13:1 13:6 13:7 13:12 13:21 13:24 46:1 46:3 46:5 46:5 46:7 46:16 46:23 47:3 47:12 48:9 48:14 48:17 48:19 49:1 49:20 49:24 57:11 57:14 58:17 59:4 59:7 59:12 | | spring(3) 32:6 41:18 69:21 | | surrounding(1) 88:4 | | | |
| | | stacks(1) 29:7 | | suspend(1) 91:24 | | | |
| | | stairs(1) 39:11 | | suspended(1) 92:6 | | | |
| | | standard(2) 37:4 50:20 | | suspension(1) 81:15 | | thinks(1) 63:19 | |
| | | standing(3) 36:14 43:18 43:22 | | swat(2) 37:2 37:3 | | third(1) 2:14 | |
| sides(1) 13:10 | | start(1) 6:4 | | swear(2) 78:13 78:14 | | thomas(6) 1:9 1:21 3:3 4:11 93:8 95:7 | |
| sign(4) 4:7 76:23 78:5 78:8 | | started(4) 4:17 22:12 22:14 60:14 | | sworn(2) 4:13 95:8 | | thorough(1) 53:14 | |
| signature(1) 93:25 | | starting(2) 24:24 46:4 | | sympathetic(1) 27:3 | | though(1) 53:11 | |
| signed(4) 13:8 14:15 37:19 91:20 | | starts(1) 29:23 | | symptoms(2) 11:20 11:23 | | thought(9) 10:1 25:9 35:3 35:3 38:19 43:6 73:7 78:10 78:10 | |
| signing(4) 4:8 77:9 77:17 78:16 | | state(12) 32:5 32:8 35:20 36:20 42:18 48:23 52:7 52:7 58:7 59:8 62:10 86:14 | | system(5) 27:13 30:22 32:10 32:13 56:3 | | | |
| silverfine(58) 2:21 3:5 4:15 5:7 5:11 5:12 6:15 18:5 18:7 18:17 18:20 19:2 19:4 23:16 38:12 39:20 40:2 44:8 44:10 45:9 45:14 50:24 51:7 51:9 52:20 53:4 53:8 53:12 53:17 53:20 53:22 57:6 61:23 62:4 64:8 64:9 70:4 70:10 71:24 72:5 80:7 80:15 80:18 80:19 83:13 83:23 84:1 84:19 85:11 87:7 87:15 87:18 88:15 89:2 89:19 90:2 90:5 91:24 | | | | systems(3) 24:6 40:12 40:13 | | threaten(1) 69:7 | |
| | | stated(3) 52:17 81:22 82:21 | | tabulations(1) 21:19 | | three(6) 18:15 20:3 34:4 34:5 52:3 | |
| | | statehouse(1) 32:9 | | take(8) 5:16 5:19 12:2 24:15 31:3 38:18 55:1 63:16 | | three-page(1) 72:11 | |
| | | statement(2) 69:12 82:22 | | | | through(10) 15:11 18:3 20:20 32:9 42:18 49:11 53:10 65:3 76:21 93:9 | |
| | | statements(1) 81:21 | | taken(7) 1:25 44:9 63:23 86:17 93:10 95:11 95:17 | | | |
| | | states(8) 1:3 12:7 13:3 17:11 32:16 49:23 86:14 93:3 | | | | throw(3) 35:7 74:1 78:8 | |
| similar(1) 68:22 | | | | takes(1) 58:8 | | throwing(1) 78:24 | |
| simply(1) 59:15 | | status(2) 5:22 62:18 | | taking(3) 11:12 58:14 92:5 | | thumb(1) 81:18 | |
| since(8) 7:20 26:5 26:5 33:16 56:22 69:19 71:17 71:17 | | statute(11) 8:13 42:12 42:12 42:20 43:1 43:5 43:6 50:8 56:4 57:15 63:14 | | talk(4) 37:18 43:23 60:9 62:20 | | till(8) 22:3 38:2 38:2 38:11 49:5 50:1 58:23 59:15 | |
| | | | | talked(7) 34:7 56:24 57:4 62:20 64:13 65:18 66:10 | | time(89) 4:5 4:6 5:14 5:18 5:23 6:4 7:3 7:9 8:17 8:20 10:5 13:2 13:12 13:21 13:24 22:11 24:7 24:14 24:20 24:23 24:24 25:1 26:9 27:20 27:24 28:7 28:8 30:2 32:3 33:7 34:7 34:9 36:21 36:22 41:17 42:3 42:10 45:24 46:1 46:3 46:3 46:5 46:6 46:7 46:14 46:16 46:23 46:23 47:12 47:13 47:13 47:15 47:17 48:9 48:9 48:14 48:17 48:17 48:19 48:20 49:19 49:20 50:1 53:10 54:24 56:15 57:1 57:11 57:14 58:1 58:8 58:10 58:17 58:21 59:4 59:7 59:12 60:24 61:6 63:12 63:15 66:11 68:11 75:11 75:14 77:16 77:23 81:7 92:3 | |
| sir(1) 89:5 | | statute's(1) 42:17 | | | | | |
| sit(5) 8:22 55:24 58:13 62:15 68:16 | | stay(1) 68:3 | | team(3) 36:20 37:2 37:3 | | | |
| sits(1) 81:19 | | stenographer(1) 80:7 | | tell(8) 12:4 26:24 40:23 65:2 72:24 75:5 79:3 81:10 | | | |
| six(3) 36:8 60:7 60:9 | | steve(5) 77:24 78:2 78:9 79:6 79:6 | | | | | |
| sje(3) 42:1 42:18 43:7 | | still(2) 6:2 33:13 | | telling(4) 76:23 76:24 79:7 79:7 | | | |
| skill(1) 95:11 | | stipulated(1) 4:2 | | temporarily(2) 8:18 8:22 | | | |
| skip(1) 28:11 | | stomach(2) 39:12 39:19 | | ten(8) 8:2 30:17 32:11 42:13 43:2 71:7 71:19 71:21 | | times(7) 11:18 11:22 12:2 13:14 60:4 60:5 79:7 | |
| skippy(1) 45:19 | | stop(2) 14:4 66:10 | | | | | |
| some(29) 4:20 6:10 14:4 15:11 15:18 17:8 19:21 21:16 27:2 27:5 28:3 34:8 36:4 38:14 38:14 38:15 40:19 42:6 42:14 43:6 43:14 45:20 58:18 63:4 64:15 71:10 75:10 81:8 92:2 | | stopped(1) 74:1 | | tension(1) 69:15 | | to.(1) 30:20 | |
| | | street(5) 1:33 2:8 2:13 78:8 95:13 | | term(1) 56:12 | | today(6) 5:15 38:2 72:10 76:11 91:18 92:1 | |
| | | stress(3) 69:15 69:19 70:1 | | terms(2) 37:8 84:10 | | | |
| | | strike(4) 4:5 36:20 57:6 57:6 | | testified(2) 11:5 14:12 | | | |
| | | struggle(1) 39:10 | | testify(4) 4:14 38:3 95:8 95:9 | | | |
| | | stuck(1) 37:19 | | testimony(2) 3:3 95:11 | | | |
| somebody(4) 27:8 35:7 46:10 81:3 | | stuff(4) 48:6 54:17 63:10 63:12 | | than(8) 14:12 25:14 37:1 52:13 66:17 78:11 86:7 88:5 | | | |
| someday(2) 79:5 79:23 | | subject(3) 10:24 37:21 84:23 | | | | | |
| somehow(2) 43:3 86:11 | | submit(1) 56:5 | | | | | |
| someone(3) 42:14 46:19 58:3 | | submitted(2) 56:6 66:16 | | thank(2) 26:7 53:23 | | | |
| someone's(1) 69:7 | | submitting(1) 63:10 | | | | together(2) 32:19 58:10 | |
| | | subsequent(1) 54:24 | | | | | |

# KELLEY.WPD

| Word | Page:Line |
|------|-----------|
| told(13) | 10:24 17:16 34:24 67:6 67:8 67:11 67:12 73:14 73:20 73:22 78:5 83:7 90:20 |
| tom(1) | 21:15 |
| took(5) | 8:21 59:17 67:16 86:6 88:8 |
| toomey(1) | 60:18 |
| top(1) | 91:8 |
| totally(1) | 43:4 |
| touch(1) | 82:11 |
| towards(1) | 24:23 |
| town(45) | 1:13 8:5 8:6 8:19 10:4 14:13 17:15 19:6 19:7 19:8 19:20 20:9 20:15 20:17 20:17 20:18 20:19 21:16 26:11 28:16 44:23 48:11 49:24 50:6 50:18 55:7 55:7 56:2 56:3 56:4 56:10 57:13 58:3 58:23 60:3 60:17 61:2 65:23 66:6 68:10 77:20 77:22 77:23 79:17 |
| town's(1) | 59:3 |
| towns(1) | 17:8 |
| tracked(1) | 60:12 |
| tracking(1) | 58:8 |
| training(2) | 15:18 63:17 |
| transcript(4) | 4:7 4:9 93:10 95:9 |
| transcription(2) | 93:13 93:18 |
| transpired(1) | 70:19 |
| treasurer(1) | 8:13 |
| treated(3) | 10:6 52:13 69:16 |
| treating(1) | 25:20 |
| trial(2) | 4:5 4:6 |
| trick(1) | 79:14 |
| tried(3) | 17:6 17:8 59:20 |
| triggering(1) | 57:23 |
| trip(1) | 32:21 |
| trips(2) | 31:3 33:18 |
| true(3) | 93:12 93:17 95:10 |
| trump(1) | 86:6 |
| trustee(1) | 42:2 |
| truth(1) | 79:7 |
| try(2) | 30:20 79:16 |
| trying(14) | 16:14 29:8 30:15 31:13 36:24 53:13 57:10 59:2 59:13 63:24 64:1 79:14 80:12 83:11 |
| turnaround(1) | 51:21 |
| turned(3) | 29:17 73:14 73:19 |
| turner(1) | 66:7 |
| turns(1) | 58:9 |
| twelve(2) | 13:3 14:1 |
| twenty-three(1) | 13:4 |
| twice(1) | 13:21 |
| two(20) | 6:22 8:21 10:6 11:21 11:23 15:10 26:19 27:1 29:22 34:5 43:16 47:2 63:13 63:21 72:23 76:6 76:7 77:5 84:22 87:22 |
| two-page(1) | 72:12 |
| type(4) | 11:23 13:7 50:1 56:8 |
| types(1) | 7:12 |
| uh-huh(1) | 12:14 |
| ultimately(1) | 49:20 |
| unanimous(2) | 52:2 62:14 |
| unconscious(1) | 63:23 |
| undated(1) | 84:13 |
| under(17) | 10:8 10:9 11:9 11:10 15:13 34:17 36:2 50:22 52:7 52:8 69:22 69:24 71:8 78:6 78:24 81:17 84:10 |
| undergoing(2) | 25:10 74:17 |
| understand(10) | 4:24 11:4 26:10 29:9 49:13 49:14 55:16 64:10 64:12 74:21 |
| understanding(4) | 26:15 26:17 26:23 |

| Word | Page:Line |
|------|-----------|
| undertake(1) | 86:21 |
| undertaken(1) | 87:20 |
| undertaking(1) | 32:12 |
| undertook(1) | 87:16 |
| unfunded(1) | 32:14 |
| uniformed(2) | 36:18 36:19 |
| union(3) | 14:22 15:2 16:23 |
| unit(3) | 36:13 36:14 88:5 |
| united(1) | 1:3 93:3 |
| unnecessary(1) | 29:20 |
| unsigned(1) | 84:12 |
| until(4) | 4:5 4:6 46:6 91:1 |
| upcoming(1) | 74:12 |
| upon(4) | 84:9 84:22 84:24 95:9 |
| upset(4) | 27:2 27:6 78:19 78:21 |
| use(12) | 13:1 13:21 14:5 16:7 45:18 48:17 49:24 59:4 60:21 60:22 83:4 85:2 |
| used(7) | 13:3 13:4 13:5 13:6 13:24 45:18 57:11 |
| uses(1) | 58:21 |
| using(2) | 46:7 58:15 |
| vacation(16) | 19:24 20:11 24:14 24:20 24:22 24:22 45:24 46:3 46:11 46:14 46:23 47:13 47:17 48:9 48:17 49:19 |
| vacation/sick(1) | 57:1 |
| vandalism(1) | 7:11 |
| varies(1) | 31:9 |
| various(1) | 7:10 |
| verbalize(1) | 9:20 |
| verbally(1) | 10:20 |
| versus(2) | 57:20 57:22 |
| via(2) | 33:1 47:24 |
| viella(6) | 77:21 78:12 78:13 78:16 79:3 80:20 |
| view(2) | 42:2 89:1 |
| violation(1) | 35:5 |
| volume(1) | 79:24 |
| voluntary(1) | 18:10 |
| volunteer(1) | 27:4 |
| volunteered(1) | 91:12 |
| vote(2) | 20:17 84:14 |
| wait(2) | 50:4 64:5 |
| waiting(1) | 57:11 |
| waived(1) | 4:9 |
| walked(2) | 21:17 73:14 |
| wall(1) | 37:19 |
| want(12) | 17:24 18:15 19:13 26:6 26:10 36:21 41:4 42:17 43:20 55:15 59:24 78:23 |
| wanted(5) | 48:23 55:10 70:18 71:2 |
| wanting(1) | 10:17 |
| wants(2) | 68:2 73:13 |
| warnock(2) | 73:24 74:1 |
| washington(1) | 33:19 |
| wasn't(20) | 10:2 16:13 21:23 29:22 30:2 34:17 36:6 36:11 45:20 45:21 46:9 46:24 55:20 56:15 63:19 69:17 74:19 74:22 76:15 78:21 |
| way(3) | 20:15 32:8 42:17 |
| we'll(14) | 4:20 4:20 5:5 18:5 19:2 23:8 23:10 52:22 71:24 83:13 83:15 85:4 86:1 89:20 |
| we're(4) | 4:18 31:10 61:8 92:1 |
| we've(6) | 6:9 25:6 29:7 42:11 65:18 |
| wear(3) | 36:20 36:23 37:3 |
| webber(1) | 82:2 |
| wednesday(3) | 1:37 93:11 95:14 |

| Word | Page:Line |
|------|-----------|
| week(5) | 37:15 42:11 42:13 42:21 42:21 |
| week's(1) | 37:16 |
| welcome(1) | 38:20 |
| well(28) | 6:20 7:7 10:9 11:10 12:22 14:7 19:20 21:5 22:9 23:1 26:1 26:21 39:8 41:20 46:9 50:8 54:17 59:6 63:3 63:16 63:18 69:22 78:6 78:9 80:11 87:7 87:11 89:19 |
| went(29) | 11:19 13:7 19:18 20:20 21:21 22:4 25:24 26:12 26:16 28:9 39:10 39:15 46:6 46:8 46:19 46:22 47:3 47:11 49:11 53:5 53:7 53:10 64:19 64:19 68:11 68:14 76:22 76:24 82:17 |
| were(96) | 5:23 6:5 6:6 6:22 7:5 8:20 10:1 10:24 10:24 11:6 11:7 11:8 11:12 11:15 11:18 11:21 12:5 12:8 12:17 14:9 15:10 15:11 16:4 16:5 19:21 20:22 20:24 21:18 21:22 22:17 22:23 23:13 23:17 24:14 24:18 25:9 27:3 27:6 27:12 29:1 29:10 29:17 30:21 33:17 35:9 35:15 35:22 36:4 36:7 36:8 36:12 36:18 36:18 37:4 37:23 37:24 38:10 38:19 43:3 46:7 46:13 46:23 47:11 47:21 47:22 52:6 52:13 52:24 56:9 58:6 58:8 58:15 59:3 59:13 59:14 59:24 61:1 63:10 63:13 66:7 73:7 74:17 75:11 76:6 76:13 77:3 77:6 78:10 78:19 82:4 83:18 85:18 86:10 89:9 90:12 |
| what(59) | 5:13 6:3 7:5 7:19 8:6 8:24 11:6 12:15 14:8 14:12 15:12 16:5 16:9 16:14 16:18 16:20 19:11 23:3 24:5 24:18 25:6 25:11 25:16 26:6 29:4 31:13 33:4 34:1 34:13 35:24 36:24 40:10 41:7 41:12 42:4 49:16 57:22 58:4 58:14 59:24 61:4 62:9 62:16 64:18 66:19 70:18 70:23 72:24 73:21 76:1 76:15 79:8 86:1 86:2 87:12 87:13 88:11 88:17 89:12 |
| what's(9) | 8:19 25:2 45:15 53:4 53:18 60:19 62:5 72:6 90:6 |
| where's(1) | 9:7 |
| wherein(1) | 81:22 |
| whereof(1) | 95:18 |
| whereupon(13) | 18:22 23:11 39:22 45:10 51:1 52:23 61:24 70:6 72:1 83:17 85:7 89:22 92:5 |
| whether(6) | 17:1 75:8 84:20 87:4 87:19 88:8 |
| while(5) | 8:7 8:21 19:2 33:17 57:11 |
| who(19) | 6:24 7:1 7:1 7:24 8:6 8:16 13:1 15:22 19:6 30:1 37:24 56:11 55:24 59:4 60:16 73:16 75:21 82:2 82:3 |
| who's(3) | 9:5 41:19 76:18 |
| whole(7) | 29:20 32:2 57:7 71:13 74:6 80:2 82:16 |
| why(4) | 18:20 23:6 24:15 70:15 |
| wide(1) | 43:7 |
| wife(4) | 12:3 39:9 73:10 74:2 |
| will(4) | 21:5 38:23 58:23 90:17 |
| within(2) | 4:7 90:18 |
| without(4) | 20:22 48:24 58:18 58:22 |
| witness(25) | 1:23 4:6 4:11 6:13 24:16 26:3 39:5 44:6 45:4 45:17 50:13 53:5 53:7 53:15 54:4 61:14 70:13 72:8 80:3 80:6 80:11 80:13 85:13 90:9 95:18 |

| Word | Page:Line |
|------|-----------|
| woman(1) | 81:23 |
| word(3) | 27:17 30:10 82:16 |
| words(12) | 9:20 25:13 42:15 64:14 72:24 74:4 79:3 79:20 81:12 82:20 83:7 86:5 |
| wore(1) | 37:7 |
| work(10) | 11:19 11:20 29:11 29:15 30:12 31:2 32:18 33:8 36:24 37:14 |
| worked(4) | 6:21 8:6 32:9 71:20 |
| working(8) | 33:6 39:18 45:20 45:21 46:24 46:24 74:19 74:20 |
| works(1) | 71:6 |
| world(2) | 61:7 61:8 |
| would(64) | 6:23 7:7 7:8 7:12 9:2 9:16 10:13 11:24 12:1 12:3 12:4 12:10 13:13 14:2 14:17 18:17 21:1 21:8 24:24 25:7 26:15 26:18 26:19 26:24 28:5 29:15 30:1 30:3 30:4 30:18 32:23 33:2 33:6 33:7 33:8 33:10 34:3 34:4 34:23 35:6 40:4 40:10 45:22 47:18 48:1 48:18 51:11 52:17 57:13 58:17 59:4 59:9 59:11 60:11 62:18 65:24 66:2 66:21 78:23 81:14 84:4 86:17 87:4 87:5 |
| wouldn't(3) | 29:21 30:8 59:16 |
| write(1) | 17:19 |
| writing(1) | 10:20 |
| written(6) | 15:7 19:19 51:20 89:6 89:7 91:18 |
| wrote(10) | 15:12 16:15 17:17 19:5 22:11 23:3 47:23 48:13 89:18 91:1 |
| yeah(11) | 6:14 39:6 47:2 47:5 47:5 55:14 73:5 90:10 90:10 91:10 91:10 |
| year(8) | 13:4 14:2 14:5 24:24 31:8 32:4 34:14 75:15 |
| yearly(1) | 12:24 |
| years(20) | 7:23 8:2 20:22 28:7 32:11 34:1 34:4 34:5 34:12 42:13 42:19 43:2 43:6 56:19 58:14 60:5 60:9 71:7 71:19 71:21 |
| yesterday(1) | 54:10 |
| yet(1) | 59:8 |
| you'd(2) | 18:2 29:3 |
| you'll(2) | 53:13 72:11 |
| you're(30) | 17:22 29:4 31:13 34:1 35:9 36:14 37:20 37:21 38:20 39:14 41:9 41:10 43:22 47:3 47:7 53:15 56:11 61:3 73:5 73:6 73:6 78:1 78:6 78:6 78:9 79:15 79:15 87:13 87:21 89:8 |
| you've(15) | 7:20 8:7 12:15 14:12 25:7 25:16 32:3 38:7 54:13 67:16 71:17 71:18 80:1 80:9 90:7 |
| yours(1) | 35:16 |
| yourself(8) | 7:6 7:16 9:21 24:13 39:2 43:8 65:16 73:23 |
| zazzarino(1) | 39:16 |
| zip(1) | 37:5 |

# EXHIBIT 5

# PERAC

**COMMONWEALTH OF MASSACHUSETTS | PUBLIC EMPLOYEE RETIREMENT ADMINISTRATION COMMISSION**

DOMENIC J. F. RUSSO, *Chairman* | A. JOSEPH DeNUCCI, *Vice Chairman*
KENNETH J. DONNELLY | ERIC A. KRISS | JAMES M. MACHADO | DONALD R. MARQUIS

JOSEPH E. CONNARTON, *Executive Director*

June 3, 2004

RECEIVED

JUN 0 9 2004
TOWN MANAGER'S OFFICE
PLYMOUTH, MA

Plymouth Retirement Board
11 Lincoln Street
Plymouth, MA 02360

Dear Retirement Board Members:

I am in receipt of a letter dated May 26, 2004 addressed to the Board from Captain Botieri regarding the conduct of Board Member Kelley. The assertions in the letter are very serious, and if supported could have an actual or perceived impact on the ability of the Plymouth Retirement Board to act fairly or to function in accordance with the provisions of G.L. c. 32, and in accordance with the pertinent regulations, most specifically 840 CMR 17.00.

We expect that the Board will immediately investigate the matters discussed in the letter, and advise the Commission within 30 days of the Board's findings and the outcome of investigation.

It is vital that Retirement Boards and the individual Board Members not only act in a fair and prudent manner in the exclusive interest of the System's members and beneficiaries, but also be perceived by others as acting in a fair and prudent manner. The Board is directed to act on this matter as soon as possible, but no later than 30 days from the receipt of this letter.

If you have questions, please contact me.

Sincerely,

Joseph E. Connarton

Joseph E. Connarton
Executive Director

JEC/sfc
p:\legal\bphillips\plymouth re kelley.doc

cc:     Captain Michael E. Botieri
        Attorney General Thomas Reilly
        State Ethics Commission
        Plymouth Town Manager, Pamela Nolan
        Town of Plymouth Board of Selectmen



# EXHIBIT 6

Westlaw Attached Printing Summary Report for HARRIS,KRISTIN T 5566283

| | |
|---|---|
| Your Search: | "executive session" /p privilege |
| Date/Time of Request: | Wednesday, August 16, 2006 08:28:00 Central |
| Client Identifier: | KELLEY |
| Database: | w_csma_cs |
| Citation Text: | Not Reported in N.E.2d |
| Lines: | 326 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.



Not Reported in N.E.2d
Not Reported in N.E.2d, 12 Mass.L.Rptr. 154, 2000 WL 1473038 (Mass.Super.)
**(Cite as: Not Reported in N.E.2d)**

**H**

Superior Court of Massachusetts.

Peter J. PORCARO and another,[FN1]

    FN1. Carolyn Porcaro

v.

The TOWN OF HOPKINTON and others.[FN2]

    FN2. Richard Bowker, individually and in his official capacity; and Mary E. Harrington, individually and in her official capacity.

**No. 965438.**

July 18, 2000.

*MEMORANDUM OF DECISION AND ORDER ON PLAINTIFFS' MOTION TO COMPEL*

BOTSFORD.

*1 The plaintiffs in this action challenge actions taken by the defendant Town of Hopkinton (the town) and certain of its officials which the plaintiffs claim purposefully deprived them of their civil rights in relation to the development of building lots they own in the town. The principal focus of the plaintiffs' complaint is the persistent refusal of the defendants to permit the issuance of building permits for the lots, which has allegedly prevented their development or sale.

Discovery has taken place over a long period of time, and has involved, *inter alia,* numerous depositions of town officials. The plaintiffs have moved to compel further deposition testimony from a variety of these officials. They have also moved to compel production of certain documents. The sought-after deposition testimony primarily concerns (1) conversations between or among the individual officials and an attorney serving as town counsel, and (2) the contents of an executive session of the town's board of selectmen held October 31, 1995. The documents at issue fall into a number of different categories. The two aspects of the plaintiffs' motion are discussed separately below.

I. Motion to Compel Testimony

A. Laurence Faiman

1. Laurence Faiman was serving as counsel for the town at times relevant to this action. The plaintiffs wish to question Mr. Faiman about any conversations he may have had with the building inspector in 1992 concerning the plaintiffs' applications for building permits. (Motion to Compel, ¶¶ A.1., A.2.) They argue that the defendants have waived any attorney-client privilege that might otherwise attach to these conversations [FN3] by virtue of the fact that two letters which Mr. Faiman wrote to town officials have been made public. The defendants disagree.

> FN3. The question whether a public client is entitled to the benefit of an attorney-client privilege is not, perhaps, fully established. See *District Attorney for the Plymouth District v. Board of Selectmen of Middleborough,* 395 Mass. 629, 632 n. 4 (1985). However, I assume that the privilege does exist. See Proposed Mass .R.Evid.501 (1980).

Both of the Faiman letters were written in 1995. The first, with a February 1995 date, is addressed to the town's planning board and concerns an apparent request by the plaintiffs for an "approval not required" endorsement of a plan for the lots. See G.L.c. 41, § 81P. The second letter, dated in August, relates to an amendment to the town's zoning bylaw which was enacted in May of 1995, and specifically to the application of the bylaw amendment to the plaintiffs' lots. I understand that independently of this lawsuit, officials of the town had made both letters public, by placing them in public files of the town or otherwise.[FN4] There is no dispute among the parties that publication of these letters waived the privilege insofar as the letters themselves are concerned, and indeed it appears that Mr. Faiman has been questioned in deposition at some length about the letters and their contents. However, this does not mean that the defendants have waived generally the attorney-client privilege in relation to all matters which touch on town officials' handling of the Porcaros' building permit applications and their lots both before and after the dates of the two letters. The plaintiffs offer no case or other authority that would support such a broad waiver theory, and I have found none; I do not read the decisions in *Commonwealth v. Goldman,* 395 Mass. 495 (1985), or *Commonwealth v. Woodberry,* 26 Mass.App.Ct. 636, 639 (1988), cited by the plaintiffs, as reaching this far. Whatever the scope of waiver, it does not encompass the conversations at issue between Mr. Faiman and the building inspector in 1992. Compare *Amca Int'l Corp. v. Phipard,* 107 F.R.D. 39, 43-44 (D.Mass.1985). Compare also *Ploof v. Cornu-Schaab Properties, Inc .,* 1 Mass.L.Rptr. 292 (1993), 1993 WL 818723 (Mass. Superior Court) (Flannery, J.). Accordingly, the plaintiffs' motion to compel is denied in relation to ¶¶ A.1 and A.2 of the motion.

> FN4. If the understanding stated in the text is incorrect, counsel should so inform me.

*2 2. With respect to ¶ A.3 of the motion to compel, the question that was objected to appears to be substantively connected to the previous question, and substantively connected to the letter discussed on p. 29 of Mr. Faiman's transcript. Accordingly, the motion to compel Mr. Faiman to answer the question is allowed. Cf. *Amca Int'l Corp. v. Phipard, supra,* 107 F.R.D. at 44 (disclosure of memorandum prepared by lawyers waives attorney-client privilege as to group of documents prepared up to the point of disclosure which relate to the same subject as the memorandum).

3. The plaintiffs next seek testimony (motion to compel, ¶ A.4) by Mr. Faiman concerning whether any of the relevant town officials discussed the intent to change the zoning bylaw before the change was made in May 1995. I do not believe that Mr. Faiman's letter of August 15, 1995, concerning the application of that bylaw amendment to the plaintiffs' lots, without more, waives the attorney-client privilege about conversations occurring before the bylaw amendment was enacted.[FN5]

> FN5. There is nothing before me to suggest that the defendants take the position in this case that the enactment of the bylaw amendment was based on advice of counsel in whole or in part; if that were the situation, perhaps a waiver would be found. See, e.g., *Weil v. Investment/Indicators Research and Mgt., Inc.,* 647 F.2d 18, 23-25 (9th Cir.1981); *Haymes v. Smith,* 73 F.R.D. 572, 577 (W.D.N.Y.1976), both cited in the *Amca* case, *Amca Intl. Corp. v. Phipard,* 107 F.R.D. 39, 42-43 (D.Mass.1985).

4. In ¶¶ A.5 and A.6 of the motion to compel, the plaintiffs want Mr. Faiman to indicate if, after his August 15, 1995, letter, he gave an opinion to any town official regarding whether the agreement for judgment superseded the bylaw amendment. I believe Mr. Faiman could be required to testify about the circumstances, including communications he had with town officials, leading up to the writing of his August 15 letter, and also about communications with town officials that related to the letter and the opinions expressed in it until the letter was disclosed publicly, even if those

communications occurred after the letter was written. See *Amca Int'l Corp., supra,* 107 F.R.D. at 44. However, the letter does not operate as a general waiver for any otherwise privileged opinion expressed by Mr. Faiman after August 15, 1995, on the subject of the relationship between the agreement for judgment and the bylaw amendment. Accordingly, the motion to compel set out in ¶¶ A.5 and A.6 should be allowed in part and denied in part.

5.  The plaintiffs seek to have Mr. Faiman testify about the discussion between and among those present at the board of selectmen's executive session held October 31, 1995.[FN6] The defendants resist, claiming that the executive session was properly held under G.L.c. 39, § 23B(3), and that the discussions occurring within the executive session are therefore confidential as well as privileged because the session involved consultations between and among town counsel and town officials. I disagree with the defendants.

> [FN6.] It appears that the persons present were two of the selectmen, the executive secretary of the board of selectmen, the building inspector and Mr. Faiman.

The Open Meeting Law, G.L.c. 39, § 23B, provides that executive sessions of governmental bodies may be held for only the limited purposes specifically set out in the section. See *District Attorney for the Plymouth Dist. v. Board of Selectmen of Middleborough,* 395 Mass. 629, 631-632 (1985). See also *Pearson v. Board of Health of Chicopee,* 402 Mass. 797, 799-800 (1988). Cf. *General Elec. Co. v. Department of Envt'l Protection,* 429 Mass. 798, 806 (1999). One of the purposes, and the one relied on by the defendants, is:

**\*3** (3) To discuss strategy with respect to collective bargaining or litigation if an open meeting may have a detrimental effect on the bargaining or litigating position of the governmental body ...

G.L.c. 39, § 23B(3). The defendants argue that as of the date of the meeting, the plaintiffs had brought one lawsuit against the town which had been resolved, and the selectmen were considering taking action that might affect that lawsuit as well as give rise to another suit, and that § 23B(3) has been recognized as applying to discussions of threatened as well as existing litigation. (Town's opposition memorandum, p. 4.) It is true that the courts have included imminently threatened litigation within the scope of § 23B(3). See *Doherty v. School Committee of Boston,* 386 Mass. 643, 648 (1982) (in the midst of "extensive" pending litigation between the school committee and the teachers union about funding of teachers' salaries, school committee could properly anticipate a legal challenge by union to layoffs of teachers based on limited funding, and executive session to discuss the potential litigation was proper); *Perryman v. School Committee of Boston,* 17 Mass.App .Ct. 346, 352 (1983) (executive session under § 23B(3) properly called where in open session of school committee's meeting, the committee's attorney advised that plaintiffs would be seeking an injunction against committee within a week based on committee's action). See also *District Attorney for the Plymouth Dist. v. Board of Selectmen of Middleborough, supra,* 395 Mass. at 632 n. 3. But in this case, the plaintiffs' first suit against the town had been resolved by an agreement for judgment filed in March of 1995, more than six months before the meeting at issue, and nothing in the record indicates that as of October 31, 1995, the plaintiffs were threatening, suggesting or even contemplating any other action against the town. That the plaintiffs did file a suit against the town months later in response to the defendants' action of revoking the building permits-a course of action proposed and voted on at the October 31, 1995, meeting-did not make the litigation imminently or obviously threatened as of October 31. The Open Meeting Law serves an important public purpose, and its exceptions are to be construed according to their terms. See *id.* at 632-633. The defendants' claim that § 23B(3) authorized the executive session held on October 31, if accepted, would stretch the exception beyond reasonable limits.

Moreover, the record indicates that the defendants violated the procedural requirements of § 23B for holding an executive session. The section provides:
No executive session shall be held until the governmental body has first convened in an open session for which notice has been given, a majority of the members have voted to go into executive session and the vote of each member is recorded on a roll call vote and entered into the minutes, the presiding officer has cited the purpose for an executive session, and the presiding officer has stated before the executive session if the governmental body will reconvene after the executive session.

**\*4** G.L.c. 39, § 23B, third paragraph. It appears that the executive session on October 31, 1995, was convened and held at 7:00 p.m., one half hour before the scheduled open meeting of the selectmen began. If my reading of the records is correct, such a procedure plainly violated the quoted statutory provisions. See *Pearson v. Board of Health of Chicopee, supra,* 402 Mass. at 798-99, 802-03 (closed meeting of board of health which was conducted in the hour before scheduled meeting found by trial judge to be an "open, flagrant and serious" violation of § 23B).

In light of the substantive and procedural flaws attending the **executive session** convened on October 31, 1995, I conclude that the defendants are not justified in claiming the matters discussed in the session and the session's minutes are exempt under § 23B(3) from discovery in this lawsuit. The separate but related question the defendants began to raise, however, is whether the contents of the discussion at the meeting are protected from disclosure by the attorney-client **privilege** because Mr. Faiman was present throughout the session. The answer is no. I have concluded that the defendants could not properly meet in **executive session** on October 31, 1995, to discuss a proposal to revoke the plaintiffs' building permits; the proposal and the vote should have been presented as part of the selectmen's scheduled open meeting. The defendants are not entitled to make an end-run around the requirements of the Open Meeting Law by asserting attorney-client **privilege**. This appears to be the point of <u>District Attorney for the Plymouth Dist. v. Board of Selectmen of Middleborough, supra</u>, 395 Mass. at 632. As that case states, the Open Meeting Law does not contain an additional, implied exception to open meetings for discussions between a board and its attorney. The plaintiffs here are entitled to question any of the participants, including Mr. Faiman, about what transpired at the October 31, 1995, **executive session**.<u>FN7</u> The motion to compel set out in ¶A.7 will be allowed.

<u>FN7.</u> In addition, the plaintiffs are entitled to discovery of the executive session minutes. See p. 10 below.

6. The plaintiffs want Mr. Faiman to testify about conversations he had with the defendant Bowker after the October 31, 1995, meeting. I agree with the defendants that no waiver of the attorney-client privilege has occurred with respect to those conversations. Since the plaintiffs appear to accept that the conversations would be privileged except for waiver, the motion to compel set out in ¶A.8 will be denied.

7. The remaining paragraphs of the plaintiffs' motion to compel testimony from Mr. Faiman will also be denied, because there is no evidence of waiver of attorney-client **privilege** relating to the conversations and topics addressed in those paragraphs, except insofar as any of these matters were discussed during the October 31, 1995, **executive session**. As indicated above, the plaintiffs are entitled to inquire about all that was said during that session.

### B. Mary E. Harrington

1. The plaintiffs seek to have Mary Harrington answer whether she ever discussed the effect of the zoning bylaw amendment with town counsel in 1995. For the reasons discussed above in connection with Laurence Faiman, I conclude that the plaintiffs would be entitled to ask Harrington about any conversation she had with town counsel that is connected with his August 15, 1995, opinion letter on the amendment-that is, any conversation preceding that letter which related to a request for an opinion, or any conversation about the letter that occurred after its issuance but before it was disclosed. I also conclude that the plaintiffs may inquire about whether Harrington discussed the effect of the bylaw amendment during the October 31, 1995, meeting. However, any other privileged conversations Harrington had with town counsel on this subject in 1995 need not be disclosed. The motion to compel in ¶B.1 will be allowed in part and denied in part, consistent with this paragraph.

*5 2. Again, for the reasons discussed above (see pp. 4-7), the plaintiffs are entitled to inquire about discussions that took place at the October 31 meeting. The motion to compel set out in ¶B.2 will be allowed.

### C. Theodore Kozak

The plaintiffs are entitled to ask Kozak about the contents of the October 31, 1995, executive session, for the reasons discussed above. They are also entitled to ask him about his conversation in a car going to Boston with Mr. Faiman on the topic of Mr. Faiman's opinion letter of August 15, 1995. The basis for this conclusion is that the defendants have not established, based on Kozak's testimony about this conversation, that it was a privileged attorney-client communication. See <u>Matter of the Reorganization of Elec. Mut. Liability Ins. Co. Ltd. (Bermuda)</u>, 425 Mass. 419, 421 (1997). It appears that other conversations alluded to in the plaintiffs' motion to compel were privileged, and Kozak will not be required to answer questions about them.

### D. Richard Bowker, Sr.

The plaintiffs are entitled to ask Bowker about the contents of the October 31, 1995, executive session, for the reasons

F. Maureen Dwinnell

The plaintiffs are entitled to ask Dwinnell about the contents of the October 31, 1995, executive session.

## II. Motion to Compel Production of Documents

### A. Requested Documents Withheld by the Defendants on Grounds of Privilege

The plaintiffs seek minutes and documents relating to the board of selectmen meeting of November 15, 1994, and the zoning board of appeals meeting of November 16, 1994. It appears that no claim of **privilege** is asserted with respect to these meetings, but there is a dispute about whether there even was a meeting on November 15, 1994. The defendants have agreed to continue to search for records of these meetings, if held, and if the records are found, they are to be produced. For reasons discussed above in connection with Laurence Faiman, the minutes of the October 31, 1995, **executive session** of the board of selectmen are to be produced.

The plaintiffs do not discuss in their memorandum in support of the motion to compel any request for correspondence between State building inspector James Barry and the town. The defendants state the plaintiffs never made such a request. The motion to compel relating to these records will be denied as waived.

Finally, the plaintiffs seek production of correspondence which the defendants have refused to turn over on grounds of attorney-client and work product privilege. With the exception of the October 31, 1995, minutes, I believe the defendants are entitled to claim privilege for the listed documents, and their production will not be ordered.

### B. Documents Requested During the Course of Depositions

The defendants object to the production of documents that were discussed and requested during the course of depositions because they claim the plaintiffs did not comply with Superior Court Rule 9C. In the circumstances, where the documents were requested and the commitment to produce them was made during depositions, the defendants should produce them.

### ORDER

**\*6** For the foregoing reasons, it is *ordered* that the plaintiffs' motion to compel deposition testimony be *allowed* with respect to Paragraph I. A.3, A.5 and A.6 to the extent discussed in this memorandum of decision, and A.7; Paragraph I. B.1, to the extent discussed in this memorandum of decision, and B.2; Paragraph I.C.1, C.2, and C.3 to the extent discussed in this memorandum of decision; Paragraph D.1 and D.2; and Paragraph E.1 of the motion. The motion to compel deposition testimony is otherwise *denied.* It is further *ordered* that the plaintiffs' motion to compel the production of documents is *allowed* with respect to Paragraph IIC, and *denied* with respect to Paragraph IID and F. The motion to compel production of documents is otherwise *allowed in part and denied in part,* consistent with the discussion in this memorandum of decision.

Mass.Super.,2000.
Porcaro v. Town of Hopkinton
Not Reported in N.E.2d, 12 Mass.L.Rptr. 154, 2000 WL 1473038 (Mass.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 7



# PERAC

**COMMONWEALTH OF MASSACHUSETTS | PUBLIC EMPLOYEE RETIREMENT ADMINISTRATION COMMISSION**

DOMENIC J. F. RUSSO, *Chairman* | A. JOSEPH DeNUCCI, *Vice Chairman*
KENNETH J. DONNELLY | ERIC A. KRISS | JAMES M. MACHADO | DONALD R. MARQUIS

JOSEPH E. CONNARTON, *Executive Director*

August 11, 2004

Geeta McGrath, Senior Investigator
State Ethics Commission
Room 619
One Ashburton Place
Boston, MA 02108

RE:    Plymouth Retirement Board – Thomas Kelley

Dear Ms. McGrath:

Enclosed is the Plymouth Retirement Board's response to my letter of June 3, 2004 relating to alleged actions by the Board's Chairman, Thomas Kelley. Based on the response, it would appear that the Board arrived at its conclusion by meeting with Mr. Kelley. It is unclear to the Commission whether any other individuals, including Captain Botieri, had been interviewed or asked to attend the meeting at which the complaint was discussed.

Finally, I note that the Board has asked that the use of Plymouth Police Department stationary be investigated further. I have no information in this regard, but if I can be of assistance, please feel free to contact me.

Sincerely,

Joseph E. Connarton
Executive Director

JEC/bjp
p:\legal\bphillips\plymouth re kelley4.doc
Enclosure

cc:    Captain Michael E. Botieri
       Attorney General Thomas Reilly
       Plymouth Town Manager, Pamela Nolan
       Town of Plymouth Board of Selectmen
       Plymouth Retirement Board

FIVE MIDDLESEX AVENUE, THIRD FLOOR | SOMERVILLE, MA 02145
PH: 617 666 4446 | FAX: 617 628 4002 | TTY: 617 591 8917 | WWW.MASS.GOV/PERAC



# EXHIBIT 8

## boston.com

THIS STORY HAS BEEN FORMATTED FOR EASY PRINTING

PLYMOUTH

# Plymouth retirees group urges tighter reins on travel budget

The Boston Globe

## Others defend pension board's spending record

By Matt Carroll, Globe Staff | November 17, 2005

Town of Plymouth retirees this week called on the Plymouth Retirement System's board members to curb their travel habits following word that they have, over the past three years, spent far more on travel than any other area retirement board.

Members of the Plymouth Retired Employees Association executive committee -- while praising the board for investments that has led to multimillion-dollar growth in the $94 million fund -- said the board's travel spending was excessive.

It would make more financial sense if one board member attended a seminar and then reported back to the others, rather than having several members attend conferences, said Claire Soares, president of the association.

"There is no reason they have to spend so much money," said Soares.

The board has spent $66,182 on trips to retirement seminars in places such Puerto Rico and Orlando, Fla., the Globe found following a review of its records. In 2004, the board spent $26,861 on seven trips, $20,000 more than was spent by the next-biggest spender, the Norfolk County system. There are 14 retirement systems in the area.

"I'd like to see them cut back," said Bud Krueger, a member of the association's executive committee, who is also a former selectman and Town Meeting moderator. "A little more frugality is called for."

Michael Sacco, a lawyer for the Plymouth Retirement System, declined to comment. The board previously has defended its travel practices as essential, saying board members need to attend professional seminars in order to oversee the town's pension funds effectively.

Although members of the Plymouth Retired Employees Association executive committee criticized the board, others either defended them or took a wait-and-see attitude.

Alba Thompson, a former president of the association, said "that board has done tremendous things for retirees. I don't want to see a rush to judgment." She said she wanted to learn more.

Bill Dykstra of Braintree , a 77-year-old retiree who is chairman of the investment committee for Arrow Mutual Insurance Co., defended the travel.

The board has more than $94 million in assets, he said, and if what its members learn by attending professional conferences can help "by one-tenth of 1 percent, that's $93,000" in investment profits, Dykstra said.

"They got a darn good return. What they spend on seminars and travel is a pittance."

Retirement boards oversee pension fund investments. The state has 106 public boards, which range from boards that cover a single town, such as in Plymouth, to statewide systems with billions in assets.

The Plymouth Retirement Board handles the investments for the town's retirees, and is not to be confused

Plymouth retirees group urges tighter reins on travel budget – The Boston Globe

Page 2 of 2

with the larger Plymouth County Retirement Board, which oversees pension funds for retired school and municipal employees from across the county.

The state Public Employee Retirement Administration Commission has oversight of the boards, but no limits are set on travel, which is up to individual boards.

Other retirement boards roughly comparable to Plymouth in size have spent far less on travel. The Weymouth and Braintree boards spent $25,949 and $10,580, respectively, over the past three years.

On one occasion, seven Plymouth board and staff members attended a four-day conference in Hyannis, staying overnight in a hotel that is about a 40-minute drive from Plymouth.

The members of the board are chairman Thomas M. Kelley, Shawn Duhamel, Richard Manfredi, John Murphy Jr., and Bruce Miller.

Matt Carroll can be reached at mcarroll@globe.com. ■

© Copyright 2005 The New York Times Company

# EXHIBIT 9

**Page 1**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CA No. 05 10596 NMG
- - - - - - - - - - - - - - - - - - - -x
THOMAS KELLEY,

Plaintiff,

vs.

TOWN OF PLYMOUTH and ROBERT J. POMEROY,
as Chief of the Plymouth Police Department
and Individually,

Defendants.
- - - - - - - - - - - - - - - - - - - -x
VOLUME I
Pages 1 - 66

DEPOSITION OF DEBRA J. SULLIVAN, a witness
called by counsel for the Defendants, taken before
Suzanne M. Hebert, Professional Shorthand Reporter
and Notary Public in and for the Commonwealth of
Massachusetts, at Brody, Hardoon, Perkins & Kesten,
LLP, One Exeter Plaza, Boston, MA, on Friday, June 9,
2006, commencing at 11:24 a.m.

**Page 2**

1   APPEARANCES:
2
3       Joseph R. Gallitano, Esq.
4       34 Main Street Ext., Suite 202
5       Plymouth, MA 02360
6           for the Plaintiff;
7
8       Brody, Hardoon, Perkins & Kesten, LLP
9       By: Jeremy I. Silverfine, Esq.
10      One Exeter Plaza
11      Boston, MA 02116
12          for the Defendants;
13
14      Law Offices of Michael Sacco
15      By: Michael Sacco, Esq.
16      285 College Highway, P.O. Box 479
17      Southampton, MA 01073
18          for the Witness.
19
20  Also Present: Thomas Kelley
21
22
23
24

**Page 3**

1                    INDEX
2
3   WITNESS: Debra J. Sullivan
4
5   EXAMINATION:                           Page
6       By Mr. Silverfine                    4
7       By Mr. Gallitano                    56
8       By Mr. Sacco                        63
9
10                 EXHIBITS
11  No.                                   Page
12  1       Letter to Plaintiff from
13          Witness 1/29/04                 29
14  2       Letter to Chief Pomeroy
15          from Witness 9/9/03             41
16  3       Plymouth Retirement Board
17          Findings of Fact                46
18
19  (Exhibits retained by Jeremy I. Silverfine, Esq.)
20
21
22
23
24

**Page 4**

1                  PROCEEDINGS
2              DEBRA J. SULLIVAN,
3   having been first duly sworn by the court
4   reporter, testified as follows:
5                  EXAMINATION
6   BY MR. SILVERFINE:
7       Q.  Good morning, Ms. Sullivan.  I'm Jeremy
8   Silverfine.  I introduced myself a few minutes ago.
9   We're here to take your deposition today on the case
10  of Thomas Kelley vs. the Town of Plymouth.  Have you
11  ever had your deposition taken before?
12      A.  No.
13      Q.  Let me just run down, if I can, a couple of
14  items and explain what's going to happen here.  I
15  will be asking you a series of questions.  You're
16  obligated to answer those questions.  If you don't
17  understand a question, you have to let me know.  If
18  you need me to repeat something, you have to let me
19  know, and I'll be happy to do so.
20          You have to give an affirmative
21  response, "yes," "no," whatever answer.  You can't
22  shake your head, and that's because the stenographer
23  has to take down a voice.  I will try and allow you
24  to finish your answer and hopefully allow me to

Page 5

1    finish my question before answering it, so, again,
2    the stenographer can take down the information.
3          If at any time you need a break, use
4    the ladie's room, coffee, there is coffee in the
5    room, but if for any reason you need a break or to
6    talk to Counsel, let me know, and we'll take a break.
7    Hopefully we won't be that long, but those are
8    essentially the ground rules; do you understand that?
9    A.  I think so.
10         MR. SILVERFINE:  And, Mr. Gallitano, usual
11   stipulations?
12         MR. SILVERFINE:  That's fine.
13   Q.  In terms of your participation, what will
14   happen, they'll be a transcript made.  We'll send the
15   transcript to you, and you'll have 30 days to read
16   and sign.  If there is any errors that the
17   stenographer, additions to make, you'll be given an
18   opportunity to do so.  If you don't do so within 30
19   days of receipt, it will be deemed waived and the
20   transcript deemed as is; do you understand that?
21   A.  Okay.
22   Q.  Could you just give us your full name.
23   A.  Debra J. Sullivan.
24   Q.  Ms. Sullivan, are you here today with

Page 6

1    counsel?
2    A.  Yes.
3    Q.  Who is your counsel, for the record?
4    A.  Michael Sacco.
5    Q.  You understand Mr. Sacco is also a witness
6    in this case?
7    A.  I understand that.
8    Q.  Okay.  Could you give us your address home
9    address?
10   A.  Do you want mailing or residence?
11   Q.  Why don't you give us residential address.
12   A.  250 Meadow Street, Carver, Mass.
13   Q.  What is your occupation?
14   A.  I'm the director of the Plymouth Retirement
15   System.
16   Q.  Is that a full-time job?
17   A.  Yes, it is.
18   Q.  And how long have you been director for the
19   retirement system?
20   A.  Approximately 11 years.
21   Q.  And prior to your work as the director for
22   the retirement system for Plymouth, where did you
23   work?
24   A.  For the Plymouth County Retirement System.

Page 7

1    Q.  And what did you do for them?
2    A.  I was an administrative assistant.
3    Q.  How long did you work there as an
4    administrative assistant?
5    A.  Five years.
6    Q.  Just in general, tell us what your duties
7    are as a director of the Retirement Board for the
8    Town of Plymouth.
9    A.  Day-to-day activities, such as, dealing
10   with membership, retirees, investment advisors,
11   retirement board, staff.
12   Q.  Could you tell us previously what your
13   educational background is.
14   A.  High school and Associate's.
15   Q.  Where did you get your Associate's from?
16   A.  I didn't finish that.  That would be at
17   Massasoit.
18   Q.  And could you just briefly describe your
19   work history after leaving high school and attending
20   Massasoit.
21   A.  I worked at Massasoit Community College
22   first as an administrative assistant, then went to a
23   private entity, Tool and Dye Shop.  I don't know what
24   they call it today, a do everything job, but went

Page 8

1    back to Massasoit, and this is for continuing
2    education, and was the Dean's secretary.
3    Q.  And how long did you do that for?
4    A.  15 years.
5    Q.  And then what year did you become the
6    administrative secretary, or assistant, I'm sorry, at
7    the Plymouth Retirement Board?
8    A.  I want to say it was either '85 or '86.
9    Q.  And you said you were an administrative
10   assistant for 11 years, or do I have that wrong?  You
11   have been a director for 11 years?
12   A.  Yes.
13   Q.  How long were you in administrative for?
14   A.  Approximately 15 years.
15   Q.  So 1990 did you become the director --
16   A.  It was '90, '91, in there.
17   Q.  And was there another job in between the
18   director and the administrative assistant?
19   A.  Well, not really.  At the time, the office
20   was myself and a part-time bookkeeper, and then as
21   the job grew, we added a full-time administrative
22   assistant.  Not sure of the sequence of events here,
23   but she was the administrative assistant and then I
24   think I became the director and we added another

2  (Pages 5 to 8)

Page 9

1  individual as well.
2    Q.  Have you worked for the retirement board
3  continuous from 1985 to present?
4    A.  For a retirement board; is that your
5  question?
6    Q.  Well, for the Plymouth Retirement Board.
7    A.  Plymouth Retirement Board was from '90,
8  '91, to the present.
9    Q.  And then the last 11 years you have been
10  the director, you said?
11    A.  I'm not sure when exactly I became the
12  director.
13    Q.  And how do you become director; do you
14  apply or are you appointed?
15    A.  I was appointed.
16    Q.  Who appointed you?
17    A.  The Retirement Board.
18    Q.  Who at the time of your appointment was on
19  the Retirement Board?
20    A.  I'm trying to think who was there.  I
21  believe it was Shawn Duhamel -- Mr. Manfredi.
22    Q.  Mr. Murphy --
23    A.  John Murphy.  There is five guys.  Who did
24  I miss?  At the time, it was Patrick Dello Russo.

Page 10

1    Q.  Is there a term of appointment?
2    A.  No.
3    Q.  So once you're appointed, you're on for
4  life?
5    A.  Well, I'm at the will of the Board.
6    Q.  And so you're an employee at will?
7    A.  Right.
8    Q.  There is no reappointment process, you
9  service until whenever basically?
10    A.  Exactly.
11    Q.  And this position is a full-time, paid
12  position?
13    A.  That's correct.
14    Q.  What is your current salary?
15    A.  I'm not sure.  I think it's $75,000.
16    Q.  Besides your work for the Retirement Board,
17  do you have any background or specialized training in
18  the area of retirement boards, retirement?
19    A.  Other than my experience, no.
20    Q.  Okay.  Could you tell us what your
21  relationship is to the Plaintiff, Thomas Kelley, is?
22    A.  He's my employer.
23    Q.  And he's been your employer for how long?
24    A.  Well, Chapter 697 came in, which was 1986,

Page 11

1    I think, when the Board went from a three-member
2  board to a five-member board.
3    Q.  And you have known him since '86, is that
4  fair to say, or have you known him before 1986?
5    A.  I have known him since he was on the Board.
6    Q.  That was 1986?
7    A.  Yes.
8    Q.  So it's someone you work with as well as
9  him being your employer, is that fair to say, in
10  other words, he's your employer and you work with him
11  as well on the Board?
12    A.  I work with all of the Board.
13    Q.  How many members of the Board did you say
14  there were?
15    A.  Five.
16    Q.  And that includes Mr. Kelley?
17    A.  That's correct.
18    Q.  Is that presently -- is he your employer?
19    A.  All five are my employers.
20    Q.  But including Mr. Kelley as of today?
21    A.  Yes.
22    Q.  And he has been your employer since 1986,
23  you said?
24    A.  Yes.

Page 12

1    Q.  And what type of personal relationship do
2  you have with him?
3    A.  I wouldn't say that there is a personal
4  relationship.  He's my boss.
5    Q.  Have you been to his home?
6    A.  Have I been to his home, yes.
7    Q.  Has he been to your home?
8    A.  Yes.
9    Q.  Socialize with him?
10    A.  No.
11    Q.  Have you ever been on his boat?
12    A.  Once.
13    Q.  Do you have regular telephone contact with
14  him?
15    A.  Yes.  Do I get to elaborate on any of that?
16    Q.  Actually, the way the process works, I get
17  to ask questions --
18    A.  And I get to answer them.
19    Q.  If there is a question, for instance --
20  Mr. Gallitano will have an opportunity to ask you
21  questions.  If Mr. Sacco decides he wants to ask you
22  questions, he has an opportunity to ask you
23  questions, but otherwise, you're obligated to answer
24  the questions.  If you don't understand a question,

3  (Pages 9 to 12)

Page 13

1  of course, please let me know; otherwise, that's how
2  it works, and the question and answers limited in --
3  if I don't ask a good question --
4      A.  Okay.
5      Q.  Answer as best you can.  In terms of the
6  deposition, did you do anything to prepare yourself
7  for the deposition today?
8      A.  I spoke with Board counsel.
9      Q.  When you say "Board counsel," is that
10  Mr. Sacco?
11      A.  That's correct.
12      Q.  Without telling me conversations with
13  Mr. Sacco, is there any documents you reviewed for
14  today?
15      A.  No.
16      Q.  Is there anyone else you spoke to besides
17  Mr. Sacco in preparation for today relative to the
18  deposition?
19      A.  No.
20      Q.  For instance, did you speak to Mr. Kelley?
21      A.  No.
22      Q.  Or Mr. Kelley's attorney?
23      A.  No.
24      Q.  During the time period that you worked with

Page 14

1  Mr. Kelley and have worked with Mr. Kelley, has he
2  discussed with you the issues he's had with the
3  police department?
4      A.  He has come into the office and, you know,
5  spoken about his problem with the Chief.
6      Q.  When did this begin?
7      A.  I would say after he had -- I'm not sure
8  whether it was during his retirement process or after
9  his retirement -- after he was retired.
10      Q.  Is that the first time you recall him
11  complaining about the Chief or the police department,
12  at least with you?
13      A.  No.
14      Q.  When was the first time you heard him
15  complain of the Chief or the police department?
16      A.  As a board member, he was -- well, the
17  police department would call the office to find out
18  when the meetings were held, the time when Mr. Kelley
19  left and he came, and that was an annoyance to
20  Mr. Kelley.
21      Q.  That's something he expressed to you, that
22  it was an annoyance to him?
23      A.  Certainly.
24      Q.  How much did he express that?

Page 15

1      A.  We met normally once a month.
2      Q.  Okay.  And during the time period you have
3  served on the Retirement Board, has there been any
4  other police officer who has served on the Retirement
5  Board?
6      A.  Police officer, no.
7      Q.  In particular, do you recall the complaints
8  that Mr. Kelley made, vis-a-vis, this annoyance that
9  you have told us about, what exactly did he say?
10      A.  I don't remember exactly what he would say.
11      Q.  All right, as best you can remember?
12      A.  Just, you know, like, for instance, you
13  know, they don't charge back anyone else with the
14  retirement system, would be charged for the time that
15  he was with us, so it was more of an annoyance that
16  no one else who worked for the Town had to go through
17  that or the system versus he had to go through that.
18      Q.  When you say they would call, they call you
19  directly --
20      A.  They would call the office, yeah.
21      Q.  Who would call you?
22      A.  Lynn Fortini.
23      Q.  Who's that?
24      A.  Chief's secretary or administrative

Page 16

1  assistant.
2      Q.  What would the conversations with Lynn
3  Fortini be?
4      A.  She would just ask what time he left or
5  what time the Retirement Board ended.
6      Q.  Relative to meetings that you had,
7  Ms. Fortini would call and find out what time it
8  began and ended?
9      A.  Yes.
10      Q.  Anything else that you recall Ms. Fortini
11  inquiring about?
12      A.  No.
13      Q.  Any other complaints that Mr. Kelley had
14  that you recall, vis-a-vis, his work at the police
15  department?
16      A.  Not specifically, no.
17      Q.  Did he make complaints to you -- were you
18  aware of complaints he made about Chief Pomeroy?
19      A.  Specifically, no.
20      Q.  How about Captain Botieri?
21      A.  When I say "specifically," I don't remember
22  any particular instance.  There was a social
23  engagement that, I guess, Mr. Kelley had been to and
24  there was words between -- I'm not sure if it was

4  (Pages 13 to 16)

Page 17

1  Botieri or who exactly it was.
2      Q.  Were you present at that function?
3      A.  No.
4      Q.  How did you hear about this interaction
5  between Mr. Botieri and Mr. Kelley, what did
6  Mr. Kelley tell you?
7      A.  Again, I'm trying to remember here.  I
8  don't remember specifically, but from what I
9  understand, it was a situation that, whoever this
10  police officer was, it was a social engagement, their
11  wives were also there, and something was said to
12  Mr. Kelley to make Mr. Kelley angry and, you know, it
13  was that kind of a situation.
14      Q.  Do you remember what Mr. Kelley told you
15  got him angry?
16      A.  I don't remember.
17      Q.  Are you aware Mr. Kelley has a temper?
18      MR. GALLITANO:  Objection.
19      Q.  You can answer.  That's an objection as to
20  form.  You can answer the question.
21      A.  Yes.
22      Q.  And had you seen examples of Mr. Kelley's
23  temper during the time period you have worked with
24  him?

Page 18

1      A.  Yes.
2      Q.  And could you tell us what you have seen in
3  the past relative to his temper?
4      A.  Only that he will get short.  He never gets
5  physical or anything like that.  He might get short
6  in his language.
7      Q.  When you say "his language," is it abusive
8  language?
9      A.  No.
10      Q.  Is it language that has profanity?
11      A.  No.
12      Q.  Just a quickened type of pace in terms of
13  the response?
14      A.  Right.
15      Q.  Again, I don't want to put words in your
16  mouth.  I'm asking you to explain what you have seen.
17      A.  Normally, the relationship is such that we
18  can talk business on a director to board member, but
19  there are times he might get short with me, in that I
20  am not giving him, maybe, the answer that he would
21  like to hear.
22      Q.  So he gets agitated if he's not getting the
23  response he thinks he wants to get, fair to say?
24      A.  Yes.

Page 19

1      Q.  Do you recall at some point during the time
2  period you worked with Mr. Kelley some issues
3  relating to Quinn Bill benefits that were being paid
4  out to the Chief and other higher-ranking members of
5  the police department?
6      A.  Paid out to them?
7      Q.  Yes.
8      A.  No.
9      Q.  Do you recall any issue in the Town of
10  Plymouth relating to a question of whether or not
11  certain Quinn Bill benefits should be paid to certain
12  members of the police department?
13      A.  Yes.
14      Q.  What is your recollection of the issue that
15  was at hand relative to the Quinn Bill benefits?
16      A.  That the Chief, when someone goes out under
17  a retirement benefit, pension benefit, accidental
18  benefit, if it was under the presumption -- the Chief
19  would not pay for 111F benefits, okay, until and
20  after the person had been retired and been proven
21  that there was a disability.
22      Q.  I don't want to confuse you at all, so I
23  want to make sure you're answering my question, and I
24  should start off:  Do you know what the Quinn Bill

Page 20

1  benefits are, before I even go there?
2      A.  I'm thinking that it's to do with 111F
3  payments.
4      Q.  If I said to you the Quinn Bill benefits
5  are different than 111F benefits, would that help you
6  at all, and, again, it's your memory?
7      A.  Again, the Quinn Bill is not something that
8  I'm versed in, so it may be something that I knew
9  when it comes up or that I look up this kind of
10  thing, but I guess at this point in time, I'm not --
11  of what the Quinn Bill, is guess.
12      Q.  If I suggested the Quinn Bill benefits has
13  to do with added remuneration to police officers for
14  having taken advance courses and gotten degrees,
15  would that help you at all?
16      A.  There is educational allowance.
17      Q.  Do you remember an issue being raised in
18  the Town of Plymouth as to Quinn Bill benefits being
19  paid to certain high-ranking officers in the Town of
20  Plymouth Police Department?
21      A.  There are people who receive extra monies
22  because of education, yes.
23      Q.  Do you remember an issue being raised in
24  the Town as to this payment of Quinn Bill benefits?

5 (Pages 17 to 20)

Page 21

1    A.  I don't recall.
2    Q.  Do you recall whether or not Mr. Kelley
3  complained about certain officers receiving extra pay
4  under the Quinn Bill as it related to Plymouth Police
5  Officers?
6    A.  I don't recall.
7    Q.  Do you recall any conversations you had or
8  overhearing Mr. Kelley complaining or questioning the
9  issuance or payment of Quinn Bill benefits to certain
10  officers in the Town of Plymouth?
11    A.  I don't recall.
12    Q.  Let me take a step back.  Before I went to
13  the Quinn Bill, I started talking about 111F
14  benefits.  What is your recollection about what
15  complaints you heard from Mr. Kelley relative to
16  receipt of 111F benefits?
17    A.  Mr. Kelley making?
18    Q.  Mr. Kelley, right.
19    A.  Making complaints?
20    Q.  Right.
21    A.  All right, say that again, please.
22    Q.  Again, I'm assuming, and I'll get to it in
23  a moment, but you understand what 111F benefits are?
24    A.  Yes.

Page 22

1    Q.  What's your understanding of them?
2    A.  When someone has gone out for injury on
3  duty.  As far as my business is concerned, 111F is
4  treated like workman's comp., in that it's not
5  taxable income, and, therefore, we treat it
6  differently in the retirement system than we do
7  normal contributions.
8    Q.  Do you recall having conversations with
9  Mr. Kelley about his receipt of any or lack thereof
10  of any 111F benefits?
11    A.  Yes.
12    Q.  Tell us what you recall about your
13  conversations with Mr. Kelley on 111F benefits.
14    A.  Again, when he retired -- again, I don't
15  remember specific conversations, but it was after he
16  had been approved and retired, he had, you know,
17  about Chief Pomeroy not paying him his 111F, not
18  converting that sick time back to his 111F, which was
19  a usual thing to do.
20    Q.  All right.  You're familiar with Chief
21  Pomeroy?
22    A.  Yes.
23    Q.  Do you know what the relationship between
24  Mr. Kelley and Chief Pomeroy was?

Page 23

1    A.  Personally, no.
2    Q.  Did you ever hear Mr. Kelley describe what
3  the relationship was?
4    A.  He didn't care for him.
5    Q.  How about the relationship between Captain
6  Botieri and Mr. Kelley?
7    A.  I don't think he cared for him either.
8    Q.  Did Mr. Kelley express why he didn't care
9  for Chief Pomeroy?
10    A.  Probably did.
11    Q.  What's your memory of that?
12    A.  I would be speculating.
13    Q.  I'm just asking for your memory, not asking
14  to speculate.
15      MR. GALLITANO:  She doesn't remember, she
16  doesn't remember.
17      MR. SILVERFINE:  I think Mr. Sacco is
18  representing her, if I'm not mistaken, and she's
19  certainly doing a fine job answering the questions.
20      MR. GALLITANO:  She certainly is.
21      MR. SILVERFINE:  I certainly can ask her,
22  and haven't asked her anything improper, can
23  certainly ask her questions about her memory.
24      MR. GALLITANO:  Go right ahead.

Page 24

1    Q.  Before I was interrupted, just tell me what
2  you remember about Mr. Kelley expressing to you about
3  his relationship or his lack thereof with Chief
4  Pomeroy.
5    A.  He didn't care for Mr. Pomeroy, or Chief
6  Pomeroy, because of the way that he managed -- okay.
7  It would be based upon his decisions, his decisions.
8    Q.  So you're saying Mr. Kelley expressed that
9  he didn't care for the way Chief Pomeroy made his
10  decisions as related to Mr. Kelley?
11    A.  Correct.
12    Q.  Did he express anything in particular, that
13  you recall?
14    A.  Just the 111F issue and, again, it had to
15  do with his not being, you know, being watched when
16  he was at a board meeting.
17    Q.  Anything else that you can recall, anything
18  else other than those two items that you recall
19  him --
20    A.  I don't recall other than those two.
21    Q.  How about, what did he say about his
22  relationship with Captain Botieri?
23    A.  Other than he worked for Pomeroy and as
24  such held the same, you know, relationship with

DUNN & GOUDREAU

Page 25

1  Pomeroy.
2      Q.  Okay.  Did he have the same issues in terms
3  of the 111F benefits and the, as you called it, the
4  watching, coming and going from the meetings, any
5  other issue that you recall as it related to Captain
6  Botieri?
7      A.  No.
8      Q.  Did he express any other animosity toward
9  any other officers besides Chief Pomeroy and Captain
10  Botieri, that you recall?
11      A.  There was Mr. Flynn.
12      Q.  Who's Mr. Flynn?
13      A.  Peter Flynn.  He's a police officer.
14      Q.  Do you know his rank?
15      A.  No.
16      Q.  What was Mr. Kelley's issue with Peter
17  Flynn?
18      A.  His issue with Mr. Flynn was because
19  Mr. Flynn was -- what's the word?  I can't think of
20  the word.  He had dealings with the retirement office
21  and Mr. Peter Flynn was very -- what's the word,
22  awful to us on the phone, you know, on e-mails.  He
23  had come to the Board for some kind of specific
24  benefit that he thought he was entitled to and the

Page 26

1  Board had voted not to give it to him, so -- I can't
2  even think of it.  Isn't this awful?  I'm going brain
3  dead.  Oh, God.
4          When somebody is -- doesn't speak
5  well to you, and, you know, this kind of thing, and
6  so Mr. Kelley was upset with Mr. Flynn for being
7  impolite, this kind of thing, to the Board, to the
8  staff of the Board, basically.
9      Q.  Going back this second, if I can, to the
10  incident, which I think you described a few minutes
11  ago, about the social function, which I think you
12  said Mr. Kelley and Mr. Botieri had some kind of
13  words --
14      A.  I don't know if it was Mr. Botieri.  I
15  don't know specifically if it was Mr. Botieri, but I
16  know -- no, I don't know who it was.
17      Q.  Did you ever hear Mr. Kelley say to anyone,
18  including Mr. Botieri, "Don't ever appear in front of
19  us," meaning, the Retirement Board?
20      MR. GALLITANO:  Objection.
21      A.  No, I didn't hear any such thing.
22      Q.  Have you ever heard Mr. Kelley say that to
23  anyone?
24      A.  No.

Page 27

1      Q.  Did Mr. Kelley ever describe to you his
2  other grievances he had with the police department
3  besides the ones that you have described?
4      A.  Not that I can recall.
5      Q.  Did he ever talk to you about his issues he
6  had a few years ago where he brought a matter to the
7  Inspector General's office?
8      A.  There was something, but I don't remember
9  what it was.
10      Q.  Did he ever talk to you or did you ever
11  hear him talk about his complaints about ranking
12  officers and the receipt of Quinn Bill benefits?
13  Again, I'm just trying to refresh your memory and see
14  if you have any memory.  If you don't, that's fine.
15      A.  I don't, sorry.
16      Q.  Besides what you have told us as it relates
17  to Mr. Kelley's 111F benefits, was there any other
18  further discussions relating to the Heart Law issue
19  that he was trying -- let me leave it at that, the
20  Heart Law issue, retirement issue, with him?
21      A.  Restate that.
22      Q.  Poorly-phrased question.  Did you ever hear
23  Mr. Kelley complain or did he make any statements as
24  it related to his claim that he was entitled to a

Page 28

1  Heart Law benefit as a police officer?
2      A.  Yes.
3      Q.  Tell us what you recall about that.
4      A.  That he had gone out -- it had been decided
5  and voted and approved by the medical doctors that he
6  had a heart attack and had it on the job and wasn't
7  to be given his benefits.
8      Q.  Are you aware of this drill that Mr. Kelley
9  participated in where he got injured?
10      A.  Yes.
11      Q.  Prior to that, I believe the date, if I'm
12  not mistaken, was May 25, 2003, I'll represent that
13  to you for the moment, if you'll take that as the
14  date, and do you recall whether or not Mr. Kelley
15  ever expressed to you that he had any medical issues
16  prior to that date?
17      A.  I don't know.  I don't know.
18      Q.  Were you aware in any way, besides what
19  Mr. Kelley may have said or not said to you, were you
20  aware in any way of any medical issues Mr. Kelley had
21  prior to May 25, 2003?
22      A.  Again, I don't know when sequentially.
23  Things happen.  I remember he had a hernia and he was
24  in the hospital for that, but I don't know whether it

7  (Pages 25 to 28)

Page 29

1  was before or after.
2      Q.  How did you become aware of his injury on
3  May 25, 2003; do you remember?
4      A.  I don't.  I was trying to think of that,
5  when or how I was told.  Town Hall, everybody knows
6  everyone, and obviously I received a phone call from
7  someone saying that Tom was in the hospital.
8      Q.  It was someone other than Tom, as far as
9  you can remember?
10     A.  Oh, yeah.  No, it wasn't Tom.
11     Q.  Then you, yourself, called other members of
12  the Board?
13     A.  That's correct, as well as Town Counsel --
14  not Town Counsel, Michael.
15     Q.  I'm going to show you some documents and
16  we're going to mark them and I'll ask you some
17  questions.
18        (Exhibit 1 marked for identification)
19     Q.  I'll show you a document marked -- look at
20  the original and that way it's clear, Exhibit 1, and
21  ask you, first of all, if you recognize that document
22  which has been marked as Deposition Exhibit No. 1.
23     A.  What is it you want me to do?
24     Q.  Very first thing, do you recognize it?

Page 30

1      A.  Yes.
2      Q.  In fact, does your signature appear at the
3  bottom?
4      A.  Yes.
5      Q.  This letter is written to Thomas Kelley; is
6  that correct?
7      A.  Yes.
8      Q.  And the first paragraph, the first line
9  says, "At your request;" do you see that?
10     A.  Yes.
11     Q.  When did Mr. Kelley ask you to write this
12  letter?
13     A.  Probably right before it.  I don't recall
14  exactly when.
15     Q.  Do you recall for what purpose you
16  understood this letter was being written for?
17     A.  Documentation that the Board was being
18  charged back for his time.
19     Q.  And do you recall, was there any discussion
20  with Mr. Kelley relative to you writing this letter?
21     A.  There must have been, otherwise, why would
22  I have written it?
23     Q.  Do you remember what the conversation was
24  that caused you to write this letter?

Page 31

1      A.  No, I do not.
2      Q.  Was there any discussion of a lawsuit, for
3  instance, that you recall?
4      A.  No.
5      Q.  Against the Town?
6      A.  No.
7      Q.  And you wrote that same first paragraph,
8  "Verification of your service as its elected member
9  began December 18, 1996;" do you see that?
10     A.  Yes.
11     Q.  And how did you determine December 18,
12  1996, as the date of service as an elected member for
13  Mr. Kelley, if you recall?
14     A.  That would have been when Chapter 697 came
15  into being, I believe.
16     Q.  All right.  And just help me on this.  It
17  says, "Elected member."  Is that when Mr. Kelley
18  first became an elected member to the Board?
19     A.  Yes.
20     Q.  You have to actually run for the position?
21     A.  Yes.
22     Q.  Prior to that, what was the procedure?
23     A.  Prior to?
24     Q.  December 18, 1996.

Page 32

1      A.  Prior to that, there were only three
2  members to the Board, and then the law changed, and
3  as part of the law changing, they added with it more
4  positions to the Retirement Board.
5      Q.  Prior to December 18, 1996, did Mr. Kelley
6  serve on the Board in any capacity?
7      A.  I don't believe so.
8      Q.  So as far as you understood, his service on
9  the Retirement Board began December 18, 1996?
10     A.  Yes.
11     Q.  Do you know when the election took place,
12  by any chance?
13     A.  It would have had to have been before that.
14  I'm not sure exactly when.  I guess Chapter 697 went
15  into being, off the top of my head, so there would
16  have had to have been an election and then his term
17  beginning.
18     Q.  In the second paragraph of Exhibit 1 you
19  wrote, "During this time period, if you were
20  scheduled to work your position as a full-time police
21  officer and those hours conflicted with your service
22  on the Retirement Board, the retirement system was
23  required to reimburse the Town."
24     A.  That's right.

Page 33

1    Q.  Did Mr. Kelley specifically ask you to
2  describe that in this letter that you drafted?
3    A.  No.
4    Q.  Why did you put that in there?
5    A.  Again, it was documentation as to why there
6  was a charge back on our payroll as to Mr. Kelley's
7  time.
8    Q.  Do you recall from the period of December
9  18, 1996, to present how much the Town has been
10  charged back for his work?
11    A.  I don't know total.
12    Q.  Is there a record somewhere of that?
13    A.  Oh, yes.
14    Q.  Where is that kept?
15    A.  In the office, in the general ledger it
16  would be.
17    Q.  Is that held in the Retirement Board?
18    A.  Yes.
19    Q.  And is that something that is public
20  information?
21    A.  Certainly.
22    Q.  And do you have an idea of how much time
23  per month that would have been?
24    A.  It would have been different depending upon

Page 34

1  how long the board meeting went.
2    Q.  Okay.  Under what provision was the
3  retirement system required to reimburse the Town; do
4  you know how that worked?  In other words, was there
5  a special addendum to something, an agreement; do you
6  remember?
7    A.  I don't.  I know that at the time the
8  chairman, Mr. Dello Russo, basically said that the
9  Retirement Board should pay for the time that he was
10  away.  I'm sure that he had spoken, the chairman, at
11  the time had spoken to the Chief and worked this out.
12    Q.  Are each of the separate departments, do
13  they have their own budgets?
14    A.  Yes.
15    Q.  So the police department had their own
16  budget?
17    A.  Yes.
18    Q.  So any time Mr. Kelley would have served on
19  the Board which they paid him for would have come out
20  of their budget?
21    A.  Yes.
22    Q.  Is it fair to say that like many towns
23  Plymouth had certain budgetary constraints during the
24  past ten years?

Page 35

1    A.  I wouldn't know that.
2    Q.  You don't come across budgetary issues?
3    A.  No, not for the Town.
4    Q.  In particular, as it relates to this issue
5  of payback, did that come up before you as to why
6  that was being implemented?
7    A.  I probably asked the chairman why as we
8  have our own budget and that monies wouldn't have
9  been budgeted for in the beginning as to why and how
10  that was going to take place.
11    Q.  Do you recall what response you got back
12  from the chairman?
13    A.  Just that we would be compensated -- not
14  compensated, but paying for the time that -- and it
15  would be done through the payroll.
16    Q.  Did that remain in effect up until the time
17  that Mr. Kelley retired?
18    A.  That's right.
19    Q.  Now, you also wrote in Exhibit 1, the last
20  paragraph, you wrote, "It's my experience since 1991
21  as Board Director" -- is that because you were Board
22  Director as of 1991?
23    A.  No.  I wasn't Board Director in 1991.
24    Q.  So when you wrote that --

Page 36

1    A.  Well, that probably was not entirely
2  correct, "as the Board Director," as the
3  administrative assistant/Board Director is probably
4  what it should have said.
5    Q.  Because you were only Board Director
6  approximately the last 11 years, right?
7    A.  That's right.
8    Q.  So it's your experience since 1991 having
9  been on the Board?
10    A.  That's correct.
11    Q.  Not as Board Director?
12    A.  That's correct.
13    Q.  You further wrote in Exhibit 1, "to have
14  this practice in your position," and is that your
15  position as a Retirement Board member you're
16  referring to or a position as a police officer?
17    A.  Say that again.
18    Q.  I'm trying to understand what you wrote in
19  Exhibit 1.  You wrote, "It's been my experience since
20  1991 as Board Director to have this being the
21  practice in only your position."
22    A.  To be the practice of charging, being
23  charged back, the retirement system being charged
24  back for his time served as a board member.

Page 37

1    Q.  And is there any remuneration as a board
2  member?
3    A.  The only people that get remuneration would
4  be the exofficio.  Everyone else is not paid.
5    Q.  Who's the exofficio?
6    A.  At that time it would have been Patrick
7  Dello Russo.
8    Q.  What's an exofficio?
9    A.  By legislature that's either the town
10  accountant or in the Town of Plymouth's case are,
11  because of special legislation, it is the finance
12  director.
13    Q.  Are board members entitled to certain
14  benefits, whether it be reimbursement for expenses or
15  travel expenses, anything like that, for attending
16  conferences?
17    A.  Certainly.
18    Q.  Who approves that, if you know?
19    A.  The Retirement Board in total approves
20  that.
21    Q.  So the members approve their own expenses
22  and travel?
23    A.  That's correct.
24    Q.  Is there any oversight to that, that you're

Page 38

1  aware of?
2    A.  There is audits, certainly, and we have a
3  regulatory authority that oversees -- we have to have
4  regulations that set the parameter to what travel
5  requirements are and so forth.
6    Q.  Are those records kept by the Retirement
7  Board as well?
8    A.  Certainly.
9    Q.  So any travel records or conferences
10  attended or any expenses paid out are, also, kept by
11  the Retirement Board?
12    A.  That's correct.
13    Q.  For each and every member?
14    A.  Correct.
15    Q.  Getting back to Exhibit 1, and I know I
16  asked you this earlier but I'll ask it in a different
17  way:  Since 1991, are you aware of any other police
18  officer or public safety officer that has served on
19  the Retirement Board?
20    A.  There has not been one.
21    Q.  Is it fair to say Thomas Kelley was the
22  only public safety officer serving on the Board since
23  the very time you have been associated with the
24  Board?

Page 39

1    A.  That's correct.
2    Q.  Are you aware, just asking if you're aware
3  of, any public safety officer who served on the
4  Retirement Board prior to your work in 1991?
5    A.  I'm not aware of one.
6    Q.  In the last sentence of Exhibit 1 you
7  wrote, "There are other board members who serve the
8  Town as well."  What positions do other board members
9  hold and what are their names?
10    A.  Patrick Dello Russo, which would have at
11  this time been the finance director, as well as the
12  other elected member, Mr. Manfredi, who is the
13  head -- what is he --
14      MR. GALLITANO:  Building commissioner.
15    Q.  Just to note, and I appreciate moving this
16  along, but it's really your memory that rules, that
17  governs.  I need your memory, not Mr. Gallitano's
18  memory.
19    A.  I know, but that is what it is.
20    Q.  I understand.  I'm just trying to explain,
21  your memory, as best you can.
22    A.  Well, good luck.
23    Q.  Fair enough.  I actually didn't catch it,
24  Mr. Manfredi, head of --

Page 40

1    A.  See.  I couldn't hear you.  I'm sorry.
2  He's the Commissioner of Public...
3    Q.  Works?
4    A.  No.  Public buildings, that kind of thing.
5    Q.  Anyone else during the time period that you
6  served on the Board served in other Town positions,
7  that you recall?
8    A.  Say again, please.
9    Q.  In other words, during the time period,
10  let's call it from December 18, 1996, until today,
11  any other board members serve the Town, as you wrote
12  in Exhibit 1?
13    A.  There was also John Madden who served on
14  the Board for a short bit.
15    Q.  What was John Madden's position?
16    A.  He was the Town accountant.
17    Q.  Prior to that, Michael Daley, who was the
18  finance director?
19    A.  That's correct.
20    Q.  Anyone else?
21    A.  He's dead now, but Mr. Collary, I think was
22  his name.  He was the treasurer and he served on the
23  Retirement Board.  These are all before my time.
24  There was somebody else, a lady, but I don't know her

10 (Pages 37 to 40)

Page 41

1  name, and Drew, Mr. Drew, I don't remember his first
2  name. I think he served on the Retirement Board.
3      Q.  I don't know if you know the answer, any of
4  the people you mentioned, Dello Russo, Manfredi,
5  Madden, Daley, you, were any of them paid on an
6  hourly basis by the Town, if you know?
7      A.  I think everyone is paid on an hourly
8  basis.
9      Q.  It's not a yearly stipend salary that other
10  people get?
11      A.  My understanding is everybody is paid
12  hourly. They have an annual figure or they may be
13  salary but they get paid an hourly -- I think.
14      MR. SILVERFINE:  We'll mark the second
15  document.
16      (Exhibit 2 marked for identification)
17      Q.  I'm going to show you what's been marked as
18  Exhibit 2 and ask you, first of all, if you recognize
19  this?
20      A.  Yes.
21      Q.  What is it?
22      A.  A letter that's sent out to the department
23  head. This particular letter would only go out to
24  police or fire, because they're the only ones who get

Page 42

1  111F, when someone has, in fact, been approved for
2  accident disability under Section 7.
3      Q.  You recognize your signature on this,
4  Exhibit 2?
5      A.  Yes.
6      Q.  You sent it on September 9, 2003, to Robert
7  Pomeroy, the Chief of Police?
8      A.  Yes.
9      Q.  And were you mandated to send this letter
10  out by some provision?
11      A.  I believe it's under the regulations, the
12  Perac regulation.
13      Q.  You wrote in the first paragraph, "Please
14  be advised September 8, 2003, the Commission approved
15  the decision to grant disability."
16      A.  That's correct.
17      Q.  Was this a quick turnaround you issued this
18  letter?
19      A.  No.
20      Q.  Would this be the normal course of business
21  you would issue this kind of letter?
22      A.  Yes.
23      Q.  Did you do this for other retirees as well?
24      A.  Yes.

Page 43

1      Q.  Was Mr. Kelley treated any differently than
2  any other Town employee?
3      A.  No.
4      Q.  Did he get special treatment because he was
5  on the Board?
6      A.  No.
7      Q.  You sent a copy to Mr. Kelley and to
8  Mr. Sacco, I see, are at the bottom, along with human
9  resources. For what purpose did you send it to
10  Mr. Sacco?
11      A.  As the Board's attorney, to let him know
12  the application was complete.
13      Q.  Likewise, what purposes did you send it to
14  the human resource department?
15      A.  To let them know the person is retiring.
16      Q.  Once you sent this letter out, does the
17  clock stop ticking on whatever benefits Mr. Kelley
18  was getting as of September 8 and he then transfers
19  to a different system; is that how it works?
20      A.  At this point here, it let's payroll,
21  number one, know to take him off the payroll, to stop
22  his earnings, sick time, whatever it is that the
23  person is using, to stop that so that the
24  contributions then stop. Human resources then are

Page 44

1  made aware so that they can contact the retiree to
2  counsel them as far as health insurance, and then
3  they let me know what kind of contributions I should
4  be holding for deductions.
5      Q.  Did you have any conversations with
6  Mr. Kelley prior to the issuance of this letter,
7  Exhibit 2, prior to its issuance on September 9,
8  2003?
9      A.  I don't recall.
10      Q.  Did you call him up and say, "September 8,
11  Perac approved your accident disability"?
12      A.  I may have.
13      Q.  Was that something you would do with all
14  retirees?
15      A.  Yes.
16      Q.  So you would call anyone, any employee, who
17  had applied?
18      A.  Yes.
19      Q.  When you wrote the second paragraph, "No
20  further retirement deductions should be withheld for
21  any amounts payable," whose attention were you
22  drawing that to?
23      A.  Payroll.
24      Q.  For Town of Plymouth?

11 (Pages 41 to 44)

Page 45

1    A.  Yes.
2    Q.  So they can draw up and take care of
3  Mr. Kelley's --
4    A.  Because of that date he then becomes
5  retired.  That becomes his termination date.
6  Benefits or payroll should stop, contributions should
7  stop.
8    Q.  Did you have any complaints from Mr. Kelley
9  as to the way this was being handled back in
10  September 2003?
11    A.  Complaints with this?
12    Q.  Yes.
13    A.  No.
14    Q.  Talking about Exhibit 2.
15    A.  No.
16    Q.  Any complaints about deductions or anything
17  that was happening, vis-a-vis, his payroll at that
18  point in time, that you recall?
19    A.  No.
20    Q.  Do you recall any discussions that you had,
21  vis-a-vis, whatever monies he may or may not have
22  been due back on September 9, 2003, when you issued
23  this letter?
24    A.  I don't recall.

Page 46

1    Q.  Okay.  And subsequent to this, do you
2  recall any conversation you had with him as to any
3  complaints he was receiving under the
4  retirement application that was approved?
5    A.  Say that again.
6    Q.  I'll try to.  Subsequent to Exhibit 2,
7  September 9, 2003, did you have any discussions with
8  Mr. Kelley as to anything he was displeased about
9  receiving certain benefits under the retirement that
10  was approved as you described on September 8?
11    A.  Any benefits under the retirement?
12    Q.  Right.
13    A.  No, not under the retirement.
14    MR. SILVERFINE:  Mark another document.
15  For the record, this was previously marked as
16  Exhibit 3 in Mr. Sacco's deposition on February 7,
17  2006.  We'll also be, coincidentally, marking this
18  Exhibit 3 in your deposition.
19    (Exhibit 3 marked for identification)
20    Q.  I'm going to put before you Exhibit 3 and
21  ask if you if you recognize that, first of all.  Take
22  your time.  It's several pages.
23    A.  It's a normal document that Mr. Sacco would
24  have produced for the Retirement Board.

Page 47

1    Q.  Is this something you recognize as being
2  the Plymouth Retirement Board's findings of fact as
3  related to Thomas Kelley?  Again, take your time
4  looking over Exhibit 3.
5    A.  This is correct.
6    Q.  In terms of Exhibit 3 on Paragraph 4, it
7  says, "By my letter dated September 3, 2003, legal
8  counsel informed the Board that the panel applied the
9  appropriate standards in addressing the issues of
10  incapacity, permanency, and causation."  First of
11  all, talking about legal counsel, talking about
12  Mr. Sacco?
13    A.  Right.
14    Q.  And he was then legal counsel to the
15  Retirement Board?
16    A.  Yes.
17    Q.  You would look to him for legal advice as
18  it related to different applications for retirement?
19    A.  One of the things.
20    Q.  And then in this case included Mr. Kelley's
21  applications; is that fair to say?
22    A.  Yes.
23    Q.  And according to Paragraph 4, Mr. Sacco
24  opined that the Board had the authority to grant

Page 48

1  Mr. Kelley's application; is that accurate?
2    A.  That's correct.
3    Q.  And that's part of the reason why you
4  issued the letter on September 9, which is Exhibit 2,
5  correct?
6    A.  Yes.
7    Q.  At the bottom of the first page of Exhibit
8  3 under 5a it says, "Kelley passed pre-employment
9  physical prior to his appointment to the Plymouth
10  Police Department which did not reveal any evidence
11  of hypertension or heart disease."  What information
12  did you have or the Board have as to that fact?
13    A.  The Retirement Board has the physicals on
14  any individual that comes into the Town of Plymouth.
15  They all have to pass a pre-employment physical exam.
16    Q.  Do you know whether or not there is a
17  review of all medical files of an applicant, even
18  information after the pre-employment physical, as it
19  relates to the retirement commission?
20    A.  The retirement application requires that
21  any medical evidence within the last five years of
22  whatever the incident or injury be received and
23  reviewed.
24    Q.  And do you know in Mr. Kelley's case

**Page 49**

1  whether or not there was a review of his entire
2  medical history including five years prior to his
3  injury suffered on May 25, 2003?
4     A. Yes. That would have been sent to
5  Mr. Sacco as well as being reviewed in the office by
6  myself.
7     Q. As far as you know, up until the time of
8  May 25, 2003, was Mr. Kelley going to work full-time?
9     A. As far as I know.
10    Q. Was he, as far as you knew, able to perform
11 the essential functions of the job of a police
12 officer for the Town of Plymouth up until his
13 incident of May 25, 2003?
14    A. As far as I know, yes.
15    Q. Any information you learned subsequent
16 that's not accurate?
17    A. No.
18    Q. So as far as you know and from the advice
19 of Counsel, this information, review of all the
20 medical evidence, indicated that Mr. Kelley up until
21 May 25, 2003, was able to perform his duties as a
22 police officer?
23    A. That's correct.
24    Q. Page 2 of Exhibit 3 where it says,

**Page 50**

1  "Conclusion and Vote," again, you based part of your
2  conclusion and vote on the opinion of Mr. Sacco's
3  legal opinion, correct?
4     A. Part.
5     Q. Right.
6     A. Yes, part.
7     Q. That's my question.
8     A. Yes.
9     Q. Also, as part of your findings here, "The
10 Board voted unanimously on September 5, 2003, to
11 apply Section 94 presumption and grant the accidental
12 disability application of Thomas Kelley;" is that
13 fair to say?
14    A. That's correct.
15    Q. Then it says, "However, this grant is
16 subject to review by Perac;" is that fair to say?
17    A. Yes.
18    Q. Once Perac approved, that's when you sent
19 the letter out, Exhibit 2?
20    A. Yes.
21    Q. Again, this is based upon a review of the
22 medical information you had of his injury suffered
23 May 25, 2003?
24    A. Yes.

**Page 51**

1     Q. And, as well as you said medical
2  information including his medical information five
3  years prior to May 25, 2003?
4     A. Yes.
5     Q. As well as the medical panel's reports?
6     A. Right.
7     Q. As well as the opinion of Mr. Sacco, all
8  taken in together, you voted together to grant this?
9     A. That's correct.
10    Q. Just for the record, Mr. Kelley, did he
11 participate in this vote?
12    A. No, he could not.
13    Q. Was there any discussion because Mr. Kelley
14 was a sitting board member about any conflict of
15 interest any of the board members may have had?
16    A. The Board Counsel was there, and, you know,
17 counseled the Board that Mr. Kelley could not
18 participate in any part of that decision process, so
19 he had to recuse himself.
20    Q. But at the same point, just bear with me on
21 this, was there any discussion about the Board itself
22 having served with a fellow board member now ruling
23 on Mr. Kelley's application, was there any discussion
24 about any potential conflict the Board might have?

**Page 52**

1     A. No, only that the Board wanted to make sure
2  that there would be -- that no one would be able to
3  make any kind of -- we had to do this so that there
4  would be no question.
5     Q. Did anyone express any concern, any
6  potential conflict, that the board members might have
7  in voting on a fellow board member's retirement
8  application?
9     A. Potential conflict, no.
10    Q. Did you ever hear Mr. Kelley complain about
11 other police officers or officials going after him or
12 out to get him?
13    A. Any other police officers?
14    Q. Right.
15    A. Other than the ones we have spoken of?
16    Q. Tell me what your recollection is about
17 Mr. Kelley saying --
18    A. Just as I say, going after him as far as
19 having to recoup, the Retirement Board having to pay
20 for the time that he served on the Board. That's the
21 one time, the one that stands out in my memory.
22    Q. How long were these meetings, by the way?
23    A. They went all different times.
24    Q. Give me the range.

(Pages 49 to 52)

DUNN & GOUDREAU

Page 53

1    A.  They could go to one hour to three hours,
2  it may be more, depending upon what the Board was
3  taking up.
4    Q.  This would be during the day, at night,
5  different times?
6    A.  The Board normally would meet during the
7  day.
8    Q.  And you're aware Mr. Kelley's shift was
9  during the day?
10    A.  I'm aware that Mr. Kelley's shift was
11  during the day.
12    Q.  That was why this whole issue of
13  reimbursement came up, fair to say, as far as you
14  know?
15    A.  In his particular case, yes.
16    Q.  How often did you meet -- I know you told
17  us roughly the time frame, but how much did the Board
18  meet?
19    A.  Well, the Board has to meet by law once a
20  month.  Occasionally once a quarter the Board might
21  have an additional meeting for investments.
22    Q.  Where would those meetings take place?
23    A.  At Town Hall.
24    Q.  Always at Town Hall?

Page 54

1    A.  Normally all at Town Hall.
2    Q.  Was there any other location you met?
3    A.  There might be a different location.  If we
4  were doing investments, we might have come into the
5  consultant's office.
6    Q.  When you say the "consultant's office,"
7  who's the consultant?
8    A.  Kevin Leonard of Segal Advisors.
9    Q.  Where are they?
10    A.  Over on Huntington Avenue in Boston.
11    Q.  Anywhere else you would meet?
12    A.  No.
13    Q.  Did you ever meet on Mr. Kelley's boat?
14    A.  No.
15    Q.  Did you ever hear of any complaints from
16  any of Mr. Kelley's supervisors as to his work as a
17  police officer?
18    A.  No.
19    Q.  Did you, yourself, have any issues with
20  Mr. Kelley's work as a Retirement Board member?
21    A.  No.
22    Q.  Do you, yourself, know Chief Pomeroy,
23  Captain Botieri?
24    A.  I know who they are.

Page 55

1    Q.  What is your relationship with either one
2  of them?
3    A.  Professional.
4    Q.  Do you have any animosity toward Chief
5  Pomeroy or Captain Botieri?
6    A.  No.
7    Q.  And I may have asked you this before, but
8  I'm just trying to kind of close some of the loops.
9  Did Mr. Kelley himself ever tell you of any medical
10  condition he may have suffered from prior to May 25,
11  2003?
12    A.  Again, not that I know of, not that I
13  remember, time lines here.
14    Q.  Were you aware that the letter that we have
15  marked as an exhibit in this case would be attached
16  to Mr. Kelley's complaint filed against the Town of
17  Plymouth?
18    A.  No.
19    Q.  When did you learn that?
20    A.  That this letter here (indicating)?
21    Q.  Yes.
22    A.  Now.
23    Q.  First time you're hearing of it?
24    A.  That my letter is being used in this

Page 56

1  complaint, yes.
2    Q.  Never had any discussion with Mr. Kelley,
3  words to the effect, "I'm going to use your letter"?
4    A.  Not that I recall.
5    Q.  Okay.
6      MR. SILVERFINE:  I have nothing further at
7  this time.  Counsel?
8      MR. GALLITANO:  Just a couple of questions.
9      EXAMINATION
10  BY MR. GALLITANO:
11    Q.  Ms. Sullivan, we'll try and get you out of
12  here.  To clarify a couple of things, in your
13  testimony earlier, you said that you first met
14  Mr. Kelley when he came on the Board; is that
15  correct?
16    A.  That's correct.
17    Q.  And in your earlier testimony today, you
18  mentioned the year 1986; did you misspeak?
19    A.  Yes.  I wasn't working for the Town at that
20  time.
21    Q.  You meant 1996?
22    A.  Correct.
23    Q.  Just thought we would clear that up.  The
24  behavior of Peter Flynn, was his behavior you were

14 (Pages 53 to 56)

Page 57

1  describing to describe one he was being rude and
2  obnoxious?
3      A. Yes.
4      Q. Was he ever belligerent in his attitude
5  towards the Board?
6      A. Yes.
7      Q. Was he belligerent to the staff?
8      A. Yes.
9      Q. You say Mr. Kelley had a had a problem with
10  him. Was that Mr. Kelley was coming to the defense
11  of the staff members?
12      MR. SILVERFINE: Objection to the form.
13      A. Yes.
14      Q. If Mr. Kelley had a problem, did he express
15  what his problem was with Mr. Flynn?
16      A. That he shouldn't speak to the retirement
17  staff in that manner, that he had no right to talk to
18  us in that way.
19      Q. But other than that, did Mr. Kelley have
20  any other grievances with Mr. Flynn?
21      MR. SILVERFINE: Objection to the form.
22      A. I don't believe so.
23      Q. Do you know if Mr. Kelley and Mr. Flynn had
24  any contact prior to that?

Page 58

1      A. Not that I'm aware of.
2      Q. In your letter, which is Exhibit 1, I
3  believe, if I could direct your attention to the last
4  paragraph where it says, "It's been my experience
5  since 1991," and in that paragraph you make mention,
6  you refer to other board members, and you also
7  testified there were other board members who were
8  town employees; is that correct?
9      A. That's right.
10      Q. The other board members that were town
11  employees came from different departments; is that
12  correct?
13      A. That's right.
14      Q. Now, each department has its own budget?
15      A. That's right.
16      Q. But there is an annual budget for the
17  entire Town, correct?
18      A. Yes.
19      Q. So in a sense, the money that's in each of
20  these individual budgets derives from a total annual
21  budget?
22      A. I'm not aware as to how that whole thing
23  works together.
24      Q. Let's put it this way: The money that

Page 59

1  belongs to any particular budget of a town department
2  is still the Town's money; is it not?
3      A. Yes.
4      Q. So if we're charging back money from one
5  budget to another budget, it's still the Town's money
6  being shifted from one location to the other
7  location?
8      A. No, not in regards to the retirement
9  system. The retirement system is a separate entity
10  from the Town.
11      Q. But the other town employees, so if a town
12  employee, for instance -- you mentioned it was
13  Mr. Manfredi serves on the Board?
14      A. Yes.
15      Q. He's the building commissioner, correct?
16      A. Yes. Thank you.
17      Q. So the building commissioner works for the
18  building department?
19      A. Yes.
20      Q. Now, as a separate department, would that
21  have its own budget?
22      A. Yes.
23      Q. So did you ever receive a request from the
24  building department to have for reimbursement of

Page 60

1  Mr. Manfredi's time spent on the Board?
2      A. No.
3      Q. To Mr. Dello Russo you mentioned was the
4  exofficio member; is that correct?
5      A. That's correct.
6      Q. And he was, also, held another position in
7  the Town besides being on the Retirement Board?
8      A. That's correct.
9      Q. What was that again?
10      A. The finance director.
11      Q. As finance director he came out of the
12  finance department; isn't that so?
13      A. Yes.
14      Q. Did you ever receive any request from the
15  finance department for a charge back to cover his
16  time on the Board?
17      A. No.
18      Q. So in your experience, the only time --
19  strike that.
20      In your experience, was there any
21  other occasion when any member who happened to be a
22  town employee serving on the Retirement Board had to
23  have his time charged back from his department to be
24  reimbursed?

15  (Pages 57 to 60)

Page 61

1    A. Not during my tenure, no.
2    Q. That would be from 1991 to present,
3  correct?
4    A. That's right.
5    Q. You mentioned you had heard of some
6  disturbance or some argument between Mr. Kelley and
7  Officer Botieri; is that correct?
8    A. That's right.
9    Q. Were you there?
10   A. No, I wasn't.
11   Q. So you didn't witness anything?
12   A. No.
13   Q. So you have no firsthand knowledge of what
14 occurred or who said what to anyone?
15   A. No.
16   Q. The matter of the 111F benefits, have you
17 handled those types of situations before, where
18 someone is injured on-duty and does not receive 111F
19 benefits? You had said in your previous testimony
20 until it's actually ruled by -- that he's been
21 retired based on an injury on duty; is that correct?
22   A. Presumption cases specifically.
23   Q. Were there two rulings in Mr. Kelley's
24 case?

Page 62

1    A. Two rulings?
2    Q. Yes, one on the presumption and one as to
3  actual injury on-duty?
4    A. No -- well, I'm not sure. It was voted
5  that he retired under Section 7 under the presumption
6  law.
7    Q. Let me try and refresh your recollection.
8  Would you refer to Exhibit 3, second page, last
9  paragraph, "Conclusion and Vote" and where it says,
10 "The Board also concluded that Kelley's permanent
11 inability to perform the essential duties and
12 positions the proximal result of the personal injury
13 he sustained May 25, 2003, while in performance of
14 his duties."
15   A. Yes. And that is, also, based on the
16 medical panel, that the doctors, the physicians, have
17 determined.
18   Q. Further up in the beginning of the
19 paragraph when you mentioned, second line,
20 accompanying the narrative report and medical
21 records, "The opinion of legal counsel and provisions
22 of Mass. General Laws Chapter 32, Sections VI and
23 VII," isn't that the injury on-duty sections?
24   A. No. VI and VII -- VII is the accidental

Page 63

1  disability?
2    Q. Right.
3    A. VI, I think, is an ordinary disability and
4  94 is the presumption.
5    Q. But what I'm saying is --
6    A. Okay, I'm sorry.
7    Q. What I'm trying to ascertain is, that in
8  submission of his application and also the ruling by
9  the medical panel, did they not, in fact, rule that
10 it was an injury on-duty that caused his retirement?
11   A. Yes.
12   Q. And in addition, the presumption law was
13 also applied?
14   A. Yes.
15      MR. GALLITANO: No further questions.
16      MR. SACCO: I want to clarify a couple of
17 points to make sure it's clear for the record.
18         EXAMINATION
19 BY MR. SACCO:
20   Q. Ms. Sullivan, when you were hired in 1991
21 and you testified that -- I think Exhibit 2 indicates
22 Mr. Kelley coming on the Board in December 1996, so
23 when you were hired by the Board, Mr. Kelley was not
24 on the Board at that time you were hired; is that

Page 64

1  correct?
2    A. That's correct.
3    Q. In terms of, and I think Mr. Gallitano
4  approached this, in your experience as Board
5  Director, how many individuals do you think you have
6  retired under the presumption, just a ballpark; could
7  you hazard a guess?
8    A. In my time, oh, 35, maybe.
9    Q. Of those approximate 35, are you aware of
10 any other individual who once they retired under the
11 presumption was not granted 111F benefits?
12   A. I'm not aware of any.
13      MR. SACCO: Thank you.
14      MR. SILVERFINE: I have no further
15 questions. Thank you.
16      (Whereupon, the deposition
17       was concluded at 12:40 p.m.)
18
19
20
21
22
23
24

16 (Pages 61 to 64)

Page 65

1   PLEASE ATTACH TO THE DEPOSITION OF DEBRA J. SULLIVAN

2   CASE: THOMAS KELLEY vs. TOWN OF PLYMOUTH, et al.

3   DATE TAKEN: June 9, 2006

4

5          ERRATA SHEET

6   PAGE LINE    CHANGE      REASON

7   ------------------------------------------------

8   ------------------------------------------------

9   ------------------------------------------------

10  ------------------------------------------------

11  ------------------------------------------------

12  ------------------------------------------------

13  ------------------------------------------------

14  ------------------------------------------------

15  ------------------------------------------------

16      I have read the foregoing transcript of my

17  deposition and except for any corrections or changes

18  noted above, I hereby subscribe to the transcript as

19  an accurate record of the statements made by me.

20      Executed this _____ day of _____, 2006.

21

22          _____

23          DEBRA J. SULLIVAN

24

Page 66

1          CERTIFICATE

2

3       I, Suzanne M. Hebert, a Professional Shorthand

4   Reporter and Notary Public in and for the

5   Commonwealth of Massachusetts, do hereby certify that

6   the foregoing is a true and accurate transcript of my

7   stenographic notes of the deposition of Debra J.

8   Sullivan, who was first duly sworn, taken at the

9   place and on the date hereinbefore set forth.

10      I further certify that I am neither attorney or

11  counsel for, nor related to or employed by any of the

12  parties to the action in which this deposition was

13  taken, and further that I am not a relative or

14  employee of any attorney or counsel employed in this

15  case, nor am I financially interested in this action.

16      THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT

17  DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY

18  MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR

19  DIRECTION OF THE CERTIFYING COURT REPORTER.

20  Signed and sealed this 26th day of June 2006

21

22  _____

23      Suzanne M. Hebert

24

17 (Pages 65 to 66)

# EXHIBIT 10

Case 1:05-cv-10596-MBB    Document 37-12    Filed 10/30/2006    Page 2 of 3
Board quick to dismiss '04 charge against chair - The Boston Globe

Page 1 of 2

boston.com

THIS STORY HAS BEEN FORMATTED FOR EASY PRINTING

# Board quick to dismiss '04 charge against chair

The Boston Globe

By Matt Carroll, Globe Staff | November 13, 2005

When three Plymouth police officers last year accused Thomas M. Kelley, chairman of the Plymouth Retirement Board and a former police officer, of threatening them with the loss of their pensions, the state board that oversees retirement systems took notice.

The Public Employee Retirement Administration Commission directed the Plymouth system to investigate the allegations, saying they represented a serious charge.

Even before receiving the letter from the state commission, the board held a closed-door hearing, and cleared Kelley of any wrongdoing. However, it did not contact or interview any of the three officers who reported being threatened, prompting the commission's executive director to forward the case to the state's Ethics Commission last summer. Kelley recently declined to comment on the allegations, except to say the dispute is personal and revolves around events that led to a lawsuit over disability benefits that he filed early this year.

The accusation against Kelley — who retired from the Police Department on a disability pension in 2003, and joined the retirement board almost a decade ago — came from Captain Michael E. Botieri in a letter written to the board on May 26, 2004.

Botieri reported that he had been confronted by Kelley at a police function a few days earlier, on May 22. Kelley was upset with him for signing the nomination papers for a woman who, like Kelley, was running for a seat on the retirement board, Botieri's letter stated.

The captain wrote that Kelley grabbed his arm and told him, "I hope you never have a heart attack and come before the retirement board." Botieri wrote the board: "I took Kelley's threat very seriously."

Botieri also wrote that Kelley had made similar threats on other occasions against Detective Stephen Viella, who also signed the woman's nomination papers, and Sergeant Michael Pedell, who allegedly had admonished Kelley on the job in 2003.

Botieri had sent a copy of his complaint to the Public Employee Retirement Administration Commission, and its executive director, Joseph E. Connarton, wrote to the Plymouth board on June 4, 2004, to urge it to investigate. If the charges are true, he wrote, it could have an "actual or perceived impact on the ability of the Plymouth Retirement Board to act fairly . . ."

On May 27, the day after receiving Botieri's letter, the board met in executive session, and considered letters from two people besides Botieri, according to board minutes. Officer Robert Hicks said there had been a verbal confrontation, but nothing physical, between Kelley and Botieri at the gathering. And Dale Webber, chairman of the town's Insurance Advisory Committee, denied Kelley had made a derogatory remark about the woman running for the board, as Botieri had asserted.

According to the minutes, Kelley said Botieri had been the aggressor when they met at the police function, and attempted to strike him before being restrained. Kelley also discounted the accusations about the other officers, saying he had only a brief exchange with Viella and he was never admonished by Pedell.

Kelley further suggested that Botieri made the accusation as a way to get revenge for the board's dismissal of an involuntary retirement application filed by another officer.

The board accepted Kelley's explanation. In a July 28, 2004, letter to Connarton, the board said that it found the allegations to be "without merit."

Board quick to dismiss '04 charge against chair - The Boston Globe

The letter noted that "since none of Captain Botieri's allegations relating to comments made to him by third parties were corroborated by the named individuals, the board considers these claims to be hearsay . . ." The board also criticized Botieri for writing his letter on Plymouth Police Department stationery.

However, neither Botieri, Viella, Pedell, nor another officer cited as a witness to the Botieri incident were contacted by the board, the four officers said in interviews with the Globe. All said Botieri's letter accurately reflected what Kelley said to them. They declined further comment.

In August 2004, Connarton asked the state Ethics Commission to look into the board's handling of the allegations. More than a year later, the Ethics Commission will not say whether it has launched an investigation.

In March, Kelley filed a so-called whistleblower lawsuit in federal court against the town and Police Chief Robert J. Pomeroy, saying he unfairly had been denied reimbursement of $2,000 in vacation pay while out on disability, before his retirement. He said his claim was denied because of previous statements he had made to Town Meeting and the state's inspector general that the chief had been paid educational benefits improperly.

The chief denied taking the money improperly, and the bylaw was later amended by Town Meeting to clarify who was eligible for the benefits.

Matt Carroll can be reached at mcarroll@globe.com. ∎

© Copyright 2005 The New York Times Company