**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                                    )
**THOMAS M. KELLEY,**                      )
                                                    )
      **Plaintiff,**                       )
                                                    )
**v.**                                              )     **C.A. NO. 05-10596-NMG**
                                                    )
**TOWN OF PLYMOUTH, et al.,**          )
                                                    )
      **Defendants.**                    )
_____)

### OFFICE OF THE INSPECTOR GENERAL'S MOTION TO QUASH DEPOSITION SUBPOENA DUCES TECUM ADDRESSED TO THE KEEPER OF THE RECORDS OR, IN THE ALTERNATIVE, FOR A PROTECTIVE ORDER

Pursuant to Fed.R.Civ.P. 45(c)(3)(A) and Fed.R.Civ.P. 26(b)(1), the Office of the

Inspector General ("IG") respectfully moves to quash a subpoena duces tecum issued by the

defendants Town of Plymouth and Robert Pomeroy, Chief of the Plymouth Police Department

("Defendants"), to the Keeper of Records, which commanded the Keeper of the Records to

appear and testify on March 14, 2007, at 10:00 a.m., and to produce and permit inspection and

copying of certain documents ("Subpoena").[1]  See Subpoena, dated February 15, 2007, attached

as Exhibit ("Ex." A).

The Subpoena should be quashed on the grounds that the IG is prohibited from producing

documents under both federal and state law.  See Fed.R.Civ.P. 45(c)(2)(B); see also M.G.L. c.

66A, §§ 2(c), 2(k); M.G.L. 12A, § 13.  It should also be quashed because the discovery sought is

unduly burdensome in that it is not relevant to Defendants' case and is otherwise available.  In

the alternative, the IG seeks a protective order to either (1) modify the Subpoena; or (2) allow the

_____

[1]The subpoena allows for the production of documents in lieu of testimony.

IG to provide an affidavit[2] in lieu of complying with the Subpoena.

## FACTUAL AND PROCEDURAL BACKGROUND

1.    Kelley Files a Complaint Against Plymouth

On March 9, 2005, the plaintiff Thomas Kelley ("Kelley") filed a verified complaint in Plymouth Superior Court, which was removed by Defendants to this Court on March 28, 2005 ("Complaint").  Kelley's allegations arise out of his employment with the Town of Plymouth Police Department (respectively "Plymouth" and the "Police Department").  Complaint at ¶ 5. Kelley alleges that Chief Robert Pomeroy ("Chief Pomeroy") ordered him to participate in a drill on May 25, 2003, despite Kelley's substantial record of physical impairment.  Complaint at ¶ 9. He also maintains that Chief Pomeroy refused union officials' request to establish a protocol to review members of the force who might not be able to participate in a drill for medical reasons. Complaint at ¶¶ 14-16.  After participating in the drill, Kelley suffered a heart attack and, later, went out on disability leave and retired.  Complaint at ¶ 17.

At the time of his retirement, Kelly sought reimbursement for vacation time that he had to use for sick leave.  See id.  Chief Pomeroy and later the Personnel Board for Plymouth denied this request.  Complaint at ¶¶ 18-19.  Kelley asserts that the reasons for the denial included, among other things, that he reported to the IG that Chief Pomeroy had used Police Department funds to reimburse himself for benefits that were not included as part of his income as it was represented in the budget of the Police Department.  Complaint at ¶¶ 21-22.  Kelley also alleges that the IG:

---

[2]This affidavit was the subject of  a joint motion by the IG and the plaintiff Thomas Kelley that was granted by this Court on June 5, 2007.

investigated the matter and reported to [Plymouth] that the manner in which Pomeroy was compensating himself for educational benefits without declaring it under the line item budget area for compensation to him for income and without authorization per a by-law [sic] or written agreement with [Plymouth] was inappropriate and in violation of state law, and required [Plymouth] Town Meeting action to correct the situation.

Complaint at ¶ 22. Kelley argues, among other things, that Chief Pomeroy's refusal (1) to establish a protocol and (2) to pay for his vacation time, were retaliatory in violation of the Commonwealth of Massachusetts' Whistle Blower Statute, M.G. L. c. 149, § 185. Complaint at Count I. This statute also explicitly provides that a whistle blower must provide his employer with written notice before making any disclosure to a public body. M.G. L. c. 149, § 185(c)(1)

    2.   <u>Subpoena</u>

On February 7, 2007, the IG and Kelley filed a Joint Motion for the Court to Order the Inspector General to Produce an Affidavit and to Issue a Protective Order ("Joint Motion"). <u>See</u> Docket Number 49. Among other things, they asked the Court to order the IG to produce an affidavit, describing Kelley's complaint to the IG and the IG's investigation of that complaint ("Affidavit"). On February 12, 2007, the Defendants opposed that motion. On February 22, 2007, the IG sought leave to file a reply, which the Court granted. On June 5, 2007, this Court granted that motion. At the Court's invitation, the IG will provide draft orders for the Court's consideration.

On or about March 1, 2007, the IG received the Subpoena at issue. <u>See</u> Subpoena. The parties' counsel agreed to stay the execution of and allowed the IG additional time to respond to the Subpoena pending their efforts to reach a resolution  Having been unable to reach an agreement, however, the IG now moves to quash this Subpoena or, in the alternative, to seek a protective order to either (1) modify the Subpoena; or (2) allow the IG to provide the Affidavit

referenced in the Joint Motion in lieu of complying with the Subpoena.

## **ARGUMENT**

I.    IG OFFICIALS WOULD VIOLATE FEDERAL AND STATE LAW BY
PROVIDING DOCUMENTS AND TESTIMONY REGARDING KELLEY'S
COMPLAINT AND THE INSPECTOR GENERAL'S INVESTIGATION OF
THAT COMPLAINT.

As a preliminary matter, the IG respectfully asks this Court to quash the Subpoena

because the production of documents or testimony regarding those documents would violate

federal and state laws.  First, the Commonwealth's Fair Information Practices Act ("FIPA"),

M.G.L. c. 66A, §§ 2(c), 2(k), prohibits the IG from turning over documents to the extent that the

documents contain "personal data," even in response to compulsory legal process, without the

consent of the data subject(s) or an appropriate judicial order.  See M.G.L. c. 66A, §§ 2(c), 2(k).

Second, the IG maintains that certain responsive documents are privileged based upon its

governing statute and federal common law.  See Fed.R.Civ.P. 45(d)(2).

A.    Requirements of FIPA

The documents reviewed by the IG and sought pursuant to the Subpoena contain personal

information about individuals other than Kelley.  Because the information sought by the

Subpoena may be "readily associated" with particular individuals it therefore constitutes

"personal data" within the meaning of FIPA.  See M.G.L. c. 66A, § 1 (defining "personal data"

as "any information concerning an individual which, because of name, identifying number, mark

or description can be readily associated with a particular individual; provided, however, that

such information is not contained in a public record, as defined in M.G.L. c. 4, § 7 clause

twenty-sixth and shall not include intelligence information, evaluative, or criminal offender

record information, as defined in 940 C.M.R. 11.02.").  The IG, as a holder of "personal data,"

may not disclose that data to a third party without the consent of the data subject(s) or an appropriate judicial order.  See M.G.L. c. 66A, § 2(c); Allen v. Holyoke Hospital, 398 Mass. 372, 379 (1986).  A data subject may also seek monetary damages.  See Torres v. Attorney General, 391 Mass. 1, 4-5 (1984); Tivnan v. Registrar of Motor Vehicles, 50 Mass. App. Ct. 96, 100 (2000); M.G.L. c. 258.  Moreover, in this case, consent of the data subjects would be potentially difficult to obtain because the data subjects may or may not currently be employed or represented by Defendants.  Even assuming that the data subjects were able to be notified, FIPA also requires the consent of data subjects, not merely notification.  See M.G.L. c. 66A, § 2(c).  If the data subjects do not respond to notification, an appropriate judicial order would still be required.

### B.    Privileges

Federal Rule of Civil Procedure 45 provides a basis for asserting that privileged matters are protected from discovery.  See Fed.R.Civ.P. 45(d)(2); see also Fed.R.Civ.P. 26(b)(1) (providing in relevant part that "[p]arties may obtain discovery regarding any matter, not privileged . . . .") (emphasis added.)  The United States Supreme Court has held that a privilege may be created by statute.  See Baldridge v. Shapiro, 455 U.S. 345, 360 (1982) (holding that "[i]t is well recognized that a privilege may be created by statute.")  Moreover, federal courts have recognized that when deference to a privilege arising from a state statue is possible, at little or no cost to federal interests, that privilege should be recognized.  See Northwestern Memorial Hosp. v. Ashcroft, 362 F.3d 923 (7th Cir. 2004) ("[C]omity impels federal courts to recognize state privileges where this can be accomplished at no substantial cost to federal substantive and procedural policy.") (internal quotations omitted); In re: Production of Records to a Grand Jury,

618 F. Supp. 440, 442 (D. Mass. 1985) (to same effect).

Here, the IG respectfully asks the Court to defer to a privilege created by an IG governing statute. Under M.G.L 12A, § 13, the IG is prevented from disclosing internal documents or testifying regarding these documents because "[a]ll records . . . shall be confidential." See M.G.L. 12A, § 13 (emphasis added.) This statute also reflects the intent of the Ward Commission, which recommended that the IG be established for the purpose of investigating government fraud and corruption. See Volume 8 Final Report to the General Court of the Special Commission Concerning State and County Buildings, dated December 31, 1980 ("Ward Commission Report"), attached as Ex. B., at 86. The Ward Commission anticipated that the IG could only fulfill its investigative function if people who cooperated "are protected against unjust publicity and other violations of privacy by a mandate that the internal proceedings . . . be kept confidential." Id. at 91. The IG's governing law and the Ward Commission Report, preclude the IG from producing confidential documents or testifying about those documents.

Finally, the IG also seeks to protect its internal documents based upon the qualified federal common law privileges for investigatory information; see, e.g., United States v. Lilly, 185 F.R.D. 113, 115 (D. Mass. 1999); and deliberative processes; see, e.g., Texaco Puerto Rico, Inc. v. Dep't of Consumer Affairs, 60 F. 3d 867 (1st Cir. 1995). Here, while the IG's investigation of this matter has concluded, the IG's ability to conduct future investigations would be threatened if it were compelled to produce documents or testify in regard to the contents of those documents. The IG could no longer assure the people who brought information to or cooperated with the IG that its investigations would remain confidential. Ultimately, the IG

would be impeded in its ability to identify government fraud and corruption.  The IG is acting in the public interest, which, upon balance, is more important than the interest of a private litigant in discovery, especially when, as discussed further below, there is no new information and there are other sources of information that more readily are available.  See Lilly, 185 F.R.D. at 115 (relying on Kattar v. Doe, Civ. A. No. 86-2206-MC, 1987 WL 11146, at *1 (D. Mass. Jan. 27, 1987) (providing that "the Court must balance the public interest in nondisclosure against the need of the particular litigant for access to the privileged information.")

In sum, the IG's internal documents are protected by both federal and state law.  The IG therefore asks this Court to quash the production of documents and testimony regarding Kelley's complaint to the IG and the IG's investigation of that complaint.

## II.    THIS COURT SHOULD QUASH THE SUBPOENA AS IT PLACES AN UNREASONABLE BURDEN UPON THE IG.

### A.    Requiring the IG to Comply With the Subpoena Would Be Unduly Burdensome Given that the Information Sought Is Not Relevant and Otherwise Available.

Under Federal Rule of Civil Procedure 26, a party may obtain discovery only as to matters that are "relevant to the subject matter involved in the pending action."  Fed.R.Civ.P. 26(b)(1).  In addition, the information sought must not be otherwise available.  See Fed.R.Civ.P. 26(b)(2).  The Subpoena should be quashed because any information that Defendants arguably seek to discover is not relevant to the subject matter of the pending action, is otherwise available, and is not reasonably calculated to lead to the discovery of admissible evidence.  See Fed.R.Civ.P. 26(b)(1).

In the Subpoena, Defendants do not specifically describe the subject matter of the deposition of the Keeper of the Records, except to the extent that the Keeper of the Records

would need to testify as to his or her knowledge of the responsive documents. <u>See</u> Subpoena. To the extent that the subject matter of these depositions can be gleaned from the document portion of the Subpoena, Defendants seek discovery relating to a broad range of issues:

> 1.    Any and all documents including but not limited to reports, emails, correspondence relating to a meeting between Thomas Kelley and the [IG] on or about January 24, 2001 and any subsequent investigation.

<u>See</u> Attachments to Subpoena.

In Count I, Kelley alleges that Chief Pomeroy and Plymouth took retaliatory action against him because he acted as a whistle-blower pursuant to M.G.L. c. 149, § 185. Complaint at Count I. In light of that allegation, Defendants may argue that the production of documents and testimony about Kelley's complaint and the IG's investigation, is relevant to verify Kelley's assertion that he was a whistle blower. Defendants may also argue that documents regarding Kelley's complaint to the IG's office may differ from the allegations contained in Kelley's pending Complaint before this Court or provides new information that cannot be obtained elsewhere. That is to say, Defendants may argue that this information is necessary to attack Kelley's credibility.

The IG, however, does not have any new information that is necessary to Defendants' case. The Court has granted the Joint Motion, which asked the Court to order the IG to provide the Affidavit. <u>See</u> 945 C.M.R. § 1:04(3)(e). The IG's Affidavit acknowledges the (1) receipt of a complaint from Kelley; (2) investigation of the allegations including an interview with a former town official; and (3) conclusion that there was no criminal violation. The IG's Affidavit supports Kelley's assertion that he complained to the IG. Kelley's description of his complaint to the IG in the Complaint before this Court, however, does not materially differ from the IG's

-8-

description of Kelley's complaint in the Affidavit. Thus, there is no new information regarding

Kelley's complaint to the IG. In addition to the IG's Affidavit, Defendants can also obtain

information regarding Kelley's complaint to the IG's office from his sworn testimony and/or an

affidavit by Kelley himself.

In addition, the IG does not have any new information that addresses the issue of whether

Defendants took retaliatory action against Kelley for acting as a whistle-blower. See M.G.L. c.

149, § 185. Implicit in Kelley's allegation that Defendants took retaliatory action against him is

the assumption that Defendants had knowledge of Kelley's complaint to the IG. The IG's

Affidavit states, however, that the IG interviewed a former town official.[3] Defendants therefore

would not obtain any new information regarding how Defendants became aware of Kelley's

complaint to the IG. See Church of Scientology of Boston v. IRS, 138 F.R.D. 9 (D. Mass. 1990)

(prohibiting the deposition of an agency official because plaintiff failed to demonstrate that the

information was not otherwise available.) Moreover, under M.G.L. c. 149, § 185, Kelley was

required to provide written notice to the Plymouth Police Department before complaining to the

IG's office. Any additional information about how Defendants were notified of Kelley's

complaint to the IG is irrelevant if Kelley failed to provide written notice to Defendants before

complaining to the IG and if Kelley does not satisfy any of the statutory exceptions for the

written notice requirement. See Dirrane v. Brookline Police Dept., 315 F.3d 65, 72 (1st Cir.

2002) (determining that "the statute is unqualified in its requirement" to give written notice to an

---

[3]Plymouth officials can also provide sworn testimony and/or affidavit regarding whether
then-current Plymouth officials communicated with the IG. Again, the information regarding
any discussions between the IG and Plymouth is otherwise available. See Church of Scientology
of Boston, 138 F.R.D. 9.

employer before complaining to an outside body); M.G.L. c. 149, § 185(c)(2).

      B.    The Deposition of the Keeper of the Records Is Unduly Burdensome As Any Information He Might Provide Is Not Relevant and Otherwise Available.

In order to be entitled to take the deposition of an administrative decision-maker, the party seeking the deposition must make a "clear showing" that the deposition is "essential to prevent prejudice or injustice," Wirtz v. Local 30, International Union of Operating Engineers, 34 F.R.D. 13, 14 (S.D.N.Y. 1963), and that the deposition "would not significantly interfere with the ability of the official to carry out his governmental responsibilities." Martin v. Valley National Bank of Arizona, 140 F.R.D. 291, 314 (S.D.N.Y. 1991). Courts have quashed depositions of high-ranking government officials. See, e.g., Church of Scientology, 138 F.R.D. at 13 (motion to quash deposition subpoena of high-ranking Internal Revenue Service official allowed); Gomez, 126 F.R.D. at 436 (motion to quash subpoena of Assistant Attorney General allowed); Alex v. Jasper Wyman & Son, 115 F.R.D. 156, 159 (D. Me. 1986) (quashing deposition subpoenas of Department of Labor officials); Sykes v. Brown, 90 F.R.D. 79 (E.D. Pa 1981) (deposition subpoena of head of Defense Personnel Support Center quashed).

The policy underlying these requirements is that "the time and energies of public officials [should] be conserved for the public's business to as great an extent as may be consistent with the ends of justice in particular cases . . . [F]ailure to place reasonable limits upon private litigants' access to responsible governmental officials as sources of routine pretrial discovery would result in a severe disruption of the government's primary function." Gomez v. City of Nashua, 126 F.R.D. 432, 434 (D.N.H. 1989) (citation omitted). This is especially true where, as is the case here, when the governmental agency is not a party to the suit. See Reynolds Metals

-10-

Co. v. Crowther, 572 F. Supp. 288, 290 (D. Mass. 1982) ("The policy behind prohibition of testimony is to conserve governmental resources where the [government] is not a party to a suit, and to minimize governmental involvement in controversial matters unrelated to official business.")  Drains on an administrative agency official's time and resources caused by responding to private discovery can be sufficient reasons to quash deposition subpoenas.  See, e.g., Gomez, 126 F.R.D. at 434.

For the reasons discussed above, the testimony of the IG's Keeper of the Records, has no legal relevance to the discrete legal issues concerning Kelley's complaint to the IG and the IG's investigation.  See Massachusetts Federation of Teachers, AFT, AFL-CIO v. Board of Education, 436 Mass. 763, 776-77 n. 13 (2002) (providing, in relevant part, "[w]here statutory language clearly authorizes actions taken by an agency, the actions are wholly lawful, and we need not look behind them to determine the agency's motives" and declining to permit discovery on whether Governor or other officials influenced agency's decisions).  The Subpoena accordingly should be quashed.  See e.g., Sykes, 90 F.R.D. 77 (granting protective order against deposition of agency official where plaintiff had not demonstrated that the official's subjective impressions were relevant).  Defendants make no allegations that even remotely suggest that the IG's receipt of Kelley's complaint and investigation were tainted by improper motives.  See Baker v. Coxe, 52 F. Supp. 2d 244, 249 n. 5 (1999) (precluding depositions of agency officials where there were no allegation that they were improperly motivated.).   In addition, Defendants should not be permitted to use discovery as a "fishing expedition" when the information regarding Kelley's allegations is otherwise available.  Finally, the IG respectfully asks this Court to weigh the public interest in favor of quashing the Subpoena especially since the IG is not a

-11-

party to this litigation.

      C.     Requiring the Keeper of the Record's Deposition Would Also Violate State Laws Requiring Confidentiality of the IG's Proceedings.

As discussed above, the IG depends upon its ability to maintain the confidentiality of its internal proceedings.  In particular, the Legislative purpose underlying the creation of IG was "to create an apolitical, professional investigative body to support effective prosecution of fraud and corruption [in government] by the full array of forces at the public's disposal."  See Ward Commission Report at 91.  Given the importance of its role in investigating government fraud and corruption, the confidentiality of the IG's internal proceedings is paramount.  See M.G.L. 12A, § 13; Ward Commission Report at 91.  As noted above, the IG can realize its investigative mission only if it can assure people who cooperate that its internal proceedings are confidential.  See Ward Commission Report at 91.  Thus, this Court should protect the Keeper of the Records from providing testimony -- or producing documents -- especially when the information about Kelley's complaint and the IG's investigation of that complaint is irrelevant to the subject matter of the proceedings and can be obtained elsewhere.  Given the importance to the public that the IG continue to be able to investigate governmental fraud and corruption in a confidential manner, the balance here weighs in favor of quashing the Subpoena.

## CONCLUSION

For the foregoing reasons, the IG respectfully requests that this Court quash the Subpoena directed to the IG.  In the alternative, the IG seeks a protective order to either (1) to modify the Subpoena; or (2) allow the IG to provide the Affidavit referenced in the Joint Motion in lieu of complying with the Subpoena.

Respectfully submitted,

OFFICE OF THE
INSPECTOR GENERAL,

By its counsel,

MARTHA COAKLEY
ATTORNEY GENERAL


/s/Christine A.Baily
Christine A. Baily, BBO #643759
Assistant Attorney General
Government Bureau
One Ashburton Place, Room 2019
Boston, Massachusetts 02108
(617) 727-2200, extension 2617

June 14, 2007

CERTIFICATION PURSUANT TO LOCAL RULE 7.1

Pursuant to Local Rule 7.1(a)(2), I hereby certify that I have conferred with Attorney Jeremy Silverfine, counsel to Defendants, on multiple occasions, in and attempt to reach a resolution regarding the Subpoena referenced in this motion.

/s/Christine A.Baily
Christine A. Baily, BBO #643759
Assistant Attorney General

June 14, 2007

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 05 10596 NMG

THOMAS KELLEY,                          )
    Plaintiff,                          )
                                   )

VS.                                     )
                                     )

TOWN OF PLYMOUTH and                    )
ROBERT J. POMEROY, as Chief of the      )
Plymouth Police Department and          )
Individually,                          )
    Defendants.                          )

## DEPOSITION SUBPOENA DUCES TECUM

TO:   Keeper of Records
       Office of the Inspector General
       Greg Sullivan
       One Ashburton Place, Room 1311, 13th Floor
       Boston, MA 02108

### GREETINGS:

YOU ARE HEREBY COMMANDED in the name of the Commonwealth of Massachusetts in accordance with the provisions of Rule 30 and 45 of the Federal Rules of Civil Procedure, to appear and testify on behalf of the defendants, before a Notary Public of the Commonwealth of Massachusetts, on March 14, 2007, at 10:00 A.M., at the office of Jeremy Silverfine, BRODY, HARDOON, PERKINS & KESTEN, LLP, One Exeter Plaza, Boston, Massachusetts, and to testify as to your knowledge, at the taking of the deposition in the above-entitled action. You are requested to bring with you the documents on the attached Schedule "A."

The requested records are to be used for the purposes of litigation. The foregoing counsel hereby certifies that the attached notice has been mailed this day to all counsel of record.

*   In lieu of appearing, we will accept certified copies of all documents requested in Schedule "A". If you have an objection to the documents requested or cannot provide this office with a complete copy of the documents, the deposition may be necessary.

*   If you have any questions, please contact Attorney Jeremy I. Silverfine upon receipt of this subpoena (617) 880-7100.

Hereof fail not as you will answer your default under the pains and penalties in the law in that behalf made and provided.

Attorney for Defendants
Jeremy I. Silverfine, BBO #542779
Brody, Hardoon, Perkins & Kesten, LLP
One Exeter Plaza
Boston, MA  02116

DATED:   2-15-07

Notary Public:
My Commission Expires

JANET E. CARUSI
Notary Public
Commonwealth of Massachusetts
My Comm. Expires May 4, 2012

Office of the Inspector General

## SCHEDULE "A"

1.  Any and all documents including but not limited to reports, emails, correspondence relating to a meeting between Thomas Kelley and the Inspector General's Office on or about January 24, 2001 and any subsequent investigation.

2.  An affidavit to certify that the attached records are a true and complete copy of the records concerning Thomas M. Kelley kept in the normal course of business. Said Affidavit should be signed under the pains and penalties of perjury by the Keeper of the Records.

Date of Service: **02/16/2007**

## RETURN OF SERVICE

**KEEPER OF RECORDS**
I this day summoned the within named **INSPECTOR GENERAL'S OFFICE, GREG SULLIVAN** to appear as within directed by delivering to **MARYBETH FARRELLY, CFO** in hand, to wit; No. **ONE ASHBURTON PLACE #1311** in the **SUFFOLK** District of said **BOSTON** an attested copy of the subpoena together with the **$0.00** fees for attendance and travel.

Service and Travel    **$28.00**

Pd Witness    **$0.00**
-----------------------------------------------------------
Total    **$28.00**

NOTES/COMMENTS:

SIGNATURE    *Kyle Caruse*

Process Server & Disinterested Person

DB37298-KC    0000226394

*EXHIBIT B*

Case 1:05-cv-10596-MBB   Document 62-3   Filed 06/14/2007   Page 2 of 3
Case 1:05-cv-1059(   MG   Document 28-2   Filed 09/2   006   Page 14 of 15
- 86 -
Vard Comm'n Report

DETECTING AND PREVENTING FRAUD

THE OFFICE OF INSPECTOR GENERAL

### Introduction

This section discusses the need to prevent and detect fraud, waste and abuse
in the expenditure of tax dollars. When the Commission began its investigation
there was no existing state agency which had or wished to perform that function.
Both the State Auditor and Comptroller have supported the establishment of a
quasi-criminal investigative unit which will identify those instances of fraud
which are presently undetected. Both officials decline to recommend that this
function be included within their agencies. The functions of prevention and
program review are not within the traditional roles of prosecutors on the state
or local level. It is to fill this function that the Office of Inspector General
has been established.

### Problems In Detection & Prevention

The Commonwealth was unable to conduct systematic comprehensive
investigations to determine the presence of fraud or abuse in a particular
project or program. There was neither the staff nor resources nor the authority
available to acquire all the necessary pieces of information and based on these
make the type of analysis that will reveal any evidence of fraud. Similarly,
those programs and procedures vulnerable to fraud were not analyzed from this
perspective. As a result, the state could never be sure of what it was paying
for. Fraudulent or abusive practices could flourish unchecked, increasing the
cost to the state for every public program.

A significant amount of fraud and illegal activities involve vendors and
those having contracts with the Commonwealth, and can only be detected through an
investigation which includes a thorough review of the books and records of those
doing business with the Commonwealth. In the area of construction, there is
fraud in the form of collusion between architects and suppliers, or between
architects and contractors; fraud in the form of materials used which do not
genuinely meet the standards set by contract specifications.

Limitations on the Role of State Auditor: The State Auditor was the
principal office in the Commonwealth responsible for an ongoing review of how the
state spends its money. The Commission has no reason to question the quality of
the State Auditor's work in this area; in fact, a great deal of the Commission's
basic information was gathered from the detailed reports of the state auditors

- 91 -

establishment, to recommend corrective action concerning such problems, abuses, and deficiencies, and to report on the progress made in implementing such corrective action.

### Recommendations & Legislation

The Commission has made every effort in drafting the legislation establishing the Office of Inspector-General to assure that the office will be independent and professional, that the Inspector General will cooperate closely with existing agencies, and that the Inspector General will not duplicate or infringe upon the work of existing agencies. The Office of Inspector General should result in lower program costs to state government through the deterrence of fraudulent conduct, the correction of wasteful management practices, and the collection of monies fraudulently lost to the Commonwealth. This will also mean a fairer and more hospitable climate for the many honest firms who wish to do business with the state.

In general terms, the act passed by the legislature provides for the establishment of an Office of Inspector General with the authority and responsibility for detecting and preventing "fraud and abuse in the expenditure of public funds" by certain departments, agencies or officers or employees of the Commonwealth. The Inspector General is given power to inspect books and accounts and other documents necessary to the performance of his functions, and would be authorized to use legal process when voluntary cooperation was withheld or when he believed that legal process would be necessary to obtain evidence before it was lost, destroyed or otherwise became unavailable. He would also be authorized to refer matters to the appropriate state law enforcement officers for prosecution of criminal offenses and to institute civil actions with the permission of the Attorney General. Public officials, business firms and individuals are protected against unjust publicity or other violations of privacy by a mandate that the internal proceedings in the Office of Inspector General be kept confidential.

The structure and powers of the Office of Inspector General were carefully crafted by this Commission to create an apolitical, professional investigative body to support effective prosecution of fraud and corruption by the full array of forces at the public's disposal. The legislature saw fit to establish this office only after 1) exempting themselves from investigation by the new Office, 2) injecting political partisanship into the Offices's controlling Inspector General Council, and 3) denying federal prosecutors access to the Inspector General's investigative findings.