# EXHIBIT 1

PLYMOUTH, ss.

SUPERIOR COURT DEPARTMENT OF THE
TRIAL COURT OF THE COMMONWEALTH
CIVIL ACTION NO. 05-0278B

Thomas M. Kelley ......................................, Plaintiff(s)

vs.

TOwn of Plymouth & Robert J. Pomeroy as
Chief of Police & Individually.................., Defendant(s)

## SUMMONS

To the above-named defendant:  Robert J. Pomeroy, Individually, Plymouth Police
Dept. 20 Long Pond Rd,, Plymouth

You are hereby summoned and required to serve upon Joseph R. Gallitano, Plaintiff's
attorney, whose address is 34 Main St. Ext. Plymouth MA 02360 answer to the complaint
which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day
of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the
complaint. You are also required to file your answer to the complaint in the office of the Clerk of this court at
Plymouth either before service upon plaintiff attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which
you may have against the plaintiff which arises out of the transaction or occurrence that is the subject
matter of the plaintiff claim or you will thereafter be barred from making such claim in any other action.

Witness, Barbara J. Rouse Esquire, at Plymouth the ...........9th.............................day of
...........March..................., in the year of our Lord Two thousand and ..five........ .

Framal R. Powers
CLERK

NOTES
1.   This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2.   When more than one defendant is involved, the names of all defendants should appear in the caption.
     If a separate summons is used for each defendant, each should be addressed to the particular
     defendant.
3.   To the plaintiff's attorney: please circle type of action involved-Tort-Motor Vehicle Tort-Contract-.
     Equitable Relief-Other.

## PROOF OF SERVICE OF PROCESS

I hereby certify and return that on ...................................., 2004, I served a copy of the within summons
together with a copy with a copy of the complaint in this action, upon the within-named defendant     , in the
following manner(See Mass. R. Civ. P. 4(d)(1-5)):...............................................................................
...............................................................................................................................

3/17/05
A TRUE COPY ATTEST

DEPUTY SHERIFF

Dated:                , 2004..............

N.B.   TO PROCESS SERVER:-
       PLEASE PLACE DATE YOU MAKE SERVICE  ON DEFENDANT IN THIS BOX ON THE ORIGINAL
AND ON COPY SERVED ON DEFENDANT.

|  |  | 2004 |
|---|---|---|

*eny must serve a copy of your written answer within 20 days as specified herein and also file the original in the Clerk's office at Plymouth.*

| CIVIL ACTION COVER SHEET | Trial Court of Massachusetts<br>SUPERIOR COURT DEPARTMENT<br>Plymouth _____ Division | DOCKET NUMBER<br>05-0278B |
|---|---|---|

| PLAINTIFF(S)<br>Thomas M. Kelley | DEFENDANT(S) Town of Plymouth and<br>Robert J. Pomeroy as Chief of the<br>Plymouth Police Dept. & Individually |
|---|---|
| ATTORNEY(S) FIRM NAME, ADDRESS AND TEL.)<br>Joseph R. Gallitano, Esq.<br>34 Main St. Ext., Suite 202<br>Plymouth MA 02360 (508) 746-1500<br>Board of Bar Overseers # (Required)  183700 | ATTORNEY(S) (if known)<br><br>FILED<br>COMMONWEALTH OF MASSACHUSETTS<br>SUPERIOR COURT DEPT. OF THE TRIAL COURT<br>PLYMOUTH COUNTY |

## ORIGIN CODE AND TRACK DESIGNATION

MAR 7 2005

Place an ☒ in one box only:

- ☒ 1. F01 Original Complaint
- ☐ 2. F02 Removal to Sup. Ct. c 231, s. 104 (F)
- ☐ 3. F03 Retransfer to Sup. Ct. c 231, s. 102C (X)

- ☐ 4. F04 District Ct. Appeal c231, s. 97 (X)
- ☐ 5. F05 Reactivated after rescript Relief from judgment/order (Mass. R. Civ. P. 60 (X)
- ☐ 6. E10 Summary process appeal (X)

## TYPE OF ACTION AND TRACK DESIGNATION (See Reverse Side)

| CODE NO.<br>B99 | TYPE OF ACTION (specify)<br>Tort-Gross Negligence | TRACK<br>(F) | IS THIS A JURY CASE?<br>☒ Yes   ☐ No |
|---|---|---|---|

### 1. PLEASE GIVE A CONCISE STATEMENT OF THE FACTS: (Required in ALL Types of Actions)

The Defendants are in violation of the State Whistle Blower Statute, M.G.L.
Ch. 149, Sec. 185. Gross negligence, willful, wanton and reckless conduct and
violation of Plaintiff's rights under the 14th amendment and under 42 USC
Sec. 1983 and denial of the Plaintiff's rights under M.G.L. Ch. 41 Sec. 111F.

### 2. IN A CONTRACT ACTION (CODE A) OR A TORT ACTION (CODE B) STATE, WITH PARTICULARITY, MONEY DAMAGES WHICH WOULD WARRANT A REASONABLE LIKELIHOOD THAT RECOVERY WOULD EXCEED $25,000:

Money damages include payment of all vacation time, loss of salary and
benefits for 16 years he would have served to his normal retirement in
the approximate amount of $220,000.00, plus punitive (treble) damages,
attorney fees and court costs.

### 3. PLEASE IDENTIFY, BY CASE NUMBER, NAME AND DIVISION, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT.

None.

| SIGNATURE OF ATTORNEY OF RECORD OR PLAINTIFF<br>*Joseph R. Gallitano* | DATE<br>3/7/05 |
|---|---|

**OFFICE USE ONLY - DO NOT WRITE BELOW THIS LINE**

## DISPOSITION

A. Judgment Entered
- ☐ 1. Before jury trial or non-jury hearing
- ☐ 2. During jury trial or non-jury hearing
- ☐ 3. After jury verdict
- ☐ 4. After court finding
- ☐ 5. After post trial motion

B. No Judgment Entered
- ☐ 6. Transferred to District Court under G.L. c.231, s.102C.

Disposition Date

RECEIVED
BY:
DATE

DISPOSITION ENTERED
BY:
DATE

# Commonwealth of Massachusetts
## County of Plymouth
## The Superior Court

CIVIL DOCKET# **PLCV2005-00278-B**

RE:   **Kelley v Plymouth et al**

TO:Joseph R Gallitano, Esquire
   34 Main St Extension
   Suite#202
   Plymouth, MA 02360

## TRACKING ORDER - F TRACK

You are hereby notified that this case is on the **fast (F) track** as per Superior Court Standing Order 1-88. The order requires that the various stages of litigation described below must be completed not later than the deadlines indicated.

| STAGES OF LITIGATION | DEADLINE |
|---|---|
| Service of process made and return filed with the Court | 06/07/2005 |
| Response to the complaint filed (also see MRCP 12) | 08/06/2005 |
| All motions under MRCP 12, 19, and 20 filed | 08/06/2005 |
| All motions under MRCP 15 filed | 08/06/2005 |
| All discovery requests and depositions completed | 01/03/2006 |
| All motions under MRCP 56 served and heard | 02/02/2006 |
| Final pre-trial conference held and firm trial date set | 03/04/2006 |
| Case disposed | 05/03/2006 |

The final pre-trial deadline is **not the scheduled date of the conference**. You will be notified of that date at a later time.
**Counsel for plaintiff must serve this tracking order on defendant before the deadline for filing return of service.**
This case is assigned to session B sitting in **CtRm 1 (Court Street, Plymouth)** at **Plymouth Superior Court.**

Dated: 03/09/2005

Francis R. Powers
Clerk of the Courts

BY: Adam Baler
Assistant Clerk

Location: CtRm 1 (Court Street, Plymouth)
Telephone: (508) 747-6911

**Disabled individuals who need handicap accommodations should contact the Administrative Office of the Superior Court at (617) 788-8130**

Check website as to status of case: http://ma-trialcourts.org/tcic

cvdtract_2.wpd 447799 inidoc01 santospa

# COMMONWEALTH OF MASSACHUSETTS

PLYMOUTH, ss.

SUPERIOR COURT
C.A. NO. *05-0278B*

THOMAS M. KELLEY,
        Plaintiff,        )
v.        )

THE TOWN OF PLYMOUTH, and ROBERT J.
POMEROY, as Chief of the Plymouth Police
Department and Individually,
        Defendants.        )

> FILED
> COMMONWEALTH OF MASSACHUSETTS
> SUPERIOR COURT DEPT. OF THE TRIAL COURT
> PLYMOUTH COUNTY
>
> MAR - 9 2005
>
> *Grant R Powers*
> CLERK

## VERIFIED COMPLAINT

1.    The Plaintiff, Thomas M. Kelley (hereinafter "Kelley"), is an individual residing at 119 Arlington Rd., Plymouth, Plymouth County, MA 02360. *A*

2.    The Defendant, Town of Plymouth (hereinafter "Plymouth"), is a duly incorporated municipality in the Commonwealth of Massachusetts, with a usual place of business at Plymouth Town Hall, 11 Lincoln Street, Plymouth, MA. *A*

3.    Mark Silvia, is the Town Manager and Chief Executive Officer for the Town of Plymouth, with a place of business at Plymouth Town Hall, 11 Lincoln Street, Plymouth, MA, and Eleanor Beth was serving as Town Manager at the time of the alleged incident set forth herein and Lawrence Pizer serves as Town Clerk for the Defendant, Plymouth, with offices at 11 Lincoln Street, Plymouth, MA and is the authorized officer for receipt of service of process in matters of litigation, involving the Town of Plymouth, and Kenneth A. Tavares as Chairman of the Board of Selectman and Chief Elected Officer of Plymouth, with a place of business at Plymouth Town Hall, 11 Lincoln Street, Plymouth MA.

1

4.      The Defendant, Chief Robert J. Pomeroy (hereinafter "Pomeroy"), individually, who resides at 244 Valley Road, Plymouth, Plymouth County, MA, and in his official capacity as Chief of Police, Plymouth Police Department, who at all times relevant to the Complaint was the Chief of Police for the Plymouth Police Department, with a usual place of business at 20 Long Pond Road, Plymouth, MA 02360.

## FACTS

5.      Kelley, was appointed as a Police Officer in the Town of Plymouth on September 19, 1977.

6.      On May 25, 2003, Pomeroy ordered members of the Plymouth police force to participate in an extremely rigorous and physically demanding drill situation, simulating the Columbine hostage incident in Colorado, in which students in a high school held various parties as hostage and were heavily armed at the time.

7.      The drill situation was conducted at the Plymouth North High School on the aforesaid date and Kelley was required to participate in the drill.

8.      Previous to May 25, 2003, there had been a substantial record of Kelley's physical impairment.  He had already contracted Lyme Disease, and he was suffering from Meniere's Disease.  Kelley was taking medication for both conditions.

9.      Pomeroy and Plymouth were well aware of Kelley's medical condition at the time that Kelley was ordered to participate in the drill.

10.     During the drill on May 25, 2003, Kelley experienced a heart incident similar to a heart attack, causing him to collapse and requiring him to be hospitalized.

11.     Kelley was taken to the Jordan Hospital for emergency treatment and then transferred to Beth Israel Hospital in Boston for treatment, where he underwent heart

2

surgery on May 26, 2003. As a result of said injury, Kelley was forced to accept a disability retirement.

12.    Kelley's retirement was approved by the Plymouth Retirement Board on the basis of an Independent Medical Panel, appointed and assigned by the State Retirement System that concluded that the cardiac incident he suffered, was a direct result of the May 25, 2003, Columbine drill. This left Kelley with a permanent disability, making it impossible for him to serve as a police officer any longer in Plymouth.

13.    The Independent Medical Panel also determined that Kelley's injury suffered on May 25, 2003, was an injury in the line of duty under Chapter 41, Section 111F, and thus he was entitled to any medical benefits related thereto as well as to his disability retirement.

14.    Prior to the May 25, 2003, drill, the Plymouth Police Union ("Union"), through its president and other representatives, approached Pomeroy and requested that he institute a protocol to review members of the force who might not be physically able to undergo such a rigorous and stressful drill situation.

15.    The Union advised Pomeroy that there were members of the force who had existing medical conditions that could possibly put them at risk for injury, some of which could even be life threatening.

16.    Pomeroy refused to establish or institute any type of protocol and insisted that all members of the force would take part in the drill regardless of their medical situation or previous medical history.

17.    After he was approved for disability retirement, Kelley submitted a request for reimbursement for vacation time he had to use before he was relieved of duty and put officially on disability. Under Mass. General Laws Ch. 41, Section 111F, Kelley was

entitled to reimbursement of $2,000.00 for vacation days he had to use for sick leave, after May 25, 2003.

18.    Pomeroy refused to reimburse Kelley as requested.  Moreover, the Personnel Board of the Town of Plymouth refused to authorize the reimbursement because Pomeroy refuted that Kelley's injury was a result of the May 25, 2003, Columbine-like drill.

19.    Pomeroy maintained that Kelley's use of vacation benefits as sick time was not related in any way to an injury on duty.

20.    Pomeroy made this determination in bad faith because he had been informed that the Independent Medical Panel had in fact ruled Kelley's injury was on duty and directly related to the May 25, 2003, drill.

21.    About a year before the drill, Kelley in his capacity as a Town Meeting Member and a member of the Plymouth Retirement Board, raised an issue regarding Pomeroy's use of funds to reimburse himself for benefits that were not included as part of his income and should have been shown as income to him in his departmental budget.  Kelley alleged Pomeroy was accepting compensation and not showing it in his budget in a manner that was prohibited by statute.

22.    Kelley reported this situation to the Inspector General's Office of the Commonwealth of Massachusetts.  The Office investigated the matter and reported to the Town that the manner in which Pomeroy was compensating himself for educational benefits without declaring it under the line item budget area for compensation to him for income and without authorization per a by-law or written agreement with the Town was inappropriate and in violation of state law, and required Town Meeting action to correct the situation.

4

23.    Subsequently, Town Meeting voted to ratify the past inappropriate compensation and authorization of funds to Pomeroy to make said payment in compliance with state regulations.

24.    Pomeroy was well aware that Kelley had reported him to the Inspector General's Office.

25.    When Pomeroy insisted that Kelley be included in the Columbine-like drill on May 25, 2003, he knew that Kelley had reported him to the Inspector General's Office, and he knew Kelley's medical conditions were preexisting and would place him in harm.

26.    Further, Pomeroy was well aware that Kelley's cardiac incident on May 25, 2003, was a result of the drill, and was well aware of the report of the Independent Medical Panel, which reviewed Kelley's injury on two points, one as an application for disability retirement and one as an injury on duty, and concluded that his condition was the result of an injury on duty on May 25, 2003, and directly related to the Columbine-like drill, which was the proximate cause of Kelley's injury.

27.    Despite this information, Pomeroy refused to compensate Kelley for vacation time, which he legitimately had to use and was entitled to have reimbursed under Chapter 41, Section 111F.

## CAUSES OF ACTION

### COUNT I:    VIOLATION OF THE STATE WHISTLE BLOWER STATUTE
### M.G. L.  Chap.  149, Sec. 185

28.     Kelley repeats and reavers paragraphs 1 through 27 as if expressly set forth fully herein.

29.     Kelley is an employee under M.G.L. 149, Section185, and his activities in reporting violations and improprieties of other employees and supervisors was an activity protected by the statute.

30.     Pomeroy's failure to pay for Kelley's vacation time under a Chapter 41, Section 111F, the failure to screen members of the police force and prevent Kelley in particular from participating in the aforesaid strenuous and stressful drill, were retaliatory in nature.

31.     Said retaliation by Pomeroy was because Kelley reported Pomeroy to the Inspector General's Office.

32.     Pomeroy's denial and the denial by the Plymouth Town Manager at that time, Pamela Nolan, of Chapter 41 Section 111F funds due Kelley was also retaliatory.

33.     All aforesaid actions were in violation of Chapter 149, Section 185, which prohibits retaliatory actions against employees who have reported wrongdoing to a disciplinary body/office or public policy-making body such as the Inspector General's Office.

34.     As a result of the actions taken by Plymouth through its Town Manager and Pomeroy, Kelley is entitled to triple damages, attorney's fees and reasonable court costs.

35.     Kelley's claims include the payment of all vacation time as well as payment for loss of all salary and benefits for the sixteen years he would have served to his normal retirement date, all in an amount of approximately $220,000.00.

6

**Wherefore,** Kelley demands a judgment for treble damages, both compensatory and punitive, against the Defendants in an amount this Court deems just and appropriate with interest, and cost of this action including attorney's fees.

## COUNT II: GROSS NEGLIGENCE ,WILLFUL, WANTON AND RECKLESS CONDUCT

36.     The Plaintiff repeats and reavers paragraphs 1 through 35 as if expressly set forth fully herein.

37.     The actions of the Town of Plymouth and the Plymouth Police Department, through Pomeroy, by failing to screen the members of the Department who would be taking part in the drill, in which the men were to be put through a rigorous, physically demanding, and stressful drill involving a hostage situation similar to the Columbine incident, resulted in Kelley suffering a cardiac incident and life-altering injury.

38.     It was well known by Pomeroy and other supervisory members of the Police Department, and well documented in Kelley's personnel file, that he had several physical illnesses for which he was being treated and being medicated; and therefore, that his participation in such an activity would place him at great risk.

39.     The Defendants owed Kelley a duty of care not to expose him needlessly to a dangerous exercise considering his pre-existing conditions.

40.     The decisions to make all members of the Department, regardless of their physical condition, participate in this exercise was willful, wanton, and reckless conduct by Plymouth, its Police Department, and in particular Pomeroy.

41.     Specifically, the Town, through Pomeroy, was negligent by failing to institute a protocol to screen members of the department who would be at risk due to existing medical conditions known to the department.

7

42.    The aforesaid negligence of the Defendants was the proximate cause of Kelley's injuries.

43.    Said acts were also intentional in nature, constituting retaliation against a whistle blower.

44.    The Defendants' action forced Kelley into an early disability retirement, which was not his choice and denied him another sixteen years of service, depriving him of 20% of his salary over the next sixteen years, as well as benefits and contribution to his normal retirement, resulting in a loss of income to him in excess of $200,000.00.

    **Wherefore,** Kelley demands a judgment for damages, both compensatory and punitive, against the Defendants in an amount this Court deems just and appropriate with interest, and cost of this action including attorney's fees.


**Count III:    VIOLATION OF PLAINTIFF'S RIGHTS UNDER THE 14TH AMENDMENT EQUAL PROTECTION UNDER THE LAW AND HIS RIGHTS UNDER 42 USC, SECTION 1983**

45.    Kelley repeats and reavers paragraphs 1 through 44 as if expressly set forth fully herein.

46.    Kelley's constitutional rights were violated in that no other member in a similar position of the Department or any other employee in the Town of Plymouth in a similar position, has been treated in such fashion and therefore the actions of the Town were in violation of his 14th Amendment Rights, as well as federal statutes protecting him from such treatment and providing for equal protection under the law.

47.    Kelley was routinely harassed by Pomeroy and treated differently then other officers in the Plymouth Police Department by monitoring his every movement on a daily

8

basis. See Affidavit of Kevin Fahey, annexed hereto and made a part hereof and marked as Exhibit A.

48.    Kelley served on the Plymouth Retirement Board, as did other Town employees. But, contrary to standard operating procedures, Plymouth and Pomeroy insisted upon reimbursement by the Retirement Board of any salary time Kelley spent on Retirement Board business. Kelley was the only Town employee who was serving or who had served on the Retirement Board subjected to such scrutiny and reimbursement policy. See Affidavit of Contributory Retirement Board Director, Debra J. Sullivan, annexed hereto and made a part hereof and marked as Exhibit B.

49.    By denying Kelley the use of vacation time and reimbursement of same for sick leave under Chapter 41, Section 111F, he was subjected to different treatment then any other police officer or other Town employee in similar circumstances.

50.    Further, by denying Kelley the reimbursement of funds, as aforesaid, and more importantly knowingly and intentionally forcing Kelley to take part in a drill any reasonably prudent person would have known would be a dangerous situation physically for Kelley, Pomeroy violated 42 U.S.C. 1983, because Pomeroy sought to harm Kelley and maliciously took action against him, exposing Kelley to treatment different from other officers on the force with the intent of causing Kelley harm.

51.    Although Pomeroy ordered all police personnel to take part in the aforesaid Columbine like drill, he did so as a pretext to cover his true intentions to harm Kelley by forcing him to take part in an exercise that would be hazardous to him. Pomeroy did so fully knowing of Kelley's pre-existing medical conditions.

52.    Pomeroy used the drill exercise as one more method to further harass Kelley in an effort to force him out of the Police Department and to retaliate against Kelley for reporting him to the State Inspector General.

9

**Wherefore,** Kelley demands a judgment for damages, both compensatory and punitive, against the Defendants in an amount this Court deems just and appropriate with interest, and cost of this action including attorney's fees.

## COUNT IV: DENIAL OF PLAINTIFF'S RIGHTS UNDER
## M.G.L. CHAP. 41, SEC. 111F.

53.    The Plaintiff repeats and reavers paragraphs 1 through 53 as if expressly set forth fully herein.

54.    As a result of having to take time to seek medical treatment, Kelley had to use some vacation time, which should have been reimbursed to him in the approximate amount of $2,000.00. Kelley was entitled to reimbursement pursuant to Mass. Gen. Laws Chapter 41, Section 111F.

55.    Kelley made numerous requests and demands for reimbursement for said days of vacation time to the Defendants, but was denied by Pomeroy and Plymouth through its Town Manager.

56.    Kelley is specifically entitled to reimbursement of any benefits and rights as set forth in M.G.L. Chapter 41, Section 111F and refusal to compensate Kelley accordingly by the Defendants is a violation of Mass. Gen. Laws Chapter 41, Section 111F.

**Wherefore,** Kelley demands a judgment for damages, both compensatory and punitive, against the Defendants in an amount this Court deems just and appropriate with interest, and cost of this action including attorney's fees.

10

**THE PLAINTIFF DEMANDS A TRIAL BY JURY.**

THOMAS M. KELLEY, the Plaintiff,

By his attorney,

Joseph R. Gallitano, BBO # 183700
Gallitano & Associates
34 Main St. Ext., Suite 202
Plymouth, MA 02360
(508) 746-1500

Dated: March 9, 2005

COMMONWEALTH OF MASSACHUSETTS

PLYMOUTH, ss.                              SUPERIOR COURT
                                          C.A. NO.

THOMAS M. KELLEY,                         )
                  Plaintiff,              )
v.                                        )
                                          )
THE TOWN OF PLYMOUTH, ROBERT J.           )
POMEROY, as Chief of the Plymouth Police  )
Department and Individually,              )
                  Defendants.             )

## VERIFICATION OF COMPLAINT

I, Thomas M. Kelley, being first duly sworn, state that I am the Plaintiff in the

above-entitled action, that I have read the foregoing complaint and know the contents

thereof, and that the same is true to my own knowledge and belief.

_____
THOMAS M. KELLEY

Dated:  March 7, 2005

# EXHIBIT A

## Affidavit of Kevin P. Fahy

1. I, Kevin P. Fahy, of Hedges Pond Rd., Plymouth, MA, am the 8 to 4 Shift Supervisor for the Plymouth Police Department in Plymouth, MA.

2. For over 18 years I was Officer Thomas Kelley's (Tom) supervisor, shift commander and friend.

3. While working for me on the 8 to 4 shift Tom was elected to the Plymouth Retirement Board.

4. A short time later Tom questioned Chief Robert Pomeroy's (Pomeroy) right to receive "incentive pay" and this signaled the beginning of Tom's every movement being scrutinized by Pomeroy and Captain Botieri (Botieri).

5. Botieri came into the lieutenant's office and he stated, "the chief doesn't like his money being fucked with".

6. I was told that when Tom went to his retirement board meetings he was to be logged off duty in the daily log.

7. If Botieri went by and found Tom at the Town Hall he wanted to know from me why he was there; the time he went off and the time he got back out on the road.

8. Tom was the only officer that I know of who was monitored everywhere he went.

Subscribed and sworn to under the pains and penalties of perjury this 23rd day of June 2004.

_Kevin P. Fahy_
Kevin P. Fahy

1

# EXHIBIT B



TOWN OF PLYMOUTH
OFFICE OF THE
# CONTRIBUTORY RETIREMENT BOARD
11 Lincoln Street
Plymouth, Massachusetts 02360-3325
FAX (508) 830-4019
(508) 830-4170

January 29, 2004

Mr. Thomas Kelley
41 Arlington Rd.
Plymouth, MA 02360

RE: Retirement Board Expense

Dear Mr. Kelley:

At your request, please accept this letter as verification that your service to the Town of Plymouth Retirement System, as its elected member, began in December 18, 1996.

During this time period, if you were scheduled to work your position as a full time police officer, and those hours conflicted with your service to the Retirement System, the Retirement System was required to reimburse the Town of Plymouth for those earnings by way of a charge back through payroll.

It has been my experience since 1991, as the Board Director, to have this be the practice in only your position. It is also noted, that there are other Board members who serve the Town as well as the System.

Yours truly,

Debra J. Sullivan
Director

Printed on recycled paper.

# EXHIBIT 2A

1

Volume I
Pages 1-159

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. NO. 05 10596 NMG

THOMAS KELLEY,                        :
                Plaintiff,            :
                                      :
vs.                                   :
                                      :
TOWN OF PLYMOUTH, et al,              :
                Defendant.            :


        DEPOSITION of THOMAS KELLEY, taken on behalf of
the Defendants, pursuant to the applicable provisions
of the Massachusetts Rules of Civil Procedure, before
Barbara M. Montijo, a Registered Professional
Reporter and Notary Public within and for the
Commonwealth of Massachusetts, at the offices of
Brody, Hardoon, Perkins & Kesten, One Exeter Plaza,
Boston, Massachusetts, on February 9, 2006,
commencing at 11:00 a.m.


# ORIGINAL


DUNN & GOUDREAU
COURT REPORTING SERVICE, INC.
One State Street
Boston, MA  02109
(617) 742-6900

7

1         Department?

2    A.    That's correct.

3    Q.    How many years did you serve?

4    A.    I started in September of 1977 and I retired

5          September 9th, 2003.

6    Q.    I'm going to ask you some background questions first,

7          before we get into some of the details of your

8          complaint and other information.  So, if you could

9          bear with me, I'll try to get through that first.

10         First of all, could you tell us a little bit about

11         your educational background?  Where did you go to

12         high school?

13   A.    I went to Catholic Memorial High School in West

14         Roxbury.

15   Q.    What year did you graduate?

16   A.    1973.

17   Q.    Did you continue to further your education?

18   A.    Yes, I did.

19   Q.    What was next?

20   A.    I went to Northeastern University and I graduated in

21         1977.

22   Q.    What kind of degree did you get?

23   A.    I have a Bachelor of Science degree in Criminal

24         Justice.

10

| | | |
|---|---|---|
| 1 | Q. | How long did you stay at Boston College? |
| 2 | A. | I was there nine months, almost a year.  I then |
| 3 | | started working down at the power plant for Edison -- |
| 4 | Q. | The power plant? |
| 5 | A. | -- as security. |
| 6 | Q. | Where is that? |
| 7 | A. | In Plymouth. |
| 8 | Q. | What did you do for the power plant? |
| 9 | A. | Security. |
| 10 | Q. | How long did you remain with them? |
| 11 | A. | I remained there until I was appointed a full-time |
| 12 | | permanent officer in 1980. |
| 13 | Q. | So, approximately 1977 through 1980? |
| 14 | A. | No, it would have been like '79, '79 to '80.  About a |
| 15 | | year in each job. |
| 16 | Q. | So, you worked for a year at Boston College, a year |
| 17 | | at the power plant? |
| 18 | A. | Correct. |
| 19 | Q. | And then, were you working an as intermittent as well |
| 20 | | during this period time? |
| 21 | A. | Same time, yes. |
| 22 | Q. | And you went on full time in 1980? |
| 23 | A. | Correct. |
| 24 | Q. | And you remained full time until your retirement? |

DUNN & GOUDREAU

14

1    anything of that sort.

2  A.  There was an issue that was brought up by -- way back

3      with Chief Nagle, which I saw in the file that you

4      have there, and that was resolved.  That was supposed

5      to be actually expunged from the file when Chief

6      Nagle was fired for stealing the test and indicted.

7      I guess it wasn't because it was there.

8  Q.  What was the complaint against you by the Chief at

9      that point?

10 A.  Oh, it had to do with some activity with vehicles.

11 Q.  When you say "activity with vehicles," involving

12     what?

13 A.  The odometers.

14 Q.  Were you accused of playing with the odometers?

15 A.  I was.  That's true.

16 Q.  What happened?

17 A.  There was an investigation on it.  I have a copy of

18     that at home.  It was an ongoing practice in the

19     Department by numerous officers.  I was asked about

20     it and I took my responsibility on the issue.

21 Q.  Just so I'm -- when did this take place?

22 A.  Oh, I want to say back in the early '80s.

23 Q.  When you say there was a practice, are you saying,

24     you, along with several other officers, were playing

15

1    with the odometers?

2  A.  The report that I have from Captain Murphy, who was

3    the Captain at the time, indicated in his report that

4    there were several other officers involved in this

5    matter.

6  Q.  But I'm asking about -- I'm not asking about other

7    officers right now.  I'm asking about you.  What was

8    your role in this?

9  A.  The dashboards were falling apart in the cars, so you

10    could adjust the mileage on the vehicle.

11  Q.  This is the cruiser or your personal vehicle?

12  A.  The cruiser.

13  Q.  Did you say you along with other officers did this?

14  A.  I can only speak for myself.

15  Q.  That's fine.  You did this, played with the odometer?

16  A.  A couple of times.  That's correct.

17  Q.  Just explain it to me, because I'm not understanding

18    what advantage that had to you.  What would be the

19    advantage to change the odometer?

20  A.  It was a foolish practice that went on in the

21    Department.  It had no advantage.

22  Q.  For what purpose -- in other words, I'm in a cruiser,

23    I'm driving around, I'm doing my job.  What advantage

24    was there to any officer, including you, to mess

16

1       around the odometer?

2  A.   It was just adjusting the numbers, that's all.

3  Q.   What advantage -- you just didn't do it for the heck

4       of it.  What advantage did you gain by changing the

5       odometer?  Did you add numbers or did you subtract

6       numbers?

7  A.   Adding numbers at times, things like that.

8  Q.   So, is it fair to say that you would do more patrol

9       than -- or substantiate the patrol you were supposed

10      to be on; is that fair to say?

11  A.   I believe there was a standing order from the Chief

12      that cars -- people had to put a hundred miles on

13      them.

14  Q.   Per week or per day?

15  A.   Per day, per eight-hour shift.

16  Q.   And so certain people weren't making them?

17  A.   You just couldn't do it and it was a foolish practice

18      done by a group of officers.  It was resolved and I

19      took my responsibility for it.

20  Q.   So, you and other officers admitted to playing with

21      the odometer to meet the hundred-mile-a-day standard

22      set; fair to say?

23  A.   That would be fair to say.

24  Q.   What kind of punishment did you get back in the '80s?

21

1    but I'll give you a copy anyway.

2              (EXHIBIT 1 MARKED FOR IDENTIFICATION)

3    Q.   I'm now showing you what's been marked as Exhibit 1

4         and I'm placing it before you.  And just for purposes

5         of identification, I'll ask you, do you recognize

6         that complaint and your signature verifying the

7         complaint?  I think it's four pages from the back.

8    A.   (Witness perusing document) Yes, I do.

9              MR. ARMSTRONG:  Off the record for a

10        moment.

11             (OFF THE RECORD)

12             MR. SILVERFINE:  Back on the record.

13   Q.   Mr. Kelley, I'm going to ask you some questions about

14        your verified complaint, which is now Exhibit 1.

15        Okay?

16   A.   Yes.

17   Q.   On page 2, paragraph 6, you said that on May 25th,

18        2003, Chief Pomeroy ordered members of the Plymouth

19        Police Department to participate in this drill.  Can

20        you tell us, were all of the officers of the Plymouth

21        Police Department required to participate in this

22        drill?

23   A.   As far as I know, when there's a standard order by

24        the Department, rules and regulations require you to

22

1          go. And I believe everybody, to my knowledge, went.

2 Q.   So, it's fair to say that all the officers were

3        required to attend this, correct?

4 A.   If it's a written order like that, yes, they are or

5        they're subject to discipline if they don't.

6 Q.   In paragraph 8 you mention that there had been a

7        substantial record of your physical impairment.

8        First of all, what was the physical impairment, the

9        substantial record of your physical impairment that

10       you're talking about?

11 A.   Before that event, every year, on a regular basis, as

12       part of the contract or agreement, everybody in the

13       Department would get a letter indicating what their

14       sick time was for the previous year.

15          At that time in the letter, it's a standard

16       letter, it says if you have any -- they give you the

17       amount of sick days that you used in the previous

18       year. They then turn around --

19          And it says if you have any circumstances,

20       doctor's notes, various things that would

21       substantiate this, so it's not an abuse issue, that

22       you have bona fide reasons for being sick, you could

23       bring them in; and then they would look at them and

24       retract the letter, okay. And that's written in the

40

1   Q.   Besides Mr. Boyle, who else?

2   A.   I don't know who was at the meeting.  It would have

3        been any of the Union officials who were there.  I

4        know Paul talked with him.

5   Q.   Were you present?

6   A.   No.

7   Q.   What was your understanding of what was specifically

8        said to the Chief relative to this meeting?

9   A.   My understanding is that at that meeting they had a

10       discussion, some type of discussion on -- the Union

11       had concerns about injuries from this training; and

12       that's what was discussed at the meeting.

13   Q.   When you say "injuries," are you referring to the

14       injuries Mr. Boyle mentioned in his deposition the

15       other day, some kind of gas mask; is that right?

16   A.   I know at the time there were a number of concerns

17       that officers had heard about.  The intensiveness of

18       the training, the type of training, and that there

19       were injuries.  I believe that was what was brought

20       up at the meeting.

21   Q.   Were specific officers mentioned, to your knowledge?

22   A.   No.  I don't know exactly.  I wasn't at the meeting.

23   Q.   So, your name specifically did not come up; is that

24       correct?

41

1    A.    I couldn't tell you that.

2    Q.    But you were sitting at the same deposition the other

3          day and heard Mr. Boyle discuss this same topic,

4          correct?

5    A.    I didn't particularly hear -- I didn't hear

6          anything.  I wasn't sitting at the table.  I was back

7          in the other room, but I know it was brought up.

8    Q.    You weren't sitting behind me the other day --

9    A.    I was behind you, but not right on top of him.  I

10         didn't hear exactly what he said.

11   Q.    We were in the room together with Mr. Boyle, these

12         two counsel and yourself, and we all listened to

13         Mr. Boyle talking.  You're saying you didn't hear

14         that?

15   A.    I heard it, yes.

16   Q.    And Mr. Boyle mentioned something to do with a gas

17         mask, but he also did not mention any officers,

18         including you, having been brought up to Chief

19         Pomeroy; is that right?

20   A.    If that's what he said, I guess that must be

21         correct.

22   Q.    You say in paragraph 15 of this Exhibit 1 that the

23         Union advised Chief Pomeroy there were officers with

24         existing medical conditions, do you see that?

42

1    A.    Uh-huh.

2    Q.    You have to say yes for the record, sir.

3    A.    Yes, I'm sorry.  Yes.

4    Q.    Were any specific officers mentioned to Chief Pomeroy

5          by the Union?

6    A.    I don't know.

7    Q.    Was your name mentioned specifically to Chief

8          Pomeroy?

9    A.    I don't know.

10   Q.    When did this discussion as far as you understand

11         take place?

12   A.    What was the question now?

13   Q.    When did this meeting take place between the Union,

14         Mr. Boyle, and Chief Pomeroy?

15   A.    I believe they had scheduled negotiations and they

16         brought it up during that.  I don't know the exact

17         date.

18   Q.    How far in advance of May 25th was this meeting?

19   A.    I couldn't tell you.

20   Q.    Was this drill specifically discussed at this

21         meeting?

22   A.    I couldn't tell you.  I wasn't at the meeting.

23   Q.    Well, I'm asking you because you put this in as part

24         of your allegations in your complaint, what you know

43

1       about it and who would have information about that.

2       So, since you listed it here, and this is a verified

3       complaint, I'm just asking you what information you

4       have about it?

5  A.   Paul Boyle would -- he was at the meeting.  He would

6       have more specifics than I would.  I know he did tell

7       me they did discuss it at a meeting with the Chief.

8  Q.   So, you don't know whether or not this drill was

9       specifically discussed?

10 A.   I believe it was.

11 Q.   And you don't know when it was?

12 A.   I don't know when the negotiations were.

13 Q.   This was a regularly scheduled negotiation between

14      the Union and the Chief?

15 A.   I believe they were impact bargaining about the

16      AR-15s, the new weapons that they were putting out.

17 Q.   But there wasn't a specific meeting about the drill

18      that was upcoming?  This meeting was a regularly

19      scheduled negotiation, would that be fair to say?

20 A.   I would say that would be fair to say.

21 Q.   In paragraph 16 you wrote that Chief Pomeroy refused

22      to establish or institute any type of protocol, do

23      you see that?

24 A.   Yes, I do.

44

1    Q.    What's the basis of your knowledge about that?

2    A.    From hearing it through the grapevine and we heard

3          that the issue was brought up by the Union.  And

4          basically, from the way I understand it, they said

5          there was no concern on the Department's side.  They

6          said that the State Police had everything; and that

7          was the end of it.

8    Q.    And just so I'm clear.  Is this again information you

9          received from Mr. Boyle or anyone else?

10   A.    I don't know exactly if it was from Paul.  I heard it

11         through the -- you know, like at roll call.  There's

12         always discussions of various current matters going

13         on.  It was through the grapevine.  I can't

14         specifically pull a name out of a hat.

15   Q.    That's what I'm asking you.  Because, again, you've

16         indicated that the Chief refused to establish any

17         type of protocol.  So, where did you get that

18         information from?

19   A.    I got that from the general consensus of the officers

20         at the station.

21   Q.    But the only officer you understood to be present was

22         Paul Boyle?

23   A.    Correct.  He was at the meeting when this issue was

24         discussed.

45

1  Q.  So, the rest of the information would have been, fair

2      to say, hearsay, because Mr. Boyle was the only one

3      present with Chief Pomeroy?

4  A.  I can't categorize it in any category.

5  Q.  You tell me what direct information you have other

6      than hearsay?

7  A.  Other than hearing it from the grapevine, that's all

8      I have.

9  Q.  In paragraph 17 of Exhibit 1 you said you submitted a

10     request for reimbursement.  To whom did you request

11     reimbursement from?

12 A.  I contacted the Union steward at the time, Larry

13     Rooney.

14 Q.  Larry Rooney?

15 A.  Uh-huh.

16 Q.  Can you spell the last name?

17 A.  R-O-O -- Rooney, R-O-O-N-E-Y.

18 Q.  He is a police officer?

19 A.  Yes, he is.

20 Q.  He's also the Union steward?

21 A.  Uh-huh.

22 Q.  Just answer for the record.

23 A.  Yes, I'm sorry.

24 Q.  What did you do through Larry Rooney?

50

1   A.   I don't follow you logically there.

2   Q.   I'm asking if that's what the Chief claimed,

3        right?

4   A.   I don't think that's correct.

5   Q.   You were sitting in on the Michael Sacco deposition

6        as well the other day, correct?

7   A.   Yes, I was.

8   Q.   You were in the same room as your counsel, myself --

9   A.   Correct.

10  Q.   -- when Mr. Sacco testified?

11  A.   Correct.

12  Q.   Do you recall Mr. Sacco saying, even in his letter

13       that he wrote on your behalf, that there was a

14       question about whether or not the Heart Law did or

15       did not apply to 111F benefits?  Do you remember

16       that, sir?

17  A.   In some incidents, that's correct, sir.

18  Q.   And that's the same concern that the Chief had at

19       that point in time relative to the application of the

20       111F benefits for that period of time?

21  A.   I disagree with that statement.

22  Q.   Well, tell me what's wrong with that statement.

23  A.   Because I suffered an injury that day and I should

24       have been -- my feeling is I should have been awarded

DUNN & GOUDREAU

1    111F benefits.  I went to the hospital via ambulance,

2    semiconscious, under oxygen.  I went from there to

3    the -- from the high school to the hospital.  I was

4    treated there.  I left the hospital via ambulance to

5    Boston.  I had a cardio catheterization done; and

6    subsequently, after that, I had to retire.

7         I was at the training program with Captain

8    Chandler, who physically aided me and dragged me out

9    of the room as I collapsed against the wall on top of

10   two other officers.  I have no understanding of how

11   someone couldn't say that that event was not in

12   the performance of my duty and I didn't suffer an

13   injury.

14  Q.   As part of your obligation, when you suffer an

15       injury, you had to submit a couple of notes from your

16       doctors back at the time, right?

17  A.   Yes, I did.

18  Q.   And I'm going to show you --

19            MR. SILVERFINE:  First of all, we'll mark

20       this as Exhibit 3.

21            (EXHIBIT 3 MARKED FOR IDENTIFICATION)

22  Q.   Exhibit 3, which I'm placing before you, do you

23       recognize that?

24  A.   (Witness perusing document) Yes, I do.

55

| | | |
|---|---|---|
| 1 | A. | I never received a decision from anybody other than |
| 2 | | the Town Manager a year later. |
| 3 | Q. | So, how did you become aware that the Personnel Board |
| 4 | | refused to authorize the reimbursement? |
| 5 | A. | I requested from the Town, the Town Manager, in |
| 6 | | writing, an explanation of this matter. |
| 7 | Q. | Did you receive anything in writing? |
| 8 | A. | Nothing.  It took me over a year. |
| 9 | Q. | And that document that you say you got was from the |
| 10 | | Town Manager, or the Personnel Board? |
| 11 | A. | I got it from the Town Manager. |
| 12 | Q. | Did you ever get anything from the Personnel Board? |
| 13 | A. | Personnel?  I think it might have been from |
| 14 | | Mrs. Flynn, who is in charge of the Personnel Board. |
| 15 | Q. | Is that Pat Flynn? |
| 16 | A. | That's Pat Flynn, correct. |
| 17 | Q. | Is she the only person on the Personnel Board? |
| 18 | A. | Well, she's in charge of it and in charge of benefits |
| 19 | | and all those issues. |
| 20 | Q. | Who was on the Personnel Board back in September |
| 21 | | 2003? |
| 22 | A. | I don't remember.  I think it would have went to the |
| 23 | | Personnel Board.  It would have went to her.  I |
| 24 | | contacted her several times. |

60

1     from each precinct.  It's a Town meeting form of

2     government.  We're elected from each precinct.

3     There's eight members from each precinct and we're

4     the legislative body of the Town.  We raise and

5     appropriate funds.  We adopt statutes and pass

6     bylaws, that type of thing.

7  Q.  And you also wrote you were a member of the Plymouth

8     Retirement Board.  How long had you been a member of

9     the Plymouth Retirement Board?

10  A.  Since 1996.

11  Q.  Is that an appointed or elected position?

12  A.  By statute that's an elected position.  I represent

13     the employees of the Town.

14  Q.  And the employees -- all the employees?

15  A.  All the employees.

16  Q.  Are there any other Town employees who also serve on

17     the Retirement Board?

18  A.  Yes, there is.

19  Q.  Who is that?

20  A.  By statute you would have the treasurer, or his

21     designee.  You would have an independent pick by the

22     Board.  You would have another re-elected member.

23     You would also have a Selectmen's -- the Board of

24     Selectmen have a pick.  They put on someone that they

·61

```
 1        appoint to be on the Board of Selectmen.
 2   Q.   How many members are on the Plymouth Retirement
 3        Board?
 4   A.   Five.
 5   Q.   Are there any other police officers besides yourself
 6        who have served in your time there?
 7   A.   No.
 8   Q.   Now, you indicate that you raise an issue regarding
 9        Chief Pomeroy's use of funds, do you see that?
10   A.   Uh-huh.
11   Q.   You have to answer for the record.
12   A.   Yes.  I'm sorry, yes.
13   Q.   How did you raise that issue?
14   A.   Well, that issue started a number of years prior to
15        that.
16   Q.   Tell me when it first began.
17   A.   Around 1998.
18   Q.   How was that issue raised?
19   A.   There was an overpayment in Needham of funds and we
20        received several memos from PAREC, our regulatory
21        agency, to be aware of all your compensation, all
22        your -- what do you call it? -- appropriate coverages
23        for what they call regular compensation under
24        Chapter 32.  Be aware of it.  Check it to make sure
```

63

| 1 | A. | Just a meeting between me and him. |
| 2 | Q. | You casually mentioned it. How did you mention it? |
| 3 | A. | I mentioned to him I looked at the personnel bylaw |
| 4 | | and given the Needham decision and the issues there, |
| 5 | | I had a concern that there was no governing document |
| 6 | | for salaries being paid. |
| 7 | Q. | When you say salary -- your limitation at that point |
| 8 | | was just as to his salary, as to the Chief's salary? |
| 9 | A. | It was salaries paid to the Police Chief and the |
| 10 | | Police Captains. The additional monies was not in |
| 11 | | the personnel bylaw. |
| 12 | Q. | What additional monies are you talking about? |
| 13 | A. | They were getting paid 30 percent more for the Quinn |
| 14 | | bill benefits and they were getting paid holiday |
| 15 | | money and uniform allowances, which were not in the |
| 16 | | personnel bylaw. |
| 17 | Q. | So, these were the Quinn bill, holiday money, uniform |
| 18 | | allowances. Were those all benefits that other |
| 19 | | patrolmen such as yourself were receiving? |
| 20 | A. | Those were collective bargaining benefits. |
| 21 | Q. | Those were benefits you and other patrolmen were |
| 22 | | receiving back in 1998? |
| 23 | A. | Patrolmen and Sergeants. |
| 24 | Q. | Which you were one of them? |

64

1  A.    Yes.

2  Q.    So, you had an issue with the Captains and the Chief

3        at that time also receiving that benefit?

4  A.    I had an issue there, but I had a concern given I

5        spoke to our attorney, Mike Sacco about it, and the

6        problem is that in the event of an audit, we had

7        people out retired under those conditions that we

8        would not be able to substantiate their pay.

9  Q.    What did Mr. Sacco tell you when you brought up this

10       issue?

11  A.    He spoke to Patrick DellaRusso and indicated to

12       Patrick the best thing would be to have the Town

13       amend the bylaw to cover the compensation paid.  And

14       Patrick DellaRusso in a casual, quiet form attempted

15       to talk to Mrs. Beth about that and get the matter

16       resolved by adjusting the personnel bylaw to cover

17       these monies.

18  Q.    Well, I'm a little confused here.  Are you saying

19       that they went forward in an attempt to amend the

20       bylaws so that the ranking officers would be

21       compensated under the Quinn bill, holiday, and

22       uniform allowance?

23  A.    That was our recommendation.

24  Q.    You recommended that?

# EXHIBIT 2B

65

1  A.    Patrick recommended that they do that.

2  Q.    Was that your recommendation?

3  A.    That was the recommendation we had from our counsel.

4  Q.    When you say "we," you're saying you in terms of the

5       Union, your counsel --

6  A.    No, Patrick.  The Board, the Retirement Board.  We

7       had concerns.

8  Q.    You're saying the Retirement Board was in agreement

9       with this; that officers, superior officers should

10     get it?

11  A.    The issue was never who should get it or not.  The

12     issue was --

13  Q.    I'm a little confused.  I'm not understanding.

14     You're saying you raised the issue relative to the

15     Chiefs and the Captains receiving these benefits,

16     right, the 30 percent under the Quinn bill, the

17     holiday, and uniform allowance?

18  A.    I raised it in the context that there was no written

19     document.  In their case, it would have been the

20     personnel bylaw, that did not address these

21     additional monies.

22  Q.    And you're saying that your lawyer said they should

23     address it, it was brought to Eleanor Beth, and she

24     tried to get it passed through --

66

1    A.    No, I'm not saying that.

2    Q.    You tell me.  I'm a little confused here.

3    A.    What happened is that once I established that there

4          was a problem, I spoke to Mike Sacco about it.  Mike

5          said the best thing to do would be to ask the Town to

6          amend the bylaw covering the document, which would

7          have documented the compensation paid, which would

8          then, when the compensation that is paid is delivered

9          to us, it would be put into the retirement formula.

10         We would have a backup document that would indicate

11         that all the monies were properly -- had a supported

12         document in the event of an audit.  That was our

13         recommendation to the Town.

14   Q.    What happened after that?

15   A.    The Town took no action.

16   Q.    Eventually, did the Town take action?

17   A.    The Town took action after it ended up in the

18         Inspector General's Office.

19   Q.    I'm a little confused here.  You're saying you're all

20         in favor of this?  You're all in favor of it?

21   A.    I wasn't trying to gyp anybody out of anything.

22   Q.    So, you're in favor of this for the superior

23         officers, the same thing the patrol officers are

24         getting, including yourself?

DUNN & GOUDREAU

71

1   and Meniere's disease prior to May 25th, 2003, you

2   would agree that those aren't life-threatening

3   diseases, correct?

4 A. I'm not a doctor.  I can't agree to that at all.

5 Q. Did you retire -- did you put in for retirement

6   prior to May 25th, 2003?

7 A. No.

8 Q. Were you suffering from a life threatening -- because

9   if you're saying they were life threatening, did you

10   apply for disability retirement due to those diseases

11   prior to May 25th, 2003?

12 A. No.

13 Q. Right.  So, my question is:  You were able to go to

14   work?

15 A. I was working.  That's correct.

16 Q. And you were living with these diseases under

17   medication prior to May 25th, 2003; is that fair to

18   say?

19 A. That's correct.

20 Q. You were on medication and you were seeing a

21   doctor?

22 A. Yes.

23 Q. And if you could, I'm assuming most of the time, like

24   some of us, you would go to work; and when you can't,

75

1    previous auditor -- you needed to have the

2    appropriate governing document in place so that our

3    justification for paying them the funds in their

4    retirement computation would be backed up by the

5    appropriate governing document.

6  Q.  Now, you told us this took place in 1998, right?

7  A.  We started in 1998.  I became aware of it probably, I

8    want to say, May, June of '98.  Patrick was going to

9    take steps to take the -- because you only have one

10   or two Town meetings and then there is what they call

11   cutoff dates for the warrant.  So, you have to -- if

12   you were going to have a fall Town meeting, you would

13   have to have -- the warrant might be closed, I think,

14   in June.  The Town meeting would be in the fall, so

15   you had to basically strategize when you could put

16   something on the warrant and have it approved and

17   amend the bylaw at that time.

18 Q.  Did you bring this up, to have it on the warrant?

19 A.  It was not my prerogative to do that.  Patrick said

20   he would handle it.

21 Q.  Was this issue brought to a Town meeting?

22 A.  Pardon me?  Yes, it was.  That's correct.

23 Q.  When was that?

24 A.  I believe it was in the fall of 2001.

76

1    Q.    And was it approved?

2    A.    Subsequently, they approved the monies.  They amended

3          the bylaw to cover all the monies that were -- you

4          know, the bylaw then clearly indicated what was being

5          paid; and that was placed into the bylaw and approved

6          by a Town meeting.

7    Q.    And you are a Town meeting member?

8    A.    Yes, I am.

9    Q.    And you voted in favor?

10   A.    Yes, I did.

11   Q.    And this was in 2001 --

12   A.    No, this was in 2003 -- 2001, you're right.

13   Q.    I'm saying what you're telling me.  I don't want to

14         put words in your mouth.

15   A.    No.  It was in 2001, September.  I'm getting a little

16         confused.

17   Q.    Let me just ask you this then:  In paragraph 21 you

18         wrote about a year before the drill, which would be

19         roughly May 2002, you raised these issues; that

20         would be inaccurate then based on what you just told

21         us?

22   A.    That would be inaccurate.  That's correct.

23   Q.    Again, just basing it on what you told us?

24   A.    Yes.

78

1  A.  Yes.

2  Q.  First of all, who did you go with to the Inspector

3      General's Office?

4  A.  I went with Dana Goodwin, Paul Boyle, and myself.

5  Q.  Dana Goodwin and Paul Boyle are both police

6      officers?

7  A.  Yes, they are.

8  Q.  And they're both Union representatives?

9  A.  Uh-huh.  Yes, I'm sorry.

10 Q.  Your counsel will tell you, so the record is clear,

11     the stenographer can't take down uh-huh.  I don't

12     mean to keep reminding you, it's just so the record

13     is clear.  I don't mean to keep tweaking you.

14 A.  I apologize.  I understand.

15 Q.  When did you go to the Inspector General's Office?

16 A.  I believe it was January 22nd of 2001.

17 Q.  Who did you meet with at the Inspector General's

18     Office?

19 A.  I met with an Inspector Quinn and an Inspector

20     O'Neil.

21 Q.  How long was the meeting?

22 A.  About four hours.

23 Q.  What documents did you present to the Inspector

24     General's Office?

88

1   Q.   You didn't raise your right hand and vote aye?

2   A.   That's not what I said.

3   Q.   Well, you tell me what you voted for?

4   A.   I voted for the amendment, for the bylaw, which would

5        have then properly put the appropriate governing

6        documents in place.

7   Q.   Which included compensating the officers for the

8        things we've been discussing, the 30 percent Quinn

9        bill, the allowances, and the other items you

10       mentioned earlier today?

11  A.   That's correct.

12  Q.   So, in effect you were ratifying the monies you

13       received, you knew that?

14  A.   Going forward.

15  Q.   Right.  And you knew that it filled in a gap and a

16       hole for prior officers, both retired and present,

17       who were receiving monies in good faith, because they

18       believed they were entitled to it; is that right?

19  A.   That's a fair statement, yes.

20  Q.   Now, you also told us just a few minutes ago

21       something about you had continual harassment up until

22       that point.  Do you remember that, just a couple of

23       minutes ago?

24  A.   Yes.

DUNN & GOUDREAU

101

1  Town's size.  I don't know what the posture is now,

2  but it went down to a certain level of manpower that

3  you needed to be on.

4 Q. Would you agree with me that the Police Department

5  ought to know how many officers are on duty in case

6  they have staffing issues; is that fair to say?

7 A. That's true.

8 Q. So if, for instance, an officer has to log off to do

9  "X," they ought to know if they need to fill a

10  sector; is that fair to say?

11 A. That's fair to say.

12 Q. So, in this case -- and, again, I understand you were

13  a Retirement Board member at the same time you were a

14  police officer for a period of time, right?

15 A. Yes.

16 Q. And they just asked you if you're going to go to a

17  meeting, log out and then log back in when you're

18  done?

19 A. Correct.  They also instituted a chargeback from the

20  Department to the retirement system.

21 Q. We'll get to that in a minute.  For right now I'm

22  just asking about logging in and logging out.

23 A. Yes.

24 Q. And again, in your complaint, Exhibit 1, paragraph

1     23, page 5, if you turn it over.  You wrote, "Town

2     meeting voted to ratify the past inappropriate

3     compensation and authorization of funds to Pomeroy."

4     Do you see that?

5  A.  Uh-huh.  Yes.

6  Q.  And your focus in your complaint is on Chief Pomeroy,

7     do you see that?

8  A.  Yes.

9  Q.  You're telling us now, under oath, that you voted to

10    ratify compensation and funds to not only Chief

11    Pomeroy, but to certain Captains and retired officers

12    as well?

13  A.  That's correct.

14  Q.  During the Town meeting in which you participated,

15    you also voted to ratify, as you say in paragraph 23,

16    the past inappropriate compensation and authorization

17    of funds to Chief Pomeroy?

18  A.  No, I didn't say that.  I said what we did at the

19    Town meeting is we voted to amend the bylaw.

20  Q.  I'm just reading what you wrote here.  You say

21    subsequently, in paragraph 23, "Town meeting voted to

22    ratify the past inappropriate compensation and

23    authorization of funds to Pomeroy."  I'm assuming

24    that's Chief Pomeroy, right?

112

1    the doctor and make an appointment and he'd look at

2    my medication and look at -- it's a very difficult

3    disease to get your arms around.

4  Q.  But you were still prior to May 25th, 2003 on the job

5    as a full-time officer?

6  A.  Correct.

7  Q.  You hadn't put in for any disability retirement or

8    other type of retirement prior to May 25th, 2003?

9  A.  No.  I was just trying to make a living.  I have two

10    kids going to college.

11  Q.  I'm not debating that.  I'm just asking.

12  A.  No, I didn't.

13  Q.  In other words, as of May 25th, whatever you were

14    suffering from didn't prevent you from going to work

15    and serving as a police officer with all the

16    requisite functions of a police officer?

17  A.  I went to work, yes, I did.

18  Q.  Are you saying you didn't perform the essential

19    functions of the job?

20  A.  I did.

21  Q.  That's what I'm asking.  So, at least up until

22    May 25th, 2003, you performed the essential

23    functions, your duties as a police officer for the

24    Town of Plymouth?

113

1   A.   Correct.

2   Q.   Don't take offense to this.  Were you overweight at

3        the time on May 25th?

4   A.   I've always been between -- I started the job

5        probably at 250 and I was probably about 265, 270.

6        I've always been that size my whole life.

7   Q.   Occasionally, it fluctuates a little heavier?  I

8        noticed one of your reports mentioned by your lawyer

9        the other day, he said something about 275 pounds?

10  A.   No.  The doctor put me down as five-four instead of

11       six-four.

12  Q.   Right.  The weight said something like 275 pounds and

13       I think your lawyer made a reference to, you're not

14       five-four.

15            MR. GALLITANO:  Just for the record, that

16       wasn't me that said that, that was Michael Sacco's

17       testimony.

18            MR. SILVERFINE:  Right.

19  A.   It's in the record.  I don't know exactly what it

20       was.  It might have been an approximate.  I know they

21       didn't weigh me at the medical panel.

22  Q.   Let's turn to page 6 on Exhibit 1, paragraph 30.  You

23       indicate in paragraph 30, the failure to screen

24       members of the police force and prevent you in

123

1    they say Car 5, I said, I'm on the way, because

2    there's been many a times where people talk minutia

3    on the radio and an officer will be calling for help

4    because he's either been hurt or something disastrous

5    was happening.

6        I drove all the way up there, got there,

7    assisted Officer Hassan.  We made an arrest of a

8    violent individual and I was called on the carpet for

9    saying I'm on my way by Botieri.

10  Q.  So, you were called into his office this time?

11  A.  I was called into Kevin's office and he said you

12    didn't give your location.

13  Q.  Who is Kevin?

14  A.  Kevin Fahy.

15  Q.  Lieutenant Kevin Fahy?

16  A.  Yes.

17  Q.  He's a friend?

18  A.  He was the Lieutenant.

19  Q.  He was your shift commander?

20  A.  That is correct.

21  Q.  Are you supposed to give your location?

22  A.  Yes, you are, but in a situation like that, time and

23    air travel, okay, when a situation is happening

24    like that, okay, you don't tie up the air with talk.

124

1     When you're on the way to the scene, you're on the

2     way.  It's assumed you're on the way and you're

3     there.

4  Q.  But my question is:  Did Lieutenant Fahy chastise you

5     for just not reporting your location?

6  A.  No, he didn't chastise me.

7  Q.  What did he do?

8  A.  He said, Tom, you've got to give your location.  I

9     know it's baloney.  You were on the way and you've

10     been doing what you've been doing for many years.

11     It's just they're picking on you.  They're going for

12     anything they can get.

13  Q.  Is there a requirement in the policies and procedures

14     you're supposed to give location?

15  A.  Yes.  Again, I emphasize, when you have a situation

16     like that --

17  Q.  I'm just asking if there is a policy and procedure?

18  A.  Yes, there is.

19  Q.  And you didn't follow that?

20  A.  At that time I was more concerned with keeping the

21     air clear for Officer Hassan to give other

22     information.

23  Q.  So, it's fair to say you didn't follow that in that

24     particular situation?

125

1    A.    It's not fair to say.

2    Q.    So, you gave your location?

3                MR. ARMSTRONG:  I want to object because I

4          think the deposition is getting argumentative now.

5    Q.    Did you understand my question, sir?

6    A.    I understood your question.

7    Q.    So, did you give your location?

8    A.    I didn't give my location.

9    Q.    What other incidents of harassment can you cite?

10   A.    Kevin called me into the office one day and said --

11   Q.    Forgive me?

12   A.    Kevin Fahy, Lieutenant Fahy.

13   Q.    Thank you.

14   A.    He called me in and said you were out the other day,

15         I think I was doing radar for a while, and in one of

16         my citations I didn't put down the date even though

17         it was a warning.

18   Q.    It was a what?

19   A.    It was a warning.  And I said, okay, Kevin.  I'll

20         make sure I do that the next time.  And he said that

21         Botieri called him on that.

22   Q.    I'm sorry, who did?

23   A.    Botieri.

24   Q.    That is the Captain?

126

1    A.    Yes.

2    Q.    Is there a requirement that you're supposed to put a

3          date on the citation?

4    A.    Yes, there is.

5    Q.    Is it fair to say that not putting the date on the

6          citation can be a fatal flaw in the citation if --

7    A.    Not on a warning, because warnings don't have any --

8          they don't have any -- they're not -- you don't go to

9          court on a warning.  A warning is exactly what it is.

10         It's a written account of me stopping you, saying you

11         were going too fast, or you took a left turn and you

12         write it out for the protection of you and me, so

13         someone doesn't say that we're stopping you for no

14         reason at all.  You write out the person's name,

15         address.  You give them a warning for going, say,

16         like five miles over the speed limit.

17   Q.    Can't a warning be brought back up if something else

18         happens, though?

19   A.    No.  Not that I'm aware of.

20   Q.    It's your testimony you're not aware of that?

21   A.    No.

22   Q.    And you're not aware of any citation that doesn't

23         have a date, it can be a fatal flaw if the citation

24         goes to court?

136

1    took any interest in doing it, but I was subject to

2    the harassment and I was told by people it's because

3    of that.

4         I never knew the magnitude of this.  It extended

5    into the Fire Department.  I never knew that from the

6    beginning.

7  Q.  Paragraph 46, who else is in a similar position that

8    you state here in paragraph 46?

9  A.  When I was on the Retirement Board, my times were

10    logged in, logged out and there was a chargeback to

11    the system for my time and service.  That has never

12    happened to any other person in the Town of Plymouth

13    that has served on the retirement system that is an

14    employee.

15  Q.  Were there any other police officers that served?

16  A.  I don't know.  I don't know the total history of

17    everybody before me.  I've been there close to ten

18    years now.

19  Q.  During the time period you were there, were you the

20    only police officer?

21  A.  There was a Department head and the Chief Financial

22    Officer was on the Board, too.  So, there would have

23    been three Town employees on the Board.

24  Q.  Any other police officers, public safety officers?

137

1  A.    No.

2  Q.    On page 9, paragraph 48, you discuss the

3        reimbursement issue.  Did the Retirement Board

4        meetings interfere with your shift or at the same

5        time as your shift as a police officer?

6  A.    What would happen is that by statute, the Retirement

7        Board has to meet once a meeting -- I mean, once a

8        month.  We have to disburse funds, we have to sign

9        for disbursement of funds.

10        But other times you could almost -- you could

11        find that we would set that date, so we'd have it in

12        advance, but then we'd have emergencies.  We had

13        investments.  We were presently running a hundred

14        million dollars.

15        Sometimes there would be a change in investment

16        managers, things would come up where we would have to

17        have a meeting to discuss that; or, to discuss the

18        performance of the funds, it might take three hours

19        to get through the eight managers that we had in

20        doing our due diligence.

21        So, with that, we would probably schedule an

22        investment meeting separate from the regular meeting,

23        because then you had a meeting that might go seven

24        hours long.  And then, we had meetings on

138

1     disabilities as well.  So, there were a number of

2     times possibly a month that I would have to meet.

3           I would then go to the meetings.  If I was

4     working 8 to 4 and if the meeting was at 8, I'd go to

5     the meeting at 8, and then go back to the station and

6     go right to work.

7  Q.   So, it's fair to say there were occasions when the

8     meetings that you attended did interfere or coincide

9     with your work as a police officer?

10  A.   Oh, yes.  Yes.

11  Q.   That was the question.  And would that be often on

12     these meetings you're mentioning?

13  A.   When we coordinated a meeting there, you know, I had

14     to look at Patrick DellaRusso's time, Dick Manfredi's

15     time, who is the Building Commissioner.  And who --

16     like any meeting that you would set up with a group

17     of people, whose schedule can meet what in the best

18     convenience of time.  You know, we'd set them up that

19     way.

20  Q.   So, taking into consideration the entire Board, by

21     necessity, there would be times when your shift was

22     overlapping with these meetings?

23  A.   Correct.  Many times they would be on my days off, so

24     there wouldn't be any problem at all.

151

1    bottom of the second paragraph in your answer to

2    Number 6.  It says, "The issue of my participation

3    was raised."  When was that raised?  Do you see that?

4    Page 4, the second paragraph of your answer.  I'll do

5    the whole line.  "Even if he didn't know" --

6  A.  Okay.

7  Q.  Do you see that?

8  A.  Yes.

9  Q.  At the bottom it says, "Especially since the issue of

10   my participation was raised"?

11 A.  I don't follow that in that respect.  I just follow

12   it that I think participation by the group as a

13   whole, everybody was as a whole.  It was raised by

14   Paul Boyle that there were concerns about the

15   intensity of the drill.

16 Q.  So, my question at this point is:  Was your

17   individual participation raised by you or anyone else

18   that you know of prior to May 25th, 2003?

19 A.  I don't know if it was raised specifically for me.

20 Q.  Did you yourself raise it with the Chief?

21 A.  No.

22 Q.  Do you know if Paul Boyle specifically raised the

23   issue with the Chief?

24 A.  I don't think -- I don't know.

152

1    Q.    Besides the general issue of all officers

2          participating in this May 25th drill raised by

3          Officer Boyle, are you aware of any other document in

4          writing that presented that issue to the Chief prior

5          to May 25th, 2003?

6    A.    I don't know exactly what transpired.  I know there

7          was a discussion about it at a meeting.

8    Q.    Again, I'm just asking, are you aware of any

9          document, piece of paper, that raises that issue

10         relative to your participation?

11   A.    No.  I don't know if there's any.

12   Q.    In the next paragraph you wrote -- and again, I'm

13         kind of jumping to the pertinent point -- "The Town,

14         through Pomeroy, was negligent by failing to

15         institute a protocol to screen members"?

16   A.    Okay, I see that.

17   Q.    Was that issue raised by you or anyone else that you

18         know of to the Chief prior to May 25th, 2003?

19   A.    I don't know exactly what transpired at that meeting

20         with Paul, and the Union officials, and the Chief.  I

21         don't know what happened, specifically wording, I

22         wasn't there.  I don't know what was exactly said,

23         but I know that Paul had told me concerns he raised

24         about the training, the intensity of the training and

153

1       how we would handle it.

2  Q.  Are you aware either yourself or through anyone else

3      specifically whether or not the issue of instituting

4      a protocol to screen members was raised?

5  A.  I don't know.  Like I said, I wasn't at that meeting.

6  Q.  Are you aware of any documentation which would

7      indicate that this issue about instituting a protocol

8      to screen members was raised prior to May 25th, 2003?

9  A.  I don't have any firsthand knowledge.

10  Q.  Is it fair to say the basis of this answer is what

11      Paul Boyle related to you in his conversation with

12      the Chief?

13  A.  Yes.

14  Q.  Anyone else?

15  A.  No.

16  Q.  I'm not looking to go over anything else, but I just

17      want to know, in Answer Number 7, on the next page,

18      there's a reference.  I think in the first paragraph

19      you indicate that you were constantly being told by

20      supervisors that, you know, they are after you

21      because of the Quinn bill issue.  Do you see that?

22  A.  Yes.

23  Q.  It's the first line going into the second line.  Who

24      told you specifically that they are after you because

157

1        harassment you were mentioning to us earlier, or was

2        it any different in this answer?

3  A.    The same type as before.

4  Q.    Did you file any grievance relative to any perceived

5        harassment that you say happened to you with Chief

6        Pomeroy?

7  A.    No.  I mean, there isn't a provision in the contract

8        for nitpicking.  You can bend -- no.

9             MR. SILVERFINE:  We'll suspend now.

10           THE REPORTER:  For the record, would you

11      like a copy of the transcript, Mr. Gallitano?

12           MR. GALLITANO:  Yes, I want a copy.  A

13      regular transcript and a mini.

14          (DEPOSITION SUSPENDED AT 3:30 P.M.)

15

16

17

18

19

20

21

22

23

24

DUNN & GOUDREAU

# EXHIBIT 3

VOLUME:  I
PAGES:  1-143
EXHIBITS:  8

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
******************************
THOMAS M. KELLEY,              *
                              *
              Plaintiff,       *
                              *
v.                            *    C.A. 1:05-CV-10596-NMG
                              *
TOWN OF PLYMOUTH, ET AL.,      *
                              *
              Defendants.      *
                              *
******************************
```

**DEPOSITION OF ROBERT J. POMEROY, A WITNESS**

called by and on behalf of the Plaintiff, pursuant to the

applicable provisions of the Federal Rules of Civil Procedure,

before Patrice C. Lucero, Certified Verbatim Reporter and

Notary Public in and for the Commonwealth of Massachusetts, at

the Law Office of Joseph R. Gallitano, 34 Main Street

Extension, Suite 202, Plymouth, Massachusetts, on Monday,

September 25, 2006, to be commenced at 10:30 a.m.

**************************
**LINDA M. CORCORAN**
**COURT REPORTING SERVICES**
**P.O. BOX 4**
**KINGSTON, MA 02364**
**(781) 585-8172**

|    |   |                                                            |
|----|---|------------------------------------------------------------|
| 1  |   | involved in training?                                      |
| 2  | A | It was so long ago; I have no memory of that.             |
| 3  | Q | Do you recall any circumstance since you have been chief  |
| 4  |   | of police in which you have made a decision that a       |
| 5  |   | particular police officer should not engage in training? |
| 6  | A | Yes.                                                      |
| 7  | Q | In what circumstances; what are the names of the police  |
| 8  |   | officers?                                                 |
| 9  |   | MR. SILVERFINE:  Objection as to the form.  You           |
| 10 |   | can answer.                                               |
| 11 | A | I can think of some specifics and some in general.  John |
| 12 |   | Abbott comes to mind.  I don't know whether he was a     |
| 13 |   | sergeant or a lieutenant at the time.  He had something  |
| 14 |   | wrong with his leg, veins or something of that nature,   |
| 15 |   | and he couldn't perform in a training exercise that would |
| 16 |   | require physical activity, but he came to the captain and |
| 17 |   | requested to be excused from that, and he was.           |
| 18 | Q | What captain, by the way?                                 |
| 19 | A | I don't know.  It was either Botieri or the other        |
| 20 |   | captain.  I don't know which one it was at the time.     |
| 21 |   | There was another guy, Officer Dennis Govoni, the same   |
| 22 |   | training, he was, I believe assigned to light duty at the |
| 23 |   | time for some type of a heart or blood pressure ailment. |
| 24 |   | He was excused from the training.  Over the years        |

| 1 | | there's been dozens and dozens of officers on light duty |
| 2 | | throughout the years.  Obviously, whatever their physical |
| 3 | | impairment was at the time and they couldn't participate, |
| 4 | | then they couldn't participate.  Just common sense. |
| 5 | Q | Do you recall if, in fact, Govoni or Abbott were told not |
| 6 | | to participate in training because of the concerns of a |
| 7 | | supervisor or superior officer? |
| 8 | A | No. |
| 9 | Q | Were you involved in the decisions to have Abbott and |
| 10 | | Govoni, Dennis Govoni, excused from training? |
| 11 | A | No. |
| 12 | Q | Who made the decision to exclude them from training? |
| 13 | A | One of the captains. I was told about it at the time.  I |
| 14 | | knew about it.  It was common sense.  They couldn't |
| 15 | | participate. |
| 16 | Q | So would you have been told about it before they were |
| 17 | | excused from training or after they were excused from |
| 18 | | training? |
| 19 | A | I don't remember. |
| 20 | Q | Am I to understand that the captains in 2003 -- this |
| 21 | | would be Captain Chandler and Captain Botieri -- |
| 22 | | understood that they had the authority to excuse |
| 23 | | patrolmen from training? |
| 24 | | MR. SILVERFINE:  Objection as to form. You |

1    Q    Do you know of any reason why Officer Kelley was not

2         excluded from the training of the Columbine-like 2003

3         training program?

4    A    He never asked.

5    Q    So, in the case of Abbott and Govoni, they asked?

6    A    I believe Abbott asked.  I don't think Govoni asked

7         because he was already on light duty.

8    Q    So the captain, in fact, took the initiative to exclude

9         him from training, in your memory?

10   A    He was excluded from a lot of things.

11   Q    Right.  But I'm talking only about the training, the

12        Columbine-like training in 2003 right now.  It was the

13        captain who took the initiative to exclude them?

14             MR. SILVERFINE:  Objection to form.

15   A    I don't know.

16   Q    You don't know.  But you do know that Officer Kelley did

17        not ask?

18   A    He didn't ask me, and no one told me if he asked them.

19   Q    Were you aware at the time of the Columbine-like training

20        that Patrolman Kelley suffered from any health

21        conditions?

22   A    Not that I remember.

23   Q    Do you recall at any time prior to the Columbine-like

24        training in May of 2003, being aware of the fact that

1           MR. SILVERFINE:  Objection as to form.  You can

2      answer.

3    A   I think I answered that earlier when I talked about the

4      rule that we have that says something to the effect that

5      if a police officer feels that they're mentally or

6      physically disqualified from performing the duties of a

7      police officer, that they should bring that to their

8      shift commander's attention.

9    Q   What I'm inquiring about, Chief, is what responsibilities

10      do you have as chief to ensure that they are capable of

11      physically and mentally performing these duties?

12   A   My observations, reports, things that I learn, things

13      that I see, things that the officers tell me, things that

14      the officer himself tells me.

15   Q   Do you see it as part of your responsibility to ensure

16      the fact that the patrolmen participating in training in

17      2003 were in good health, in good mental health and good

18      physical health?

19   A   I don't know how anyone can possibly do that.

20   Q   Well, is it your responsibility as chief to do it;

21      whether it's impossible to do it or not, is it your

22      responsibility to make sure that patrolmen are in good

23      physical and mental health at the time they are trained?

24           MR. SILVERFINE:  Objection as to form.

1    A    I can only repeat my answer to the last question.  If an

2         officer tells me, if another officer tells me, if a

3         supervisor tells me, or I make observations that would

4         have a basis that I would form my decision on whether

5         they could participate in training or do their duties as

6         a police officer, then I would act on that.

7    Q    Do you see it's your responsibility to tell your

8         lieutenants and captains to make sure that you are

9         informed of all health conditions reported to them by

10        police officers prior to training?

11   A    No.

12   Q    Do you see it's your responsibility to have your

13        captains, lieutenants, and sergeants inform you of health

14        conditions, physical and mental, regarding police

15        officers prior to performing their regularly assigned

16        duties?

17   A    No.

18   Q    Do you have staff meetings with your command staff?

19   A    Yes.  Yes.

20   Q    Do you often discuss the health, mental and physical

21        health, of police officers in those meetings?

22   A    Sometimes.

23   Q    Did you ever discuss Officer Kelley in those meetings?

24   A    No.

41

```
1              can answer.
2    A    Sometime prior to the exercise.  The colonel from the
3         state police -- and I think it was Colonel DiFarber
4         [phonetic] -- came to the Plymouth County Police Chiefs
5         meeting and said that there was a new program that they
6         were offering to train local police officers called
7         Active Shooter Training, and that upon request, which I
8         wrote to him and asked for a request -- requested he
9         provided his tactical team which he would send out to
10        police departments to train their officers in Active
11        Shooter Training.  So I asked for permission, and he
12        granted it, and I told him --
13   Q    You asked him for permission?  I'm sorry.
14   A    I asked for his permission to do this, and he sent the
15        officers, and I had my training supervisor coordinate it.
16   Q    The training supervisor was Captain Chandler, or was it
17        Captain Michael Botieri?
18   A    No.  I think it was Captain Chandler.  And the training
19        officer at the time, I believe, was Lieutenant Rogers,
20        but I'm not sure.
21   Q    Lieutenant Rogers was the training officer in the
22        department at the time?
23   A    I said I'm not sure.  I don't remember.
24   Q    When you were a lieutenant for three months, were you the
```

1        materials regarding the scope of the training, any

2        limitations in the training, exactly what was going on to

3        the police officers in the town; you didn't read any

4        materials on it?

5                    MR. SILVERFINE:   Objection as to form.

6    A   No.

7    Q   Did you ever ask to see any materials regarding it?

8    A   No.

9    Q   The training officer was Lieutenant Rogers?

10   A   I'm not sure.  I think it was, but I'm not sure.

11   Q   Did you ever have any meetings prior to May of 2003 with

12       the people involved in training in the town police

13       department; did you have any meetings regarding this

14       training program?

15   A   No.

16   Q   Did you have any conversations with anyone involved with

17       training that described the rigors or physical challenge

18       or the exertion that would be required of a police

19       officer undergoing any part of the training that was

20       conducted in May of 2003?

21   A   No.

22   Q   Do you recall ever making any inquiry of anyone as to how

23       rigorous this training would be for police officers?

24   A   No.

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | How long was that? |
| 3 | A | Almost a duplicate schedule.  Virtually duplicate of the |
| 4 | | one in 2003. |
| 5 | Q | Schedule-wise.  What about content? |
| 6 | A | As far as I know, it's the exact same thing. |
| 7 | Q | Did you have discussions with someone prior to 2005's |
| 8 | | training programs that described that training program to |
| 9 | | you? |
| 10 | A | No.  Basically, we had some discussion that centered |
| 11 | | completely around making arrangements to do the training |
| 12 | | again. |
| 13 | Q | That discussion was with whom? |
| 14 | A | I don't remember. |
| 15 | Q | That involved state police instructors? |
| 16 | A | Yes. |
| 17 | Q | That was in 2005? |
| 18 | A | Yes.  And I'm planning on doing it again this year. |
| 19 | Q | In '06? |
| 20 | A | Yes.  '07 it will be. |
| 21 | Q | Did you do any training in '04? |
| 22 | A | No.  Well, no Active Shooter Training.  There was other |
| 23 | | training that happened, but no Active Shooter Training in |
| 24 | | '04. |

```
 1        training in 2003 in the Columbine-like training?

 2   A    I don't remember.

 3   Q    Do you know if any police officers signed any documents

 4        prior to engaging in training?

 5   A    I don't know.

 6   Q    Just so I can be clear, you never saw any printed

 7        documents that described the 2003 Columbine-like

 8        training?

 9   A    Correct.

10   Q    You made a determination that Officer Kelley would not

11        get reimbursed for time after his injury in the

12        Columbine-like training, a period, I gather, of about two

13        weeks; is that right?

14             MR. SILVERFINE:   Objection as to form.

15   A    I don't understand what you mean.

16   Q    Well, do you know what Section 111 benefits are?

17   A    Yes.

18   Q    Did you write the decision he would not get those

19        benefits?

20   A    Yes, but originally you said reimbursed.  He was paid.

21        He didn't receive 111F benefits, but he was paid.

22   Q    Using his earned time?

23   A    Sick time or vacation time, yes.

24   Q    Right.  So when I said reimbursed, I confused you as to
```

54

1         what I was asking?

2   A    Yes.

3   Q    Oh, I'm sorry.  Let's go to Section 111 benefits, Chief.

4   A    Okay.  111F.

5   Q    You denied them?

6   A    Yes, I did.

7   Q    What basis did you use to deny them?

8   A    I did not think that 111F benefits were applicable to the

9         situation.

10   Q    Why?

11   A    From my understanding of 111F.

12   Q    Based upon your understanding of 111F?

13   A    Yes.

14   Q    What specifically do you know about Section 111F that

15         would cause you not to allow those benefits to be

16         extended to Officer Kelley?

17   A    I believe that he was entitled most likely to the Heart

18         Law presumption.

19   Q    You believe the Heart Law presumption applies to 111

20         benefits?

21   A    No.  I believe it applied to his situation.

22   Q    And that's the basis for your decision not to provide him

23         111 benefits?

24   A    Yes.  And what I said earlier:  I don't think that his

55

1       situation was applicable to 111F.

2    Q   Why?

3    A   Because that's my understanding of the statute.

4    Q   What is it about the understanding of the statute that

5        applies to Officer Kelley's case that results in you

6        deciding that he doesn't get the benefits of 111F?

7    A   It's my interpretation of the statute.

8    Q   What is it about your interpretation?

9    A   My interpretation of the statute is that in his situation

10       the facts particular to his situation did not come under

11       111F.

12   Q   You can't give us any more of an explanation for why you

13       denied the police officer involved in this case the

14       statutorily provided benefit of Section 111F?

15                 MR. SILVERFINE:   Objection as to form.

16   A   I didn't think in my interpretation he was entitled to

17       the 111F benefits.

18   Q   And you can't be any more specific as to what it is about

19       the nature of his claim that makes you think that 111

20       benefits don't apply?

21   A   I think that the Heart Bill was applicable, not 111F.

22   Q   When the Heart Bill is applicable, 111 F is not; is that

23       what you're saying?

24   A   That's correct.

56

1    Q    So you can only have the benefit of one of those

2         statutes, not both?

3    A    Yes.

4    Q    Is that the reason why today he has never received 111

5         benefits?

6              MR. SILVERFINE:   Objection as to form.

7    A    He retired for an accidental disability.

8    Q    I understand that, but I'm saying is that the reason

9         today after your initial decision and you were sued in

10        this case and you're an individually named defendant; do

11        you still hold to the position that he should be denied

12        111F benefits because he is being provided the benefits

13        of a presumption under the Heart Law?

14             MR. SILVERFINE:   Objection as to form.

15   A    Yes.

16   Q    So the original decision that the benefits of one law

17        applies, that being the Heart Law, causes 111 benefits to

18        be lost, that decision that you made back in late 2003,

19        you still hold to today in 2006?

20             MR. SILVERFINE:   Objection as to form.

21   A    Yes.

22   Q    Do you believe that he was injured at the scene of the

23        Columbine-like training?

24   A    I don't know what you mean by injured.

LINDA M. CORCORAN COURT REPORTING SERVICES (781) 585-8172

|    |   |                                                              |
|----|---|--------------------------------------------------------------|
| 1  | A | I still don't understand what you mean by injured. It's a    |
| 2  |   | legal term, as you know, and it has legal significance.      |
| 3  | Q | Fine.  Your obligation when you get a claim from a police     |
| 4  |   | officer is to make a determination as to why he was not      |
| 5  |   | injured or why he was injured; your obligation is to         |
| 6  |   | determine whether or not an injury has been sustained?       |
| 7  | A | That's correct.                                              |
| 8  | Q | And you made the determination in Kelley's case that an      |
| 9  |   | injury was not sustained?                                    |
| 10 | A | I believe that he was eligible for the Heart Law             |
| 11 |   | presumption.                                                 |
| 12 | Q | I'm asking you whether or not an injury was sustained.       |
| 13 | A | I do not believe that he was entitled to an injury as        |
| 14 |   | applicable to 111F benefits.                                 |
| 15 | Q | So you believe that he didn't fulfill the requirements of    |
| 16 |   | the language or the use of the word "injury" as it           |
| 17 |   | appears in 111F?                                             |
| 18 | A | Well, I'll restate it.  I don't think that 111F was          |
| 19 |   | applicable to the situation.                                 |
| 20 | Q | So, as a chief of police, do you understand that he was      |
| 21 |   | removed from the scene by EMTs?                              |
| 22 | A | Yes.                                                         |
| 23 | Q | He was taken to a hospital?                                  |
| 24 | A | Yes.                                                         |

| | | |
|---|---|---|
| 1 | | doctor reviewing him, and we talked about that medical |
| 2 | | doctor, Dr. Thakur from Boston University Medical School, |
| 3 | | and then you have the retirement board all agreeing that |
| 4 | | he was injured -- they use the word "injured" - on |
| 5 | | May 25, 2003, and you disagree with each of those, and |
| 6 | | yet you didn't have him examined? |
| 7 | | MR. SILVERFINE:  Objection as to form. |
| 8 | A | I don't disagree with what's in these documents. |
| 9 | Q | Did you have him examined? |
| 10 | A | No. |
| 11 | Q | Why not? |
| 12 | A | I didn't think it was necessary. |
| 13 | Q | It's your view, the view you hold today and the view you |
| 14 | | held in 2003 with regard to his 111 benefits; is that |
| 15 | | supported, sustained in any respect by any medical |
| 16 | | personnel? |
| 17 | A | I just want to reiterate I did not have these medical |
| 18 | | reports prior to me making my decision.  I only got these |
| 19 | | after he was retired. |
| 20 | Q | Right.  At that time and place, there was never an |
| 21 | | attempt on your part when you first got these documents |
| 22 | | to reverse your decision; right? |
| 23 | A | No. |
| 24 | | MR. ARMSTRONG:  Would you mark that as |

1     your original decision, at all?

2  A  No.

3  Q  Now, in each of these cases, these people were suggesting

4     medical conditions that you didn't agree with; is that

5     right?

6  A  No.

7  Q  No.  You agree that all of these conditions existed?

8  A  I'm not a medical doctor.  Whatever they find they find

9     as far as his medical condition.

10 Q  You have no dispute with anything that they're saying?

11 A  I have no dispute with their medical findings.

12 Q  So you have no dispute with Donald Moore's statement that

13    the date of injury was May 25, '03?

14 A  I'm not going to dispute Dr. Donald Moore.  That's his

15    opinion.

16 Q  But you have another opinion?

17 A  I'll restate it for probably the seventh time.  I don't

18    think that what happened to Officer Kelley on May 23rd is

19    compensable under 111F.  I think he gets compensated

20    under the Heart Law.  [Pause] Can I take five minutes for

21    a restroom break, please?

22 Q  Go right ahead.  Take as long as you want, Chief.

23                 [Off the record.]

24 Q  Prior to May 25, 2003 -- you may have answered this; I

1      can't recall if you did -- did you know that Officer

2      Kelley had Lyme disease or Meniere's disease prior to the

3      training?

4  A   I think I said, if my memory is the still the same, I

5      don't ever remember hearing anything about Meniere's

6      disease.  I knew there was a couple people in the

7      department that had Lyme disease.  Whether he was one of

8      them I don't know.

9  Q   You meet periodically with the presidents, the leaders of

10     these bargaining units, inside your department?

11  A   Yes.

12  Q   I assume that Officer Kelley was a member of the

13     patrolmen's union?

14  A   Yes.

15  Q   That's how you describe it in the town, patrolmen's

16     union?

17  A   Yes.

18  Q   Did you meet with the leadership periodically; do you

19     have a standard meeting time with the leadership of the

20     union?

21  A   No.

22  Q   At your request or their request, these meetings are

23     called?

24  A   Yes.

1    Q   Generally, where are they held -- at your office?

2    A   Usually.

3    Q   Prior to the May 25th training in 2003, did you meet with

4        the union to discuss police training?

5    A   No.

6    Q   Have you ever discussed police training --

7    A   Excuse me.

8    Q   I'm sorry.

9    A   Yes.  But not this training.

10   Q   You discussed training in general?

11   A   No.  We discussed another specific training.

12   Q   What training did you discuss with the police leadership?

13   A   AR-15 training.  It's a rifle.

14   Q   The rifle.  When did that meeting take place?

15   A   I don't know.  It was around this time.

16   Q   But it was prior to May 25th, do you think?

17   A   I believe it was, yes.

18   Q   The police leadership, is that a good way of describing

19       the union leadership?

20   A   Sure.  That or the members of their executive board.

21   Q   So that usually there are a certain set number of people

22       that come to visit with you?

23   A   No.  Sometimes there's one.  Sometimes there's three or

24       four.

1 Q On occasion of the rifle discussions, who was there?

2 A Officer Boyle, Paul Boyle; and Officer Dana Goodwin.

3   There may have been others, but I know that they were

4   there.

5 Q At the time of that meeting or any other time with anyone

6   that you could describe as being in the leadership of the

7   patrolmen's union --

8 A Yes.

9 Q -- was there any discussion about who should or should

10   not be involved in the Columbine-like training?

11 A No.

12 Q Was there any discussion about who should or should not

13   in the uniformed ranks be involved in training generally?

14 A No.

15 Q There was at no time a conversation brief or lengthy,

16   maybe not at one of these meetings, between you and

17   anyone in the leadership of the patrolmen's association

18   about Officer Kelley and his medical conditions?

19 A Never.

20 Q So, therefore, there was no discussion at all in any

21   meeting informal or formal between you and Officer Boyle

22   who is president of that --

23 A President.

24 Q -- and was in 2003?

99

| | | |
|---|---|---|
| 1 | A | Captain Botieri. |
| 2 | Q | It also affected a third person; right? |
| 3 | A | Well, it affected more than that. |
| 4 | Q | In what respect? |
| 5 | A | It affected the second captain, and it affected benefits |
| 6 | | of the fire chief and the deputy fire chiefs. |
| 7 | Q | In fact, it had an impact on what the people were going |
| 8 | | to earn or what people did earn after the issue came up? |
| 9 | A | It didn't have any effect. |
| 10 | Q | It didn't at all? |
| 11 | A | No. |
| 12 | Q | There would be no issue financially with regard to |
| 13 | | Botieri or any other captain or yourself as a result of |
| 14 | | Kelley's activity? |
| 15 | A | No.  Nothing changed. |
| 16 | Q | In Botieri's case, he was receiving overtime? |
| 17 | A | Yes. |
| 18 | Q | And you do not? |
| 19 | A | Right. |
| 20 | Q | Did the amount of his overtime change through the years? |
| 21 | A | I don't know. |
| 22 | Q | Would it surprise you if I told you it did? |
| 23 | A | I don't know. |
| 24 | Q | You are in charge of the weekly payroll in |

1   A    I know that they were contacted because Mr. Griffin told

2        me so.  There was rumors back in the beginning of 2001

3        that Kelley went to the inspector general's office.  That

4        was up to him.  I wasn't the least bit concerned about

5        it.  They never contacted me.

6   Q    Did you contact anyone because Kelly went to the

7        inspector general's office?

8   A    No.  I only heard rumors that he went.  I didn't know for

9        a fact that he went.  I didn't know if he complained

10       about me or the finance director or the town manager.  I

11       have no idea.

12  Q    You never talked to Griffin about the subject?  Griffin,

13       apparently, according to the newspapers, was talking to

14       the newspapers, at least, and was talking to the

15       inspector general.  You said that he mentioned it in

16       passing?

17  A    Quite awhile later he mentioned to me, "Oh, by the way,"

18       and that's how he said it, "Oh, by the way, I never told

19       you that they came down."  He says, "There was nothing to

20       it, and they left."

21  Q    The manager at the time in the town was Eleanor Beth.

22       Did she talk to you --

23  A    No.  She never talked to be me about the inspector

24       general's office, and I don't think that she ever talked

LINDA M. CORCORAN COURT REPORTING SERVICES (781) 585-8172

1       was contacted once, and that's all I know.

2   Q   So the town manager did not speak to you as chief of

3       police about the inspector general asking questions?

4   A   Correct.

5   Q   When did you first learn of the fact that the inspector

6       general had been contacted by Officer Kelley?

7   A   There was a rumor -- and that's all it was was a rumor --

8       around February of 2001.  There was a rumor going around

9       that Kelley went to the inspector general's office.

10  Q   Do you know how you shared in that rumor?

11  A   I remember it was gossip at the station.  I didn't know

12      if it was true or not.

13  Q   Do you know if the inspector general in the contacts that

14      were being made with Eleanor or the former town manager

15      ever suggested, made a recommendation as to what the town

16      might do in the circumstances that they were discussing

17      with the town, like pass a new bylaw?

18  A   No idea.

19  Q   Eventually a bylaw was passed?

20  A   A bylaw was passed, yes.

21  Q   Were you relieved that the bylaw was passed?

22  A   I told you earlier I wasn't the least bit concerned about

23      the arrangement that was in existence before the bylaw.

24  Q   The collective bargaining agreement has certain

1    Q    Had you ever done that in the case of any other police

2         officer who served like-agency boards?

3                   MR. SILVERFINE:   Objection as to form.

4    A    Kelley was the first one to be on the retirement board,

5         so he wasn't the only officer that I had to talk to about

6         attending meetings.

7    Q    Who else did you talk to about attending meetings?

8    A    Several months prior to Kelley getting on the retirement

9         board, I prohibited Sergeant Abbott from attending PERAC

10        meetings.

11   Q    You told Abbott that he couldn't go to the meetings?

12   A    That's right.   Not while he was working.

13   Q    But you later relented; you changed your mind?

14   A    I changed my mind.

15   Q    What caused you to change your mind?

16   A    A statute was passed that specifically authorized an

17        on-duty, public employee be allowed time off to attend

18        PERAC meetings.

19   Q    Did you require that the PERAC group reimburse the Town

20        of Plymouth for the amount of money that was lost by way

21        of Abbott being at a PERAC board meeting?

22   A    There was no such provision allowed by the statute.

23   Q    So that meant that you didn't?

24   A    I couldn't, so I didn't.

120

1    Q    But in the case of Kelley, you did require that the

2         retirement board pay the town?

3    A    Yes.   There's a statute that allows that, so I required

4         it.

5    Q    The statute is where, Chief?

6    A    In Chapter 32.

7    Q    What's it say?

8    A    I don't know.  I'd have to read it.

9    Q    When you told Kelley or the retirement board that the

10        town would have to be reimbursed for the time that he

11        spent at retirement board meetings, did you consult with

12        any other town department manager; did you consult with

13        the town manager?

14   A    Well, I have to restate that.  I did not tell the

15        retirement board originally that they had to reimburse

16        the department for time Kelley spent at the meeting.  My

17        original directive to Kelley was that he could not attend

18        retirement board meetings while he was working for the

19        police department.  Kelley and the board then provided me

20        with a statute that says that we could be reimbursed, and

21        that was an equitable solution, so that's what we agreed

22        upon.

23   Q    So, as long as you were reimbursed the money that he was

24        earning as a police officer, everything was okay?

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Any other circumstances where police officers are |
| 3 | | attending meetings while they are scheduled to work for |
| 4 | | the town? |
| 5 | A | Yes. |
| 6 | Q | Who is that? |
| 7 | A | The Massachusetts Police Association. |
| 8 | Q | Who's that? |
| 9 | A | Which officers? |
| 10 | Q | Yes. |
| 11 | A | They change.  The contracts allow so many of them to go |
| 12 | | to these meetings, and the statute also allows, and I |
| 13 | | don't remember the details.  There's some statutory |
| 14 | | provision that allows some to attend some of these |
| 15 | | meetings.  I think Abbott is one of those as well. |
| 16 | Q | Is that in Chapter 32 also, Chief? |
| 17 | A | No, it's not. |
| 18 | Q | Do you know what chapter it is? |
| 19 | A | No, I don't. |
| 20 | Q | But it has to do with time off for meetings for the |
| 21 | | Massachusetts Police -- |
| 22 | A | -- Association.  Yes. |
| 23 | Q | -- Association.  One, two or three officers at a time? |
| 24 | A | There's a  difference.  I don't remember.  The statute |

1                    [Off the record.]

2   Q   Did you take any retaliation against Officer Kelley for

3       him complaining about you not being paid overtime

4       pursuant to bylaws of the town?

5   A   I never got paid overtime.

6   Q   When you were paid Quinn Bill benefits.  Did you take any

7       action against him in retaliation?

8   A   Absolutely not.

9   Q   Did you to take any retaliation against him because he

10      went to the inspector general --

11   A   No.

12   Q   -- about the Quinn Bill issue?

13   A   No.

14   Q   Did you have any conversation with Captain Botieri or

15      Captain Chandler in which you discussed the fact that

16      they needed to watch Officer Kelley more than they needed

17      to watch other officers?

18   A   No.

19   Q   Did you ever tell them that they needed to watch him

20      because he was a troublemaker?

21   A   No.  Never.

22   Q   Did you consider Officer Kelly while he was a police

23      officer to be a troublemaker?

24   A   Yes.

| | | |
|---|---|---|
| 1 | Q | And that he was complaining about the Quinn Bill? |
| 2 | A | Oh, that was not why he was a troublemaker. |
| 3 | Q | And that he was complaining about the fact that you were |
| 4 | | being paid Quinn Bill benefits without the benefit of a |
| 5 | | bylaw? |
| 6 | A | No. |
| 7 | Q | No, that's not a troublemaker either? |
| 8 | A | Oh, he complained about everything all the time. |
| 9 | Q | Can you tell me some of the things that he complained to |
| 10 | | you about that you would characterize as making him a |
| 11 | | troublemaker. |
| 12 | A | He was a constant source of irritation to most everyone. |
| 13 | | I'd characterize him as a pest. |
| 14 | Q | A pest? |
| 15 | A | A pest. |
| 16 | Q | What type of issues would he raise? |
| 17 | A | Oh, he got into a big controversy about access to |
| 18 | | Saquish. |
| 19 | Q | That's a Town of Duxbury issue, is it; or is it a |
| 20 | | Plymouth issue? |
| 21 | A | It's the Plymouth-Duxbury line. |
| 22 | Q | That's what, he disagreed with your policy? |
| 23 | A | No.  Just Tom liked to insert himself in every issue that |
| 24 | | he could.  I never really spoke to him much at all.  I |

1     just avoided him.

2   Q  But Saquish is accessed not through Plymouth --

3   A  It's through Duxbury into Plymouth, yes.

4   Q  It's Plymouth that's off the shore down by the harbor; is

5     that the town of Plymouth's land out there?

6   A  We got to go through Kingston, through Duxbury, and then

7     you get into Plymouth.

8   Q  So who was he arguing with with respect to access to

9     Saquish?

10  A  He wouldn't argue.  He'd just make his views known how he

11    thinks life should be.

12  Q  Any other issues that you can recall?

13  A  His work always needed constant follow up.  He wrote poor

14    reports.  He had a lot of citizens complaints.  He didn't

15    talk to people very nicely.  He had a poor appearance.

16    Quite frankly, I just thought he reflected poorly on the

17    department as a whole.

18  Q  What about using his radio?

19  A  What about it?

20  Q  There were issues about Botieri calling him or Fahy

21    calling him about not having his radio on?

22  A  Those are all just a constant list of -- they're all

23    minor infractions, but it's the same employee doing it

24    over and over again.

**LINDA M. CORCORAN COURT REPORTING SERVICES (781) 585-8172**

# EXHIBIT 4



# IMPORTANT DELIVERY

SOUTHOFBOSTON.COM



Old Colony Memorial    Google

southofboston.com    Web    Search

Wed., Jan. 11. 2006

Full Forecast

**LATEST NEWS**
THE PATRIOT LEDGER
THE ENTERPRISE
OLD COLONY MEMORIAL
AP WORLD &
   NATIONAL NEWS
LOCAL WEATHER
LOCAL TV LISTINGS

**CLASSIFIEDS**
Announcements
Automotive
Employment
Merchandise
Real Estate
Rentals
Recreation
Services
Yard Sales
Place an Ad
MORTGAGE CENTER

**DEATH NOTICES**
Patriot Ledger
Enterprise
Old Colony Memorial

**HOME DELIVERY**
Patriot Ledger
Enterprise
Local Town Newspapers

**LOCAL GUIDES**
Dining/Entertainment
Business Profiles
Home & Garden
Online Yellow Pages
PLYMOUTH GUIDE

**SPECIAL SECTIONS**
Living Well/Health News
Wedding/Bridal
Education & Training
ONLINE PERSONALS

SOUTHOFBOSTON.COM
Archive
Contact Us
Work for Us
Newspapers in Education
Home Page

MPG Newspapers
9 Long Pond Rd.
Plymouth, MA 02360
(508) 746-5555

CONTACT US

LOCAL NEWS, SPORTS, FEATURES & OPINION   |   DEATH NOTICES

ARCHIVES

# Benefits paid without vote        9/6/2001

*By Tamson W. Burgess MPG Newspapers*
PLYMOUTH (Sept. 6) Town meeting will be asked in October to approve benefits paid to top police and fire employees since the 1980s, based only on verbal agreements with a former town administrator.

The total amount of money isn't available, but it amounts to thousands of dollars every year.

No one ever made the payments part of the personnel bylaw that authorizes compensation for non-union town employees. Verbal agreements aren't acceptable in municipal finance, finance director Patrick Dello Russo said.

Town manager Eleanor Beth and human resources director Pat Flynn have asked the personnel board to go to town meeting in October to amend the bylaw to include all the payments already being made. But questions about how the omission happened, who knew about it, and for how long have complicated the process.

The police chief and police captains receive holiday pay, a uniform allowance and the same educational incentive pay the town pays to police union members up to 30 percent depending on what degrees they've earned. The captains also get some overtime.

The fire chief and his two deputies receive holiday pay and uniform allowances that also aren't included in the bylaw. Those payments go back at least to 1981, Fire Chief Tom Fugazzi said.

The payments to police captains go back to 1988, when captains were taken out of the police superior officers union. Former town manager Bill Griffin promised that captains would continue to get the benefits they got as union members and that the change wouldn't result in decreased pay or benefits.

Four years later, when Robert Pomeroy was promoted from captain to chief, Griffin made another verbal agreement with him that he wouldn't lose the benefits he had been assured as captain.

"I don't have an explanation," Griffin said in an interview this week. "Frankly, 13 years later, I don't remember what was going on back then. We intended to do it and it didn't get done. I take responsibility for it. I made a mistake and I'm sorry."

Selectmen chairman Ken Tavares said there would be no incentive to be promoted without the benefits.

"Why do you want to become a chief or a captain if the incentives are going to be taken away?" Tavares asked. "The best educated won't want to be promoted."

"It's not usually a good selling point to take a promotion and take less money," Beth added.

Beth, pressed Tuesday night for a dollar figure on the amount of money involved, told selectmen civil service rules wouldn't allow the town to collect the money back from the employees. She questioned whether the board wanted to spend more time figuring out how much was paid, since it can't get the money back.

The money to pay the benefits was included in the police and fire budgets each year and appropriated by town meeting.

Both Pomeroy and Fugazzi continued to budget the money because, Pomeroy said, they had an agreement with the town manager that they could. When asked if it ever dawned on either of them to remind the manager that their deal had never been put into the bylaw, Pomeroy shook his head no. "We were always under the impression this was an agreement," he said.

Dello Russo hasn't been actively involved in the issue but is the town's expert on the legalities of town finance.

"When did people know and when did they take action is the question," he said. "What it comes down to is whether it's just poor, sloppy management practice."

If it was put on a back burner by mistake with no intent to hide it, then you have to correct it as soon as you

know, he explained.

The personnel board split 2-2 on the proposal to correct it. One member is out of town, and the board will take another vote when he returns.

Tom Kelley claims he discussed the error with both Beth and Flynn back in the spring of 1998. They took no action to make the problem public until they brought it to the personnel board three months ago.

Kelley is a Plymouth police officer and former union steward. He said his interest in this issue has nothing to do with being on the police force. He's also a Precinct 6 town meeting representative and a member of the town's retirement board.

He says new policies adopted by the retirement board forced Flynn and Beth to act on the problem. The board enacted a new system of checking all payments to town employees to establish retirement benefits, he said. The payments being made under the verbal agreements couldn't have been accounted for under the new process, he said.

He said he's been concerned since he first discovered the incongruity almost four years ago because he knew when these employees eventually retired his board wouldn't be able to count the unauthorized payments toward their retirement benefits.

In a memo to selectmen this week Beth says neither she nor Flynn learned of the problem until "within the last year."

A memo Flynn wrote to Kelley in July 2000 includes specific amounts of overtime paid to a police captain. As human resource director it's her responsibility to oversee the bylaw, which states those covered by the personnel bylaw cannot receive overtime. But two months later, minutes from the Sept. 6, 2000 personnel board meeting record that Kelley specifically asked the board, with Flynn in attendance, whether anyone was being paid outside the bylaw. The board said no. Kelley said he believes the board genuinely didn't know it was happening. But Flynn never corrected their answer, Kelley said.

Beth apparently not only knew there was a problem but was already looking into how it happened at least 18 months ago. She's distributed a letter from Griffin dated March 2, 2000, explaining the agreement he made with Pomeroy when he was promoted to chief.

Personnel board member Edward Santos doesn't recall being told about the verbal agreements and the minutes from the meetings around that time couldn't be found when the board requested them this week. A memo from Griffin to the finance committee in 1988 says he planned to take needed changes to the personnel board soon. Flynn suggested there had probably been lots of changes in the board since 1988. Santos told her that, in fact, he was chairman at the time. Current chairman Jean Johnson said she was also serving on the board in 1988 and didn't recall being told of the deal either.

"This has been going on too long for us to just arbitrarily approve it," Santos said. "I happen to think I smell a snake."

He said he wants all the facts and figures to go before town meeting and let it decide what to do. "We all know there are other people looking over our shoulder," he added.

"The finance committee or somebody has been passing a budget every year to appropriate this stuff. Somebody above our board knew about this," personnel board member Arthur Moriarty said.

"What's to prevent this from happening again tomorrow or the next day?" board member Alfred Lopresti asked.

When selectmen considered the article Tuesday night, chairman Ken Tavares went into a tirade, claiming the issue had turned into a personal attack on Pomeroy. He didn't mention Kelley's name.

"This is not a personal matter," Kelley said yesterday (Wednesday) "It's a matter of public finance, fair treatment of all employees and accountability. The lag time between when they knew and when they acted is the issue."

The personnel bylaw was revised in 1995 but made no reference to the Griffin agreements. The town paid $25,000 to a consultant in 1997 to reclassify all the non-union town positions and rewrite the bylaw, but the current bylaw, passed in 1998, still makes no mention of the benefits.

The personnel bylaw now only covers about 18 town employees. It had served as the compensation agreement for about 100 people until middle management employees formed a union.

Beth says the reason she didn't act sooner to fix the mistake was because she was waiting to finalize a contract with that new union, something that didn't happen until last winter.

The personnel board asked last week for more documentation on the problem. Tuesday, right before the issue went to selectmen, Beth gave the personnel board a letter from Griffin.

Griffin served as the town's executive secretary from 1978 to 1981, when the job was changed to town manager. He held that position until 1995. Beth was assistant town manager when he left.

"I apologize that such an action (amending the bylaw) was not taken back in 1988. I do wish to stress, however, that such an oversight was unintentional and that everyone did and has continued to work in good

# EXHIBIT 5

Volume II, pages 1-95

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. 1:05-cv-10596-NMG

```
--------------------------)
THOMAS M. KELLEY,         )
        Plaintiff        )
VS.                      )
                         )
TOWN OF PLYMOUTH, ET AL, )
      Defendant          )
--------------------------)
```

CONTINUED DEPOSITION OF THOMAS M. KELLEY, a

witness called for examination by counsel for the

Defendant, taken pursuant to the applicable provisions of

the Massachusetts Rules of Civil Procedure, before

LINDA M. CORCORAN, a Court Reporter-Notary Public in and

for the Commonwealth of Massachusetts, at the Law Offices

of Joseph R. Gallitano & Associates, 34 Main Street

Extension, Suite 202, Plymouth, Massachusetts, on

Wednesday, June 21, 2006, commencing at 2:07 p.m.

**LINDA M. CORCORAN**
**CERTIFIED COURT REPORTER**
**P. O. Box 4**
**Kingston, Massachusetts   02364**
**(781) 585-8172**

Page 9

1   he part of?

2        A.    He would have been a part of the department of

3   -- the finance department.

4        Q.    Anyone else you can think of?

5        A.    Right now presently a Bruce Miller, who's now

6   there.

7        Q.    Where's he from?

8        A.    He's now the finance director.  He replaced

9   Dello Russo.

10       Q.    Do you know when that was?

11       A.    Let's see.  Geez, I don't remember.  Maybe

12  around 2003, 2004, somewhere in that area.

13       Q.    Relative to the Columbine-like drill back on

14  May 25, 2003, prior to the drill itself, did you object

15  to participation in that drill?

16       A.    I was never made aware that an objection would

17  be entertained.

18       Q.    But the question is, did you?

19       A.    No, I didn't.

20       Q.    In other words, did you verbalize that you

21  yourself had an objection to participate for any reason?

22       A.    No, prior to that I --

23       Q.    All right.

24       A.    Excuse me.

Page 48

1    indicating to him that I would be seeing my doctor prior

2    to -- I think it was the 21st I saw my doctor of June.

3    And we had the complete file and the results of the

4    cardiac catheterization.  At that point I then determined

5    from talking in counsel with my doctor and my personal

6    friends and stuff that I have to put my papers in to

7    retire.

8         Q.   Back in June 25, 2003, did you speak to Captain

9    Botieri about this sick time and vacation time?

10        A.   All I said to him at that -- I saw him at the

11   town hall, like it says, and I said I just put in my

12   papers that day -- I believe a couple of days before

13   that, and then I wrote this to the chief.  I said, "Put

14   me in for sick time because I put my papers in as of this

15   date."

16        Q.   Back on June 25, 2003, did you request that

17   your use of sick time be changed to vacation time so you

18   would not be restricted in your activities?

19        A.   Not at that point, no.  I put in for sick time

20   then because I had additional time and I knew I'd have to

21   retire and I was putting my application in.

22        Q.   On June 25, 2003, did you speak to Captain

23   Botieri and state that you wanted to be able to be out

24   and about and be able to drink on your boat without

# EXHIBIT 6

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 05 10596 NMG

THOMAS KELLEY,                    )
    Plaintiff,                    )
                                )
                                 )
VS.                               )
                                 )
TOWN OF PLYMOUTH, et al           )
    Defendants.                   )

## PLAINTIFF'S ANSWERS TO DEFENDANTS'
## FIRST SET OF INTERROGATORIES

### INTERROGATORY NO. 1

Please state your full name, residence, age, date of birth, social security number, and name and address of your employer(s) (if any), your position with such employer(s) and the length of time employed or affiliated with such employer(s).

### ANSWER

Thomas M. Kelley, 119 Arlington Rd., Plymouth, Plymouth County, MA 02360, DOB 10/26/54; S.S. # 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; retired.

### INTERROGATORY NO. 2

If you, your attorney, or an investigator on behalf of you and/or your attorney have taken the written or recorded statement of any person relative to the allegations set forth in your complaint, please state the name and address of each person whose statement was taken and the date and time each such statement was taken.

### ANSWER

Kevin P. Fahy, of Hedges Pond Rd., Plymouth, MA.

Debra J. Sullivan, Contributory Retirement Board Director

Both documents were in the form of an Affidavit and were produced in the Plaintiff's automatic disclosure.

**INTERROGATORY NO. 3**

Please itemize and describe with particularity each and every damage, loss, injury or harm which you have suffered or will suffer as a result of the offenses alleged in the Complaint, describing the manner in which each such damage, loss, injury or harm was calculated, and identify all documents concerning such damage, loss, injury or harm.

**ANSWER**

After I was approved for disability retirement, I submitted a request for reimbursement for vacation time I had to use before I was relieved of duty and put officially on disability. Under Mass. General Laws Ch. 41, Section 111F, I was entitled to reimbursement of $2,000.00 for vacation days I had to use for sick leave, after May 25, 2003. My claims include the payment of all vacation time as well as payment for loss of all salary and benefits for the sixteen years I would have served to my normal retirement date, all in an amount of approximately $220,000.00. In addition I am seeking treble damages for statutory violations.

**INTERROGATORY NO. 4**

State the full name and present address of each and every person whom you or your attorneys expect to call as an expert witness at trial including the subject matter on which each such expert is expected to testify, the substance of the facts and opinions to which each such expert is expected to testify, a summary of the grounds for each such opinion of each such expert and the documents upon which each such expert will base his/her opinion.

**ANSWER**

The Plaintiff and his attorney have not yet determined who will be called as an expert witness at trial and reserve the right to supplement this response in accordance with the Scheduling Order.

**INTERROGATORY NO. 5**

Please set forth the facts on which you rely when you allege that the defendants violated Massachusetts General Laws Chapter 149, § 185, specifically identify with particularity all

activities, policies and or practices undertaken by the defendants that you believed were in violation of law or posed a risk to pubic health, safety or the environment.

**ANSWER**

Pomeroy was well aware that I had reported him to the Inspector General's Office. When Pomeroy insisted that I be included in the Columbine-like drill on May 25, 2003, he knew that I had reported him to the Inspector General's Office, and he knew my medical conditions were preexisting and would place me in harm. Further, Pomeroy was well aware that my cardiac incident on May 25, 2003, was a result of the drill, and was well aware of the report of the Independent Medical Panel, which reviewed my injury on two points, one as an application for disability retirement and one as an injury on duty, and concluded that my condition was the result of an injury on duty on May 25, 2003, and directly related to the Columbine-like drill, which was the proximate cause of my injury.

Despite this information, Pomeroy refused to compensate me for vacation time, which I legitimately had to use and was entitled to have reimbursed under Chapter 41, Section 111F.

I was an employee under M.G.L. 149, Section 185, and my activities in reporting violations and improprieties of other employees and supervisors was an activity protected by the statute. Pomeroy's failure to pay for my vacation time under a Chapter 41, Section 111F, the failure to screen members of the police force and prevent me in particular from participating in the aforesaid strenuous and stressful drill, were retaliatory in nature. Said retaliation by Pomeroy was because I reported him to the Inspector General's Office.

Pomeroy's denial and the denial by the Plymouth Town Manager at that time, Pamela Nolan, of Chapter 41 Section 111F funds due me was also retaliatory. All aforesaid actions were in violation of Chapter 149, Section 185, which prohibits retaliatory actions against employees who have reported wrongdoing to a disciplinary body/office or public policy-making body such as the Inspector General's Office.

3

## INTERROGATORY NO. 6

Please describe in detail the facts on which you rely when you allege that the defendants' conduct was willful, wanton and reckless, including but not limited to the facts on which you rely when you claim that the defendants intentionally failed to institute a protocol to screen members of the department who would be at risk due to existing medical conditions known to the department and that these actions constituted retaliation against a whistleblower.

## ANSWER

See answer to Interrogatory Number 5. In addition, The actions of the Town of Plymouth and the Plymouth Police Department, through Pomeroy, by failing to screen the members of the Department who would be taking part in the drill, in which the men were to be put through a rigorous, physically demanding, and stressful drill involving a hostage situation similar to the Columbine incident, resulted in me suffering a cardiac incident and life-altering injury.

It was well known by Pomeroy and other supervisory members of the Police Department, and well documented in my personnel file, that I had several physical illnesses for which I was being treated and being medicated; and therefore, that my participation in such an activity would place me at great risk. Even if he didn't know, Pomeroy had a duty to investigate, especially since the issue of my participation was raised.

The Defendants owed me a duty of care not to expose me needlessly to a dangerous exercise considering my pre-existing conditions. The decisions to make all members of the Department, regardless of their physical condition, participate in this exercise was willful, wanton, and reckless conduct by Plymouth, its Police Department, and in particular Pomeroy. Specifically, the Town, through Pomeroy, was negligent by failing to institute a protocol to screen members of the department who would be at risk due to existing medical conditions known to the department.

The aforesaid negligence of the Defendants was the proximate cause of my injuries. Said acts were also intentional in nature, constituting retaliation against a whistle blower.

4

The Union attempted to screen officers and institute a protocol, but the Union was ignored.

## INTERROGATORY NO. 7

Please describe in detail the facts on which you rely when you allege that your constitutional rights were violated, including but not limited to the facts on which you rely when you claim that you have been harassed and treated differently than other similarly situated officers in the Plymouth Police Department.

## ANSWER

The constant harassment consisted of having to log in and out for meetings, constantly being told by Supervisors that you know they are after you because of the Quinn Bill issue, being denied vacation or holidays by violation of contract.

My constitutional rights were violated in that no other member in a similar position of the Department or any other employee in the Town of Plymouth in a similar position, has been treated in such fashion and therefore the actions of the Town were in violation of my 14th Amendment Rights, as well as federal statutes protecting me from such treatment and providing for equal protection under the law.

I was routinely harassed by Pomeroy and treated differently then other officers in the Plymouth Police Department by monitoring my every movement on a daily basis.

I served on the Plymouth Retirement Board, as did other Town employees. But, contrary to standard operating procedures, Plymouth and Pomeroy insisted upon reimbursement by the Retirement Board of any salary time I spent on Retirement Board business. I was the only Town employee who was serving or who had served on the Retirement Board subjected to such scrutiny and reimbursement policy.

By denying me the use of vacation time and reimbursement of same for sick leave under Chapter 41, Section 111F, I was subjected to different treatment then any other police officer or other Town employee in similar circumstances. Further, by denying me the reimbursement of funds, as aforesaid, and more importantly knowingly and intentionally forcing me to take part in

5

a drill any reasonably prudent person would have known would be a dangerous situation physically for me, Pomeroy violated 42 U.S.C. 1983, because Pomeroy sought to harm me and maliciously took action against me, exposing me to treatment different from other officers on the force with the intent of causing me harm.

Although Pomeroy ordered all police personnel to take part in the aforesaid Columbine like drill, he did so as a pretext to cover his true intentions to harm me by forcing me to take part in an exercise that I objected to participating in and would be hazardous to me. Pomeroy did so fully knowing of my pre-existing medical conditions. Pomeroy used the drill exercise as one more method to further harass me in an effort to force me out of the Police Department and to retaliate against me for reporting him to the State Inspector General.

**INTERROGATORY NO. 8**

Please set forth the facts, on which you rely when you allege that the defendants violated Massachusetts General Laws Chapter 41, § 111F, specifically identify with particularity all activities, policies and/or practices undertaken by the defendants that you believed were in violation of this law.

**ANSWER**

As a result of having to take time to seek medical treatment, I had to use some vacation time, which should have been reimbursed to me in the approximate amount of $2,000.00. I was entitled to reimbursement pursuant to Mass. Gen. Laws Chapter 41, Section 111F.

I made numerous requests and demands for reimbursement for said days of vacation time to the Defendants, but was denied by Pomeroy and Plymouth through its Town Manager. I was specifically entitled to reimbursement of any benefits and rights as set forth in M.G.L. Chapter 41, Section 111F and refusal to compensate me accordingly by the Defendants is a violation of Mass. Gen. Laws Chapter 41, Section 111F. The medical panel on retirement decision indicated my injury was related to the incident on May 25, 2003, Chapter 41, Section 111F benefits should have begun on May 25, 2003.

6

**INTERROGATORY NO. 9**

Please describe in detail the facts on which you rely when you claim that you were subjected to retaliatory conduct by the defendants.

**ANSWER**

See answers to Interrogatories number 5, 6, 7, and 8 above. In addition, see Affidavits of Kevin Fahy and Debra Sullivan produced in my automatic discovery.

**INTERROGATORY NO. 10**

Please set forth all the facts on which you rely when you allege that the Defendants were aware of your preexisting medical conditions and that the May 25, 2003 drill would aggravate that medical condition.

**ANSWER**

Based on the medical notes on record in my personnel file prior to the incident.

**INTERROGATORY NO. 11**

Please set forth all communications that you had with any union representative prior to the May 25, 2003 drill regarding your inability to participate due to your preexisting medical condition.

**ANSWER**

The Union President was to hold a membership meeting with the Chief on the issues and concerns about my preexisting medical condition and inability to participate in the drill.

**INTERROGATORY NO. 12**

Please set forth all communications that you had with any individual from the Inspector General's Office regarding Chief Pomeroy's compensation for educational benefits.

**ANSWER**

I contacted the Inspector General by phone to report the violation of the Quinn Bill activities and Chief Pomeroy. I was called in for an extensive interview with Inspector O'Neil

and produced records that I had in my possession. All records sent to Inspector O'Neil, were returned to me and were produced in my automatic discovery.

## INTERROGATORY NO. 13

Please set forth all the facts on which you rely when you allege that the May 25, 2003 drill caused the injuries referred to in your Complaint.

## ANSWER

The State Medical Panel decision confirmed that the May 25, 2003, drill caused my injuries. See records of the Medical Panel furnished in my automatic discovery.

## INTERROGATORY NO. 14

Please set forth all the facts that evidence that you or someone on your behalf request that Chief Pomeroy establish or institute any type of protocol to review members of the force who might not be physically able to undergo a rigorous and stressful drill situation and that Chief Pomeroy refused.

## ANSWER

The Union met with the Chief prior to the drill. Previous to May 25, 2003, there had been a substantial record of my physical impairment. I had already contracted Lyme disease, and I was suffering from Meniere's disease. I was taking medication for both conditions. Pomeroy and Plymouth were well aware of my medical condition at the time that I was ordered to participate in the drill.

## INTERROGATORY NO. 15

Please set forth all the facts on which you rely when you allege that Chief Pomeroy was aware that you had reported him to the Inspector General's Office regarding his compensation for educational benefits.

**ANSWER**

Town Manager, Eleanor Beth, told me in her office that Pomeroy was aware of the Inspector General Office Investigator. I wrote of the harassment on the job.

## INTERROGATORY NO. 16

Between the period 1998 to the present date, have you been treated by any medical provider including but not limited to a doctor, psychiatrist, psychologist, social worker, counselor or other mental health provider, and if so, please set forth for each such treatment:

    a.    the reason for the treatment;

    b.    the date(s) of the treatment;

    c.    the name and last known address of each doctor, psychiatrist, psychologist, social worker, counselor or other mental health provider who treated you, and identify all documents of each psychiatrist, psychologist, social worker, counselor or other mental health provider;

    d.    any diagnoses made by each doctor, psychiatrist, psychologist, social worker, counselor or other mental health provider who treated you.

**ANSWER**

My regular attending physician is Dr. Donald Moore, 139 Sandwich St., Plymouth, MA 02360, telephone number (508) 747-1443. Dr. Bernard J. Durante, 61 Industrial Park Road, Plymouth, MA (508) 746-8977 treated me for Menier's disease. Dr. Phillip J. Molloy, Rheumatology Associates of Southeastern Massachusetts, 45 Resnik Road, Plymouth, MA (508) 746-5351 treated me for Lyme disease. I was treated at Jordan Hospital by my regular attending physician, Dr. Donald Moore on May 25, 2003, when I had my heart attack. I was then treated at Beth Israel Deaconess Medical Center on May 27, 2003 for my heart attack.

## INTERROGATORY NO. 17

If you allege that you suffered physical injury as a result of the events alleged in the complaint, set forth:

a.    the nature of past physical injury;

b.    the date on which the past physical injury occurred;

c.    the name and last known address of each medical provider who treated you for the past physical injury and identify all documents of each medical provider.

**ANSWER**

As a result of the events set forth in my Verified Complaint, I suffered a heart attack during the Columbine Drill. Dr. Moore, treated me at the Jordan Hospital and then I was treated at Mass. General. The defendant has these records.

**INTERROGATORY NO. 18**

If you allege that you have suffered lost income as a result of the incident alleged in your complaint, please set forth the specific amount lost as well as the basis for your claim.

**ANSWER**

Regular salary, present salary, future earnings, loss of 20% of salary for 16 years, overtime and raises. In addition, retirement benefits based upon additional income over a 16 year period, which was a result of injury I will not receive.

**INTERROGATORY NO. 19**

Are you now, or have you ever been, a plaintiff or defendant in any other civil suit? If so, state the nature of the claim(s), the court and docket number under which the civil matter proceeded, and the status or disposition of each suit.

**ANSWER**

Years ago I was involved in a case involving Captain Boteri. I do not remember the name of the case. The case was settled and I do not have access to the records. The case was settled and all parties held harmless. The case never went beyond on deposition.

Signed and sworn to under the pains and penalties of perjury this 25 day of August, 2005.

Thomas M. Kelley

# EXHIBIT 7

May 27 03 08:43p    Thomas Kelley                    15082242505                    P.1

 **BETH ISRAEL DEACONESS**
**MEDICAL CENTER**
A member of CAREGROUP



A major teaching hospital
of Harvard Medical School

5/27/03

To Whom It May Concern,

Mr. Thomas Kelley was hospitalized at Beth Israel Deaconess Medical Center from 5/26/03 through 5/27/03. He may return to work 2 weeks from his hospital discharge date. Please call if I may be of further assistance.

Since

Lydia Bazzano MD
617-632-7171
617-667-4700 page

6|10



# EXHIBIT 8

# Donald M. Moore Jr., M.D.
## Cardiology and Internal Medicine

139 Sandwich St.
Plymouth, MA  02360
508 747-1443

Dear Chief Pomeroy,

6/11/03

    Mr. Thomas Kelley has been under my care for years.  Recently during a training exercise he developed severe chest pain and dizziness that required hospitalization and eventual cardiac catheterization in Boston.  He has a mild cardiac condition (cardiomyopathy) and would be best served medically by staying out of work for the rest of his vacation time, or about a month.  We will be adjusting his meds during that period of time.  I think his overall prognosis for the future is good.  He should be able to return to work.

Sincerely,



Donald M. Moore Jr., M.D.



EXHIBIT #4

Kelley

2.9.06    Bm

# EXHIBIT 9



### TOWN OF PLYMOUTH
# POLICE DEPARTMENT

20 Long Pond Road
Plymouth, Massachusetts 02360
FAX (508) 830-4227
(508) 830-4218

Thomas Kelley
41 Arlington Road
Plymouth, MA 02360

June 24, 2003

On May 25, 2003, you were participating in an on-duty training exercise. During the training session, you reported that you were experiencing chest pains and you were transported to the Jordan Hospital in Plymouth. According to your written report of the incident, you were later transported to Beth Israel Hospital for further treatment.

Subsequently, you filed an "Injury on Duty" form. On June 19, 2003, you sent an e-mail inquiring if your request for Injury on Duty status was approved for this incident.

Service connected injuries are covered by MGL Chapter 41, S111F and by Article XI of your collective bargaining agreement. As you know, to be approved as an "Injury on Duty", a police officer must be *"incapacitated for duty because of injury sustained in the performance of his duty without fault of his own..."*

To date, the only medical reports the Police Department has received from you regarding this incident are:

1) a May 27, 2003 memo from Dr. Lydia Bazzano which merely states that you were hospitalized at Beth Israel Medical Center from 5/26/03 through 5/27/03 and that you may return to work two weeks after discharge from the hospital; and

2) a June 11, 2003 memo from Dr. Donald Moore that states that you have been under his care for years, that during a recent training exercise you developed severe chest pain and dizziness which required hospitalization and cardiac catherization, that you have a mild cardiac condition (cardiomyopathy), that you should take vacation time for about one month, and that your overall prognosis is good and that you should be able to return to work.

EXHIBIT #5

Kelley
2.9.06

Both Captain Chandler and Captain Botieri have had conversations with you regarding your claim for "Injury on Duty" status for this incident. Both Captains have advised you that before a determination can be made on approving this incident as "Injury on Duty", that you must provide the Department with sufficient medical documentation that includes a specific diagnosis of your condition that clearly indicates that your medical condition is work related.

As you may know, Massachusetts courts have ruled that the statutory presumption contained in MGL C32, S94, also know as the "Heart Law" does not necessarily apply to injured-on-duty leave under MGL C41, S111F.

Once you have provided the required documentation, the Department will review the materials. The Department may then deny or approve "Injury on Duty" status, or the Department may require that you be examined by a Town designated physician in order to assist the Department in making a determination whether to approve "Injury on Duty" status.


Robert J. Pomeroy
Chief of Police



Cc: Patricia Flynn, Director of Human Resources

# EXHIBIT 10

From:    PLYMTH::BUDGE
To:      POMEROY, KELLEY        3-JUL-2003 10:15:10.12
CC:
Subj:    retirement

EXHIBIT  10
_Kelley_
6-21-06
LINDA M. CORCORAN
CERTIFIED COURT REPORTER

Chief,

    Off. Kelley is using my account due to the fact that his account password is expired and we had no access at this time.

                                                    Lt. Budge

Dear Chief   On 6/25/03 I filed my retirement application to the Plymouth Retirement Board pursuant the Heart Law (c32-94). I spoke to Capt. Botieri at the town hall the same day and informed him of my actions. I also requested that the vaction time that i was scheduled on 7/01/03 to be changed to sick time. As you know the policy of the Town of  Plymouth in retirement cases involving c32-94 the police officer or firefighter has been required to use sick time till the retirement board concludes with the case. At this point sick time should be used till at lest the end of this month. I will keep you up the speed on this matter as soon as i hear of any changes.

      Thomas Kelley.

# EXHIBIT 11

Page 3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. 1:05-cv-10596-NMG

--------------------------)
THOMAS M. KELLEY,                    )
        Plaintiff                    )
VS.                                  )
                                     )
TOWN OF PLYMOUTH, ET AL,             )
        Defendant                    )
--------------------------)

DEPOSITION OF PAUL F. BOYLE, JR., a witness

called for examination by counsel for the Plaintiff,

taken pursuant to the applicable provisions of the

Massachusetts Rules of Civil Procedure, before LINDA M.

CORCORAN, a Court Reporter-Notary Public in and for the

Commonwealth of Massachusetts, at the Law Offices of

Joseph R. Gallitano & Associates, 34 Main Street

Extension, Plymouth, Massachusetts, on Tuesday, February

7, 2006, commencing at 1:10 p.m.

LINDA M. CORCORAN
CERTIFIED COURT REPORTER
P. O. Box 4
Kingston, Massachusetts  02364
(781) 585-8172

---

Page 3

I N D E X

TESTIMONY OF:  PAUL F. BOYLE, JR.                              Page

Direct examination by Attorney Gallitano                        4

Cross-examination by Attorney Silverfine                       45

Redirect examination by Attorney Gallitano                     49

E X H I B I T S

Plaintiff's                                                   Page

Exhibit No. 1          Letter dated September 9,
                       2001                                     30

---

Page 2

A P P E A R A N C E S

On behalf of the plaintiff:

JOSEPH R. GALLITANO, ESQUIRE
LAW OFFICES OF JOSEPH R. GALLITANO & ASSOCIATES
34 Main Street Extension, Suite 202
Plymouth, MA  02360
(508) 746-1500; FAX (508) 747-1150

RICHARD D. ARMSTRONG, JR., P.C. .
1400 Hancock Street
Third Floor
Quincy, MA  02169
(617) 471-4400; (617) 471-4404

On behalf of the defendant:

JEREMY I. SILVERFINE, ESQUIRE
BRODY HARDOON PERKINS & KESTEN, LLP
One Exeter Plaza
Boston, MA  02116
(617) 880-7100; FAX (617) 880-7171

On behalf of the deponent:

WILLIAM M. STRAUS, ESQUIRE
15 Hamilton Street
New Bedford, MA  02740
(508) 992-1260

Also present:

Thomas M. Kelley

---

Page 4

1        S T I P U L A T I O N S

2        IT WAS STIPULATED AND AGREED by and between

3    counsel for the respective parties that all objections,

4    except as to the form of the question, shall be reserved

5    until time of trial; that motions to strike shall be

6    reserved until time of trial; that the witness shall read

7    and sign the transcript of this deposition within 30

8    days; however, reading and signing of the deposition

9    transcript before a notary shall be waived.

10        P R O C E E D I N G S

11        PAUL F. BOYLE, JR., a witness called for

12    examination by counsel for the plaintiff, having been

13    satisfactorily identified and having been duly sworn, on

14    oath deposes and testifies as follows:

15        DIRECT EXAMINATION BY ATTORNEY GALLITANO

16        Q.   Could you please state your full name for the

17    record.

18        A.   My name is Paul F. Boyle, Jr.

19        Q.   And your address, please?  Your residence?

20        A.   14 Admiral Byrd, B-Y-R-D, Road.  That's in

21    Plymouth 02360.

22        Q.   Mr. Boyle, are you employed?

23        A.   Yes, I am.

24        Q.   What's your occupation?

Page 9

1      Q.   Do you know if they ran those exercises in any
2  other communities?
3      A.   I know that they did, yes.
4      Q.   What other communities did they run those
5  exercises in?
6      A.   Specifically, I don't know.
7      Q.   When did you first become aware that Plymouth
8  was going to take part -- Plymouth police force was going
9  to take part in that Columbine type of exercise?
10      A.   I believe it was April of that same year.
11      Q.   In your capacity as union president, did you
12  inquire as to how that drill was conducted in other
13  communities?
14      A.   Could you ask that again, please?
15      Q.   In your capacity as the president of the
16  Plymouth union, Plymouth police officers' union, did you
17  inquire as to how that drill was conducted in any other
18  communities?
19      A.   Inquire with those communities; is that what
20  you're asking?
21      Q.   Yes.
22      A.   No, I didn't inquire within those communities.
23      Q.   Did you inquire -- make any inquiries of any
24  kind as to how the exercises may have been conducted in

Page 10

1  other communities?
2      A.   No, I didn't contact any other communities who
3  had participated in it.
4      Q.   Did you talk to anyone and gain any knowledge
5  as to how the drills were conducted or how the exercises
6  went in other towns?
7      A.   No, I didn't ask anything about how exercises
8  went in other towns.
9      Q.   Did you ever gain any information that the
10  exercises that they were conducting in other -- in any
11  other place within the Commonwealth -- that there were
12  problems as far as injuries during the exercise?
13      A.   Yes, I did.
14      Q.   Could you explain to me what you found out?
15      A.   There was a posting on the back wall, and a
16  couple of officers had approached me regarding -- I think
17  there were two specific incidents.  I don't know the
18  communities or the officers.  One where some munition
19  struck an officer's hand causing some damage to the
20  knuckle and another one where an officer had
21  hyperventilated.  And you're wearing a mask during the
22  exercise.  He had hyperventilated and suffered some
23  injury as a result of that.
24      Q.   When you say there was a posting on the back

Page 11

1  wall, what back wall are you talking about?
2      A.   We have a bulletin board on the back wall as
3  you go down the stairs to the locker room, and that's
4  where most things get posted.  It's not a -- I shouldn't
5  say it's a sanction bulletin board.  It's not anything
6  that the job itself puts official postings on.  It's more
7  just an information -- informal informational bulletin
8  board.
9      Q.   Do you know who posted it?
10      A.   I think one of them Officer Rossborough posted,
11  and I'm not sure about the other.
12      Q.   As union president, were you aware of any --
13           MR. GALLITANO:  Strike that.
14      Q.   As president of the union and also just as a
15  brother officer, were you aware of any other officers
16  that had preexisting medical conditions?
17      A.   Any officers that I worked with that had
18  preexisting medical conditions?
19      Q.   Work with or if you didn't work with them
20  directly, but you knew they were on the force.
21      A.   Oh, sure.  There's tons of them there.
22      Q.   As a result of having that knowledge of other
23  officers with preexisting medical conditions, did you at
24  any time talk to the chief about any type of screening

Page 12

1  process or before -- screening process of officers who
2  might take place -- might take part in the exercise that
3  was scheduled for May 25 or any previous dates of May 25?
4      A.   I believe the conversation I had with the chief
5  was during a bargaining session over the AR-15 rifles,
6  and I believe it was the same time I became aware of this
7  exercise taking place.  And we asked about the safety
8  equipment that was required, and we did ask about -- did
9  raise the concerns of the two incidents that we were
10  aware of at the time.  And the chief responded to that.
11      Q.   What was the chief's response?
12      A.   The chief, I believe his response -- and I
13  don't want to be quoted on it.  It has been some time.
14      Q.   Your best recollection.
15      A.   Was to the effect that the state police have
16  all the safety gear required and that they would be
17  responsible for making sure that the exercise was
18  conducted safely.  Also, that there were going to be
19  paramedics or an ambulance crew on the exercise site
20  while it was in play.
21      Q.   At any time did you make any suggestion to the
22  chief or request about instituting a protocol for
23  screening potential participant -- officer participants
24  regarding who might have previous health issues?  In

# EXHIBIT 12

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

CIVIL ACTION

NO.5-10596-NMG

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

THOMAS KELLEY,                              *

       PLAINTIFF                       *

VS.                                         *

TOWN OF PLYMOUTH & ROBERT J.                *

POMEROY, AS CHIEF OF THE                    *

PLYMOUTH POLICE DEPARTMENT &                *

INDIVIDUALLY,                               *

       DEFENDANT                       *

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *


       DEPOSITION of LAWRENCE ROONEY, a
witness called on behalf of the Defendant,
pursuant to the applicable provisions of
Federal Rules of Civil Procedure, before
Marjorie L. Simmons, a Shorthand Reporter
and Notary Public in and for the
Commonwealth of Massachusetts on
Wednesday, November 15, 2006 commencing at
10:45 a.m., at the offices of Brody,
Hardoon, Perkins & Kesten LLP, One Exeter
Plaza, Boston, Massachusetts.


       DUNN AND GOUDREAU
   COURT REPORTING SERVICE INC.
      ONE STATE STREET
BOSTON, MASSACHUSETTS  02109
    {617} 742-6900

ORIGINAL

Page 12

```
 1   Q.   How long did you work with him in the two-
 2        man car on the job?
 3   A.   There was no specific time.  It was maybe
 4        an overtime shift.  We worked different
 5        shifts at the time.
 6   Q.   For a how long a time?
 7   A.   Did we work together?
 8   Q.   Yes.
 9   A.   I don't know.  I couldn't tell you.
10   Q.   And is it fair to say that you served on
11        the board with him in the union or --
12   A.   No, he was not on the board any times I
13        was.
14   Q.   But you did do some work on his behalf as
15        part of your duties as union steward, is
16        that correct?
17   A.   That is correct.
18   Q.   Let me talk initially about what has been
19        described as an active shooter training
20        back in May 25, 2003.  Do you remember
21        that training?
22   A.   Yes.
23   Q.   And did you participate in any meetings in
24        your capacity as a union steward or as a
```

Page 13

```
 1        police officer in any meetings with the

 2        chief prior to that active shooter

 3        training?

 4   A.   No.

 5   Q.   Are you aware of any complaints that the

 6        union had that were made to the chief of

 7        police of Plymouth about the active

 8        shooter training prior to May 25, 2003?

 9   A.   No.

10   Q.   You were active in the union at that

11        particular point in time?

12   A.   Yes.

13   Q.   May 2003?

14   A.   Yes.

15   Q.   Are you aware of any concerns that the

16        union had prior to participating or having

17        Plymouth police participate in that

18        training?

19   A.   No.

20   Q.   Were you aware of any medical problems Tom

21        Kelley was having prior to May 25, 2003?

22   A.   I believe I heard he had acquired Lyme

23        disease.  That is the only thing I may

24        have heard.
```

Page 15

```
 1        the date.

 2   Q.   Prior to May 25, 2003?

 3   A.   I believe it is, yes.

 4   Q.   How long a period of time did he stay at

 5        home?

 6   A.   I don't know.

 7   Q.   It is fair to say he was an active police

 8        officer at least prior to May 25, 2003?

 9   A.   I believe so, yes.

10   Q.   Anything else you are aware of about Mr.

11        Kelley's medical history?

12   A.   No.

13   Q.   Are you aware of Mr. Kelley asking anyone

14        from the union to discuss any medical

15        concerns of his prior to the May 25, 2003

16        active shooter training?

17   A.   Not that I am aware of, no.

18   Q.   Did you participate.  In your capacity as

19        a union representative, with the chief of

20        police prior to May 25, 2003 as related to

21        some AR-15s.  Do you know what AR-15s are?

22   A.   Yes.

23   Q.   For the purpose of the record what is it?

24   A.   Riffles we use for on duty assignments.
```

Page 19

1   A.   Not that I am aware of, no.

2            MR. STRAUS:  Didn't participate

3        when, on your last question I'm sorry.

4        You have been referring to dates.  In that

5        question you didn't.

6   Q.   May 25, 2003.

7   A.   No.

8   Q.   Okay.  Did you participate or approach

9        Chief Pomeroy requesting any type of

10       protocol to review members of the police

11       force that would not be able to physically

12       participate that night, May 25, 2003?

13  A.   No, I did not.

14  Q.   Are you aware of any member or

15       representative of the union who did that

16       with the chief for the May 25, 2003 drill?

17  A.   No, I do not.

18  Q.   Did you advise Chief Pomeroy, did you

19       advise Chief Pomeroy that there were

20       members of the police force who had

21       existing medical conditions that would put

22       them at risk?

23  A.   No, I did not.

24  Q.   Are you aware of any union representatives

Page 20

```
 1        who advised Chief Pomeroy there were

 2        members of the police department who had

 3        existing medical conditions that could put

 4        them at risk for the May 25, 2003

 5        training?

 6    A.  No, I do not.

 7    Q.  Okay.  I know that is a lot.

 8             Are you aware of Officer Kelley's

 9        performance as a police officer during his

10        tenure there?

11    A.  Of his performance?

12    Q.  Yes.

13    A.  Sure.

14    Q.  Were there complaints against him filed by

15        other officers or administration that you

16        are aware of?

17    A.  Not that I am aware of, no.

18    Q.  What kind of demeanor, could you describe

19        Mr. Kelley's demeanor, his temperament as

20        a police officer?

21    A.  I think he was fine.  He came in and did

22        his work, you know.  We all complain about

23        different things but I wouldn't say he was

24        a complainer either.  He was no different
```

Page 38

1    the documentation to substantiate it is an

2    injury on duty, they put you on sick day.

3    It could take a day or a month. And when

4    that happened I believe, you know, it was

5    called his sick time. It was reverted

6    back to IOD status which encompasses

7    vacation. He wanted -- at this time he

8    wanted reimbursement. He had retired.

9  Q.  Do you recall the chief asking you in a

10     sense on behalf of Kelley to have him

11     supplement anything, any of his medicals

12     submissions?

13 A.  I don't recall.

14 Q.  Any discussions like that?

15 A.  I don't recall.

16 Q.  Do you recall having any discussion with

17     Mr. Kelley about that?

18 A.  I don't recall that, no.

19 Q.  What is the procedure or what was the

20     procedure back in May of 2003 if an

21     officer wanted to be excused from a

22     particular training, what would the

23     officer have to do?

24 A.  I would say e-mail one of the captains and

Page 39

```
 1          basically with a reason why you can't or

 2          go visit them personally, say I can't

 3          because of XYZ.

 4    Q.    It is incumbent upon the officer to make

 5          that step?

 6    A.    Yes, I would believe so.  Yes.

 7    Q.    And so as long as the officer showing up

 8          for duty, it would be up to him to say I

 9          can't in a sense, I can't do this training

10          because of XYZ or words to that effect?

11    A.    That is correct.

12    Q.    And you say you know of at least one

13          officer, Sergeant Abbott, who did that is

14          there anyone else you can recall?

15    A.    No.

16    Q.    And Kevin Coakley, does that ring a bell?

17    A.    I know Officer Coakley, I was unaware he

18          was excused.

19    Q.    Officer Scharath?

20    A.    I know Officer Scharath.  I was unaware he

21          didn't go to the training either.

22    Q.    And for instance, there were several

23          active military duty persons, they

24          couldn't attend?
```

Page 40

```
 1   A.   They weren't here.  Sure.

 2   Q.   But if there was a medical reason it would

 3        be up to the officer to go seek out a

 4        superior officer and notify them?

 5   A.   That is what I would do.

 6   Q.   Okay.  And that is something that would --

 7        is that in the rules or regulations or

 8        just past practice, common sense?

 9   A.   Common sense, yeah.  I mean you get an

10        assignment, you have an assignment and if

11        you can't complete the assignment, you

12        have to tell somebody.  You have to tell

13        your boss whether it be a sergeant,

14        captain or chief.

15   Q.   When we talking about Exhibit Nos. 1 and 2

16        and about your discussions with the chief,

17        back in November of 2003, was that

18        encompassing, that is the 111-F benefits

19        as well, is that a separate issue that you

20        brought up?

21   A.   I don't recall.

22   Q.   And let me direct your attention for the

23        next series of questions to a July 4, 2001

24        complaint for lack of a better word.  Do
```

# EXHIBIT 13

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. 1:05-cv-10596-NMG

-------------------------)
THOMAS M. KELLEY,         )
     Plaintiff          )
VS.                       )        **COPY**
                        )
TOWN OF PLYMOUTH, ET AL,  )
     Defendant          )
-------------------------)

DEPOSITION OF MICHAEL E. BOTIERI, a witness

called for examination by counsel for the Plaintiff,

taken pursuant to the applicable provisions of the

Massachusetts Rules of Civil Procedure, before LINDA M.

CORCORAN, a Court Reporter-Notary Public in and for the

Commonwealth of Massachusetts, at the Law Offices of

Joseph R. Gallitano & Associates, 34 Main Street

Extension, Plymouth, Massachusetts, on Wednesday,

June 21, 2006, commencing at 10:21 a.m.

**LINDA M. CORCORAN**
**CERTIFIED COURT REPORTER**
**P. O. Box 4**
**Kingston, Massachusetts  02364**
**(781) 585-8172**

Page 28

1    require you to make sure that every patrolman

2    participating in training is fit and able and physically

3    capable of participating in that training?

4         A.    If an officer is fit and able to perform his

5    duties on a daily basis, he's fit and able to perform any

6    training.

7         Q.    That's your opinion as being --

8         A.    Yes, sir.

9         Q.    -- captain in charge of operations?

10        A.    Yes, sir.

11        Q.    That is different than being physically capable

12   of performing a certain training program; is that

13   correct?

14        A.    I don't understand.

15        Q.    Is there any rule or regulation regarding the

16   obligations of any captain or the chief or training

17   officer to make sure that all police officers

18   participating in training -- currently in training are

19   physically capable of participating in the training?

20        A.    I still don't understand the question.

21        Q.    Do you have any knowledge at all that inside

22   the operations of the Plymouth Police Department there is

23   any consideration given to physical abilities when

24   training programs are set up for police officers?

1    A.    They would be unless they had a health concern

2    that they brought forward.

3    Q.    Do you know of any rule or regulation regarding

4    current training where health considerations are to be

5    reviewed by training officers or the chief with regard to

6    patrolmen participating in annual training?

7    A.    What do you mean by health considerations?

8    Q.    Well, what I meant was exactly what you just

9    said to me, if there was a health consideration, these

10   people may not participate in the Columbine-like training

11   program when we were discussing Govoni and Abbott.  I

12   believe you said to me there may be a health

13   consideration for them in their cases and, therefore,

14   they wouldn't participate.  I want to know whether or not

15   there's any rule or requirement today in current training

16   that imposes an obligation on a captain or the chief or

17   the training officer to consider health considerations in

18   who participates in training.

19   A.    We would only know there's a health

20   consideration if the officer brought it forward.

21   Q.    So then it's fair to say that the way the

22   Plymouth Police Department treats the issue of health

23   considerations is that it's required of the officer to

24   raise the issue to the captain or to the training officer

1    or to the chief today?

2        A.    Could you repeat that, sir?

3        Q.    Do you know if there's any obligation of the

4    chief or the training officer or the captain in charge of

5    training to inquire of the police force as to whether or

6    not there are any men who are not able for health

7    considerations to participate in training?

8        A.    I don't know of any.

9        Q.    And your testimony is today that, as far as you

10   know, having been the captain of operations for -- how

11   many years?

12       A.    Six years.

13       Q.    -- six years in the police department, the only

14   way a health consideration is raised with respect to

15   training is if the police officer raises it to a training

16   officer, a captain, or the chief?

17       A.    There would be no other way of knowing.

18       Q.    Are you aware of any injuries sustained in

19   training programs -- has there been a training program in

20   2006?

21       A.    What kind of training, sir?

22       Q.    Police training.  You mentioned earlier the

23   four-day training program, plus the one-day that deals

24   with CPR.

Page 54

1    the meetings?

2         A.    Eventually.

3         Q.    And the process, as you understand it, that led

4    to that decision was lengthy?  You said eventually?

5         A.    I wouldn't say lengthy.

6         Q.    Well, when did it begin and when did it end, if

7    you recall?

8         A.    I don't recall.

9         Q.    But you think it involved a number of

10   discussions?

11        A.    I believe in 1996 John Abbott was treated the

12   same way that Tom Kelley was treated as far as on-duty

13   attendance of his PERAC meetings.

14        Q.    And what way would that be when you said the

15   same as Tom Kelley was treated?

16        A.    He'd have to let us know if he was going to

17   meetings.  I don't recall if he actually went or didn't

18   go.  I don't recall how that worked out at that time.

19        Q.    But it's your understanding that he eventually

20   did go to these meetings in Boston?

21        A.    Yes.

22        Q.    In the middle of his schedule?

23        A.    I don't recall if it was the middle of his

24   schedule, but I believe he went to the meetings

Page 82

1      Q.   (Reading)  A short time after Tom questioned

2   Chief Robert Pomeroy's right to receive incentive pay,

3   and this signaled the beginning of Tom's every movement

4   being scrutinized by Pomeroy and Captain Botieri (end

5   reading).

6      Do you agree with that statement?

7      A.   No.

8      Q.   Paragraph 7 says:  (Reading)  If Botieri went

9   by and found Tom at the town hall, he wanted to know (end

10   reading) -- excuse me.  (Reading)  If Botieri went by and

11   found Tom at the town hall, he wanted to know from me why

12   he was there, the time he went off, and the time he got

13   back out on the road (end reading).

14      Do you agree with that statement?

15      A.   No.

16      Q.   Paragraph No. 8 says:  (Reading)  Tom was the

17   only officer that I know of who was monitored everywhere

18   he went (end reading).

19      Do you agree with that statement?

20      A.   Absolutely not.

21      MR. ARMSTRONG:  We'll put that in the record of

22   this deposition.  If we haven't put 1 in, we'll put

23   that in first.

24      Q.   Do you recall conversations with Kevin Fahy

Page 85

1      A.    That Tom wasn't turning his computer on or his

2   radio on or responding to calls properly or walking when

3   he was told to or not taking a cruiser when he was told

4   to, a myriad of issues.

5      Q.    And these were issues that occurred only with

6   Tom Kelley and not with other police officers?

7              MR. SILVERFINE:    Objection as to form.

8              You can answer.

9      A.    No.

10      Q.    It occurred with other police officers as well?

11      A.    Some of the issues.

12      Q.    And on these issues that you have just

13   described, did you issue warning notices to Kelley?

14      A.    He was spoken to.

15      Q.    Who spoke to him?

16      A.    I've spoken to him, Lieutenant Budge had spoken

17   to him, Lieutenant Fahy had spoken to him, and possibly

18   other supervisors.

19      Q.    Is it fair to say that you continually managed

20   the work of police officers and cruisers and that you're

21   talking to police officers all the time about events like

22   you've just described?

23      A.    Sure.

24      Q.    What conversations did you have with Kevin Fahy

1       Q.    Kevin Fahy says in his affidavit you monitored

2   Kelley.  You were not monitoring Kelley on this radio

3   issue or the computer; is that right?

4       A.    We monitor all officers.

5       Q.    There was an occasion when Officer Kelley

6   filled out a warning for a motor vehicle violation and he

7   didn't have it dated.  Do you remember that?

8       A.    I remember one such incident.  There could have

9   -- I believe there were many.  I don't know which one

10   you're talking about.

11       Q.    Well, there was one when -- I think that you

12   might have issued him a reprimand because he didn't put

13   the date on the warning.

14       A.    It's possible.  It's possible.

15       Q.    And do you recall that particular incident when

16   you issued him a reprimand?

17       A.    I recall the citation.

18       Q.    What are the circumstances surrounding that

19   citation?  Explain it to me.

20       A.    It was sloppy work.  It was awful.  It didn't

21   have specific, I believe, location, dates.  It was an

22   awful piece of work.  That can't be tolerated by any

23   officer.

24       Q.    And this is on a warning citation?

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

# EXHIBIT 14

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 05 10596 NMG

THOMAS KELLEY,                    )
    Plaintiff,                   )
                             )
                             )
VS.                               )
                             )
TOWN OF PLYMOUTH and              )
ROBERT J. POMEROY, as Chief of the )
Plymouth Police Department and    )
Individually,                     )
    Defendants.                  )

### DEFENDANT, TOWN OF PLYMOUTH'S ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

**INTERROGATORY NO. 1:**

Identify yourself, stating your name, business address, title, and capacity in which you are answering these interrogatories.

**ANSWER NO. 1:**

Patricia Flynn, 11 Lincoln Street, Plymouth, Massachusetts, Director of Human Resources, Keeper of the Records.

**INTERROGATORY NO. 2:**

Identify each person who assisted in the answering of these interrogatories or constituted a source of information in connection with these interrogatories, including, but not limited to, name, address, office, title, position, and relationship to the Town of Plymouth and their particular contribution to the answers provided.

**ANSWER NO. 2:**

The defendant objects to this interrogatory in that it seeks information that is privileged, constitutes attorney work product and/or was obtained in anticipation of litigation. Without waiving said objection, other than receiving some assistance from my attorneys, I responded to the questions with some assistance from Chief Robert Pomeroy.

**INTERROGATORY NO.3:**

List the name, address, qualifications and area of expertise of each expert witness you intend to call at trial; summarize each opinion that will be given; and specify the facts upon which each opinion is based.

**ANSWER NO.3:**

The defendant has not decided whom, if any, experts it expects to call at the time of trial in this matter. The defendant reserves the right to supplement this answer.

**INTERROGATORY NO.4:**

List the names, and addresses of all witnesses you intend to call at trial.

**ANSWER NO.4:**

The defendant objects to this interrogatory on the grounds that the selection of a trial witness is an integral part of the trial strategy, therefore this interrogatory directly seeks disclosure of the mental impressions, conclusions, opinions and legal theories of the defendant's attorney. Notwithstanding and without waiving this objection the defendant states, that it has not yet determined who will testify as witnesses at trial

**INTERROGATORY NO.5:**

Please identify any insurance policy which may satisfy any judgment entered in the action, including policies of the Defendant, Town of Plymouth.

**ANSWER NO.5:**

Massachusetts Interlocal Insurance Association, File No. M04PO22172.

**INTERROGATORY NO.6:**

Please state the names and addresses of all persons, including Town employees, public officials, member of town committees or boards, committees, or organizations, who registered a complaint against the Plaintiff, concerning his work performance, at any time during his employment with the Town of Plymouth and provide the following:

      a.  date of the complaint;
      b.  whether or not the complaint was verbal or written, if written a copy of same, if verbal a recordation or account of said complaint;
      c.  to whom the complaint was made;
      d.  subject matter of the complaint;
      e.  notification given the Plaintiff if written, a copy of same, if verbal an account of content of notification;
      f.  action taken regarding each and every complaint, if any.

**ANSWER NO.6:**

a.-f.    The defendant objects to this interrogatory on the grounds that it is overly broad, unduly burdensome, and it seeks information which is irrelevant to the subject matter of this action, which will be inadmissible at the trial of this action, and which is not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding and without waiving this objection I have been informed:

05/04/84    Chief Richard Nagle issued a letter of reprimand and assignment to extra duty to the plaintiff for tampering with odometers in police cruisers;

12/29/90    Citizen Jason Kapolis filed a complaint against the plaintiff re: excessive force. Mr. Kapolis subsequently sued the Town of Plymouth. The matter settled;

06/29/91    Citizen Martin Bloom filed a complaint against the plaintiff re: conduct unbecoming an officer. The complaint was unfounded;

08/07/91    Citizen Fabio Pastore filed a complaint against the plaintiff re: physical abuse, threat. Additional information was sought but was not received;

07/27/92    Citizen Kim Hall filed a complaint against the plaintiff re: excessive force. A determination was made that the plaintiff responded to a violent situation and arrested an alleged perpetrator in a manner in which no further injuries occurred to any party, including the plaintiff;

06/15/95    Citizen Jay Wilson filed a complaint against the plaintiff re: assault and battery. The complaint was found to have no basis;

08/14/96    Citizen Joseph Govoni filed a complaint against the plaintiff re: shoddy police work. A determination was made that the plaintiff's accident report contained three errors but that the report was subsequently amended to correct the mistakes;

10/01/96    Plaintiff was issued a letter of reprimand for intemperate behavior in the roll call room;

02/26/97    Lieutenant Kevin Fahy admonished the plaintiff for failure to answer the police radio and for leaving his patrol area without permission for lunch break;

07/23/97    Lieutenant Kevin Fahy reminded the plaintiff to log onto his police cruiser computer every morning when he went out on patrol;

08/27/97    Plaintiff responded to a suspicious activity at a bank but failed to write a report until September 1, 1997;

02/17/98    Lieutenant Kevin Fahy ordered the plaintiff to sign a receipt for Town's Sexual Harassment Policy;

04/29/98    Plaintiff arrested Mark Herd. On September 29, 2000, Mr. Herd filed a criminal complaint against the plaintiff and another officer. Mr. Herd subsequently dropped the complaint application;

| | |
|---|---|
| 06/26/99 | Plaintiff ordered to work mandatory overtime on July 4, 1999; |
| 07/28/99 | Plaintiff failed to appear in court after receiving a summons and the plaintiff failed to notify the department that he had received a summons from the defense attorney. The plaintiff was informed of possible disciplinary action if situation occurs again; |
| 03/18/99 | Captain Michael Botieri spoke to the plaintiff re: spending time at Town Hall and not responding to a call; |
| 12/15/99 | Captain Michael Botieri spoke to the plaintiff re: not walking the North Plymouth Beat; |
| 12/20/99 | Captain Michael Botieri spoke to the plaintiff re: going to Town Hall without notifying the station; |
| 03/15/00 | Plaintiff was upset about receiving a poor evaluation from a citizen survey. The plaintiff went into Captain Michael Botieri's office with Officer Jesse, a union representative. Captain Botieri advised the plaintiff that he would not be bullied or intimidated by him. Captain Botieri also informed the plaintiff that he would be disciplined if he ever spoke to him [Botieri] in that manner again; |
| 05/31/00 | Lieutenant Arthur Budge, Jr. spoke with the plaintiff re: his poor job performance, not answering his car radio from dispatch, not giving location when called, and not calling out upon arrival at calls. The plaintiff was further informed that his reports have been lacking in information and investigation. A written report was forwarded to Captain Michael Botieri for possible disciplinary action; |
| 06/01/00 | Captain Michael Botieri spoke with the plaintiff re: his poor job performance as indicated by Lieutenant Arthur Budge, Jr.; |
| 07/10/00 | Captain Michael Botieri spoke with the plaintiff re: using his personal motor vehicle while assigned to the Town Walking Beat. All documentation concerning the plaintiff's personal use of his vehicle was forwarded to Captain Michael Botieri; |
| 07/28/00 | Captain Michael Botieri spoke with the plaintiff re: not appearing in Wareham District Court; |
| 08/22/00 | Captain Michael Botieri gave the plaintiff a verbal reprimand for failure to give his location when dispatched on a call; |
| 01/10/01 | Captain Michael Botieri spoke with the plaintiff re: poor quality of work (incomplete traffic citations); |

| 05/08/01 | Plaintiff ordered to work July 4, 2001; |
| 08/24/01 | Captain Michael Botieri spoke with the plaintiff re: inappropriate behavior at roll call; |
| 05/21/02 | Plaintiff was involved in a disturbance with another patrol officer and a supervisor at the Plymouth Police Department. Lieutenant Roy Ahlquist and Captain Michael Botieri admonished the plaintiff; |
| 11/05/02 | Citizen Lauren Goldman filed a complaint against the plaintiff re: rude and unprofessional behavior. The complaint against the plaintiff was deemed not sustained. |

The defendant reserves the right to supplement this response.

**INTERROGATORY NO.7:**

Please provide the basis for refusal to give the Plaintiff reimbursement for time spent while injured under Chapter 41 Section 111F to compensate him for the vacation days he had to use as sick leave.

**ANSWER NO.7:**

Upon information and belief, no injury on duty has been established.

**INTERROGATORY NO.8:**

Please state the names of employees either in the police department or fire department or any other department of the Town who have used vacation days as sick time and then have had said days reimbursed and the factual circumstances surrounding the approval and payment of aforesaid reimbursement.

**ANSWER NO.8:**

After review, I am currently unaware of any such employees.

**INTERROGATORY NO.9:**

Please state on what basis the Town is relying to refute the Retirement Board Medical Panel's review of the Plaintiff's injuries and decision that said injury was an injury on duty.

**ANSWER NO.9:**

The defendant objects to this interrogatory to the extent that it relates to fact or the application of fact and cannot be answered until after discovery has been completed. Notwithstanding and without waiving this objection the defendant states that it is our understanding that the Retirement Board made findings.

**INTERROGATORY NO.10:**

Please state if the Town was aware, and if so when they were informed that Chief Pomeroy had been approached by the Union officials for the Plymouth Police Brotherhood seeking a protocol, rules or a procedure to be instituted to screen officers who might be at risk due to previous health conditions and by participating in the so-called Columbine drill on May 25, 2003, and if so copies of any written communication concerning same and response by the Town or instructions from the Town to Chief Pomeroy concerning instituting a protocol to screen officers who may be at risk by participating in the aforesaid drill.

**ANSWER NO.10:**

I am not aware of any such communications.

**INTERROGATORY NO.11:**

Please state the date and time when Chief Pomeroy was authorized and when his captains were authorized to receive Quinn bill money pursuant to verbal agreements and state who made said verbal agreements and under what verbal conditions, date and time and any stipulations regarding said payments.

**ANSWER NO.11:**

The defendant objects to this interrogatory on the ground that the matter sought calls for a legal conclusion the undersigned is not competent to make. Notwithstanding and without waiving this objection the defendant states, I have been informed that Chief Robert Pomeroy was appointed to the position of Chief of Police by former Town Manager, William R. Griffin, in November 1992. When Chief Pomeroy was appointed, Mr. Griffin informed him that he would continue to receive thirty percent career educational incentive pay. I have also been informed that the Town of Plymouth adopted the Education Incentive Bill (Quinn bill) at a Town Meeting in 1972.

**INTERROGATORY NO.12:**

Please provide the total amount of monies paid to Chief Pomeroy and any other captains or other ranking officers, such as lieutenants who received Quinn bill money pursuant to any verbal agreement with the Town.

**ANSWER NO.12:**

I am not aware of the total amount of monies paid to Chief Pomeroy pursuant to any verbal agreement but please refer to Exhibit 5 attached to Defendant Town of Plymouth's Responses to Plaintiff's Requests for Production of Documents, which details Chief Pomeroy's compensation from 1992 through the present.

**INTERROGATORY NO.13:**

Please give the authority under which the Town was permitted to make Quinn bill payments to any officer or ranking officer such as Chief Pomeroy or any captain by virtue of a verbal agreement and under what authority said payments were made.

**ANSWER NO.13:**

The defendant objects to this interrogatory on the ground that the matter sought calls for a legal conclusion the undersigned is not competent to make. Notwithstanding and without waiving this objection the defendant states, I have been informed that the Town of Plymouth adopted the Education Incentive Bill (Quinn bill) at a Town Meeting in 1972.

**INTERROGATORY NO.14:**

Please provide a record for the times Chief Pomeroy demanded reimbursement for time spent by the Plaintiff in his activities as a member of the Retirement System giving the date and time and the amount of money that was charged back to the police department's budget pursuant to requests made by Chief Pomeroy.

**ANSWER NO. 14:**

The defendant objects to this interrogatory on the grounds that it is overly broad and unduly burdensome and not likely to lead to admissible evidence. Notwithstanding and without waiving this objection the defendant states reimbursement was made from the Retirement Board to the Police Department but I am currently unaware of the date and time and the amount of money that was charged back to the police department's budget. The defendant reserves the right to supplement this response.

**INTERROGATORY NO.15:**

Please provide an accounting of all other departments in which said charge backs to various departments was made in order to compensate said departments for any participation by a member of said department in a retirement system or any other Town system that was authorized as part of either statute or contract.

**ANSWER NO.15:**

None.

**INTERROGATORY NO.16:**

Please provide the names of the officers, the dates and times and the amounts paid to said officers to cover shifts for when the Plaintiff was involved in Retirement Board activities and for which the Chief of the Police Department requested reimbursement to his budget to provide said coverage in place of the Plaintiff while the Plaintiff was unavailable on Retirement Board duty.

**ANSWER NO.16:**

The defendant objects to this interrogatory on the grounds that it is overly broad and unduly burdensome and not likely to lead to admissible evidence. Notwithstanding and without waiving this objection the defendant states I am currently unaware of the dates and times and the amounts paid to officers to cover shifts for when the plaintiff was involved in Retirement Board activities.

**INTERROGATORY NO.17:**

Please state date and time when the Town of Plymouth was contacted by the Inspector General's office regarding its policy and procedure in compensating Chief Pomeroy and other ranking officers Quinn bill funds pursuant to a verbal agreement.

**ANSWER NO.17:**

I am not aware of any such contact.

**INTERROGATORY NO.18:**

Please provide all documentation from the Inspector General's Office to the Town of Plymouth with its decision and any instruction on remedial procedures that should be taken in order to change the manner in which Quinn bill payment were being made to Chief Pomeroy and other members of the Department.

**ANSWER NO.18:**

None.

**INTERROGATORY NO.19:**

Please identify in addition to Chief Pomeroy what other officers were involved in such payments that were authorized only under verbal agreement and the dates and times they received payments and how much total payments they received under said verbal agreement arrangement.

**ANSWER NO.19:**

I am not aware of the total amount of monies paid to any other officers pursuant to any verbal agreement but please refer to Exhibit 5 attached to Defendant Town of Plymouth's Responses to Plaintiff's Requests for Production of Documents, which details Chief Robert Pomeroy's and Captains William O'Meara (retired 4/20/99), Michael Botieri, and Charles Chandler's compensation from 1992 through the present.

**INTERROGATORY NO.20:**

Please state what action was required by the Inspector General and when such action was taken. Provide any records regarding same.

**ANSWER NO.20:**

The defendant objects to this interrogatory on the ground that the matter sought calls for a legal conclusion the undersigned is not competent to make. Notwithstanding and without waiving this objection the defendant states, I am currently unaware of any such action.

**INTERROGATORY NO.21:**

Please state if the Town was ever advised by its Chief Financial Officer that the payments being made of Quinn bill benefits to the Chief and other ranking officers was improper and should cease.

**ANSWER NO.21:**

I am not aware if the Chief Financial Officer made the above statement.

**INTERROGATORY NO.22:**

Please provide the name of other police officers in the Plymouth Police department whose activities were monitored in the same fashion as the Plaintiff requiring supervisors to make individual reports back to Chief Pomeroy or other command officers regarding Plaintiff's movements throughout his shift as to place, time and activity.

**ANSWER NO.22:**

I have been informed that all police officers are supervised.

**INTERROGATORY NO.23:**

Please provide a list of other officers denied Chapter 41 Section 111F benefits who were injured on duty from the years 2001 to 2005.

**ANSWER NO.23:**

None.

**INTERROGATORY NO.24:**

Please state if anyone in Town government administration discussed the Columbine like drill scheduled for May 25, 2003 with Chief Pomeroy and raised concerns about any officers that might be at risk due to previous health conditions with the Chief at that time.

**ANSWER NO.24:**

I am not aware of anyone who raised such concerns.

**INTERROGATORY NO.25:**

Please provide all dates and times that Chief Pomeroy met with representatives of the Plymouth Police Union Brotherhood or any other person(s) to discuss their concerns for safety of police officers who were to participate in the aforesaid drill on May 25, 2003, and injuries that had occurred in other police departments that participated in similar training drills conducted by the State Police, including in your answer, who was present at these meetings and if notes or tape recordings were taken.

**ANSWER NO.25:**

I am not aware of any such meetings.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 11
DAY OF OCTOBER 2005

_____
PATRICIA FLYNN, DIRECTOR OF HUMAN RESOURCES
TOWN OF PLYMOUTH

As to Objections:

Defendants,
By their attorney,

_____
Jeremy Silverfine, BBO#542779
Leonard H. Kesten, BB0# 542042
BRODY, HARDOON, PERKINS & KESTEN
One Exeter Plaza
Boston, MA 02116
(617) 880-7100

Dated: 10/12/05

11

# EXHIBIT 15

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
---------------------------------------- )
THOMAS M. KELLEY                         )
Plaintiff,                               )
VS.                                      ) C.A. 1:05-cv-10596-NMG
                                         )
TOWN OF PLYMOUTH, ET AL.                 )
Defendant.                               )
---------------------------------------- )
```

DEPOSITION OF WILLIAM R. GRIFFIN, a witness called for
examination by counsel for the Plaintiff, taken pursuant to
the applicable provisions of the Federal Rules of Civil
Procedure, before JO-ANNE M. GOLDEN, a Court Reporter-Notary
Public in and for the Commonwealth of Massachusetts, at
JOSEPH R. GALLITANO & ASSOCIATES, 34 Main Street Ext., Suite
202, Plymouth, Massachusetts, on Friday, July 13, 2007,
commencing at 1:02 p.m.

LINDA M. CORCORAN
CERTIFIED COURT REPORTER
P. O. Box 4
Kingston, Massachusetts 02364
(781) 585-8172

APPEARANCES

On behalf of the plaintiff:

JOSEPH R. GALLITANO, ESQUIRE
JOSEPH R. GALLITANO & ASSOCIATES
34 Main Street Ext., Suite 202
Plymouth, MA 02360
(508) 746-1500

Co-Counsel on behalf of the plaintiff

RICHARD D. ARMSTRONG, JR., ESQUIRE
RICHARD D. ARMSTRONG, JR., P.C.
1400 Hancock Street
Third floor
Quincy, MA 02169
(617)471-4400

On behalf of the defendants:

JEREMY I. SILVERFINE, ESQUIRE
BRODY HARDOON PERKINS & KESTEN, LLP
One Exeter Plaza
Boston, MA 02116
(617)880-7100

- 2 -

I N D E X

TESTIMONY OF: WILLIAM R. GRIFFIN          Page

Direct examination by Attorney Gallitano    6

Cross-examination by Attorney Silverfine   24

E X H I B I T S

Plaintiff's                                Page

Exhibit No. 1    Letter dated March 2, 2000
                 from William R. Griffin      4

- 3 -

**DEPOSITION OF WILLIAM R. GRIFFIN 7/13/07**    MiniDep by Kenson

| | |
|---|---|
| 1  MR. GALLITANO: We're going to go off the | 1  me. |
| 2  record. I'm going to just break for a moment to talk | 2  Q. You don't recall their names. But, I mentioned the name |
| 3  to co-counsel and we'll be back. I'm about finished. | 3  Quinn and that didn't seem to be -- register at all? |
| 4  (OFF THE RECORD AT 1:25 p.m) | 4  A. No. |
| 5  (ON THE RECORD AT 1:28 p.m.) | 5  Q. How about a Mr. O'Neill? |
| 6  MR. GALLITANO: Just a few more questions Mr. | 6  A. It triggers something, but not with full confidence. |
| 7  Griffin and I'll be done and turn it over to Mr. | 7  MR. GALLITANO: Very good. I think that's all I |
| 8  Silverfine. | 8  have for you today. Thank you. |
| 9  (BY MR. GALLITANO) | 9  CROSS EXAMINATION |
| 10 Q. Just again, with the Town in conversations, did you talk to | 10  MR. SILVERFINE: Good afternoon, my name is |
| 11  anybody from the Union at all? | 11  Jeremy Silverfine and my firm represents the Town of |
| 12 A. I don't recall that I did. | 12  Plymouth and Chief Pomeroy in this particular civil |
| 13 Q. The police union I'm referring to? | 13  action. I'm just going to ask you a few questions |
| 14 A. I had a -- I had a conversation one night with Mr. Kelley, | 14  about what my brother just asked for clarifications. |
| 15  but it had absolutely no reference to this, but I do want to | 15  So, hopefully we'll be very brief. |
| 16  -- He made a quick comment to me on the street. | 16  (BY MR. SILVERFINE) |
| 17 Q. Okay. | 17 Q. The career incentive pay that you reference in your answers |
| 18 A. It was a funny comment, as usual. | 18  to his questions, is that also known as the Quinn Bill? |
| 19 Q. But, it had nothing to do with this case or with this | 19 A. Yes, it is. |
| 20  matter? | 20 Q. Do you recall when it was you were negotiating with now |
| 21 A. It had to do with the Town Manager who took -- | 21  Chief Pomeroy for the position as Chief? |
| 22 Q. Oh, took your position. Oh, okay. In your conversation | 22 A. I'm going to look at this. |
| 23  with Eleanor Beth, do you recall any specifics with that? | 23 Q. Sure. |
| 24 A. Only what I testified on before. | 24 A. He was appointed in November of -- so sometime in November |
| - 20 - | - 22 - |

| | |
|---|---|
| 1  Q. You said you may have talked with Pat Flynn the personnel -- | 1  of -- |
| 2  A. There was one phone call and -- | 2  Q. 1992? |
| 3  Q. Oh, okay. | 3  A. 1992. |
| 4  A. And I believe it was Eleanor Beth, may have been Pat Flynn. | 4  Q. Okay. And was part of the negotiation between you on behalf |
| 5  Q. Oh, I see. | 5  of the Town and Chief Pomeroy in accepting the position as |
| 6  A. Just trying to make it clear to that. | 6  Chief, the understanding that he would receive these Quinn |
| 7  Q. So you had only one conversation with anybody from the Town | 7  Bill incentive pay that he was receiving prior to becoming |
| 8  on that -- | 8  Chief? |
| 9  A. As I recall on that subject. | 9  A. Yes. |
| 10 Q. On that subject. You were never contacted by Mr. DelaRusso | 10 Q. And that was part of the negotiation that you agreed to with |
| 11  or had any conversation with him regarding the financial | 11  Chief Pomeroy? |
| 12  part of that? | 12 A. It wasn't necessarily -- I would not put it in the context |
| 13 A. No. | 13  of negotiation. I thought he was entitled to it. |
| 14 Q. So, just to be clear. You only had one conversation with | 14 Q. And did -- you were asked about Mr. Kelley, the plaintiff |
| 15  the Town Manager's office and that was with Eleanor Beth, | 15  in this case. Did you ever have any or have you had any |
| 16  you think? | 16  conversations with Mr. Kelley that you recall specifically |
| 17 A. I believe so, yes, on that topic. | 17  as relate to his complaints or issues regarding any pay |
| 18 Q. On that topic. And you were contacted directly by Chief | 18  incentives that Chief Pomeroy was receiving? |
| 19  Pomeroy, once. | 19 A. A conversation between us? |
| 20 A. Yes, I believe. Yes. | 20 Q. Right. |
| 21 Q. You then recalled after some refreshing your recollection, | 21 A. I don't recall that I ever had one. |
| 22  that there were two people who came to see you and they were | 22 Q. Did he ever call you since November 1992, at any point in |
| 23  from the Inspector General's office? | 23  time since then and discuss with you this issue? |
| 24 A. I believe they were, yeah. That's what they represented to | 24 A. I don't recall that, no. |
| - 21 - | - 23 - |

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05 10596 NMG

THOMAS KELLEY,                              )
     Plaintiff,                          )
                                  )
                                  )
V.                                          )
                                  )
TOWN OF PLYMOUTH and                        )
ROBERT J. POMEROY, as Chief of the          )
Plymouth Police Department and              )
Individually                                )
     Defendants.                         )

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
THEIR MOTION FOR SUMMARY JUDGMENT**

The defendants, Town of Plymouth and Robert J. Pomeroy, Individually and as

Chief of the Plymouth Police Department, submit this memorandum of law in support

of their motion for summary judgment.  *See* Fed. R. Civ. P. 56.  As grounds, the

defendants state that the (1) plaintiff did not qualify for 111F benefits as the plaintiff

failed to provide appropriate medical documentation; (2) plaintiff failed to demonstrate

that his medical condition was job-related; (3) plaintiff was not treated differently than

other similarly situated officers; and (4) plaintiff has otherwise failed to state a claim for

relief.

**I.     Background[1]**

1.     The plaintiff, Thomas Kelley ("Kelley"), alleges that the Town of Plymouth

       ("Town") and Robert J. Pomeroy ("Pomeroy"), Individually and as Chief of the

       Plymouth Police Department, violated the State Whistle Blower Statute, (M.G.L

---

[1] The facts in this section are drawn from the Statement of Material Undisputed Facts
("Statement of Facts").  As required under summary judgment procedure, such facts
must be interpreted in favor of the non-moving party.  In so stating undisputed material
facts, the defendants do not concede or rely on these facts for any purpose other than
this motion for summary judgment.

c. 149 §185), and his civil rights pursuant to 42 U.S.C. §1983, and the Fourteenth (14th) Amendment of the United States Constitution. (See Kelley's Complaint, copy attached hereto as Exhibit 1).

2.      Kelley also alleges that the defendants committed gross negligence by their willful, wanton and reckless conduct and that the defendants wrongfully denied Kelley's benefits pursuant to M.G.L. c. 41 §111F.  (Exhibit 1).

3.      Kelley was appointed as a police officer in Plymouth on September 19, 1977, and retired on September 9, 2003, due to an accidental disability.  (Exhibit 1, ¶5, and See Deposition of Kelley, Vol. I, pg. 7, attached hereto as Exhibit 2).

4.      Kelley alleges that the defendants forced him to participate in a physically demanding drill which resulted in Kelley experiencing a heart incident.  (Exhibit 1).

5.      Kelley also alleges that the only reason he was forced to participate in the drill was to retaliate against him for his involvement in reporting an alleged violation of the Town's by-law to the Inspector General's ("IG") office.  (Exhibit 1).

6.      Kelley further alleges that he has also been the victim of harassment due to the IG report.  (Exhibit 1).

7.      In 1996, Kelley was elected as a member of the Retirement Board for the Town of Plymouth.  (Exhibit 2, pg. 60).

8.      During his tenure with the Retirement Board, Kelley alleges that Pomeroy and the Town treated him differently than any other Town employee.  (Exhibit 1, ¶48).

9.      Kelley was the only member of the Plymouth police department to be involved with the Retirement Board.  (Exhibit 2, pg. 61, 136-137).

10. Kelley alleges that he was treated differently because Pomeroy required the Retirement Board to reimburse the police department for time Kelley spent on Retirement Board business.  (Exhibit 1, ¶48).

11. Kelley alleges that he was the only Town employee who was subjected to the reimbursement policy.  (Exhibit 1, ¶48).

12. Pomeroy did require the Retirement Board to reimburse the police department for time Kelley spent on Retirement Board business when he was scheduled for active duty.  (See Deposition of Pomeroy, pg. 120-121, attached hereto as Exhibit 3).

13. Due to staffing concerns, Kelley was also required to log in and out when his shift overlapped with Retirement Board business.  (Exhibit 2, pg. 101, 138).

14. The same statute that authorized Kelley's attendance at Retirement Board meetings also permitted reimbursement to the police department for the time Kelley spent at any such meetings.  (Exhibit 3, pg. 120).

15. Kelley was not treated differently than any other Plymouth police officer; Pomeroy had also originally prohibited Sergeant John Abbott ("Abbott") from attending any Public Employee Retirement Administration Commission ("PERAC") meetings when he was scheduled for duty.  (Exhibit 3, pg. 119).

16. Abbott was ultimately allowed, however, to attend PERAC meetings after a statute was passed that specifically allowed public employees time off to attend any such meetings.  (Exhibit 3, pg. 119).

17. The statute, however, did not allow for reimbursement to the police department for time Abbott spent on PERAC business.  (Exhibit 3, pg. 119).

18. Kelley also alleges that Pomeroy retaliated against him in violation of the Whistle Blower Statute because he reported an alleged violation of the Town's by-law to the IG's office.  (Exhibit 1, ¶31).

19. According to Kelley, the Chief and police captains had received holiday pay, uniform allowances and Educational Incentive Benefits ("Quinn Bill") which were not provided for in the Town's by-laws. (See Exhibit 1, ¶21 and Exhibit 2, pg. 63).

20. Kelley testified that he first became concerned about the alleged violations in either May or June of 1998.  (Exhibit 2, pg. 75).

21. After discovering the alleged violations, Kelley testified that he spoke with Michael Sacco ("Sacco"), counsel for the Retirement Board.  (Exhibit 2, pg. 64-65).

22. Sacco then allegedly spoke with Eleanor Beth ("Beth"), Town Manager, and Patrick Della Russo, Town Chief Financial Officer about the alleged violations. (Exhibit 2, pg. 64-65).

23. Sacco allegedly recommended that the Town amend its by-laws to allow the Chief and police captains to continue to receive Quinn Bill benefits.  (Exhibit 2, pg. 64-65).

24. According to Kelley, however, the Town took no action.  (Exhibit 2, pg. 66).

25. Beth claimed the Town did not take any immediate action because it was in the process of negotiating a new contract with the labor union.  (See *Old Colony Memorial* Article; "Benefits paid without vote" dated September 6, 2001, attached hereto as Exhibit 4).

26.     Therefore, on or about January 22, 2001, Kelley testified that he went to the IG's office to express his concern about the alleged by-law violation.[2] (Exhibit 2, pg. 78).

27.     According to Kelley, the IG's office ultimately found that the manner in which Pomeroy had been compensating himself for educational benefits was in violation of the by-law and therefore the Town needed to take some corrective action.  (Exhibit 1, ¶22).

28.     In September 2001, at a Town Meeting, the Town meeting members, <u>including Kelley</u>, voted to amend the bylaw to approve the receipt of Quinn Bill benefits by the Chief, the captains and several retired members of the Plymouth Police Department.  (Exhibit 2, pg. 75-76, 102).

29.     Kelley testified that he knew by voting in favor of the amendment, he was ratifying all of the money that the Chief, the captains and the retired officers had received over the past years.  (Exhibit 2, pg. 88).

30.     Kelley testified that he did not want to "gyp anybody out of anything" and that he was absolutely in favor of the amendment.  (Exhibit 2, pg. 66).

31.     Kelley's report to the IG's office had no financial impact on Pomeroy; he continued to receive all of his benefits.  (Exhibit 3, pg. 99).

32.     Kelley also alleges that Pomeroy retaliated against him by forcing him to participate in an exercise drill on May 25, 2003, despite Pomeroy's alleged knowledge of plaintiff's medical condition.  (Exhibit 1, ¶¶51, 52).

---

[2] In Kelley's Complaint, he alleges that he reported the Chief to the IG's office approximately one year before the May 25, 2003 drill.  Kelley, however, later amended his testimony and stated that he first reported it on or about January 22, 2001.  (Exhibit 2, pg. 78).

33.   Pomeroy first learned about the exercise drill at a Plymouth County Police
      Chiefs' meeting.  (Exhibit 3, pg. 41).

34.   The Massachusetts State Police provided the training that was intended to mimic
      a situation in which heavily armed individuals held high school students as
      hostages.  (Exhibit 1, ¶6 and Exhibit 3, pg. 41).

35.   The drill was held on May 25, 2003, and all Plymouth police officers were
      required to participate in the exercise drill. (Exhibit 1, ¶6, and Exhibit 2, pg. 21-
      22).

36.   Two officers, however, were ultimately excused from participating in the drill.
      (Exhibit 3, pg. 30-31).

37.   Abbott requested that he be excused from participating due to a leg condition.
      (Exhibit 3, pg. 30-31).

38.   Police Officer Dennis Govoni ("Govoni") was also excused from participating in
      the drill because he had previously been assigned to light duty due to a heart or
      blood pressure condition.  (Exhibit 3, pg. 30-31).

39.   Kelley never requested that he be excused from participating in the training.
      (Exhibit 3, pg. 34, and see Kelley Deposition, Vol. II, pg. 9, attached hereto as
      Exhibit 5).

40.   Kelley claims that because Pomeroy allegedly knew he suffered from Lyme
      disease and Meniere's disease that he should have been excused from
      participating in the drill.  (Exhibit 1, ¶¶ 8, 9).

41.   Kelley alleges, however, that despite the above knowledge Pomeroy required
      him to participate in the drill because he knew it would be hazardous to Kelley.
      (Exhibit 1, ¶51).

42.　According to Kelley, the mandatory order for all police personnel to participate in the drill was merely a pretext to cover up Pomeroy's true intentions of causing harm to Kelley.  (Exhibit 1, ¶¶ 51, 52).

43.　Kelley also alleges that the Plymouth Police Brotherhood (the "Union") approached Pomeroy and requested that he institute a protocol to screen members of the police force who may not be able to physically undergo such a rigorous drill.  (Exhibit 1, ¶14).

44.　Pomeroy, however, allegedly refused to institute such a protocol.[3]  (Exhibit 1, ¶15).

45.　Kelley further alleges that the Union was to hold a meeting with Pomeroy to discuss Kelley's preexisting medical condition and his inability to participate in the drill.[4]  (See Kelley's Answers to Defendants' Interrogatories, Answer No. 11, attached hereto as Exhibit 6).

46.　Pomeroy testified that he did not meet with anyone, including members of the Union, to discuss the physical challenges involved in the May 25, 2003 training or the physical condition of any police personnel.  (Exhibit 3, pg. 44, 83-84).

---

[3] It is interesting to note that Kelley testified that he did not attend any meetings between Pomeroy and the Union concerning the exercise drill.  Kelley merely heard through the "grapevine" that Pomeroy refused to institute such a protocol.  (Exhibit 2, pg. 43-45, 151-153).

[4] Once again, Kelley has no first hand knowledge of whether or not his name was specifically mentioned to Pomeroy as someone who was physically incapable of participating in the drill.  (Exhibit 2, pg. 40-42, 151-153).

47.   The only meeting Pomeroy had with the Union prior to the drill was a regularly
      scheduled negotiation to discuss AR-15 assault rifle training.  (Exhibit 3, pg. 83
      and Exhibit 2, pg. 43).

48.   Kelley did not grieve his participation in the drill nor did he request to be
      excused from the drill.  (Exhibit 2 pg. 131-132, and Exhibit 5, pg. 9).

49.   During the drill on May 25, Kelley experienced a heart incident.[5]  (Exhibit 1, ¶10).

50.   Kelley was ultimately brought to Beth Israel Deaconess Medical Center where he
      underwent a cardio catheterization on May 26, 2003.  (Exhibit 1, ¶11 and Exhibit
      2, pg. 50-51).

51.   In June 2003, Kelley provided a note to the defendants which stated that he
      would be able to return to work two weeks after his hospital discharge date.  (See
      correspondence to "To Whom It May Concern" from Lydia Bazzano, M.D. dated
      May 27, 2003, attached hereto as Exhibit 7).

52.   On or about June 11, 2003, Kelley provided a second note which stated that he
      "would be best served medically by staying out of work for the rest of his
      vacation time, or about a month."  (See correspondence to Pomeroy from Donald
      M. Moore, Jr., M.D. dated June 11, 2003, attached as Exhibit 8).

53.   After Kelley's hospitalization, he requested that instead of sick time he be placed
      on "vacation time."  (Exhibit 5, pg. 47).

54.   On June 24, 2003, Pomeroy wrote a letter to Kelley informing him that before a
      determination could be made about his "injured on duty" status, Kelley needed
      to provide the department with sufficient medical documentation.  (See

_____

[5] Kelley testified that he weighed approximately 265 or 270 pounds on the date of the
drill.  (Exhibit 2, pg. 113).

correspondence to Kelley from Pomeroy dated June 24, 2003, attached hereto as Exhibit 9).

55. The documentation requested by Pomeroy needed to include a specific diagnosis of Kelley's condition that clearly indicated that the medical condition was work related. (Exhibit 9).

56. On June 25, 2003, Kelley filed his application for accidental disability retirement pursuant to M.G.L. c. 32 §§7 & 94. (Exhibit 5, pg. 48).

57. On July 3, 2003, Kelley requested that the defendants change his July 1, 2003 vacation time to sick time. (See email to Pomeroy from Kelley dated July 3, 2003, attached as Exhibit 10).

58. On September 9, 2003, as a result of the cardiac incident sustained by Kelley, he was retired with an accidental disability from the Plymouth Police Department. (Exhibit 1, ¶12, and Exhibit 2, pg. 7, 10).

59. Kelley alleges that the injury he suffered was an injury in the line of duty pursuant to M.G.L. c. 41 §111F and therefore he was entitled to receive reimbursement in the amount of $2,000.00 for the vacation days he used as sick time after May 25, 2003. (Exhibit 1, ¶¶13, 17).

60. Pomeroy, however, denied Kelley's application for M.G.L. c. 41 §111F benefits because he felt that the cardiac incident experienced by Kelley on May 25, 2003 was not compensable under that statute. (Exhibit 3, pg. 54, 81).

61. Pomeroy felt the Heart Law better applied to Kelley's situation. (Exhibit 3, pg. 54, 81).

62. Kelley claims that this denial of benefits subjected him to treatment that was different than any other police officer or Town employee. (Exhibit 1, ¶49).

63. Kelley filed his Complaint on March 17, 2005. (Exhibit 1).

II.    **Argument**

A.    **Summary Judgment Standard.**

As discussed *infra*, summary judgment is appropriate here because "the pleadings, depositions, answers to interrogatories, and admissions on file" show that there is no genuine issue as to any material fact and that the defendants are entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  *See Hinchey v. Nynex Corp.*, 144 F.3d 134, 140 (1ˢᵗ Cir. 1998).

B.    **The Defendants are Entitled to Summary Judgment in Their Favor on All Counts of the Complaint.**

1.    **The Plaintiff Has Failed to State a Claim for Violation of the State Whistle Blower Statute, M.G.L. c. 149 §185.**

M.G.L. c. 149 §185(b), in part, states cities and towns, as employers shall not take any retaliatory action against an employee because the employee does any of the following:

> (1)    Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer, or of another employer with whom the employee's employer has a business relationship, that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law, or which the employee reasonably believes poses a risk to public health, safety or the environment.

In this case, Kelley alleges that because he reported alleged violations of the Town's by-laws to the IG's office in January 2001, Pomeroy (1) failed to screen members of the Plymouth police force from participating in the May 25, 2003 drill; (2) required Kelley to participate in the strenuous and stressful drill; and (3) denied Kelley's M.G.L. c. 41 §111F benefits.  (Exhibit 1, ¶30-32, and Exhibit 2, pg. 78).

Kelley testified that he first became aware of the alleged violations of the Town's by-laws in May or June 1998.  (Exhibit 2, pg. 75).  He stated that although he gave the Town ample opportunity to rectify the situation, nothing was ever done.  (Exhibit 2, pg.

66).  As a result of the Town's alleged inaction, Kelley then reported the alleged

violations to the IG's office in January 2001.  (Exhibit 2, pg. 78).  Kelley testified that the

only reason he reported the alleged by-law violations was because he was concerned

that if the Town were audited, it would not be able to substantiate the benefits that were

being paid.  (Exhibit 2, pg. 64).  Kelley further stated that he did not want to "gyp

anybody out of anything."  (Exhibit 2, pg. 66).

    In September 2001, Kelley, as a Town meeting member, voted to amend the

Town's by-law to approve the receipt of Quinn Bill benefits by the Chief, the captains

and several retired members of the Plymouth Police Department.  (Exhibit 2, pg. 75-76,

102).  Kelley testified that he knew by voting in favor of the amendment, he was

ratifying all of the money that the Chief, the captains and the retired officers had

received over the past years.  (Exhibit 2, pg. 88).  In fact, as a result of Kelley's action,

Pomeroy suffered no adverse financial impact; he continued to receive his Quinn Bill

benefits.  (Exhibit 3, pg. 99).

    Kelley also alleges that Pomeroy ordered all police personnel to participate in an

exercise drill (commonly referred to as "the Columbine-like drill"), solely to cover his

true intentions of causing Kelley harm.  (Exhibit 1, ¶51).  Pomeroy first learned about

the drill at a Plymouth County Police Chiefs' meeting.  (Exhibit 3, pg. 41).  The training

was intended to mimic a situation in which heavily armed individuals held high school

students as hostages.  (Exhibit 1, ¶6 and Exhibit 3, pg. 41).  The Massachusetts State

Police ran the program and Pomeroy requested that they provide the training for his

department.  (Exhibit 3, pg. 41).  The exercise drill was held on May 25, 2003, and all

Plymouth police officers were required to participate.  (Exhibit 1, ¶6, and Exhibit 2, pg.

21-22).

Although all police personnel were required to participate in the drill, two officers were ultimately excused due to their medical conditions. (Exhibit 3, pg. 30-31). Abbott requested that he be excused due to a leg condition and Govoni was excused due to a heart or blood pressure condition. (Exhibit 3, pg. 30-31). Both officers brought their medical conditions to the attention of their superior officers and both officers were therefore excused from participating in the drill. Kelley, on the other hand, never brought his alleged medical condition to the attention of any superior officer and he never requested that he be excused from participating in the drill. (Id. pg. 34 and Exhibit 5, pg. 9).

Kelley alleges that Pomeroy knew that Kelley would suffer harm if he were required to participate in the drill. (Exhibit 1, ¶¶9, 51). Kelley claims that Pomeroy was aware of his alleged medical condition (i.e. Lyme disease and Meniere's disease) and that Pomeroy knew Kelley's medical condition in conjunction with the rigorous physical activity of the drill would be hazardous to Kelley's health. (Id.). Pomeroy allegedly masterminded the entire drill solely as a means to harass Kelley and force him out of the police department. (Exhibit 1, ¶52).

Although Kelley stated that he suffered from Lyme disease and Meniere's disease, he testified that he was able to perform the essential functions of his job prior to May 25, 2003. (Exhibit 2, pg. 71, 112-113). Kelley also testified that he did not notify the defendants that he suffered from hypertension or heart disease. (Exhibit 2, pg. 55). Pomeroy testified that it was up to the individual officer to inform the shift commander if he felt mentally or physically unable to perform his duties. (Exhibit 3, pg. 38). In this situation, Kelley did not inform any superior officer that he felt he was unable to participate in the exercise drill. (Exhibit 3, pg. 34).

Kelley also alleges that the Union requested that Pomeroy implement a protocol to screen each member of the department to determine if each officer were physically able to participate in such a rigorous and stressful drill situation. (Exhibit 1, ¶¶14, 16). Kelley claimed that not only did Pomeroy refuse to implement such a protocol he further insisted that all members of the force participate in the drill regardless of their medical situation or previous medical history. (Id.). Kelley, however, was not present at the meeting between Pomeroy and the Union and was therefore not privy to the exact discussions that took place. (Exhibit 2, pg. 43-45, 151-153). Kelley further testified that he merely heard about Pomeroy's alleged refusal through the "grapevine." (Id.).

Pomeroy testified that he did not meet with any members of the Union to specifically discuss the drill or the physical condition of any police personnel. (Exhibit 3, pg. 44, 83-84). In fact, the only meeting between Pomeroy and Union that took place prior to the drill was a regularly scheduled negotiation to discuss AR-15 assault rifle training. (Id. and Exhibit 2, pg. 43). During that meeting Paul Boyle ("Boyle"), the President of the Union, inquired about the drill's safety equipment. (See Deposition of Boyle, pg. 12, attached hereto as Exhibit 11). Pomeroy informed Boyle that the Massachusetts State Police had all the safety gear and that they were responsible for making sure that the exercise was conducted in a safe manner. (Id.) Pomeroy further stated that there would be paramedics and/or an ambulance crew on scene during the drill. (Id.).

Lawrence Rooney ("Rooney"), police officer and Union Steward, testified that he was not aware of any complaints by the Union regarding the drill. (See Rooney Deposition, pg. 13, attached hereto as Exhibit 12). Rooney also stated that he was not aware of any concerns the Union had regarding individual police officer participation in the drill due to any pre-existing medical conditions. (Id. pg. 12, 19-20). Rooney

further testified that he did not approach Pomeroy to request a screening protocol and he was not aware of any other member who may have done so. (Id. pg. 19). Finally, Rooney also stated that Kelley did not ask him to discuss Kelley's alleged medical condition with Pomeroy prior to the drill. (Id. pg. 15). Pomeroy was under no obligation to screen the members of the Plymouth police department prior to their participation in the May 25, 2003 drill.

Kelley's allegations that Pomeroy waited more than two years after his report to the IG's office to plan such an elaborate and expensive ruse is ludicrous. In order for Pomeroy's alleged plan to work, he needed to have known that Kelley suffered from both Lyme disease and Meniere's disease. Pomeroy testified that he was aware that several members of the police department suffered from Lyme disease but he could not recall if Kelley was one of them. (Exhibit 3, pg. 82). Pomeroy also stated that he never knew that Kelley suffered from Meniere's disease. (Id.). Pomeroy would also have needed to believe the unsubstantiated allegation of Kelley that those two diseases combined, with the physical demands of the drill, would cause Kelley to suffer a heart incident. Kelley did not notify anyone that he could not participate in the drill. Nor, for that matter did Kelley notify anyone that his medical condition was of such a nature that he could not perform all the essential functions of his job. Pomeroy testified that he never took any retaliatory action against Kelley and Kelley's allegation that this training drill was a pretext solely to cause him harm is beyond reason. (Id. pg. 129).

Pomeroy felt that this exercise drill was so important he repeated it in 2005, after Kelley retired, and he plans to repeat it again in 2007. (Exhibit 3, pg. 46). Clearly, the reason Pomeroy planned this drill was to provide training for his officers in case a Columbine type situation ever arose in the Town of Plymouth, and not to harm Kelley.

Accordingly, Kelley cannot prove that he was retaliated against for reporting the alleged Town by-law violation to the IG's office and summary judgment should enter in the defendants' favor on Count I.

**2.**    **The Plaintiff Has Failed to State a Claim for Gross Negligence, Willful, Wanton and Reckless Conduct**

Kelley alleges that the defendants' failure to screen members of the Plymouth Police Department prior to their participation in the physically demanding drill caused Kelley to suffer a cardiac incident on May 25, 2003.  (Exhibit 1, ¶37).

In May 2003, it was incumbent upon each police officer to either speak with or email a captain if that officer wanted to be excused from a particular training.  (Exhibit 12, pg. 38-39).  Rooney testified that the officer would have to provide a reason to his superior why he felt he was unable to participate.  (Id.)  Rooney further stated that it was just "common sense" for an officer to inform a superior if he felt he was unable to complete an assignment.  (Id, at pg. 40).

Captain Michael Botieri ("Botieri") testified that if an officer was "fit and able to perform his duties on a daily basis", then that officer was "fit and able to perform any training."  (See Deposition of Botieri, pg. 28, attached hereto as Exhibit 13).  Botieri further testified that the only way an officer's health concern would become known to the department was if that officer raised it with a training officer, a captain or the Chief. (Id. pg. 30-31).  Pomeroy, however, also testified that he would act upon information he received from other officers or supervisors regarding the physical and/or mental condition of another officer.  (Exhibit 3, pg. 39).

Pomeroy further testified that if a police officer felt he was mentally or physically unable to perform the essential functions of the job, that officer should bring his concerns to the attention of the shift commander.  (Exhibit 3, pg. 38).  Kelley testified

that prior to May 25, 2003, he was able to perform the essential functions of his job despite his alleged battle with Lyme disease and Meniere's disease. (Exhibit 2, pg. 71, 112-113). As Kelley himself testified that he was fit for duty, how were the defendants supposed to perceive that the training drill would cause Kelley to suffer a cardiac incident.

Accordingly, Kelley cannot prove that the defendants were negligent by failing to institute a protocol to screen members of the department who would be at risk due to existing medical conditions and therefore summary judgment should enter in the defendants' favor on Count II.

3.    **The Plaintiff Has Failed to State a Claim for Violation of His Federal Civil Rights.**

"To establish a violation of 42 U.S.C. § 1983, a plaintiff must show by a preponderance of evidence that: (1) the challenged conduct was attributable to a person acting under color of state law; and (2) the conduct deprived the plaintiff of rights secured by the Constitution or law of the United States." *Johnson v. Mahoney*, 424 F.3d 83, 89 (1st Cir. 2005) citing *Soto v. Flores*, 103 F.3d 1056, 1061-62 (1st Cir. 1997), *cert. denied*, 522 U.S. 819 (1997)). In this case, Kelley cannot prove that the allegations against the defendants deprived him of his rights secured by the Constitution or laws of the United States. None of the incidents alleged by Kelley, rise to the level of a violation of Kelley's federal civil rights.

Pomeroy testified that he was never aware of an official investigation by the IG's office because he had not been contacted regarding Kelley's allegations. (Exhibit 3, pg. 105, 107). Pomeroy stated, around February 2001, he had heard a rumor that Kelley had spoken with the IG's office. (Id.). Pomeroy, however, was not concerned about Kelley's alleged report because he believed that his benefits were not in jeopardy because the

Town had adopted the Quinn Bill at a Town Meeting in 1972. (See Defendant, Town of Plymouth's Answers to Plaintiff's First Set of Interrogatories, Answer to Interrogatory No. 11, attached hereto as Exhibit 14). William Griffin ("Griffin"), the former Plymouth Town Manager testified that when he appointment Pomeroy as Chief, he thought Pomeroy was entitled to receive Quinn Bill benefits. (See Deposition of Griffin, pg. 23, attached hereto as Exhibit 15).

Kelley alleges that he was treated differently than other Town employees. (Exhibit 1, ¶46). As mentioned above, Pomeroy had also originally prohibited Abbott from attending any PERAC meetings when he was scheduled for duty. (Exhibit 3, pg. 119). Pomeroy only relented when a statute was passed specifically allowing public employees to attend PERAC meetings. (Id.) Pomeroy did not seek reimbursement from PERAC because there was no statutory provision allowing for reimbursement. (Id.). Botieri also testified that both Abbott and Kelley had to let him know when they were going to attend their respective meetings. (Exhibit 13, pg. 54).

Kelley also alleges that Pomeroy began monitoring his every movement on a daily basis. (Exhibit 1, ¶47). All police officers are supervised. (Exhibit 14, Answer to Interrogatory No. 22, and Exhibit 13, pg. 87). That is the function of a supervisor. Pomeroy did not instruct Botieri to watch Kelley any more closely than he watched any other officer. (Exhibit 3, pg. 129-130, and Exhibit 13, pg. 82).

 If Kelley felt scrutinized, it was because Kelley's work always needed constant follow-up. (Exhibit 3, pg. 131). Over the years, Kelley had a lot of citizen complaints. (Id.). Kelley also had some issues following police department rules and regulations. For example, Kelley: (1) received a reprimand for tampering with the odometers in his cruiser, (2) failed to turn on his radio, (3) failed to turn on his computer, (4) failed to respond to radio calls in a proper manner, (5) failed to properly fill out a citation, and

(6) failed to walk his beat when ordered to without the use of a cruiser.  (Exhibit 2, pg. 14-16, 123-126, and Exhibit 13, pg. 85).  It is interesting to note that Kelley has never filed a grievance against Pomeroy for any of the alleged "nitpicking" he has experienced throughout his career.  (Exhibit 2, pg. 157).

Kelley cannot demonstrate that he was harassed by Pomeroy or treated differently than other officers in the Plymouth Police Department.  Accordingly, Kelley cannot prove that the defendants violated 42 U.S.C. §1983 and summary judgment should enter in the defendants' favor on Count III.

**4.     The Plaintiff Has Failed to State a Claim that His M.G.L. c. 41 §111F Benefits Were Wrongfully Denied**

M.G.L. c. 41 §111F states, in pertinent part:

Whenever a police officer…is incapacitated for duty because of injury sustained in the performance of his duty without fault of his own…is so incapacitated because of injuries so sustained, he shall be granted leave without loss of pay for the period of such incapacity; provided, that no such leave shall be granted for any period after such police officer or fire fighter has been retired or pensioned in accordance with law or for any period after a physician designated by the board or officer authorized to appoint police officers or fire fighters in such city, town or district determines that such incapacity no longer exists.

When a claim for injury on duty is presented to the Chief, it is his obligation to determine whether or not an injury has actually been sustained.  (Exhibit 3, pg. 58). After careful review of the situation, Pomeroy denied Kelley's request for M.G.L. c. 41 §111F benefits.  (Id. pg. 54-56).  Pomeroy felt that Kelley was entitled to receive benefits pursuant to M.G.L. c. 32 §94 (Heart Law) not 111F.  (Id.).

Kelley suffered a cardiac incident on May 25, 2003 and was ultimately taken to Beth Israel Deaconess Medical Center for treatment.  However, on May 27, 2003, Dr. Lydia Bazzano wrote a letter that Kelley *would be able* to return to work two weeks after he was discharged from the hospital.  [Emphasis added].  (Exhibit 7).  Further, on June

11, 2003, Dr. Donald Moore wrote a letter stating that Kelley would benefit medically if he *were to remain out of work for the rest of his vacation time*. [Emphasis added]. (Exhibit 8).

On June 19, 2003, Kelley requested a status on his Injury on Duty Application. (Exhibit 9). Pomeroy responded that before a determination could be made, Kelley needed to provide sufficient medical documentation that included a specific diagnosis of Kelley's condition and that his medical condition was work related.[6] (Id.). Clearly, additional documentation was needed, as Kelley's own doctors did not identify Kelley's condition as a permanent heart related incident.

After Kelley had already retired, he submitted supplemental medical documentation to Pomeroy. By the time the documentation was submitted, however, Pomeroy had already denied Kelley's application. (Exhibit 3, pg. 79). Although Kelley did not receive 111F benefits for the two weeks he was out, he did get paid from his sick or vacation time. (Exhibit 3, pg. 53). That is precisely what sick time is for.

Kelley is also seeking the loss of all salary and benefits for the sixteen years he would have served to his normal retirement date. Kelley should not be entitled to recover this money because (1) he is on a disability retirement and is already receiving benefits, and (2) there is no guarantee that Kelley would have been able to work for another sixteen years, especially given his alleged ill health.

Accordingly, Kelley cannot prove that the defendants wrongfully denied his M.G.L. c. 41 §111F benefits and summary judgment should enter in the defendants' favor on Count IV.

---

[6] Both Captains Botieri and Charles Chandler had previously informed the plaintiff that he needed to provide additional medical documentation. (Exhibit 9).

**III.    Conclusion**

For the reasons set forth above, summary judgment should enter in favor of Defendants, Town of Plymouth and Robert J. Pomeroy, Individually and as Chief of Police of the Plymouth Police Department.

Respectfully submitted,
Defendants,
By their Attorneys,


_____/s/ Jeremy Silverfine_____
Leonard H. Kesten, BBO No. 542042
Jeremy Silverfine, BBO No. 542779
Karen W. Peters, BBO No. 658903
BRODY, HARDOON, PERKINS & KESTEN, LLP
One Exeter Plaza
Boston, MA 02116
(617) 880-7100

Dated:  July 30, 2007