UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05 10596 NMG

| | |
|---|---|
| THOMAS KELLEY,<br>    Plaintiff,<br><br>V.<br><br>TOWN OF PLYMOUTH and<br>ROBERT J. POMEROY, as Chief of the<br>Plymouth Police Department and<br>Individually<br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS AND SUPPORTING EXHIBITS OF THE DEFENDANTS SUBMITTED IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1, the defendants Robert Pomeroy, individually and as Chief of the Plymouth Police Department, and the Town of Plymouth, submit this statement of facts, with supporting attachments.

**Statement of Material Undisputed Facts For Summary Judgment Purposes Only.**

1. The plaintiff, Thomas Kelley ("Kelley"), alleges that the Town of Plymouth ("Town") and Robert J. Pomeroy ("Pomeroy"), Individually and as Chief of the Plymouth Police Department, violated the State Whistle Blower Statute, (M.G.L c. 149 §185), and his civil rights pursuant to 42 U.S.C. §1983, and the Fourteenth (14th) Amendment of the United States Constitution. (See Kelley's Complaint, copy attached hereto as Exhibit 1).

2. Kelley also alleges that the defendants' committed gross negligence by their willful, wanton and reckless conduct and that the defendants wrongfully denied Kelley's benefits pursuant to M.G.L. c. 41 §111F.  (Exhibit 1).

3. Kelley was appointed as a police officer in Plymouth on September 19, 1977, and retired on September 9, 2003, due to an accidental disability. (Exhibit 1, ¶5, and See Deposition of Kelley, Vol. I, pg. 7, attached hereto as Exhibit 2).

4. Kelley alleges that the defendants forced him to participate in a physically demanding drill which resulted in Kelley experiencing a heart incident. (Exhibit 1).

5. Kelley also alleges that the only reason he was forced to participate in the drill was to retaliate against him for his involvement in reporting an alleged violation of the Town's by-law to the Inspector General's ("IG") office. (Exhibit 1).

6. Kelley further alleges that he has also been the victim of harassment due to the IG report. (Exhibit 1).

7. In 1996, Kelley was elected as a member of the Retirement Board for the Town of Plymouth. (Exhibit 2, pg. 60).

8. During his tenure with the Retirement Board, Kelley alleges that Pomeroy and the Town treated him differently than any other Town employee. (Exhibit 1, ¶48).

9. Kelley was the only member of the Plymouth police department to be involved with the Retirement Board. (Exhibit 2, pg. 61, 136-137).

10. Kelley alleges that he was treated differently because Pomeroy required the Retirement Board to reimburse the police department for time Kelley spent on Retirement Board business. (Exhibit 1, ¶48).

11. Kelley alleges that he was the only Town employee who was subjected to the reimbursement policy. (Exhibit 1, ¶48).

12. Pomeroy did require the Retirement Board to reimburse the police department for time Kelley spent on Retirement Board business when he was scheduled for

active duty. (See Deposition of Pomeroy, pg. 120-121, attached hereto as Exhibit 3).

13. Due to staffing concerns, Kelley was also required to log in and out when his shift overlapped with Retirement Board business. (Exhibit 2, pg. 101, 138).

14. The same statute that authorized Kelley's attendance at Retirement Board meetings also permitted reimbursement to the police department for the time Kelley spent at any such meetings. (Exhibit 3, pg. 120).

15. Kelley was not treated differently than any other Plymouth police officer; the Chief had also originally prohibited Sergeant John Abbott ("Abbott") from attending any Public Employee Retirement Administration Commission ("PERAC") meetings when he was scheduled for duty. (Exhibit 3, pg. 119).

16. Abbott was ultimately allowed, however, to attend PERAC meetings after a statute was passed that specifically allowed public employees time off to attend any such meetings. (Exhibit 3, pg. 119).

17. The statute, however, did not allow for reimbursement to the police department for time Abbott spent on PERAC business. (Exhibit 3, pg. 119).

18. Kelley also alleges that Pomeroy retaliated against him in violation of the Whistle Blower Statute because he reported an alleged violation of the Town's by-law to the IG's office. (Exhibit 1, ¶31).

19. According to Kelley, the Chief and police captains had received holiday pay, uniform allowances and Educational Incentive Benefits ("Quinn Bill") which were not provided for in the Town's by-laws. (See Exhibit 1, ¶21 and Exhibit 2, pg. 63).

20. Kelley testified that he first became concerned about the alleged violations in either May or June of 1998. (Exhibit 2, pg. 75).

21. After discovering the alleged violations, Kelley testified that he spoke with Michael Sacco ("Sacco"), counsel for the Retirement Board. (Exhibit 2, pg. 64-65).

22. Sacco then allegedly spoke with Eleanor Beth ("Beth"), Town Manager, and Patrick Della Russo, Town Chief Financial Officer about the alleged violations. (Exhibit 2, pg. 64-65).

23. Sacco allegedly recommended that the Town amend its by-laws to allow the Chief and police captains to continue to receive Quinn Bill benefits. (Exhibit 2, pg. 64-65).

24. According to Kelley, however, the Town took no action. (Exhibit 2, pg. 66).

25. Beth claimed the Town did not take any immediate action because it was in the process of negotiating a new contract with the labor union. (See *Old Colony Memorial* Article; "Benefits paid without vote" dated September 6, 2001, attached hereto as Exhibit 4).

26. Therefore, on or about January 22, 2001, Kelley testified that he went to the IG's office to express his concern about the alleged by-law violation.[1] (Exhibit 2, pg. 78).

27. According to Kelley, the IG's office ultimately found that the manner in which Pomeroy had been compensating himself for educational benefits was in violation of the by-law and therefore the Town needed to take some corrective action. (Exhibit 1, ¶22).

28. In September 2001, at a Town Meeting, the Town meeting members, including Kelley, voted to amend the bylaw to approve the receipt of Quinn Bill benefits by

---

[1] In Kelley's Complaint, he alleges that he reported the Chief to the IG's office approximately one year before the May 25, 2003 drill. Kelley, however, later amended his testimony and stated that he first reported it on or about January 22, 2001. (Exhibit 2, pg. 78).

the Chief, the captains and several retired members of the Plymouth Police Department. (Exhibit 2, pg. 75-76, 102).

29. Kelley testified that he knew by voting in favor of the amendment, he was ratifying all of the money that the Chief, the captains and the retired officers had received over the past years. (Exhibit 2, pg. 88).

30. Kelley testified that he did not want to "gyp anybody out of anything" and that he was absolutely in favor of the amendment. (Exhibit 2, pg. 66).

31. Kelley's report to the IG's office had no financial impact on Pomeroy; he continued to receive all of his benefits. (Exhibit 3, pg. 99).

32. Kelley also alleges that Pomeroy retaliated against him by forcing him to participate in an exercise drill on May 25, 2003, despite Pomeroy's alleged knowledge of plaintiff's medical condition. (Exhibit 1, ¶¶51, 52).

33. Pomeroy first learned about the exercise drill at a Plymouth County Police Chiefs' meeting. (Exhibit 3, pg. 41).

34. The Massachusetts State Police provided the training that was intended to mimic a situation in which heavily armed individuals held high school students as hostages. (Exhibit 1, ¶6 and Exhibit 3, pg. 41).

35. The drill was held on May 25, 2003, and <u>all</u> Plymouth police officers were required to participate in the exercise drill. (Exhibit 1, ¶6, and Exhibit 2, pg. 21-22).

36. Two officers, however, were ultimately excused from participating in the drill. (Exhibit 3, pg. 30-31).

37. Abbott requested that he be excused from participating due to a leg condition. (Exhibit 3, pg. 30-31).

38. Police Officer Dennis Govoni ("Govoni") was also excused from participating in the drill because he had previously been assigned to light duty due to a heart or blood pressure condition. (Exhibit 3, pg. 30-31).

39. Kelley never requested that he be excused from participating in the training. (Exhibit 3, pg. 34 and see Kelley Deposition, Vol. II, pg. 9, attached hereto as Exhibit 5).

40. Kelley claims that because Pomeroy allegedly knew he suffered from Lyme disease and Meniere's disease that he should have been excused from participating in the drill. (Exhibit 1, ¶¶ 8, 9).

41. Kelley alleges, however, that despite the above knowledge Pomeroy required him to participate in the drill because he knew it would be hazardous to Kelley. (Exhibit 1, ¶51).

42. According to Kelley, the mandatory order for all police personnel to participate in the drill was merely a pretext to cover up Pomeroy's true intentions of causing harm to Kelley. (Exhibit 1, ¶¶ 51, 52).

43. Kelley also alleges that the Plymouth Police Brotherhood (the "Union") approached Pomeroy and requested that he institute a protocol to screen members of the police force who may not be able to physically undergo such a rigorous drill. (Exhibit 1, ¶14).

44. Pomeroy, however, allegedly refused to institute such a protocol.[2] (Exhibit 1, ¶15).

---

[2] It is interesting to note that Kelley testified that he did not attend any meetings between Pomeroy and the Union concerning the exercise drill. Kelley merely heard through the "grapevine" that Pomeroy refused to institute such a protocol. (Exhibit 2, pg. 43-45, 151-153).

45. Kelley further alleges that the Union was to hold a meeting with Pomeroy to discuss Kelley's preexisting medical condition and his inability to participate in the drill.[3] (See Kelley's Answers to Defendants' Interrogatories, Answer No. 11, attached hereto as Exhibit 6).

46. Pomeroy testified that he did not meet with anyone, including members of the Union, to discuss the physical challenges involved in the May 25, 2003 training or the physical condition of any police personnel. (Exhibit 3, pg. 44, 83-84).

47. The only meeting Pomeroy had with the Union prior to the drill was a regularly scheduled negotiation to discuss AR-15 assault rifle training. (Exhibit 3, pg. 83 and Exhibit 2, pg. 43).

48. Kelley did not grieve his participation in the drill nor did he request to be excused from the drill. (Exhibit 2 pg. 131-132, and Exhibit 5, pg. 9).

49. During the drill on May 25, Kelley experienced a heart incident.[4] (Exhibit 1, ¶10).

50. Kelley was ultimately brought to Beth Israel Deaconess Medical Center where he underwent a cardio catheterization on May 26, 2003. (Exhibit 1, ¶11 and Exhibit 2, pg. 50-51).

51. In June 2003, Kelley provided a note to the defendants which stated that he would be able to return to work two weeks after his hospital discharge date. (See correspondence to "To Whom It May Concern" from Lydia Bazzano, M.D. dated May 27, 2003, attached hereto as Exhibit 7).

---

[3] Once again, Kelley has no first hand knowledge of whether or not his name was specifically mentioned to Pomeroy as someone who was physically incapable of participating in the drill. (Exhibit 2, pg. 40-42, 151-153).
[4] Kelley testified that he weighed approximately 265 or 270 pounds on the date of the drill. (Exhibit 2, pg. 113).

52. On or about June 11, 2003, Kelley provided a second note which stated that he "would be best served medically by staying out of work for the rest of his vacation time, or about a month." (See correspondence to Pomeroy from Donald M. Moore, Jr., M.D. dated June 11, 2003, attached as Exhibit 8).

53. After Kelley's hospitalization, he requested that instead of sick time he be placed on "vacation time." (Exhibit 5, pg. 47).

54. On June 24, 2003, Pomeroy wrote a letter to Kelley informing him that before a determination could be made about his "injured on duty" status, Kelley needed to provide the department with sufficient medical documentation. (See correspondence to Kelley from Pomeroy dated June 24, 2003, attached hereto as Exhibit 9).

55. The documentation requested by Pomeroy needed to include a specific diagnosis of Kelley's condition that clearly indicated that the medical condition was work related. (Exhibit 9).

56. On June 25, 2003, Kelley filed his application for accidental disability retirement pursuant to M.G.L. ch. 32 §§7 & 94. (Exhibit 5, pg. 48).

57. On July 3, 2003, Kelley requested that the defendants change his July 1, 2003 vacation time to sick time. (See email to Pomeroy from Kelley dated July 3, 2003, attached as Exhibit 10).

58. On September 9, 2003, as a result of the cardiac incident sustained by Kelley, he was retired with an accidental disability from the Plymouth Police Department. (Exhibit 1, ¶12, and Exhibit 2, pg. 7, 10).

59. Kelley alleges that the injury he suffered was an injury in the line of duty pursuant to M.G.L. c. 41 §111F and therefore he was entitled to receive

reimbursement in the amount of $2,000.00 for the vacation days he used as sick time after May 25, 2003. (Exhibit 1, ¶¶13, 17).

60. Pomeroy, however, denied Kelley's application for M.G.L. c. 41 §111F benefits because he felt that the cardiac incident experienced by Kelley on May 25, 2003 was not compensable under that statute. (Exhibit 3, pg. 54, 81).

61. Pomeroy felt the Heart Law better applied to Kelley's situation. (Exhibit 3, pg. 54, 81).

62. Kelley claims that this denial of benefits subjected him to treatment that was different than any other police officer or Town employee. (Exhibit 1, ¶49).

63. Kelley filed his Complaint on March 17, 2005. (Exhibit 1).

>Respectfully submitted
>The Defendants,
>By their attorneys,
>BRODY, HARDOON, PERKINS & KESTEN, LLP
>
>/s/ Jeremy Silverfine
>Leonard E. Kesten, BBO # 542042
>Jeremy I. Silverfine, BBO # 542779
>Karen W. Peters, BBO # 658903
>One Exeter Plaza
>Boston, MA 02116
>(617) 880-7100

Dated: July 30, 2007