UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

THOMAS M. KELLEY,
     Plaintiff,

v.                                Civil Action No. 05-10596-NMG

TOWN OF PLYMOUTH, et al
     Defendants.

**PLAINTIFF, THOMAS M. KELLEY'S, MEMORANDUM IN
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**BACKGROUND**

The Statement of Disputed Facts are incorporated herein by reference.

Said Complaint is incorporated herein by reference and annexed hereto as Exhibit A.  The

Plaintiff's Complaint has four counts.

Count I is based upon Chief Pomeroy's course of retaliation against Kelley for Kelley

reporting the Quinn bill payments to Pomeroy were improper to the Town Manager, the

Plymouth Retirement Board and the Inspector General's office in violation of the "Whistle

Blower" Statute, MGL Chapter 149 § 185.

The harassment of Kelley in retaliation for questioning the payment of Quinn Bill

benefits to Chief Pomeroy began in the spring of 1998 by constant monitoring of Kelley's every

movement when on duty, along with scrutinizing his operation procedures and any breaks or any

other movements he made.  Fahey Deposition, pages 23, 24 and 27, Exhibit G and Boyle

Deposition, page 43, Exhibit R.  Kelley Affidavit, paragraphs 17, 18, 40, 42-45, Exhibit D.

Kelley's inclusion in the Columbine like drill is partially based on negligence, Count II of

the Complaint, but also part of the overall attack on Kelley who was treated differently than all

other officers.  As part of Count II, Kelley has alleged that his inclusion in the drill was required

by the Chief due to both the Chief's negligence in not educating himself regarding the strenuous

nature of the drill and failing to inquire as to existing medical conditions of his men.  Any

reasonably prudent person and especially someone like Pomeroy with his extensive experience would have at minimum instituted a protocol to screen officers predisposed to potential injury. A course of action far more responsible, then merely providing for ambulances and emergency medical personnel to be present at the time and place of conducting the training drill.

The Chief had been warned of potential injury to personnel by the President of the Union during a meeting to discuss AR-15 Training.  Boyle Deposition, page 14, Exhibit R.

Chief Pomeroy had knowledge of Kelley's pre-existing medical condition because he issued a letter to Kelley regarding the extent of Kelley's sick time and number of sick days used by Kelley and because Kelley e-mailed them to the Chief in response to the letters from the Chief to Kelley concerning attendance.  Exhibit B, Kelley E-mails and letters regarding his illnesses and Chief's memo re sick time absence issues.

Only after Kelley was injured did Chief Pomeroy allow two other officers to be excused from the drill for medical reasons.  The disparative treatment directed at Kelley over a long period of time extending even into his retirement for an injury on duty by Chief Pomeroy and the Town denying his injury on duty and entitlement to 111F benefits was the basis for Count III, Violation of Kelley's 14th Amendment Rights and his Rights under 42 USC § 1983.

Count IV is based upon Pomeroy's denial of benefits to Kelley under M.G.L. Ch. 41 § 111F for an injury on duty.  The denial of said benefits by Pomeroy in view of the overwhelming documentation that Kelley was injured on duty is not only a violation of Ch. 41, §111F, but further supports the Whistle Blower retaliation, 14th Amendment and 42 USC §1983 violations by the Defendants.

Under no circumstances, does the Plaintiff, Kelley, in his Complaint or in any of his testimony remotely suggest that Chief Pomeroy set up the "Columbine like" training drill "as a pretext only to cause" Kelley harm.  The aforesaid contention is a quantum leap of fiction on the part of the Defendants to distort the facts and the actual allegations made by the Plaintiff.

Therefore in view of the retaliatory treatment, which culminated in Pomeroy refusing to pay Kelley Chapter 41 § 111F benefits amounting to approximately $2,000.00, Officer Kelley filed the within complaint, which is now the subject of Defendant's Motion for Summary Judgment.

## STANDARD OF REVIEW

Summary Judgment can only be rendered if the Defendants carry their burden of showing that there is no genuine issue as to any material fact and that they are entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The Court must view the entire record in the light most favorable to Kelley and indulge all reasonable inferences to his favor. Padilla-Garcia v. Rodriguiez, 212 F.3d 69, 74 (1st Cir. 2000).

The Defendants have the burden of showing that "there is an absence of evidence" to support Kelley's case. FDIC v. Municipality of Ponce, 904 F2d 740, 742 (1st Cir. 1990). If, and only if, the Defendants do so, then the burden shifts to Kelley to establish a genuine factual dispute. Id. In deciding whether a factual dispute is genuine, the Court must determine whether "the evidence is such that a reasonable jury *could* return a verdict for the non-moving part." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (emphasis added).

In addition, in employment discrimination cases, the Court must be mindful that the "often elusive" intent to discriminate is usually shown only through indirect proof and inferences from apparently benign conduct. Reed v. Lepage Bakeries, 244 F.3d 254, 259 n.3 (1st Cir. 2001).

Judged under this standard, the Defendants have not met their burden on Kelley's claims, Counts I-IV of his Complaint.

**ARGUMENT**

**COUNT I- CHAPTER 149: SECTION 185. KELLEY HAS STATED SUFFICIENT
EVIDENCE OF VIOLATIONS BY THE DEFENDANTS, REQUIRING REVIEW OF
DISPUTED FACTS BY A JURY.  THE DEFENDANTS ARE NOT ENTITLED TO
SUMMARY JUDGMENT ON COUNT I.**

The Massachusetts whistleblower law provides that you cannot lawfully retaliate against

an employee for disclosing or threatening to disclose what the employee believes to be a

violation of the law.  The law also provides protection against retaliation against an employee

who has provided information to a public body conducting an investigation or inquiry.  In this

matter Plymouth, Massachusetts police officer Thomas Kelly is an employee of the Town and

raised issues related to the unlawful payment of monies to certain police officers, including but

not limited to the Chief of Police, Robert J. Pomeroy.  Kelley discussed the unauthorized

payments with the media, the town retirement board, other town officials and the Inspector

General's Office for the Commonwealth.  Chief Pomeroy is a licensed attorney in Massachusetts

and long time Chief of the Plymouth Police Department.  He and some other officers had been

paid in excess of $500,000.00 in unauthorized payments over a period of years.  The Defendants

do not dispute the fact that the payments were not authorized by the Town by-laws and therefore

the Town later made a change in the law after an investigation was launched by the

Massachusetts Inspector General's Office.

Chief Pomeroy also served as a sworn officer of the department at other ranks before

assuming the position of Chief.  Kelly also served the Town as an elected Town meeting

Member and as Chair of the Town's Retirement Board and at one time held a leadership position

in the Plymouth patrolman's union.  Pomeroy Deposition, page 147, Exhibit K.  Pomeroy in his

deposition denied ever calling the Town Manager about Officer Kelly raising the compensation

issue.  But, former Town Manager, William R. Griffin clearly disputes the Chief's testimony

when he says that Chief Pomeroy called him about Kelly and was upset.  Griffin Deposition,

page 17, Exhibit I.  The Chief maintains that he was not upset by Kelly's action nor was he upset

by the extensive news coverage of certain officers getting more than $500,000 in unauthorized

payments, including himself.  The Chief says he did not call Griffin.  Griffin testified that he was

visited by two investigators from the Inspector General's Office because of the Kelly complaints

that "the Chief was illegally receiving benefits that he wasn't entitled to".  Griffin Deposition,

page 15, Exhibit I. Griffin was interviewed for 45 minutes by the IG investigators and

subsequently wrote a letter to his successor explaining how he understood the Chief was taking

this extra unauthorized compensation.  Chief Pomeroy called Griffin and asked him to write said

letter.  Griffin Deposition, page 8, Exhibit I).

Kelly's involvement with this issue caused a furor in the Police Department. Former

Lieutenant Fahy testified in his deposition that others in the department knew that Kelly was

being watched after he raised the illegal payment issues (Fahy Deposition, page 39, Exhibit G)

and that no one was watched like this police officer was monitored.  Fahy Deposition, pages 21

24, 25, 29, 33, 34, 39 and 45-46, Exhibit G.  Kelly himself spoke about it in his deposition when

he claimed that he was being harassed over the simplest things.  Kelley Deposition, pages 97, 98,

Exhibit Q.  Fahy warned him that they were out to get him, (see Kelley Deposition, pages 80, 89,

Exhibit Q) and that the harassment included issues like warnings for leaving a date off of a

citation that was a motor vehicle moving violation warning.  Kelley Deposition, pages 119, 120,

125, 126, Exhibit Q).  Officer Boyle told him to "watch his back".  Kelley Deposition, page 122,

Exhibit Q.  Captain Botieri a ten year veteran as Captain of operations and a beneficiary like the

Chief of the $500,000.00 in illegal payments, could not explain why he was keeping such a close

eye on Kelly's citations and his other work.  Botieri Deposition, pages 88-91, Exhibit P.  He

could not recall looking at citations for anyone during the last seven shifts he worked prior to his

deposition.  Botieri Deposition, page 90, Exhibit P.  Kelly was reprimanded for not giving his

cruiser location as he was rushing to give back up to an officer responding to a call where

physical violence was reported.  Kelley Deposition pages122-123, Exhibit Q.  Officer Kelly was

also given a verbal warning  (Botieri Deposition, page 101, line 16, Exhibit P) for not having his

computer on when it was malfunctioning.  Kelly Deposition, page 128, Exhibit Q.  Kelly

testified that he always had a "portable" on him.

Kelly was both a Town Meeting member elected in 1992 and a Retirement Board

member elected in 1996.  Kelley Deposition pages 59-60, Exhibit Q.  Kelley was also for a time

Treasurer of the Police Association.  Kelley Deposition, page 147, Exhibit Q.  Despite all this

public service he had to have the Town reimbursed for the time spent in his monthly meetings at

the Retirement Board held at the Town Hall.  Kelley Deposition, page 101, Exhibit Q. Yet no

other town employee was treated that way in their departments and the Captain and Chief did not

care if others in the town were attending the same meetings or that those departments did not

have to be reimbursed.  Botieri Deposition, pages 59-61, Exhibit P, Pomeroy's Deposition, page

120, Exhibit K.

While he was on vacation he was ordered to work a Fourth of July on what would have

been his regular day off.  He had previously been approved to be on vacation yet he was called

back.  In an unusual move, a police officer was dispatched to his house and startled his wife who

was home. No call was first made to his home and Mrs. Kelly was told to have Officer Kelly

who was not at home, to call the station immediately.  Botieri Deposition, pages 91, 92-95,

Exhibit P.  Yet, Captain Botieri says he cannot recall doing that to any other officer.  Botieri

Deposition, pages 95-96, Exhibit P.

As further evidence of retaliation, Pomeroy refused to compensate Kelley after his injury

pursuant to Chapter 42 § 111F despite overwhelming evidence that Kelley was injured on duty.

Kelley sets forth in detail in his opposition to dismissal of Count IV set forth herein and

incorporates said opposition here as well.

After reviewing the opposition to Defendants' Motion for Summary Judgment on Count

IV and the further evidence set forth herein, the evidence of material facts supporting the claim

of retaliation by Chief Pomeroy is substantial and if believed by a jury would warrant a finding
for the Plaintiff.

The refusal to pay $2,000.00 to reimburse Kelley's use of vacation days and the absurd
denial that Kelley's injury was an injury on duty display the intent to do harm to Kelley and
malicious nature of the treatment of Kelley by Chief Pomeroy.

Kelley's version of events regarding the Chief's reaction to Kelley raising the issue of
improper payment of benefits to Chief Pomeroy are a complete contradiction.  Kelley's
statement of disputed facts clearly puts Pomeroy's statements and the Town's actions regarding
retaliation at complete odds with eyewitness testimony from police union officials and a police
supervisor.  The statements of former Town Manager Griffin regarding the Chief's anger and
requesting a written letter supporting the Chief's own theory for his payment contradicts the
Chief's testimony of his being oblivious to the Inspector General's investigation and Kelley's
activities.

The Court in Bell v. Potter, 234 F. Supp. 2d 91; 2002 U.S. Dist. LEXIS 24161, (Case No.
1 attached hereto) clearly stated that with diverging versions regarding retaliation and assessing
the credibility of the defendant's statements as to whether its rationale is pretext is a jury issue.

> In the analogous context of **summary judgment** under Rule 56, we have stated
> that the court must review the record 'taken as a whole.'  And the standard for granting
> **summary judgment** 'mirrors' the standard for judgment as a matter of law, such that
> 'the inquiry under each is the same.'  It therefore follows that, in entertaining a motion
> for judgment as a matter of law, the court should review all of the evidence in the record.
>
> In doing so, however, the court must draw all reasonable inferences in favor of the
> nonmoving party, and it may not make credibility determinations or weigh the evidence.
> 'Credibility determinations, the weighing of the evidence and the drawing of legitimate
> inferences from the facts are **jury** functions, not those of a judge.'  Thus, although the
> court should review the record as a whole, it must disregard all evidence favorable to the
> moving party that the **jury** is not required to believe.  That is, the court should give
> credence to the evidence favoring the nonmovant as well as that 'evidence supporting the
> moving party that is uncontradicted and unimpeached, at least to the extent that that
> evidence comes from disinterested witnesses.'

In <u>Larch v. Mansfield Municipal Electric Department</u>, 272 F.3d 63; 2001 U.S. App.

LEXIS 25892, a jury found for an employee under the "Whistle Blower" statute, Mass. G.L. Ch.

149 § 185 and that Mansfield Municipal Electric Department retaliated against the Plaintiff for

refusing to participate in what he believed was an activity that would be in violation of a law.

In upholding the jury's decision the Court said:

> We review the district court's denial of [a] motion for judgment as a matter of law *de novo*, viewing the evidence in the light most favorable to [the non-moving party] and drawing all reasonable inferences in its favor. Our inquiry is whether the evidence, when viewed from this perspective, would permit a reasonable **jury** to find in favor of [the non-moving party] on any permissible claim or theory. <u>Foster-Miller, Inc. v. Babcock & Wilcox Canada, 210 F.3d 1, 7 (1<u>st</u> Cir. 2000)</u>. (Citations and internal quotation marks omitted). We conclude that the evidence was sufficient to support the jury's verdict.

Kelley has presented substantial evidence of retaliation against him form the outset of his

raising the issue of unauthorized payments being paid to Chief Pomeroy in 1998.

The Chief became aware of Kelley's complaint to the Town Manager Eleanor Beth,

raising the issue to the Retirement Board and the Inspector General. Despite his denials, which

strain belief, there is testimony from people that he sought assistance and support to fend off an

investigation. Rank and file officers testified it was common knowledge in the station house that

the Chief was angry at Kelley for raising this payment of Quinn Bill benefits. Taking the

evidence most favorable to the non-moving party requires the matter go to a jury to weigh the

credibility of the Chief and if his actions were pretext to cover up retaliation against Kelley in

violation of M.G.L. Ch. 149 §185.

For the aforesaid reasons the Defendants' Motion for Summary Judgment on Count I

should be denied.

**<u>COUNT II – KELLEY HAS STATED SUFFICIENT EVIDENCE OF NEGLIGENCE BY THE DEFENDANTS AS THE PROXIMATE CAUSE OF THE PLAINTIFF'S INJURY ON DUTY REQUIRING REVIEW OF DISPUTED FACTS BY A JURY. THE DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON COUNT II.</u>**

Defendants are not entitled to judgment as a matter of law since there are genuine issues

of material facts as to Count II. The Defendants argue that negligence did not occur. The Chief

is a lawyer and a member of the Joint Management Labor Committee, which is a state agency for overseeing certain collective bargaining for municipal and town employees in police and fire departments. He serves as Vice Chair of that committee and was appointed to it by Governor Romney. Pomeroy Deposition, page 10, Exhibit K. There are seven unions representing employees of the Plymouth Police Department. Pomeroy Deposition, page 14, Exhibit K.

Pomeroy ordered training for the entire police force without inquiring about the level of physical exertion. There were eighty patrolmen in May, 2003. Botieri Deposition, page 13, Exhibit P. The Chief testified that he never discussed the physical rigors of the training with the State Police Colonel with whom he first discussed the training. Pomeroy Deposition, page 42, Exhibit K.

The Chief has no protocols of any kind or rules written or otherwise regarding safe training techniques. Pomeroy Deposition, pages 28, 48, Exhibit K. He has never read anything on the issue of ensuring that police officers are safe in their training modules. Pomeroy Deposition, pages 23, 27 and 28, Exhibit K. The Chief does not see that he has any responsibility for the safety for the eighty police officers under his command when in a training mode. Pomeroy Deposition, pages 37, 40, Exhibit K.

Captain Botieri was asked five times in his deposition if there were any rules or regulations, protocols or standard operating procedures regarding who should or should not be included in training and he answered on five occasions that he did not understand the question. Botieri Deposition, pages 25, 26, 28, Exhibit P. He was extremely reluctant to talk in his deposition about the total absence of rules or protocols. No one had told any police officer about what physical challenges to expect because no one in the command structure knew or cared to know themselves.

The Chief never asked and Botieri, the Captain of Operations claims that it is not his nor the Chief's responsibility to worry about the physical challenges.

In the Motion for Summary Judgment filed here the Defendants admit that they didn't even discuss the issue with the union: "Pomeroy testified that he did not meet with any members of the Union to specifically discuss the drill or the physical condition of any police personnel". Pomeroy Deposition, page 13, Exhibit K.

Botieri completed his undergraduate work majoring in sociology and holds a Masters degree. Botieri Deposition, pages 5 and 6, Exhibit P. He was promoted to Captain in 1996 and has always held the title, Captain of Operations. Captain Botieri says he has nothing to do with training but that it is entirely up to the men to determine if they are fit and able to perform the training. In fact, in answer to one question on the subject of screening officers prior to training, he said the Chief had no responsibility in the area of evaluating the patrol officers and that there is no other way of knowing unless the men raise the issue individually. Botieri Deposition, pages 29, 30, 31, Exhibit P.

Officer Kelly had provided the information as to both of his diseases (Lyme and Meniere's) to Captain Botieri and to the Chief when the subject of his attendance came up in general reviews. The department notifies patrol officers of the level of their use of earned paid time off in annual letters and officers are given the chance to respond and Kelly did that by providing medical notes from doctors to the Captain and informed the Chief by email. Botieri said he knew these notes existed. Botieri Deposition, page 102, Exhibit P. Botieri also said that he had no knowledge if anyone was injured in training in recent years.

Further the Union did raise the issue of safety of the men in the Columbine Drill and possible injury. Boyle Deposition, page 14, Exhibit R. Boyle the Union President brought other instances of injury during said drill in other departments to the Chief's attention including a meeting to discuss the SR-15 instruction and training exercise. Boyle Deposition, page 14, Exhibit R.

Kelley could not ask to be excused since the exercise was mandatory. Exhibit T, Botieri e-mail to all personnel. No one was excused until after Kelley was injured and others realized they were at risk due to pre-existing medical issues. Officer Govoni in his Affidavit, marked Exhibit C and annexed hereto, directly disputes Defendant's statements that officers could have been excused if they asked. Govoni refused to participate after Kelley was injured. Abbott was excused after Govoni was permitted not to participate. Both were after Kelley was seriously injured causing alarm with other officers with pre-existing medical issues.

Kelley has presented substantial disputed facts for a jury to consider the issues of duty owed by the Chief, breach of said duty and negligence on the part of the Chief, and whether aforesaid negligence was willful and wanton and the proximate cause of Kelley's injury during the training drill. Said disputed facts supported by testimony and evidence referenced herein provide material facts to be considered by a jury. The United States Supreme Court ruled in Tiller Executor v. Atlantic Coast Line  Railroad Co., 318 U.S. 54; 63 S. Ct. 444; 87 L.Ed. 610; 1943 U.S. LEXIS 1300, that in particular cases involving negligence should go to a jury to determine the disputed facts to reach a decision as to liability the court said:

> No case is to be withheld from a **jury** on any theory of assumption of risk; and questions of **negligence** should under proper charge from the court be submitted to the **jury** for their determination. Many years ago this Court said of the problems of **negligence**, 'We see no reasons, so long as the **jury** system is the law of the land, and the **jury** is made the tribunal to decide disputed **questions of fact**, why it should not decide such questions as these as well as others.' Jones v. East Tennessee, V. & G. R. Co., 128 U.S. 443, 445. Or as we have put it on another occasion, 'Where the facts are in dispute and the evidence in relation to them is that from which fair-minded men may draw difference inferences,' the case should go to the **jury**.

The Plaintiff, Kelley, has presented a substantial evidence of material facts by written evidence and deposition testimony. Though disputed, if believed by a jury would warrant a finding in his favor. As a result of there being substantial disputed material facts, the Defendants' Motion for Summary Judgment as to Count II, regarding negligence on the part of the Defendants should be denied.

**COUNT III-DEFENDANTS' MOTION FOR SUMMARY JUDGMENT REGARDING KELLEY'S EQUAL PROTECTION CLAIMS UNDER THE 14TH AMENDMENT, 42 U.S.C. § 1983 SHOULD BE DENIED.**

**A.      Kelley has stated an Equal Protection Violation and Enough**
**         Evidence for a Jury to Decide the Claim.**

There are genuine issues of material facts in this case. Defendants are not entitled to judgment as a matter of law. Kelley has produced enough evidence from which a reasonable jury could conclude Kelley was harassed and treated differently then similarly situated Town employees in violation of the equal protection clause of the 14th amendment and 42 USC § 1983.

Kelley was routinely criticized over trumped up performance issues. Fahy Deposition, Exhibit G and Fahy Affidavit, Exhibit H. His every movement was being watched by his supervisors on order from the Chief. The Chief admitted to Former Town Manager Griffin he was angry about Kelley challenging his Quinn Bill benefits. Griffin Deposition, page 12, Exhibit I.

The Chief's denial of Kelley's Ch. 111F benefits is contrary to past practice and intentionally done in retaliation for Kelley's Whistle Blower activity. The Union (Boyle Deposition, pages 21, 44 & 45, Exhibit R) acknowledges a past practice for reimbursement of vacation or sick days used by an officer while awaiting an adjudication of his injury being attributed to an on duty activity as was the case for Officer Kelley. The denial by the Chief of said benefits was an effort to intentionally harm Kelley in view of the overwhelming evidence and ruling by independent panels and boards that his injury was an injury on duty.

Kelley's inclusion in the drill was not necessary and the Chief knew of preexisting conditions. The Chief made participation mandatory. Only after Kelley was injured did two officers refuse to participate in the drill and were eventually excused. (Govoni Affidavit, Exhibit C).

Inclusion in the drill was one more way of the Chief going after Kelley to make Kelley's work environment more difficult for him.      Kelley's 42 U.S.C. § 1983, and 14th Amendment

12

claims allege his treatment was in violation of his equal protection rights.  The Plaintiff should be allowed to present his evidence based on the disputed facts and undisputed facts, which support his claims to a jury and the fact finders.  The Court has issued a number of decisions that support claims alleging a malicious intent to harm a party when such malicious conduct is on the part of a public government entity.

In Moran v. Bench, 353 F.2d 193 (1st Cir., *cert denied*, 384 U.S. 906 (1965), a motorist brought a § 1983 claim against a Massachusetts Registry of Motor Vehicles employee for suspending and not reinstating her driver's license.  The First Circuit affirmed summary judgment against the plaintiff, but explained how a federal claim could be stated:

> [I]f defendants employed their official powers *for the purpose of injuring the plaintiff*, rather than to serve the proper ends of their governmental duties, plaintiff might well have a claim under the civil rights statute.

Id. at 194 (emphasis added), citing Yick Wo v. Hopkins, 118 U.S. 356 (1886), and People v. Walker, 200 N.E.2d 779 (N.Y. 1964).

In LeClair v. Saunders, 627 f.2d 606 (2c Cir. 1980), the LeClair's (Vermont dairy farm owners) sued Saunders (a Commonwealth of Massachusetts dairy farm inspector) under § 1983.  They alleged that he violated their equal protection rights by selectively enforcing Massachusetts dairy regulations against them on milk that they shipped into Massachusetts.  Citing Moran, the Second Circuit announced the following test for equal protection selective enforcement claims under § 1983:

> "[W]e believe that liability in the instant type of equal protection case should depend on proof that (1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."

Id. at 610 (footnote omitted).

In reversing a jury verdict for the LeClairs, the Court noted that they would have prevailed on appeal if they had shown that Saunders' was *out to get* Mr. LeClair:

In this case, where no invidious discrimination or interference with the exercise of other express constitutional rights has occurred, the malice/bad faith standard should be scrupulously met. If Saunders went after Mr. LeClair to _get him_ for any reason, then he should be liable. But we do not believe the evidence in this case can support such a conclusion.

Id. (emphasis added).

In Rubinovitz v. Rogato, 60 F.2d 906 (1st Cir. 1995), landowners sued various City of Lynn officials under § 1983 for revoking zoning variances and selective enforcement of building code provisions. The District Court granted summary judgment, but on appeal the First Circuit ruled that the landowners could pursue their equal protection claims against the city purchasing director Rogato) and the city gas inspector (Baron). The First Circuit endorsed the Yerardi/LeClair test, and stated that "a reasonable jury might well be able to conclude that there was an orchestrated conspiracy involving a number of officials, selective enforcement, malice, and substantial harm." Id. at 912. Evidence of malice was that Rogato was friends with a tenant that plaintiffs had evicted; that Rogato was "personally hostile" to the plaintiffs and had spoken to other city officials about them; and that Baron had told others that the plaintiffs were "bad people" and that one of them was a "bitch." Id.

Rubinovitz, at page 912, cited Esmail v. Macrane, 53 F.23d 176 (7th Cir. 1995), in which the Seventh Circuit held that a person seeking to renew his liquor license stated an equal protection claim under § 1983 by alleging that denial of his license was "the result solely of a vindictive campaign by the mayor" against him. Id. at 179. The Court noted that the suit was "not barred by the 'class of one' rule, because there is no such rule." Id. at 180. Accordingly, "if the power of government is brought to bear on a harmless individual merely because a powerful state or local official harbors a malignant animosity toward him, the individual ought to have a remedy in federal court." Id. at 179. Thus, the plaintiff could proceed under the equal protection clause to prove that the mayor had engaged in a "spiteful effort to 'get' him…" Id. at 180.

In Bass v. City of Albany, 968 F.2d 1067 (11th Cir. 1992) a former policeman filed suit under § 1983 against the City of Albany (Georgia), the Albany police chief, and the city manager, alleging that he had been wrongfully terminated from his job.  The Eleventh Circuit reversed summary judgment against Bass on his due process claim, but affirmed summary judgment on his disparate treatment equal protection claim.  The Court, however, noted that a termination for improper motives would state an equal protection claim:

> "As with selective prosecution in criminal cases, Bass' termination would violate the equal protection clause of the Fourteenth Amendment if it were based on improper motives.  United States v. Lichenstein, 610 F.2d 1272 (5th Cir.), *cert. Denied*, 447 U.S. 907 (1980).  Bass, however, cannot show that the City's termination of him was selective, invidious, in bad faith or based on impermissible considerations such as race, religion, or his exercise of constitutional rights".

Id. at 1070.

However, in the present case the Plaintiff can show that his treatment was intentional action by Defendants to harass him, to have his supervisors watch him, inclusion in a strenuous drill despite his known ailments, and denying him 111F benefits despite overwhelming evidence of his injury on duty.  Fahy Deposition, pages 20, 23, 24, 27, 29, 33, 34 & 37, Exhibit G.

In Vanderhurst v. Colorado Mountain College District, 16 F. Supp. 2d 1297 (D. Colo. 1998), a teacher asserted § 1983 claims challenging his termination.  His equal protection claims alleged that the defendant's decision to terminate him was "vindictive," and that two teachers went unpunished for conduct similar to that, which led to his termination.  The Court ruled that the equal protection claims could proceed to trial, and in so doing relied on Esmail, Rubinovitz, and LeClair.  See, 16 F. Supp. 2d at 1300-02, 1306-07.

In Columbus v. Biggio, 76 F. Supp. 2d 43 (D. Mass. 1999) (Tauro, J.), Columbus, who was the building inspector for the Town of Stoneham, brought a § 1983 suit against a member of Stoneham's board of selectmen, the town administrator, the town counsel and the town itself. His suit alleged that the defendants "engaged in a campaign of harassment and threats," which

included reclassifying his job to a lower pay, imposing onerous work conditions, attempting to force him to retire, and suspending him without pay for filing a MCAD complaint against them. Id. at 49.  In short, Columbus alleged the defendants did everything but terminate him.

In denying defendants' motion to dismiss the equal protection claim, Judge Tauro relied on Yaradi's and Rubinovitz:

> Plaintiff's Equal Protection claim is saved…by evidence that his selective treatment was motivated by 'bad faith or malicious intent to injure.'  Yarardi's 932 F.2d at 94….The actions taken…against Mr. Columbus… 'give enough indication of a malicious orchestrated campaign' [against him to survive a Rule 12(b)(6) motion].  Rubinovitz, 60 F.3d at 912.

Id. at 52.

There is ample evidence already present from which a reasonable jury could infer the Defendant Pomeroy acted with malice.  Affidavit of Plaintiff marked Exhibit D and annexed hereto and made a part hereof.

To the extent that Plaintiff has to prove he was treated differently than comparable employees, the Court has not mandated a certain quantity of comparative evidence.  In Vanderhust and Columbus, there was evidence that the plaintiffs were treated differently than two other employees and one other employee, respectively.  There is no magic number. This is what we have a jury for; and the Plaintiff will be able to provide the evidence set forth herein and accompanying exhibits, leaving the issue of credibility to a fact finding jury.

For these reasons Summary Judgment should be denied.

## COUNT IV- Denial Of Plaintiff's Rights Under M.G.L. Chap. 41, Sec. 111F.

Kelley has produced enough evidence from which a jury could conclude that Kelley was wrongfully denied Chapter 41, § 111F benefits, which he was entitled to receive.

On May 25, 2003, Pomeroy ordered members of the Plymouth police force to participate in an extremely rigorous and physically demanding drill situation, simulating the Columbine school hostage incident in Colorado.

The drill situation was conducted at the Plymouth North High School on the aforesaid date and Kelley was required to participate in the drill.  Previous to May 25, 2003, there had been a substantial record of Kelley's physical impairment.  He had already contracted Lyme Disease, and he was suffering from Meniere's Disease.  Kelley was taking medication for both conditions.  During the drill on May 25, 2003, Kelley experienced a heart incident similar to a heart attack, causing him to collapse and requiring him to be hospitalized.

Kelley was taken to the Jordan Hospital for emergency treatment and then transferred to Beth Israel Hospital in Boston for treatment, where he underwent heart surgery on May 26, 2003. As a result of said injury, Kelley was forced to accept a disability retirement.  Kelley's retirement was approved by the Plymouth Retirement Board on the basis of an Independent Medical Panel, appointed and assigned by the State Retirement System that concluded that the cardiac incident he suffered, was a direct result of the May 25, 2003, Columbine drill. This left Kelley with a permanent disability, making it impossible for him to serve as a police officer any longer in Plymouth.

The Independent Medical Panel also determined that Kelley's injury suffered on May 25, 2003, was an injury in the line of duty under Chapter 41, Section 111F, and thus he was entitled to any medical benefits related thereto as well as to his disability retirement.  After he was approved for disability retirement, Kelley submitted a request for reimbursement for vacation time he had to use before he was relieved of duty and put officially on disability.  Under Mass. General Laws Ch. 41, Section 111F, Kelley was entitled to reimbursement of $2,000.00 for vacation days he had to use for sick leave, after May 25, 2003.

Pomeroy refused to reimburse Kelley as requested. Moreover, the Personnel Board of the Town of Plymouth refused to authorize the reimbursement because Pomeroy refuted that Kelley's injury was a result of the May 25, 2003, Columbine-like drill. Pomeroy maintained that Kelley's use of vacation benefits as sick time was not related in any way to an injury on duty. Further, Pomeroy was well aware that Kelley's cardiac incident on May 25, 2003, was a result of the drill, and was well aware of the report of the Independent Medical Panel, which reviewed Kelley's injury on two points, one as an application for disability retirement and one as an injury on duty, and concluded that his condition was the result of an injury on duty on May 25, 2003, and directly related to the Columbine-like drill, which was the proximate cause of Kelley's injury.

Despite this information, Pomeroy refused to compensate Kelley for vacation time, which he legitimately had to use and was entitled to have reimbursed under Chapter 41, Section 111F. As a result of having to take time to seek medical treatment, Kelley had to use some vacation time, which should have been reimbursed to him in the approximate amount of $2,000.00. Kelley was entitled to reimbursement pursuant to Mass. Gen. Laws Chapter 41, Section 111F. Kelley made numerous requests and demands for reimbursement for said days of vacation time to the Defendants, but was denied by Pomeroy and Plymouth through its Town Manager. Kelley is specifically entitled to reimbursement of any benefits and rights as set forth in M.G.L. Chapter 41, Section 111F and refusal to compensate Kelley accordingly by the Defendants is a violation of Mass. Gen. Laws Chapter 41, Section 111F.

Officer Kelley was injured on duty. The leading case law concerning Chapter 41, Section 111F benefits is the <u>Wormstead v. Town Manager of Saugus and others</u>, 366 Mass. 659; 322 N.E.2d 171; 1975 Mass. LEXIS 1128, annexed hereto as Case No. 2.

In the <u>Wormstead</u> case an officer returning from his lunch break while on duty and being paid for said time was involved in a traffic accident and injured. He was initially denied Chapter

31, § 111F benefits.  The Court ruled that any injury "arising out of" an officer's employment entitled him to 111F benefits as an injury on duty.  The Plymouth Retirement Board ruled Kelley's injury an injury on duty.  See Exhibit E.

Kelley was being paid at the time of his injury.  He was involved in a police activity to wit the training drill.  He was injured as a result of the strenuous nature and conditions of the drill.  An independent medical panel ruled his injury as an injury on duty.  See Medical Panel Report, Exhibit F.  The Defendants have no legal standing to characterize Kelley's injury as anything other than an injury on duty.  The Defendant has furnished no legal argument, which supports the Chief's position or cited any law that would contradict the Wormstead case.

Further, no summary judgment should be granted unless this Court based upon the undisputed facts should issue summary judgment in favor of the Plaintiff since the Defendant does not dispute the findings of the Plymouth Retirement Board, PERAC or the Independent Medical Panel.  The Defendant does not dispute Kelley was injured during the course of the training drill on May 25, 2003. The Chief merely disagrees with the findings and refuses to compensate Kelly by reimbursing him for his vacation days, a practice commonly used by the member of the department.  Boyle Deposition, page 21, Exhibit R, Sacco Deposition, page 49, Exhibit N.

There is no legal basis or authority for the Chief to refuse payment of Chapter 41 § 111F Benefits to Kelley.  The Chief's actions are arbitrary and capricious.  The Defendant's request for summary judgment should be denied.

## **CONCLUSION**

For all the above stated reason, the Defendant's Motion for Summary judgment should be denied is all respects and the Plaintiffs four counts of his complaint be set down for final pretrial conference and a jury trial.

Respectfully submitted,
Thomas M. Kelley, Plaintiff
by his attorneys,

*/s/ Joseph R. Gallitano*
Joseph R. Gallitano, Esq.
 BBO # 183700
34 Main Street Ext., Suite 202
Plymouth MA  02360
(508) 746-1500

*/s/ Richard D. Armstrong*
Richard D. Armstrong, Jr., PC
BBO # 021580
1400 Hancock Street
3rd Floor
Quincy, MA  02169
(617) 471-4400

Dated:  September 12, 2007

# EXHIBIT A

COMMONWEALTH OF MASSACHUSETTS

PLYMOUTH, ss.

SUPERIOR COURT
C.A. NO.  05-0278B

THOMAS M. KELLEY,
          Plaintiff,
v.

THE TOWN OF PLYMOUTH, and ROBERT J.
POMEROY, as Chief of the Plymouth Police
Department and Individually,
          Defendants.

)
)
)
)
)
)
)
)
)

FILED
COMMONWEALTH OF MASSACHUSETTS
SUPERIOR COURT DEPT. OF THE TRIAL COURT
PLYMOUTH COUNTY

MAR - 9 2005

_Cent R Tower_
CLERK

## VERIFIED COMPLAINT

1.     The Plaintiff, Thomas M. Kelley (hereinafter "Kelley"), is an individual residing at

119 Arlington Rd., Plymouth, Plymouth County, MA 02360.

2.     The Defendant, Town of Plymouth (hereinafter "Plymouth"), is a duly

incorporated municipality in the Commonwealth of Massachusetts, with a usual place of

business at Plymouth Town Hall, 11 Lincoln Street, Plymouth, MA.

3.     Mark Silvia, is the Town Manager and Chief Executive Officer for the Town of

Plymouth, with a place of business at Plymouth Town Hall, 11 Lincoln Street, Plymouth,

MA, and Eleanor Beth was serving as Town Manager at the time of the alleged incident

set forth herein and Lawrence Pizer serves as Town Clerk for the Defendant, Plymouth,

with offices at 11 Lincoln Street, Plymouth, MA and is the authorized officer for receipt

of service of process in matters of litigation, involving the Town of Plymouth, and

Kenneth A. Tavares as Chairman of the Board of Selectman and Chief Elected Officer of

Plymouth, with a place of business at Plymouth Town Hall, 11 Lincoln Street, Plymouth

MA.

4.    The Defendant, Chief Robert J. Pomeroy (hereinafter "Pomeroy"), individually,

who resides at 244 Valley Road, Plymouth, Plymouth County, MA, and in his official

capacity as Chief of Police, Plymouth Police Department, who at all times relevant to the

Complaint was the Chief of Police for the Plymouth Police Department, with a usual

place of business at 20 Long Pond Road, Plymouth, MA  02360.

## FACTS

5.    Kelley, was appointed as a Police Officer in the Town of Plymouth on September

19, 1977.

6.    On May 25, 2003, Pomeroy ordered members of the Plymouth police force to

participate in an extremely rigorous and physically demanding drill situation, simulating

the Columbine hostage incident in Colorado, in which students in a high school held

various parties as hostage and were heavily armed at the time.

7.    The drill situation was conducted at the Plymouth North High School on the

aforesaid date and Kelley was required to participate in the drill.

8.    Previous to May 25, 2003, there had been a substantial record of Kelley's

physical impairment.  He had already contracted Lyme Disease, and he was suffering

from Meniere's Disease.  Kelley was taking medication for both conditions.

9.    Pomeroy and Plymouth were well aware of Kelley's medical condition at the time

that Kelley was ordered to participate in the drill.

10.    During the drill on May 25, 2003, Kelley experienced a heart incident similar to a

heart attack, causing him to collapse and requiring him to be hospitalized.

11.    Kelley was taken to the Jordan Hospital for emergency treatment and then

transferred to Beth Israel Hospital in Boston for treatment, where he underwent heart

surgery on May 26, 2003. As a result of said injury, Kelley was forced to accept a disability retirement.

12.    Kelley's retirement was approved by the Plymouth Retirement Board on the basis of an Independent Medical Panel, appointed and assigned by the State Retirement System that concluded that the cardiac incident he suffered, was a direct result of the May 25, 2003, Columbine drill. This left Kelley with a permanent disability, making it impossible for him to serve as a police officer any longer in Plymouth.

13.    The Independent Medical Panel also determined that Kelley's injury suffered on May 25, 2003, was an injury in the line of duty under Chapter 41, Section 111F, and thus he was entitled to any medical benefits related thereto as well as to his disability retirement.

14.    Prior to the May 25, 2003, drill, the Plymouth Police Union ("Union"), through its president and other representatives, approached Pomeroy and requested that he institute a protocol to review members of the force who might not be physically able to undergo such a rigorous and stressful drill situation.

15.    The Union advised Pomeroy that there were members of the force who had existing medical conditions that could possibly put them at risk for injury, some of which could even be life threatening.

16.    Pomeroy refused to establish or institute any type of protocol and insisted that all members of the force would take part in the drill regardless of their medical situation or previous medical history.

17.    After he was approved for disability retirement, Kelley submitted a request for reimbursement for vacation time he had to use before he was relieved of duty and put officially on disability. Under Mass. General Laws Ch. 41, Section 111F, Kelley was

3

entitled to reimbursement of $2,000.00 for vacation days he had to use for sick leave, after May 25, 2003.

18.    Pomeroy refused to reimburse Kelley as requested.  Moreover, the Personnel Board of the Town of Plymouth refused to authorize the reimbursement because Pomeroy refuted that Kelley's injury was a result of the May 25, 2003, Columbine-like drill.

19.    Pomeroy maintained that Kelley's use of vacation benefits as sick time was not related in any way to an injury on duty.

20.    Pomeroy made this determination in bad faith because he had been informed that the Independent Medical Panel had in fact ruled Kelley's injury was on duty and directly related to the May 25, 2003, drill.

21.    About a year before the drill, Kelley in his capacity as a Town Meeting Member and a member of the Plymouth Retirement Board, raised an issue regarding Pomeroy's use of funds to reimburse himself for benefits that were not included as part of his income and should have been shown as income to him in his departmental budget.  Kelley alleged Pomeroy was accepting compensation and not showing it in his budget in a manner that was prohibited by statute.

22.    Kelley reported this situation to the Inspector General's Office of the Commonwealth of Massachusetts.  The Office investigated the matter and reported to the Town that the manner in which Pomeroy was compensating himself for educational benefits without declaring it under the line item budget area for compensation to him for income and without authorization per a by-law or written agreement with the Town was inappropriate and in violation of state law, and required Town Meeting action to correct the situation.

23.     Subsequently, Town Meeting voted to ratify the past inappropriate compensation and authorization of funds to Pomeroy to make said payment in compliance with state regulations.

24.     Pomeroy was well aware that Kelley had reported him to the Inspector General's Office.

25.     When Pomeroy insisted that Kelley be included in the Columbine-like drill on May 25, 2003, he knew that Kelley had reported him to the Inspector General's Office, and he knew Kelley's medical conditions were preexisting and would place him in harm.

26.     Further, Pomeroy was well aware that Kelley's cardiac incident on May 25, 2003, was a result of the drill, and was well aware of the report of the Independent Medical Panel, which reviewed Kelley's injury on two points, one as an application for disability retirement and one as an injury on duty, and concluded that his condition was the result of an injury on duty on May 25, 2003, and directly related to the Columbine-like drill, which was the proximate cause of Kelley's injury.

27.     Despite this information, Pomeroy refused to compensate Kelley for vacation time, which he legitimately had to use and was entitled to have reimbursed under Chapter 41, Section 111F.

## CAUSES OF ACTION

### COUNT I:    VIOLATION OF THE STATE WHISTLE BLOWER STATUTE
### M.G. L.  Chap.  149, Sec. 185

28.    Kelley repeats and reavers paragraphs 1 through 27 as if expressly set forth fully

herein.

29.    Kelley is an employee under M.G.L. 149, Section185, and his activities in

reporting violations and improprieties of other employees and supervisors was an activity

protected by the statute.

30.    Pomeroy's failure to pay for Kelley's vacation time under a Chapter 41, Section

111F, the failure to screen members of the police force and prevent Kelley in particular

from participating in the aforesaid strenuous and stressful drill, were retaliatory in nature.

31.    Said retaliation by Pomeroy was because Kelley reported Pomeroy to the

Inspector General's Office.

32.    Pomeroy's denial and the denial by the Plymouth Town Manager at that time,

Pamela Nolan, of Chapter 41 Section 111F funds due Kelley was also retaliatory.

33.    All aforesaid actions were in violation of Chapter 149, Section 185, which

prohibits retaliatory actions against employees who have reported wrongdoing to a

disciplinary body/office or public policy-making body such as the Inspector General's

Office.

34.    As a result of the actions taken by Plymouth through its Town Manager and

Pomeroy, Kelley is entitled to triple damages, attorney's fees and reasonable court costs.

35.    Kelley's claims include the payment of all vacation time as well as payment for

loss of all salary and benefits for the sixteen years he would have served to his normal

retirement date, all in an amount of approximately $220,000.00.

6

**Wherefore**, Kelley demands a judgment for treble damages, both compensatory and punitive, against the Defendants in an amount this Court deems just and appropriate with interest, and cost of this action including attorney's fees.

## COUNT II: GROSS NEGLIGENCE ,WILLFUL, WANTON AND RECKLESS CONDUCT

36.    The Plaintiff repeats and reavers paragraphs 1 through 35 as if expressly set forth fully herein.

37.    The actions of the Town of Plymouth and the Plymouth Police Department, through Pomeroy, by failing to screen the members of the Department who would be taking part in the drill, in which the men were to be put through a rigorous, physically demanding, and stressful drill involving a hostage situation similar to the Columbine incident, resulted in Kelley suffering a cardiac incident and life-altering injury.

38.    It was well known by Pomeroy and other supervisory members of the Police Department, and well documented in Kelley's personnel file, that he had several physical illnesses for which he was being treated and being medicated; and therefore, that his participation in such an activity would place him at great risk.

39.    The Defendants owed Kelley a duty of care not to expose him needlessly to a dangerous exercise considering his pre-existing conditions.

40.    The decisions to make all members of the Department, regardless of their physical condition, participate in this exercise was willful, wanton, and reckless conduct by Plymouth, its Police Department, and in particular Pomeroy.

41.    Specifically, the Town, through Pomeroy, was negligent by failing to institute a protocol to screen members of the department who would be at risk due to existing medical conditions known to the department.

7

42.    The aforesaid negligence of the Defendants was the proximate cause of Kelley's injuries.

43.    Said acts were also intentional in nature, constituting retaliation against a whistle blower.

44.    The Defendants' action forced Kelley into an early disability retirement, which was not his choice and denied him another sixteen years of service, depriving him of 20% of his salary over the next sixteen years, as well as benefits and contribution to his normal retirement, resulting in a loss of income to him in excess of $200,000.00.

**Wherefore**, Kelley demands a judgment for damages, both compensatory and punitive, against the Defendants in an amount this Court deems just and appropriate with interest, and cost of this action including attorney's fees.

**Count III:    VIOLATION OF PLAINTIFF'S RIGHTS UNDER THE 14TH AMENDMENT EQUAL PROTECTION UNDER THE LAW AND HIS RIGHTS UNDER 42 USC, SECTION 1983**

45.    Kelley repeats and reavers paragraphs 1 through 44 as if expressly set forth fully herein.

46.    Kelley's constitutional rights were violated in that no other member in a similar position of the Department or any other employee in the Town of Plymouth in a similar position, has been treated in such fashion and therefore the actions of the Town were in violation of his 14th Amendment Rights, as well as federal statutes protecting him from such treatment and providing for equal protection under the law.

47.    Kelley was routinely harassed by Pomeroy and treated differently then other officers in the Plymouth Police Department by monitoring his every movement on a daily

8

basis. See Affidavit of Kevin Fahey, annexed hereto and made a part hereof and marked as Exhibit A.

48.    Kelley served on the Plymouth Retirement Board, as did other Town employees. But, contrary to standard operating procedures, Plymouth and Pomeroy insisted upon reimbursement by the Retirement Board of any salary time Kelley spent on Retirement Board business. Kelley was the only Town employee who was serving or who had served on the Retirement Board subjected to such scrutiny and reimbursement policy. See Affidavit of Contributory Retirement Board Director, Debra J. Sullivan, annexed hereto and made a part hereof and marked as Exhibit B.

49.    By denying Kelley the use of vacation time and reimbursement of same for sick leave under Chapter 41, Section 111F, he was subjected to different treatment then any other police officer or other Town employee in similar circumstances.

50.    Further, by denying Kelley the reimbursement of funds, as aforesaid, and more importantly knowingly and intentionally forcing Kelley to take part in a drill any reasonably prudent person would have known would be a dangerous situation physically for Kelley, Pomeroy violated 42 U.S.C. 1983, because Pomeroy sought to harm Kelley and maliciously took action against him, exposing Kelley to treatment different from other officers on the force with the intent of causing Kelley harm.

51.    Although Pomeroy ordered all police personnel to take part in the aforesaid Columbine like drill, he did so as a pretext to cover his true intentions to harm Kelley by forcing him to take part in an exercise that would be hazardous to him. Pomeroy did so fully knowing of Kelley's pre-existing medical conditions.

52.    Pomeroy used the drill exercise as one more method to further harass Kelley in an effort to force him out of the Police Department and to retaliate against Kelley for reporting him to the State Inspector General.

9

Wherefore, Kelley demands a judgment for damages, both compensatory and punitive, against the Defendants in an amount this Court deems just and appropriate with interest, and cost of this action including attorney's fees.

## COUNT IV:  DENIAL OF PLAINTIFF'S RIGHTS UNDER M.G.L. CHAP. 41, SEC. 111F.

53.    The Plaintiff repeats and reavers paragraphs 1 through 53 as if expressly set forth fully herein.

54.    As a result of having to take time to seek medical treatment, Kelley had to use some vacation time, which should have been reimbursed to him in the approximate amount of $2,000.00.  Kelley was entitled to reimbursement pursuant to Mass. Gen. Laws Chapter 41, Section 111F.

55.    Kelley made numerous requests and demands for reimbursement for said days of vacation time to the Defendants, but was denied by Pomeroy and Plymouth through its Town Manager.

56.    Kelley is specifically entitled to reimbursement of any benefits and rights as set forth in M.G.L. Chapter 41, Section 111F and refusal to compensate Kelley accordingly by the Defendants is a violation of Mass. Gen. Laws Chapter 41, Section 111F.

Wherefore, Kelley demands a judgment for damages, both compensatory and punitive, against the Defendants in an amount this Court deems just and appropriate with interest, and cost of this action including attorney's fees.

**THE PLAINTIFF DEMANDS A TRIAL BY JURY.**

THOMAS M. KELLEY, the Plaintiff,

By his attorney,

Joseph R. Gallitano, BBO # 183700
Gallitano & Associates
34 Main St. Ext., Suite 202
Plymouth, MA  02360
(508) 746-1500

Dated:  March 9, 2005

11

COMMONWEALTH OF MASSACHUSETTS

PLYMOUTH, ss.                               SUPERIOR COURT
                                           C.A. NO.

THOMAS M. KELLEY,                     )
              Plaintiff,              )
v.                                    )
                                      )
THE TOWN OF PLYMOUTH, ROBERT J.       )
POMEROY, as Chief of the Plymouth Police )
Department and Individually,          )
              Defendants.             )

## <u>VERIFICATION OF COMPLAINT</u>

I, Thomas M. Kelley, being first duly sworn, state that I am the Plaintiff in the

above-entitled action, that I have read the foregoing complaint and know the contents

thereof, and that the same is true to my own knowledge and belief.

THOMAS M. KELLEY

Dated:  March 7, 2005

# EXHIBIT A

**Affidavit of Kevin P. Fahy**

1. I, Kevin P. Fahy, of Hedges Pond Rd., Plymouth, MA, am the 8 to 4 Shift Supervisor for the Plymouth Police Department in Plymouth, MA.

2. For over 18 years I was Officer Thomas Kelley's (Tom) supervisor, shift commander and friend.

3. While working for me on the 8 to 4 shift Tom was elected to the Plymouth Retirement Board.

4. A short time later Tom questioned Chief Robert Pomeroy's (Pomeroy) right to receive "incentive pay" and this signaled the beginning of Tom's every movement being scrutinized by Pomeroy and Captain Botieri (Botieri).

5. Botieri came into the lieutenant's office and he stated, "the chief doesn't like his money being fucked with".

6. I was told that when Tom went to his retirement board meetings he was to be logged off duty in the daily log.

7. If Botieri went by and found Tom at the Town Hall he wanted to know from me why he was there; the time he went off and the time he got back out on the road.

8. Tom was the only officer that I know of who was monitored everywhere he went.

Subscribed and sworn to under the pains and penalties of perjury this 23rd day of June 2004.

_____
Kevin P. Fahy

1

# <u>EXHIBIT B</u>



TOWN OF PLYMOUTH

OFFICE OF THE

# CONTRIBUTORY RETIREMENT BOARD

11 Lincoln Street
Plymouth, Massachusetts 02360-3325
FAX (508) 830-4019
(508) 830-4170

January 29, 2004

Mr. Thomas Kelley
41 Arlington Rd.
Plymouth, MA 02360

RE: Retirement Board Expense

Dear Mr. Kelley:

At your request, please accept this letter as verification that your service to the Town of Plymouth Retirement System, as its elected member, began in December 18, 1996.

During this time period, if you were scheduled to work your position as a full time police officer, and those hours conflicted with your service to the Retirement System, the Retirement System was required to reimburse the Town of Plymouth for those earnings by way of a charge back through payroll.

It has been my experience since 1991, as the Board Director, to have this be the practice in only your position. It is also noted, that there are other Board members who serve the Town as well as the System.

Yours truly,

Debra J. Sullivan
Director

♻ Printed on recycled paper.

# EXHIBIT B



TOWN OF PLYMOUTH

# POLICE DEPARTMENT

20 Long Pond Road
Plymouth, Massachusetts 02360
FAX (508) 830-4227
(508) 830-4218

TO:     Officer Thomas Kelley
FROM:   Chief Robert J. Pomeroy
RE:     Sick Leave
DATE:   September 16, 2002

A review of your sick leave usage from July 1, 2001 to June 30, 2002 indicates that you claimed illness on 23 days and left your shift early due to claimed illness on 1 occasions.

You are reminded that according to the agreement between the Town of Plymouth and your collective bargaining group, an employee who uses all of his/her annual sick leave may be considered excessively absent. Further, employees are to be at work on a regular, consistent and continuing basis. Excessive or unusual amounts of absences from work are contrary to the Town's attendance requirements.

You are hereby notified that your sick leave record will be monitored for the next six (6) months in order to give you the opportunity to improve your attendance.

Continued absences may lead to a requirement that a doctor's certificate be submitted to substantiate each absence due to claimed illness. Further, a continued pattern of absences may result in disciplinary action. I sincerely hope you will take the action necessary to correct this situation.

If you believe that any of the information contained herein is inaccurate, or that you have special circumstances, which warrant consideration, you should respond in writing to this office upon receipt of this letter.

Robert J. Pomeroy
Chief of Police

Employee Signature

Date: 9/19/02

Supervisor Signature

**Bernard J. Durante M.D., F.A.C.S.**
Plymouth Ears, Nose and Throat

61 Industrial Park Road
Plymouth, MA 02360
(508) 746-8977

FOR _Tim Kelley_                                          AGE

ADDRESS _____  DATE _4/24/02_

To whom it my concern Tim Kelley
suffers from Meniers disease and is
currently being treated.

PHYSICIAN'S
SIGNATURE _____

_____
Interchange is mandated unless the practitioner writes the words "no substitution" in this space.

ADDRESS _____

DEA NO. _____AD2475261_____        NON REP. ☐    REFILL _____ TIMES

---

**DONALD M. MOORE, JR., M.D.**
139 SANDWICH STREET
PLYMOUTH, MA  02360

TELEPHONE (508) 747-1443        DEA REG. NO. BM2078497

NAME _Thomas Kelley_                    AGE

ADDRESS _____  DATE _3/27/03_

℞

He is under my care
for Menniers syndrome
and should be excused from
work for the post few
days due to this
problem

☐ LABEL
REFILL _____ TIMES

_____, M.D.

INTERCHANGE IS MANDATED UNLESS THE PRACTITIONER
WRITES THE WORDS "NO SUBSTITUTION" IN THIS SPACE.

## RHEUMATOLOGY ASSOCIATES
## OF SOUTHEASTERN MASSACHUSETTS
### 45 RESNIK ROAD
PLYMOUTH, MASSACHUSETTS 02360

TELEPHONE: (508) 746-5351

PHILIP J. MOLLOY, M.D.

ROBERT W. SIMMS, M.D.

September 20, 2002

Thomas Kelley
41 Arlington Road
Plymouth, MA 02360

To Whom It May Concern:

On August 19, 2002, I evaluated Thomas Kelley in my office for symptoms possibly associated
with a past history of treated Lyme disease.

Respectfully,

Philip J. Molloy, MD, FACP

PJM/pa

**Bernard J. Durante M.D., F.A.C.S.**
Plymouth Ears, Nose and Throat

61 Industrial Park Road
Plymouth, MA 02360
(508) 746-8977

FOR _Tim Kelley_    AGE _____

ADDRESS _____  DATE _4/25/02_

To Whom it My Concern Tim Kelley
Suffers from Menias disease and is
currently being treated.

PHYSICIAN'S
SIGNATURE _____

Interchange is mandated unless the practitioner writes the words "no substitution" in this space.

ADDRESS _____

DEA NO. _AD2475261_    NON REP. ☐    REFILL _____ TIMES

```
From:   PLYMTH::KELLEY        24-SEP-2002 10:16:54.66
To:     KELLEY, BOTIERI, POMEROY
CC:
Subj:   SICK LETTER DATED 6/16/02
```

DEAR CHIEF, I HAVE GIVEN CAPT. BOTIERI TWO DOCTORS NOTES FOR THE SICK TIME
INDICATED IN YOUR LETTER DATED 9/16/02. THESE MEDICAL CONDICTIONS ARE ON GOING
AND I AM UNDER DOCTOR'S CARE FOR THE ILLNESSES INDICATED. THANK YOU T KELLEY

```
From:    PLYMTH::KELLEY        25-SEP-2002 15:08:06.45
To:      KELLEY, POMEROY, BOTIERI
CC:
Subj:    SICH TIME
```

DEAR CHIEF I HAVE PROVIDED CAPT. BOTIERI WITH DOCUMENTATION OF SICK TIME OUT
LINED IN YOU 9 16/ 02 LETTER. ARE YOU GOING TO RETRACT YOUR 9/16/02 LETTER TO
ME. THANK YOU T.KELLEY

# EXHIBIT C



UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

THOMAS M. KELLEY,
      Plaintiff,

v.                            Civil Action No. 05-10596-NMG

TOWN OF PLYMOUTH, et al
      Defendants.


## AFFIDAVIT OF DENNIS M. GOVONI

I, Dennis M. Govoni, being first duly sworn, state that I am a witness in the

above-entitled action, I am over the age of 18 and competent to testify.  Further, I have

read my Affidavit and know the contents thereof, and the same is true to my own

knowledge and belief.

      1.      My names is Dennis M. Govoni and I reside at 9 Chestnut Street,

Kingston, MA 02364.

      2.      I am a retired Plymouth Police Officer as of April 28, 2004.

      3.      I was an acting patrolman on the Plymouth Police force in May through

August, 2003.

      4.      During said period you were ordered to participate in so-called Columbine

Shooting Drill in Plymouth conducted by a State Police training force.

      5.      At the time I was experiencing symptoms indicative of a potential heart

problem.

      6.      After May 25, 2003, when I learned of Officer Kelley's heart incident

during the aforesaid drill conducted on that day I no longer believed it was safe for me to

participate in the Columbine Shooting training for which I was scheduled for at a later date.

7.    It was after Officer Kelley's injury that I refused to participate in said drill.

8.    I was required then to produce a medical statement from my general practitioner physician concerning my health and that I was only fit for desk duty.

9.    I was then excused from participating in said drill.

Subscribed and sworn to under the pains and penalties of perjury this 21st day of August, 2007.

_Dennis M. Govoni_
Dennis M. Govoni

# EXHIBIT D

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

THOMAS M. KELLEY,
    Plaintiff,

v.                                                      Civil Action No. 05-10596-NMG

TOWN OF PLYMOUTH, et al
    Defendants.

## AFFIDAVIT OF THOMAS M. KELLEY

I, Thomas M. Kelley, (hereinafter referred to as Kelley), the Plaintiff herein, hereby state that I am over the age of 18 and competent to testify. I have read my Affidavit and know the contents thereof, and that the same is true to my own knowledge and belief:

1.    Kelley, was appointed as a Police Officer in the Town of Plymouth on September 19, 1977.

2.    On May 25, 2003, Pomeroy ordered members of the Plymouth police force to participate in an extremely rigorous and physically demanding drill situation, simulating the Columbine hostage incident in Colorado, in which students in a high school held various parties as hostage and were heavily armed at the time.

3.    The drill situation was conducted at the Plymouth North High School on the aforesaid date and Kelley was required to participate in the drill.

4.    Previous to May 25, 2003, there had been a substantial record of Kelley's physical impairment. He had already contracted Lyme Disease, and he was suffering from Meniere's Disease. Kelley was taking medication for both conditions.

1

5.    Pomeroy and Plymouth were well aware of Kelley's medical condition at the time that Kelley was ordered to participate in the drill.

6.    During the drill on May 25, 2003, Kelley experienced a heart incident similar to a heart attack, causing him to collapse and requiring him to be hospitalized.

7.    Kelley was taken to the Jordan Hospital for emergency treatment and then transferred to Beth Israel Hospital in Boston for treatment, where he underwent heart surgery on May 26, 2003. As a result of said injury, Kelley was forced to accept a disability retirement.

8.    Kelley's retirement was approved by the Plymouth Retirement Board on the basis of an Independent Medical Panel, appointed and assigned by the State Retirement System that concluded that the cardiac incident he suffered, was a direct result of the May 25, 2003, Columbine drill. This left Kelley with a permanent disability, making it impossible for him to serve as a police officer any longer in Plymouth.

9.    The Independent Medical Panel also determined that Kelley's injury suffered on May 25, 2003, was an injury in the line of duty under Chapter 41, Section 111F, and thus he was entitled to any medical benefits related thereto as well as to his disability retirement.

10.    Prior to the May 25, 2003, drill, the Plymouth Police Union ("Union"), through its president and other representatives, approached Pomeroy and requested that he institute a protocol to review members of the force who might not be physically able to undergo such a rigorous and stressful drill situation.

11.    The Union advised Pomeroy that there were members of the force who had existing medical conditions that could possibly put them at risk for injury, some of which could even be life threatening.

12.    Pomeroy refused to establish or institute any type of protocol and insisted that all members of the force would take part in the drill regardless of their medical situation or previous medical history.

13.    After he was approved for disability retirement, Kelley submitted a request for reimbursement for vacation time he had to use before he was relieved of duty and put officially on disability.  Under Mass. General Laws Ch. 41, Section 111F, Kelley was entitled to reimbursement of $2,000.00 for vacation days he had to use for sick leave, after May 25, 2003.

14.    Pomeroy refused to reimburse Kelley as requested.  Moreover, the Personnel Board of the Town of Plymouth refused to authorize the reimbursement because Pomeroy refuted that Kelley's injury was a result of the May 25, 2003, Columbine-like drill.

15.    Pomeroy maintained that Kelley's use of vacation benefits as sick time was not related in any way to an injury on duty.

16.    Pomeroy made this determination in bad faith because he had been informed that the Independent Medical Panel had in fact ruled Kelley's injury was on duty and directly related to the May 25, 2003, drill.

17.    In 1998, long before the aforesaid drill, Kelley in his capacity as a Town Meeting Member and a member of the Plymouth Retirement Board, raised an issue regarding Pomeroy's use of funds to reimburse himself for benefits that were not included as part of his income and should have been shown as income to him in his departmental budget.

3

Kelley alleged Pomeroy was accepting compensation and not showing it in his budget in a manner that was prohibited by statute.

18.     Kelley reported this situation to the Town Manager, the Plymouth Retirement Board, and the Inspector General's Office of the Commonwealth of Massachusetts in the spring of 1998. The IG Office investigated the matter and the Town acknowledged that the manner in which Pomeroy was compensating himself for educational benefits without declaring it under the line item budget area for compensation to him for income and without authorization per a by-law or written agreement with the Town was inappropriate and in violation of state law, and required Town Meeting action to correct the situation.

19.     Subsequently, Town Meeting voted to ratify the past inappropriate compensation and authorization of funds to Pomeroy to make said payment in compliance with state regulations.

20.     Pomeroy was well aware that Kelley had reported him to the Inspector General's Office and was responsible for raising the issue, regarding his unauthorized receipt of Quinn Bill incentive pay. Pomeroy commenced a long and continuous course of harassing retaliation against Kelley even after Kelley was forced to retire in 2003 due to his injury on duty.

21.     When Pomeroy insisted that Kelley be included in the Columbine-like drill on May 25, 2003, he knew that Kelley had reported him to the Inspector General's Office, and he knew Kelley's medical conditions were preexisting and would place him in harm, which was part of Pomeroy's retaliatory treatment of Kelley.

22.     Further, Pomeroy was well aware that Kelley's cardiac incident on May 25, 2003, was a result of the drill, and was well aware of the report of the Independent Medical

Panel, which reviewed Kelley's injury on two points, one as an application for disability retirement and one as an injury on duty, and concluded that his condition was the result of an injury on duty on May 25, 2003, and directly related to the Columbine-like drill, which was the proximate cause of Kelley's injury.

23.    Despite this information, Pomeroy refused to compensate Kelley for vacation time, which he legitimately had to use and was entitled to have reimbursed under Chapter 41, Section 111F and past practices of the Town of Plymouth in its treatment of similarly situated employees, again further retaliatory treatment of Kelley by Pomeroy..

24.    Kelley is an employee under M.G.L. 149, Section185, and his activities in reporting violations and improprieties of other employees and supervisors was an activity protected by the statute.

25.    Pomeroy's failure to pay for Kelley's vacation time under a Chapter 41, Section 111F, the failure to screen members of the police force and prevent Kelley in particular from participating in the aforesaid strenuous and stressful drill, were retaliatory in nature.

26.    All of the aforesaid retaliation by Pomeroy was because Kelley reported Pomeroy to the Inspector General's Office, Town Manager, and the Plymouth Retirement Board.

27.    Pomeroy's denial and the denial by the Plymouth Town Manager at that time, Pamela Nolan, of Chapter 41 Section 111F funds due Kelley was also retaliatory.

28.    All aforesaid actions were in violation of Chapter 149, Section 185, which prohibits retaliatory actions against employees who have reported wrongdoing to a disciplinary body/office or public policy-making body such as the Inspector General's Office.

29.    As a result of the actions taken by Plymouth through its Town Manager and Pomeroy, Kelley is entitled to triple damages, attorney's fees and reasonable court costs.

30.    Kelley's claims include the payment of all vacation time as well as payment for loss of all salary and benefits for the sixteen years he would have served to his normal retirement date, all in an amount of approximately $220,000.00.

31.    The actions of the Town of Plymouth and the Plymouth Police Department, through Pomeroy, by failing to screen the members of the Department who would be taking part in the drill, in which the men were to be put through a rigorous, physically demanding, and stressful drill involving a hostage situation similar to the Columbine incident, resulted in Kelley suffering a cardiac incident and life-altering injury.

32.    It was well known by Pomeroy and other supervisory members of the Police Department, and well documented in Kelley's personnel file, that he had several physical illnesses for which he was being treated and being medicated; and therefore, that his participation in such an activity would place him at great risk.

33.    The Defendants owed Kelley a duty of care not to expose him needlessly to a dangerous exercise considering his pre-existing conditions.

34.    The decisions to make all members of the Department, regardless of their physical condition, participate in this exercise was willful, wanton, and reckless conduct by Plymouth, its Police Department, and in particular Pomeroy.

35.    Specifically, the Town, through Pomeroy, was negligent by failing to institute a protocol to screen members of the department who would be at risk due to existing medical conditions known to the department.

36.    The aforesaid negligence of the Defendants was the proximate cause of Kelley's injuries.

37.    Said acts were also intentional in nature, constituting retaliation against a whistle blower.

38.    The Defendants' action forced Kelley into an early disability retirement, which was not his choice and denied him another sixteen years of service, depriving him of 20% of his salary over the next sixteen years, as well as benefits and contribution to his normal retirement, resulting in a loss of income to him in excess of $200,000.00.

39.    Kelley's constitutional rights were violated in that no other member in a similar position of the Department or any other employee in the Town of Plymouth in a similar position, has been treated in such fashion and therefore the actions of the Town were in violation of his 14th Amendment Rights, as well as federal statutes protecting him from such treatment and providing for equal protection under the law.

40.    Kelley was routinely harassed by Pomeroy and treated differently then other officers in the Plymouth Police Department by monitoring his every movement on a daily basis.

41.    Kelley served on the Plymouth Retirement Board, as did other Town employees. But, contrary to standard operating procedures, Plymouth and Pomeroy insisted upon reimbursement by the Retirement Board of any salary time Kelley spent on Retirement Board business. Kelley was the only Town employee who was serving or who had served on the Retirement Board subjected to such scrutiny and reimbursement policy.

42.    By denying Kelley the use of vacation time and reimbursement of same for sick leave under Chapter 41, Section 111F, he was subjected to different treatment then any other police officer or other Town employee in similar circumstances.

43.    Further, by denying Kelley the reimbursement of funds, as aforesaid, and more importantly knowingly and intentionally forcing Kelley to take part in a drill any reasonably prudent person would have known would be a dangerous situation physically for Kelley, Pomeroy violated 42 U.S.C. 1983, because Pomeroy sought to harm Kelley and maliciously took action against him, exposing Kelley to treatment different from other officers on the force with the intent of causing Kelley harm.

44.    Although Pomeroy ordered all police personnel to take part in the aforesaid Columbine like drill, he did so as a pretext to cover his true intentions to harm Kelley by forcing him to take part in an exercise that would be hazardous to him.  Pomeroy did so fully knowing of Kelley's pre-existing medical conditions.

45.    Pomeroy used the drill exercise as one more method to further harass Kelley in an effort to force him out of the Police Department and to retaliate against Kelley for reporting him to the State Inspector General.

46.    As a result of having to take time to seek medical treatment, Kelley had to use some vacation time, which should have been reimbursed to him in the approximate amount of $2,000.00.  Kelley was entitled to reimbursement pursuant to Mass. Gen. Laws Chapter 41, Section 111F.

47.    Kelley made numerous requests and demands for reimbursement for said days of vacation time to the Defendants, but was denied by Pomeroy and Plymouth through its Town Manager.

48.    Kelley is specifically entitled to reimbursement of any benefits and rights as set forth in M.G.L. Chapter 41, Section 111F and refusal to compensate Kelley accordingly by the Defendants is a violation of Mass. Gen. Laws Chapter 41, Section 111F.


Signed and sworn to under the pains and penalties of perjury this 10th day of September, 2007.

Thomas M. Kelley

9

# EXHIBIT E

EXHIBIT 3
SACCO
2-7-06
LINDA M. CORCORAN
CERTIFIED COURT REPORTER

## PLYMOUTH RETIREMENT BOARD

### FINDINGS OF FACT

APPLICANT:        Thomas Kelley

1.        Thomas Kelley (hereinafter referred to as "Kelley") has been employed as a police officer in the Town of Plymouth Police Department for approximately 26 years. On or about June 25, 2003, Kelley filed an application for accidental disability retirement pursuant to M.G.L. c. 32, §§ 7 and 94, the so-called "Heart Law." Kelley submitted a document entitled Member's Application for Disability Retirement ("Application") in conjunction with other relevant documentation claiming that as a result of being diagnosed with cardiomyopathy, he should be retired for accidental disability. It is also significant to note that notwithstanding the presumption that Kelley's cardiac impairment was sustained in the line of duty, an incident occurred while in the performance of his duties on May 25, 2003, when he collapsed during a mandatory training exercise.

2.        The Board reviewed the Application and conducted an evidentiary hearing regarding the matter. Thereafter, the Board voted to convene a Regional Medical Panel and requested that the Public Employee Retirement Administration Commission appoint said Panel. The appointed panel members were Madhusadan Thakur, M.D., Robert Ellison, M.D. and George Philippides, M.D. ("Panel"). The Panel examined Kelley on August 6, 2003; on or about September 3, 2003 the Board received the Panel's Regional Medical Panel Certificate ("Certificate"), which answered all three questions in the affirmative, thus opining that Kelley is permanently unable to perform the essential duties of a police officer and his incapacity is such as might be the natural and proximate result of the personal injury sustained or hazard undergone on account of which retirement is claimed.

3.        The Board sought the opinion of its legal counsel whether the Panel had applied the appropriate standard in rendering its opinion and whether the Board had the authority to grant Kelley's Application.

4.        By letter dated September 3, 2003, legal counsel informed the Board that the Panel had applied the appropriate standard in addressing the issues of incapacity, permanency and causation. Counsel further opined that the Board has the authority to grant Kelley's Application provided that the Board finds that there is insufficient evidence to offset the statutory presumption that Kelley's disabling coronary artery disease was sustained in the line of duty, or if there is evidence to offset the presumption, there is sufficient evidence to establish that Kelley's permanent incapacity is the natural and proximate result of the personal injury he sustained on May 25, 2003.

5.        On July 29, 2003, the Board conducted an evidentiary hearing to review Kelley's Application and the Panel's Certificate. The Board, upon review of all the medical and non-medical evidence, voted to accept the Panel's Certificate and narrative report. Thereafter, the Board found that:

>        a.        Kelley passed a pre-employment physical prior to his appointment to the Plymouth Police Department which did not reveal any evidence of hypertension or heart disease;

b. Kelley is permanently unable to perform the essential duties of a police officer as a result of his coronary artery disease; and

c. There is insufficient evidence to rebut the presumption that Kelley's coronary artery disease and hypertensive heart disease were sustained in the line of duty.

d. Kelley's permanent incapacity is the natural and proximate result of the personal injury he sustained on May 25, 2003.

Accordingly, the Board voted to grant Kelley's Application and award him accidental disability retirement.

## CONCLUSION AND VOTE

After reviewing the Application, the Regional Medical Panel Certificate, the accompanying narrative report, the medical records, the opinion of legal counsel and the provisions of M.G.L. c. 32, §§ 6, 7 and 94, the Board concluded that Thomas Kelley is permanently unable to perform the essential duties of a police officer as a result of being diagnosed with cardiomyopathy, and insufficient evidence exists to rebut the presumption that his coronary artery disease and hypertensive heart disease were sustained in the line of duty. The Board also concluded that Kelley's permanent inability to perform the essential duties of his position is the natural and proximate result of the personal injury he sustained on May 25, 2003 while in the performance of his duties. Thereafter, the Board voted unanimously on September 5, 2003 to apply the Section 94 presumption and grant the accidental disability application of Thomas Kelley provided, however, that said grant is subject to review by the Public Employee Retirement Administration Commission pursuant to the provisions of M.G.L. c. 32, § 21(1)(d).

Single Narrative

| INCIDENT LOCAL # PRIORITY ACC REP | ACTIVITY ADDRESS (JURISDICTION) DISPOSITION | OFFICER(S) | RECEIVED DISPATCHED ARRIVED CLEARED | DISPATCHER SUPERVISOR NATURE INCIDENT TYPE |
|---|---|---|---|---|
| I0310366 1 No   No | CALL FOR SERVICE PLY NO HIGH SCHOOL 41 OBERY WHITING LN @57 PLYMOUTH, MA, 02360 (01) OTH AGENCY CONT | HARRIMAN G | 05/25/2003, 13:35 05/25/2003, 13:35 05/25/2003, 13:35 05/25/2003, 13:35 | HARRIMAN G AHLQUIST TRANS AMBULANCE TRANS AMBULANCE CT: HARRIMAN G |

Caller's Info: CAPT CHARLES CHANDLER
              20 LONG POND RD, PLYMOUTH MA 02360

   Reported as: TRANS AMBULANCE      Found as: TRANS AMBULANCE
Domestic Abuse: No

Dispatcher Remarks:
       AMBULANCE REQUESTED TO THE PLY NORTH HIGH SCHOOL FOR AN OVERHEATED SUBJECT -
       PLY FIRE ADVISED

REPORTER    CAPT CHARLES CHANDLER              License: 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   (MA)
(Male)      20 LONG POND RD
M9200151    PLYMOUTH  MA  02360
            Phone: None Recorded              DOB: 05/22/1960 Age: 43
            Commt: REPORTED INCIDENT

VICTIM      PTL THOMAS KELLEY                 License: None
(Male)      20 LONG POND RD
M9200176    PLYMOUTH  MA  02360
            Phone: 830-4218      Race: WHI    DOB: 10/26/1954 Age: 48
            Commt: MEDICAL EMERGENCY


Narrative(s):

Narr.  1: KELLEY THOMAS M        Division: None      Status: Open        [I0310366]
    Title: REPORT                Entered: KELLEY THOMAS M           Date: 06/19/03
                                 Reviewed: No officer               Edit: 06/19/03

       On 5/25/03 I attended a mandatory active shooter training exercise at Plymouth
       North High School. The attendees were divided up at the start of the day into
       teams. My team on which I was placed consisted of Captain Chandler, Paul
       Caraher, Lt. Higgins, Tim O'Hara and myself.
           The program consisted of active firing of paint ball weapons and
       combatants also firing back at the teams. This exercise was injunctions with
       the Massachusetts State Police Strike Response Team. The activities were where
       a combination of high stress and physical exertion to simulate a real live
       response to a hostage situation and a active shooter in a school.
           In the afternoon while performing with my team a live exercise I
       experienced severe chest pains which cause me to almost lose consciousness
       during the drill and was taken to the cafeteria right away. At the cafeteria
       the State Police EMT'S present administered oxygen to me and an ambulance was
       called right away. I was unable to catch my breath at this point and the pain

PLYMOUTH POLICE DEPARTMENT
Incident Report

J    2003                                                          Thursday 10:59

Single Narrative

| INCIDENT LOCAL # PRIORITY ACC REP | ACTIVITY ADDRESS (JURISDICTION) DISPOSITION | OFFICER(S) | RECEIVED DISPATCHED ARRIVED CLEARED | DISPATCHER SUPERVISOR NATURE INCIDENT TYPE |
|---|---|---|---|---|

Narrative    1 (continued)  By: KELLEY THOMAS M              Incident I0310366

in my chest was increasing. The State Police EMT'S present at the scene indicated that my blood pressure at that point was 192 over 162. The Plymouth EMS arrived and a short time later in the ambulance at the scene I was given several nitro pills right away. I was then transported to the Jordan Hospital at the hospital I remember getting more nitro and other medications.

Later in the evening I was admitted to the hospital and informed by Dr. Moore my physician that he was arranging for me to be transported to a Boston hospital for further treatment.

The next day I was transported to Beth Israel Deacons Hospital in Boston. I was given a Cardiac Catheter procedure that day and the attending physician after the procedure indicated the training exercise cause this problem. The condition was told to me is cardiomyopathy.

On June 11/03 I met with Dr. Moore and he confirmed the situation to Chief Pomeroy in a letter dated 6/11/02.

PLYMOUTH POLICE DEPARTMENT

June 19, 2003                                    Incident Report                              Thursday 10:58

Single Narrative

| INCIDENT LOCAL # PRIORITY ACC REP | ACTIVITY ADDRESS (JURISDICTION) DISPOSITION | OFFICER(S) | RECEIVED DISPATCHED ARRIVED CLEARED | DISPATCHER SUPERVISOR NATURE INCIDENT TYPE |
|---|---|---|---|---|
| I0310366 1 No    No | CALL FOR SERVICE PLY NO HIGH SCHOOL 41 OBERY        WHITING LN @57 PLYMOUTH, MA, 02360 (01) OTH AGENCY CONT | HARRIMAN G | 05/25/2003, 13:35 05/25/2003, 13:35 05/25/2003, 13:35 05/25/2003, 13:35 | HARRIMAN G AHLQUIST TRANS AMBULANCE TRANS AMBULANCE CT: HARRIMAN G |

Caller's Info: CAPT CHARLES CHANDLER
              20 LONG POND RD, PLYMOUTH MA 02360

 Reported as: TRANS AMBULANCE      Found as: TRANS AMBULANCE
Domestic Abuse: No

Dispatcher Remarks:
      AMBULANCE REQUESTED TO THE PLY NORTH HIGH SCHOOL FOR AN OVERHEATED SUBJECT -
      PLY FIRE ADVISED

REPORTER   CAPT CHARLES CHANDLER            License: 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  (MA)
(Male)     20 LONG POND RD
M9200151   PLYMOUTH  MA  02360
           Phone: None Recorded          DOB: 05/22/1960 Age: 43
           Commt: REPORTED INCIDENT

VICTIM     PTL THOMAS KELLEY              License: None
(Male)     20 LONG POND RD
M9200176   PLYMOUTH  MA  02360
           Phone: 830-4218     Race: WHI   DOB: 10/26/1954 Age: 48
           Commt: MEDICAL EMERGENCY

Narrative(s):

Narr.  1: CHANDLER CHARLES R CAPT   Division: None    Status: Open      [I0310366]
    Title: MEDICAL EMERGENCY        Entered: CHANDLER CHARLES R CAPT   Date: 05/28/03
                                    Reviewed: No officer              Edit: 05/28/03

      May 28, 2003 12:32 PM

      On Sunday, 25 May 2003, I was assigned to attend Active Shooter training at
      Plymouth North High School.  During this time I was the senior officer present.
      At approximately 1335 hrs. while conducting an exercise my team was performing
      a simulated arrest in the Men's Restroom opposite the Main Office.  At this
      time I became aware that Off. Kelley was in physical distress.  I observed him
      breathing raggedly and loudly.  Through his protective mask I saw that his face
      was flushed.  I saw him lean heavily against the wall and grasp his side.

      The State Police Safety Officer then terminated the exercise and notified an
      EMT on their team.  Off. Kelley was assisted to the cafeteria, where his
      protective equipment was removed.  I saw that his clothing was drenched with
      perspiration.  An ambulance was requested for possible heat exhaustion.  Upon

PLYMOUTH POLICE DEPARTMENT
Incident Report

June 19, 2003

Thursday 10:58

Single Narrative

| INCIDENT LOCAL # PRIORITY ACC REP | ACTIVITY ADDRESS (JURISDICTION) DISPOSITION | OFFICER(S) | RECEIVED DISPATCHED ARRIVED CLEARED | DISPATCHER SUPERVISOR NATURE INCIDENT TYPE |
|---|---|---|---|---|

Narrative   1 (continued)  By: CHANDLER CHARLES R CAPT    Incident I0310366

their arrival Off. Kelley was transported to the Jordan Hospital Emergency
Department.

# EXHIBIT F



COMM. OF MASS.
P.E.R.A.C.

**Commonwealth of Massachusetts**
**Public Employee Retirement Administration Commission**
5 Middlesex Avenue, 3rd Floor
Somerville, MA 02145
(617) 591-8956
Fax (617) 628-4414

2003 SEP -2  A 9: 29

RECEIVED

## APPLICANT INFORMATION

| | |
|---|---|
| **PERAC ID:** 2004240210 | **TYPE OF DISABILITY:**    AH (M) |

**EXHIBIT** *1*
*JACCO*
*2-7-06*
LINDA M. CORCORAN
CERTIFIED COURT REPORTER

**SOCIAL SECURITY NUMBER:**          032467939

**MEMBER:**                          Thomas M Kelley

**MEMBER ADDRESS:**                  41 Arlington Road

                                     Plymouth, MA 02360

**RETIREMENT BOARD:**                Plymouth Retirement Board

**OCCUPATION:**                      POLICE

**EMPLOYER:**                        Chief Robert Pomeroy

**REGIONAL MEDICAL PANEL**
**PHYSICIAN:**                       Madhusadan Thakur, M.D. -- CARDIO
                                     Robert C Ellison, M.D. -- CARDIO
                                     George J Philippides, M.D. -- CARDIO

**MEDICAL PANEL SPECIALTY:**         CARDIO

**EXAMINATION LOCATION:**            Doctors Office Building, Suite 804
                                     720 Harrison Avenue
                                     Boston, MA 02118

**DATE:**                            Wednesday, August 06, 2003

**TIME:**                            01:45 PM

# COMMONWEALTH OF MASSACHUSSETTS
## PUBLIC EMPLOYEE RETIREMENT ADMINISTRATION COMMISSION
### REGIONAL MEDICAL PANEL CERTIFICATE

COMM. OF MASS.
P.E.R.A.C.

**MEMBER:**    Thomas M Kelley

**PERAC ID:**    2004240210

S.S. #: 032467939

2002 SEP -2 A 9: 29

RECEIVED

**TYPE OF DISABILITY:** AH

The member's retirement board will provide you with all information relating to the member's claimed disability and the current job description. This information is critical to your ability to perform a comprehensive medical evaluation and assess the member's ability to perform the essential duties of his/her job. If this information has not been received, please contact the PERAC Medical Panel Unit.

---

DID THE MEDICAL PANEL REVIEW THE MEMBER'S JOB DESCRIPTION?

YES ☑    NO ☐

DID THE MEDICAL PANEL RECEIVE AND REVIEW MEDICAL RECORDS IDENTIFIED ON THE TRANSMITTAL OF BACKGROUND INFORMATION TO A REGIONAL MEDICAL PANEL FORM PRIOR TO RENDERING A MEDICAL OPINION IN THIS CASE?

YES ☑    NO ☐

PLEASE LIST ANY RECORDS NOT LISTED ON THE TRANSMITTAL OF BACKGROUND INFORMATION TO A REGIONAL MEDICAL PANEL FORM, WHICH THE PANEL REVIEWED.

1. IS THE MEMBER MENTALLY OR PHYSICALLY INCAPABLE OF PERFORMING THE ESSENTIAL DUTIES OF HIS OR HER JOB AS DESCRIBED IN THE CURRENT JOB DESCRIPTION?

YES ☑    NO ☐

Please continue ONLY if you answered yes to question #1.

2. IS SAID INCAPACITY LIKELY TO BE PERMANENT?

YES ☑    NO ☐

**PERMANENCY:** A disability is permanent if it will continue for an indefinite period of time which is likely never to end even though recovery at some remote, unknown time is possible. If the medical panel is unable to determine when the applicant will no longer be disabled, they must consider the disability to be permanent. However, if the recovery is reasonably certain after a fairly definite time, the disability cannot be classified as permanent. It is imperative that the medical panel make its determination based on the actual examination of the applicant and other available medical tests or medical records which have been provided. It is *not* the physician's task to look into employment possibilities that may become available to an applicant at some future point in time.

COMM. OF MASS.
COMMONWEALTH OF MASSACHUSETTS P.E.R.A.C.
PUBLIC EMPLOYEE RETIREMENT ADMINISTRATION COMMISSION
**CERTIFICATE FOR ACCIDENTAL DISABILITY (HEART)**
G.L. c. 32, s. 94

2003 SEP -2  A 9: 29

**MEMBER:**  Thomas M Kelley
**PERAC ID:**  2004240210

S.S. #: 032467939
TYPE OF DISABILITY:  AH

When answering the following questions, please consider that the law establishes a rebuttable presumption that any impairment of health caused by heart disease or hypertension is service connected unless the contrary is shown by competent medical evidence.

---

Your determination on the following questions should naturally lead to your response to Question # 3.

➢ Are there any uniquely predominant non-service connected influences upon this member's mental or physical condition which might have substantially contributed to or resulted in the incapacity of the applicant?

➢ Are there any non-service connected accidents or hazards undergone which might have contributed to or resulted in the incapacity of the applicant?

➢ Is there evidence that, although not irrebuttable, so predominates as to obligate a fact finder to come to the conclusion that, for this particular applicant, a uniquely predominant non-service connected influence on the member's mental or physical condition and/or non-service connected accident or hazard caused the incapacity of this applicant?

3.  **IS SAID INCAPACITY SUCH AS MIGHT BE THE NATURAL AND PROXIMATE RESULT OF THE PERSONAL INJURY SUSTAINED OR HAZARD UNDERGONE ON ACCOUNT OF WHICH RETIREMENT IS CLAIMED?***

YES ☑        NO ☐

**IN YOUR NARRATIVE, PLEASE STATE FULLY YOUR RATIONALE FOR THE ANSWERS YOU HAVE GIVEN.**

***PLEASE NOTE:** In your narrative, you must use the exact language of Question #3 in your response about causality.

COMMONWEALTH OF MASSACHUSETTS
PUBLIC EMPLOYEE RETIREMENT ADMINISTRATION COMMISSION

## CERTIFICATION OF MEDICAL PANEL FINDINGS

2003 SEP -2  A 9: 29

| | |
|---|---|
| **MEMBER:** Thomas M Kelley | **S.S. #:** 032467939 |
| **PERAC ID:** 2004240210 | **TYPE OF DISABILITY:** AH |

RECEIVED

---

### MAJORITY OPINION

*In the case of a joint examination, all three physicians must sign if they are in agreement with the majority opinion.*

I hereby certify that I have examined the member named on this certificate, and that the findings stated in this certificate and narrative express my professional medical opinion which was arrived at in an independent manner and free of undue influence.

_____ M.D.

_____ M.D.

_____ M.D.

---

### MINORITY OPINION

*To be completed only if a joint examination is conducted by all three physicians.*
*The dissenting physician MUST also complete the Medical Panel Certification Minority Report.*

I hereby certify that I have examined the member along with the other members of the medical panel and that I respectfully disagree with the Majority findings.

_____ M.D.

---

### APPLICANT PHYSICIAN AND/OR EMPLOYER'S PHYSICIAN

I hereby certify that I was present at the examination conducted by the Regional Medical Panel Physician(s).  I understand that I have a right to submit a written opinion to the Retirement Board.

_____ M.D.

_____ M.D.

# PERAC

**COMMONWEALTH OF MASSACHUSETTS | PUBLIC EMPLOYEE RETIREMENT ADMINISTRATION COMMISSION**

ROBERT E. TIERNEY, *Chairman* | A. JOSEPH DeNUCCI, *Vice Chairman*
C. CHRISTOPHER ALBERTI | KENNETH J. DONNELLY | ERIC A. KRISS | JAMES M. MACHADO | DONALD R. MARQUIS

JOSEPH E. CONNARTON, *Executive Director*

TO:        PLYMOUTH RETIREMENT BOARD

FROM:    MEDICAL PANEL UNIT

DATE:    SEPTEMBER 2, 2003

RE:        REVIEW OF MEDICAL PANEL CERTIFICATE

Please be advised that P.E.R.A.C. has completed its review of the following Medical Panel Certificate(s) and found the Certificate(s) to be in order:  **Drs. Thakur-Ellison-Philippides**

## THOMAS M. KELLEY

**Your retirement board is encouraged to review the attached report(s) to determine if it is completed to your satisfaction.**

If upon review of the enclosed report, your board determines that additional information or clarification is required, the board may submit to PERAC in writing, a request which identifies the additional information which is desired.  The board's request will then be forwarded by this office to the physicians.

Your retirement board may also choose to write directly to the medical panel for clarification.  **PERAC must be provided with a copy of all correspondence between the board and the medical panel.**

If you should have any questions regarding the enclosed material, please do not hesitate to contact this office.

BL/kmh
Enclosure




COMM. OF MASS.
P.E.R.A.C.

CARDIOLOGY &
INTERNAL MEDICINE

MADHU P. THAKUR, M.D., M.R.C.P. (EDIN.), F.A.C.C.
BOSTON UNIVERSITY MEDICAL CAMPUS · BOSTON MEDICAL CENTER
DOCTORS OFFICE BUILDING
SUITE 804
720 HARRISON AVE.   BOSTON, MASS. 02118
TELEPHONE 617 - 267-1223

2003 SEP -2  A 9: 29

RECEIVED
August 14, 2003

Mr. Joseph E. Connarton, Executive Director
Public Employee Retirement Administration Commission
Five Middlesex Avenue
Somerville, MA   02145


Re:   Thomas M. Kelley
      (PERAC ID:   2004240210)
      DATE OF EXAMINATION:   August 6, 2003
                             (Time:   1:45 to 2:30 p.m.)

Dear Sir:

Mr. Thomas M. Kelley, a 48-year-old police officer from
Plymouth, was referred for the consideration of his
application for accidental disability under the Heart Law and
was examined by the members of the Regional Medical Panel
consisting of Dr. M. P. Thakur, Dr. Robert Ellison, and
Dr. George Philippides.   This examination began at 1:45 p.m.
and ended at 2:30 p.m.   This time did not include record
review and dictation.

**HISTORY OF PRESENT COMPLAINTS:**   Mr. Kelley was in a training
program of his job responsibilities, participating eight
hours a day in a group of four, and he had an episode of
shortness of breath, sweating, and he collapsed.   He was
taken to Jordan Hospital.   He was noted to have a blood
pressure of 196/62.   He was admitted into the hospital and he
had a stabbing pain in the retrosternal anterior chest.   He
was referred to Beth Israel Hospital where he had undergone
cardiac catheterization.   The patient states that his cardiac
catheterization was borderline but he was found to have left
ventricular dysfunction and he knew that his left ventricular
function as revealed by ejection fraction was 43% and he is
on the following medication:   Aspirin, Metoprolol, Lipitor,
and Lisinopril.   Risk factors for coronary heart disease:   He
is not a cigarette smoker, he drinks only socially.   He has
no history of hypertension.   His total cholesterol, he
stated, was 230 mg. and no history of diabetes.

COMM. OF MASS.
P.E.R.A.C.

Page 2                                          2003 SEP -2  A 9: 29

Thomas M. Kelley


CURRENT SYMPTOMS:  He continues to get some dizzy spells and
shortness of breath on exertion.

PAST MEDICAL HISTORY:  He had a hernia repair.

MEDICAL RECORD REVIEW:  The review of cardiac catheterization
report states that coronary angiography performed on May 27,
2003 revealed the right dominant system, no obstructive
coronary disease.  The left main was normal.  The LAD had a
smooth 30% narrowing just after the first major diagonal
branch, and the left circumflex and the obtuse marginals were
normal.  The right coronary artery was an enormous vessel
which was without angiographic disease in the vessel.  The
hemodynamics revealed mild elevation of left-sided filling
pressure with a left ventricular end diastolic pressure
(LVEDP) of 15 mm. of Mercury, and left ventricular systolic
function was depressed with ejection fraction of 43% and he
has diffuse hypokinesis.  The conclusion was that his
coronary arteries are without any significant obstructive
disease, mild diastolic ventricular dysfunction, and
moderately severe systolic ventricular dysfunction and
suggested the diagnosis of cardiomyopathy.  The letter of his
cardiologist, Donald Moore, letter dated July 16, 2003 states
that with his recent incident, he has been diagnosed to have
cardiomyopathy and he is being treated for this condition,
and he recommends that the patient is symptomatic and there
is a potential risk of him performing his job
responsibilities as a police officer.

PHYSICAL EXAMINATION:  The physical examination by the Panel
members showed a weight of 273 pounds, height of 5'4", blood
pressure of 125/80, heart rate of 76 per minute.  There was
no cardiomegaly by clinical examination.  S1 normal, S2
normal, S3 absent.  Chest examination was clear, and
peripheral pulses were palpable.  He did not manifest signs
of congestive heart failure.

RELEVANT PERSONAL AND FAMILY HISTORY:  Father is 88 years old
and there was no history of coronary heart disease.  A
specific question regarding his alcohol intake was that he
does not drink excessively.  He just drinks socially.

COMM. OF MASS.
P.E.R.A.C.

Page 3                                          2003 SEP -2  A 9: 29

Thomas M. Kelley

**FINAL DIAGNOSIS:**   Cardiomyopathy, ? idiopathic.   RECEIVED

**PROGNOSIS:**   Fair.

**FINAL CONCLUSION:**   The members of the Regional Medical Panel
considered the job responsibilities of Mr. Kelley as a police
officer and also considered the findings of the cardiac
catheterization which showed elevated left ventricular end
diastolic pressure to 15 and depressed systolic function with
ejection fraction of 43%.   The patient is being treated by
his physician for cardiomyopathy, the cause of which remains
unclear.   He has no obstructive coronary artery disease.   In
light of his symptoms of shortness of breath on exertion and
dizzy spells, the Panel unanimously recommends that he should
be disabled from his duties as a police officer and has
answered yes to Question One and also considered that this is
a condition which is likely to have progression because the
cause of this is not known, and the Panel also therefore
concluded that the disability is permanent and answered yes
to Question Two.   In light of the findings of the cardiac
catheterization and his clinical symptoms and idiopathic
nature of his cardiomyopathy, the Panel concluded that the
said incapacity is such as might be the natural and proximate
result of the personal injury sustained or hazard undergone
on account of which retirement is claimed, and answered yes
to Question Three.

Sincerely,


M. P. Thakur, M.D.      R. Ellison, M.D.      G. Philippides, M.D.

# EXHIBIT G

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

CA No.  05 10596 NMG

- - - - - - - - - - - - - - - - - - - + - - - - - - x

THOMAS KELLEY,

Plaintiff,

vs.

TOWN OF PLYMOUTH and ROBERT J. POMEROY,

as Chief of the Plymouth Police Department

and Individually,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - x

VOLUME I                              Pages 1 - 50


        DEPOSITION OF KEVIN P. FAHY, a witness

called by counsel for the Defendants, taken before

Suzanne M. Hebert, Professional Shorthand Reporter

and Notary Public in and for the Commonwealth of

Massachusetts, at Brody, Hardoon, Perkins & Kesten,

LLP, One Exeter Plaza, Boston, MA, on Friday, June 9,

2006, commencing at 12:58 p.m.

1    department, all the stuff that went on, not

2    specifically this.  I may have asked him what he was

3    doing in reference to it and really didn't get into

4    it with him.

5        Q.    Do you remember what he said?

6        A.    No.

7        Q.    You wrote after this in Exhibit 1, "This

8    signaled the beginning of Tom's every move being

9    scrutinized by Pomeroy and Captain Botieri."  What do

10   you mean by that?

11       A.    Tom was singled out.  If he went out, for

12   instance, if he went out at the Town Hall at 3:00 on

13   a Tuesday, Wednesday, whatever, the Retirement Board

14   was meeting, I was ordered to log, "Came in and out,"

15   every place he went.

16             At times Botieri would come down and

17   ask me where Kelley was, "Why is he here?  Why is he

18   there?"  I said, "Well" -- I had to have an answer.

19   I asked Tom to let me know when he went out, and he

20   let me know when he went out.  He called me on the

21   telephone or put himself out at the Town Hall so I

22   knew it, and I went out and logged him to my

23   supervisor's log.

24       Q.    Is that part of your duties as a

1    supervisor?

2        A.    Well, I knew where he was going before

3    that, but this was just -- normally I did not log an

4    individual officer out.

5        Q.    When you say "logged out," this is for the

6    Retirement Board meetings?

7        A.    Yes.

8        Q.    Any other officer that you supervised who

9    was a Retirement Board member you supervised?

10       A.    No.

11       Q.    So Mr. Kelley was the only one, a member of

12    the Retirement Board?

13       A.    That's correct.

14       Q.    Do you remember when it began roughly?

15       A.    After he was elected to the Retirement

16    Board and then I never logged him out up to that

17    point, in other words, when he became a Retirement

18    Board member, that went on for a while, but after he

19    questioned Pomeroy's incentive pay, that's when

20    Botieri came down, and I believe in my affidavit,

21    came into my office.

22       Q.    Besides logging him out, anything else?

23    When you say "scrutinize," anything else you had to

24    do?

1      A.    Well, I didn't have to do, but he was

2    treated differently.

3      Q.    Tell me what you mean by that.

4      A.    I was in my office one day; and Sergeant

5    Dorman was doing a roll call behind me, and I heard,

6    like, a small earthquake, and I left my office and

7    went in the roll call room, and there was a little

8    bit of a disturbance that happened.

9                    I asked Sergeant Dorman what

10   happened, and he said, "Well, Tom Kelley and

11   Abbott" -- I believe, but he was a sergeant or

12   patrolman, I'm not sure, had a disagreement about

13   something and it got a little hot and it was

14   straightened out.  Nobody was touched, no punches

15   were thrown, just a verbal spat.

16                    Botieri came downstairs and wanted to

17   know what happened, and I said it was taken care of.

18   It was a verbal spat.  At that time Botieri ordered

19   Dorman to write up what happened, because Dorman was

20   in the room at the time.  Dorman did, and Tom, I

21   believe, received a reprimand or -- I don't know if

22   it was a suspension or what.  I think it was a

23   reprimand and nothing happened to John Abbott.  It

24   was an agreement between two people that was handled

1    by the Sergeant and he was singled out in reference

2    to that.

3        Q.    Who was the sergeant?

4        A.    At the time it was Richard Dorman.

5        Q.    When did this happen, the incident with

6    Sergeant Richard Dorman?

7        A.    I couldn't tell you when it happened.

8        Q.    Could you give me the year?

9        A.    I couldn't give you an exact date.

10       Q.    Mid-'90s?

11       A.    Could be, yeah.  I couldn't tell you.

12       Q.    Anything else that you recall relative to

13   Paragraph 4, where you say he was scrutinized by

14   Pomeroy and Botieri, anything else you recall?

15       A.    If he went over to the Town Hall, Botieri

16   would show up there or follow him.

17       Q.    How do you know that?

18       A.    He came in and asked me.  I got a call one

19   day --

20       Q.    When you say "he," you mean Botieri?

21       A.    Botieri.  I got a call one day just about

22   2:55, and it was Tom Kelley telling me that he was

23   off at the Town Hall for his Retirement Board

24   meeting, and he said Botieri was outside, "Why was he

1    following me?"  And I said, "I don't know, but I'll

2    ask."  And I didn't get the phone down, and in came

3    my office was Botieri wanting to know what Tom Kelley

4    was doing at the Town Hall.  I told him, I said, "Why

5    didn't you go over and ask him?  You were just

6    there."  He didn't like that.

7        Q.    When was this?

8        A.    Mid-'90s.

9        Q.    Anything else that you remember?

10       A.    Then he said to me, "We want him logged out

11   every place he goes, everything he does," and

12   Pomeroy, excuse my French, "Pomeroy doesn't want him

13   fucking with his money."

14       Q.    And, again, just trying to encapsulate

15   this, when did this happen, as far as you remember?

16       A.    In the mid-'90s.

17       Q.    And what did you say back to Mr. Botieri?

18       A.    I said I would log him out.

19       Q.    What else do you recall about the scrutiny

20   you describe in Paragraph 4?

21       A.    Well, they just scrutinized every move he

22   made.

23       Q.    Again, looking to your memory, as to what

24   other activity you recall.

A.    For me, it was the Retirement Board and where he was and that was it.

Q.    Was anyone else present when Botieri said this to you?

A.    No, just Botieri and I.

Q.    And this took place where?

A.    In my office.

Q.    Do you remember what time it was?

A.    About 3:00 in the afternoon.

Q.    In Paragraph 6 you say, "I was told when Tom went to the Retirement Board he was to be logged off duty in his daily log."  Who told you that?

A.    Botieri.

Q.    When did he tell you that?

A.    Same day.

Q.    Same meeting you referred to in Paragraph 5, the money being blanked with?

A.    That's correct.

Q.    And it was just you and Botieri?

A.    Yes.

Q.    How long did the conversation last you and Botieri had?

A.    Less than five minutes.

Q.    Anything else discussed that you remember?

Q.    So Mr. Kelley was the first officer that you could recall served on the Retirement Board?

A.    First active police officer, yes.

Q.    In Paragraph 7 of Exhibit 1, you wrote, "If Botieri went by and found Tom at Town Hall, he wanted to know when he was there, the time he went off, and the time he got back on the road."  Do you see that?

A.    Yes.

Q.    Do you remember when that conversation took place?

A.    No.

Q.    Did this conversation take place, besides the one you mentioned, sometime in the mid-'90s, did it take place again, different events?

A.    Different times, yes.

Q.    Do you remember when it was?

A.    No.

Q.    Do you remember how many times that conversation --

A.    No, I don't.

Q.    Do you remember if anyone else was present during any of these conversations with Mr. Botieri?

A.    No.

Q.    Did these meetings take place all in the

1    Q.    You were on the day assignment at that

2    time?

3    A.    Day shift.

4    Q.    Is it fair to say you were the only

5    lieutenant during your shift generally?

6    A.    Right.

7    Q.    You also wrote in Paragraph 8, "Tom was the

8    only officer I know of who was monitored everywhere

9    he went."  Do you see that?

10    A.    Yes.

11    Q.    What do you mean by that?

12    A.    Other officers went to court when they were

13    on duty.  They were never logged out.  The safety

14    officers went out to schools.  They were never logged

15    out on my shift commander's log, you know?  He was

16    the only one I was ordered to log out.

17    Q.    Was it part of the officer's duty to let a

18    supervisor know where they are?

19    A.    Yeah, they all did.

20    Q.    From the time they sign in in the morning

21    until the time they leave, if they're in a sector,

22    they're supposed to radio in at a certain point?

23    A.    In other words, they have a set sector

24    where they go.  They stay in that sector.  If they

Page 33

1    Pomeroy?

2        A.    No.

3        Q.    Did he ever talk about any grievances

4    besides the one we have talked about he filed against

5    the Police Department?

6        A.    No.

7        Q.    Did you have any problems with any of

8    Thomas Kelley's work performance during the year?

9        A.    No.

10       Q.    Did you ever reprimand him?

11       A.    No.

12       Q.    Did you ever write him up for anything?

13       A.    No.

14       Q.    Are you aware of any reprimands or

15   write-ups he received?

16       A.    The one with Abbott.

17       Q.    Anything else that you know?

18       A.    Not that I know of.  It's been seven years.

19       Q.    Just asking for your best memory.  I

20   appreciate it.  Did you ever tell Mr. Kelley words to

21   the effect, "They're out to get you"?

22       A.    Yes, I did.

23       Q.    What were you referring to?

24       A.    Botieri and Pomeroy.

Page 34

1      Q.    When did you say that?

2      A.    Right after they started scrutinizing his

3   every move.  I said to, "Cover your ass."

4      Q.    When did you say that?

5      A.    After this incident happened.

6      Q.    Just for the record, so we're clear, what

7   incident are you referring to?

8      A.    The Retirement Board, when he questioned

9   Pomeroy's right and the day he went over to the --

10   right after that, Botieri came down and ordered me to

11   put him in the log.

12      Q.    And besides what you have told us, anything

13   else that you were referring to, when you say, "They

14   are out to get you," anything else you're referring

15   to?

16      A.    No.

17      Q.    Is it fair to say you don't remember when

18   that meeting or series of discussions you're

19   referring to took place?

20      A.    I can't give you a specific date.

21      Q.    At a certain point, I think you said,

22   "Watch your back" to him?  Did you say that to him?

23      A.    Watch your back or your ass.  I forget what

24   it was.

1    A.    I have a daily log.  Every lieutenant did a

2  daily log for their shift.  I would log in anybody

3  who called in sick, anybody who went home sick, and

4  after this specific date in question, I had to log

5  him out when he went over to the Town Hall for

6  retirement.  That was the only man that I supervised

7  that had that done to him.

8                Other supervisors who went to court

9  were never logged out.  Safety officers were never

10  logged out.  Detectives were never logged out.  In

11  other words, if we had a homicide or something, I

12  would put in my log, C-pack Unit advised, Detectives

13  advised, Supervisors advised," in other words, Chief

14  of Police would be advised, if it was serious, but

15  that was the only time other officers, if it was a

16  serious incident.  In other words, I made the calls.

17    Q.    Did you yourself have any issues with

18  Mr. Kelley's police reports?

19    A.    No, I did not.

20    Q.    Besides what you have described for us, did

21  anyone else have any issues with his incident report

22  writing?

23    A.    No, not that I know of.

24    Q.    Did you yourself or were you aware of any

1   police officer while he worked for you?

2       A.   Yes, he was.

3       Q.   And you weren't aware of anything that

4   prevented him during the time period he worked for

5   you performing the essential functions of the job of

6   a police officer?

7       A.   No.

8       Q.   Did Mr. Kelley ever express to you he was

9   being picked on by the Chief and the Captain?

10      A.   I don't know if he said "picked on," but it

11  was obvious that they were after him.

12      Q.   But I'm asking you, and maybe I didn't

13  phrase it right, did he ever express to you -- I'm

14  using that term -- any term that he was being picked

15  on by Captain Botieri or Chief Pomeroy?

16      A.   I would say, yes, but I can't give you a

17  specific time.  It was obvious in the station.  I

18  wasn't the only one who knew about this, I believe.

19      Q.   Who else knew about this?

20      A.   The whole shift.

21      Q.   Give me some names.

22      A.   Dana Goodwin.

23      Q.   Someone else?

24      A.   Paul Boyle, Jack Walsh, William Hedge.

Page 43

1        A.    No.

2        Q.    Are you aware of any animosity Mr. Kelley

3   has toward Chief Pomeroy?

4        A.    No.

5        Q.    How about against Captain Botieri?

6        A.    Animosity?  I can't speak for Tom.

7        Q.    I'm asking if you ever heard him say

8   anything about Captain Botieri that would indicate

9   the animosity?

10       A.    I guess retirement, but I left.  I wasn't

11  there for the festivities.

12       Q.    There was the interaction between

13  Mr. Botieri and Mr. Kelley?

14       A.    Correct.

15       Q.    You heard about it later?

16       A.    I did.

17       Q.    Did Mr. Kelley tell you about it?

18       A.    No.  I heard other people and I was very

19  upset that I wasn't there.  My wife keeps me on a...

20       Q.    Did you hear from either Botieri or Pomeroy

21  that they were, as you say, after Mr. Kelley because

22  of his visit to the I.G.'s office?

23       A.    No, just the thing from Botieri, when he

24  said he -- the Chief didn't want Kelley fucking with

Page 44

1    his money.

2        Q.    And that's, you say, sometime in the

3    mid-'90s, as best you can remember?

4        A.    Right.

5        Q.    Were you aware, again, I know I asked part

6    of this question, were you aware of any medications

7    Mr. Kelley may have been taking while you were his

8    shift commander or supervisor?

9        A.    No.

10           MR. SILVERFINE:  That's all I have for

11   today.

12           MR. GALLITANO:  I have a few.

13                      EXAMINATION

14   BY MR. GALLITANO:

15       Q.    I have a few questions, and we'll get out

16   of here.  Just to clarify, when officers are on your

17   shift and were going to certain places, they would

18   call in to say where they were?

19       A.    Correct.

20       Q.    When they call in, you didn't necessarily

21   log that in, they were just notifying you where they

22   were?

23       A.    Would say, "Signal 3 at McDonald's," stuff

24   like that, just regular talk.

Page 45

1      Q.   But that wasn't something you had to log

2 down in your log?

3      A.   No.

4      Q.   But when it came to Officer Kelley,

5 wherever he went, if he said he was going to CVS, did

6 you have to log that in?

7      A.   No.  I had to be aware where he was going,

8 but every time he went out to a retirement meeting,

9 he had to go, and if he went over to Town Hall and he

10 was going to be out of the car, you had to log him.

11     Q.   If he was going to Town Hall, not

12 necessarily for a retirement, did you have to log him

13 out again?

14          MR. SILVERFINE:  Objection to form.

15     A.   Yes.

16     Q.   Was there any other times, other than going

17 to retirement meetings, you had to log him in and

18 out?

19     A.   No.  That was about what I can remember.

20     Q.   How many officers did you supervise on a

21 shift?

22     A.   Wintertime could be ten to 12.  Summertime

23 could be 25 to a maximum of 35.

       Q.   And regardless of the season, were there

Page 46

1    any other officers that you had to perform this

2    surveillance of the officer, by logging him in and

3    out of different locations?

4              MR. SILVERFINE:  Objection to form.

5         A.   No.

6         Q.   You may have commented you didn't trust the

7    second floor very much in one of your responses to

8    Attorney Silverfine's questions.  In that comment,

9    you didn't trust the second floor, who were you

10   referring to when you said "second floor"?

11        A.   Botieri and the Chief.

12        Q.   What was the basis of that statement, your

13   lack of trust of them?

14        A.   They weren't very well -- how can you say

15   that?  I didn't trust them and watched my rear end,

16   also, because I had dealings with Bob at a negative

17   connotation, and Botieri, I wouldn't trust in 100

18   years.

19        Q.   Let's just explore that a little further,

20   just as far as the comment of not trusting them, did

21   you derive that from their treatment of you in

22   particular or members of the rank and file officers?

23             MR. SILVERFINE:  Objection as to form.

24        A.   Well, treatment of me in reference to stuff

Page 47

1    that -- in other words, for promotion to captain I

2    was passed over three times, twice by Bob and -- how

3    can you say it, he had his blow boys, in other words,

4    his friend, that came up for a promotional exam.  He

5    told them in January and didn't tell the lieutenants.

6    He told his sergeant friend in January and didn't

7    tell the lieutenants until August, six weeks before.

8        Q.    Following up on that, in general, when you

9    mentioned Bob, are you referring to Chief Pomeroy?

10       A.    Chief Pomeroy.

11       Q.    And further follow-up, in the treatment of

12   officers, how would you describe police officers, how

13   would you describe the way Chief Pomeroy treated all

14   of the officers?

15       A.    Chief Pomeroy really never showed himself.

16   He would ignore the officers.  He wasn't a

17   people-oriented person.

18       Q.    You mentioned in your previous testimony,

19   you mentioned something about a group of officers or,

20   perhaps, ranking officers that got separate type of

21   treatment?

22       A.    Well, they knew about an exam coming up

23   eight months before the lieutenants did.

24       Q.    Was this information given to everyone?

Page 48

1      A.   No.

2      Q.   So was this given only to a select few?

3      A.   I believe it was.

4      Q.   How you would describe the treatment that

5  Mr. Kelley, who was an officer at the time, received

6  from the second floor, you described Pomeroy and

7  Botieri?

8           MR. SILVERFINE:   Objection as to form.

9      A.   Well, after he questioned the incentive, he

10  was scrutinized.

11     Q.   Was he treated the same as every other

12  officer?

13          MR. SILVERFINE:   Objection as to form.

14     A.   No.

15     Q.   Were any of the officers treated the same

16  as Tom Kelley?

17     A.   No.

18          MR. GALLITANO:   I have no further

19  questions.   Thank you.

20          (Whereupon, the deposition

21           was concluded 1:54 p.m.)

22

23

24

# EXHIBIT H

## Affidavit of Kevin P. Fahy

1. I, Kevin P. Fahy, of Hedges Pond Rd., Plymouth, MA, am the 8 to 4 Shift Supervisor for the Plymouth Police Department in Plymouth, MA.

2. For over 18 years I was Officer Thomas Kelley's (Tom) supervisor, shift commander and friend.

3. While working for me on the 8 to 4 shift Tom was elected to the Plymouth Retirement Board.

4. A short time later Tom questioned Chief Robert Pomeroy's (Pomeroy) right to receive "incentive pay" and this signaled the beginning of Tom's every movement being scrutinized by Pomeroy and Captain Botieri (Botieri).

5. Botieri came into the lieutenant's office and he stated, "the chief doesn't like his money being fucked with".

6. I was told that when Tom went to his retirement board meetings he was to be logged off duty in the daily log.

7. If Botieri went by and found Tom at the Town Hall he wanted to know from me why he was there; the time he went off and the time he got back out on the road.

8. Tom was the only officer that I know of who was monitored everywhere he went.

Subscribed and sworn to under the pains and penalties of perjury this 23rd day of June 2004.

_Kevin P. Fahy_
Kevin P. Fahy

1

# EXHIBIT I

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


------------------------- )
THOMAS M.  KELLEY         )
        Plaintiff,        )
VS.                       ) C.A. 1:05-cv-10596-NMG
                          )
TOWN OF PLYMOUTH, ET AL.  )
        Defendant.        )
-------------------------)



            DEPOSITION OF WILLIAM R.  GRIFFIN, a witness

called for examination by counsel for the Plaintiff, taken

pursuant to the applicable provisions of the Federal Rules

of Civil Procedure, before JO-ANNE M. GOLDEN, a Court

Reporter-Notary Public in and for the Commonwealth of

Massachusetts, at JOSEPH R. GALLITANO & ASSOCIATES, 34 Main

Street Ext., Suite 202, Plymouth, Massachusetts, on Friday,

July 13, 2007, commencing at 1:02 p.m.



**LINDA M. CORCORAN**
**CERTIFIED COURT REPORTER**
**P. O. Box 4**
**Kingston, Massachusetts  02364**
**(781) 585-8172**

1   A.   Hopefully I have the scenario or the chronology

2        correct.  I think it first began, I received a phone

3        call from I believe the Town Manager at the time,

4        Eleanor Beth.  It may have been Pat'Flynn, the

5        personnel director, but I think it was Eleanor Beth.

6        And I was told that there was an issue relating to the

7        benefits that Chief Pomeroy was receiving and that she

8        wanted the background from me as to did I in fact agree

9        when he was -- I appointed -- I should point out, I

10       appointed Chief Pomeroy as the chief, so and -- they

11       were asking me whether I had agreed to certain benefits

12       for him in addition to the salary he received.  I

13       recall education pay as the one -- as the major one.  I

14       gave that background and stated what happened.  At a

15       later time, I don't know how long -- how much later, I

16       did receive a call from Chief Pomeroy, he told me that

17       the Union was challenging his right to certain benefits

18       and would I be willing to write a letter, sort of, for

19       the file as to what I had agreed to do at the time of

20       his appointment, thus I wrote this letter.

21   Q.   Did he mention anyone else had raised the issue in any

22        other context besides the Union?

23   A.   I remember Tom Kelley's name specifically, but I think

24        at the time he was a union official.  I don't recall

1   anyone else other than union related.

2  Q.   But, he did mention Tom Kelley to you?

3  A.   Yes.

4  Q.   Okay, what did he say about Tom Kelley?

5  A.   That he was sort of the person behind the challenge of

6        his benefits.  I think he may have been union president

7        at the time.  I think he was union president when I

8        left, but I'm not sure about that.

9  Q.   Did he mention -- did Chief Pomeroy mention anything to

10       you about the retirement board, any impact upon

11       retirement issues?

12  A.  No, I don't recall that.

13  Q.   So, when he called you, did he ask you to do anything

14       specifically?

15  A.   Write a letter.  To put into writing what I had agreed

16       to verbally.

17  Q.   So, then when you appointed the Chief, you in fact

18       agreed to the education pay incentive for him?

19  A.   When I appointed the Chief -- when I informed him of

20       the decision to appoint him, we discussed his

21       compensation and I stated at the time that I did not

22       see it necessary for him to take a step back relative

23       to the benefits that he was receiving at the time.  I

24       was very strong in wanting him to be appointed of the

1    candidates I had.  And I certainly -- you face this

2    every time you bring someone from a union overtime

3    basis to a position that's going to have a -- sort of a

4    lump sum salary.  And I knew he was going to be

5    experiencing some impact because he wouldn't be able to

6    earn overtime and I thought that the other benefits

7    were reasonable for police chief to have, so I agreed

8    to them.

9  Q.  How long after you appointed him did you remain as Town

10     Manager in Plymouth?

11  A.  May I look at this for a second?

12  Q.  Sure you can.

13  A.  Okay, well this reminds me that he was appointed in

14     November of 1992 and I left in 1995.  So somewhere two

15     and a half to three years probably.

16  Q.  Now when you made the appointment of Robert Pomeroy as

17     chief, you had just testified that you had made this

18     verbal agreement with him.  Was that ever reduced to

19     writing?

20  A.  No, I don't believe so.

21  Q.  So, did the Chief have a written contract or was his

22     appointment mainly a verbal appointment?

23  A.  As I recall at the time his position of police chief

24     was actually in the personnel ordinance, by laws -- the

Page 11

1          classification and compensation plan.

2    Q.   So was there then to include your agreement of his

3          receiving incentive pay under the Quinn Bill, was there

4          an amendment to the by law then to included that

5          incentive pay?

6    A.   I don't believe there was.  I don't believe it was

7          required.

8    Q.   Then the -- so there was no written contract and there

9          was no written by law that specifically allowed for or

10         stated that he was getting the incentive pay?

11   A.   There are two parts to that question.  There was no

12         written contract.

13   Q.   Right.

14   A.   And I do not recall that the personnel by law addressed

15         the issue of Quinn Bill benefits for a police officer.

16   Q.   When the Chief called you, when did he call you; do you

17         recall, roughly?

18   A.   Well, I wrote this letter in March of 2000, must have

19         been -- I'm usually prompt in responding to any request

20         I get, so probably late in February of 2000.

21   Q.   Did you have just one conversation with him regarding

22         this issue?

23   A.   I don't recall.

24   Q.   Do you recall -- you said he mentioned Mr. Kelley, do

Page 12

```
 1         you recall if he said anything in particular about Mr.

 2         Kelley?

 3    A.   As I stated before that he was -- that Kelley and the

 4         Union -- I don't know that it was exclusively Mr.

 5         Kelley was challenging his rights to these benefits.

 6    Q.   Did he make any derogatory statements regarding Mr.

 7         Kelley?

 8    A.   I'm sure there was a certain tone to his comments, but

 9         beyond that I don't recall any specific words.

10    Q.   Did he seem upset?

11    A.   Yes.

12    Q.   Did he express any anger?

13    A.   I would say no.

14    Q.   Did he state anything of what his intentions were?

15    A.   I think -- the only way I would put that was to fight

16         for the benefits that he was receiving.  This was in

17         the context of his income was going to be and that what

18         was in that context.  He's protecting what his -- what

19         he thought were his proper benefits.

20    Q.   Did he make any mention or if -- Strike that.  Did

21         Chief Pomeroy or any representative of the Town of

22         Plymouth make any mention to you of the need for a Town

23         Meeting action regarding this matter?

24    A.   No.
```

| 1  |    | bells? |
|----|----|--------|
| 2  | A. | No. |
| 3  | Q. | Do you recall what the -- Was there a conversation only |
| 4  |    | on the phone or did anyone come out'-- did anyone come |
| 5  |    | to see you in person? |
| 6  | A. | Now that you raise -- I don't recall.  You just get in |
| 7  |    | my mind the fact that he came to the office, but I |
| 8  |    | can't be sure of that. |
| 9  | Q. | Was there one inspector or two inspectors? |
| 10 | A. | Well, now that you say that, I can see two people |
| 11 |    | sitting in front of my desk. |
| 12 | Q. | Okay, so then they did come to see you? |
| 13 | A. | I believe now that it's -- it's refreshing my memory. |
| 14 | Q. | Did they identify themselves as inspectors from the |
| 15 |    | Inspector General's office? |
| 16 | A. | I believe so. |
| 17 | Q. | How long of an interview did you have with him? |
| 18 | A. | It's a long time ago now.  I don't know, maybe 45 |
| 19 |    | minutes. |
| 20 | Q. | And what did you discuss? |
| 21 | A. | The benefits the Chief was enjoying and what did I |
| 22 |    | agree to and what were the rules associated with |
| 23 |    | benefits relative -- well, all the same things we |
| 24 |    | talked about today. |

Page 16

1  Q.  Now after refreshing your recollection, do you recall

2      their names at all?

3  A.  No.

4  Q.  Did they present any identification to you?

5  A.  I don't recall.

6          **MR. GALLITANO:** Let's go off the record for a

7      minute.

8          **(Whereupon Attorney Richard Armstrong**

9      **joins the deposition)**

10         **(OFF THE RECORD AT 1:18 p.m.)**

11         **(ON THE RECORD AT 1:18 p.m.)**

12 **(BY MR. GALLITANO)**

13 Q.  The meeting you had with the two officials that you

14     believe were from the Inspector General's office, did

15     they state why they were investigating it?

16 A.  I believe they stated that they had received a

17     complaint.

18 Q.  Did they say who had made the complaint?

19 A.  I do not believe so.

20 Q.  Did they describe what the complaint was?

21 A.  That the Chief was illegally receiving benefits that he

22     wasn't entitled to.

23 Q.  And so -- did they ask you some questions along that

24     line of why he was getting these benefits?

Page 23

| 1  | A. | As I recall on that subject. |
| 2  | Q. | On that subject.  You were never contacted by Mr. |
| 3  |    | DelaRusso or had any conversation with him regarding |
| 4  |    | the financial part of that? |
| 5  | A. | No. |
| 6  | Q. | So, just to be clear.  You only had one conversation |
| 7  |    | with the Town Manager's office and that was with |
| 8  |    | Eleanor Beth, you think? |
| 9  | A. | I believe so, yes, on that topic. |
| 10 | Q. | On that topic.  And you were contacted directly by |
| 11 |    | Chief Pomeroy, once. |
| 12 | A. | Yes, I believe.  Yes. |
| 13 | Q. | You then recalled after some refreshing your |
| 14 |    | recollection, that there were two people who came to |
| 15 |    | see you and they were from the Inspector General's |
| 16 |    | office? |
| 17 | A. | I believe they were, yeah.  That's what they |
| 18 |    | represented to me. |
| 19 | Q. | You don't recall their names.  But, I mentioned the |
| 20 |    | name Quinn and that didn't seem to be -- register at |
| 21 |    | all? |
| 22 | A. | No. |
| 23 | Q. | How about a Mr. O'Neill? |
| 24 | A. | It triggers something, but not with full confidence. |

# EXHIBIT J

ROBERT K. COUGHLIN, CHAIRMAN
JAMES A. MacDONALD, VICE-CHAIRMAN
MARIE-LOUISE KEHOE
THOMAS R. POLITO, JR.
PAUL M. MUNCHBACH

WILLIAM R. GRIFFIN
TOWN ADMINISTRATOR

NANCY A. BAKER
ASST. TOWN ADMINISTRATOR



# TOWN OF DEDHAM

## BOARD OF SELECTMEN

DEDHAM TOWN HALL
26 BRYANT STREET
P.O. BOX 306
DEDHAM, MA 02027

TEL (781) 326-5770

FAX (781) 461-5992

TDD (781) 326-4946

March 2, 2000

To Whom It May Concern:

My name is William R. Griffin. I am currently the Town Administrator of Dedham, MA. Formerly, I was the Town Manager of Plymouth, MA. In November of 1992, as Town Manager of Plymouth, I promoted Captain Robert J. Pomeroy of the Plymouth Police Department to the position of Chief of Police. When I appointed Chief Pomeroy, I fixed his starting salary at Step III of the salary pay scale for Police Chief. In addition to his salary, I informed Chief Pomeroy that he would continue to receive holiday pay and thirty percent career educational incentive pay as he had been receiving prior to his promotion to the position of Chief of Police.

Very truly yours,

William R. Griffin
Town Administrator



EXHIBIT
1
W. Griffin 5/13/07

# EXHIBIT K

VOLUME:   I
PAGES:   1-143
EXHIBITS:   8

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
********************************
THOMAS M. KELLEY,                *
                                 *
              Plaintiff,         *
                                 *
v.                               *    C.A. 1:05-CV-10596-NMG
                                 *
TOWN OF PLYMOUTH, ET AL.,        *
                                 *
              Defendants.        *
                                 *
********************************
```

**DEPOSITION OF ROBERT J. POMEROY, A WITNESS**

called by and on behalf of the Defendants, pursuant to the

applicable provisions of the Federal Rules of Civil Procedure,

before Patrice C. Lucero, Certified Verbatim Reporter and

Notary Public in and for the Commonwealth of Massachusetts, at

the Law Office of Joseph R. Gallitano, 34 Main Street

Extension, Suite 202, Plymouth, Massachusetts, on Monday,

September 25, 2006, to be commenced at 10:30 a.m.

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***
**LINDA M. CORCORAN**
**COURT REPORTING SERVICES**
**P.O. BOX 4**
**KINGSTON, MA 02364**
**(781) 585-8172**

| 1 | A | Southern New England School of Law. |
| 2 | Q | Southern what? |
| 3 | A | Southern New England School of Law. |
| 4 | Q | Did you get a degree from there? |
| 5 | A | Yes. |
| 6 | Q | What's the degree? |
| 7 | A | J.D. |
| 8 | Q | What year? |
| 9 | A | 1996. |
| 10 | Q | Are you a member of the Massachusetts Bar? |
| 11 | A | Yes. |
| 12 | Q | Do you practice law? |
| 13 | A | Pro bono. |
| 14 | Q | How often have you done that? |
| 15 | A | Maybe a dozen times.  I'd say up to a couple dozen times. |
| 16 | Q | Are you court appointed? |
| 17 | A | No. |
| 18 | Q | In that pro bono work, have you been involved in any |
| 19 | | depositions? |
| 20 | A | No. |
| 21 | Q | Have you been deposed before? |
| 22 | A | Yes. |
| 23 | Q | How many times? |
| 24 | A | A few.  I don't remember.  Three, four, five.  I think |

1   A   The JLMC, as it's usually referred to, they have

2       statutory jurisdiction over interest bargaining for

3       police and fire throughout the Commonwealth.  They

4       conduct mediations, arbitrations.  It's a tri-part-type

5       committee composed of labor and management and neutrals.

6   Q   Do you have to have a lot of knowledge of the collective

7       bargaining process to be appointed to a position like

8       that?

9   A   I think it's helpful.  It's not a requirement.

10  Q   Do you have a lot of knowledge about the collective

11      bargaining process?

12  A   I have a fair amount of knowledge.

13  Q   Did you apply for the position?

14  A   Yes.

15  Q   In the application process, did you detail your

16      experience in the collective bargaining process as part

17      of the application?

18  A   There was no formal application.

19  Q   In the informal application process, did you refer to or

20      detail or otherwise call someone's attention to your

21      background in the collective bargaining process?

22  A   I was a volunteer for approximately four years as what

23      they call an alternate member of the committee prior to

24      being appointed as a management member of the committee,

LINDA M. CORCORAN COURT REPORTING SERVICES (781) 585-8172

13

| | | |
|---|---|---|
| 1 | | that local? |
| 2 | A | There's a couple.  Custodians is one group.  Dispatchers |
| 3 | | is another group.  Meter enforcement officers and |
| 4 | | crossing guards is another AFSCME group. |
| 5 | Q | There's a second AFSCME unit? |
| 6 | A | There's three. |
| 7 | Q | There's three AFSCME units? |
| 8 | A | Yes, there's three AFSCME units. |
| 9 | Q | Inside your department? |
| 10 | A | Yes. |
| 11 | Q | The clerical employees in the department, are they |
| 12 | | members of a union? |
| 13 | A | Yes. |
| 14 | Q | Is that one of the AFSCME units? |
| 15 | A | No. |
| 16 | Q | That's another unit, SEIU? |
| 17 | A | No.  That's NAGE, N-A-G-E. |
| 18 | Q | National Association of Government Employees? |
| 19 | A | Yes. |
| 20 | Q | So that brings the total number of units to five in the |
| 21 | | department? |
| 22 | A | So far. |
| 23 | Q | What else? |
| 24 | A | We have the OPEIU union. |

14

| | | |
|---|---|---|
| 1 | Q | What is that? |
| 2 | A | I think the only employees in that is the animal control |
| 3 | | officers.  I don't remember what the acronym is. |
| 4 | Q | You don't remember? |
| 5 | A | No.  OPEIU, I believe, but I don't remember what it |
| 6 | | stands for. |
| 7 | Q | That's six units. |
| 8 | A | Yes.  And the superior officers. |
| 9 | Q | That includes the lieutenants and the sergeants? |
| 10 | A | Yes. |
| 11 | Q | Not the captains? |
| 12 | A | Correct. |
| 13 | Q | How many lieutenants and captains? |
| 14 | A | There's two captains, six lieutenants, and ten or eleven |
| 15 | | sergeants in that group. |
| 16 | Q | That's seven bargaining units in your department. |
| 17 | A | Yes.  I think that's all of them. |
| 18 | Q | How many people in total in the police department? |
| 19 | A | Including some on-call people, part-timers, between 130 |
| 20 | | and 145. |
| 21 | Q | You're familiar with the term "FTE"? |
| 22 | A | Full time equivalents? |
| 23 | Q | Yes. |
| 24 | A | Yes. |

22

1    regarding screening of police officers based upon

2    concerns of their physical abilities to perform training?

3            MR. SILVERFINE:  Objection as to form.  You can

4        answer.

5    A   No.

6    Q   Are you familiar with any rules, protocols, anything

7        written regarding who should and should not be involved

8        in certain levels of training?

9            MR. SILVERFINE:  Objection as to the form.  You

10       can answer.

11   A   Specifically training, no.

12   Q   Are there any rules now that would be accessible to a

13       sergeant involved in the training of personnel that would

14       guide that person with regard to making judgments about

15       police officers and their physical capacity to endure

16       training?

17   A   Yes.

18   Q   Were they available when you were a sergeant?

19   A   No.

20   Q   Where are these rules?

21   A   There's a general rule that talks in the rules and

22       regulations manual.  It's 13 point something.  I don't

23       remember the exact rule.

24   Q   Can you remember what the rule says?

23

1   A   Generally.

2   Q   Yes.

3   A   Something to the effect that if an officer finds that he

4       is mentally or physically incapable of performing the

5       duties of a police officer, he's to report that to his

6       shift commander.

7   Q   Is there any rule that imposes on the shift commander or

8       the sergeant in charge of training responsibilities for

9       determining whether or not the police officers being

10      trained are physically capable of being physically

11      trained?

12          MR. SILVERFINE:   Objection as to form.  You can

13      answer.

14  A   Not specifically in writing.  But, obviously, if a

15      supervisor saw some physical or mental infirmity that was

16      obvious to him, he'd make some comment about it.

17  Q   You would say that that's an obligation of a sergeant

18      who's involved in training personnel?

19  A   All supervision.

20  Q   So it would be an obligation of all the superior officers

21      including the chief?

22  A   Yes.

23  Q   This rule is not written?

24  A   Correct.

24

| | | |
|---|---|---|
| 1 | Q | This rule is part of a police officer's duty at those |
| 2 | | ranks? |
| 3 | A | Yes.  There is no written rule. |
| 4 | Q | You're aware of a number of associations that police |
| 5 | | departments outside of collective bargaining |
| 6 | | organizations belong to; you have, I assume, affiliation |
| 7 | | with the Massachusetts Chief of Police Association; |
| 8 | | right? |
| 9 | A | Yes. |
| 10 | Q | You're a member? |
| 11 | A | Yes. |
| 12 | Q | Do you hold any office in that organization? |
| 13 | A | No. |
| 14 | Q | Does that organization perform any advice or counsel to |
| 15 | | people like yourself at your level with regard to the |
| 16 | | rigors of training or screening police officers with |
| 17 | | respect to physical limitations? |
| 18 | A | I've never seen anything about screening officers to |
| 19 | | their limitations for training. |
| 20 | Q | Nothing? |
| 21 | A | No. |
| 22 | Q | That's the Police Chiefs Association? |
| 23 | A | Right. |
| 24 | Q | Do they talk about training at all? |

27

1    to training?

2  A    Yes.

3  Q    Do you recall at all in your days as the lieutenant

4       whether or not --

5              MR. SILVERFINE:  Did you say captain?

6              MR. ARMSTRONG:  I'm sorry?

7              MR. SILVERFINE:  Did you say captain?  You said

8       you were skipping over lieutenant.

9              MR. ARMSTRONG:  Oh, I'm sorry.  I did say

10      lieutenant.  I meant captain.

11 Q    In your days as a captain, do you recall ever reading,

12      receiving any materials from these organizations

13      regarding how to screen, how to limit, how to make sure,

14      how to review physical capacity or mental capacity of

15      police officers in a training model?

16 A    No.

17 Q    Have you ever seen anything like that from these

18      organizations?

19 A    No.

20 Q    In your capacity as chief of police, this group expands

21      to add several more organizations.  Have you ever seen

22      any like materials with regard to reviewing, screening,

23      limiting, checking on a police officer's physical

24      limitations or mental limitations in regard to his

1      capacity to be trained?

2                   MR. SILVERFINE:  Objection as to form.  You can

3             answer.

4    A    No.

5    Q    Do you have any protocols inside the town, rules,

6             regulations, written, unwritten, in practice, in the

7             collective bargaining agreements that refer to your

8             obligation to ensure that a police officer is physically

9             and mentally capable to be trained?

10   A    That's an awful broad question, and I'd have to talk

11            about specific instances to give you an answer.

12   Q    Well, is there anything written?

13   A    No, there's nothing written.

14   Q    Is there anything in the collective bargaining agreements

15            that refer to physical limitations or mental limitations

16            with regard to training?

17   A    No, not that I'm aware of.

18   Q    You are undoubtedly aware of your obligation -- correct

19            me; I may be assuming too much -- but of your obligation

20            to provide a safe work environment for police officers in

21            the town; is that correct?

22                   MR. SILVERFINE:  Objection as to form.  You can

23            answer.

24   A    To the best of my ability on things I can control.

37

1   Q   But, in fact, the department was aware in May of 2003,

2       Chief, that he had Lyme disease and Meniere's disease; is

3       that true?

4              MR. SILVERFINE:  Objection as to form.  You can

5       answer.

6   A   My answer did not refer to the Lyme disease or Meniere's

7       disease.

8   Q   Well, I'm asking you about those two conditions in May of

9       2003.

10   A   I don't know enough about either one of them to make a

11       determination.

12   Q   So you would say that knowing what you do now about his

13       Meniere's disease and his Lyme disease and that he had it

14       prior to May of 2003, prior to the Columbine-like

15       training, and he had these conditions, you're saying you

16       can't make a judgment as to whether or not he should have

17       participated in that training?

18              MR. SILVERFINE:  Objection as to form.

19   A   That's right.

20   Q   Have you ever issued while you were chief any type of

21       directive to police officers to ensure the fact that they

22       are physically capable and mentally capable of performing

23       in training or performing in their police duties in

24       general?

```
 1   Q   Do you remember at any specific meeting prior to

 2       conducting the Columbine-like training in May of 2003

 3       where you inquired as to the health, mental and physical

 4       of each officer to be trained?

 5   A   No.

 6   Q   Was that subject at all a point of discussion in any of

 7       the meetings that you held with your command staff prior

 8       to the training in May of 2003?

 9   A   No.

10   Q   You would agree with me that you did have meetings with

11       your command staff prior to the training in 2003?

12   A   Very brief meetings.

13   Q   Did you have any planning meetings at all in May or prior

14       to May of 2003 regarding the planning, execution, or the

15       conduct of training by the Massachusetts State Police of

16       Plymouth police officers?

17   A   No, I didn't.

18   Q   None at all?

19   A   No.  None.

20   Q   When did you first find out that your department was

21       going to be 100 percent trained, your patrol uniformed

22       department was going to be trained, in a Columbine-like

23       exercise?

24                MR. SILVERFINE:  Objection as to the form.  You
```

42

| 1 | | training officer? |
|---|---|---|
| 2 | A | No. |
| 3 | Q | In your discussions with the colonel, did you discuss |
| 4 | | with him any limitations with regard to physical or |
| 5 | | mental capacity of prospective trainees? |
| 6 | A | I never spoke to the colonel about it. |
| 7 | Q | Well, you spoke to him at the association meeting; right? |
| 8 | A | No, I did not. |
| 9 | Q | He made the presentation at the meeting? |
| 10 | A | Yes, he did. |
| 11 | Q | And then what did you do -- return to your office and |
| 12 | | tell the training officer? |
| 13 | A | No.  No.  I said I wrote him a letter.  I wrote the |
| 14 | | colonel a letter. |
| 15 | Q | You wrote him a letter? |
| 16 | A | Yes. |
| 17 | Q | Did he write back to you? |
| 18 | A | I don't remember whether he wrote or one of his staff |
| 19 | | people called one of my people. |
| 20 | Q | Did this training cost the Town of Plymouth any money; |
| 21 | | did you have to pay the Massachusetts State Police for |
| 22 | | it? |
| 23 | A | No, we did not have to pay the Massachusetts State |
| 24 | | Police. |

44

1    materials regarding the scope of the training, any

2    limitations in the training, exactly what was going on to

3    the police officers in the town;  you didn't read any

4    materials on it?

5              MR. SILVERFINE:  Objection as to form.

6  A  No.

7  Q  Did you ever ask to see any materials regarding it?

8  A  No.

9  Q  The training officer was Lieutenant Rogers?

10  A  I'm not sure.  I think it was, but I'm not sure.

11  Q  Did you ever have any meetings prior to May of 2003 with

12    the people involved in training in the town police

13    department; did you have any meetings regarding this

14    training program?

15  A  No.

16  Q  Did you have any conversations with anyone involved with

17    training that described the rigors or physical challenge

18    or the exertion that would be required of a police

19    officer undergoing any part of the training that was

20    conducted in May of 2003?

21  A  No.

22  Q  Do you recall ever making any inquiry of anyone as to how

23    rigorous this training would be for police officers?

24  A  No.

1    Q    What is it; is it written down?

2    A    It's common sense.

3    Q    The answer to my question is no; it is not written down?

4    A     Would you rephrase the question, please, or restate it.

5    Q    I want to know whether or not there's any written,

6         unwritten rule, protocol, regulation, directive, anything

7         that you know of that would impose upon a supervising

8         policeman or a superior officer an obligation to make a

9         determination as to whether or not police officers have

10        the mental or physical capacity to undergo training in

11        the police department now.

12              MR. SILVERFINE:  Objection as to form.

13   A    Yes.

14   Q    Is it written?

15   A    No.

16   Q    When you say no, does that mean it's part of an e-mail or

17        is it brought up at meetings; how does a supervising

18        police officer know about it?

19   A    I could give you an example.

20   Q    Yes.

21   A    That probably would be the best way.

22   Q    Go head.

23   A    If Officer Jones showed up to go to the range today, and

24        he has a cast on his arm, he can't fire his weapon; or if

LINDA M. CORCORAN COURT REPORTING SERVICES (781) 585-8172

52

| | | |
|---|---|---|
| 1 | Q | Were those meetings taking place in May of 2003? |
| 2 | A | I think so. |
| 3 | Q | You don't recall? |
| 4 | A | I don't remember. |
| 5 | Q | You wouldn't recall, then, I gather, whether or not |
| 6 | | Officer Kelley's health status was discussed in one of |
| 7 | | those meetings? |
| 8 | A | I already answered that previously. I said his health |
| 9 | | status was not discussed. |
| 10 | Q | In the staff meetings, is any time reserved for health |
| 11 | | status or physical or mental status of police officers, |
| 12 | | uniformed personnel; in those staff meetings, any time |
| 13 | | reserved for that subject? |
| 14 | A | Not reserved, no. |
| 15 | Q | But it comes up? |
| 16 | A | Not that I can recall. |
| 17 | Q | Those staff meetings were being held in May 2003? |
| 18 | A | I don't remember. |
| 19 | Q | Then I gather the same answer would apply if I were to |
| 20 | | ask you about Officer Kelley's health condition being |
| 21 | | discussed in the staff meetings; you would say as you |
| 22 | | said earlier? |
| 23 | A | Never to my recollection was his health ever brought up. |
| 24 | Q | Are you aware of any waivers that were signed prior to |

1      what I was asking?

2  A   Yes.

3  Q   Oh, I'm sorry.  Let's go to Section 111 benefits, Chief.

4  A   Okay.  111F.

5  Q   You denied them?

6  A   Yes, I did.

7  Q   What basis did you use to deny them?

8  A   I did not think that 111F benefits were applicable to the

9      situation.

10 Q   Why?

11 A   From my understanding of 111F.

12 Q   Based upon your understanding of 111F?

13 A   Yes.

14 Q   What specifically do you know about Section 111F that

15     would cause you not to allow those benefits to be

16     extended to Officer Kelley?

17 A   I believe that he was entitled most likely to the Heart

18     Law presumption.

19 Q   You believe the Heart Law presumption applies to 111

20     benefits?

21 A   No.  I believe it applied to his situation.

22 Q   And that's the basis for your decision not to provide him

23     111 benefits?

24 A   Yes.  And what I said earlier:  I don't think that his

55

1       situation was applicable to 111F.

2    Q  Why?

3    A  Because that's my understanding of the statute.

4    Q  What is it about the understanding of the statute that

5       applies to Officer Kelley's case that results in you

6       deciding that he doesn't get the benefits of 111F?

7    A  It's my interpretation of the statute.

8    Q  What is it about your interpretation?

9    A  My interpretation of the statute is that in his situation

10      the facts particular to his situation did not come under

11      111F.

12   Q  You can't give us any more of an explanation for why you

13      denied the police officer involved in this case the

14      statutorily provided benefit of Section 111F?

15              MR. SILVERFINE:   Objection as to form.

16   A  I didn't think in my interpretation he was entitled to

17      the 111F benefits.

18   Q  And you can't be any more specific as to what it is about

19      the nature of his claim that makes you think that 111

20      benefits don't apply?

21   A  I think that the Heart Bill was applicable, not 111F.

22   Q  When the Heart Bill is applicable, 111 F is not; is that

23      what you're saying?

24   A  That's correct.

1   Q   So you can only have the benefit of one of those

2       statutes, not both?

3   A   Yes.

4   Q   Is that the reason why today he has never received 111

5       benefits?

6           MR. SILVERFINE:  Objection as to form.

7   A   He retired for an accidental disability.

8   Q   I understand that, but I'm saying is that the reason

9       today after your initial decision and you were sued in

10      this case and you're an individually named defendant; do

11      you still hold to the position that he should be denied

12      111F benefits because he is being provided the benefits

13      of a presumption under the Heart Law?

14          MR. SILVERFINE:  Objection as to form.

15  A   Yes.

16  Q   So the original decision that the benefits of one law

17      applies, that being the Heart Law, causes 111 benefits to

18      be lost, that decision that you made back in late 2003,

19      you still hold to today in 2006?

20          MR. SILVERFINE:  Objection as to form.

21  A   Yes.

22  Q   Do you believe that he was injured at the scene of the

23      Columbine-like training?

24  A   I don't know what you mean by injured.

64

1  Q   You cannot explain to me what standards, what use of

2      language that you apply as chief of police when you

3      receive a claim from a police officer that they've been

4      injured?

5          MR. SILVERFINE:  Objection as to form.

6  A   It depends on the circumstances.

7  Q   It depends upon the circumstances?

8  A   Yes.

9  Q   Well, let's talk about Officer Kelley's circumstance.

10 A   Okay.

11 Q   What did you do in analyzing his claim?

12 A   I looked at his report; I looked at Captain Chandler's

13     report, and I looked at the medical documentation that

14     Officer Kelley provided initially.

15 Q   So you looked at Chandler's report?

16 A   Yes.

17         MR. ARMSTRONG:  Would you mark this two-page

18     document as Plaintiff's 1.

19         [WHEREUPON, Plaintiff's Exhibit No. 1 was

20     marked.]

21 Q   Chief, would you look at what has been marked as

22     Plaintiff's Exhibit 1 and tell me if you've ever seen

23     that document before.

24         [Witness reviews document.]

LINDA M. CORCORAN COURT REPORTING SERVICES (781) 585-8172

65

1   A   Yes.

2   Q   Is this the document that you reviewed in making your

3       determination that Section 111 benefits would not be

4       provided to Officer Kelley?

5               MR. SILVERFINE:  Objection as to form.

6   A   No.

7   Q   Pardon me?

8   A   No.

9   Q   No.  Did you ever see this document at the time the claim

10      was being made for 111 benefits?

11  A   Yes.

12  Q   I thought you told me that you saw Captain  Chandler's

13      report.

14  A   I did.

15  Q   Is there another report than this?

16  A   No.  You asked me if this was the document that I made my

17      decision on.

18  Q   Oh, I'm sorry.  This was the document that you referred

19      to as Captain Chandler's report?

20  A   Yes, it is.

21  Q   Nothing in this document would indicate to you the fact

22      that they stopped training, that Captain Chandler who

23      says he was the senior officer present --

24              MR. SILVERFINE:  Objection as to form.

1    Q    -- says that Kelley was in physical distress would

2         indicate that he was injured?

3              MR. SILVERFINE:  Objection as to form.

4    A    No.   It indicates he was in physical distress.

5    Q    And that means not injured under Massachusetts law,

6         Section 111F?

7              MR. SILVERFINE:  Objection as to form.

8    A    No, it doesn't.

9    Q    It doesn't mean that he's injured?

10   A    No, it doesn't mean that either.

11   Q    Well, let me get this straight.  Kelley was in physical

12        distress is what Chandler says in his report.

13   A    Yes.

14   Q    That does not constitute injury as you view it under

15        Section 111F?

16   A    Not necessarily.

17   Q    In Kelley's case, did it or did it not constitute injury

18        under Section 111F?

19             MR. SILVERFINE:  Objection as to form.  Go

20        ahead.

21   A    This was only part of my decision.

22   Q    But I'm asking you only about this.

23             MR. SILVERFINE:  Objection as to form.

24   Q    Does it constitute injury?

1  Q    But you don't see this as determinative in terms of your

2       decision-making process; right?

3  A    My decision was made far prior to this document being in

4       existence.

5  Q    But you have the right to reverse that decision anytime;

6       right?

7  A    I don't know about at any time, but I could have changed

8       my mind, yes.

9  Q    When you read this, you could have changed your mind?

10 A    Well, I think it had already been to the town manager by

11      then.

12 Q    Well, then you don't have the authority to change your

13      mind at this point?

14 A    I don't know.

15 Q    But personal injury sustained, you say this didn't affect

16      your decision-making process?

17 A    My decision was made far prior to this document being in

18      existence.

19 Q    I, therefore, assume that you answer my question no; this

20      does not have any impact on your decision-making process;

21      is that right?

22           MR. SILVERFINE:  Objection as to form.  Answer

23      the question the way you can.

24 A    I don't know what you're asking.

1    Q    I asked you if it had any impact on your decision-making

2         process.  You said, well, I made my decision a long time

3         ago.

4    A    That's right.

5    Q    I'm saying to you could you reverse your decision, and

6         you say you don't know?

7    A    I would have had to discuss it with legal counsel.

8    Q    Did you discuss it with legal counsel after you saw this?

9    A    No.

10   Q    Why not?

11   A    It had already gone to the town manager's level at that

12        point.

13   Q    So the only reason this document did not affect your

14        decision-making process or did not cause you to reverse

15        your decision is that it had now gone to the town

16        manager's office?

17             MR. SILVERFINE:  Objection as to form.

18   A    No, that's not what I said.

19   Q    Well, if it was still a decision within your office,

20        would you have reversed your decision based upon what you

21        just read in paragraph three?

22   A    No.

23   Q    Why not?

24   A    Because I'll say what I've said, I think, six or seven

1    Q    Nothing in this document caused you to rethink or to

2         change your decision regarding 111F benefits?

3    A    That's correct.

4    Q    At the time of the August 14 letter reaching you, you had

5         made your decision, and it's gone to the town manager?

6    A    I don't remember when it went to the town manager.

7    Q    It says here in the history of the present complaints,

8         which is a paragraph on page one of Dr. Thakur's

9         letter --

10   A    Yes.

11   Q    -- it says here in Line No. 3 under the paragraph History

12        of Present Complaints, "He had an episode of shortness of

13        breath, sweating, and he collapsed.  He was taken to

14        Jordan Hospital.  He was noted to have a blood pressure

15        of 196/62.  He was admitted into the hospital and had a

16        stabbing pain in the retrosternal anterior chest.  He was

17        referred to Beth Israel Hospital where he had undergone

18        cardiac catheterization."  Does what is reported there

19        constitute an injury under 111F?

20   A    Not necessarily.

21   Q    In Officer Kelley's case?

22   A    No.

23   Q    The answer is no?

24   A    Mm-hm.

1    Q    Further on in the document that I've given you,

2         Plaintiff's Exhibit 2, there is a Plymouth Retirement

3         Board Findings of Fact.  Have you seen that before?

4              [Witness reviews document.]

5    A    Yes.

6    Q    In the last sentence in the first paragraph it reads on

7         page -- these pages aren't numbered -- but on the piece

8         of paper that's entitled "Plymouth Retirement Board

9         Findings of Fact," there is a Paragraph 1, and in the

10        last sentence it says, "It is also significant to note

11        that notwithstanding the presumption that Kelley's

12        cardiac impairment was sustained in the line of duty, an

13        incident occurred while in the performance of his duties

14        on May 25, 2003, when he collapsed during a mandatory

15        training exercise."

16             In Paragraph No. 4 in the second sentence, it

17        says, "Counsel further opined that the Board has the

18        authority to grant Kelley's Application provided that the

19        Board finds that there is insufficient evidence to offset

20        the statutory presumption that Kelley's disabling

21        coronary artery disease was sustained in the line of

22        duty, or if there is evidence to offset the presumption,

23        there is sufficient evidence to establish that Kelley's

24        permanent incapacity is the natural and proximate result

| | | |
|---|---|---|
| 1 | | of the personal injury he sustained on May 25, 2003."  Do |
| 2 | | you remember reading that? |
| 3 | A | Yes. |
| 4 | Q | Does this constitute an injury within the meaning of |
| 5 | | Section 111F? |
| 6 | A | No, not in my opinion. |
| 7 | Q | On the second page, just in a subparagraph d, there is a |
| 8 | | sentence that reads, "Kelley's permanent incapacity is |
| 9 | | the natural and proximate result of the personal |
| 10 | | injury" -- |
| 11 | A | I'm sorry.  I don't see where you are.  Could you just |
| 12 | | give me a second. |
| 13 | Q | Subparagraph d. |
| 14 | A | D? |
| 15 | Q | D like in Delta. |
| 16 | A | Yes.  I got it now. |
| 17 | Q | "Kelley's permanent incapacity is the natural and |
| 18 | | proximate result of the personal injury he sustained on |
| 19 | | May 25, 2003."  Do you think that that constitutes |
| 20 | | evidence to you that Kelley sustained an injury within |
| 21 | | the meaning of 111F? |
| 22 | A | No. |
| 23 | Q | You would agree with me that I have just been reading |
| 24 | | from the Findings of Fact from the Plymouth Retirement |

| | | |
|---|---|---|
| 1 | A | Right. |
| 2 | Q | The employer's physician, there's nothing done there; |
| 3 | | right? |
| 4 | A | No. |
| 5 | Q | So is there any particular reason why you are replacing |
| 6 | | your judgment as to whether or not this injury or this |
| 7 | | episode, as you like to call it, this episode was caused |
| 8 | | by the training of May 25, 2003? |
| 9 | | MR. SILVERFINE:  Objection as to form. |
| 10 | A | I'm not replacing my opinion -- replacing their opinion |
| 11 | | with mine.  No, I'm not doing that. |
| 12 | Q | You believe the episode was caused by the training on |
| 13 | | May 25, 2003; right? |
| 14 | A | I don't know. |
| 15 | Q | You have the right, don't you, to have him examined by a |
| 16 | | town physician; right? |
| 17 | A | Who?  Kelley? |
| 18 | Q | Yes. |
| 19 | A | Yes. |
| 20 | Q | Did you do that? |
| 21 | A | No. |
| 22 | Q | Now, you have three doctors on a medical panel saying |
| 23 | | that he sustained an injury or, as you call it, an |
| 24 | | episode, related to May 25, 2003.  You have a medical |

80

1          Plaintiff's 3.

2                    [WHEREUPON, Plaintiff's Exhibit No. 3 was

3          marked.]

4     Q    Have you ever seen what I just handed you?  The record

5          has marked it as Exhibit 3.

6                    [Witness reviews document.]

7     A    Yes.

8     Q    The sentence, "I believe that his experience during this

9          training exercise could recur at any time during stress

10         and for that reason makes his going back to any work as a

11         police officer dangerous," the date of injury, this

12         doctor, Dr. Donald M. Moore, Jr. -- are you familiar with

13         Dr. Moore here in Sandwich -- Sandwich Street.  I'm

14         sorry.

15    A    I don't know him.

16    Q    He's in Plymouth.  You're not familiar with Dr. Moore?

17    A    I've heard the name.  Don't know him.

18    Q    Dr. Moore from Plymouth says that the date of injury was

19         May 25, 2003.  "I believe his disability is work

20         related."  Did that affect your original decision; have

21         you made your decision yet, Chief?  It's July 16, '03, he

22         dates this letter.

23    A    I didn't see this until after Kelley was retired.

24    Q    After he was retired.  Does this change your decision,

| | | |
|---|---|---|
| 1 | | your original decision, at all? |
| 2 | A | No. |
| 3 | Q | Now, in each of these cases, these people were suggesting |
| 4 | | medical conditions that you didn't agree with; is that |
| 5 | | right? |
| 6 | A | No. |
| 7 | Q | No.  You agree that all of these conditions existed? |
| 8 | A | I'm not a medical doctor.  Whatever they find they find |
| 9 | | as far as his medical condition. |
| 10 | Q | You have no dispute with anything that they're saying? |
| 11 | A | I have no dispute with their medical findings. |
| 12 | Q | So you have no dispute with Donald Moore's statement that |
| 13 | | the date of injury was May 25, '03? |
| 14 | A | I'm not going to dispute Dr. Donald Moore.  That's his |
| 15 | | opinion. |
| 16 | Q | But you have another opinion? |
| 17 | A | I'll restate it for probably the seventh time.  I don't |
| 18 | | think that what happened to Officer Kelley on May 23rd is |
| 19 | | compensable under 111F.  I think he gets compensated |
| 20 | | under the Heart Law.  [Pause] Can I take five minutes for |
| 21 | | a restroom break, please? |
| 22 | Q | Go right ahead.  Take as long as you want, Chief. |
| 23 | | [Off the record.] |
| 24 | Q | Prior to May 25, 2003 -- you may have answered this; I |

1  Q    Generally, where are they held -- at your office?

2  A    Usually.

3  Q    Prior to the May 25th training in 2003, did you meet with

4       the union to discuss police training?

5  A    No.

6  Q    Have you ever discussed police training --

7  A    Excuse me.

8  Q    I'm sorry.

9  A    Yes.  But not this training.

10  Q    You discussed training in general?

11  A    No.  We discussed another specific training.

12  Q    What training did you discuss with the police leadership?

13  A    AR-15 training.  It's a rifle.

14  Q    The rifle.  When did that meeting take place?

15  A    I don't know.  It was around this time.

16  Q    But it was prior to May 25th, do you think?

17  A    I believe it was, yes.

18  Q    The police leadership, is that a good way of describing

19       the union leadership?

20  A    Sure.  That or the members of their executive board.

21  Q    So that usually there are a certain set number of people

22       that come to visit with you?

23  A    No.  Sometimes there's one.  Sometimes there's three or

24       four.

```
 1   Q   On occasion of the rifle discussions, who was there?

 2   A   Officer Boyle, Paul Boyle; and Officer Dana Goodwin.

 3       There may have been others, but I know that they were

 4       there.

 5   Q   At the time of that meeting or any other time with anyone

 6       that you could describe as being in the leadership of the

 7       patrolmen's union --

 8   A   Yes.

 9   Q   -- was there any discussion about who should or should

10       not be involved in the Columbine-like training?

11   A   No.

12   Q   Was there any discussion about who should or should not

13       in the uniformed ranks be involved in training generally?

14   A   No.

15   Q   There was at no time a conversation brief or lengthy,

16       maybe not at one of these meetings, between you and

17       anyone in the leadership of the patrolmen's association

18       about Officer Kelley and his medical conditions?

19   A   Never.

20   Q   So, therefore, there was no discussion at all in any

21       meeting informal or formal between you and Officer Boyle

22       who is president of that --

23   A   President.

24   Q   -- and was in 2003?
```

103

1       anything to do -- has no impact at all?

2    A   No.

3                   [WHEREUPON, Plaintiff's Exhibit No. 7 was

4        marked.]

5    Q   Would you look at seven -- is it?

6                   THE COURT REPORTER:   Plaintiff's 7.

7    Q   Plaintiff's 7.  Did you look at it?

8    A   Yes.

9    Q   Have you seen it before?

10   A   Yes.

11   Q   Does that change at all your answer to the question just

12       a moment ago as to whether or not the passage of the

13       bylaw would have an impact on the amounts of monies

14       figured in your retirement?

15   A   No.

16   Q   Do you hold animosity towards Mr. Kelley for raising the

17       issue of the Quinn Bill that affected you and affected

18       two captains?

19   A   Well, I didn't like it.  I don't hold any animosity.  I

20       think he's misguided; I think he's wrong, but everybody's

21       entitled to their opinion.

22   Q   Did you take any action as chief of police that was a

23       result of you not liking it?

24   A   Not liking what?

LINDA M. CORCORAN COURT REPORTING SERVICES (781) 585-8172

1  A    I know that they were contacted because Mr. Griffin told

2       me so.  There was rumors back in the beginning of 2001

3       that Kelley went to the inspector general's office.  That

4       was up to him.  I wasn't the least bit concerned about

5       it.  They never contacted me.

6  Q    Did you contact anyone because Kelly went to the

7       inspector general's office?

8  A    No.  I only heard rumors that he went.  I didn't know for

9       a fact that he went.  I didn't know if he complained

10      about me or the finance director or the town manager.  I

11      have no idea.

12 Q    You never talked to Griffin about the subject?  Griffin,

13      apparently, according to the newspapers, was talking to

14      the newspapers, at least, and was talking to the

15      inspector general.  You said that he mentioned it in

16      passing?

17 A    Quite awhile later he mentioned to me, "Oh, by the way,"

18      and that's how he said it, "Oh, by the way, I never told

19      you that they came down."  He says, "There was nothing to

20      it, and they left."

21 Q    The manager at the time in the town was Eleanor Beth.

22      Did she talk to you --

23 A    No.  She never talked to be me about the inspector

24      general's office, and I don't think that she ever talked

LINDA M. CORCORAN COURT REPORTING SERVICES (781) 585-8172

 1     can break it up for me, I'd be glad to answer it.

 2  Q  There's rules of thumb in the labor arbitration process,

 3     you'd agree with me; right?

 4          MR. SILVERFINE:  I'm sorry.  What was that?

 5          MR. ARMSTRONG:  The rules of thumb.

 6  Q  Do you know what a rule of thumb is?

 7  A  I know what a rule of thumb is.

 8  Q  Would you agree with me that there's generally a rule of

 9     thumb that disciplinary actions have a life in a

10     personnel file of collective bargaining members of one

11     year?

12  A  No.

13  Q  Have you seen collective bargaining agreements that

14     specifically say two years?

15  A  I don't recall.

16  Q  Three years?

17  A  I don't know.

18  Q  But you've seen them with one year?

19  A  It depends on the collective bargaining unit.  I've got

20     seven.  I don't know --

21  Q  What is your practice in the town of Plymouth today, in

22     September of 2006?

23  A  As far as what?

24  Q  Keeping disciplinary records for patrolmen or retirees.

1   Q   You have disciplinary actions, at least in the answers to

2       your interrogatories, back to 1984 on Officer Kelley.

3       That's 22 years ago.

4   A   I have what?  I didn't hear what you said.

5   Q   Disciplinary actions for complaints against the plaintiff

6       concerning his work performance.  And you have records

7       back to 1984 on Officer Kelley.  Were you aware of that?

8   A   I don't know whether you're talking about complaints or

9       disciplinary action that's contained in the personnel

10      file.

11  Q   In your production of information in response to the

12      interrogatories, there's something dated 10/1/96.  That's

13      over ten years ago.

14  A   All right.

15  Q   And you say plaintiff was issued a letter of reprimand

16      for intemperate behavior in a roll call room.

17  A   Yes.

18  Q   So you would agree with me that you have a disciplinary

19      action, a letter of reprimand, in Kelley's file that is

20      older than 10 years ago?

21              MR. SILVERFINE:  Objection as to form.  Go

22      ahead.

23  A   I guess if it's there, it's there.

24  Q   [Reading] "Lieutenant Kevin Fahy" -- this is February of

LINDA M. CORCORAN COURT REPORTING SERVICES (781) 585-8172

```
 1        February 26, 1997?

 2   A    Yes, I do.

 3   Q    Thank you.  Then on July 23, 1997 -- strike that.

 4        On February 17, 1998, you said in answer to

 5        interrogatories, "Lieutenant Kevin Fahy ordered the

 6        plaintiff to sign a receipt for the town's sexual

 7        harassment policy."  Is that a disciplinary action?

 8   A    It's not in his personnel file.

 9   Q    How do you know that?

10   A    Because I never took any action to put it in his

11        personnel file.

12   Q    But this is Lieutenant Kevin Fahy.  How do you know how

13        to put this on the document in 2006 unless you've got

14        some record of it; where is it?

15   A    It's at the police station.

16   Q    You are aware of the definition of a personnel record in

17        Massachusetts?

18   A    I know there is a definition.  I can't quote it.

19   Q    Right.  Are you aware that definition includes numerous

20        files that may be located in various places inside a

21        place of employment?  It's a fairly broad definition of

22        what a personnel record is.  So, when you say it's not in

23        his personnel file, I assume it's in another file?

24   A    Yes.
```

115

| | | |
|---|---|---|
| 1 | Q | And you would say that being the head of the department |
| 2 | | for the last six or seven years and a lawyer and on the |
| 3 | | JLMC, you would say that's not part of the personnel |
| 4 | | records? |
| 5 | A | Yes. |
| 6 | Q | You would say that's not? |
| 7 | A | That's right. |
| 8 | Q | So it would not affect his tenure of employment if he |
| 9 | | were currently employed by the police department; is that |
| 10 | | right? |
| 11 | A | Correct. |
| 12 | Q | Why would you keep it, Chief? |
| 13 | A | To indicate if there was similar instances of conduct. |
| 14 | Q | What difference would that make to you as chief? |
| 15 | A | There's a term called progressive discipline. |
| 16 | Q | So you would have to agree with me that you are, in fact, |
| 17 | | keeping this record as evidence that might, in fact, |
| 18 | | affect his tenure of employment? |
| 19 | | MR. SILVERFINE:  Objection as to form. |
| 20 | A | No.  I disagree. |
| 21 | Q | [Reading] "On May 31st of 2000, Lieutenant Arthur |
| 22 | | Budge, Jr., spoke with the plaintiff, re:  his poor job |
| 23 | | performance, not answering his car radio from dispatch, |
| 24 | | not giving location when called and not calling out upon |

1    arrival at calls.  The plaintiff was further informed his

2    reports had been lacking in information and

3    investigation.  A written report was forwarded to Captain

4    Michael Botieri for possible disciplinary action."  Is

5    that in his personnel file?

6  A  No.

7  Q  But it's in the special file?

8  A  It's in the complaint file.

9  Q  Where is that kept?

10 A  Captain Botieri keeps it.  He's the internal

11    investigations officer.

12 Q  Do you know if that resulted in disciplinary action?

13 A  There's nothing in his personnel file regarding that.

14 Q  About 31 days later -- I'm sorry -- forty-one days later,

15    on July 10, 2000, there's an entry that says, "Captain

16    Michael Botieri spoke with the plaintiff about using his

17    personal motor vehicle when assigned to the town walking

18    beat.  All documentation concerning the plaintiff's

19    personal use of his vehicle was forwarded to Captain

20    Michael Botieri."  Is that disciplinary action?

21 A  There's nothing in his disciplinary file or his

22    discipline file or his personnel file regarding that.

23 Q  Is there something called a personal file; is there

24    something called a disciplinary file?

122

1          talks about one thing; the contract talks about another

2          thing.  The contract talks about delegates, and I don't

3          remember what the statute talks about.

4    Q    The contract you're referring to is the collective

5          bargaining agreement?

6    A    Yes.

7    Q    The Mass. Patrolmen's Association is the collective

8          bargaining organization?

9    A    The Massachusetts Police Association is a fraternal

10         organization.

11   Q    Your collective bargaining agreement allows bargaining

12         unit members time off by right of the contract

13         language --

14   A    Yes.

15   Q    -- to attend a fraternal organization --

16   A    Yes.

17   Q    -- meeting?

18   A    Yes.

19   Q    In addition to that, you're saying that there's a statute

20         that provides the right?

21   A    That's correct.

22   Q    Any other police officers while on duty attending

23         meetings, in the time that you've been chief?

24   A    I can't recall any others.

1              [Off the record.]

2     Q    Did you take any retaliation against Officer Kelley for

3          him complaining about you not being paid overtime

4          pursuant to bylaws of the town?

5     A    I never got paid overtime.

6     Q    When you were paid Quinn Bill benefits.  Did you take any

7          action against him in retaliation?

8     A    Absolutely not.

9     Q    Did you to take any retaliation against him because he

10         went to the inspector general --

11    A    No.

12    Q    -- about the Quinn Bill issue?

13    A    No.

14    Q    Did you have any conversation with Captain Botieri or

15         Captain Chandler in which you discussed the fact that

16         they needed to watch Officer Kelley more than they needed

17         to watch other officers?

18    A    No.

19    Q    Did you ever tell them that they needed to watch him

20         because he was a troublemaker?

21    A    No.  Never.

22    Q    Did you consider Officer Kelly while he was a police

23         officer to be a troublemaker?

24    A    Yes.

| | | |
|---|---|---|
| 1 | Q | Other officers were not doing this? |
| 2 | A | Very, very rare.  Most officers just come and do their |
| 3 | | job and go home at the end of the day without ever being |
| 4 | | counseled or reprimanded. |
| 5 | Q | Do you ever remember the cruiser being in front of the |
| 6 | | fire station that Captain Botieri remembered quite |
| 7 | | clearly? |
| 8 | A | I remember getting a call from a citizen, but they didn't |
| 9 | | name Kelley.  They said -- and I get these calls all the |
| 10 | | time -- there's a cruiser parked behind the fire station. |
| 11 | | I called the captain, and I said I got a report of a car |
| 12 | | being behind the fire station; send somebody down to find |
| 13 | | out what's going on.  I had no idea who it was. |
| 14 | Q | It was Kelley? |
| 15 | A | I don't know. |
| 16 | Q | Was it the inspectional services car? |
| 17 | A | I don't know. |
| 18 | Q | They use a car that is an old police car; right? |
| 19 | A | Could be.  I don't know. |
| 20 | Q | You don't know. |
| 21 | A | I don't follow up on those minor issues. |
| 22 | Q | There was an issue several years ago, I gather, and you |
| 23 | | maintained some records about odometers being changed. |
| 24 | A | That was long before I was chief. |

1              MR. SILVERFINE:  Objection as to form.

2    A    I don't know.

3    Q    The question goes on, and it's my question to him, "What

4         about the Quinn Bill?  You said maybe not to do with the

5         Quinn Bill.  Well, maybe, maybe not, or what?"  Mr.

6         Silverfine objects as to form.

7              And then the Captain asks, "What's the

8         question, sir?"

9              The question then gets stated, "The question is

10        whether or not it was because of the Quinn Bill."

11             The answer is, "That might have been part of

12        it, but there are several other reasons as well."

13             Would you agree with Captain Botieri that the

14        Quinn Bill might have been part of why you thought

15        Officer Kelley was a troublemaker?

16             MR. SILVERFINE:  Object to form.

17   A    I think he was just generally a poor employee.

18   Q    That's not considering the fact that he was complaining

19        about the Quinn Bill or that he went to the inspector

20        general?

21   A    That didn't have -- I mean, was I happy that he did those

22        things?  No, I wasn't happy.  Did it bother me?  No.

23   Q    But in your unhappiness, did it affect your judgment in

24        any respect with regard to your relationship as chief and

# EXHIBIT L

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
* * * * * * * * * * * * * *
                          *
THOMAS M. KELLEY,         *
           Plaintiff,     *
                          *  CA 1:05-cv-10596-NMG
vs.                       *
                          *
TOWN OF PLYMOUTH, ET AL   *
           Defendants.    *
                          *
* * * * * * * * * * * * * *
```

DEPOSITION of **ELEANOR BETH,** a witness called
on behalf of the Plaintiff, taken pursuant to the
applicable provisions of Federal Rules of Civil Procedure,
before Catherine Ann LaBonte, CVR-CM, MSE, a Certified
Court Reporter and Notary Public, in and for the
Commonwealth of Massachusetts, at the office of Attorney
Frank K. Duffy, 157 Locust Street, Falmouth, Massachusetts,
on Tuesday, February 27, 2007, commencing at 1:00 p.m.

* * * * * * * * * * * * * * * * * *

*LINDA M. CORCORAN, CVR*
*Certified Court Reporter*
*P.O. Box 4*
*Kingston, Massachusetts 02364*
*(781) 585-8172, Fax (781) 585-2218*

PENGAD • 1-800-631-6989 • www.pengad.com

LASER BOND FORM B

16

| | | |
|---|---|---|
| 1 | | under the Quinn Bill?  This incentive pay, how was it |
| 2 | | shown in the budget? |
| 3 | A. | By my memory, there's a line for Quinn Bill benefits |
| 4 | | that would encompass all Quinn Bill benefits, but I |
| 5 | | don't know, you know.  I haven't seen a budget for |
| 6 | | awhile. |
| 7 | Q. | It didn't delineate who got the money then? |
| 8 | A. | No. |
| 9 | Q. | It didn't show up -- would the money being paid to |
| 10 | | the chief be reflected in the line item for the |
| 11 | | chief's salary? |
| 12 | A. | I doubt it.  I would imagine that -- you know, we had |
| 13 | | personnel services lines that was everybody's salary, |
| 14 | | and then we'd have other benefit lines, and I would |
| 15 | | imagine all of the benefits were lumped together no |
| 16 | | matter who they went to. |
| 17 | Q. | Did the retirement board ever contact you at any time |
| 18 | | regarding this issue and how it might impact |
| 19 | | retirement benefits? |
| 20 | A. | Not that I remember. |
| 21 | Q. | Mr. Kelley came to you, you said, and brought this |
| 22 | | issue to your attention? |
| 23 | | MR. SILVERFINE:  Objection as to |
| 24 | | form. |

LASER BOND FORM B    PENGAD • 1-800-631-6989 • www.pengad.com

| | | |
|---|---|---|
| 1 | A. | No, I -- what I said, I believe, is that Mr. Kelley |
| 2 | | raised the issue with the town. I don't ever |
| 3 | | remember him speaking to me personally about it. It |
| 4 | | may have happened, I just don't remember. |
| 5 | Q. | Did he ever ask to meet with you about this? |
| 6 | A. | I don't remember. |
| 7 | | **[Exhibit 2, Letter dated 5/10/01, so marked]** |
| 8 | Q. | Let me show you, this was a document that was |
| 9 | | produced by the town in our production of documents |
| 10 | | request. This is Exhibit 2. It was Item Number 45 |
| 11 | | in the town's voluntary disclosure. Do you recall |
| 12 | | receiving that letter? |
| 13 | A. | No, I actually don't. I obviously did, but I don't |
| 14 | | remember it. |
| 15 | Q. | Maybe I can refresh your recollection. Do you recall |
| 16 | | him hand-delivering it to you? |
| 17 | A. | No. I mean, I vaguely remember the letter because I |
| 18 | | remember the allegations "about to get me." I mean, |
| 19 | | I believe that he brought it to me, I just don't |
| 20 | | remember. We had several conversations, Officer |
| 21 | | Kelley and I. |
| 22 | Q. | You did? |
| 23 | A. | Over the many years. |
| 24 | Q. | Okay. But did you have any conversations then |

18

```
 1        regarding the contents of this letter?

 2   A.   Well, the letter says that we discussed it in my

 3        office.  I believe we did, but I don't remember it.

 4   Q.   When he said he discussed it in your office, he's

 5        talking about the payroll discrepancy issue?

 6                       MR. SILVERFINE:  Objection to the

 7        form.

 8   A.   That's what it says.

 9   Q.   As a result of receiving this letter, did you discuss

10        this matter with Chief Pomeroy at all?

11   A.   I don't remember.

12   Q.   He's made some claims here of harassment.  Did you

13        conduct any kind of investigation or inquiry

14        regarding his claims?

15   A.   I don't remember that, either.

16   Q.   So you don't know if you did or you didn't?

17   A.   I doubt it.  I probably talked -- Officer Kelley had

18        let several people, including myself, know that he

19        felt for a long time that, you know, various people

20        were out to get him and it was not really new.  He

21        was not alleging an individual incident.  There

22        really wasn't anything to investigate as far as I

23        could tell.

24   Q.   He mentioned here the Inspector General's Office.
```

PENGAD • 1-800-631-6989 • www.pengad.com

LASER BOND FORM B

| | | |
|---|---|---|
| 1 | | Were you aware that he had gone to the Inspector |
| 2 | | General's Office concerning this payroll issue? |
| 3 | A. | As far as I know, this was the first I knew of it. |
| 4 | Q. | But once you saw this letter, you then had knowledge |
| 5 | | that he had gone to the Inspector General's Office? |
| 6 | A. | That's what it says. |
| 7 | Q. | Did you then talk to the chief about this at all? |
| 8 | A. | Not that I remember. |
| 9 | Q. | Did you talk to Bill Griffin about it at all? |
| 10 | A. | Well, only because -- only in regard to the town |
| 11 | | meeting, you know, needing to rectify the situation |
| 12 | | or make clear the situation because Bill was one who |
| 13 | | had negotiated these benefits. |
| 14 | Q. | Now, this letter is dated May 10, 2001. |
| 15 | A. | Okay. |
| 16 | Q. | The town meeting took place in October of 2001.  Now, |
| 17 | | what transpired between the time you received this |
| 18 | | letter regarding the payroll discrepancy and the |
| 19 | | actual action in town meeting?  What steps did you |
| 20 | | take? |
| 21 | A. | Well, the letter -- let's see, I sent the board a |
| 22 | | memo in August.  Probably the warrant was put |
| 23 | | together over the summer.  If this came up in May, I |
| 24 | | would assume that at that point we knew there was a |

PENGAD • 1-800-631-6989 • www.pengad.com

LASER BOND FORM B

1   A.   Well, he wasn't a department head.

2   Q.   What was his title then?

3   A.   He was a division head.

4   Q.   Well, let's amend the question to department heads

5        and division heads.

6   A.   Okay, yes.  That did occur actually probably a few

7        times when someone would come saying they felt that

8        they were being mistreated, would be the word I would

9        use, by their superior, and we would investigate.

10  Q.   Were there any other instances other than the

11       division head that I referred to?  Were any other

12       departments, for instance, like the director of

13       finance?  Was there ever a problem in that office?

14  A.   Yes, there were.  There were a few departments where

15       there were differences between people.  Some

16       situations would be investigated and some would be

17       treated as more frivolous.  It would depend on the

18       situation.

19  Q.   How did you make a determination whether it was

20       serious or frivolous?

21  A.   By talking to the individual and/or the person that

22       they were alleging was bothering them.  Having a

23       meeting between them.  Often times, the situation

24       would be raised by the union.

PENGAD • 1-800-631-6989 • www.pengad.com

LASER BOND FORM B

1    Q.   So there was a grievance procedure?

2    A.   Right, correct.

3    Q.   But if there wasn't a grievance procedure, for

4         instance, if it were non-union issues, did you handle

5         it the same way?

6    A.   I don't remember a situation where a non-union person

7         ever claimed that they were being mistreated.   We

8         didn't have very many non-union people.

9    Q.   Right.

10   A.   Fourteen to be exact.

11   Q.   Good memory.

12   A.   For some things.

13   Q.   If this had occurred in other departments -- and you

14        just testified that you would have a meeting between

15        the parties to resolve it, if possible -- why didn't

16        you do the same -- take the same course of action in

17        Mr. Kelley's situation?

18                        MR. SILVERFINE:   Objection as to

19        form.

20   A.   In my memory, I don't think there was actually ever a

21        time that there was a meeting with an employee about

22        allegations that was not in a union framework.

23   Q.   Are you familiar with the term "whistle blower?"

24   A.   Yes.

28

| | | |
|---|---|---|
| 1 | Q. | And in the course of your public service as |
| 2 | | selectman, town manager, assistant town manager, had |
| 3 | | you come across any whistle blower incidents at any |
| 4 | | time? |
| 5 | A. | Yes. |
| 6 | Q. | Are you aware of the statute that prohibits |
| 7 | | harassment of a whistle blower? |
| 8 | A. | I'm aware that there is such a statute.  I'm not |
| 9 | | familiar with its provisions. |
| 10 | Q. | But you're aware that there is such a statute? |
| 11 | A. | Yes. |
| 12 | Q. | What was your past experience with a whistle blower |
| 13 | | issue then? |
| 14 | A. | In 1979, after the blizzard of '78, a disgruntled |
| 15 | | wife called, I guess, the attorney general -- I can't |
| 16 | | remember exactly -- allegedly that her husband was |
| 17 | | having an affair with the town accountant behind the |
| 18 | | filing cabinets during the blizzard. |
| 19 | Q. | Which town was this? |
| 20 | A. | This was in Scituate. |
| 21 | Q. | Okay.  I wanted to make that clear.  It wasn't --- |
| 22 | A. | No, it was not. |
| 23 | Q. | And my client wasn't involved. |
| 24 | A. | No.  The contract for the town accountant was not |

1    Q.  Talk about going through snow budget money.  Oh, my

2        God.

3    A.  Hey, we went through Bob and the no name storm and

4        all that stuff when I was in Plymouth, which was bad

5        enough.

6    Q.  That was bad.  Again, getting back to where Mr.

7        Kelley in his letter of May 10, 2001, clearly says

8        that he has some involvement with the Inspector

9        General's Office, did that in any way, considering

10       your past experience, trigger any concern on your

11       part regarding the claim of retaliation against him?

12               MR. SILVERFINE:  Objection as to

13       form.  Go ahead.

14    A.  No, it really didn't.  I really -- I saw that he had

15       gone to the Inspector General's Office, and I figured

16       they would investigate and that it would be

17       adjudicated.  But I didn't take his out-to-get-me

18       statements any more seriously than I had the other

19       times that he had them.  I had several conversations

20       with Mr. Kelley.  He had, I think, the kind of

21       outlook that people were out to get him, as many of

22       us have over time, and I trusted the chief as a

23       professional and I didn't put a lot credence into it.

24    Q.  You've stated you were aware that he went to the

PENGAD • 1-800-631-6989 • www.pengad.com

LASER BOND FORM B

# EXHIBIT M

Thomas M. Kelley
41 Arlington Rd. Plymouth MA 02360
Telephone:(508)224-2505
Email: Tkelley154@aol.com
May 10, 2001

EXHIBIT 2

Dear Mrs. Beth,

The reason I requested an appointment with you was not to discuss a work place assignment but rather to officially notify you of on-going workplace harassment. As you know and we have recently discussed in your office the serious violations that are on-going involving the town's personnel bylaw by the chief and captain. The harassment I wanted to discuss with you has been on-going since April of 1999. When I first discovered the discrepancies in the pay roll records and the personnel bylaw. I have been told by past and present supervisors that they are "out to get me" as a result of you discovering the personnel bylaw problems and the monies involved. I have taken these warnings very seriously and have recently reported the entire matter to the proper state agency. I have enclosed a copy of MGL12A-section 14 for your review. I have instructed my attorney to write the inspector generals office in regards to this matter and will also request a copy of there report pursuant MGL12A-12.

In closing I would like to know when you specifically plan to notify the personnel board about this matter. I am also requesting a copy of the letter to the personnel board explaining this situation as you promised prior to the April town meeting. If you have any questions please don't hesitate to call.

Sincerely,

Thomas M. Kelley

# EXHIBIT N

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. 1:05-cv-10596-NMG

```
-------------------------)
THOMAS M. KELLEY,         )
        Plaintiff        )
VS.                      )
                         )
TOWN OF PLYMOUTH, ET AL, )
        Defendant        )
-------------------------)
```

DEPOSITION OF MICHAEL SACCO, a witness called for examination by counsel for the Plaintiff, taken pursuant to the applicable provisions of the Massachusetts Rules of Civil Procedure, before LINDA M. CORCORAN, a Court Reporter-Notary Public in and for the Commonwealth of Massachusetts, at the Law Offices of Joseph R. Gallitano & Associates, 34 Main Street Extension, Plymouth, Massachusetts, on Tuesday, February 7, 2006, commencing at 10:02 a.m.

**LINDA M. CORCORAN**
**CERTIFIED COURT REPORTER**
**P. O. Box 4**
**Kingston, Massachusetts   02364**
**(781) 585-8172**

Page 21

1                              September 3, 2003, was

2                              marked as Exhibit No. 2 for

3                              the plaintiff.)

4    BY MR. GALLITANO

5         Q.    I'd like to show you a letter dated September

6    3, 2003, to the retirement board signed by you on

7    Kirkpatrick & Lockhart stationery and ask you if you

8    recognize this.  And that's marked as Exhibit 2.

9              (Hands to witness.)

10        A.    Yes, this is the letter that I wrote to the

11   board after reviewing the medical panel certificate which

12   I had just discussed in my prior testimony, and other

13   than one minor typographical error where Mr. Kelley's

14   height was listed as five foot four as opposed to six

15   foot four, I didn't find that there were any errors or

16   omission in the medical panel certificate.  And I offered

17   my opinion that based on the medical records and the

18   evidence before the board, that there was insufficient

19   evidence to offset the presumption that his cardiac

20   impairment was job related.  I also noted that because

21   this was an injury which took place while in the actual

22   performance of his duties, that the board also had the

23   ability to find that Mr. Kelley not only had the benefit

24   of a presumption but that the incident which took place

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Page 22

1   on May 25, 2003, was the natural and proximate cause of

2   his incapacity.

3       Q.    And under what section of the general laws then

4   would apply if it's an injury on duty?

5       A.    If it's an injury sustained while in the

6   performance of your duties, that's Section 7 of Chapter

7   32.   The presumption section is Section 94 of Chapter 32.

8   And as I noted in the opening paragraph of this letter,

9   the application was submitted both pursuant to Sections 7

10  and 94.

11      Q.    Was there a finding under both sections?

12      A.    My recollection was that the board found that

13  there was both insufficient evidence to offset the

14  presumption and that, in fact, the injury which occurred

15  on May 25, 2003, was the proximate cause of Mr. Kelley's

16  cardiac disability.

17      Q.    Was that also supported by the medical panel?

18      A.    Yes, it was, although the panel evaluated it

19  under the so-called "Heart Law," the presumption statute,

20  Section 94, by answering as they did that -- and let me

21  just back up a little bit.

22           The medical panel is charged with addressing

23  the issue of causation in terms of medical possibility.

24  Is it medically possible that an incident that is

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Page 23

1    described caused the disability?  And they answer in the

2    affirmative to that question.  So clearly in the medical

3    panel's opinion they felt that Mr. Kelley's disability

4    was such that it might have been caused by the incident,

5    and they describe the incident in their report.  There's

6    no family history.  There's no other causative risk

7    factors.  They weighed those risk factors, as I recall.

8    They mentioned those in the report, that there were no

9    risk factors that would give them any pause to find that

10   there was any other cause related to the disability other

11   than the event that occurred on May 25 of 2003.

12          And I should also add just for purpose of

13   clarification that under the retirement statute an

14   aggravation of a preexisting condition is also

15   compensable even if it was undetected.  And in Mr.

16   Kelley's case, as I recall, there was no documented

17   cardiac history prior to the event that took place on May

18   25 of 2003.

19   Q.    I want to show you a -- along those lines a

20   findings of fact.

21          MR. GALLITANO:  Could you mark that, please.

22                          (Whereupon, the findings of

23                           fact were marked as Exhibit

24                           No. 3 for the plaintiff.)

1    BY MR. GALLITANO

2        Q.    Mr. Sacco, do you recognize this?

3              (Hands to witness.)

4        A.    I do.

5        Q.    Could you tell me what this is and who prepared

6    it, if you know?

7        A.    Certainly.  This is the findings of fact of the

8    Plymouth Retirement Board pertaining to the accidental

9    disability application of Thomas Kelley.  I prepared

10   these, which, again, is normal procedure.  I prepared

11   these after consulting with the retirement board

12   throughout the process, but specifically on July 29 of

13   2003 when the board had an evidentiary hearing with

14   respect to Mr. Kelley's application, and then as noted on

15   the second page of this under the conclusion and vote,

16   that the board voted unanimously on September 5, 2003, to

17   apply the presumption and grant the accidental disability

18   application of Mr. Kelley.  And the board also found

19   specifically that his disability was the result of the

20   personal injury he sustained on May 25 of 2003.

21             So in essence the board found that Mr. Kelley

22   qualified for accidental disability both under the "Heart

23   Law" where he had the benefit of a presumption, but also

24   that his disability was the direct result of that which

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

Page 25

1  occurred while in the performance of his duties on May 25

2  of 2003.

3  These findings I've prepared to submit to

4  PERAC.  As I noted earlier when you asked me about what

5  PERAC's role is -- and you'll note in the findings the

6  very last sentence or the last clause of the last

7  sentence is that any granting by the retirement board is

8  subject to the review of PERAC, and it gives the

9  statutory cite for that.  So these are routinely

10  performed, and, in fact, the PERAC regulations require

11  that retirement boards make specific findings and forward

12  it to them subject to their review for approval of any

13  granting of a disability retirement.

14  Q.  So the Plymouth Retirement Board would have

15  seen the medical panel information, plus the findings of

16  fact that you prepared and submitted to them in their

17  evidentiary hearing, correct?

18  A.  Yes.

19  Q.  Then all of this would have been reviewed by

20  PERAC, and they would have reviewed the same

21  documentation?

22  A.  Yes, PERAC would -- PERAC reviews everything.

23  They have 30 days after all the documents are submitted

24  to it.  If they don't take action within 30 days, then by

Page 26

1    operation of law the board's decision is final and

2    binding, but they can -- normally they do take action

3    within that 30 days.  And then often cases, if the

4    application is incomplete or there's some question

5    regarding either the issues of disability, permanency, or

6    causation, they will remand it back to the retirement

7    board for further proceedings, and that did not take

8    place in this particular case.  I'm not sure exactly what

9    date PERAC approved it, but PERAC approved the board's

10   granting of the accidental disability on both aspects of

11   it, both for Section 7 and 94.

12        Q.   So you've been practicing in this area for over

13   20 years?

14        A.   As far as an attorney, I've been practicing

15   since 1992, and my practice has been virtually exclusive

16   of representing retirement boards.  But prior to that,

17   when I worked at the Teacher's Retirement Board starting

18   in 1983, I provided a variety of functions there.  So

19   I've been working with this retirement statute in one

20   aspect or another for going on 23 years now.

21        Q.   How many applications related to, say, Chapter

22   -- let me get the right chapter here -- 32, Section 7 do

23   you think you've reviewed in the course of your career?

24        A.   Probably a couple thousand.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Page 27

1      Q.    Is there any doubt in your mind as someone who

2    is familiar with the statute and familiar with the

3    requirements to meet that, the statute to qualify as an

4    injury on duty, that Mr. Kelley's injury was an injury on

5    duty?

6      A.    No doubt in my mind.  This was one of the more

7    clear-cut cases that I've seen.  Most "Heart Law" cases,

8    interestingly enough, are brought when the injury, so to

9    speak, was off duty.  There are -- if a police officer is

10   sitting home watching TV and has a heart attack, there's

11   a presumption that that heart attack was sustained in the

12   line of duty.  More often than not that's what you see in

13   these cases.

14      But in this particular case with Mr. Kelley,

15   there was no question that he was in the performance of

16   his duties.  He was at a mandated training session which

17   was sanctioned and run by the Plymouth Police Department.

18   During the performance of that particular function and

19   while participating in that training session, he had a

20   cardiac event that required hospitalization, and he

21   ultimately was disabled as a result of that.  There

22   wasn't even any need to stretch to connect the dots in

23   this case.  I mean, it was very clear that the incident

24   that occurred on that particular date caused his cardiac

Page 28

1    impairment which resulted in his disability.

2        Q.    In your opinion as a professional in this field

3    then, is there any legal basis or any basis of any kind

4    for any town official, the police chief, the selectmen,

5    town manager, personnel director, to deny any benefits on

6    the basis that he was not injured on duty?

7            MR. SILVERFINE:  Objection as to form.

8            MR. GALLITANO:  Let me rephrase.

9        A.    No, actually, I'm just -- I'm pausing not

10   because I don't understand the question, but because I

11   want to just --

12       Q.    Well, he raised an objection.  Let me rephrase

13   it anyway.

14       A.    Okay, sure.

15       Q.    Is there any basis for anyone to refute that

16   this was an injury on duty?

17           MR. SILVERFINE:  Objection as to form.

18       A.    When I review these applications, I can't say I

19   try to look for a problem, but basically my role is to

20   make sure that an individual receives the benefit if he's

21   entitled to that benefit.  But if he or she is not, it's

22   my role to point out the flaws in the process, the flaws

23   in the application, the flaws in the evidence.  The

24   burden is on the member to go forward and present his or

Page 33

1   virtually all of the cases, the individual who was

2   utilizing sick leave and/or vacation time is then

3   recredited with that sick leave or vacation time and

4   placed on 111F benefits retroactively to the date of

5   injury, and then he's ultimately retired.  And if he has

6   any either sick leave or vacation time, then he can cash

7   in pursuant to either a collective bargaining agreement

8   or under the wage statute that he is able to do so.

9        Q.   On the basis of your previous testimony that

10   the finding here was that, in fact, this was an injury on

11   duty, then taking that and using Mr. Kelley's situation,

12   he then would have been entitled to reimbursement if he

13   had used any vacation or sick time retroactively once the

14   retirement board had ruled and notified the town that he

15   was retired pursuant to that statute?

16        A.   Yes.  And just to use the dates, if I can get

17   them correctly, his injury was May 25 of 2003.  If he was

18   required to use sick leave from May 25 of '03 until

19   September 8 of '03, what would normally happen is he

20   would then be recredited with the sick leave for that

21   period of May 25 to September 8 of '03, and he would be

22   placed retroactively on injured-on-duty benefits for that

23   same period pursuant to Chapter 41, Section 111F.

24             Again, that is what in my experience is

Page 34

1    routinely done in cities and towns throughout the

2    Commonwealth on pure "Heart Law" cases, but again, this

3    was not a pure "Heart Law" case because there was a

4    specific injury that occurred while in the performance of

5    Mr. Kelley's duties.  And I'm aware of no basis either in

6    law or in fact upon which he could have been denied 111F

7    benefits.  There were no medical records submitted to the

8    retirement board, and we had access to all the medical

9    records.  There were no medical records suggesting that

10   his heart condition or his cardiac event occurred outside

11   of the line of duty.  It was very obvious he was working

12   when it occurred, so there was nothing in there to

13   suggest even remotely that there was anything else that

14   would have caused his disability other than that event

15   that occurred on May 25 of 2003.

16        Q.    Then in Mr. Kelley's case where he used both

17   sick and vacation days, the vacation days would also be

18   subject to reimbursement under 111F benefits?

19        A.    Well, again, it's not -- this is not something

20   that is stated explicitly in the statute.  This is a

21   practice that is utilized, again, around the

22   Commonwealth.  My experience is with "Heart Law" cases.

23   And sometimes it's in the collective bargaining

24   agreement.  Sometimes it's not.  But it is normally a

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Page 36

1          MR. GALLITANO:  I have a copy for you right

2     here.

3          A.    If I could just take a minute to read it

4     through.

5          Q.    Sure, take your time.

6          A.    I do recognize it obviously, but I want to just

7     read it through.

8              (Pause.)

9          Q.    I've reviewed the letter.  My recollection was

10    that back then in November or I'd say probably October or

11    November of 1999 there was an issue of concern to the

12    retirement board.  Most retirement boards are very

13    conscientious and concerned, but this board is particular

14    in its diligence in terms of making sure that employees

15    receive all the benefits to which they're entitled.  And

16    there was some concern that individuals who were applying

17    under one of the presumptions, that they would go for a

18    period of time without pay because if the cardiac event

19    or if it was a cancer or a lung issue involving a

20    firefighter, if that individual did not have any sick

21    leave or vacation time, the individual would basically go

22    without any compensation for the period during which he

23    or she were seeking disability retirement.  And the board

24    asked me to provide an analysis to it with respect to the

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1    interplay between the injured-on-duty statute, which is

2    Chapter 41, Section 111F, and the accidental disability

3    statute, which is General Laws Chapter 32, Section 7 and

4    94, particularly focusing on the presumption.  And in

5    this letter I stated that it was my understanding -- and

6    it is my understanding, and it certainly was back then --

7    that it was the town's practice to reimburse individuals

8    for their sick leave and vacation time when they were

9    applying under the presumption; that is, they would be

10   required to utilize sick leave and vacation time until

11   such time as their disability was either approved or

12   denied.  If it was denied, then it certainly was

13   appropriate for them to use sick leave or vacation time

14   because their injury would not be found to be sustained

15   in the line of duty, but if the injury was found to be

16   sustained in the line of duty, that the town would

17   recognize that and put the individual retroactively back

18   onto 111F benefits from the date of injury to the date of

19   retirement.

20          I also stated in this letter that the statutory

21   presumptions which are found in Chapter 32 do not apply

22   to Chapter 41, Section 111F benefits, but again, based on

23   my experience -- and, in fact, I said earlier that 95

24   percent of what I do or the majority of what I do is

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1   retirement board work.  I also represent a few unions,

2   and in that capacity I've had occasion to negotiate with

3   fire chiefs a compromise, if you will, on these types of

4   issues so that someone doesn't go without pay for a

5   particular period of time while the disability is

6   pending.

7           Again, in most cases the town will recognize

8   -- the city or town will recognize that an award of

9   accidental disability qualifies someone for benefits

10  under Chapter 41, Section 111F because the language in

11  the two statutes are virtually identical in terms of

12  sustaining an injury while in the performance of his or

13  her duties.  So this letter was basically done at the

14  request of the retirement board so that they would have a

15  clear understanding of the interplay between these two

16  statutes, which can be fairly complex at times.  And so

17  that I think my understanding was they wanted to engage

18  the town, the employer, to make sure the employees and

19  the members in the retirement system's best interests

20  were being considered in this type of a process.

21      Q.   So in reviewing this -- and I notice that there

22  is -- on page 3 that there's a proposed policy; is that

23  not correct?

24      A.   Yes.  As a result of my submitting this letter,

1       A.    Well, obviously I knew that Mr. Kelley was not

2   on injured-on-duty status, which I could not come up with

3   any rational explanation as to why that had not occurred.

4   Again, there was just -- it's almost like trying to prove

5   that the sun rises every day.  I mean, someone's on duty

6   and suffers a cardiac event and becomes disabled.  It is

7   as clear-cut a case of a job-related disability as I've

8   ever seen, particularly related to a cardiac event.

9          And even after the fact when you look back on

10  it in retrospect, if -- there are certainly occasions --

11  this was not one of them -- where someone could say,

12  "Well, he had a family history, a smoking history.  He

13  was obese.  He had a previous heart attack off the job.

14  He had a cardiac condition."  None of those so-called

15  risk factors were in play here.  So I was somewhat

16  surprised, very surprised, I guess, that Mr. Kelley was

17  not receiving 111F benefits, but I assumed, for whatever

18  reason that the town had elected not to do so, that

19  certainly at the end of the day when his case was

20  ultimately approved by the board, that they would do what

21  they had done, or at least it was my understanding, what

22  they had always done in the past, which was to recredit

23  him with his sick leave and vacation time and place him

24  retroactively on IOD status, which I'm sure everyone

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Page 47

1     of duty, I'm sure there's a reporting procedure.  Once he

2     reports that injury, the employer then has a choice to

3     place him on 111F benefits or not.  If he is, he receives

4     100 percent of his compensation tax-free for the time --

5     I believe the statute states until the disability either

6     no longer exists or he is retired.  Those are the two

7     points at which the town can terminate the benefits once

8     they've granted to him.  Certainly at any time during the

9     receipt of 111F benefits -- and again, normally this is

10    consistent with a collective bargaining agreement but not

11    always the case -- the town can periodically have someone

12    examined.  It's usually their right to do so to see if

13    the individual is still disabled.

14            This was not a long period of time.  Mr. Kelley

15    had the injury in May, applied in July, and was

16    ultimately retired in September.  And again, my

17    recollection is the town did not have him examined during

18    that time, or if they did have him examined, there was no

19    -- there was no contrary medical evidence in this case.

20    None.  Not one sentence, as I recall, which in any way

21    even remotely suggested that either Mr. Kelley was not

22    suffering from a cardiac impairment or that it was the

23    result of anything other than that which occurred on May

24    25 of 2003.

1    Q.    So based on that, was Mr. Kelley someone

2    eligible for 111F?

3    A.    Absolutely, absolutely.    ,

4    Q.    No question?

5    A.    Not only eligible, I would say that entitled in

6    the context that this is exactly the case -- a case in

7    which the statute was drafted for this particular

8    purpose, to compensate an injured officer in the line of

9    duty.

10    Q.    Because, in fact, doesn't 111F benefits

11    substitute for what would be normally in a private sector

12    workmen's compensation?

13    A.    Yes.    I mean, the distinction being worker's

14    compensation is not 100 percent of the pay as it is with

15    111F, but again, I think that's a recognition from the

16    legislature that, you know, these -- the public safety

17    employees are the ones who are running in the burning

18    buildings when everybody is running out.    The police

19    officers who are putting their lives on the line, they're

20    entitled to full pay if they get injured.

21    Q.    Thank you.    I want to change subjects now from

22    the injury of Mr. Kelley to another topic involving Mr.

23    Kelley's interaction with the chief of police.

24    Did you ever become aware of Mr. Kelley having

Page 50

1   you can get up to 25 percent extra in salary, all of

2   which is to be considered in the calculation of your

3   retirement allowance.  That statute, has to be adopted by

4   the local legislative branch of government.  In this

5   case, I think would have been town meeting.

6          And at some point -- I can't tell you exactly

7   when, but it was brought to my attention, as it would

8   with any other issue that comes before the retirement

9   board, that certain individuals were receiving payments

10  pursuant to the so-called Quinn Bill, but there was no

11  authority for the town to do so.  There was a question of

12  whether or not the town had actually adopted the Quinn

13  Bill, and there was a question of whether or not certain

14  individuals who were receiving Quinn Bill payments were

15  being -- that those payments were authorized by either a

16  collective bargaining agreement or personnel bylaws.  So

17  that's how the issue of the payments were brought to my

18  attention.

19          Then we -- I recall having discussions with my

20  client that I don't want to get into the specifics, but

21  there were discussions on this issue.  And we tried

22  through the board then chairman, Mr. Dello Russo, who was

23  also, as I said earlier, the CFO for the Town of

24  Plymouth, that rather than try and create problems and

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

EXHIBIT O

# Kirkpatrick & Lockhart LLP

75 State Street
Boston, MA 02109-1808
617.261.3100
www.kl.com

EXHIBIT  2
Sacco
2-7-06
LINDA M. CORCORAN
CERTIFIED COURT REPORTER

Michael Sacco
617.261.3207
Fax 617.261.3175
msacco@kl.com

September 3, 2003

Patrick DelloRusso, Chairman
Richard A. Manfredi, Member
Thomas A. Kelley, Member
John Murphy, Jr., Member
Shawn Duhamel, Member
Plymouth Retirement Board
11 Lincoln Street
Plymouth, Massachusetts 02360

Re:   <u>Accidental Disability Application of Thomas A. Kelley</u>

Dear Mr. Chairman and Members of the Board:

As the Board members are aware, Thomas M. Kelley has been employed as a Police Officer in the Town of Plymouth Police Department since September 19, 1977 or a period of approximately 26 years.  On or about June 25, 2003, Mr. Kelley filed with the Plymouth Retirement Board a Member's Application for Disability Retirement ("Application") pursuant to M.G.L. c. 32, §§ 7 and 94, the so-called "Heart Law," claiming that as a result of suffering a cardiac event and cardiac impairment, he should be retired for accidental disability.  Mr. Kelley's Application is submitted pursuant to Section 7 based on an incident which occurred on May 25, 2003, when he collapsed during a training exercise.  According to the incident reports, Mr. Kelley was performing a simulated arrest when his breathing became labored, and he leaned against a wall and grabbed his side.  The training exercise was terminated and Mr. Kelley was transported to Jordan hospital, and subsequently to Beth Israel for cardiac evaluation.

The Board conducted an evidentiary hearing, at which Mr. Kelley appeared and provided testimony regarding the events as described above.  Following the hearing, the Board voted to refer the matter to the Public Employee Retirement Administration Commission ("PERAC") for the convening of a regional medical panel specializing in cardiology.  PERAC convened said panel, which was comprised of Drs. Thakur, Ellison and Philippides ("Panel").  The Panel examined Mr. Kelley on August 6, 2003, and subsequently forwarded a Regional Medical Panel Certificate ("Certificate"), which answered all three questions in the affirmative, thus opining that as a result of his cardiomyopathy and resultant symptoms, Mr. Kelley is permanently unable to perform the essential duties of a police officer, and his incapacity is such as might be the natural

# Kirkpatrick & Lockhart LLP

Plymouth Retirement Board
September 3, 2003
Page 2

and proximate result of the personal injury sustained or hazard undergone on account of which retirement is claimed.

Recently, I had the opportunity to review the Panel's Certificate and narrative report. Other than a minor typographical error, in which the Panel lists Mr. Kelley's height as 5'4" rather than his actual height of 6'4", it appears that the Panel has applied the appropriate standard and not otherwise lacked pertinent facts in rendering its opinion. There has been no evidence presented to the Board to lead it to believe that Mr. Kelley is not disabled, or that his disability is the result of some ailment or injury unrelated to his employment. In addition, Mr. Kelley has the benefit of the presumption pursuant to M.G.L. c. 32, § 94 that his cardiac impairment was sustained in the line of duty. Accordingly, based on all the evidence, it would be appropriate for the Board to find that Mr. Kelley is permanently unable to perform the essential duties of a police officer based on his cardiac impairment, and insufficient evidence exists to rebut the presumption that his cardiac impairment was sustained in the line of duty. In addition, in light of the fact that Mr. Kelley suffered a personal injury while in the performance of his duties as a police officer, it would be appropriate for the Board to also find that Mr. Kelley's permanent incapacity is the natural and proximate result of the personal injury he sustained on May 25, 2003.

Should the Board have any further questions regarding this matter, do not hesitate to contact me directly.

Very truly yours,

Michael Sacco

# EXHIBIT P

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. 1:05-cv-10596-NMG

```
------------------------)
THOMAS M. KELLEY,        )
      Plaintiff          )
VS.                      )
                         )
TOWN OF PLYMOUTH, ET AL, )
      Defendant          )
------------------------)
```

DEPOSITION OF MICHAEL E. BOTIERI, a witness

called for examination by counsel for the Plaintiff,

taken pursuant to the applicable provisions of the

Massachusetts Rules of Civil Procedure, before LINDA M.

CORCORAN, a Court Reporter-Notary Public in and for the

Commonwealth of Massachusetts, at the Law Offices of

Joseph R. Gallitano & Associates, 34 Main Street

Extension, Plymouth, Massachusetts, on Wednesday,

June 21, 2006, commencing at 10:21 a.m.

**LINDA M. CORCORAN**
**CERTIFIED COURT REPORTER**
**P. O. Box 4**
**Kingston, Massachusetts   02364**
**(781) 585-8172**

Page 5

1    Q.    How long have you worked for them?

2    A.    Approximately twenty and a half years.

3    Q.    Twenty years ago you joined the force in what

4    capacity?

5    A.    Yes, patrolman.

6    Q.    Prior to working for the Plymouth Police

7    Department as a patrolman, where were you employed?

8    A.    Pilgrim Nuclear Power Station.

9    Q.    In what capacity?

10   A.    Security.

11   Q.    How long did you work at Pilgrim Nuclear Power

12   Plant in security?

13   A.    Approximately four years.

14   Q.    And prior to that time, where were you

15   employed?

16   A.    I was in college by that time.

17   Q.    Where did you go to school?

18   A.    Southeastern Mass. University.

19   Q.    And what degree do you have?

20   A.    From there I have a degree in sociology, and

21   then I had a further degree.

22   Q.    Do you have a degree after that?

23   A.    Master's degree, yes.

24   Q.    In what?

Page 6

1      A.   Criminal justice.

2      Q.   Where did you receive that?

3      A.   Anna Maria College.            ′

4      Q.   And when did you receive it?

5      A.   1988.

6      Q.   Now, during the course of this deposition, if

7    you don't understand a question, will you please tell me

8    that you don't understand it, and I'll try to rephrase it

9    for you.

10     A.   Yes.

11     Q.   Okay?

12     A.   Yes.

13     Q.   Are you on any medication?

14     A.   No, sir.

15     Q.   Have you been sued personally in any lawsuit?

16     A.   Yes.

17     Q.   And have you ever been deposed?

18     A.   Yes.

19     Q.   How many times have you been deposed?

20     A.   Maybe twice.

21     Q.   And when was the last time?

22     A.   Many years ago.

23     Q.   Ten years ago?

24     A.   More.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

Page 10

1    Plymouth Police Department for how long?

2        A.   Almost ten years.

3        Q.   And what is your responsibility as a captain in

4    the Plymouth Police Department?

5        A.   Currently?

6        Q.   Yes.

7        A.   I'm the captain of operations responsible for

8    the uniform division as well as the detective division,

9    prosecution division.

10       Q.   Detective division, the uniform division --

11       A.   Yes, and prosecution.

12       Q.   And the prosecution.

13            Are there other divisions?

14       A.   Yes, sir.

15       Q.   What are the other divisions?

16       A.   Training division, records division, and then

17   there are support staff.

18       Q.   And you currently have no responsibility for

19   the training division, the records division --

20       A.   That's correct.  I have no responsibility at

21   this time.

22       Q.   -- or the support staff?

23       A.   That's correct.

24       Q.   In May of 2003, were you in the -- were your

1      A.    Patrolman.

2      Q.    And the next rank in the chain of command is

3   what?

4      A.    I believe that's it, sir.

5      Q.    How many patrolmen are there in the Town of

6   Plymouth today?

7      A.    I would say low 80s.

8      Q.    And in May of 2003, how many were there?

9      A.    Approximately the same.

10     Q.    You described your responsibility as

11   operations?

12     A.    Yes, sir.

13     Q.    And specifically do you have a title with the

14   word "operations" in it?

15     A.    Yes, sir.

16     Q.    What is that title?

17     A.    Captain of operations.

18     Q.    And in May of 2003, were you involved at all

19   with the training exercise that is the subject of this

20   case, a Columbine-like training exercise?

21     A.    Yes.

22     Q.    You were involved with that?

23     A.    Yes.

24     Q.    Were you involved in any of the discussions

Page 20

1  Q. Are you aware of any protocols or standard

2 operating procedures or rules that are used by the

3 Plymouth Police Department regarding who participates in

4 training programs, those current training programs, the

5 ones that you've testified to, the four-day program?

6  A. I don't understand the question.

7  Q. Do you know of any -- any rules, any

8 regulations regarding the inclusion or exclusion of

9 police officers in training programs in the Town of

10 Plymouth?

11   MR. SILVERFINE:  Objection as to form.

12   You can answer.

13  A. I still don't understand the question.

14  Q. Do you know of any occasion when a patrolman in

15 the Town of Plymouth has been told he cannot for any

16 reason participate in a training program?

17  A. Yes.

18  Q. Can you give me an example?

19  A. The specific Columbine-style training you're

20 speaking of, a couple of officers weren't able to

21 participate.

22  Q. And who were they?

23  A. My memory is John Abbott and Dennis Govoni, and

24 there could have been others.

Page 22

1       Q.   And is he still a sergeant in the police

2  department?

3       A.   No, sir.

4       Q.   When did he retire?

5       A.   He did not retire.

6       Q.   Did he pass away?

7       A.   He did not pass away.

8       Q.   Was he terminated?

9       A.   He was not terminated.

10      Q.   Why is he not with the Plymouth Police

11  Department now?

12      A.   He's not a sergeant.

13      MR. SILVERFINE:  Objection as to form.

14      Q.   I'm sorry.  I wasn't following what you said to

15  me.  You said that he's not now in the police department?

16      A.   No, I didn't.

17      Q.   I'm sorry.  I misunderstood you.  Is John

18  Abbott currently a Plymouth Police Department employee?

19      A.   Yes, sir.

20      Q.   In what capacity?

21      A.   He's a lieutenant.

22      Q.   Thank you.  And Dennis Govoni, is he currently

23  a Plymouth Police Department employee?

24      A.   No, sir.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

Page 23

1    Q.    And when did he leave the department?

2    A.    Within the last couple of years.  I don't know

3    specifically.

4    Q.    Do you know why he left?

5    A.    I believe he retired.

6    Q.    Do you know with respect to John Abbott the

7    circumstances under which he did not participate in the

8    Columbine-like training course and specifically who told

9    him that he was not to participate?

10   A.    Could you repeat the question, sir?

11   Q.    John Abbott didn't participate in the

12   Columbine-like training program?

13   A.    I don't believe he did.

14   Q.    Do you know who told him that he was not to

15   participate?

16   A.    No.

17   Q.    Do you know who in the Town of Plymouth would

18   have been responsible for telling a police officer like

19   John Abbott not to participate in the Columbine-like

20   training program?

21   A.    Could you repeat that again?

22   Q.    As I understand it, you were the captain of

23   operations in 2003, May, right?

24   A.    Yes.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Page 25

1        A.    Either Captain Chandler or the training

2    supervisor at the time, which I believe was Sergeant John

3    Rogers.  I'm not 100 percent on that, but that's my

4    memory at this time.

5        Q.    Do you know if, in fact, Captain Chandler or

6    John Rogers, Sergeant John Rogers, or, for that matter,

7    the chief were -- if they were to tell a police officer

8    not to participate in the Columbine-like training

9    program, that they were following any particular rule,

10   regulation that the Plymouth Police Department has with

11   respect to training programs?

12              MR. SILVERFINE:  Objection as to form.

13              You can answer.

14       A.    I don't understand the question.

15       Q.    Do you know if there is any rule or regulation

16   regarding physical limitations, health issues that would

17   cause Captain Chandler, Sergeant Rogers, or the chief to

18   exclude a person from training in 2003?

19       A.    It's my memory that these officers requested

20   because of medical issues not to participate.

21       Q.    And how do you know that?

22       A.    That's my memory.

23       Q.    Do you recall who told you that they requested

24   that?

Page 26

1          MR. SILVERFINE:  Objection as to form.

2      A.   No.

3      Q.   Do you recall ever having a conversation with

4  John Abbott about his not participating in the May 2003

5  Columbine-like training program?

6      A.   I don't recall it specifically.

7      Q.   Do you recall having a conversation with Dennis

8  Govoni regarding he not participating in the

9  Columbine-like training program?

10     A.   I don't recall a specific conversation

11  regarding that, no.

12     Q.   Are you unaware of any current rules,

13  regulations, standard operating procedures that would

14  require a police officer to not under certain

15  circumstances to participate in current training

16  programs?

17     A.   I don't understand the question.

18     Q.   Are there any rules or regulations in the

19  police department currently that would exclude an officer

20  who was on the force from the training programs because

21  of a health reason?

22     A.   There's the possibility of an officer assigned

23  to light-duty status being omitted from training based on

24  his limitation.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

1          Q.   Do you understand that to be a rule of the

2     police department?

3          A.   It's been in effect since I've been up as

4     captain.

5          Q.   So the rule is -- is it written somewhere,

6     Captain?

7          A.   I don't know that, no.

8          Q.   But would you state the rule fairly stated

9     would be that if you're on reduced or light duty, did you

10    say, you might not be permitted to participate in

11    training programs?

12         A.   It's possible.

13         Q.   Would you say that if you are on -- did you

14    describe it as light duty?

15         A.   Yes.

16         Q.   If you're on light duty, you are not to

17    participate in training programs?

18         A.   No, sir.

19         Q.   You would say that you may not be?

20         A.   Each case is specific to the officer's

21    limitations.

22         Q.   Do you know of any rule or regulation in the

23    Plymouth Police Department that imposes the duty on the

24    training officers or your office or the chief that would

Page 28

1   require you to make sure that every patrolman

2   participating in training is fit and able and physically

3   capable of participating in that training?

4       A.   If an officer is fit and able to perform his

5   duties on a daily basis, he's fit and able to perform any

6   training.

7       Q.   That's your opinion as being --

8       A.   Yes, sir.

9       Q.   -- captain in charge of operations?

10      A.   Yes, sir.

11      Q.   That is different than being physically capable

12  of performing a certain training program; is that

13  correct?

14      A.   I don't understand.

15      Q.   Is there any rule or regulation regarding the

16  obligations of any captain or the chief or training

17  officer to make sure that all police officers

18  participating in training -- currently in training are

19  physically capable of participating in the training?

20      A.   I still don't understand the question.

21      Q.   Do you have any knowledge at all that inside

22  the operations of the Plymouth Police Department there is

23  any consideration given to physical abilities when

24  training programs are set up for police officers?

Page 29

1      A.    As I stated, if an officer is able and fit to

2   perform day-to-day duties, they're able and fit to

3   perform training, and that's a consideration.

4      Q.    But that, in fact, was not the case with John

5   Abbott and Dennis Govoni; is that right?

6      A.    I don't understand.

7      Q.    Well, they were performing as police officers,

8   weren't they, on a daily basis in May of 2003?

9      A.    I don't recall what their status was at that

10  time.

11     Q.    Do you have any reason to believe that they

12  were on reduced duty, either of them, or light duty?

13     A.    It's possible.

14     Q.    Would it be fair to say that if they were

15  performing their duties as police officers in May of

16  2003, that they were fit and able to participate in the

17  Columbine-like training program?

18          MR. SILVERFINE:   Objection as to form.

19     A.    Could you say that again, sir?

20     Q.    Well, if they were actually performing their

21  duties as police officers on a daily basis, their daily

22  schedules in May of 2003, would they have been,

23  therefore, capable of participating in the Columbine-like

24  training program?

Page 30

1       A.    They would be unless they had a health concern

2    that they brought forward.

3       Q.    Do you know of any rule or regulation regarding

4    current training where health considerations are to be

5    reviewed by training officers or the chief with regard to

6    patrolmen participating in annual training?

7       A.    What do you mean by health considerations?

8       Q.    Well, what I meant was exactly what you just

9    said to me, if there was a health consideration, these

10   people may not participate in the Columbine-like training

11   program when we were discussing Govoni and Abbott.  I

12   believe you said to me there may be a health

13   consideration for them in their cases and, therefore,

14   they wouldn't participate.  I want to know whether or not

15   there's any rule or requirement today in current training

16   that imposes an obligation on a captain or the chief or

17   the training officer to consider health considerations in

18   who participates in training.

19      A.    We would only know there's a health

20   consideration if the officer brought it forward.

21      Q.    So then it's fair to say that the way the

22   Plymouth Police Department treats the issue of health

23   considerations is that it's required of the officer to

24   raise the issue to the captain or to the training officer

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Page 31

1  or to the chief today?

2       A.    Could you repeat that, sir?

3       Q.    Do you know if there's any obligation of the

4  chief or the training officer or the captain in charge of

5  training to inquire of the police force as to whether or

6  not there are any men who are not able for health

7  considerations to participate in training?

8       A.    I don't know of any.

9       Q.    And your testimony is today that, as far as you

10 know, having been the captain of operations for -- how

11 many years?

12      A.    Six years.

13      Q.    -- six years in the police department, the only

14 way a health consideration is raised with respect to

15 training is if the police officer raises it to a training

16 officer, a captain, or the chief?

17      A.    There would be no other way of knowing.

18      Q.    Are you aware of any injuries sustained in

19 training programs -- has there been a training program in

20 2006?

21      A.    What kind of training, sir?

22      Q.    Police training.  You mentioned earlier the

23 four-day training program, plus the one-day that deals

24 with CPR.

Page 32

1      A.    Yes, sir.

2      Q.    That's the only training that goes on, right?

3      A.    I wouldn't say it's the only training, but...

4      Q.    Well, I thought that that was the only

5    training.  I'm sorry, Captain.  How many training

6    programs do go on in the course of a calendar year?

7      A.    That's the only yearly training.  There are

8    always officers going to training programs, one day, two

9    days, or things like that.

10     Q.    Let's talk about the yearly training.

11     A.    Yes, sir.

12     Q.    What's involved in the yearly training program?

13     A.    The in-service program addresses several topics

14   I believe with input from the chiefs of police throughout

15   the state.  And it could be domestic violence.  It could

16   be terrorism.  It could be Incident Command Systems.

17   It's always firearms, usually CPR, First Responder, and

18   whatever the hot topic is at the time.

19     Q.    Does this all take place in one day or four

20   days?

21     A.    No, sir, it takes place -- firearms is one day.

22   First Responder and CPR is typically one day.  The other

23   three days are half blocks of each topic usually,

24   sometimes a full day.

Page 33

1      Q.    So there's like six blocks of training?

2      A.    In three days there'd be six blocks, but it

3   could also have one topic encompass an entire day.

4      Q.    Of those, that training, that annual training

5   program, is there any physical exertion in any of that

6   training?

7      A.    There could be.

8      Q.    Where would it be?

9      A.    Firearms and possibly defensive tactics, if

10  that's encompassed in the training for that year.

11     Q.    The training program changes annually?

12     A.    Some of it's consistent.  Some of it does

13  change, yes.  So do you have a training program for 2006

14  somewhere?

15     A.    The Municipal Training Council has.

16     Q.    And this training program is preset by the

17  Municipal Training Council as far as you know?

18     A.    I believe it's preset for the year, and I

19  believe it's with the input of the chiefs of police as to

20  what topics they would like to see, and there's a

21  decision made at the state level.

22     Q.    Is this a training module that is the same for

23  Plymouth, if you know, as it would be for Barnstable?

24     A.    I don't know.

1      Q.   So this training that goes on might be

2   different for Plymouth than it is for an abutting town?

3      A.   It would be the same for all of the departments

4   participating at the academy that we enroll our officers

5   in, which could encompass several towns.

6      Q.   This particular training program, has it

7   occurred in 2006 already?

8           MR. SILVERFINE:  Objection as to form.

9           You can answer.

10     A.   Yes.  I'm not sure if it's complete or not, but

11  I believe it might be just ending now.

12     Q.   And do you know if anybody's been injured

13  during the course of this program?

14     A.   I don't know.

15     Q.   Do you know if anyone was injured in 2005's

16  annual training?

17     A.   I don't know.

18     Q.   Or 2004?

19     A.   I have no memory of any injuries.

20     Q.   Is it possible that someone was and you

21  wouldn't be aware of it?

22     A.   It's possible.

23     Q.   Now, you say there are other training programs

24  that people are going to?

Page 37

1   document prior to the training?

2       A.   I don't recall.

3       Q.   Do you know if police officers in the Town of

4   Plymouth sign documents prior to training programs in

5   general or those who participate in the annual training,

6   the yearly training, that you've described?

7       A.   I don't understand the question as far as

8   signing documents.

9       Q.   I understand that there were certain waivers or

10  disclaimers that were required of officers prior to the

11  2003 training program.  Are you aware that there are

12  waivers?

13      A.   It's possible.  I don't remember.

14      Q.   Have you ever seen one of these documents?

15      A.   Excuse me?

16      Q.   Have you ever seen a document like that?

17      A.   I don't recall.

18      Q.   Have you participated in training programs?

19      A.   Yes, sir.

20      Q.   Have you ever signed a waiver of responsibility

21  or disclaimer for physical injuries occurring while you

22  were in training?  Have you ever signed a document like

23  that?

24      A.   I don't recall.

Page 38

1    Q.   You know of no policy requiring by the Plymouth

2    Police Department that people sign these documents prior

3    to training programs?

4    A.   Specific training or all training?

5    Q.   All training.

6    A.   I have no memory of that, no.

7    Q.   Do you know if they have documentation that

8    people must sign prior to specific training programs?

9    A.   There are documents you sign in some programs.

10    Q.   Are these the programs that have physical

11    exertion involved in them?

12    A.   I don't know.

13    Q.   What kind of programs do you recall require

14    that people sign documents prior to participating in the

15    programs?

16    A.   I believe there's a document that the officers

17    sign for in-service.  I don't have any specific memory to

18    it, though.

19    Q.   You don't have any such documents in your

20    possession?

21    A.   No, sir.

22    Q.   Do you know if the Massachusetts State Police

23    has a requirement that certain documents be signed by

24    police officers they are training in various departments

Page 39

1    that the police, the Massachusetts State Police, require

2    that documents be signed?

3        A.    It's possible.  I have no memory of it at this

4    time.

5        Q.    And you have never signed a document for

6    Massachusetts State Police training?

7        A.    I might have.

8        Q.    You might have?

9        A.    I might have.

10       Q.    And you would not have a copy of any of those

11   documents?

12       A.    I do not.

13       Q.    Do you know if the Municipal Training Institute

14   -- is that what you called it?  The Municipal Training?

15       A.    I believe it's called the Municipal Training

16   Council at this time.

17       Q.    This is a state organization that conducts

18   training programs for police departments?

19       A.    Yes, sir.

20       Q.    Do you know if that council has any documents

21   that it requires being signed by participants prior to

22   participating in training?

23       A.    I believe there is a document.  I just don't

24   have a memory of the form of it.

Page 47

1           A.    Approximately 121,000.

2           Q.    And that's your total compensation?

3           A.    From the town, yes.

4           Q.    Do you know how much of that is Quinn Bill

5      payments?

6           A.    Thirty percent of my base salary.

7           Q.    What is your base salary?

8           A.    Approximately 81,000.

9           Q.    Do you receive 30 percent of your overtime as

10     part of your Quinn payment currently?

11          A.    I don't understand the form of that question.

12          Q.    Does the Quinn payment cover -- you said it

13     covered 30 percent of your base.  Does it also pay out 30

14     percent of your overtime?

15          A.    Is it calculated into overtime?  Is that the

16     question?

17          Q.    Yes.

18          A.    I believe it is.

19          Q.    And is it calculated into holiday time?

20          A.    I believe it is.

21          Q.    Are you aware of the town meeting's actions in

22     passing a bylaw that permitted the payment of Quinn Bill

23     payouts to the captains and to the chief?

24                MR. SILVERFINE:  Objection.

Page 54

1    the meetings?

2        A.    Eventually.

3        Q.    And the process, as you understand it, that led

4    to that decision was lengthy?  You said eventually?

5        A.    I wouldn't say lengthy.

6        Q.    Well, when did it begin and when did it end, if

7    you recall?

8        A.    I don't recall.

9        Q.    But you think it involved a number of

10   discussions?

11       A.    I believe in 1996 John Abbott was treated the

12   same way that Tom Kelley was treated as far as on-duty

13   attendance of his PERAC meetings.

14       Q.    And what way would that be when you said the

15   same as Tom Kelley was treated?

16       A.    He'd have to let us know if he was going to

17   meetings.  I don't recall if he actually went or didn't

18   go.  I don't recall how that worked out at that time.

19       Q.    But it's your understanding that he eventually

20   did go to these meetings in Boston?

21       A.    Yes.

22       Q.    In the middle of his schedule?

23       A.    I don't recall if it was the middle of his

24   schedule, but I believe he went to the meetings

Page 55

1    eventually.

2        Q.    While at the time he was scheduled actually to

3    be a uniformed police officer in the Town of Plymouth, he

4    was in Boston attending these meetings?

5        A.    It's possible.

6        Q.    Well, it wouldn't really involve your

7    considerations or the chief's, would it?  You're the

8    chief of operations.  You're the captain.  If he was

9    doing this at night on his own time, right, then you

10   wouldn't be talking about it at all, would you?

11       A.    I'm not talking about it.  You're asking me

12   about it.

13       Q.    I know, but I mean, you're telling me that

14   you're conversing with the chief in some conversations

15   about whether or not John Abbott can attend these

16   meetings in Boston.

17       A.    Right.

18       Q.    These meetings in Boston that you're talking

19   about are meetings that are being conducted in Boston

20   when Abbott is scheduled to be in uniform in the Town of

21   Plymouth on duty; is that right?

22       A.    Those were the discussions.  I just don't have

23   any specific memory as to when he went, if he actually

24   did ever go, on duty.  I don't have any specific memories

Page 56

1    to what actually happened at the time, but I know

2    eventually he was allowed to go.

3        Q.    And when was that that he was allowed to go?

4        A.    I don't recall.  It was after 1996.

5        Q.    But in 1996 he was treated the same as Tom

6    Kelley, you said?

7        A.    Yes.

8        Q.    So that he had to tell you when he was going to

9    these meetings in 1996?

10        A.    Yes.

11        Q.    So he was going to meetings in 1996?

12        A.    I don't have any memory of him going, though.

13    That's my dilemma.  So I'm just telling you what I

14    remember.  I do remember that that was the setup, but I

15    don't remember -- with Tom Kelley I remember tons of

16    times he went.  I don't have any specific knowledge of

17    when, if it actually ever happened, so I can't really

18    say, but the discussions were, does he have the ability

19    to go to a PERAC meeting while he's on duty.

20        Q.    In 1996 do you understand that you told him

21    that he has to check in with you before he goes to these

22    meetings or because -- are you telling me that that's

23    essentially what Tom Kelley had been required to do?

24        A.    That's my memory.  I just don't recall it

Page 59

1    Abbott?  I know you -- I think you answered this, but do

2    you know of any other circumstances?

3         A.    What kind of meetings?    '

4         Q.    Any meetings unrelated to police work but they

5    are police officers attending meetings of other

6    organizations.

7         A.    Not that I can think of, no.

8         Q.    Police officers go and give safety talks to the

9    Kiwanis?  To the Rotary?  Police officers do go to

10   meetings other than police training meetings?

11        A.    That would be police related if they went to a

12   Kiwanis to speak on police.  I thought you meant other

13   than police-related issues.

14        Q.    Right.  Nobody else?

15        A.    Not that I can think of right now.

16        Q.    You were aware, Captain, that there were other

17   town employees on the retirement board, right?

18        A.    At this time?

19        Q.    When Kelley was on the board and you were

20   discussing whether or not he should have time off and

21   whether or not the town should be -- police department

22   should be reimbursed at that time, you were aware that

23   there were other town employees on the Plymouth

24   Retirement Board; is that true?

# EXHIBIT P 1

(Continued Excerpts from Deposition
of Michael E. Botieri)

Page 60

1      A.    I can think of one other.

2      Q.    Who was that?

3      A.    Dick Manfredi.

4      Q.    And he was a building commissioner?

5      A.    Yes.

6      Q.    Did you inquire at any time with the

7  inspectional services or whoever is in charge of the

8  office of the building commissioner as to what they were

9  requiring of him with respect to reimbursement?

10     A.    It wouldn't be my place to do such a thing.

11     Q.    And the chief never asked you to do that?

12     A.    No.

13     Q.    You have no knowledge of the chief ever talking

14 to somebody in the town as to how they were treating the

15 building commissioner's absence of his duties?

16     A.    I don't recall that conversation.

17     Q.    Do you know of any other town employee who's on

18 the retirement board?

19     A.    Not that I can think of right now.

20     Q.    The town treasurer is on the town retirement

21 board; is that true?

22     A.    At the time I believe the finance director was

23 on.  You're right.

24     Q.    Did you get into any conversation with the

Page 61

1    chief about talking to people in the town about how the

2    finance director's pay was to be reimbursed?

3        A.    Not that I recall.

4        Q.    The chief never told you to do that?

5        A.    It wouldn't be my place to do that, no.

6        Q.    The chief never asked you with respect to how

7    they were controlling the finance director's attendance

8    to -- at those meetings as opposed to his finance

9    director's duties, that he'd have to check in with

10   somebody before he left to go to retirement board

11   meetings?

12       A.    I have no knowledge of that.

13       Q.    Did you make the decision that Officer Kelley

14   was to report to you prior to going to these meetings, or

15   did the chief make that decision?

16       A.    The chief.

17       Q.    Did you make the decision that Officer Kelley's

18   pay should be reimbursed to the police department for the

19   time he spent at retirement board meetings, or did the

20   chief make that decision?

21       A.    I didn't make it.  I don't know who made it.

22       Q.    Do you know if John Abbott was prohibited from

23   attending PERAC meetings when he first made a request to

24   attend PERAC meetings?

1    of his duties and things like that.

2        Q.    What about the Quinn Bill?  You said maybe not

3    to do with the Quinn Bill.  Well, maybe, maybe not, or

4    what?

5            MR. SILVERFINE:  Objection as to the form.  I

6        don't know if that's a question.

7        A.    What's the question, sir?

8        Q.    The question is whether or not it was because

9    of the Quinn Bill.

10       A.    That might have been a part of it, but there

11   were several other reasons as well.

12       Q.    You said it might have been a part of it?

13       A.    That's correct.

14       Q.    He's complaining about the money you make and

15   the chief makes.

16       A.    I never --

17           MR. SILVERFINE:  There's no question.

18       Q.    And you're saying it may be a part of it?

19       A.    My interpretation was that Officer Kelley

20   always told me he supported the payments to both the

21   chief and the captains.  He never had a problem with

22   them.  His only problem was with the fact that the town

23   didn't do their job and document it properly.  That's the

24   conversation I've always had with Kelley about it.  It

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Page 80

1   was never "I don't think you guys deserve it."  So I

2   didn't have a big problem with it.

3          Q.   I'm not asking about your problem, Captain.

4   I'm asking about conversations with the chief.

5          A.   I don't recall those conversations.

6          Q.   You didn't have any conversations with the

7   chief?

8          A.   Oh, we spoke about it.  And, like I say, I

9   don't think that either of us were happy about the whole

10  situation.

11         Q.   Do you recall what the chief said to you about

12  Kelley?

13             MR. SILVERFINE:  Objection.  When are you

14         talking?

15             MR. ARMSTRONG:  I'm sorry?

16             MR. SILVERFINE:  When?

17             MR. ARMSTRONG:  In these conversations.

18         A.   Not specifically, no.

19         Q.   Who's Kevin Fahy, please?

20         A.   He's a retired lieutenant.

21         Q.   Have you seen his affidavit signed on the 23rd

22  of June 2004?

23         A.   I'd have to take a look at it, sir, to tell

24  you.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

1      A.    That Tom wasn't turning his computer on or his

2    radio on or responding to calls properly or walking when

3    he was told to or not taking a cruiser when he was told

4    to, a myriad of issues.

5      Q.    And these were issues that occurred only with

6    Tom Kelley and not with other police officers?

7            MR. SILVERFINE:   Objection as to form.

8            You can answer.

9      A.    No.

10     Q.    It occurred with other police officers as well?

11     A.    Some of the issues.

12     Q.    And on these issues that you have just

13   described, did you issue warning notices to Kelley?

14     A.    He was spoken to.

15     Q.    Who spoke to him?

16     A.    I've spoken to him, Lieutenant Budge had spoken

17   to him, Lieutenant Fahy had spoken to him, and possibly

18   other supervisors.

19     Q.    Is it fair to say that you continually managed

20   the work of police officers and cruisers and that you're

21   talking to police officers all the time about events like

22   you've just described?

23     A.    Sure.

24     Q.    What conversations did you have with Kevin Fahy

Page 87

1    Q.   Kevin Fahy says in his affidavit you monitored
2    Kelley.  You were not monitoring Kelley on this radio
3    issue or the computer; is that right?
4    A.   We monitor all officers.
5    Q.   There was an occasion when Officer Kelley
6    filled out a warning for a motor vehicle violation and he
7    didn't have it dated.  Do you remember that?
8    A.   I remember one such incident.  There could have
9    -- I believe there were many.  I don't know which one
10   you're talking about.
11   Q.   Well, there was one when -- I think that you
12   might have issued him a reprimand because he didn't put
13   the date on the warning.
14   A.   It's possible.  It's possible.
15   Q.   And do you recall that particular incident when
16   you issued him a reprimand?
17   A.   I recall the citation.
18   Q.   What are the circumstances surrounding that
19   citation?  Explain it to me.
20   A.   It was sloppy work.  It was awful.  It didn't
21   have specific, I believe, location, dates.  It was an
22   awful piece of work.  That can't be tolerated by any
23   officer.
24   Q.   And this is on a warning citation?

1    A.    I don't recall if it was a warning or not.    It

2    wouldn't matter to me.    It's a citation.

3    Q.    And do you review citations on a continuing

4    basis in your duties as a captain?

5    A.    Not necessarily.

6    Q.    How would it be that on a particular occasion

7    you'd be looking at Kelley's citations?

8    A.    I don't recall.    It could have been brought to

9    my attention by a superior officer.

10    Q.    But you don't recall the circumstances?

11    A.    Not right now.

12    Q.    Do you often talk to police officers about how

13    they're making out the citations?

14    A.    I don't understand the question.

15    Q.    Well, there are superior officers.    There are

16    officers between you and the patrolmen, right?

17    A.    That's correct.

18    Q.    There's a lieutenant?    There's a sergeant?

19    A.    That's correct.

20    Q.    Is there somebody in charge of the department

21    in addition to them?    A desk sergeant?    Or is the command

22    structure such on an operating day that you are the

23    captain, then there is a lieutenant, and then there is a

24    sergeant, and then there's patrolmen, right?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Page 89

1          A.    Correct.

2          Q.    So the lieutenant and the sergeant stand in the

3     command structure between you and the patrolmen?

4          A.    Correct.

5          Q.    Is there a shift supervisor?

6          A.    Shift commander.

7          Q.    Is that in addition to the lieutenant and the

8     sergeant?

9          A.    No, sir.

10         Q.    And who is the shift commander?  The

11    lieutenant?

12         A.    Typically.

13         Q.    But it could on some occasions be the sergeant?

14         A.    That's true.

15         Q.    Now, is it the shift commander's obligation to

16    look over the warning slips?

17         A.    It's all supervisors' responsibilities to check

18    the work.

19         Q.    The sergeant's obligation to look over the

20    warning slips?

21         A.    It could be.

22         Q.    And the chief -- the captain in charge of

23    operations responsibility to look over warning slips?

24         A.    Not necessarily.

Page 90

Q.    How many police officers have you talked to in
the last seven shifts that you've worked about making out
motor vehicle citations inappropriately?

A.    The last seven shifts?

Q.    Yeah, the last seven shifts.

A.    I don't recall any issues being raised.

Q.    Would it be fair to say that you don't often
talk to police officers about how they make out their
citations, right?

A.    I don't believe that's true.

Q.    There was an occasion when you sent, is it
true, a car into Cedarville -- you sent an automobile, a
Plymouth police car, into Cedarville to check on Officer
Kelley's whereabouts on one occasion?  Do you remember
that circumstance?

A.    I remember one circumstance where we received a
call that his cruiser was parked at the fire station, so
we sent the patrol supervisor to check on it.

Q.    And do you remember the circumstances -- this
is, once again, there is a shift commander and a sergeant
on duty, and you get involved in the decision to send a
police car to check on a police cruiser at a firehouse?

A.    I believe the call came to the chief.  That's
my memory, that there was a cruiser parked at the

Page 91

1    firehouse for an extended period of time.  That's my

2    memory.

3        Q.    And would it be fair to say that people in the

4    police department know whether or not it's Kelley's

5    cruiser?

6        A.    I don't understand.

7        Q.    Do you understand -- when you first heard of

8    the incident of the police car at the firehouse, am I to

9    understand that the chief of police brought this to your

10   attention?

11       A.    That's my memory on that specific incident.

12       Q.    Do you recall if the chief of police said

13   Kelley's cruiser is at the firehouse?

14       A.    He would have no way of knowing that.

15       Q.    He wouldn't know that?

16       A.    He would know there was a cruiser.  He might

17   know the number.  I don't remember him ever saying it's

18   Officer Kelley's.

19       Q.    So he did not say to you, "Kelley's cruiser is

20   at the firehouse"?

21       A.    No.  No, he did not say that.  No.

22       Q.    And so what did you do, if you can recall, as

23   captain in charge of operations?  Did you call the shift

24   commander and say, "Send a car down to the firehouse"?

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Page 92

1        A.    That's correct.

2        Q.    With what instruction?

3        A.    To see who's there.

4        Q.    And you did this not knowing it was Kelley?

5        A.    No.

6        Q.    Returning for a moment to the 4th of July in

7    2001, the town had the collective bargaining agreement

8    that calls for mandatory overtime.  Then the town also

9    has a policy of hiring police officers from other

10    departments; is that true?

11        A.    No.

12        Q.    You don't hire a police officer from the

13    Plymouth house of correction at any time?

14        A.    Deputy sheriffs.  They're not police officers.

15        Q.    All right.  Then you don't hire -- sorry.  The

16    question was, you don't hire anybody from the house of

17    correction?

18        A.    We do.

19        Q.    You do.  And they are deputy sheriffs?

20        A.    Yes, sir.

21        Q.    Why do you hire them?

22        A.    Augment our force and assist us with traffic.

23        Q.    And do you do that during holidays?

24        A.    Which holidays?

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Page 93

1      Q.   Any holidays.

2      A.   If they were needed.

3      Q.   Fourth of July 2001, would they have been

4   needed, do you know?

5      A.   I believe they were, yes.

6      Q.   Did you hire some?

7      A.   Yes.

8      Q.   How many did you hire that day?

9      A.   I don't recall exactly.

10      Q.   Do you have a record of this?

11      A.   It's possible.

12      Q.   What about state police, do you hire the state

13   police?

14      A.   We had in years past.

15      Q.   In 2001 you didn't hire any?

16      A.   I don't recall.

17      Q.   Did you hire any for 2006?

18      A.   No.   State police, is that the question, sir?

19      Q.   Yeah.

20      A.   No.

21      Q.   And you don't know if you hired any in '05 or

22   '04?  The state police?

23      A.   I can answer no to '05 and no to '04.  I can't

24   go back.  There was a year we stopped, and I don't know

1    exactly.  But the last few years, no.

2        Q    If I understand it correctly, Kelley was in the

3    middle of his vacation at the time when the mandatory

4    overtime assignment came up for the 4th of July; is that

5    right?

6        A.    What do you mean when it came up?

7        Q.    In the 2001 assignment of overtime on July 4th,

8    he was in the middle of his vacation, right?

9        A.    He was on vacation.  I'm not sure if it was the

10   middle, the end, the beginning, but he was on vacation.

11       Q.    Mandatory overtime on the collective bargaining

12   agreement, does it give you the right to assign people to

13   mandatory overtime in the middle of -- when they're on

14   vacation?

15       A.    Are you talking about currently or back in

16   2001?

17       Q.    2001.

18       A.    I believe we could order them on their day off

19   back then.

20       Q.    I'm talking about when they were on vacation.

21       A.    I believe on their day off during their

22   vacation we could order them back then.

23       Q.    So you're saying that during their vacation you

24   could?

Page 95

1        A.    On their day off.

2        Q.    So just to make it clear because I'm not sure

3    any reader of the record would understand what you just

4    said, when I tell you vacation and you say day off, you

5    mean a particular day in the week that would have

6    normally been their day off?

7        A.    Yes, sir.

8        Q.    All right.  Not on their vacation?

9        A.    Not on the specific vacation day.

10       Q.    Day.  But on the day off in their schedule?

11       A.    That was part of the conflict, but yes.

12       Q.    And so was it your position at the time that

13   Kelley was on his day off on the 4th of July when you

14   were calling him back?

15       A.    I don't recall what the circumstances were

16   specifically with Tom.

17       Q.    You were involved in that -- before you were

18   involved in that schedule --

19            MR. ARMSTRONG:  Don't answer that question.

20       Q.    When was the last time you ordered a police

21   officer to work on his day off while he was on vacation?

22       A.    Specifically me or --

23       Q.    Yeah, you.

24       A.    -- create a list?  Have it done?

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Page 96

1      Q.    You.

2      A.    Me specifically?  A long time.  I don't recall.

3      Q.    When was the last time you created the list?

4      A.    For what?

5      Q.    In which you had a list of names for mandatory

6   overtime and on that list was a police officer on

7   vacation and you were going to assign him to work on his

8   day off.  When was the last time you created a list like

9   that?

10     A.    Two weeks ago.

11     Q.    What was that officer's name?

12     A.    Well, he specifically -- he wasn't on vacation

13  because it hadn't been granted yet, but he had requested

14  a week's vacation, and he was ordered on his day off.

15  But it hadn't been granted, so I guess that's not

16  specific to your question.

17     Q.    No.

18     A.    Your question is on vacation.

19     Q.    On vacation.  Would you call someone back on

20  his day off while he's on vacation?

21     A.    We wouldn't -- it's a new rule now.  It's done

22  differently than '01, so I'm a little confused as to what

23  you want me to respond to.

24     Q.    Currently the rule is that you do not call

Page 101

1          A.    I don't believe so.

2          Q.    And who was the officer who was operating the

3     cruiser?

4          A.    I believe it was the car that was assigned to

5     Officer Kelley.

6          Q.    Do you recall when that occurred?

7          A.    No, sir.

8          Q.    You spoke about the warnings and the police car

9     being down by the firehouse and the radio not being on,

10    the computer not being on.  There is under the collective

11    bargaining agreement a disciplinary process?

12         A.    Yes, sir.

13         Q.    Did you take any action under that disciplinary

14    process with respect to Officer Kelley on the issue of

15    the computer or radio?

16         A.    I believe he was given verbal warnings along

17    the way.

18         Q.    Verbal warnings.  And that would have to do

19    with the radio and the computer.  What about the

20    warnings, the motor vehicle citations not being made out

21    correctly, do you believe that he was verbally warned

22    over that too?

23         A.    I don't recall the specific action taken on

24    each of the incidents.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Page 102

1      Q.    There was also an incident where he was called

2    I believe into your office to discuss the issue of

3    responding to another officer's call, and there was a

4    conversation I believe you were present for with regard

5    to the fact that when he called in and he said he was

6    responding in some supportive action to that officer, he

7    had not given his location.

8          Do you recall that conversation?

9      A.    Somewhat.

10     Q.    Do you know when it occurred?

11     A.    No.

12     Q.    Did you attend a meeting with Officer Kelley

13   and Officer Rooney in your office about the issue of

14   overtime?

15     A.    I'd need more information to refresh my memory

16   on that.

17     Q.    You received doctors' notes from Officer Kelley

18   with regard to his medical condition with Lyme disease

19   and his medical condition of Meniere's disease?  Yes?

20     A.    I'm not sure I specifically received them.  I

21   knew they existed.  I don't remember specifically being

22   given them, no.

23     Q.    Did you ever make any inquiry with regard to

24   his health conditions regarding training, his eligibility

Page 108

1          Go ahead.

2          A.    The letter talks about the fact that they

3     didn't -- could not corroborate the complaint.  However,

4     they never spoke to anyone that I identified, including

5     myself.  They only had a meeting through executive

6     session with Mr. Kelley there.  He was the only one

7     heard.  There was a witness mentioned, and I did read the

8     statement the witness gave, and it's not even accurate as

9     far as whether there was or wasn't an assault.  So they

10    referred to the witness and misquoted him in the letter,

11    and through intimidation, as Mr. Kelley works most of his

12    business, he was able to get the retirement board to not

13    even investigate or ask one question.

14         Q.    Did they say anything in the letter back to you

15    in which they said that they wished that you would take

16    your personal problems with Mr. Kelley out of the

17    retirement board agendas and not be complaining to them

18    about issues that reflected your personal problems with

19    Kelley?

20         A.    I don't recall that being in the letter.

21              MR. ARMSTRONG:  Let's go off the record for

22         just a second.

23              (Pause off the record.)

24              MR. ARMSTRONG:  You can mark that as 3.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Page 109

```
 1                              (Whereupon, a letter dated

 2                              July 28, 2004, was marked

 3                              as Exhibit No. 3 for the

 4                              plaintiff.)

 5            THE WITNESS:  May I write on this?  Is this my

 6       copy?

 7            MR. SILVERFINE:  If that's not an exhibit, you

 8       can write on it.

 9  BY MR. ARMSTRONG

10       Q.   Have you had a chance to read that letter?

11       A.   Yes.

12       Q.   Have you seen it before?

13       A.   Yes.

14       Q.   Did you discuss that letter with the chief?

15       A.   I don't recall the conversation, but I'm sure I

16  did.

17       Q.   And did you respond to that letter?

18       A.   In what way?

19       Q.   In any way.  Did you write a letter to Joseph

20  Connarton, the executive director of the Public Employee

21  Retirement Administrative Commission, or to any of the

22  members of the retirement board, Murphy, Duhamel,

23  Manfredi?  Did you ever say anything to them?

24       A.   I spoke with Mr. Connarton on several occasions
```

Page 110

1    regarding this.  I don't recall speaking with the

2    individual board members of the Plymouth Retirement

3    Board.

4         Q.    And did you speak to Connarton after this

5    letter?

6         A.    I don't recall.  Probably before and after.

7         Q.    I was saying to you earlier that there was in

8    the letter -- in this letter from the retirement board,

9    as I understand it, to Connarton -- it wasn't a letter to

10   you, but you were cc'd in it -- that this is a reflection

11   of your personal animosity towards Kelley.

12        A.    What's the question?

13        Q.    That your accusations against him that had led

14   to this document being created was as a result of your

15   personal animosity against Kelley.

16        A.    Absolutely not.

17             MR. SILVERFINE:  Is that a question, or is that

18        a statement?

19             MR. ARMSTRONG:  It was a question.

20        A.    The letter is fact.  It's not anything to do

21   with any personal feelings.

22        Q.    Did you have any discussions with the chief

23   about whether or not the incident that occurred at the

24   training, Columbine-like training, was an incident that

Page 112

1     A.   No.

2     Q.   Do you know anything about the treatment that

3   was provided to him at Jordan Hospital that day?

4     A.   No.

5     Q.   Did you make any inquiries about that level of

6   treatment while he was being treated there?

7     A.   Did I?

8     Q.   Yeah.

9     A.   I don't recall doing that.

10    Q.   Did you respond in any way to the fact that

11   Officer Kelley had been removed from the training site?

12    A.   I don't understand the question.

13    Q.   Well, when -- I gather you can't tell me when

14   you found out that something was wrong with Officer

15   Kelley during the training physically.  You can't tell me

16   when you found that out or if you found that out?

17    A.   I believe it was that day.  I just don't have a

18   specific memory as to who -- whether someone came to tell

19   me or I just heard it.

20    Q.   And did you just continue on with your duties,

21   or did you do something in response to that information,

22   or don't you recall at all?

23    A.   It wouldn't have been my place.  Captain

24   Chandler was dealing with it.

Page 113

1      Q.   Do you recall the fact that Chandler went in

2   the ambulance with Kelley?

3      A.   I don't recall that.

4      Q.   Do you recall the fact that you went to Jordan

5   Hospital?

6      A.   I might have.

7      Q.   You don't recall going there?

8      A.   I don't but I might have.

9      Q.   So therefore, you would not recall talking to

10  anyone at Jordan Hospital about why Kelley was in the

11  hospital?

12     A.   I don't.  No, I don't.

13     Q.   The doctors' notes with respect to Lyme disease

14  and Meniere's disease, did you find them to be -- did you

15  talk to the chief about those notes and whether or not

16  they formulated a basis for concern with respect to his

17  health condition?

18          MR. SILVERFINE:  Objection as to form.

19          You can answer.

20     A.   Could you rephrase that?

21     Q.   Well, do you think that the doctors' notes

22  indicate that he has a health condition that should have

23  prevented him from training in the Columbine-like

24  training program?  Do you have any opinion as a captain

1    in charge of operations as to whether or not a patrolman

2    under your command should be in training when you have

3    possession of notes that he suffers from these two

4    diseases?

5         MR. SILVERFINE:  Objection as to form.

6         A.    I still don't understand the question.

7         Q.    Has there ever been a time that you worked as

8    captain when you have received information about a police

9    officer that's caused you concern as a captain as to

10   whether or not this police officer should be performing

11   certain duties as a police officer?

12        A.    Sure.

13        Q.    When you received the information with respect

14   to the Lyme disease, did you get concerned that Kelley

15   may not be capable of performing his duties as a police

16   officer?

17        MR. SILVERFINE:  Objection as to form.

18        A.    I don't recall receiving any documentation.  I

19   remember seeing it.  I don't know if it was issued, given

20   to me, or I just passed it on to the chief or the

21   business manager or what.

22        Q.    So you don't recall having been approached by

23   Kelley and Kelley giving you these documents, documents

24   regarding Lyme disease and documents regarding Meniere's

Page 115

1    disease?

2        A.    It's possible he gave me some documents, but I

3    would have passed them on to the chief.  That would be my

4    role.

5        Q.    You wouldn't have any specific responsibility

6    to determine whether or not this was, in fact, a medical

7    condition that would require that he not complete certain

8    training?

9        A.    Would I make that determination?

10       Q.    Yeah.

11       A.    I wouldn't make that determination.  The chief

12   would make that determination.

13       Q.    Captain Chandler wouldn't?  The training

14   officer wouldn't?  This would be the chief's

15   responsibility to decide whether or not this information

16   would raise a question about whether or not this officer

17   should be enrolled in training exercises?

18       A.    It would be my role to pass on the information

19   to the chief.  It would be the captain's -- Captain

20   Chandler's role as well.

21       Q.    Do you make any determination as to whether or

22   not an officer may have been injured on duty?

23       A.    Not typically, no.

24       Q.    Did you discuss with the chief of police

1    for?

2         A.    Specifically whether he should or shouldn't be

3    paid it?

4         Q.    Yeah.

5         A.    It's not my decision, no.  We discussed the

6    fact of the injury on duty but not whether he should or

7    should not get paid.  That's above me.

8         Q.    That's the chief of police's decision whether

9    or not he's going to be paid?

10        A.    Absolutely, yeah.

11        Q.    Did you ever recommend he not be paid?

12        A.    No.

13        Q.    Did you ever recommend that he does get paid?

14        A.    No.

15        Q.    What was the nature of the discussion with the

16   chief about whether Kelley should be paid?

17        A.    My recollection is the fact that Officer Kelley

18   hadn't provided enough medical documentation to properly

19   document the injury on duty.

20        Q.    Was that your decision or the chief's decision?

21        A.    The chief's.

22        Q.    Were you happy with that decision?

23        A.    It makes sense to me.  It makes perfect sense.

24        Q.    Can you recall another circumstance where an

Page 118

1    officer was denied monies because he didn't provide

2    enough information about an injury on duty?

3        A.    Sure.

4        Q.    Could you tell me who that might be?

5        A.    There's been several.  I recall an instance

6    with, I believe, Sergeant Gomes where he didn't document

7    properly an injury that happened on duty.  There might

8    have been a situation with Lieutenant Fahy, and I'm sure

9    there are others where the injury-on-duty status was not

10   authorized.

11          MR. SILVERFINE:  Counsel, can I interrupt for

12       one second off the record.

13          (Discussion off the record.)

14   BY MR. ARMSTRONG

15       Q.    Do you recall in Sergeant Gomes' case or Fahy's

16   or any of the other cases -- I'm not sure if you're

17   recalling them -- in those circumstances, the police

18   officers were claiming benefits for an injury on duty

19   that could have occurred during training?

20       A.    Is the question those two circumstances were

21   they involved training?  Is that the question?

22       Q.    No.  Any of the circumstances where officers

23   were denied benefits, did they involve officers raising

24   issues of being injured on duty during training

Page 119

1    exercises?

2        A.    Not that I can recall right now.

3        Q.    Just to be clear, you did not recall being at

4    the Jordan Hospital that day?

5        A.    As we sit here, I do not.  It's very possible I

6    went up there that day.  That would be me.

7            MR. ARMSTRONG:  Fine.  That's all the questions

8        I have.

9            (Whereupon, at 1:02 p.m. the taking of the

10   deposition was concluded.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

EXHIBIT Q

1

Volume I
Pages 1-159

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. NO. 05 10596 NMG

THOMAS KELLEY,                     :
              Plaintiff,           :
                                   :
vs.                                :
                                   :
TOWN OF PLYMOUTH, et al,           :
              Defendant.           :

        DEPOSITION of THOMAS KELLEY, taken on behalf of
the Defendants, pursuant to the applicable provisions
of the Massachusetts Rules of Civil Procedure, before
Barbara M. Montijo, a Registered Professional
Reporter and Notary Public within and for the
Commonwealth of Massachusetts, at the offices of
Brody, Hardoon, Perkins & Kesten, One Exeter Plaza,
Boston, Massachusetts, on February 9, 2006,
commencing at 11:00 a.m.

COPY

DUNN & GOUDREAU
COURT REPORTING SERVICE, INC.
One State Street
Boston, MA  02109
(617) 742-6900

59

```
 1        that's what he sent me, this letter, and that's what

 2        it was.

 3   Q.   And you'll agree with me, back in June 2003,

 4        Exhibit 4, he had before him Exhibit 3 and Exhibit 4

 5        in this deposition, those are the two documents that

 6        were submitted to him, correct, by you at that

 7        point?

 8   A.   Correct.  He also had my injury reports, Captain

 9        Chandler's report, several officers' reports.

10        Officer Chandler -- Captain Chandler went to the

11        hospital when I was at the hospital.  When I woke up,

12        he was there.  He had all the verification he needed

13        that something must have happened.

14   Q.   I understand.  I'm just asking you -- what I'm

15        asking you in terms of your medicals is that's what

16        he had at that point?

17   A.   Yes.

18   Q.   In paragraph 21 you said, "The year before this

19        drill, in your capacity as a Town meeting member,"

20        how long had you been a Town meeting member?

21   A.   I believe since 1992.

22   Q.   What does a Town meeting member do in the Town of

23        Plymouth?

24   A.   The Town of Plymouth has elected Town meeting members
```

60

1       from each precinct.  It's a Town meeting form of

2       government.  We're elected from each precinct.

3       There's eight members from each precinct and we're

4       the legislative body of the Town.  We raise and

5       appropriate funds.  We adopt statutes and pass

6       bylaws, that type of thing.

7  Q.   And you also wrote you were a member of the Plymouth

8       Retirement Board.  How long had you been a member of

9       the Plymouth Retirement Board?

10  A.   Since 1996.

11  Q.   Is that an appointed or elected position?

12  A.   By statute that's an elected position.  I represent

13       the employees of the Town.

14  Q.   And the employees -- all the employees?

15  A.   All the employees.

16  Q.   Are there any other Town employees who also serve on

17       the Retirement Board?

18  A.   Yes, there is.

19  Q.   Who is that?

20  A.   By statute you would have the treasurer, or his

21       designee.  You would have an independent pick by the

22       Board.  You would have another re-elected member.

23       You would also have a Selectmen's -- the Board of

24       Selectmen have a pick.  They put on someone that they

75

1    previous auditor -- you needed to have the

2    appropriate governing document in place so that our

3    justification for paying them the funds in their

4    retirement computation would be backed up by the

5    appropriate governing document.

6  Q.  Now, you told us this took place in 1998, right?

7  A.  We started in 1998.  I became aware of it probably, I

8    want to say, May, June of '98.  Patrick was going to

9    take steps to take the -- because you only have one

10   or two Town meetings and then there is what they call

11   cutoff dates for the warrant.  So, you have to -- if

12   you were going to have a fall Town meeting, you would

13   have to have -- the warrant might be closed, I think,

14   in June.  The Town meeting would be in the fall, so

15   you had to basically strategize when you could put

16   something on the warrant and have it approved and

17   amend the bylaw at that time.

18 Q.  Did you bring this up, to have it on the warrant?

19 A.  It was not my prerogative to do that.  Patrick said

20   he would handle it.

21 Q.  Was this issue brought to a Town meeting?

22 A.  Pardon me?  Yes, it was.  That's correct.

23 Q.  When was that?

24 A.  I believe it was in the fall of 2001.

80

| | | |
|---|---|---|
| 1 | Q. | Well, you were a police officer, right?  You've been |
| 2 | | one -- you were one for many years? |
| 3 | A. | Yes. |
| 4 | Q. | For what purpose did you go to the Inspector |
| 5 | | General's Office? |
| 6 | | MR. ARMSTRONG:  He answered that question. |
| 7 | | MR. SILVERFINE:  He can answer again. |
| 8 | A. | I spoke to Mr. Quinn on the phone one day, just an |
| 9 | | inquiry, and I placed some facts in front of him.  He |
| 10 | | told me you must come in here and speak to us, |
| 11 | | because there are some serious issues here.  He then |
| 12 | | explained to us what the process is and what they |
| 13 | | were going to do when I went in to Boston. |
| 14 | Q. | After you made your presentation, did anything happen |
| 15 | | vis-a-vis the IG's Office? |
| 16 | A. | Before we left the Inspector General's Office, |
| 17 | | Mr. Quinn asked myself, Dana Goodwin, and Paul Boyle |
| 18 | | if we were willing to testify in front of a Grand |
| 19 | | Jury.  We all answered in the affirmative.  He |
| 20 | | indicated there was enough here to put a Grand Jury |
| 21 | | together and he was going to contact Plymouth, get a |
| 22 | | Grand Jury together, and then contact us to come in |
| 23 | | and testify. |
| 24 | Q. | Are you aware that the IG's Office has no ability to |

89

1  Q.  Who was harassing you up until January 22, 2001?

2  A.  I was harassed on a regular basis.  I was told by my

3       day Lieutenant, Kevin Fahy, and I was told by various

4       members, that they were out to get me.

5  Q.  Who was out to get you?

6  A.  The Chief and Captain Botieri.

7  Q.  The Chief and Captain Botieri were out to get you?

8  A.  Uh-huh.  Yes.  Yes, sorry.

9  Q.  And who told you this?  You said Kevin Fahy?

10  A.  Kevin Fahy.

11  Q.  He's one of the gentleman whose affidavit is next to

12       your complaint, Exhibit 1?

13  A.  That's correct.

14  Q.  He is a friend of yours?

15  A.  He's a Lieutenant.  I worked with him on the day

16       shift.

17  Q.  He's a friend of yours?

18  A.  Correct.  I worked with him for 25 years.

19  Q.  He told you that the day Lieutenant -- who was

20       that?

21  A.  Kevin Fahy.

22  Q.  That's not a separate individual, it's the same

23       guy?

24  A.  The same guy.

1          My reports, simple reports, stuff that --

2      something that was a minor mistake, I was constantly

3      pulled on the carpet for it.  I was constantly -- a

4      lunch break.  If I was five minutes over -- you were

5      on the air all the time anyway, I was always on

6      portable.  It was why didn't he answer the radio or

7      something like that.  I constantly would get e-mails

8      on stuff and I would then justify it or have already

9      done that and not hear nothing from it.  They were

10     waiting for me -- anything.  They were biting at the

11     lip to grab anything that I did wrong.

12  Q.  In terms of you said, quote, "pulled on the carpet,"

13     who would do that?

14  A.  Kevin would get a call from Botieri, find out this,

15     find out that type of thing.  And Kevin would call me

16     and say -- and then I would have a legitimate answer

17     for it, and then that would be the end of it.  It

18     wouldn't materialize into anything.

19  Q.  So, you weren't actually called into the office, your

20     supervisor took care of it with you?

21  A.  It would be -- like I said, it would be the simplest

22     little things.  He might have the -- or like the

23     computers in the car, when they first got them, would

24     shut off and they wouldn't go back on, they had

98

1  trouble with that.  He would call down to Kevin and

2  say, Kevin, Kelley doesn't have his computer on.  And

3  he would say, well, the computer doesn't work today,

4  or there's something wrong with it.  I'd bring the

5  car in and they'd fix it.  We had trouble with them,

6  the way they were put into the cars.

7 Q. My understanding of the term "pulled on the carpet,"

8  is actually somebody comes into the office and you

9  have a discussion with the officer about an event.

10  You weren't actually called on the carpet, you're

11  saying your supervisor had a complaint from his

12  supervisor about check with Kelley on why he wasn't

13  answering the radio, words to that effect?

14 A. Every minor little thing.

15 Q. I understand what you're saying, but you're actually

16  not being pulled on the carpet.  You're saying --

17 A. I was never disciplined, or reprimanded, or written

18  up.

19 Q. You're saying your supervisor called up and said the

20  Captain, for lack of a better term, is checking on

21  you to see why you weren't answering the radio?

22 A. The Captain called down and said.

23 Q. Right.  And you said --

24 A. Correct.

101

1       Town's size.  I don't know what the posture is now,

2       but it went down to a certain level of manpower that

3       you needed to be on.

4  Q.  Would you agree with me that the Police Department

5       ought to know how many officers are on duty in case

6       they have staffing issues; is that fair to say?

7  A.  That's true.

8  Q.  So if, for instance, an officer has to log off to do

9       "X," they ought to know if they need to fill a

10      sector; is that fair to say?

11  A.  That's fair to say.

12  Q.  So, in this case -- and, again, I understand you were

13      a Retirement Board member at the same time you were a

14      police officer for a period of time, right?

15  A.  Yes.

16  Q.  And they just asked you if you're going to go to a

17      meeting, log out and then log back in when you're

18      done?

19  A.  Correct.  They also instituted a chargeback from the

20      Department to the retirement system.

21  Q.  We'll get to that in a minute.  For right now I'm

22      just asking about logging in and logging out.

23  A.  Yes.

24  Q.  And again, in your complaint, Exhibit 1, paragraph

119

| | | |
|---|---|---|
| 1 | Q. | So, just to stop right there.  January to September |
| 2 | | is roughly eight, nine months? |
| 3 | A. | I misunderstood the question, I'm sorry. |
| 4 | Q. | That's why I'm walking you through it, so there's no |
| 5 | | misunderstanding. |
| 6 | A. | Okay. |
| 7 | Q. | You're then saying, just so I understand this, |
| 8 | | roughly almost two years later, a little under two |
| 9 | | years later, he's retaliating against you for |
| 10 | | reporting him in January 2001 to the IG's Office; is |
| 11 | | that right? |
| 12 | A. | That's correct.  All during that period after that |
| 13 | | and through all that area there, he was -- I was |
| 14 | | constantly being harassed by various people in the |
| 15 | | Department.  I was told -- they were saying the Chief |
| 16 | | told them to do this, or Botieri told them to do |
| 17 | | this, and they would say to me, you know, they're |
| 18 | | just picking on you.  They're just going off on you |
| 19 | | because of what you did. |
| 20 | Q. | Let's break that down.  You said various people, |
| 21 | | which people harassed you and which people told |
| 22 | | you? |
| 23 | A. | I had Lieutenant Fahy tell me that. |
| 24 | Q. | What did Fahy tell you? |

120

1   A.   Exactly that.  He wrote me an e-mail.

2   Q.   Saying what?

3   A.   Saying they're after you.  I've had Botieri in my

4        office screaming and hollering about you.  They want

5        to find out anything and everything.  In his

6        affidavit he states --

7   Q.   Is that the e-mails, have you produced that as part

8        of your package?

9   A.   I think you could have a few of them in the discovery

10       there.

11  Q.   You've produced all the e-mails relative to this?

12  A.   All that I could possibly have.

13  Q.   Who else besides Lieutenant Fahy?

14  A.   I was told by other officers.

15  Q.   I need names.

16  A.   I was told by Officer Boyle, Goodwin.  You could put

17       anybody that worked on the day -- okay, put all the

18       men on the day shift.

19  Q.   I'm asking you.  I don't want to put words in your

20       mouth.  You tell me who told you and what they told

21       you?  For instance, what did Boyle tell you?

22  A.   He told me they were after you, to watch your back at

23       any point in time.

24  Q.   What did Goodwin tell you?

1          was on the road.  And then, I met him there and I

2          said, what are you here for?  He goes, well, the

3          Chief got a call, ordered me down here to get you.

4          And I said, well, I'm not here. ·That's a fire car.

5          That second car was a fire car.  They used the white

6          and red lights.  And I said, hey, it wasn't me.  It

7          wasn't me.

8    Q.    So, what happened as a result of that?

9    A.    Nothing.

10   Q.    What other incidents are you referring to?

11   A.    There was one time where Captain Botieri called and I

12         had to write a little report about it.  It was an

13         incident where I was off -- I was just finishing

14         lunch and there was a call that Dennis Hassan went on

15         where it was a violent fight of a husband and a wife

16         on a road up in the northern section of Town, in

17         Manomet, and we were the only two cars.  I heard the

18         call, I started making my way to the car.  I got on

19         the -- when I got in the car, I took off.  I was

20         heading up there, because I knew I'd be his only

21         backup, because he jumped out of the car and said

22         send me a backup right away.  I immediately,

23         instinctively, being on the job almost 25 years,

24         jumped in the car and started that way.  And when

123

```
 1        they say Car 5, I said, I'm on the way, because

 2        there's been many a times where people talk minutia

 3        on the radio and an officer will be calling for help

 4        because he's either been hurt or something disastrous

 5        was happening.

 6             I drove all the way up there, got there,

 7        assisted Officer Hassan.  We made an arrest of a

 8        violent individual and I was called on the carpet for

 9        saying I'm on my way by Botieri.

10  Q.    So, you were called into his office this time?

11  A.    I was called into Kevin's office and he said you

12        didn't give your location.

13  Q.    Who is Kevin?

14  A.    Kevin Fahy.

15  Q.    Lieutenant Kevin Fahy?

16  A.    Yes.

17  Q.    He's a friend?

18  A.    He was the Lieutenant.

19  Q.    He was your shift commander?

20  A.    That is correct.

21  Q.    Are you supposed to give your location?

22  A.    Yes, you are, but in a situation like that, time and

23        air travel, okay, when a situation is happening

24        like that, okay, you don't tie up the air with talk.
```

125

```
 1   A.   It's not fair to say.

 2   Q.   So, you gave your location?

 3              MR. ARMSTRONG:  I want to object because I

 4        think the deposition is getting argumentative now.

 5   Q.   Did you understand my question, sir?

 6   A.   I understood your question.

 7   Q.   So, did you give your location?

 8   A.   I didn't give my location.

 9   Q.   What other incidents of harassment can you cite?

10   A.   Kevin called me into the office one day and said --

11   Q.   Forgive me?

12   A.   Kevin Fahy, Lieutenant Fahy.

13   Q.   Thank you.

14   A.   He called me in and said you were out the other day,

15        I think I was doing radar for a while, and in one of

16        my citations I didn't put down the date even though

17        it was a warning.

18   Q.   It was a what?

19   A.   It was a warning.  And I said, okay, Kevin.  I'll

20        make sure I do that the next time.  And he said that

21        Botieri called him on that.

22   Q.   I'm sorry, who did?

23   A.   Botieri.

24   Q.   That is the Captain?
```

126

1   A.   Yes.

2   Q.   Is there a requirement that you're supposed to put a

3        date on the citation?

4   A.   Yes, there is.

5   Q.   Is it fair to say that not putting the date on the

6        citation can be a fatal flaw in the citation if --

7   A.   Not on a warning, because warnings don't have any --

8        they don't have any -- they're not -- you don't go to

9        court on a warning.  A warning is exactly what it is.

10       It's a written account of me stopping you, saying you

11       were going too fast, or you took a left turn and you

12       write it out for the protection of you and me, so

13       someone doesn't say that we're stopping you for no

14       reason at all.  You write out the person's name,

15       address.  You give them a warning for going, say,

16       like five miles over the speed limit.

17  Q.   Can't a warning be brought back up if something else

18       happens, though?

19  A.   No.  Not that I'm aware of.

20  Q.   It's your testimony you're not aware of that?

21  A.   No.

22  Q.   And you're not aware of any citation that doesn't

23       have a date, it can be a fatal flaw if the citation

24       goes to court?

128

```
 1        would be with coverage.  No matter what it was, I'd

 2        have those slips put in there.  Even though I was a

 3        senior man, I wouldn't get them back, or -- I

 4        couldn't make plans.  Constantly, you know, if there

 5        was something wrong with the computer in the car, I

 6        would have somebody say go put your computer on.

 7        Then, I'd say the computer was on and there's a

 8        problem with it, and then they'd find a slip and say,

 9        oh, yeah, it needs to be fixed.

10   Q.   What else?

11   A.   Things of that nature.

12   Q.   Anything else?

13   A.   No.

14   Q.   You wrote in Section 35 something about benefits for

15        the 16 years he would have served.  How did you

16        arrive at that number, 16 years?

17   A.   Well, as it stands, I don't -- I left the job when I

18        was 48-and-a-half, I believe, or just 49.  I could

19        have worked until I was 65.  I only receive 72

20        percent or 73 percent of my salary and I believe the

21        math adding that up came to $220,000.

22   Q.   So, what you're saying is, just so -- I'll paraphrase

23        it.  You're saying absent that incident, you would

24        have served 16 more years?
```

147

1    Q.   Do you socialize with him?

2    A.   I was the Treasurer of the Police Association.  So, I

3         ran functions that Kevin and different officers went

4         to.  I haven't seen Kevin in years now.  He's -- he

5         works over at the Federal Courthouse.

6    Q.   I forgot to ask you this a couple of minutes ago.

7         The Retirement Board duties that you had while you

8         were a police officer, approximately how many hours a

9         week or a month did that require of your time?

10   A.   Like I said, it was very simple.  Some months you

11        have your standard meeting.  There wouldn't be any

12        disabilities or various things that would take up

13        more time, because Patrick and Dick said they don't

14        want -- they want to be able to schedule the meetings

15        where we could have maybe a couple of hours, but if

16        we had an investment meeting and then a regular

17        meeting, it sometimes would go six hours and it was

18        just too much.  And we didn't want to -- obviously,

19        we wanted to put our best efforts into the investment

20        side of it and give it our best effort.

21             So, if we had a quarterly report coming in

22        April, say, we might have to schedule two meetings.

23        Sometimes something comes up where a fund company

24        might be taken over by another company.  It happens

EXHIBIT R

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. 1:05-cv-10596-NMG

```
-------------------------)
THOMAS M. KELLEY,        )
      Plaintiff          )
VS.                      )
                         )
TOWN OF PLYMOUTH, ET AL, )
      Defendant          )
-------------------------)
```

DEPOSITION OF PAUL F. BOYLE, JR., a witness
called for examination by counsel for the Plaintiff,
taken pursuant to the applicable provisions of the
Massachusetts Rules of Civil Procedure, before LINDA M.
CORCORAN, a Court Reporter-Notary Public in and for the
Commonwealth of Massachusetts, at the Law Offices of
Joseph R. Gallitano & Associates, 34 Main Street
Extension, Plymouth, Massachusetts, on Tuesday, February
7, 2006, commencing at 1:10 p.m.

**LINDA M. CORCORAN**
**CERTIFIED COURT REPORTER**
**P. O. Box 4**
**Kingston, Massachusetts  02364**
**(781) 585-8172**

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

1    other words, that they might be at risk by taking part in

2    such an exercise?

3        A.    I don't think it was done that strenuously.  I

4    think it was done on the heels of the incident that we

5    knew about, the officer that had hyperventilated.  And

6    again, I don't recall right now what his outcome was.

7    But we didn't make a --

8        Q.    Which officer are you talking about that

9    hyperventilated?

10       A.    The one that was posted on the back wall.  But

11   we didn't make any formal request, written request.  Is

12   that what you're asking?

13       Q.    Written, verbal.  Either one.

14       A.    We didn't make any formal request, no.

15       Q.    But you did make the chief aware that there had

16   been some incidents of people going down during these

17   exercises as far as becoming ill?

18            MR. SILVERFINE:  Objection as to form.

19       Q.    You can answer.

20       A.    I don't want you putting words in my mouth

21   there.  I think I answered it.  We made -- we talked

22   about the two incidents I just discussed here, and we

23   talked about them in that capacity.  "Officer going

24   down," it means something different to me than I'm sure

Page 14

1    it does to you, but that's a bit of a strong --

2        Q.    Well, let me rephrase it then.  What I'm trying

3    to -- and I'm not trying to put words in your mouth.  I

4    just want you to give me your best recollection, is if

5    you had any conversations with the chief advising him of

6    concerns for people with preexisting medical conditions

7    taking part in such a strenuous activity.

8             MR. SILVERFINE:  Objection as to form.

9        A.    Yes, we did.

10       Q.    What did you tell him?

11       A.    Exactly as I testified to previously.  You

12   know, we were concerned about the officer who had a

13   problem with his hand.  We were concerned with the

14   incident of the officer who hyperventilated.  And we

15   asked him about those.  We asked him about details or the

16   scenarios and the exercises, which I don't think there

17   was a great deal of information exchanged there.  And

18   basically the exercise was an order to participate.  So

19   it was not anything really for the union to do in that

20   capacity.

21       Q.    If someone did not want to participate in the

22   exercise, did they have that option?

23       A.    I don't believe so.  I don't know that that's a

24   question for me.  I don't know anybody that didn't

1    participate.  I don't know that it was left up to each

2    individual.

3        Q.    Did the chief say that everyone had to

4    participate?  Did he make that statement to you?

5        A.    No, he didn't make that statement.  No.

6        Q.    Was there anything in writing that came out to

7    the members of the union or the membership rank and file

8    that they all had to participate in the drill?

9        A.    Yes, it was a written order like we get for

10   in-service training and everything else.  It outlines the

11   schedule, the times, what you're required to bring, and

12   it's expected that everybody will be there.

13       Q.    Right.  And in that written order, did it make

14   any provision for anyone who felt that they might have a

15   medical condition that would prevent them or place them

16   in danger?  Was there an option for them to report that

17   or make a request that they be excused?

18       A.    I don't know that.  I'd have to look at the

19   order.  I don't believe I have a copy of it anywhere.

20       Q.    Do you recall anything like that?

21       A.    I don't, no.

22       Q.    What was the drill like?

23       A.    My scenario?

24       Q.    Yes.

1       A.    It was at Plymouth North High School.

2       Q.    Go ahead.  Continue.

3       A.    And we went in and everybody was patted down on

4    their way in to make sure they didn't have any contraband

5    items.  Then we sat down.  There was a classroom aspect

6    going over the safety rules and going over the exercise

7    scenarios.  Then officers were divided up into teams.

8    They were told to make team leaders and fire team members

9    out of them.  And then we were escorted by state police

10   personnel to different areas of the school.  Each team

11   was escorted to a different area.  And they were walked

12   through exercise scenarios, and they were also taught

13   some movement tactics and firearms handling and loading/

14   reloading-type exercises.

15          After probably an hour of that, we reconvened

16   in the cafeteria, and then we went back through and did a

17   couple of series of exercises, live exercises.  We broke

18   for lunch, and then we continued in the afternoon where

19   we did, I believe, just one series of exercises and then

20   one large-scale mass exercise that involved all the teams

21   working together.

22      Q.    How would you describe the level of exertion in

23   participating in these exercises?

24      A.    Oh, it was pretty intense.  You -- it

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

Page 18

1    definitely tasked you.  There was a lot of running.

2    There was a lot of high stress, a lot of radio traffic, a

3    lot of other outside variables that maybe on a routine

4    day to day we don't deal with but definitely something

5    that we could expect.

6         Q.   Do you consider yourself in pretty good

7    physical condition?

8         A.   I did at that time, yes.

9         Q.   Did you find it physically taxing?

10        A.   Yes, it was.

11        Q.   How would you describe your level of energy at

12   the end of the exercise?  By that, I mean were you

13   exhausted, were you just breathing heavy, or you didn't

14   even break a sweat?  You know, how would you describe

15   your condition after you completed the exercise?

16        A.   I felt like I had had a great workout in it.  I

17   mean, it was -- during the exercise you're breathing

18   heavy at times, and you're real quiet other times.  But

19   it's a cycle.  It's a constant roller coaster up and

20   down, running hard.  It gets your blood pressure up.  It

21   gets your heart moving fast.  And then other times where

22   it's -- you're doing a surveillance or trying to gather

23   intelligence where, you know, you're real quiet and

24   moving real slow.  So at the end of the day it's over.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

Page 21

1      Q.    Could you tell me about that?

2      A.    I believe -- I want to say it was September/

3    October time frame that --

4      Q.    Of 2003?

5      A.    Of 2003.

6            -- that I was contacted through our vice

7    president, Dana Goodwin, by Officer Kelley himself, and

8    Officer Rooney, who was the steward at the time, that

9    Officer Kelley had used the two weeks' post-injury.  And

10   our understanding at the time was under 111F -- and I

11   believe it's still our understanding -- is that once his

12   injuries are adjudicated, then he's to be reimbursed for

13   that time.

14     Q.    Did you or did the union in his behalf do

15   anything in regard to that?

16     A.    Officer Kelley asked us to file a grievance on

17   his behalf during that same time frame, that fall of

18   2003, and I believe I sent him a letter.  I had spoke to

19   counsel, and I had gotten a couple of opinions on it that

20   because he had left service the union was impotent in

21   representing him in that matter.

22     Q.    So he couldn't file a grievance then any longer

23   because he was now retired?

24     A.    That's correct.

Page 25

1        A.   Yes, there was a -- there was a time when it

2   was questioned.

3        Q.   When was that?

4        A.   I believe January of 2003.

5        Q.   What was the issue at that time in 2003?

6        A.   I believe the issue was the way the funds were

7   being appropriated for his Quinn Bill.  It had something

8   to do with the retirement calculation, and I'm not even

9   100 percent on that.  But there was an issue at the

10  retirement board level, and it was brought up by Officer

11  Kelley.

12       Q.   Did you ever bring this issue, the manner in

13  which he was being paid his Quinn benefits, to the

14  attention of any agency outside the Town of Plymouth?

15       A.   Did I specifically?

16       Q.   Yes.

17       A.   No.

18       Q.   Did you ever have any contact with the

19  inspector general's office?

20       A.   Yes.

21       Q.   Would that qualify as an agency outside the

22  Town of Plymouth?

23       A.   You asked me if I brought it there.

24       Q.   All right.  You didn't bring it.  Did you ever

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

Page 26

1   speak with an agency outside of the Town of Plymouth

2   about the manner in which the chief was being compensated

3   with his Quinn benefits?

4        A.   Yes, I was there when it was spoken about.

5        Q.   Did you go there voluntarily?

6        A.   I went there at the request of Officer Kelley.

7             MR. GALLITANO:   I'm just going to stop here for

8        a minute.   I want to make some copies of something.

9             (Short recess was taken.)

10  BY MR. GALLITANO

11       Q.   All right.   Let's go back.   We were at the

12  inspector general's office.   Who attended that meeting

13  with you?

14       A.   Myself, Tom Kelley, and Dana Goodwin.

15       Q.   I think you mentioned earlier Dana Goodwin

16  holds a position in the union.

17       A.   He does, yes.

18       Q.   What's that position?

19       A.   Vice president.

20       Q.   What was discussed with --

21            MR. GALLITANO:   Strike that.

22       Q.   Who did you meet with at the inspector

23  general's office?

24       A.   I don't recall their names.   There were two

Page 43

1    A.    I don't know that I was concerned.  It's part

2    of my business.  It's part of what I do.  I look at it as

3    a -- I don't know how to best describe it, but it's just

4    business, you know.

5    Q.    Part of the role of being the union president?

6    A.    That's what we do.  You know, we don't go out

7    looking for it, but it came to us, and this is how we saw

8    it, and we address it the way we think best benefits our

9    members.

10    Q.    So you feel you had the protection of the union

11    characterization in your participation in the meeting at

12    the inspector general's office?

13    A.    No, I feel that only goes so far.  You know, I

14    acted as a union representative, as president of the

15    union.  I don't know that affords me any protection.  I

16    don't know that it denies me any protection, but, you

17    know, that's the capacity I do these things in.

18    Q.    Did you have a concern that there might be

19    retaliation against Mr. Kelley for his actions?

20    A.    I assume there would be some type of recourse

21    against him, yeah.  I mean, it's indicative of the

22    department to begin with, and bringing this to light is

23    only going to kind of stir a hornet's nest.  So, you

24    know, I assume he'd have to make sure he dots his i's and

Page 44

1    crosses his t's.

2        Q.    What do you mean it's indicative of the

3    department anyway?

4        A.    Well, I think it's like any workplace

5    environment.  You know, ours may be more so than many

6    others, but, you know, you get into, especially in a

7    police or a public safety organization and, you know,

8    there's a rank structure, and when you start questioning

9    some of that, then people take issue with it.  You know,

10   and our place is no different.  You know, there's little

11   shots across the bow, so to speak, that go on, and, you

12   know, doing something like this, you know, this directly

13   involves our top-ranking three people.  You know, to

14   think they're not going to take notice and -- you know,

15   whatever they choose to do with it is up to them, but to

16   think they're not going to take notice and that you might

17   not have to keep an eye out and not give them anything

18   to, you know, maybe discipline you on or speak to you

19   about, I think you'd be crazy.  And that would be my

20   advice to anybody no matter what the circumstances are.

21       Q.    Did you believe that Mr. Kelley then was the

22   subject of retaliation after that?

23       A.    I think they kept a close eye on him, yeah.

24       Q.    Do you know of any instances where you felt it

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

1   was retaliation?  Any action they took against him or

2   anything they may have denied him?

3       A.   I don't know about denial, but, you know, they

4   -- he was definitely monitored.  You know, he had to

5   account for his whereabouts, the shift men had to account

6   for his whereabouts more so than anybody else on the

7   tour.  I didn't work his shift, but that's what was, you

8   know, pretty well-known throughout the grapevine.

9       Q.   The chief denying him 111F benefits for his

10  injury on duty, do you think that was retaliation?

11      A.   I can't make that leap.  I don't -- I don't

12  know what the chief's reason for denying him was.  I

13  mean, he -- you know, one of the nicest guys you'd ever

14  meet was Carl Ditmars, and he denied him, so...

15      Q.   Okay.  Go figure, huh?

16          MR. GALLITANO:  I don't have any further

17      questions.

18          Thank you.

19          MR. SILVERFINE:  I just have a couple I just

20      want to follow up on, if I can.

21          CROSS-EXAMINATION BY ATTORNEY SILVERFINE

22      Q.   Good afternoon.  I'm Jeremy Silverfine,

23  representing the town and the chief in this matter.

24          Are you aware that the "Heart Law" provision

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

# EXHIBIT S



**PLYMOUTH POLICE BROTHERHOOD**

385 Court Street, Suite 308
Plymouth, MA 02360
Phone: 508-747-8237
Fax: 508-747-2098

September 9, 2001



EXHIBIT /
DOYLE
2-7-06
LINDA M. CORCORAN
CERTIFIED COURT REPORTER

Mr. Phillip Ricardi
Chairman, Finance Committee
Town of Plymouth
11 Lincoln Street
Plymouth, MA 02360

Dear Mr. Ricardi,

I am writing as a result of the recent Old Colony Memorial news article, September 6, 2001, titled "Benefits paid without vote". As I am sure you are aware, the article addresses pay incentives received by the police chief and captains since 1988.

It is not the intent of the Union to determine whether or not the benefits paid were legal or even if the recipients are entitled to receive the benefit. Ms. Beth and Mr. Griffin are quoted in the article as admittedly knowing the benefit was paid outside municipal finance statutes. As a result, the Union feels obligated to question how these benefits are being paid and by what authority. Our basis for the inquiry is twofold; First, the entire matter places a dark cloud over the police department with the impression pay and benefits are being received arbitrarily. Second, we are currently in a period of an open contract and pending negotiations, whereby the Town Manager has painted a difficult future financial picture. It is in the interest of the Union to ensure the financial situation as outlined for us by the Town Manager and the Chief of Police is accurate.

I will address the issues raised in the article as printed; **"The total amount of money paid isn't available, but amounts to thousands of dollars every year".** Why isn't the total amount available? The total amounts to just over one hundred thousand dollars annually for the last two years, and reduces annually back to 1988. The town should be able provide the exact figures with very little effort.

**"Verbal agreements aren't acceptable in municipal finance, finance director Patrick Dello Russo said".** We believe Mr. Dello Russo is correct. If, in fact he is correct, then why have the benefits not ceased pending the proper corrective action? Ms. Beth acknowledges she learned of the payments within the last year. According to municipal finance law, the payments should have been stopped.

**"The police chief and police captains receive holiday pay, a uniform allowance and the same educational incentive pay the town pays to police union members – up to thirty percent depending on what degrees they've earned".** The

education incentive pay is not a statutory entitlement. All sworn Officers are "eligible" for the pay once they meet the degree criteria outlined in the statute. However, the benefit is not automatic, it needs to be bargained for or negotiated, which is why police departments like Hanson and Boston have recently started receiving the benefit. This benefit has only been afforded to the chief and captains of the Plymouth police department by verbal agreement, which Ms. Beth acknowledges is outside of legal authority. In the last contract, the Union negotiated an increase in the master's step by five percent. For this increase, our members gave up other benefits in our contract to help fund the incentive. The incentive was part of our agreement that went to town meeting in writing for everyone to see the money involved, was voted on, and approved. I am now reading the captains receive the same education incentive increase as the patrolmen. I am curious by what authority the captains receive the increased education incentive as they have only started receiving it within the last year. I do not recall any negotiations or changes in the personnel by-law authorizing an increase for the captain's incentive. Furthermore, where did the funding come from to increase the benefit mid fiscal year, and what if anything did they give up to help fund the incentive?

**"Beth, pressed Tuesday night for a dollar figure on the amount of money involved, told selectmen civil service rules wouldn't allow the town to collect the money back from the employees. She questioned whether the board wanted to spend more time figuring out how much was paid, since it can't get the money back".** Ms. Beth is partially correct. It is unclear whether or not the money can be reclaimed from the employees for benefits paid, however the funds can be reclaimed from the person authorizing payment. We don't believe it is appropriate to dismiss the issue based on the ability to retrieve the funds without first determining the amount in question and raising the proper issues.

In closing, Mr. Tavares' statements in the article are inexcusable. When a matter of public finance is brought to the attention of the board, it should be addressed immediately and with all seriousness. For Mr. Tavares to cast aside the issue on the notion "this issue is a personal attack on Chief Pomeroy" only lends credence to the idea the benefits are being paid outside of legal authority. The Union respectfully requests the Finance Committee take no action until a comprehensive financial audit of the police department is accomplished.

Sincerely,

Paul F. Boyle Jr.
President

# EXHIBIT T

Subj:      Active Shooter Training

The State Police SERT Team will be providing Active Shooter training for all
Plymouth Police Officers.  The training will consist of 5 hrs of classroom
training followed by 8 hrs of practical exercise.

Classroom training will be held at Plymouth P.D. training room.  The practical
exercise will be scheduled on Saturdays at a local school building.  Attendance
is manditory for all officers.  Schedules will be posted.  No make-up classes
will be scheduled.  Address all scheduling conflicts with Sgt. John Rogers.

Michael Botieri
Captain

# CASE # 1

Source: My Sources > Massachusetts > Find Cases > MA Federal & State Cases, Combined ⓘ
Terms: in an action by plaintiff , a whistle-blower, alleging retaliation by his employer, summary judgment not appropriate since issue is for a jury to dete... (Edit Search | Suggest Terms for My Search | Feedback on Your Search)

☞Select for FOCUS™ or Delivery

☐

*234 F. Supp. 2d 91, \*; 2002 U.S. Dist. LEXIS 24161, \*\**

CANDY BELL, Plaintiff, v. JOHN E. POTTER, in his official capacity as Postmaster General of the United States of America, United States Postal Service, Defendant.

CIVIL ACTION NO. 00-10054-RBC n1

n1 With the parties' consent this case was referred and reassigned to the undersigned for all purposes including trial and the entry of judgment pursuant to 28 U.S.C. § 636(c).

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

234 F. Supp. 2d 91; 2002 U.S. Dist. LEXIS 24161

December 12, 2002, Decided

**DISPOSITION: [\*\*1]** Defendant's Motion For Judgment As Matter Of Law Or In Alternative For New Trial was denied.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Defendant former **employer** moved for judgment as a matter of law, or alternatively a new trial, after a **jury** returned a verdict in favor of plaintiff former employee in the employee's Title VII of the Civil Rights Act of 1964 **retaliation** action.

**OVERVIEW:** As to judgment as a matter of law, the **employer** argued that the employee's evidence was insufficient on many grounds such that the verdict could not stand. The court, however, concluded that there was sufficient evidence. The **jury** could have concluded that a fitness-for-duty examination (FFD) was an adverse action. The employee testified that when the FFD was ordered she felt punished for complaining. None of the **employer's** cases stood for the proposition that, as a general matter, sending an employee for an FFD could not serve as the basis for a **retaliation** claim. The court found that the **jury** could have reasonably concluded that the employee filed her Equal Employment Opportunity (EEO) complaint in good faith; it was not for the court to second guess the **jury's** credibility assessment, but only determine if there was sufficient evidence for such a conclusion. Further, where the adverse action occurred only days after the **employer** learned of the employee's protected activity, it appeared that a causal connection could reasonably be inferred. Finally, it was permissible for the **jury** to infer discrimination from the falsity of the **employer's** explanation.

**OUTCOME:** The **employer's** motion was denied.

**CORE TERMS:** retaliation, prima facie case, personnel, adverse action, protected activity, matter of law, new trial, reasonable jury, causal connection, credibility, favorable, summary judgment, sexual harassment, causation, harassment, pretextual, sufficient evidence, jury believed, trier of fact, moving party, psychological, absenteeism, credible, ordering, pretext, shifted, suffice, supervisor, suspension, entitled to judgment

## LexisNexis(R) Headnotes  Hide Headnotes

Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burden Shifting
Labor & Employment Law > Discrimination > Retaliation > General Overview

*HN1* A **retaliation** claim is analyzed according to the familiar three-stage "burden-shifting" paradigm set forth in the McDonnell Douglas decision.  More Like This Headnote

Evidence > Procedural Considerations > Preliminary Questions > Admissibility of Evidence > General Overview
Labor & Employment Law > Collective Bargaining & Labor Relations > Unfair Labor Practices > Interference With Protected Activities
Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview

*HN2* In accordance with the McDonnell Douglas analytical framework, it is incumbent upon the plaintiff first to make out a prima facie case of **retaliation** under Title VII of the Civil Rights Act of 1964. Courts have routinely noted that the prima facie burden is quite easy to meet. To establish a prima facie case, the plaintiff simply has to show that: (1) her **employer** was aware that she engaged in activity protected under Title VII (such as filing an Equal Employment Opportunity complaint); (2) some adverse employment action followed; and (3) there was a causal connection between the protected activity and the adverse action, motivated in part by **retaliation.**  More Like This Headnote | *Shepardize: Restrict By Headnote*

Evidence > Inferences & Presumptions > General Overview
Labor & Employment Law > Discrimination > Retaliation > Burdens of Proof
Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview

*HN3* Proof of a Title VII of the Civil Rights Act of 1964 prima facie case gives rise to a legally mandatory rebuttable presumption of **retaliation.** Once a prima facie case, and, hence, a presumption of discriminatory **retaliation** is established, then the burden shifts to the **employer** to articulate a legitimate reason for the adverse employment action. If the **employer** produces evidence of a non-retaliatory reason for its actions and the fact finder believes it, then the presumption of **retaliation** disappears. At that point, the plaintiff must prove by a preponderance of the evidence that the **employer's** stated reason for the adverse action were mere **pretext** and that it was actually taken in **retaliation.** However, after the **employer** has interposed a non-retaliatory reason for its actions, the fact finder may still rely on evidence that was offered during the plaintiff's case-in-chief: A satisfactory explanation by the defendant destroys the legally mandatory inference of discrimination arising from the plaintiff's initial evidence. Nonetheless, this evidence and inferences properly drawn therefrom may be considered by the trier of fact on the **issue** of whether the defendant's explanation is pretextual. Indeed, there may be some cases where the plaintiff's initial evidence, combined with effective cross-examination of the defendant, will suffice to discredit the defendant's explanation.  More Like This Headnote

Civil Procedure > Trials > Judgment as Matter of Law > General Overview

*HN4* Under Fed. R. Civ. P. 50, a court should render judgment as a matter of law when a party has been fully heard on an **issue** and there is no legally sufficient evidentiary basis for a reasonable **jury** to find for that party on that **issue.**  More Like This Headnote

Civil Procedure > Summary Judgment > Appellate Review > General Overview
Civil Procedure > Trials > Judgment as Matter of Law > General Overview
Evidence > Procedural Considerations > Weight & Sufficiency

*HN5* In the context of **summary judgment** under Fed. R. Civ. P. 56, the court must

review the record taken as a whole. And the standard for granting **summary judgment** mirrors the standard for judgment as a matter of law, such that the inquiry under each is the same. It therefore follows that, in entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record. In doing so, however, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are **jury** functions, not those of a judge. Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the **jury** is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.  More Like This Headnote

Civil Procedure > Trials > Jury Trials > Jury Instructions > Objections to Instructions
Labor & Employment Law > Discrimination > Retaliation > General Overview
HN6 For purposes of a **retaliation** claim, determining whether an action is materially adverse necessarily requires a case-by-case inquiry.  More Like This Headnote

Labor & Employment Law > Discrimination > Retaliation > General Overview
HN7 In the context of **retaliation,** to support a **jury's** finding that an action was an adverse action, there must be some evidence that it resulted in a meaningful consequence to the plaintiff.  More Like This Headnote

Labor & Employment Law > Discrimination > Harassment > Racial Harassment > Burdens of Proof > Objective & Subjective Standards
Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Burdens of Proof > Objective & Subjective Standards
Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview
HN8 Regardless of whether any of the conduct that the plaintiff lists in her Equal Employment Opportunity complaint was prohibited under Title VII of the Civil Rights Act of 1964, an employee's reasonable belief that it crosses the line suffices as long as the complainant communicates that belief to the **employer** in good faith.  More Like This Headnote

Civil Procedure > Trials > Jury Trials > Province of Court & Jury
HN9 It is not for the court to second guess the **jury's** credibility assessment, but only to determine if there was sufficient evidence for a reasonable **jury** to come to a conclusion.  More Like This Headnote

Labor & Employment Law > Collective Bargaining & Labor Relations > Unfair Labor Practices > Interference With Protected Activities
Labor & Employment Law > Discrimination > Retaliation > General Overview
HN10 In the context of a **retaliation** claim, one way of showing causation is by establishing that the **employer's** knowledge of the protected activity was close in time to the **employer's** adverse action. So, temporal proximity alone can be enough evidence of causation to establish a prima facie case of **retaliation.** It is sufficient in circumstances where the action is taken very close in time to the protected activity. Of course, the closer the adverse action is to the protected activity, the stronger the inference of causation.  More Like This Headnote

Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burden Shifting
HN11 It is permissible for the trier of fact to infer the ultimate fact of discrimination from

the falsity of an **employers** explanation.  More Like This Headnote

Civil Procedure > Judgments > Relief From Judgment > Motions for New Trials
Civil Procedure > Judgments > Relief From Judgment > Motions to Alter & Amend
*HN12* See Fed. R. Civ. P. 59(a)(1).

Civil Procedure > Judgments > Relief From Judgment > Motions for New Trials
*HN13* It is firmly within the trial court's discretion to grant a motion for a new trial. A new trial may be granted if the clear weight of the evidence does not support the verdict. Moreover, a judge may order a new trial if the verdict will result in a clear miscarriage of justice. An excessive award of damages is also grounds for a new trial. However, deference must be accorded to a **jury's** verdict; it should not be overturned except under most compelling of circumstances where it is seriously erroneous.  More Like This Headnote

Civil Procedure > Judgments > Relief From Judgment > Motions for New Trials
Civil Procedure > Judgments > Relief From Judgment > Motions to Alter & Amend
*HN14* A Fed. R. Civ. P. 59 motion can only be granted if the evidence, viewed from the perspective most favorable to the plaintiff, is so one-sided that the defendant is plainly entitled to judgment, for reasonable minds could not differ as to the outcome.  More Like This Headnote

**COUNSEL:** For CANDY M. BELL, Plaintiff: Matthew Cobb, Law Firm of Matthew Cobb, Boston, MA.

For JOHN E. POTTER, Defendant: Barbara Healy Smith, U.S. Attorney's Office, Boston, MA.

For JOHN E. POTTER, Defendant: Gina Y. Walcott-Torres, U.S. Attorney's Office, Boston, MA.

**JUDGES:** ROBERT B. COLLINGS, United States Magistrate Judge.

**OPINION BY:** ROBERT B. COLLINGS

**OPINION:** [*93]

**MEMORANDUM AND ORDER ON DEFENDANTS' (SIC) MOTION FOR JUDGMENT AS A MATTER OF LAW OR IN THE ALTERNATIVE FOR A NEW TRIAL ( # 84)**

COLLINGS, U.S.M.J.

I. **INTRODUCTION**

On June 4, 2002, following a six-day trial the **jury** returned a verdict in favor of the plaintiff Candy Bell ("Bell" or "plaintiff") on her Title VII **retaliation** claim as against the defendant John E. Potter, in his official capacity as Postmaster General of the United States Postal Service ("Potter" or "defendant"). Ten days later on June 14, 2002, the defendant filed his renewed motion for judgment as a matter of law pursuant to Rule 50(b), Fed. R. Civ. P., or in the alternative, that a new trial be granted pursuant to Rule 59, Fed. R. Civ. P. ( # 84) **[**2] [**94]** After the trial transcripts were filed, Potter submitted his memorandum in support of his Rule 50(b)/Rule 59 motion on August 23, 2002. ( # 101) Bell filed her opposition to the defendant's motion ( # 108) on September 6, 2002 and, with leave of Court, Potter filed a reply brief on September 26, 2002. ( # 109) With the record now complete, the defendant's post-trial motion stands ready for decision.

## II. THE LAW - RULE 50(b), FED. R. CIV. P.

Prior to reaching the defendant's numerous arguments, it is perhaps best to set the contextual stage. In a nutshell, Bell claimed that the Postal Service subjected her to **retaliation** for having filed an EEO complaint. *HN1*Such a claim, of course, is analyzed according to the familiar three-stage "burden-shifting" paradigm set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973), and Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981).

*HN2*In accordance with this analytical framework, it was incumbent upon the plaintiff first to make out a prima facie case of **retaliation** under Title VII. Courts have routinely noted that "the prima **[**3]** facie burden is quite easy to meet." Hodgens v. General Dynamics Corp., 144 F.3d 151, 165 (1 Cir., 1998)(internal quotation marks and citations omitted). "All that is needed is the production of admissible evidence which, if uncontradicted, would justify a legal conclusion of discrimination." Brennan v. GTE Gov't Sys. Corp., 150 F.3d 21, 26 (1 Cir., 1998)(citation omitted). To establish a prima facie case, Bell simply had to show that: 1) her **employer** was aware that she engaged in activity protected under Title VII (such as filing an EEO complaint); 2) some adverse employment action followed; and 3) there was a causal connection between the protected activity and the adverse action, motivated in part by **retaliation.** See, e.g., Hernandez-Torres v. Intercontinental Trading, Inc., 158 F.3d 43, 47 (1 Cir., 1998); Petitti v. New England Tel. & Tel. Co., 909 F.2d 28, 33 (1 Cir., 1990).

*HN3*Proof of the Title VII prima facie case gives rise to a legally mandatory rebuttable presumption of, in this instance, **retaliation.** Burdine, 450 U.S. at 254. Once a prima facie case, and, hence, a presumption of discriminatory **retaliation** was **[**4]** established, then the burden shifted to the **employer,** Potter, to articulate a legitimate reason for the adverse employment action. McDonnell Douglas Corp., 411 U.S. at 802. n2 If the **employer** produces evidence of a non-retaliatory reason for its actions and the fact finder believes it, then the presumption of **retaliation** disappears. At that point, the plaintiff must prove by a preponderance of the evidence that the **employer's** stated reason for the adverse action was mere **pretext** and that, in fact, it was actually taken in **retaliation.** McDonnell Douglas Corp., 411 U.S. at 804; St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507-508, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993); Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 19 (1 Cir., 1999). However, after the **employer** has interposed a non-retaliatory reason for its actions, the fact finder may still rely on evidence that was offered during the plaintiff's case-in-chief:

> A satisfactory explanation by the defendant destroys the legally mandatory inference of discrimination arising from **[*95]** the plaintiff's initial evidence. Nonetheless, this evidence and inferences properly **[**5]** drawn therefrom may be considered by the trier of fact on the **issue** of whether the defendant's explanation is pretextual. Indeed, there may be some cases where the plaintiff's initial evidence, combined with effective cross-examination of the defendant, will suffice to discredit the defendant's explanation.

Burdine, 450 U.S. at 255 n. 10.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 To be clear, the defendant's burden is one of production; the plaintiff always carries the ultimate burden of persuasion in a <u>Title VII claim. Burdine, 450 U.S. at 253.</u>

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Turning now to the motion at hand, it is important at the outset to detail the applicable standard. In this regard the Supreme Court has provided clear guidance:

> *HN4*Under Rule 50, a court should render judgment as a matter of law when "a party has been fully heard on an **issue** and there is no legally sufficient evidentiary basis for a reasonable **jury** to find for that party on that **issue.**"

$\searrow \beta$

> \* \* \* \*

> *HN5*In the analogous context of **summary judgment** under Rule 56, we have stated **[\*\*6]** that the court must review the record "taken as a whole." And the standard for granting **summary judgment** "mirrors" the standard for judgment as a matter of law, such that "the inquiry under each is the same." It therefore follows that, in entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record.

> In doing so, however, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are **jury** functions, not those of a judge." Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party [] that the **jury** is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses."

<u>Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S. Ct. 2097, 2109-2110, 147 L. Ed. 2d 105 (2000)</u> **[\*\*7]** (internal citations omitted).

However, it is important to note that the defendants Rule 50(b) motion in the instant case is made after the **jury** has returned its verdict for the plaintiff. That is not the time to be challenging the adequacy of Bell's prima facie case. As the First Circuit has written:

> When, as now, an employment discrimination action has been submitted to a **jury,** the burden-shifting framework has fulfilled its function, and backtracking serves no useful purpose. To focus on the existence of a prima facie case after a discrimination case has been fully tried on the merits is to "unnecessarily evade[] the ultimate question of discrimination vel non." <u>United States Postal Serv. Bd. of Govs. v. Aikens, 460 U.S. 711, 713-14, 103 S. Ct. 1478, 1481, 75 L. Ed. 2d 403 (1983);</u> see also <u>Mesnick, 950 F.2d 816, 824-25.</u> By like token, our evaluation of post-trial motions seeking relief from a **jury's** verdict in such a case is similarly

confined to the ultimate question of discrimination. Consequently, to wander afield in pursuit of appellant's phantom "prima facie case" argument is a bit like undertaking early morning calisthenics: it might be good **[\*\*8]** exercise, but it certainly is not essential to the business of the day.

Sanchez v. Puerto Rico Oil Co., 37 F.3d 712, 720 (1 Cir., 1994); see also Alvarez-Fonseca v. Pepsi Cola of Puerto Rico Bottling Company, 152 F.3d 17, 26 (1 Cir., **[\*96]** 1998), cert. denied, 526 U.S. 1123, 143 L. Ed. 2d 806, 119 S. Ct. 1778 (1999)("Moreover, at this stage of the McDonnell Douglas analysis it is irrelevant whether or not the facts in question sufficed to establish a prima facie case or not. Instead, the question is whether the whole of the evidence mustered by the plaintiff, regardless of whether it was initially presented to establish the prima facie case or to show **pretext,** suffices to allow a finding that the defendant intentionally discriminated against him.")

## III. DISCUSSION - RULE 50(b) MOTION

Potter argues that Bell's evidence was insufficient on many grounds such that the verdict cannot stand. Specifically, it is asserted that the plaintiff failed to produce evidence upon which a reasonable **jury** could have concluded that: (1) the Fitness-for-Duty Examination ("FFD") was an "adverse action," (2) she filed her EEO complaint in good faith, (3) **[\*\*9]** there was a causal connection between filing the complaint and the subsequent actions taken by the Postal Service, or (4) the reasons stated by the Postal Service for taking the adverse personnel actions were pretextual. (Memorandum in Support # 101 at 1) These contentions shall be examined seriatim in order to determine whether, taking all the evidence in the light most favorable to the plaintiff, there was any legally sufficient basis for a reasonable **jury** to find in her favor.

1. Is there sufficient evidence for a reasonable **jury** to conclude that scheduling an FFD constituted an adverse personnel action?

While Potter concedes that the 14-day suspension and notice of removal were adverse personnel actions, he takes **issue** with the FFD being so characterized. It is argued that "the burden to articulate a nondiscriminatory reason for the FFD never shifted to the defendant" because the plaintiff failed to show that the FFD was an adverse employment action. n3 ( # 101 at 16) The defendant points out that his evidence was to the effect that the FFD was ordered for the plaintiff's benefit and perhaps even might have prevented her suspension and removal. ( # 101 at 5, 7) The problem with **[\*\*10]** defendant's analysis is that it ignores the fact that the **jury** plainly believed Bell and disbelieved the witnesses called by the defendant on the **issue.**

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n3 As stated, supra, it is not material at this point whether the plaintiff made out a prima facie case. Alvarez-Fonseca, 152 F.3d at 26; Sanchez, 37 F.3d at 720. What is pertinent is whether, on the basis of all the evidence and taking that evidence in the light most favorable to the plaintiff, the **jury** could have found that the order sending her to an FFD was in **retaliation** for her having filed an EEO complaint.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

*HN6*⚓"Determining whether an action is materially adverse necessarily requires a case-by-case inquiry." Blackie v. State of Maine, 75 F.3d 716, 725 (1 Cir., 1996). The **jury** was properly instructed to apply an objective test to make that determination. ( # 101 at 6 citing **Jury** Instructions V:103) Ultimately, it was for the **jury** to decide whether the FFD was an adverse employment action taken in **retaliation** for Bell's **[**11]** filing of the EEO complaint.

*HN7*⚓To support the **jury's** finding that the FFD was an adverse action, there must be some evidence that it resulted in a meaningful consequence to the plaintiff. Bishop v. Bell Atlantic Corp., 299 F.3d 53, 59 (1 Cir., 2002). While the defendant maintains that scheduling an FFD was either of no consequence or was actually a benefit to the plaintiff, ordering a psychological examination to determine if an employee is fit to continue working could be an adverse action. **[*97]**

Bell testified that when the FFD was ordered she felt "punished for complaining[,] like it was an attack on [her] again. You go to FFD. They are doing something...just another superficial investigation." (Plaintiff's Joint Opposition # 108 at 24, quoting II: 86) Basically, the plaintiff argues that the FFD was ordered because of the Postal Service's desire to make Bell look like a problem and that it was reasonable for her to perceive this as a form of punishment. ( # 108 at 21) She observes that the FFD was a psychological exam designed to determine if she is "mentally unfit" to work. Bell claims that the FFD was essentially a preemptive strike undertaken to discredit her. ( # **[**12]** 108 at 5-6)

None of the cases upon which the defendant relies stand for the proposition that, as a general matter, sending an employee for an FFD cannot serve as the basis for a **retaliation** claim. In Frankel v. United States Postal Service, **summary judgment** was denied as to the FMLA and Title VII **retaliation** claims which challenged the order to submit to an FFD. Even in the context of the discrimination claim on which **summary judgment** was granted, it was not determined that the FFD was not an adverse action. Rather, the Court found that the plaintiff failed to show a causal connection between the protected activity and the challenged actions (including an FFD). Frankel, 96 F. Supp.2d 19, 27-28 (D. Mass., 2000).

The defendant's reliance on other cases is similarly misplaced. See Schoffstall v. Henderson, 223 F.3d 818, 825 (8 Cir., 2000)(did not hold that ordering an FFD could not be the basis for a **retaliation** claim, but only that the specific facts of the case did not support that finding); Vislisel v. Turnage, 930 F.2d 9, 10 (8 Cir., 1991)(**summary judgment** upheld because of failure to show a causal connection between the FFD and the plaintiff's **[**13]** discrimination complaint; Campbell v. Prince George's County Maryland, 2001 U.S. Dist. LEXIS 7961, 2001 WL 706039 at *6 (D. Md., 2001)(found that the plaintiff had established her prima facie case of **retaliation** and that it is a question for the trier of fact to decide whether an FFD was an adverse employment action considering, inter alia, the emotional distress it may cause); Jones v. Billington, 12 F. Supp. 2d 1, 9, 14-15 (D.D.C., 1997)(it was "assumed that a request for a fitness for duty examination is an employment action covered by Title VII." As to the FFD, **summary judgment on the retaliation** claim was granted because plaintiff failed to connect the FFD causally to his protected activity or show that defendant's reason for requesting it was **pretext**). In sum, an FFD can constitute an adverse personnel action and the **jury** had a sufficient evidentiary basis upon which to conclude that it was in this case.

2. Was it reasonable for the **jury** to conclude that the plaintiff filed her EEO complaint in good faith?

The defendant claims to be entitled to judgment as a matter of law because the plaintiff failed to establish by a preponderance of the evidence that her EEO complaint **[**14]** was based on a reasonable belief that she had been the victim of racial and/or sexual

harassment. ( # 101 at 11) [HN8]Regardless of whether any of the conduct that the plaintiff listed in her EEO complaint was prohibited under Title VII, "an employee's reasonable belief that it crosses the line suffices, as long as the complainant communicates that belief to the **employer** in good faith." Higgins v. New Balance, 194 F.3d 252, 262 (1 Cir., 1999) (citations omitted). So, the **issue** is to be decided on the basis of a subjective inquiry into whether the plaintiff believed she was the victim of discrimination, not whether **[*98]** the defendant's conduct about which the plaintiff complained was in fact illegal.

The defendant contends that Bell's complaint regarding the March 15th incident did not describe "race or sex-based discrimination" and that she failed to offer corroborating evidence of her sexual and racial harassment claims or that such harassment was the cause of her absences from work. ( # 101 at 8) In her brief, Bell proffers several examples of conduct about which she complained that could have led the **jury** to conclude that she believed she was the victim of race and gender discrimination. **[**15]** ( # 108 at 13-15) Bell asserts that when she went to EEO she told them about "everything," including allegations that she had continually been the victim of "fat black woman type jokes" and comments such as "nigger" and "F   ing Whore" in the workplace. ( # 108 at 15, 17-19) She claims that she complained about the abuse to her supervisor several times and he just told her to ignore the comments. ( # 108 at 11 citing II: 39) Indeed the plaintiff alleges that she was wearing headphones on the day she missed the call concerning her son's accident in order to tune out this pervasive verbal harassment in the workplace. ( # 108 at 15 citing II: 54)

Again, [HN9]it is not for the Court to second guess the **jury's** credibility assessment, but only to determine if there was sufficient evidence for a reasonable **jury** to come to that conclusion. See generally Anderson v. Liberty Lobby, 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). The plaintiff presented evidence that her EEO complaint was ultimately triggered by the events of March 15, but that it was also a response to what she reasonably believed was a long history of racial and sexual harassment at the Post Office. **[**16]** Based on Bell's testimony as to what she had endured in the nature of racial and sexual harassment over the years and the inadequate response of management, the **jury** could have reasonably concluded that Bell believed in good faith that the March 15th incident was more of the same.

3. Is there sufficient evidence to satisfy the plaintiff's initial burden of showing a causal connection between the EEO complaint and the three adverse personnel actions that followed? n4

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n4 Again, the case having been fully tried and a **jury** verdict rendered, this is not the juncture at which to examine the sufficiency of the plaintiff's prima facie case. Alvarez-Fonseca, 152 F.3d at 26; Sanchez, 37 F.3d at 720.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The **issue is whether the jury,** on the evidence taken in the light most favorable to Bell, could find that the adverse personnel actions were taken in **retaliation** for her having filed her EEO complaint. As a practical matter, **employers** typically do not explicitly declare their intentions to discriminate **[**17]** or retaliate against an employee for engaging in Title VII protected activity. "Therefore, generally the plaintiff-employee must make do with circumstantial evidence, leaving it to the **jury** whether to infer from the nature of the materially adverse employment conditions that the defendant-**employer** harbored a

retaliatory animus." Simas v. First Citizens' Federal Credit Union, 170 F.3d 37, 48 (1 Cir., 1999). Keeping in mind that the **jury** believed Bell's testimony, the evidence, viewed through the Rule 50(b) lens, is sufficient to support the verdict.

For example, Bell contends that even with her notable record for absenteeism, never before had she been sent for an FFD. Within days of going to the EEO, she was being ordered to submit to a psychological exam. Causation can generally be established by making an inference based on the timing of events. **HN10**⟲"One way **[*99]** of showing causation is by establishing that the **employer's** knowledge of the protected activity was close in time to the **employer's** adverse action.'" Frankel, 96 F. Supp.2d at 24 (quoting Wyatt v. City of Boston, 35 F.3d 13, 16 (1 Cir., 1994)). So, temporal proximity alone could be enough evidence **[**18]** of causation to establish a prima facie case of **retaliation.** It is sufficient in circumstances, such as this, where the action is taken "very close" in time to the protected activity. Clark County School District v. Breeden, 532 U.S. 268, 273-274, 149 L. Ed. 2d 509, 121 S. Ct. 1508 (2001)(temporal proximity alone was insufficient to prove causation because the adverse action occurred twenty months later). Of course, the closer the adverse action is to the protected activity, the stronger the inference of causation. Here, where the adverse action occurred only days after the **employer** learned of the protected activity it appears that a causal connection could reasonably be inferred.

Although only the FFD has been specifically discussed, these three actions cannot be considered in isolation. They were ordered by the same supervisor (Mr. Breen) and were a series of actions, beginning with an FFD, ordered just days after the plaintiff filed with EEO.

4. Did the plaintiff satisfy her burden of proof when the burden shifted back to her to show that the reasons offered by the Postal Service for the three personnel actions were pretextual?

Again, the defendant argues the **[**19]** prima facie case **issue** which is not germane at this stage of the proceedings. The defendant claims that the plaintiff did not offer sufficient evidence upon which a reasonable **jury** could have found that the reason stated by the Postal Service for ordering an FFD was pretextual. This argument completely ignores the plain fact that the **jury** believed Bell's testimony and disbelieved that of the Postal Service officials who posited the non-discriminatory reason for the personnel actions. If a plaintiff offers evidence from which the **jury** could disbelieve that the asserted non-discriminatory reason was the true reason for the actions taken, there is no necessity that the plaintiff produce anything more. As the Supreme Court has written, **HN11**⟲"...it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the **employers** explanation." Reeves, 530 U.S. at 147.

The defendant takes the position that the evidence he offered established that the FFD was scheduled in response to the plaintiffs complaints of disabling work-related stress. The **jury** need not have credited this evidence, however; indeed, it is clear from the verdict that they did **[**20]** not.

For example, it was shown that Bell had a long history of work-related stress and absenteeism during her nine years of Postal Service employment that proceeded her EEO complaint. The plaintiff argues that retaliatory animus is evidenced by that fact that it was not until Bell engaged in the protected activity that the Postal Service decided to take action and initiate a series of adverse actions. Although Potter maintained that the 14-day suspension and Notice of Removal were consequences of Bell alleged unexplained absences from work, the plaintiff notes that she had bad been in a state of "equilibrium" with her **employer** with regard to absenteeism until she filed a complaint with EEO in March of 1997. ( # 108 at 29) The determination as to whether the defendant motive and intent were really **retaliation** is left to the **jury** in cases such as these because "proof is generally based on

inferences that must be drawn, rather than on the proverbial "smoking gun.'" Rossy v. Roche Products Inc., 880 F.2d 621, 624 (1 Cir., 1989). If, **[*100]** on the evidence they viewed as credible, the jurors could disbelieve the testimony by defendant's witnesses as to why the Postal Service took **[**21]** the actions it did, then the verdict must stand.

In sum, from the totality of the evidence, both direct and circumstantial, taken in the light most favorable to the plaintiff, the **jury** could have found the following:

a. Bell's testimony was credible and the testimony of Mr. Breen and the other Postal Service officials who testified as to the reasons personnel actions were taken against Bell were not credible. n5

b. Bell had been subject to a long history of racial and sexual harassment at her employment.

c. Bell's supervisors, most especially Mr. Breen, neglected or refused to deal with the long-standing problem of the sexual and racial harassment of Bell in any effective way.

d. Bell, based on (a) and (b), believed, in good faith, that what happened on March 15th were further acts which were motivated by her race and sex.

e. Bell told Mr. Breen that she had filed the EEO complaint.

f. Immediately thereafter Mr. Breen commenced the first adverse personnel action, followed in succession by the second and third.

g. Mr. Breen took these actions in **retaliation** for Bell having filed the EEO complaint.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n5 Even though the Court "...should review the record as a whole, it must disregard all evidence favorable to the moving party that the **jury** is not required to believe." Reeves, 530 U.S. at 151 (citation omitted). The **jury** was clearly not "required" to believe the testimony of Mr. Breen.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - **[**22]**

It follows that Potter's motion for judgment as a matter of law must be denied. Any other result would require the Court to overturn the **jury's** credibility determinations, which, as the Supreme Court has stated, is improper when ruling on a Rule 50 motion. Reeves, 530 U.S. at 150-1 citing Anderson v. Liberty Lobby, 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

## IV. THE LAW - RULE 59 MOTION

Rule 59(a), Fed. R. Civ. P., provides that [HN12]"[a] new trial may be granted...on all or part of the **issues** (1) in an action in which there has been a trial by **jury**, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." [HN13]It is firmly within the trial court's discretion to grant a motion for a new trial. Allied Chemical Corp. v. Daiflon, Inc., 449 U.S. 33, 36, 66 L. Ed. 2d 193, 101 S. Ct. 188 (1980). A new trial may be granted if the clear weight of the evidence does not support the verdict. Shiels Title Co., Inc. v. Commonwealth Land Title Ins. Co., 184 F.3d 10, 19 (1 Cir., 1999); Kearns v. Keystone Shipping Co., 863 F.2d 177, 181 (1 Cir., **[**23]** 1988).

Moreover, a judge may order a new trial if the verdict "'will result in a clear miscarriage of justice.'" Puerto Rico Aqueduct & Sewer Auth. v. Constructora Lluch, Inc., 169 F.3d 68, 77 (1 Cir., 1999) quoting Phav v. Trueblood, Inc., 915 F.2d 764, 766 (1 Cir., 1990). An excessive award of damages is also grounds for a new trial. Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 433, 135 L. Ed. 2d 659, 116 S. Ct. 2211 (1996). However, deference must be accorded to a **jury's** verdict; it should not be overturned except "under most compelling of circumstances" where it is seriously erroneous. Flores-Suarez v. Turabo Medical Center, 165 F. Supp.2d 79, 85 (D.P.R., 2001)(citing Velazquez **[\*101]** v. Figueroa-Gomez, 996 F.2d 425, 427 (1 Cir., 1993)).

## V. DISCUSSION - RULE 59 MOTION

Defendant argues that no reasonable **jury** could have found that the adverse personnel actions taken by the Postal Service were motivated by a desire to retaliate against the plaintiff for filing an EEO complaint. Therefore Potter requests that judgment as a matter of law or a new trial be granted in order to avoid a miscarriage of justice. **[\*\*24]** Again, the defendant must meet a high standard to persuade the Court that judgment should be granted as a matter of law. *HN14* This motion can only be granted "if the evidence, viewed from the perspective most favorable to the [plaintiff], is so one-sided that the [defendant] is plainly entitled to judgment, for reasonable minds could not differ as to the outcome." FHS Props. Ltd. Pshp. v. BC Associates, 175 F.3d 81, 85 (1 Cir., 1999)(quoting Gibson v. City of Cranston, 37 F.3d 731, 735 (1 Cir., 1994)).

As the discussion regarding the Rule 50(b) motion indicates, this is not such a case. The **jury** believed Bell's testimony; it was within their province to do so. In deciding a Rule 59 motion, the Court cannot make its own credibility judgments and substitute those for the judgments of the **jury.** Yet this is precisely what the defendant asks the Court to do. The Rule 59 motion, at least as to liability, is without merit.

## VI. CONCLUSION AND ORDER

For the reasons stated it is ORDERED that Defendants' (sic) Motion For Judgment As A Matter Of Law Or In The Alternative For A New Trial ( # 84) be, and the same hereby is, DENIED.

ROBERT B. COLLINGS **[\*\*25]**

United States Magistrate Judge

December 12, 2002.

Source: My Sources > Massachusetts > Find Cases > MA Federal & State Cases, Combined ⓘ
Terms: in an action by plaintiff , a whistle-blower, alleging retaliation by his employer, summary judgment not appropriate since issue is for a jury to dete... (Edit Search | Suggest Terms for My Search | Feedback on Your Search)
View: Full
Date/Time: Sunday, August 26, 2007 - 2:51 PM EDT

* Signal Legend:
● - Warning: Negative treatment is indicated
Ⓠ - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
ⓘ - Citation information available

\* Click on any *Shepard's* signal to *Shepardize®* that case.



About LexisNexis  |  Terms & Conditions
Copyright ©  2007 LexisNexis, a division of Reed Elsevier Inc. All rights
reserved.

# CASE # 2

Source: My Sources > Massachusetts > Find Cases > **MA Federal & State Cases, Combined** ⓘ

Terms: **wormstead v. town manager of saugus** (Edit Search | Suggest Terms for My Search | Feedback on Your Search)

☙Select for FOCUS™ or Delivery

☐

*366 Mass. 659, \*; 322 N.E.2d 171, \*\*;*
*1975 Mass. LEXIS 1128, \*\*\**

### Charles N. **Wormstead**, Third, v. **Town Manager** of **Saugus** & others [1]

[1] The other parties were the treasurer and the chief of police of the town.

[NO NUMBER IN ORIGINAL]

Supreme Judicial Court of Massachusetts

366 Mass. 659; 322 N.E.2d 171; 1975 Mass. LEXIS 1128

November 6, 1974, Argued
January 20, 1975, Decided

**PRIOR HISTORY: [\*\*\*1]** Essex.

Bill in equity filed in the Superior Court on February 7, 1972.

The suit was heard by *Brogna*, J., on a master's report.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff policeman sought review of an order of the Superior Court (Massachusetts), which reversed a decree granting him relief in his action against defendant **town manager** seeking declaratory relief to establish his claim of right to be granted leave without loss of pay under Mass. Gen. Laws ch. 41, § 111F.

**OVERVIEW:** The policeman went to his home during his lunch break. On his way back to the police station his car was struck by another vehicle. The policeman was severely injured and unable to return to work. He sought a declaration to establish his claim of right to be granted leave without pay under § 111F. The appellate court reversed an interlocutory decree finding that the policeman's injury was sustained in the performance of his duty within the meaning of § 111F. The court remanded the appellate court's order and held that the policeman was entitled to leave without loss of pay. All that had to be established in order to create an entitlement under § 111F was the sustaining of an injury in the performance of a duty. Section 111F did not additionally require proof that the injury specifically resulted from that duty. The policeman's injury occurred during a period for which he was being paid, when he was on call, and while he was engaged in activities consistent with and helpful to the accomplishment of police functions.

**OUTCOME:** The court remanded the order reversing the decree granting the policeman relief in his action seeking to establish his claim of right to be granted leave without loss of pay and affirmed the original decree.

**CORE TERMS:** lunch, police officer, lunch break, station, workmen's, subsidiary, loss of

pay, Compensation Act, performance of duty, interlocutory decree, final decree, tour of duty, incapacitated, arrest, fault, master's report, employer's premises, working hours, emergency, eat, captain, night, coming rule, leave word, hours of work, place of work, disability, construe, coverage, modified

## LEXISNEXIS® HEADNOTES                                          ⊟**Hide**

Labor & Employment Law > Leaves of Absence > Short-Term Leave 🐦

Workers' Compensation & SSDI > Compensability > Course of Employment > Place & Time 🐦

**HN1**⚓Mass. Gen. Laws ch. 41, § 111F, grants leave without loss of pay to a police officer incapacitated for duty because of injury sustained in the performance of his duty without fault of his own. More Like This Headnote | *Shepardize:* Restrict By Headnote

Civil Procedure > Judicial Officers > Masters > General Overview 🐦

Civil Procedure > Judicial Officers > References 🐦

Civil Procedure > Appeals > Standards of Review > General Overview 🐦

**HN2**⚓When the order of reference does not require a master to report the evidence, both the trial judge and the appellate justices are required to treat the master's findings of fact as binding unless they are mutually inconsistent, contradictory, plainly wrong or vitiated in view of the controlling law. Where, on the other hand, the master in his report sets forth all of the subsidiary findings upon which he bases an ultimate conclusion, it is the duty of the trial court, and of the supreme court, to draw its own inferences from those findings. These principles apply equally whether the case is before the supreme court for initial appellate review or following a decision of the appeals court. More Like This Headnote | *Shepardize:* Restrict By Headnote

Workers' Compensation & SSDI > Compensability > Course of Employment > Place & Time 🐦

Workers' Compensation & SSDI > Compensability > Injuries > General Overview 🐦

**HN3**⚓An injury arises out of the employment if it arises out of the nature, conditions, obligations or incidents of the employment. In other words, out of the employment looked at in any of its aspects. While the words "arising out of" refer to the physical cause of the injury and the activity of the employee, the words "in the course of" refer mainly to the time, place, and circumstances of the injury. Did the injury occur within the hours of work? Was the place where the injury occurred closely enough related to the employment so as reasonably to be included within its risks? Were there any attendant circumstances which would enlarge or restrict the ordinary time or place covered by the employment?" More Like This Headnote

Labor & Employment Law > Leaves of Absence > Short-Term Leave 🐦

Workers' Compensation & SSDI > Compensability > Course of Employment > Place & Time 🐦

**HN4**⚓The court has allowed recovery under both Mass. Gen. Laws ch. 41, § 111F, and Mass. Gen. Laws. ch. 152, § 26, to claimants who were "off duty," in the sense of not being paid for their labors, at the moment they sustained their injuries. Nevertheless, whether the employer compensates the employee for the activity in which he is injured is a relevant consideration, notwithstanding that the activity is one which is of some benefit to the employee. More Like This Headnote | *Shepardize:* Restrict By Headnote

Workers' Compensation & SSDI > Compensability > Course of Employment > Personal Comfort 🐦

Workers' Compensation & SSDI > Compensability > Course of Employment > Place & Time 🐦

Workers' Compensation & SSDI > Remedies Under Other Laws > Exclusivity > General Overview 🐦

**HN5** The mere fact that the performance of duties which results in injury to an
employee occurs before or after regular working hours or during a lunch period
will not bar him from compensation if his claim is otherwise
compensable.  More Like This Headnote | *Sheppardize:* Restrict By Headnote

Workers' Compensation & SSDI > Compensability > Course of Employment > Going & Coming Rule
Workers' Compensation & SSDI > Compensability > Course of Employment > Place & Time
Workers' Compensation & SSDI > Coverage > Employment Relationships > Casual Employees

**HN6** Where an employee has fixed hours of work and a fixed place of employment,
injuries going to and from work do not arise in the course of employment unless
the employee is on the employer's premises. The "going and coming" rule has
little, if any, applicability to trips made to and from the central place of work
during periods when an employee is either working or on call. An employee who
has no single, fixed place of business is, for obvious reasons, generally exempt
from the "going and coming" rule.  More Like This Headnote |
*Sheppardize:* Restrict By Headnote

## HEADNOTES / SYLLABUS                                               ⊟ **Hide**

### HEADNOTES

*Police. Words,* "In the performance of . . . duty."

### SYLLABUS

A police captain, who, without fault on his part, was incapacitated for duty by an injury
sustained in a traffic accident while returning to the police station from his "lunch break," a
period for which he was paid, when he was on call, and while he was engaged in
activities helpful to the accomplishment of police functions, was held to have been injured "in
the performance of his duty" under G. L. c. 41, § 111F, and to be entitled to leave without
loss of pay. [662-667]

**COUNSEL:** *Francis J. Tobin* for the plaintiff.

*Bradbury Gilbert,* Town Counsel (*David L. Taylor* with him) for the defendants.

**JUDGES:** Tauro, C.J., Quirico, Braucher, Kaplan, & Wilkins, JJ.

**OPINION BY:** QUIRICO

### OPINION

**[\*659]  [\*\*172]** The plaintiff, a policeman, brought this bill for declaratory and other
relief in the Superior Court to establish his claim of right to be granted leave without loss of
pay under G. L. c. 41, § 111F, as appearing in St. 1964, c. 149. **HN1** This statute, in so far
as it pertains **[\*\*\*2]** to this case, grants leave without loss of pay to a police officer
"incapacitated for duty because of injury sustained in the performance of his duty without

fault of his own."

The case was referred to a master, who, after holding hearings, found a number of subsidiary facts and concluded therefrom that the plaintiff's injury was not sustained in the performance of his duty. The trial judge, however, **[*660]** entered an interlocutory decree by which he (a) sustained several exceptions by the plaintiff to the master's report, (b) ruled that the master's ultimate conclusion was not supported by the subsidiary findings, and (c) found and ruled that the plaintiff's injury was sustained in the performance of his duty within the meaning of G. L. c. 41, § 111F. The judge accordingly entered a final decree granting the relief requested by the plaintiff. The defendants appealed and the appeal was entered in the Appeals Court. That court, holding that the plaintiff's injury was not sustained in the performance of his duty, reversed both the interlocutory and final decrees. It further ordered that a new interlocutory decree be entered confirming the master's report as filed and that **[***3]** a new final decree be entered declaring that the plaintiff is not entitled to leave without loss of pay under G. L. c. 41, § 111F. *Wormstead* v. *Town Manager* of *Saugus,*
    Mass. App. Ct.    (1974). a The plaintiff applied to us for further appellate review, and we granted the application. G. L. c. 211A, § 11, inserted by St. 1972, c. 740, § 1. See S.J.C. Rule 3:24, § 7, 359 Mass. 834, and fn. thereon, and 838 (1972).

### FOOTNOTES

UNKNOWN a 308 N. E. 2d 921, 924-925.

The order of reference to the master did not require him to report the evidence. $^{HN2}$In such circumstances, "both the trial judge and the appellate justices are required to treat the master's findings of fact as binding unless they are mutually inconsistent, contradictory, plainly wrong or vitiated in view of the controlling law." *Selectmen of Hatfield* v. *Garvey,* 362 Mass. 821, 825 **[**173]** (1973). Where, on the other hand, as in this case, "the master in his report sets forth all of the subsidiary findings upon which he bases an ultimate conclusion, **[***4]** it is the duty of the trial court, and of this court, to draw its own inferences from those findings." *Corrigan* v. *O'Brien,* 353 Mass. 341, 346 (1967). These principles apply equally whether the case is before us for initial appellate review or following a decision of the Appeals Court. *Ballantine* v. *Falmouth,* 363 Mass. 760, 762 **[*661]** fn. 2 (1973). *Ford* v. *Flaherty,* 364 Mass. 382, 387, and fn. 3 (1973). In view of these rules, we here summarize the findings we consider pertinent to the only issue before us: whether the plaintiff's injury occurred in the performance of his duty as that term is used in G. L. c. 41, § 111F. ²

### FOOTNOTES

2 The defendants concede that the plaintiff was incapacitated for duty because of injury and that the injury occurred without fault of the plaintiff.

On November 27, 1971, the plaintiff, a captain in the **Saugus** police department, was the commanding officer of that department's night division, with a tour of duty from 5 p.m. to 1 a.m. the following morning. He **[***5]** was assigned to the station and had charge of the police department during his tour of duty, subject only to orders of the chief of police. At 8 p.m., the plaintiff took his lunch break, leaving the desk officer in charge of the station, and made the four-minute drive to his home in his own automobile. He was wearing civilian clothes except that he had on his uniform trousers; he carried his service revolver. On arriving home, he had something to eat and then watched television until 8:30 p.m. At that time he collected some police investigation papers which were in his house and left to return to the station. While he was driving back to the station, in the exercise of due care, his

automobile was struck in the rear by another vehicle. In this collision the plaintiff was severely injured. He was unable to return to work from the day of the accident until, at least, some time after the master filed his report. The record does not disclose whether he has returned at all.

The circumstances and nature of the plaintiff's lunch break are clearly of primary significance here. An officer's employment contract provides that he "shall work 40 hours" a week, and the town pays an officer **[\*\*\*6]** for a forty-hour week. Provision for a lunch break is not made in the employment contract.

On July 10, 1967, however, the chief of police by written order established a schedule of lunch periods for the night division which was to be followed in the absence of an emergency. The purpose of the break is to allow the officer **[\*662]** to get something to eat during his tour of duty. Under the schedule, the lunch period for the captain in charge of the night division was set from 8 p.m. to 8:45 p.m. During his lunch period any officer, including the commanding officer, can go where he pleases, but he must leave word where he can be reached by telephone or walkie-talkie in case of an emergency. The desk officer is left in charge in the absence of the captain. As noted above, time spent during the lunch period is part of an officer's forty-hour work week; it is similarly part of his eight-hour shift. Unless he works beyond these required periods of time, an officer is not paid overtime wages. Exclusive of the lunch period, an officer works less than the forty hours weekly for which he is paid.

The plaintiff often performed police functions, such as making arrests, while on his **[\*\*\*7]** lunch break. On some occasions he was called back to the station when something "technical" came up. At times, when he was engaged in investigations, he took no break. An officer "is considered to be 'off duty' while at lunch, that is to say, not acting as a police officer, but if he is notified, **[\*\*174]** for example, of a robbery and he interrupts his lunch hour to make an arrest, he is then 'on duty.'" [3]

### FOOTNOTES

[3] We construe these particular "subsidiary facts" to be merely a statement of how the police officers themselves viewed their lunch break. Building on these facts, the master stated in his "findings and conclusions" that "[d]uring his lunch period, the . . . [plaintiff] was 'off duty' . . . ." We believe the Appeals Court erred in considering itself bound by this statement, in *Wormstead* v. *Town Manager of Saugus,*  Mass. App. Ct.  ,  (1974) (308 N. E. 2d 921, 924), since it is not a subsidiary fact but a conclusion of law in the context of this case. See *Corrigan* v. *O'Brien,* 353 Mass. 341, 346 (1967).

**[\*\*\*8]** For reasons hereafter stated, the plaintiff is entitled to leave without loss of pay. We note first, however, that all that must be established in this case to create an entitlement under G. L. c. 41, § 111F, the disability being conceded, is the sustaining of an injury in the performance of duty; the statute does not additionally require proof that the injury specifically resulted from that duty. On this point, G. L. c. 41, § 111F, is in contrast to G. L. c. 32, § 7, relating to accidental disability retirement, which does **[\*663]** impose such a restrictive dual requirement. [4] *Boston Retirement Bd.* v. *Contributory Retirement Appeal Bd.* 340 Mass. 109, 110-111 (1959). Moreover, as we pointed out in *Pettinella* v. *Worcester,* 355 Mass. 412, 415-416 (1969): "It should be noted that the act which we interpret here [G. L. c. 41, § 111F], as originally proposed, contained language which would have permitted continued compensation to police and firemen incapacitated due to 'injuries incurred or illnesses contracted through no fault of their own in the *actual* performance of duty' . . . . However, the statute as finally enacted changed the requirements for compensation **[\*\*\*9]** to 'injury sustained in the performance of his duty without fault of his own.'"

## FOOTNOTES

4 We hereby reject the dictum in *Pettinella* v. *Worcester,* 355 Mass. 412, 415 (1969), where we indicated that G. L. c. 41, § 111F, also contains such a dual requirement. We note that we allowed recovery in the *Pettinella* case despite this dictum.

Thus we cannot construe G. L. c. 41, § 111F, as the defendants request us to do, to require a direct connection between the injury in question and a specific police activity unique to the nature of law enforcement. We do not accept the defendants' arguments: (1) "it is immaterial that the police officer or employee is being paid for the actual time when the injury was received or that the injury took place during his tour of duty"; (2) "the prerequisite [to recovery] is that at the time of injury he is performing a police duty or a specific duty of his employment"; or (3) "the injury must arise out of a risk or condition peculiar to the employment and not common to all persons." **[***10]** We reject these arguments in favor of a broader construction of the words "in the performance of his duty" comparable to the words "arising out of and in the course of his employment" contained in § 26 of the Workmen's Compensation Act, G. L. c. 152. [5]

## FOOTNOTES

5 While we have previously suggested by analogy to G. L. c. 32, § 7, that G. L. c. 41, § 111F, should be construed more restrictively than G. L. c. 152, § 26, we now realize that analogy is imprecise. See fn. 4, *supra*. Therefore, there is no reason to continue to regard our cases construing the Workmen's Compensation Act as inapposite to cases in which recovery is sought under G. L. c. 41, § 111F. We have recently noted that the original Workmen's Compensation Act, St. 1911, c. 751, did not provide coverage for any governmental employees. *Seibolt* v. *County of Middlesex, ante,* 411, 414 (1974). And while a series of amendments has since extended coverage to most governmental employees, the two groups which have never been brought under this umbrella are members of a police or fire force. G. L. c. 152, § 69, as from time to time amended. See *Seibolt* v. *County of Middlesex, supra,* at 414-416. By providing for leave without loss of pay for a police officer or fire fighter who is incapacitated because of injury sustained in the performance of his duty, the Legislature has, in essence, filled a gap in the Workmen's Compensation Act.

**[***11]** **[*664]** **[**175]** The construction of the "arising out of" clause is settled law: [HN3]"An injury arises out of the employment if it arises out of the nature, conditions, obligations or incidents of the employment; in other words, out of the employment looked at in any of its aspects." *Papanastassiou's Case,* 362 Mass. 91, 93 (1972), quoting *Caswell's Case,* 305 Mass. 500, 502 (1940), and *Bator's Case,* 338 Mass. 104, 106 (1958). The meaning of the "in the course of" clause is equally well established. As stated in Locke, Workmen's Compensation, § 261 (1968): "While the words 'arising out of' refer to the physical cause of the injury and the activity of the employee, the words 'in the course of' refer mainly to the time, place, and circumstances of the injury. Did the injury occur within the hours of work? Was the place where the injury occurred closely enough related to the employment so as reasonably to be included within its risks? Were there any attendant circumstances which would enlarge or restrict the ordinary time or place covered by the employment?"

In looking at the plaintiff's employment in all of its aspects, as the foregoing authorities require us to do, **[***12]** we perceive several factors particularly pertinent to our decision. Among these factors are that the plaintiff's injury occurred during a period (1) for which he

was being paid, (2) when he was on call, and (3) while he was engaged in activities consistent with and helpful to the accomplishment of police functions.

We recognize that the first of these factors, that the plaintiff was being paid for the time during which he was injured, is not alone dispositive of the issue before us. [HN4] We have allowed recovery under both G. L. c. 41, § 111F, and G. L. c. 152, § 26, to claimants who were "off duty," in the **[*665]** sense of not being paid for their labors, at the moment they sustained their injuries. Yates v. Salem, 342 Mass. 460, 462 (1961). Canavan's Case, 364 Mass. 762, 764-765 (1974). Nevertheless, our cases also show that whether the employer compensates the employee for the activity in which he is injured is a relevant consideration, notwithstanding that the activity is one which is of some benefit to the employee. Souza's Case, 316 Mass. 332, 337 (1944). Papanastassiou's Case, 362 Mass. 91, 93-94 (1972). Indeed, plain common sense would lead one to **[***13]** the conclusion that a police officer or other employee who is injured during his working hours has a better claim to compensation, all other things being equal, than one who is injured outside those hours.

The second factor noted above, that the plaintiff was on call at the time of his injury, is also significant. A venerable line of workmen's compensation cases established the principle that one who is injured while on call, even though not actually working, is entitled to compensation, at least where he is injured on the employer's premises. See, for example, Doyle's Case, 256 Mass. 290, 292 (1926); Sullivan's Case, 265 Mass. 463, 464-465 (1929). And in Rupp's Case, 352 Mass. 658, 659-660 (1967), we affirmed, under the "on call doctrine," an award of compensation to a visiting nurse who did not live at her place of work and who was injured during working hours while off her employer's premises on her way home, where she was to remain on call until her normal quitting time. In the instant case, the plaintiff was on call during his entire lunch period, and had to leave word where he could be reached in an emergency. As proof that the plaintiff's on call status was **[***14]** of more than theoretical significance, the master found in his subsidiary facts that the plaintiff sometimes made arrests during **[**176]** his break, sometimes was called back to the station, and sometimes took no break at all. [6]

## FOOTNOTES

[6] While a police officer may in theory be on call twenty-four hours a day, we do not suggest here that an officer injured while completely on his own time and engaged in no activity related in any way to his police duties can be said to have sustained his injury while in the performance of his duty. McHugh v. County of Burlington, 44 N. J. Super. 401 (1957), cited by the defendants, is thus easily distinguishable.

**[*666]** The third factor militating in favor of the plaintiff's position is that he was injured while engaged in activities consistent with and helpful to the accomplishing of police functions. As pointed out in our recital of the facts of this case, the chief of police established the lunch break schedule for the purpose of allowing an officer to get something **[***15]** to eat. In view of the nature of police work, it is undoubtedly of benefit to a town to have an officer relax for a short period in the middle of a shift. In going home the plaintiff was following an accepted practice. In bringing some investigation papers from his home back to the station he was engaged in a task incidental to the performance of his duty. See Papanastassiou's Case, 362 Mass. 91, 93-94 (1972). The instant case is therefore to be distinguished from decisions denying compensation to an employee injured while engaged in an activity wholly beyond the scope of his employment for some purpose entirely his own. Chapman's Case, 321 Mass. 705, 708-711 (1947). In the last cited case, we added: [HN5] "The mere fact that the performance of duties which resulted in injury to the employee occurred before or after regular working hours or during a lunch period would not bar him from compensation if his claim was otherwise compensable." 321 Mass. at 710. See Pettinella

v. _Worcester,_ 355 Mass. 412, 413-414, 416 (1969).

Lastly, we feel that nothing we have said to this point in this opinion is undercut by the general rule that _HN6_ "where the employee has fixed hours of work **[\*\*\*16]** and a fixed place of employment, injuries going to and from work do not arise in the course of employment unless the employee is on the employer's premises." Locke, Workmen's Compensation, § 262 (1968). As _Rupp's Case,_ 352 Mass. 658 (1967), makes clear, the "going and coming" rule has little, if any, applicability to trips made to and from the central place of work during periods when an employee is either working or on call. Furthermore, numerous cases establish that an employee who has no single, fixéd place of business is, for obvious reasons, generally exempt from the "going and coming" rule. _Keaney's Case,_ 232 Mass. 532, 534 (1919). **[\*667]** _Souza's Case,_ 316 Mass. 332, 333-337 (1944). _Mandell's Case,_ 322 Mass. 328, 330-331 (1948). We take notice that a police officer, although he may have a primary place of duty (as the plaintiff here did), is engaged in a somewhat peripatetic occupation. This fact is amply borne out in the record here, the master having found that the plaintiff sometimes made arrests while on his lunch break. Since a police officer can serve in some capacity anywhere in a community, we believe he should be included in that class of "traveling **[\*\*\*17]** workers" not barred from receiving compensation to which he is otherwise entitled by the "going and coming" rule.

In light of our conclusions, the case is remanded to the Superior Court where the interlocutory decree concerning the master's report is to be modified to overrule the plaintiff's exceptions nos. 1 and 2 for reasons expressed by the Appeals Court. **Wormstead v. Town Manager** of **Saugus,** Mass. App. Ct. , (1974). b As thus modified, the interlocutory decree is affirmed. As originally entered, the final decree of the Superior Court is affirmed.

### FOOTNOTES

UNKNOWN b 308 N. E. 2d 921, 923.

_So ordered._

Source: My Sources > Massachusetts > Find Cases > **MA Federal & State Cases, Combined** ⓘ
Terms: **wormstead v. town manager of saugus** (Edit Search | Suggest Terms for My Search | Feedback on Your Search)
View: Full
Date/Time: Sunday, August 26, 2007 - 2:03 PM EDT

\* Signal Legend:
● - Warning: Negative treatment is indicated
Ⓠ - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
ⓘ - Citation information available
\* Click on any _Shepard's_ signal to _Shepardize®_ that case.

 **LexisNexis®**     About LexisNexis | Terms & Conditions
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.