UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

THOMAS M. KELLEY,
    Plaintiff,

v.                                        Civil Action No. 05-10596-NMG

TOWN OF PLYMOUTH, et al
    Defendants.

## PLAINTIFF, THOMAS M. KELLEY'S, RULE 56.1 STATEMENT OF DISPUTED FACTS

## DISPUTED FACTS

1.      In 1998 Kelley was singled out for adverse treatment from other similarly situated police officers after initially challenging Chief Pomeroy receiving incentive pay. See Deposition of Kevin Fahey, hereinafter Fahey Deposition at page 20, lines 1-24, page 21, lines 15-21, page 47, lines 4-17, attached hereto as Exhibit G.

2.      Kelley was scrutinized and monitored by Captain Boteiri. Fahey Deposition at page 23, lines 1-24, page 24, lines 1-24, page 27, lines 1-14, Exhibit G. Also, see Affidavit of Kevin Fahey, attached hereto as Exhibit H.

3.      Other officers who had other duties never logged in and out as required for Kelley. Fahey Deposition at page 29, lines 7-17, Exhibit G.

4.      Pomeroy knew Kelley was behind the challenge to his incentive pay, treated him differently with the intent to cause him harm. Fahey Deposition at page 33, lines 19-24, page 34, lines 1-11, Exhibit G.

5.      Kelley was singled out by Pomeroy by monitoring his every move while other officers who provided and performed additional duties of service were not. Fahey Deposition, page 37, lines 1-24, Exhibit G.

6. Pomeroy knew Kelley was behind the investigation of his illegally receiving incentive pay.  Fahey Deposition, page 43, lines 20-24, page 44, line 1, Exhibit G.

7. Former Town Manager Griffin was contacted by the Town Manager Eleanor Beth regarding issues surrounding Chief Pomeroy receiving Quinn Bill incentive pay and what agreement Griffin made with the Chief.  Deposition of William R. Griffin, hereinafter Griffin Deposition, page 8, lines 1-24, attached hereto as Exhibit I.

8. Chief Pomeroy contacted Griffin, former Town Manager, to ask for a letter explaining his receiving incentive pay.  Griffin Deposition, page 8, lines 1-24, Exhibit I.

9. Chief Pomeroy specifically acknowledged that the Plaintiff, Kelley, was challenging the Chief receiving Quinn Bill money as not pursuant to proper procedures.  Griffin Deposition, page 8, lines 14-24, page 9, lines 1-9, Exhibit I.

10. Chief Pomeroy never had any written authorization to receive Quinn Bill benefits once he became chief.  Griffin Deposition, page 10, lines 16-24, page 11, lines 9-24, Exhibit I.

11. Chief Pomeroy was upset and angry over Kelley challenging his receiving Quinn Bill benefits.  Griffin Deposition, page 12, lines 1-11, Exhibit I.

12. The Inspector General was conducting an investigation in regards to Kelley's complaint and interviewed Griffin as part of the investigation. Griffin Deposition, page16, lines 1-24, Exhibit I.

13. The investigation by the Inspector General's office was regarding Chief Pomeroy illegally receiving Quinn Bill benefits that he was not entitled to.  Griffin Deposition, page 16, lines 12-24, Exhibit I.

14. During the time period of the Inspector General's investigation of the Complaint made by Kelley, the Town of Plymouth through the former Town Manager, Eleanor Beth and Chief Pomeroy contacted former Plymouth Town Manager Griffin to question him

2

about Pomeroy receiving Quinn Bill benefits.  Griffin Deposition, Page 23, lines 1-24, Exhibit I.

15.     Chief Pomeroy requested Griffin to send him a letter regarding the verbal agreement Pomeroy had to receive Quinn Bill benefits.  See Griffin Deposition Exhibit 1 from Chief Robert Pomeroy Deposition dated July 13, 2007, a letter from Griffin dated March 2, 2000, a true copy annexed hereto and made a part hereof as Exhibit J.

16.     The Plymouth Police Department had no written procedures or rules for determining if a police officer was healthy enough or has physical limitations that would keep him from training. The chief never asked the state police colonel about the physical exertion or whether police officers should be screened for the Columbine training drill conducted in Plymouth in May, 2003.  Deposition of Chief Robert Pomeroy, hereinafter Pomeroy Deposition, page 42, attached hereto as Exhibit K.

17.     In fact, Pomeroy never talked to anyone about the drill. The chief has no protocols or rules written or otherwise regarding safe training techniques.  Pomeroy Deposition, page 28, lines 1-24, page 44, lines 1-24, page 48, lines 1-24, Exhibit K.

18.     The chief relies only on the reports of the individual police officers.  Pomeroy Deposition, page 22, lines 1-24, page 23, lines 1-24, page 24, lines 1-24, page 28, lines 1-24, Exhibit K.

19.     Pomeroy has never read anything about the issue of ensuring that police officers are safe in their training modules.  Pomeroy Deposition, page 23, lines 1-24, page 27 lines 1-24, page 28, lines 1-24, Exhibit K.

20.      The Chief does not see that he has any responsibilities for insuring that officers are physically capable of training exercises he orders them to attend.  Pomeroy Deposition, page 37, lines 1-24, page 40, lines 1-24, Exhibit K.

21. The chief knows of no meetings where Kelly's health was discussed, Pomeroy Deposition, page 52, lines 1-24, Exhibit K.

22. The chief said that Kelly did not get 111F benefits because of "my interpretation" that he was not entitled. Pomeroy Deposition, page 54, lines 1-24, page 55, lines 1-24, page 56, lines 1-24, Exhibit K.

23. Captain Chandler's report does not indicate that officer Kelly was injured Pomeroy Deposition, page 64, lines1-24, page 65, lines 1-24, page 66, lines 1-24, Exhibit K.

24. Documents approving retirement say that Kelley's injury was sustained while on duty, but when the chief read the document, Exhibit 2 at the deposition, a true copy annexed hereto and made a part hereof as Exhibit F, it did not change his view. Pomeroy Deposition, page 71, lines 1-24, page 72, lines 1-24, Exhibit K.

25. Dr. Thakur's letter does not constitute "injury", Pomeroy Deposition, page 74, lines 1-24, and a Finding of Fact for the Plymouth Retirement Board did not convince the Chief that Kelley was injured on duty and entitled to Ch. 41 § 111F benefits. Pomeroy Deposition, page 75, lines 1-24, page 76, lines 1-24, Exhibit K.

26. The Chief did not have Kelley examined by a town doctor. Pomeroy Deposition, page 78, lines 1-24, Exhibit K.

27. After Kelly retired certain information came to Pomeroy, but it did not cause him to have Kelly examined or consider reversing his decision. Pomeroy Deposition, page 78, lines 1-24, page 80, lines 1-24, page 81, lines 1-24, Exhibit K.

28. Pomeroy thought it important to discuss AR-15 training but not the Columbine like training. Pomeroy Deposition, page 83, lines 1-24, page 84, lines 1-24, Exhibit K.

29. Pomeroy said he was not the least bit concerned about the Quinn issue, Pomeroy Deposition, page 105, lines 1-24, but he didn't like it. Pomeroy Deposition, page 103, lines 1-24, Exhibit K.

30. Pomeroy denies that personnel action is alive for one year. Pomeroy Deposition, page 110, lines 1-24, Exhibit K.

31. Kelly's disciplinary record from 22 years is still around and was produced in response to discovery requests. Pomeroy Deposition, page 112, lines 1-24, Exhibit K.

32. Documents were presented in discovery that Pomeroy said are not in Kelley's personnel file. Rather they are in an incident file. Pomeroy Deposition, page 114, lines 1-24, page 115, lines 1-24, and page 116, lines 1-24, Exhibit K.

33. The collective bargaining contract allows for officers to attend meetings of a fraternal organization, Mass. Patrolman's Association, Pomeroy Deposition, page 122, lines 1-24, Exhibit K.

34. Pomeroy said he never told either Captain to watch Kelly because he was a trouble maker, BUT HE DID CONSIDER Kelly to be a trouble maker. Pomeroy Deposition, page 129, lines 1-24, Exhibit K.

35. Odometer issue involving Kelley was years before Pomeroy was Chief. Pomeroy Deposition, page 132, lines 1-24, Exhibit K.

36. It did not bother Pomeroy that Kelley was questioning the Quinn bill issues but "I wasn't happy". Pomeroy Deposition, page 135, lines 1-24, Exhibit K.

37. There are seven collective bargaining units in the police department. Pomeroy Deposition, page 14, lines 1-24, Exhibit K.

38. Pomeroy is a lawyer. Pomeroy Deposition, page 6, lines 1-24, Exhibit K.

39. Pomeroy is the Vice Chairman of the Joint Management Labor Committee appointed by Governor Romney. It oversees interest bargaining for fire and police and

conducts mediations and arbitrations.  Pomeroy Deposition, page 10, lines 1-24, Exhibit K.

40.     Chief Pomeroy never showed the incentive funds coming to him in his budget, the incentive funds were not reflected in the Chief's salary in his budget.  Deposition of Eleanor Beth, hereinafter Beth Deposition, page 16, lines 1-24, Exhibit L.

41.     Kelley hand delivered a letter to Beth as Town Manager that he was being harassed by the Chief and he was reporting the incentive pay issues to the Inspector General dated May 10, 2001.  Beth Deposition, pages 17, 18 and 19, Exhibit L.

42.     Beth as Town Manager knew the Inspector General was investigating and called former Town Manager, Griffin regarding pay agreement with the Chief.  Beth Deposition, page 18, line 24, page 19, lines 1-24, Exhibit L; Exhibit #2 from Deposition attached hereto as Exhibit M.

43.     The Town treated Kelley different from other town employees who alleged mistreatment by their supervisors.  Beth Deposition, page 26, lines 1-24, Exhibit L.

44.     Town Manager Beth is familiar with the Whistle Blower statute from past experience.  Beth Deposition, page 28, lines 1-11, Exhibit L.

45.     Even though aware of the Whistle Blower statute, Town Manager, Beth, did nothing to investigate harassment claims by Kelley, despite she knew he went to Inspector General's office with a complaint, regarding Chief's improper budgetary practices to pay himself Quinn Bill benefits.  Beth Deposition, page 30, lines 6-22, Exhibit L.

46.     The Medical Panel said Kelley's injury in the Columbine like shooting drill on May 25, 2003, was the natural and proximate cause of his incapacity.  Deposition of Michael Sacco, Exhibit N, hereinafter Sacco Deposition at pages 21-22, Exhibit N; See

Sacco Letter Exhibit 2 of his deposition, a true copy annexed hereto and made a part hereof as Exhibit O.

47. An Independent Medical Panel stated Kelley was injured on duty. Sacco Deposition at pages 23 – 24, Exhibit N; See Exhibit 1 to Sacco Deposition attached hereto as Exhibit F and Exhibit 3 to Sacco Deposition attached hereto as Exhibit E.

48. Public Employees Retirement Administration Commission (PERAC) reviewed the Retirement Board's findings and affirmed injury on duty. Sacco Deposition page 25, lines 19-24, page 26, lines 1-20, Exhibit N.

49. Kelley was injured in performance of duty despite, Chief Pomeroy's denial of injury on duty. Sacco Deposition, page 27, lines 1-24, page 28, line 1, Exhibit N.

50. Kelley was entitled retroactively to Chapter 41 Section 111F benefits. Sacco Deposition, page 33, lines 9-24, page 34, lines 1-24, Exhibit N.

51. Customary for the Town to allow injured officers to use vacation and sick leave until adjudicated injury on duty by Medical Panel, then officer paid retroactively. Sacco Deposition, page 36, lines 9-24, page 37, lines 1-24, page 38, lines 1-24, Exhibit N.

52. Town should have done what it normally would do and put Kelley retroactively on injury on duty status and reimbursed him for vacation days used by him until ruling made he was injured on duty. Sacco Deposition, page 41, lines 1-24, Exhibit N.

53. Kelley was eligible for the Chapter 41, Sec. 111F Benefit denied him by Chief Pomeroy. Sacco Deposition, page 47, lines 14-24, page 48, lines 1-9, Exhibit N.

54. Chief Pomeroy not entitled to Quinn benefits without a by-law authorizing payment. Sacco Deposition, page 50, lines 6-18, Exhibit N.

55. Abbot and Govoni did not participate in Columbine training. Deposition of Captain Michael Botieri, hereinafter Botieri Deposition, page 20, lines 1-24, Exhibit P.

56.    Chandler, Rogers or the Chief told the two not to train. Botieri Deposition, pages 22, 23, lines 1-24, Exhibit P.

57.    Only rule for training is that if you were fit and able then you are fit and able. Botieri Deposition, pages 27-28, lines 1-24, Exhibit P.

58.    The department relies solely on the individual police officer to judge whether he can participate in training when health considerations exist. Botieri Deposition, page 31, lines 1-24, Exhibit P.

59.    The Captain of Operations has no knowledge if anyone has been injured in training in 2006, 2005, or 04. Botieri Deposition, page 34, lines 1-24, Exhibit P.

60.    The Captain has no knowledge if they sign disclaimers. Botieri Deposition, pages 37, 38 and 39, lines 1-24, Exhibit P.

61.    Botieri has a Bachelor in Sociology, SE Mass. University and Master in Criminal Justice, Anna Maria. Botieri Deposition, pages 5-6, lines 1-24, Exhibit P.

62.    Botieri has been a Captain for 10 yrs. Botieri Deposition, page 10, lines 1-24, Exhibit P.

63.    As Captain of Operations, he had no training responsibilities. Botieri Deposition, page 10, lines 1-24, Exhibit P.

64.    Botieri made $121,000 in 2005. Botieri Deposition, page 47, lines 1-24, Exhibit P.

65.    Abbot was treated the same as Kelly. Botieri Deposition, pages 54-56, lines 1-24, Exhibit P.

66.    Several reasons why the chief would not be happy with Kelley on Quinn Bill benefits "That might have been part of it,…) Botieri Deposition, page 79, lines 1-24. " I don't think that either of us was happy about the whole situation" Botieri Deposition, page 80, lines 1-24, Exhibit P.

67. On the radio and computer issues, Botieri said they monitor all officers. Botieri Deposition, page 87, lines 1-24, Exhibit P.

68. We talk to officers all the time about these issues, Botieri Deposition, page 85, lines 1-24, Exhibit P. Kelley's harassment started right after he raised Quinn Bill benefits issue with the Town in May of 1998. Kelley Deposition, page 75, line 1-24, Exhibit Q.

69. Talked to Kelly and looked at his warnings and yet there are others in the command structure. Botieri Deposition, pages 89-91, lines 1-24, Exhibit P.

70. Botieri cannot recall ordering a police officer to work his day off while on vacation. Botieri Deposition, pages 95, 96, lines 1-24, Exhibit P.

71. Botieri knew the medical notes existed on Kelley's Meniere's and Lyme disease. Botieri Deposition, pages 113-114, lines 1-24, Exhibit P.

72. Retirement board tells Botieri to take his personal disputes some where else. Botieri Deposition, pages 108-110, lines 1-24, Exhibit P.

73. Botieri does recall working on the training day in May, 2003, but was not at the site and cannot remember going to Jordan Hospital. Botieri Deposition pages 112-113, lines 1-24, Exhibit P.

74. The Chief gets the medical information and would have received Kelly's and he alone makes the decision to not have him train. Botieri Deposition, page 115, lines 1-24, Exhibit P.

75. Chief also decides on whether Kelly would get the money he was looking for based upon an injury on duty. Botieri Deposition, page 117, Exhibit P, lines 1-24.

76. Botieri doesn't recall others being similarly denied. Botieri Deposition, pages118-119, lines 1-24, Exhibit P.

77. The Union President, Paul Boyle, advised the Chief of two incidents in other Departments involving injuries to personnel taking part in the Columbine type shooting

drill, the same type of drill in which the Plaintiff, Kelley, was injured. Deposition of Paul Boyle, hereinafter Boyle Deposition, page 13, lines 1-24, Exhibit R.

78. The Union President, Boyle expressed concerns about people with existing medical conditions being required to participate in the drill to Chief Pomeroy. Boyle Deposition, page 14, lines 1-20, Exhibit R.

79. Union President Boyle, said the drill was by written order and no one had an option not to participate. Boyle Deposition, page 14, lines 18-24, page 15, lines 1-21, Exhibit R.

80. According to Boyle, the level of exertion was intense and physically demanding even for a person in good condition. Boyle Deposition, page 17, lines 22-24, page 18, lines 1-10, Exhibit R.

81. According to past practices in the Department and the understanding with the Plymouth Police Union, Kelley was entitled to reimbursement for use of his vacation days once his injury was adjudicated as an injury on duty. He was entitled to Chapter 41 Section 111F benefits. Boyle Deposition, page 21, lines 6-13, Exhibit R.

82. Boyle and Dana Goodwin, President and Vice-President of the Plymouth Police Union accompanied Officer Kelley to a meeting with the Inspector General when Officer Kelley filed a complaint regarding Chief Pomeroy improperly receiving Quinn Bill benefits. Boyle Deposition, page 25, lines 18-24, page 26, lines 1-8, Exhibit R.

83. The Union raised issues of the Chief receiving the Quinn Bill benefits in a letter to the Plymouth Finance Committee. Boyle Deposition Exhibit #1, a true copy annexed hereto and made a part hereof as Exhibit S.

84. The Plymouth Police Department Senior Management was predisposed to retaliate against Officer Kelley. Boyle Deposition, page 43, lines 8-24, page 44, lines 1-20, Exhibit R.

85.     Officer Kelley did experience retaliation by Senior Management of the Police Department for raising the issue of the Chief and others improperly receiving Quinn Bill benefits.  Boyle Deposition, page 44, lines 21-23, page 45, lines 4-8, Exhibit R.

                Respectfully submitted,

                Thomas M. Kelley, Plaintiff,
                by his attorneys,


*/s/ Joseph R. Gallitano*
Joseph R. Gallitano, Esq.
 BBO # 183700
34 Main Street Ext., Suite 202
Plymouth MA  02360
(508) 746-1500

*/s/ Richard D. Armstrong*
Richard D. Armstrong, Jr., PC
BBO # 021580
1400 Hancock Street
3rd Floor
Quincy, MA  02169
(617) 471-4400

Dated:  September 12, 2007