UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.:  05 10596 NMG

THOMAS KELLEY,                          )
     Plaintiff,                          )
                                        )
VS.                                     )
                                        )
TOWN OF PLYMOUTH and                    )
ROBERT J. POMEROY, as Chief of the      )
Plymouth Police Department and          )
Individually,                           )
     Defendants.                          )

## DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

The defendants submit this reply memorandum in support of their motion for summary judgment.

### I.    The Defendants Are Entitled to Summary Judgment on Count I:  Chapter 149, § 185

The plaintiff attempts to raise factual disputes in the context of his claim under Chapter 149, § 185, saying that his version of events present a "complete contradiction", but his cited facts are either immaterial or erroneous.  For example, the plaintiff – without citation -- says that Chief Pomeroy denied talking to former Town Manager Griffin about the compensation issue.  This is incorrect, as indicated at pages 87 and 105, for example, of the Chief Pomeroy's deposition testimony, attached at **Defendants' Exhibit 16**, attached.  The plaintiff, again without citation, also states that the Chief maintained he was not upset that the issue was raised.  In fact, Chief Pomeroy said that he didn't like it, but testified that he simply viewed the plaintiff as misguided and knew that everyone was entitled to his or her opinion.  Pomeroy Deposition, p. 103, at **Defendants' Exhibit 15**, attached.  He testified that sometimes people liked him and sometimes they hated him but that it went with the

job. Id., p. 104. He had no issues or concerns with the benefits he was receiving and believed they were proper. Id., p. 104.

Yet, this is the basis of the plaintiff's Chapter 149, § 185 claim -- that he "raised issues related to the unlawful payment of monies to certain police officers…", including Chief Pomeroy. The plaintiff's own deposition testimony, however, reveals that there really was no disputed issue as to these payments, let alone as to them being "illegal". He testified that he raised the compensation issue only in the context of there being no written document on it, that he was in favor of superior officers receiving the same as patrolmen, and that as a town meeting member he voted in 2001 to approve the amendment to the bylaw that covered all the monies and thereby ratified the amounts paid.[1] Kelley Deposition, pp. 65-66, 76, 102, attached at Defendants' **Exhibit 2B.** See also Pomeroy Deposition, p. 89, citing Depo Exhibit 4 (that inspector general's office viewed issue as one to be resolved by town however it wished to resolve it), at **Defendants' Exhibit 16**, attached. Thus, nothing changed in terms of the Chief's compensation. Pomeroy Depo, p. 99, **at Defendants' Exhibit 3**. The plaintiff thus has failed to state a claim for violation of G.L. c. 149, § 185.

In any event, the plaintiff's Complaint identifies the following conduct as being "retaliatory in nature" in terms of c. 149, § 185 claim: the failure to pay him vacation time under §111F, and the "failure to screen members of the police force and prevent Kelley in particular from participating in" a stressful drill. Complaint, ¶ 30, at **Defendants' Exhibit 1**. Yet, the plaintiff does not address at all the issue of the screening in his Opposition argument on this claim and details the § 111F issue later in his discussion of Count IV. Instead, the plaintiff discusses various incidents he claims were harassment for having "raised the illegal payment issues." Where these were never alleged in his Complaint in

---

[1]     Moreover, the Town Manager who appointed Chief Pomeroy had agreed that the Chief would receive these benefits. Griffin Depo, p. 25, at **Defendants' Exhibit 17**.

terms of his § 185 count, he cannot be permitted to assert them now as a basis for it in an attempt to stave off summary judgment.  In any event, such attempt fails for the following reasons:

The plaintiff relies on Lt. Fahy's deposition testimony in maintaining he was "scrutinized," but Fahy's testimony was only in terms of the plaintiff having to log in and out when he attended Retirement Board meetings on his shift.  Fahy Deposition, pp. 20-21, 25, at **Plaintiffs' Exhibit G**.  His testimony as to any claimed "scrutiny" of the plaintiff was solely in terms of the plaintiff's Retirement Board attendance and that it was only in that context that he said "they are out to get you." Id., pp. 25, 34.  But, the plaintiff was the only officer in the department who was a member of the board and attended meetings while on shift. Id., p. 27.  The plaintiff himself agrees that he had an obligation to log out so that the department would know he was at a meeting and not on duty.  Kelley Depo, p. 100, at **Defendants' Exhibit 18**.  Moreover, Lt. Fahy testified that this procedure began when the plaintiff was elected to the retirement board  -- which was in 1996, Kelley Depo, p. 60 at **Defendants' Exhibit 2A**, and thus prior to the plaintiff raising the compensation issue.[2]  Fahy Depo, p. 21, at **Plaintiff's Exhibit G**.

The plaintiff testified that, through Fahy, he was called on the carpet for minor mistakes, such as not giving a location when he responded to a back up call or not dating a citation.  Kelley Depo, pp. 97, 121-122, 125-126, at **Plaintiffs' Exhibit Q**.  But, in fact, Lt. Fahy testimony contradicts these claims.  Lt. Fahy testified that there were never any problems that superior officers asked him to keep track of in terms of the plaintiff.  Fahy Depo, pp. 35-36, at **Defendants' Exhibit 19**, attached.  Lt. Fahy's supervisors never told him they were having issues with the plaintiff particularly. Id., p. 36.  Lt. Fahy specifically testified that (1) he did not discuss with the plaintiff about an instance of not giving his

---

[2]     Fahy's testimony as to various events dating in the "mid-90's" thus too is irrelevant. Of significance is that Fahy was retired at the time of the plaintiff's allegations.

location when responding to a call – although he probably had told all of his officers that they needed to give their location when responding to a call and (2) that he did not remember talking to the plaintiff about not dating his tickets. Id., p. 42.

As for the July 4th issue, the plaintiff being called in to work was done in compliance with his contract language. Pomeroy Deposition, p. 125, at **Defendant's Exhibit 16**, attached. There were about 7 or 8 other officers called in as well. Notably, the six or seven others grieved it, but plaintiff did not. Id., p. 125; Kelley Depo, pp. 95-96, at **Defendants' Exhibit 18**, attached.

Simply put, the plaintiff's attempt to create a basis for, and a disputed issue of fact regarding Count I fails. He has not stated a claim against the defendants for violation of Mass. General Laws, C. 149, § 185 and the defendants are entitled to summary judgment on this claim.

## II.    The Defendants Are Entitled to Summary Judgment on Count II: Gross Negligence, Willful, Wanton and Reckless Conduct.

The plaintiff's efforts to stave off summary judgment on Count II also fail. The nub of the plaintiff's claim here is the department did not screen its members who would be taking part in a training drill. Not surprisingly, the plaintiff cites to no case law holding that a "failure to screen" in such instance amounts to negligence or willful, wanton and reckless conduct. In fact, it doesn't.

The Chief expressly testified that he has never seen anything about screening officers as to their limitations for training in the years of his affiliation with the Massachusetts Chief of Police Association or any of the other many organizations to which he belongs. Pomeroy Depo, pp. 24-26, at **Defendants' Exhibit 16**, attached. Rather, the general rule is that if an officer finds that he is mentally or physically incapable of performing the duties of a police officer, he is to report that to his shift commander. Id., p. 23. Or, if a supervisor observes

an obvious physical or mental infirmity, he or she can act on it. <u>Id</u>., p. 23. The plaintiff offers nothing to counter this testimony.

Instead, the plaintiff tries to mischaracterize the Chief's testimony on this point in saying that the Chief has "never read anything on the issue" of ensuring police officers are safe in training. But, as noted, the Chief's testimony was that there is nothing written on it – not that he hadn't read available material. Also, the plaintiff errs in saying (1) the Chief "has no protocols" regarding safe training techniques when he testified only that there was nothing written, <u>id</u>. at p. 28, and (2) that the Chief does not see that he has "any responsibility for the safety for the eight police officers under his command when in a training mode" and the cited testimony lends no support for that assertion. The plaintiff's attempts to interject an issue of fact in such respects thus fail.

Similarly, that Captain Botieri did not understand questions asked by counsel during a deposition does not create a factual dispute. Nor does the plaintiff's subjective belief – asserted wholly without supporting citation – that Captain Botieri was "reluctant" to talk about the rules or protocols and that "no one in the command structure knew or cared to know" what physical challenges were to be expected in the training. The fact is that it was a State Police conducted training.

Simply put, the plaintiff never expressed concern that he had any condition rendering him unable to participate in the training. The plaintiff certainly never asked to be excluded from the training. Pomeroy Depo, p. 34, at **Defendants' Exhibit 16**, attached. Nor has the plaintiff made any connection between Lyme disease or Menieres' disease and an inability to undergo training -- <u>see id</u>., p. 37 -- or for that matter, any cardiac condition. Yet, the plaintiff alleges that the Chief signed his department up for a training opportunity offered by and run by the Massachusetts State Police simply because he knew it would cause the plaintiff harm. This is preposterous.

Although its not really relevant,[3] the plaintiff offers an affidavit of Officer Govoni and claims it "directly disputes Defendant's statements that officers could have been excused if they asked."  In fact, that affidavit says that Officer Govoni was deemed fit only for desk duty and that he was excused from participating in the drill.  This conforms with the Chief's testimony that an officer assigned to light duty would not have participated in the drill.  Pomeroy Deposition, pp. 30-31, at **Defendants' Exhibit 16**, attached.  The plaintiff also states, without supporting citation, that "Abbott was excused after Govoni was permitted not to participate."  Actually, Abbott had approached a captain ahead of time and asked that he be excused from training because he couldn't perform in a training exercise that would require physical activity.  Id., p. 30.  Abbott was, in fact, excused.

The plaintiff's opposition thus confirms that the defendants are entitled to summary judgment in their favor on Count II as well.

### III.   The Defendants are Entitled to Summary Judgment On Count III: Equal Protection Claims under 14th Amendment and § 1983

Section 1983 creates a private right of action for violations of federally protected rights.  Because it has no statute of limitations provision, § 1983 claims, "borrow[s] the appropriate state law governing limitations unless contrary to federal law."  Poy v. Boutselis, 352 F.3d 479, 483 (1st Cir. 2003).  In Massachusetts, the statute of limitations governing civil rights claims requires that the action be commenced within the three years following the date when the cause of action accrues.  Messere v. Murphy, 32 Mass.App.Ct. 917, 585 N.E.2d 350 (1992), citing G.L. c. 260, § 5B.

It has been held that "[a]lthough the limitations period is determined by state law, the

---

[3]     The immateriality of the Govoni Affidavit is one basis upon which the defendants have asked that this Court strike the same in a motion to strike filed herewith and incorporated herein.  Perhaps more importantly, the Govoni Affidavit was submitted after service of the defendants' motion for summary judgment and after discovery had closed and, thus, is an improper eleventh hour affidavit that should be disregarded.

date of accrual is a federal law question." <u>Carreras-Rosa v. Alves-Cruz</u>, 127 F.3d 172, 174 (1st Cir. 1997).   Section § 1983 claims accrue "when the aggrieved party knows or has reason to know of the injury which is the basis for his action."  <u>Rodriguez Narvaez v. Nazario</u>, 895 F.2d 38, 42 n. 5 (1st Cir. 1990).

Here, the plaintiff's testimony is that he has been treated differently apparently since he first raised the compensation issue in 1998.  His Complaint in this case, however, wasn't filed until March 2005, more than three years later.  The claim is thus time-barred on this basis.  The defendants are entitled to summary judgment on this claim based on the statute of limitations (and, most particularly in terms of the "trumped up performance issues" and having "his supervisors watch him" that he tries to hook via Lt. Fahy given that Lt. Fahy retired in 1999).  Fahy Depo, p. 7, at **Defendants' Exhibit 19**, attached.  Alternatively, the defendants are entitled to summary judgment in their favor because the plaintiff has failed to establish such a claim.

There are two essential elements to a § 1983 claim: First the challenged conduct must be attributable to a person acting under color of state law; second, the conduct must have worked a denial of rights secured by the Constitution or by federal law.  <u>Pariseau v. City of Brockton</u>, 135  F. Supp. 2d 257, 262 (D. Mass. 2001).  The second element requires the plaintiff to prove not only a deprivation of federal right, but also that the defendants' conduct was a cause in fact of the alleged deprivation.  <u>Id</u>.  Here, the plaintiff claims that the defendants denied him benefits under a state statute, c. 41, § 111F, and had him participate in a training exercise.  Neither speaks to a deprivation of a federal right or the deprivation of a property interest.  <u>See</u> <u>Rooney v. Town of Yarmouth</u>, 410 Mass. 485, 573 N.E.2d 969 (1991) (under statute incorporated in police collective bargaining agreement, M.G.L.A. c. 41, § 108L, which provided career incentive pay for police officers, officer had no protected property interest in benefits he claimed were due him).  In the absence of a

deprivation of a specific constitutional right, a claim that action by a town was improperly motivated or violated, a local or state law simply raises a matter of local, not constitutional, concern. See Chiplin Enter. v. City of Lebanon, 712 F.2d 1524, 1527 (1st Cir.1983) ; Olech, supra (Breyer, J., concurring) (ordinary violations of city or state law are not constitutional violations).

But, even beyond this fatal flaw, it bears note that the plaintiff alleges that the defendants treated him "differently than similarly situated Town employees."  He does not claim unequal treatment due to membership in any protected class or racial or gender group but, perhaps, seeks to argue the possibility of a "class of one" equal protection claim. Village of Willowbrook v. Olech, 528 U.S.562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000). To establish such a claim, however, a plaintiff must show that he has (1) been intentionally treated differently (2) from others similarly situated and (3) without any rational basis for the difference in treatment. Id. The plaintiff has failed to make this showing here.

First, there is no evidence of the requisite intent.  "Th[is] burden is an onerous one," Pariseau v. City of Brockton, 135 F.Supp.2d 257, 264 (D. Mass. 2001), and the plaintiff has not met it here.  A plaintiff "may not prevail simply by asserting an inequity and taking on the self-serving conclusion that the defendant was motivated by a discriminatory animus". 18 Massachusetts Practice § 401.  Yet, this is all the plaintiff does here.  In fact, at page 16 of his Opposition, he references his Affidavit.  But, the defendants have moved to strike that affidavit as it is rife with inappropriate legal argument, conclusory facts, and matters not based on personal knowledge.  The defendants refer this Court to that motion and incorporate the same here by this reference.  Suffice it to say, speculation or conclusory assertions, however, are insufficient to ward off summary judgment on a civil rights claim. See Burns v. State Police Ass'n of Mass., 230 F.3d 8, 9 (1st Cir. 2000) (party opposing summary judgment "may not rely on conclusory allegations and unsupported speculation

... even when elusive concepts like motive or intent are at issue...."); <u>Rogan v. City of Boston</u>, 267 F.3d 24 (1st Cir. 2001) (plaintiff who aspires to ward off summary judgment cannot rest on conclusory allegations, empty rhetoric, and unsupported speculation).

The plaintiff's claim would also fail on the second prong -- that he was treated differently from similarly situated persons.  It is this comparative element that distinguishes the Equal Protection Clause.  <u>See</u> <u>Ross v. Moffitt</u>, 417 U.S. 600, 609, 94 S.Ct. 2437, 41 L.Ed.2d 341(1974).  This element is especially important in class-of-one cases, so as to avoid over broad definition of "similarly situated" and one not useful to an equal protection analysis.  <u>Jennings v. City of Stillwater</u>, 383 F.3d 1199, 1214 (10th Cir. 2004), citing <u>Lakeside Builders, Inc. v. Planning Bd. Of Franklin</u>, 2002 WL 31655250 (D. Mass. 2002). Thus, a "class-of-one" plaintiff must provide a specific and detailed account of other similarly situated persons who were in fact treated differently.  The plaintiff here states in conclusory fashion that he was treated differently in terms of the denial of his § 111F benefits, but fails to provide the requisite specifics.  <u>Lakeside Builders, Inc. v. Planning Bd. Of Franklin</u>, 2002 WL 31655250 (D. Mass. 2002) (dismissing purported "class of one" when insufficient specifics were alleged to support conclusory allegation that plaintiff was "similarly situated" to others who were treated differently).   The plaintiff cites to the Boyle Deposition as acknowledging "a past practice for reimbursement" but that citation does not support his contention.  In fact, Boyle testified at those pages that the Chief had also denied the request of a Carl Dimars and that Boyle could not identify the Chief's denial of the plaintiff's request for the benefits as "retaliation."

The plaintiff likewise would stumble on the third prong if he could ever reach it – that the defendants' alleged conduct had no rational basis.  This concept in the context of a "class of one" equal protection claim requires "more than just a perceived difference in treatment for which the plaintiff has received an unsatisfactory explanation."  <u>Lakeside</u>

Builders, Inc., supra, citing Collins v. Nuzzo, 244 F.3d 246 251 (1st Cir. 2001) and Hilton v. City of Wheeling, 209 F.3d 1005, 1008 (7th Cir. 2000). The plaintiff has failed to meet this standard here. There is a rational basis for the drill: namely, police training and testing. The plaintiff undisputedly was not the only officer who had to undergo that training. There also is a rational basis for the denial of the reimbursement of the plaintiff's vacation time under § 111F. The plaintiff was not considered entitled to those benefits in light of his retirement under the Heart Law.

In light of the foregoing, the defendants are entitled to summary judgment on the equal protection count.

### IV.    The Defendants are Entitled to Summary Judgment on Count IV: Denial of Benefits under M.G.L. c. 41, § 111F.

The Plaintiff claims he is "entitled" to reimbursement under § 111F of some $2,000 for vacation time he used after the May 2003 drill. The plaintiff, however, submitted to the Department two doctor's notes in the weeks following that drill and during which time the vacation time was applied. One note dated May 27, 2003 said that the plaintiff "may return to work 2 weeks from his hospital discharge date." Note, at **Defendants' Exhibit 7.** The other, dated June 11, 2003, said that the plaintiff "had a mild cardiac condition" and "would be best served medically by staying out of work for the rest of his vacation time, about a month…. I think his overall prognosis for the future is good. He should be able to return to work." Note, at **Defendants' Exhibit 8**. Instead of returning after the vacation time was applied, he put in his retirement papers. Kelley Depo, p. 143, at **Defendants' Exhibit 18**, attached. He was retired under c. 32, § 7, the Heart Law. In arguing "entitlement" to the monies under § 111F, the plaintiff relies upon findings made under c. 32, but even the Union attorney acknowledged that the statutory presumptions of c. 32 do not apply to c. 41, § 111F benefits. Sacco Depo, p. 37, at **Plaintiff's Exhibit N**. The plaintiff was never established as an "injury on duty" under c. 41, § 111F. See id., p. 41. As such,

he has no "entitlement" to anything under that statute. The defendants are thus entitled to summary judgment on Count IV as well.

## Conclusion

For the reasons stated above and in the defendants' original papers, summary judgment should enter in favor of the defendants on all counts of the plaintiffs' complaint.

Respectfully submitted,
Defendants,
By their attorneys,


/s/ Jeremy Silverfine
Jeremy Silverfine, BBO #542779
Deidre Brennan Regan, BBO #552432
BRODY, HARDOON, PERKINS & KESTEN, LLP
One Exeter Plaza
Boston, MA 02116
(617) 880-7100

Dated: 10/11/07

# EXHIBIT 16

VOLUME:  I
PAGES:  1-143
EXHIBITS:  8

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

THOMAS M. KELLEY,                        *
                                         *
                Plaintiff,               *
                                         *
v.                                       *    C.A.  1:05-CV-10596-NMG
                                         *
TOWN OF PLYMOUTH, ET AL.,                *
                                         *
                Defendants.              *
                                         *
* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**DEPOSITION OF ROBERT J. POMEROY, A WITNESS**

called by and on behalf of the Plaintiff, pursuant to the

applicable provisions of the Federal Rules of Civil Procedure,

before Patrice C. Lucero, Certified Verbatim Reporter and

Notary Public in and for the Commonwealth of Massachusetts, at

the Law Office of Joseph R. Gallitano, 34 Main Street

Extension, Suite 202, Plymouth, Massachusetts, on Monday,

September 25, 2006, to be commenced at 10:30 a.m.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
**LINDA M. CORCORAN**
**COURT REPORTING SERVICES**
**P.O. BOX 4**
**KINGSTON, MA 02364**
**(781) 585-8172**

1    A    Generally.

2    Q    Yes.

3    A    Something to the effect that if an officer finds that he

4         is mentally or physically incapable of performing the

5         duties of a police officer, he's to report that to his

6         shift commander.

7    Q    Is there any rule that imposes on the shift commander or

8         the sergeant in charge of training responsibilities for

9         determining whether or not the police officers being

10        trained are physically capable of being physically

11        trained?

12            MR. SILVERFINE:   Objection as to form.   You can

13        answer.

14   A    Not specifically in writing.   But, obviously, if a

15        supervisor saw some physical or mental infirmity that was

16        obvious to him, he'd make some comment about it.

17   Q    You would say that that's an obligation of a sergeant

18        who's involved in training personnel?

19   A    All supervision.

20   Q    So it would be an obligation of all the superior officers

21        including the chief?

22   A    Yes.

23   Q    This rule is not written?

24   A    Correct.

| | | |
|---|---|---|
| 1 | Q | This rule is part of a police officer's duty at those |
| 2 | | ranks? |
| 3 | A | Yes.   There is no written rule. |
| 4 | Q | You're aware of a number of associations that police |
| 5 | | departments outside of collective bargaining |
| 6 | | organizations belong to; you have, I assume, affiliation |
| 7 | | with the Massachusetts Chief of Police Association; |
| 8 | | right? |
| 9 | A | Yes. |
| 10 | Q | You're a member? |
| 11 | A | Yes. |
| 12 | Q | Do you hold any office in that organization? |
| 13 | A | No. |
| 14 | Q | Does that organization perform any advice or counsel to |
| 15 | | people like yourself at your level with regard to the |
| 16 | | rigors of training or screening police officers with |
| 17 | | respect to physical limitations? |
| 18 | A | I've never seen anything about screening officers to |
| 19 | | their limitations for training. |
| 20 | Q | Nothing? |
| 21 | A | No. |
| 22 | Q | That's the Police Chiefs Association? |
| 23 | A | Right. |
| 24 | Q | Do they talk about training at all? |

25

| | | |
|---|---|---|
| 1 | A | Sure. |
| 2 | Q | But in those discussions about trainings, they never talk |
| 3 | | about looking at the limitations involving a police |
| 4 | | officer's physical or mental capacity? |
| 5 | | MR. SILVERFINE:  Objection as to form.  You can |
| 6 | | answer. |
| 7 | A | Not for training exclusively, no. |
| 8 | Q | There are other associations that you're affiliated with |
| 9 | | or the department is affiliated with beyond collective |
| 10 | | bargaining organizations and the Police Chiefs |
| 11 | | Association? |
| 12 | A | Yes. |
| 13 | Q | What are they? |
| 14 | A | I'm a member of the Plymouth County Police Chiefs |
| 15 | | Association. |
| 16 | Q | I assume that's all the chiefs in the county? |
| 17 | A | Yes. |
| 18 | Q | Any others? |
| 19 | A | The Southeast Massachusetts Chiefs of Police Association, |
| 20 | | the New England Chiefs Association, the International |
| 21 | | Association of Chiefs of Police, the FBI National Academy |
| 22 | | Associates, the FBI LEEDA organization, Law Enforcement |
| 23 | | Executive Development Associates.  That's all of them. |
| 24 | Q | And you maintain membership in each of these? |

1    A    Yes.

2    Q    Do all of these organizations that you maintain

3         membership in, do they require that you be the chief of

4         police to be a member?

5    A    No.

6    Q    Which ones would not require that you be the chief?

7    A    You could be an associate member of the Southeast Chiefs

8         Association.  You could become an associate member of the

9         Mass. Chiefs Association.  You could become an associate

10        member of the International Association of Chiefs of

11        Police.  You could be a full member of the FBI National

12        Academy Associates and the FBI LEEDA program without

13        being a chief.

14   Q    Would you have been a member of any of those

15        organizations when you were sergeant?

16   A    No.

17   Q    We'll skip over lieutenant.  You were only there for a

18        few months.  But as captain when you were there for three

19        years, were you a member of any of these organizations

20        that you could become a member of without being the

21        chief?

22   A    Yes.

23   Q    In any of those organizations, are you familiar with any

24        information that they provide to members with regard

LINDA M. CORCORAN COURT REPORTING SERVICES (781) 585-8172

28

1    capacity to be trained?

2                MR. SILVERFINE:  Objection as to form.  You can

3         answer.

4    A    No.

5    Q    Do you have any protocols inside the town, rules,

6         regulations, written, unwritten, in practice, in the

7         collective bargaining agreements that refer to your

8         obligation to ensure that a police officer is physically

9         and mentally capable to be trained?

10   A    That's an awful broad question, and I'd have to talk

11        about specific instances to give you an answer.

12   Q    Well, is there anything written?

13   A    No, there's nothing written.

14   Q    Is there anything in the collective bargaining agreements

15        that refer to physical limitations or mental limitations

16        with regard to training?

17   A    No, not that I'm aware of.

18   Q    You are undoubtedly aware of your obligation -- correct

19        me; I may be assuming too much -- but of your obligation

20        to provide a safe work environment for police officers in

21        the town; is that correct?

22                MR. SILVERFINE:  Objection as to form.  You can

23        answer.

24   A    To the best of my ability on things I can control.

LINDA M. CORCORAN COURT REPORTING SERVICES (781) 585-8172

1         involved in training?

2    A    It was so long ago; I have no memory of that.

3    Q    Do you recall any circumstance since you have been chief

4         of police in which you have made a decision that a

5         particular police officer should not engage in training?

6    A    Yes.

7    Q    In what circumstances; what are the names of the police

8         officers?

9              MR. SILVERFINE:  Objection as to the form.  You

10        can answer.

11   A    I can think of some specifics and some in general.  John

12        Abbott comes to mind.  I don't know whether he was a

13        sergeant or a lieutenant at the time.  He had something

14        wrong with his leg, veins or something of that nature,

15        and he couldn't perform in a training exercise that would

16        require physical activity, but he came to the captain and

17        requested to be excused from that, and he was.

18   Q    What captain, by the way?

19   A    I don't know.  It was either Botieri or the other

20        captain.  I don't know which one it was at the time.

21        There was another guy, Officer Dennis Govoni, the same

22        training, he was, I believe assigned to light duty at the

23        time for some type of a heart or blood pressure ailment.

24        He was excused from the training.  Over the years

**LINDA M. CORCORAN COURT REPORTING SERVICES (781) 585-8172**

1     there's been dozens and dozens of officers on light duty

2     throughout the years.  Obviously, whatever their physical

3     impairment was at the time and they couldn't participate,

4     then they couldn't participate.  Just common sense.

5  Q  Do you recall if, in fact, Govoni or Abbott were told not

6     to participate in training because of the concerns of a

7     supervisor or superior officer?

8  A  No.

9  Q  Were you involved in the decisions to have Abbott and

10    Govoni, Dennis Govoni, excused from training?

11 A  No.

12 Q  Who made the decision to exclude them from training?

13 A  One of the captains. I was told about it at the time.  I

14    knew about it.  It was common sense.  They couldn't

15    participate.

16 Q  So would you have been told about it before they were

17    excused from training or after they were excused from

18    training?

19 A  I don't remember.

20 Q  Am I to understand that the captains in 2003 -- this

21    would be Captain Chandler and Captain Botieri --

22    understood that they had the authority to excuse

23    patrolmen from training?

24              MR. SILVERFINE:  Objection as to form. You

34

1    Q    Do you know of any reason why Officer Kelley was not

2         excluded from the training of the Columbine-like 2003

3         training program?

4    A    He never asked.

5    Q    So, in the case of Abbott and Govoni, they asked?

6    A    I believe Abbott asked.  I don't think Govoni asked

7         because he was already on light duty.

8    Q    So the captain, in fact, took the initiative to exclude

9         him from training, in your memory?

10   A    He was excluded from a lot of things.

11   Q    Right.  But I'm talking only about the training, the

12        Columbine-like training in 2003 right now.  It was the

13        captain who took the initiative to exclude them?

14                 MR. SILVERFINE:  Objection to form.

15   A    I don't know.

16   Q    You don't know.  But you do know that Officer Kelley did

17        not ask?

18   A    He didn't ask me, and no one told me if he asked them.

19   Q    Were you aware at the time of the Columbine-like training

20        that Patrolman Kelley suffered from any health

21        conditions?

22   A    Not that I remember.

23   Q    Do you recall at any time prior to the Columbine-like

24        training in May of 2003, being aware of the fact that

1    Q    But, in fact, the department was aware in May of 2003,

2         Chief, that he had Lyme disease and Meniere's disease; is

3         that true?

4              MR. SILVERFINE:  Objection as to form.  You can

5         answer.

6    A    My answer did not refer to the Lyme disease or Meniere's

7         disease.

8    Q    Well, I'm asking you about those two conditions in May of

9         2003.

10   A    I don't know enough about either one of them to make a

11        determination.

12   Q    So you would say that knowing what you do now about his

13        Meniere's disease and his Lyme disease and that he had it

14        prior to May of 2003, prior to the Columbine-like

15        training, and he had these conditions, you're saying you

16        can't make a judgment as to whether or not he should have

17        participated in that training?

18              MR. SILVERFINE:  Objection as to form.

19   A    That's right.

20   Q    Have you ever issued while you were chief any type of

21        directive to police officers to ensure the fact that they

22        are physically capable and mentally capable of performing

23        in training or performing in their police duties in

24        general?

87

| | | |
|---|---|---|
| 1 | | the time you first discovered that he was raising that |
| 2 | | issue? |
| 3 | A | I never talked to Kelley about it. |
| 4 | Q | Never? |
| 5 | A | Never. |
| 6 | Q | Did you talk to the town manager about it? |
| 7 | A | Yes.  But not for quite awhile after I first heard about |
| 8 | | it.  Sometime afterwards. |
| 9 | Q | There were newspaper articles regarding the payment of |
| 10 | | these monies; right? |
| 11 | A | At some point there was.  He started first complaining in |
| 12 | | 1999, and I think the newspaper articles maybe weren't |
| 13 | | until 2000, 2001. |
| 14 | Q | At the time when he was complaining in 1999, do you know |
| 15 | | whether or not he was a town meeting member in the town |
| 16 | | of Plymouth? |
| 17 | A | I don't remember. |
| 18 | Q | Do you know if the town meeting in the town of Plymouth |
| 19 | | has an obligation to pass the town budget? |
| 20 | A | Yes.  They vote on it.  They're the legislative body for |
| 21 | | the town. |
| 22 | Q | Right.  So they have a great responsibility invested in |
| 23 | | them by the town's people over the financial affairs of |
| 24 | | the town; correct? |

103

1     anything to do -- has no impact at all?

2  A  No.

3          [WHEREUPON, Plaintiff's Exhibit No. 7 was

4     marked.]

5  Q  Would you look at seven -- is it?

6          THE COURT REPORTER:  Plaintiff's 7.

7  Q  Plaintiff's 7.  Did you look at it?

8  A  Yes.

9  Q  Have you seen it before?

10  A  Yes.

11  Q  Does that change at all your answer to the question just

12     a moment ago as to whether or not the passage of the

13     bylaw would have an impact on the amounts of monies

14     figured in your retirement?

15  A  No.

16  Q  Do you hold animosity towards Mr. Kelley for raising the

17     issue of the Quinn Bill that affected you and affected

18     two captains?

19  A  Well, I didn't like it.  I don't hold any animosity.  I

20     think he's misguided; I think he's wrong, but everybody's

21     entitled to their opinion.

22  Q  Did you take any action as chief of police that was a

23     result of you not liking it?

24  A  Not liking what?

**LINDA M. CORCORAN COURT REPORTING SERVICES (781) 585-8172**

104

1    Q    Not liking whatever Kelley was doing with respect to the

2         Quinn Bill, raising it.  It appeared in newspapers.  Your

3         name was in the newspapers.

4    A    I'm in the newspaper all the time.  Sometimes people

5         praise me.  Sometimes they hate me.  It goes with the

6         job.  It was irrelevant, really, what Kelley thought of

7         me.  I've got a hundred and something employees.  Some of

8         them like me.  Some of them don't.  I'm sure on occasion

9         I'm the topic of dinnertime conversation.

10             People like some policies I implement. Some

11        people don't like them.  It's irrelevant.  I do what I

12        think is right.  I had no issues whatsoever with the

13        benefits I was receiving.  I believe they were entirely

14        proper and just, and I had no concerns about it

15        whatsoever.

16   Q    I was asking you about the newspaper articles and the

17        conversation with the personnel board and the retirement

18        board about the bylaw, the absence of the bylaw.  What

19        about the inspector general's probe, as the newspapers

20        like to call it, did you hold any animosity around the

21        fact that Kelley seemed to trigger that?

22   A    I don't know if there was a probe.  That's what the

23        newspaper said.

24   Q    Right.

105

1    A    I know that they were contacted because Mr. Griffin told

2         me so.  There was rumors back in the beginning of 2001

3         that Kelley went to the inspector general's office.  That

4         was up to him.  I wasn't the least bit concerned about

5         it.  They never contacted me.

6    Q    Did you contact anyone because Kelly went to the

7         inspector general's office?

8    A    No.  I only heard rumors that he went.  I didn't know for

9         a fact that he went.  I didn't know if he complained

10        about me or the finance director or the town manager.  I

11        have no idea.

12   Q    You never talked to Griffin about the subject?  Griffin,

13        apparently, according to the newspapers, was talking to

14        the newspapers, at least, and was talking to the

15        inspector general.  You said that he mentioned it in

16        passing?

17   A    Quite awhile later he mentioned to me, "Oh, by the way,"

18        and that's how he said it, "Oh, by the way, I never told

19        you that they came down."  He says, "There was nothing to

20        it, and they left."

21   Q    The manager at the time in the town was Eleanor Beth.

22        Did she talk to you --

23   A    No.  She never talked to be me about the inspector

24        general's office, and I don't think that she ever talked

125

```
 1        certain number of personnel required for a particular

 2        event or shift, then we go to the mandatory overtime

 3        list, and that's done by order of seniority.  And then

 4        there's a system where blocks are filled in.  So,

 5        basically, the person who hasn't worked in the most

 6        recent is first up for the mandatory overtime that's

 7        available.

 8   Q.   So, in the case of Officer Kelley being called in on one

 9        July Fourth when he was on vacation, that was, I assume,

10        in compliance with the contract language?

11   A    Yes.

12   Q    Do you recall that particular occasion?

13   A    Yes.

14   Q    What year was that?

15   A    1999.

16   Q    As a result of that issue, let's say, surrounding him

17        working the Fourth of July, he complained to the town

18        manager about it.  Do you recall that?

19   A    Well, it wasn't just him.  There were about seven or

20        eight officers.  He's the only one that complained to the

21        town manager.  The other six or seven filed a grievance.

22        He did not.

23   Q    In fact, this was all raised prior to the Fourth of July;

24        is that correct?
```

# EXHIBIT 17

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
--------------------------- )
                              )
THOMAS M.  KELLEY             )
        Plaintiff,            )
VS.                           )  C.A. 1:05-cv-10596-NMG
                              )
TOWN OF PLYMOUTH, ET AL.      )
        Defendant.            )
---------------------------)
```

DEPOSITION OF WILLIAM R.  GRIFFIN, a witness

called for examination by counsel for the Plaintiff, taken

pursuant to the applicable provisions of the Federal Rules

of Civil Procedure, before JO-ANNE M. GOLDEN, a Court

Reporter-Notary Public in and for the Commonwealth of

Massachusetts, at JOSEPH R. GALLITANO & ASSOCIATES, 34 Main

Street Ext., Suite 202, Plymouth, Massachusetts, on Friday,

July 13, 2007, commencing at 1:02 p.m.


**LINDA M.  CORCORAN**
**CERTIFIED COURT REPORTER**
**P. O. Box 4**
**Kingston, Massachusetts   02364**
**(781) 585-8172**

1    behalf of the Town and Chief Pomeroy in accepting the

2    position as Chief, the understanding that he would

3    receive these Quinn Bill incentive pay that he was

4    receiving prior to becoming Chief?

5  A.  Yes.

6  Q.  And that was part of the negotiation that you agreed to

7    with Chief Pomeroy?

8  A.  It wasn't necessarily -- I would not put it in the

9    context of negotiation.  I thought he was entitled to

10    it.

11  Q.  And did -- you were asked about Mr. Kelley, the

12    plaintiff in this case.  Did you ever have any or have

13    you had any conversations with Mr. Kelley that you

14    recall specifically as relate to his complaints or

15    issues regarding any pay incentives that Chief Pomeroy

16    was receiving?

17  A.  A conversation between us?

18  Q.  Right.

19  A.  I don't recall that I ever had one.

20  Q.  Did he ever call you since November 1992, at any point

21    in time since then and discuss with you this issue?

22  A.  I don't recall that, no.

23  Q.  Okay.  Do you recall anyone from the Union -- the

24    Plymouth police union calling you and raising that

# EXHIBIT 18

1

```
 1                                     Volume I
                                    Pages 1-159
 2

 3            UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS

 4                              C.A. NO. 05 10596 NMG

 5

   THOMAS KELLEY,                    :
 6            Plaintiff,             :
                                     :
 7   vs.                             :
                                     :
 8   TOWN OF PLYMOUTH, et al,        :
              Defendant.             :
 9

10

11

12

13          DEPOSITION of THOMAS KELLEY, taken on behalf of
     the Defendants, pursuant to the applicable provisions
     of the Massachusetts Rules of Civil Procedure, before
14   Barbara M. Montijo, a Registered Professional
     Reporter and Notary Public within and for the
15   Commonwealth of Massachusetts, at the offices of
     Brody, Hardoon, Perkins & Kesten, One Exeter Plaza,
16   Boston, Massachusetts, on February 9, 2006,
     commencing at 11:00 a.m.

17

18

19                      ORIGINAL

20

21               DUNN & GOUDREAU
          COURT REPORTING SERVICE, INC.
22               One State Street
               Boston, MA  02109
23               (617) 742-6900

24
```

95

1   Q.   You knew about this before you went in?

2   A.   No.

3   Q.   Did you grieve this -- my question was:  Did you

4        grieve this with the Union, that coming in between

5        your vacation months?

6   A.   I was told, Tom, if you grieve it, we'll lose this

7        opportunity to do something good, to make this work

8        in the future.  So, I said, I'll come in.  I wasn't

9        going to put the Union in that position.

10  Q.   Eventually, for whatever reason, you agreed to go in

11       and you did?

12  A.   I went to work.

13  Q.   And then you took the rest of the month off after

14       that?

15  A.   That's correct.

16  Q.   What else besides this incident do you say was an

17       example of the harassment that you said you were

18       suffering prior to January 2001?  And that's, by the

19       way --

20                    (OFF THE RECORD)

21            MR. SILVERFINE:  Back on the record.

22  Q.   Mr. Kelley, you'll agree, by the way, that that

23       example, which we just discussed about the vacation,

24       was postJanuary 2001, what you just described,

DUNN & GOUDREAU

96

1    correct?

2  A.  It was July 4th, 2001.

3  Q.  And you'll agree with me that's after January,

4    2001?

5  A.  Correct.

6  Q.  If I could just go back to what you said earlier.

7    You said you had suffered from harassment previous to

8    January 2001.  Could you tell me what harassment you

9    say you suffered prior to January 2001 when you went

10    on your visit to the IG's Office?

11  A.  Prior to?

12  Q.  Right.  I'm just taking again -- what you told us

13    earlier, you said because of -- and I'm paraphrasing

14    now -- the harassment you suffered when you went to

15    the IG's Office with Dana and Paul.  So, I'm asking

16    you what harassment you say you suffered prior to

17    your January visit of 2001 to the IG's Office?

18  A.  Well, there was constant examples of when I had to

19    go to -- like when I had meetings.  I had to log in,

20    log out.  If I was -- Botieri would ask, if he saw

21    the car here or there, he was constantly calling

22    Kevin saying, why's Kelley doing this, why's Kelley

23    doing that.  And I had legitimate questions -- or

24    legitimate areas to be.

100

1  would hear from people saying they're calling on you

2  again.

3  Q.  My question, I guess, was:  Were you obligated as an

4      officer when you were off duty and going to

5      retirement meetings, for instance, to log out?

6  A.  I did tell them where I was, yes.

7  Q.  I'm saying, in other words, you were no longer an

8      active police officer?

9  A.  Oh, yeah.

10 Q.  I'm in a meeting, I'm no longer patrolling the

11     streets of Plymouth?

12 A.  Correct.

13 Q.  Would you agree with me you had an obligation to log

14     out, so they would know you were at a retirement

15     meeting and not on duty?

16 A.  That's correct.

17 Q.  How big a Department manwise was Plymouth, let's say,

18     for instance, in 2001?  How many members were there?

19 A.  I think about a hundred.

20 Q.  And at any single shift that you would serve on,

21     about how many officers were on duty?

22 A.  Well, there were two manning postures.  By that I

23     mean, they had a summer manning posture and a winter

24     manning posture, because of the seasonal work and the

143

1   A.    Exhibit 3.  When I spoke with her and got that

2          letter, she told me that it takes about two weeks for

3          the cardio caths to be reduced to writing.  I don't

4          know if you're following me on that.

5   Q.    I am.

6   A.    What they do is the doctor recites it.  As they

7          speak, they make these -- I heard them do it because

8          you're half awake.  They take a tape and they reduce

9          that into report form.  So, she said in two weeks I'd

10         get that.  So, I went home.  I was on sick for a

11         while.  I had a lot of medication.  I had a lot of

12         things to think about.  I talked to my brother-in-law

13         and various people, my wife.

14             I just told the Department put me in for

15         vacation time.  I've got to sort this all out and see

16         what's going on.  I then got the cardio cath from

17         Boston, which was after those two letters, okay.  I

18         didn't have them at the time.

19             I had an appointment with Dr. Moore, we went

20         over the cardio cath results, and he said I can't let

21         you go back.  And then, I realized how serious it was

22         and I put my retirement papers in around, I think it

23         was, the 28th of June; and that's how I came to the

24         2,000.  It's about two weeks' work.  It was two --

# EXHIBIT 19

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

CA No.  05 10596 NMG

- - - - - - - - - - - - - - - - - - - - - - - - - x

THOMAS KELLEY,

                                    Plaintiff,


vs.


TOWN OF PLYMOUTH and ROBERT J. POMEROY,

as Chief of the Plymouth Police Department

and Individually,

                                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - x

VOLUME I                          Pages 1 - 50



        DEPOSITION OF KEVIN P. FAHY, a witness

called by counsel for the Defendants, taken before

Suzanne M. Hebert, Professional Shorthand Reporter

and Notary Public in and for the Commonwealth of

Massachusetts, at Brody, Hardoon, Perkins & Kesten,

LLP, One Exeter Plaza, Boston, MA, on Friday, June 9,

2006, commencing at 12:58 p.m.

# ORIGINAL

1     A.   Correct.

2     Q.   Now, is that the rank you held when you

3 retired?

4     A.   Yes.

5     Q.   Did you start off as a patrol officer?

6     A.   Yes.

7     Q.   Could you briefly describe for us how long

8 you held rank of patrol officer and what ranks you

9 held in the police department?

10    A.   I transferred 1975 to Plymouth and became a

11 sergeant in 1980, '80, '81.  I became a lieutenant in

12 1981 and full-time lieutenant in 1984.

13    Q.   And then you retired as lieutenant, you

14 mentioned?

15    A.   Yes.

16    Q.   What was your retirement date, if you

17 recall?

18    A.   25 September 1999.

19    Q.   Could you briefly describe your educational

20 background for us.

21    A.   I have an associate's degree from Massasoit

22 Community College.  I have a bachelor's degree from

23 Suffolk University.  I have a master's degree from

24 Northeastern University, and I have a year of law

Page 35

1        Q.    Is that during the same period we're

2    talking?

3        A.    Right.

4        Q.    This wasn't a separate episode, this was

5    during the same period?

6        A.    Right.

7        Q.    If I asked you this, again, forgive me,

8    just trying to, as lawyers do, ask all of the

9    questions.  Did you ever have any problems with

10   Mr. Kelley's work as it related to your shift?

11       A.    No.

12       Q.    Did you ever need to tell him to do certain

13   things which he wasn't doing you felt correctly as a

14   police officer?

15       A.    I would say the normal, in other words,

16   "Get the tickets going, write a couple of tickets,

17   citations."  I had to visit the whole shift, but...

18       Q.    Did you have any issues or concerns about

19   him covering his sector?

20       A.    No.

21       Q.    How about answering his radio?

22       A.    No.

23       Q.    Were there problems you were aware of with

24   Mr. Kelley your superior officers asked you to keep

Page 36

1    track of him?

2        A.    No.

3        Q.    In other words, somebody said, "We didn't

4    get a call back, a call we put out to Mr. Kelley.

5    Can you make sure he answers his page or phone call"?

6        A.    No.  They would report right -- in other

7    words, after every shift, every call the officers

8    went on, they would have to fill out a card or do a

9    report.

10        Q.    An incident report?

11        A.    An incident report.  And he was one of 25

12    on a shift that didn't have time to do it.  They

13    would have to do it the next day or two days later,

14    but there was always a long list going.

15        Q.    So he was one of several officers who

16    weren't filling out his reports on time, so to speak?

17        A.    They didn't have time to do it at times.

18        Q.    Did your supervisors tell you they were

19    having issues with Mr. Kelley besides what you have

20    told us?

21        A.    No.

22        Q.    Just if you could describe for us, you

23    talked about the log-in, log-out procedure.  How does

24    that work?

Page 42

1    his location on an assist with Officer Hassan.    Do

2    you recall that?

3        A.    No.

4        Q.    You had apparently had to discuss with him

5    that he didn't give location as he was reporting to

6    assist another officer; do you remember that incident

7    at all?

8        A.    No.

9        Q.    Do you recall telling him, "Tom, you have

10    to give your location"?

11        A.    I probably made the statement to every one

12    of them.

13        Q.    Do you recall incidents where Mr. Kelley

14    did not put the date on tickets?

15        A.    No.

16        Q.    Did you have discussions with Mr. Kelley

17    about that at all?

18        A.    No.

19        Q.    Is it fair to say if you don't put the date

20    on a ticket it can be thrown out of court?

21        A.    Those were all reviewed by the prosecutor's

22    office and they're the ones that were supposed to

23    place the -- to scrutinize that.

24        Q.    Did you ever talk to him about that?