UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

THOMAS M. KELLEY,
     Plaintiff,

v.                                  <u>Civil Action No. 05-10596-NMG</u>

TOWN OF PLYMOUTH, et al
     Defendants.

**<u>PLAINTIFF, THOMAS M. KELLEY'S,
OPPOSITION TO DEFENDANTS'
MOTION TO STRIKE AFFIDAVITS OF
THOMAS M. KELLEY AND DENNIS M. GOVONI</u>**

**I.    <u>DEFENDANTS' MOTION TO STRIKE THE KELLEY AFFIDAVIT
SHOULD BE DENIED.</u>**

Kelley's Affidavit reflects both his Complaint, which was verified and included in his Opposition to Summary Judgment, as well as his Deposition testimony, which supports his entire Affidavit, and is annexed hereto as supportive material, and submits the transcripts of the first 2 sessions of 3 total sessions of his deposition, attached hereto as Exhibit A. His testimony and exhibits thereto when taken in their entirety supports his entire Affidavit. One must remember that the Plaintiff served as a former union official, served and continues to do so as a Plymouth Town Meeting member and a member and former Chairman of the Plymouth Retirement Board. Therefore his statements are not conclusions or arguments, but facts upon his personal knowledge to information as an aforesaid municipal officer, which allowed him to be privy to such information personally. In addition, the Commonwealth of Massachusetts Regulation 840 CMR 15.03, annexed to Plaintiff's Rebuttal to Defendants' Reply to Plaintiff's Opposition clearly indicates that Chief Pomeroy was in violation of State Regulations. Regardless,

the Plaintiff to be subject Chapter 149 § 185 only had to demonstrate that he had a reasonable belief of wrong doing on the part of the Defendants, which was more than evident by virtue of the actions of Defendants by the misappropriation of funds to which Pomeroy was not legally entitled.

The Plaintiff requests that the Motion to Strike his Affidavit be denied and his supplemental submission of his deposition transcripts be accepted in support of his Affidavit.

## II.    <u>DEFENDANTS' MOTION TO STRIKE THE GOVONI AFFIDAVIT SHOULD BE DENIED.</u>

The Defendants specifically mention Officer Dennis Govoni and Sergeant John Abbott as officers who sought to be excused form the Columbine like Drill in their Motion for Summary Judgment in a fashion insinuating that they sought permission before Plaintiff Kelley was injured at his session of said training drill.  In fact, the Plaintiff contends it was only after he was injured that anyone was excused for medical reasons from subsequent training sessions of the Columbine Drill.  Sgt. Abbott is retired and lives out of state.  At this time he was not available to support Plaintiff's contention.

However, Dennis Govoni also retired was available and his Affidavit completely contradicts the statements set forth by the Defendants regarding his ultimately not participating in the drill.  He actually refused to participate in the drill after Kelley was injured as stated in his Affidavit.

Further, the Defendants introduced Govoni as an example of excusing officers who asked to be excluded from the Columbine training session.  He was mentioned in the Depositions of Chief Pomeroy and Captain Botieri.

The Defendants reintroduced Officer Govoni in their Memorandum in Support of their Motion for Summary Judgment.  Both the Plaintiff and Defendants listed Dennis Govoni in their Fed. R. Civ. P. 26(a) (1) (A) Voluntary Disclosure Statement as an individual likely to have discoverable information in paragraph number 41 in said statements.  As of May 13, 2005, the Defendants had ample opportunity to depose Mr. Govoni and chose not to depose him.

After characterizing Govoni's exclusion from the Columbine training in a manner to support their misconceived contentions set forth in their Memorandum for Summary Judgment, a rebuttal affidavit cannot be prohibited from consideration by the Court.  The Defendants opened the door by setting forth their contention based upon hearsay and their own self-serving interpretation of events. The Plaintiff has a right to respond with primary contradictory evidence pursuant to Fed. R. Civ. Proc. 56.1, which specifically requires and authorizes the opposing party to summary judgment to produce affidavits to support the non-moving party's contentions why summary judgment should be denied.

The Plaintiff is well within his procedural rights to present Govoni's Affidavit. The Defendants raised the issue by misrepresenting Govoni's actions and therefore his affidavit is admissible.

As for the typographical error in paragraph 4, the words "you were" are corrected to "I was" in the Confirmatory Affidavit, Exhibit B annexed hereto and made a part hereof.

The content of the Affidavit and its context are clear and cannot be ignored by the Court in view of the misrepresentation of Govoni's activities relating to the training session proffered by the Defendants.

The Plaintiff respectfully requests this Court deny the Defendants' Motion to

Strike the Affidavits of Thomas Kelley and Dennis Govoni.

Respectfully submitted,

Thomas M. Kelley, the Plaintiff,
by his attorneys,

*/s/ Joseph R. Gallitano*
Joseph R. Gallitano, Esq.
 BBO # 183700
34 Main Street Ext., Suite 202
Plymouth MA  02360
(508) 746-1500

*/s/ Richard D. Armstrong*
Richard D. Armstrong, Jr., PC
BBO # 021580
1400 Hancock Street
3rd Floor
Quincy, MA  02169
(617) 471-4400

Dated:  November 15, 2007

# **EXHIBIT A**

Page 1

```
 1                                      Volume I
                                        Pages 1-159
 2
                     UNITED STATES DISTRICT COURT
 3           FOR THE DISTRICT OF MASSACHUSETTS
 4                              C.A. NO. 05 10596 NMG
 5
     THOMAS KELLEY,                     :
 6              Plaintiff,              :
                                        :
 7   vs.                                :
                                        :
 8   TOWN OF PLYMOUTH, et al,           :
                Defendant.              :
 9
10
11
12
                DEPOSITION of THOMAS KELLEY, taken on behalf of
13        the Defendants, pursuant to the applicable provisions
          of the Massachusetts Rules of Civil Procedure, before
14        Barbara M. Montijo, a Registered Professional
          Reporter and Notary Public within and for the
15        Commonwealth of Massachusetts, at the offices of
          Brody, Hardoon, Perkins & Kesten, One Exeter Plaza,
16        Boston, Massachusetts, on February 9, 2006,
          commencing at 11:00 a.m.
17
18
19
20
21                      DUNN & GOUDREAU
                 COURT REPORTING SERVICE, INC.
22                     One State Street
                       Boston, MA  02109
23                     (617) 742-6900
24
```

Page 2

```
 1   APPEARANCES:
 2   JOSEPH R. GALLITANO, ESQUIRE
     GALLITANO & ASSOCIATES
 3   34 MAIN STREET, SUITE 202
     PLYMOUTH, MA  02360
 4   TELEPHONE NO. (508) 746-1500
     FOR:  THOMAS KELLEY
 5
         -and-
 6
     RICHARD D. ARMSTRONG, JR., ESQUIRE
 7   RICHARD D. ARMSTRONG, JR., P.C.
     1400 HANCOCK STREET, THIRD FLOOR
 8   QUINCY, MA  02169
     TELEPHONE NO. (617) 471-4400
 9   FOR:  THOMAS KELLEY
10   JEREMY SILVERFINE, ESQUIRE
     BRODY, HARDOON, PERKINS & KESTEN
11   ONE EXETER PLAZA
     BOSTON, MA  02116
12   TELEPHONE NO. (617) 880-7100
     FOR:  TOWN OF PLYMOUTH, et al.
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1          (DEPOSITION COMMENCED AT 10:55 A.M.)
 2          MR. SILVERFINE:  All motions, except as to
 3   form, are reserved until trial.
 4          MR. ARMSTRONG:  Objections.  All
 5   objections, right.
 6          MR. SILVERFINE:  Just tell me which -- I'm
 7   only dealing with one counsel.
 8          MR. GALLITANO:  Mr. Armstrong is going to
 9   be lead today.
10          MR. SILVERFINE:  That's fine.  As you guys
11   both know, it's not a tag team.
12          MR. GALLITANO:  No, it isn't.
13          MR. ARMSTRONG:  We're going to read and
14   sign.
15          MR. SILVERFINE:  Do you want a notary?
16          MR. ARMSTRONG:  No.  We don't need to do
17   that.  We'll waive the notary.
18                  THOMAS KELLEY
19       The deponent, having been satisfactorily
20       identified and duly sworn by the Notary Public,
21       deposes and testifies as follows:
22          EXAMINATION BY MR. SILVERFINE
23   Q.  Mr. Kelley, good morning.  My name is Jeremy
24   Silverfine.  I'll be taking your deposition today.
```

Page 3

```
 1              I N D E X
 2
     WITNESS                    PAGE
 3
     THOMAS KELLEY
 4
        Examination by Mr. Silverfine . . . . . . . .  4
 5
 6          E X H I B I T S
 7   NO.  DESCRIPTION            PAGE
     (Defendant)
 8
 9   1    Verified Complaint . . . . . . . . . . .   21
10   2    Answers to Interrogatories . . . . . . . .  27
11   3    Letter dated 5/27/2003 from Dr. Bazzano .   51
12   4    Letter dated 6/11/2003 from Dr. Moore . .   53
13   5    Letter dated 6/24/2005 from Robert Pomeroy  57
14   *Reporter's Note:
15   (Exhibits were retained by Attorney Silverfine)
16
17
18
19
20
21
22
23
24
```

Page 5

```
 1   And essentially, as you saw the other day at the
 2   other depositions, you're obligated to answer my
 3   questions.  If there's any time you need to talk to
 4   your attorney, certainly let me know, and I'll allow
 5   you and your counsel to step out and confer.  If you
 6   don't understand something, you have to let me know.
 7   Anytime you need a break, to use the men's room, for
 8   whatever reason, also please let me know.
 9       At the end of this deposition, the stenographer
10   will make a transcript.  You'll have an opportunity
11   to read it and make any corrections you feel are
12   necessary and return them through your counsel.  Have
13   you understood everything so far?
14   A.  Yes.
15   Q.  The only other thing is, if you would just allow me
16   to finish my question, and likewise, hopefully, I'll
17   allow you to finish your answer.  The stenographer
18   can only take down one person at a time; that way the
19   record will be clean.  All right, why don't we start
20   off with -- why don't you give us your full name?
21   A.  My name is Thomas Kelley, 41 Arlington Road.
22   Q.  I'm sorry, say it again?
23   A.  41 Arlington Road.
24   Q.  41 Arlington Road?
```

THOMAS KELLEY

Page 6

1   A.  Uh-huh.  Plymouth, Mass.
2   Q.  Who do you live there with?
3   A.  I live there with my wife.
4   Q.  What's her name?
5   A.  Judith.
6   Q.  Anyone else?
7   A.  My two children.  Colleen and Bridget.
8   Q.  How old are they?
9   A.  Colleen's 20 and Bridget's 19.
10  Q.  Is your wife employed?
11  A.  Yes.
12  Q.  What is her occupation?
13  A.  She's a schoolteacher with the Town of Abington.
14  Q.  How long has she been a schoolteacher?
15  A.  Thirty years.  Just going on thirty years.
16  Q.  Now, what is your Social Security number?
17  A.  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.
18  Q.  Your date of birth?
19  A.  10/26/54.
20  Q.  Are you currently employed?
21  A.  No, I'm not.
22  Q.  You're retired?
23  A.  I'm retired.
24  Q.  And you're retired from the Town of Plymouth Police

Page 7

1       Department?
2   A.  That's correct.
3   Q.  How many years did you serve?
4   A.  I started in September of 1977 and I retired
5       September 9th, 2003.
6   Q.  I'm going to ask you some background questions first,
7       before we get into some of the details of your
8       complaint and other information.  So, if you could
9       bear with me, I'll try to get through that first.
10      First of all, could you tell us a little bit about
11      your educational background?  Where did you go to
12      high school?
13  A.  I went to Catholic Memorial High School in West
14      Roxbury.
15  Q.  What year did you graduate?
16  A.  1973.
17  Q.  Did you continue to further your education?
18  A.  Yes, I did.
19  Q.  What was next?
20  A.  I went to Northeastern University and I graduated in
21      1977.
22  Q.  What kind of degree did you get?
23  A.  I have a Bachelor of Science degree in Criminal
24      Justice.

Page 8

1   Q.  Anything further after Northeastern?
2   A.  Nothing other than in-service training, which would
3       have been through the, I believe, Bristol Community
4       Police Academy down in Fall River.
5   Q.  That was part of your police training?
6   A.  Correct.
7   Q.  Any other formal education?
8   A.  I'm presently -- I have a designation of Chartered
9       Pension Professional.
10  Q.  I'm sorry, Chartered?
11  A.  Chartered Pension Professional.
12  Q.  What is that?
13  A.  It's a professional designation in regards to
14      retirement benefits, how systems are put together,
15      that type of thing, from Boston University.
16  Q.  And you went to school for that?
17  A.  I went to school there.  They had a program, a
18      certificate program.
19  Q.  How long a program was that?
20  A.  It was a two-year program and you got the designation
21      after the second exam.
22  Q.  In what year did you receive your certification?
23  A.  I don't have it right off the top of my head.  It
24      was in -- it's in my personnel file.  You have a copy

Page 9

1       of it.  It's in there as a designation.
2   Q.  Best memory?
3   A.  At least five years ago.
4   Q.  So, around 2000, 2001, roughly?
5   A.  In that area, I would say.
6   Q.  Any other educational certificates?
7   A.  I'm certified in State regulations from the
8       Commonwealth of Massachusetts from PAREC and the
9       State retirement regulations.
10  Q.  Anything else?
11  A.  That's it.
12  Q.  Let's talk a little bit about your work background.
13      When you got out of Northeastern, was your first job
14      with the Plymouth Police Department?
15  A.  I worked there as an intermittent.
16  Q.  Starting in September?
17  A.  September.
18  Q.  Was that your first full-time job?
19  A.  I worked at Boston College as campus police as well.
20      I worked two jobs.
21  Q.  When were you working at Boston College?
22  A.  At the same time I was working for the Town.
23  Q.  September of '77?
24  A.  Correct.

Page 10

1　Q.　How long did you stay at Boston College?
2　A.　I was there nine months, almost a year. I then
3　　　started working down at the power plant for Edison --
4　Q.　The power plant?
5　A.　-- as security.
6　Q.　Where is that?
7　A.　In Plymouth.
8　Q.　What did you do for the power plant?
9　A.　Security.
10　Q.　How long did you remain with them?
11　A.　I remained there until I was appointed a full-time
12　　　permanent officer in 1980.
13　Q.　So, approximately 1977 through 1980?
14　A.　No, it would have been like '79, '79 to '80. About a
15　　　year in each job.
16　Q.　So, you worked for a year at Boston College, a year
17　　　at the power plant?
18　A.　Correct.
19　Q.　And then, were you working an as intermittent as well
20　　　during this period time?
21　A.　Same time, yes.
22　Q.　And you went on full time in 1980?
23　A.　Correct.
24　Q.　And you remained full time until your retirement?

Page 11

1　A.　That's correct.
2　Q.　And any other employment between 1980 until your
3　　　retirement?
4　A.　No.
5　Q.　Now, during your years as a police officer, you
6　　　started off as a patrol officer?
7　A.　That's correct.
8　Q.　Did that position change at all during your years as
9　　　a police officer?
10　A.　No.
11　Q.　You retired as a patrol officer?
12　A.　That is correct.
13　Q.　Did your shifts change during the years you were
14　　　there?
15　A.　When I first started, because of my seniority, I was
16　　　on midnights. Then, I went -- as the seniority
17　　　changed, I went from 5 to 1, 4 to 12, and then 8
18　　　to 4.
19　Q.　You retired when you were doing 8 to 4?
20　A.　That's correct.
21　Q.　How long were you on 8 to 4, do you remember?
22　A.　I'd say almost ten years.
23　Q.　Now, during your career as an officer for Plymouth,
24　　　had you ever been reprimanded or complained about?

Page 12

1　A.　I've never been suspended. Anything to do with civil
2　　　service, I'm sure that there were some complaints
3　　　that I was aware of that were handled by the Town at
4　　　the time and found to have no basis.
5　Q.　Let's talk first about internal reprimands or
6　　　complaints. Do you recall any internal reprimands or
7　　　complaints that you received during your career?
8　　　When I say "internal," inside the Department, either
9　　　from a supervisor or fellow officer.
10　A.　There was -- I remember myself and Mr. Abbott had an
11　　　argument and I received a letter involving that.
12　Q.　When was that?
13　A.　It has to be -- I think '93, maybe.
14　Q.　Who is Mr. Abbott?
15　A.　He was a Sergeant -- no, he was a patrolman at the
16　　　time. John Abbott.
17　Q.　What was his complaint?
18　A.　Well, we had an argument about an issue. I'm trying
19　　　to think of what the issue *was* about. It was about
20　　　something in the Town and that was probably the end
21　　　of it.
22　Q.　Any other internal reprimands or complaints against
23　　　you that you're aware of?
24　A.　Other than going through the discovery information

Page 13

1　　　there, there were some complaints that were handled
2　　　by the Department, that was probably 15 years ago.
3　Q.　Were they internal or external complaints about
4　　　you?
5　A.　They were external ones.
6　Q.　So people, citizens complaining about you?
7　A.　Correct.
8　Q.　And that, you say, is the first time you heard of
9　　　it?
10　A.　No. I mean, you're going back 15 years. When I
11　　　reviewed the information that we had in the
12　　　proceedings here, I looked at the complaints and I
13　　　have the -- I looked over the reports that I have as
14　　　well as the investigation Captain O'Meara did on
15　　　those, and they were found to have no merit.
16　Q.　Besides those complaints, were there any other
17　　　internal complaints, either from a fellow officer
18　　　or supervisor, other than the one you mentioned with
19　　　Mr. Abbott?
20　A.　Well, by "a complaint," I mean, as in a supervisor,
21　　　or anybody? If there's an issue -- explain what you
22　　　mean by "a complaint."
23　Q.　A complaint that led to a letter, a reprimand, a
24　　　suspension, dock in pay, an extra day's work,

Page 14

1    anything of that sort.
2    A.  There was an issue that was brought up by -- way back
3         with Chief Nagle, which I saw in the file that you
4         have there, and that was resolved.  That was supposed
5         to be actually expunged from the file when Chief
6         Nagle was fired for stealing the test and indicted.
7         I guess it wasn't because it was there.
8    Q.  What was the complaint against you by the Chief at
9         that point?
10   A.  Oh, it had to do with some activity with vehicles.
11   Q.  When you say "activity with vehicles," involving
12        what?
13   A.  The odometers.
14   Q.  Were you accused of playing with the odometers?
15   A.  I was.  That's true.
16   Q.  What happened?
17   A.  There was an investigation on it.  I have a copy of
18        that at home.  It was an ongoing practice in the
19        Department by numerous officers.  I was asked about
20        it and I took my responsibility on the issue.
21   Q.  Just so I'm -- when did this take place?
22   A.  Oh, I want to say back in the early '80s.
23   Q.  When you say there was a practice, are you saying,
24        you, along with several officers, were playing

Page 15

1    with the odometers?
2    A.  The report that I have from Captain Murphy, who was
3         the Captain at the time, indicated in his report that
4         there were several other officers involved in this
5         matter.
6    Q.  But I'm asking about -- I'm not asking about other
7         officers right now.  I'm asking about you.  What was
8         your role in this?
9    A.  The dashboards were falling apart in the cars, so you
10        could adjust the mileage on the vehicle.
11   Q.  This is the cruiser or your personal vehicle?
12   A.  The cruiser.
13   Q.  Did you say you along with other officers did this?
14   A.  I can only speak for myself.
15   Q.  That's fine.  You did this, played with the odometer?
16   A.  A couple of times.  That's correct.
17   Q.  Just explain it to me, because I'm not understanding
18        what advantage that had to you.  What would be the
19        advantage to change the odometer?
20   A.  It was a foolish practice that went on in the
21        Department.  It had no advantage.
22   Q.  For what purpose -- in other words, I'm in a cruiser,
23        I'm driving around, I'm doing my job.  What advantage
24        was there to any officer, including you, to mess

Page 16

1    around the odometer?
2    A.  It was just adjusting the numbers, that's all.
3    Q.  What advantage -- you just didn't do it for the heck
4         of it.  What advantage did you gain by changing the
5         odometer?  Did you add numbers or did you subtract
6         numbers?
7    A.  Adding numbers at times, things like that.
8    Q.  So, is it fair to say that you would do more patrol
9         than -- or substantiate the patrol you were supposed
10        to be on; is that fair to say?
11   A.  I believe there was a standing order from the Chief
12        that cars -- people had to put a hundred miles on
13        them.
14   Q.  Per week or per day?
15   A.  Per day, per eight-hour shift.
16   Q.  And so certain people weren't making them?
17   A.  You just couldn't do it and it was a foolish practice
18        done by a group of officers.  It was resolved and I
19        took my responsibility for it.
20   Q.  So, you and other officers admitted to playing with
21        the odometer to meet the hundred-mile-a-day standard
22        set; fair to say?
23   A.  That would be fair to say.
24   Q.  What kind of punishment did you get back in the '80s?

Page 17

1    A.  I did one shift of extra duty.
2    Q.  Anything else that you can recall in terms of
3         reprimands, suspensions, dock in pay, extra shifts
4         that you recall during your career?
5    A.  No.  I can't recall anything that I know of.
6    Q.  So, that's the -- what you've just told us is the
7         only one that you can recall of the events you can
8         recall?
9    A.  That's correct.
10   Q.  And in terms of external complaints; in other words,
11        citizens complaints, besides the one you said you
12        just saw in the file, anything else you can recall?
13   A.  No, I really can't.  I mean, you're going back almost
14        30 years.  I know that there's a specific State law
15        that requires any citizen complaint, whether how big
16        or how small, be investigated by the Department, and
17        I know they were.  And if there were any complaints,
18        Captain O'Meara would have addressed them.  And I
19        remember getting letters back from him stating that
20        they were without merit, some of the ones that I can
21        -- that were there.  Some of them were related to
22        arrests, people were arrested and might not have been
23        too happy.
24   Q.  Have you ever been sued in your capacity as a police

Page 18

1    officer?
2  A. Yes, I was.
3  Q. Can you tell me the name of that case?
4  A. That was a case in 19 -- I don't know the exact
5    year. It was involving then Sergeant Botieri, I
6    think, Darrell Furtado, and a number of other
7    officers. The individual's name was Kapolis.
8  Q. Could you spell that for us?
9  A. I don't know how to spell Kapolis.
10  Q. Just the best you can.
11  A. C -- K-A-P-O-L-I-S.
12  Q. What court were you sued in?
13  A. It never went to court. I just remember we took a
14    deposition once. I just went to a deposition once in
15    Malden.
16  Q. I mean, in order to get to a deposition, there had to
17    be an action. Do you remember where that action was
18    filed?
19  A. Federal Court. I couldn't tell you. Federal, I
20    guess. I don't know.
21  Q. And you had your deposition taken in that case?
22  A. I had a deposition taken in Malden with officer --
23    with, at the time, Sergeant Botieri.
24  Q. Do you remember the attorney who took your

Page 19

1    deposition?
2  A. No, I don't. I know his office was right in Malden
3    Square. It began with an "L."
4  Q. What happened to the case itself?
5  A. The case was ultimately settled with a stipulation.
6    I remember specifically seeing that in the record,
7    that the incident happened between 1 and 3 in the
8    morning. The Town stipulated that the incident
9    happened at that time and I went home at 12:00. I
10    was working 4 to 12; and that was the end of it.
11  Q. Do you remember just what was the underlying
12    allegation that Mr. Kapolis made against you and the
13    other officers?
14  A. He indicated that he was arrested by Sergeant Botieri
15    and he indicated that he had been assaulted.
16  Q. Excessive force type of thing?
17  A. Excessive force type of thing.
18  Q. Do you remember what year this was, roughly?
19  A. It would have been the time -- Sergeant Botieri was a
20    Sergeant at the time. Captain Botieri was a Sergeant
21    at the time. He had to -- he was working 4 to 12 and
22    he was working a double that night. It was an
23    overnight. The Sergeant sometimes took over the desk
24    when the Lieutenant went out. So, I don't know

Page 20

1    whether he was in charge of the station at the time.
2    I would believe -- I would gander to guess it would
3    have to be between '88 and '90, I would say.
4  Q. Any other suits that you were involved with as an
5    officer?
6  A. No.
7  Q. How about as a civilian, any other suits you've been
8    involved with?
9  A. No.
10  Q. Any other depositions that you have given under
11    oath?
12  A. No.
13  Q. I'm going to be jumping around a little bit, but
14    I'll try to direct you with the questions, so there's
15    no confusion. If I confuse you, it's inadvertent.
16    So, please, let me know and I'll rephrase the
17    question. What I'm going to do is I'm going to go
18    through some of the *paragraphs* in your complaint,
19    some of your Answers to Interrogatories, and some
20    other things and ask you questions about them so we
21    can discover information about them. Okay?
22  A. Sure.
23        MR. SILVERFINE: Let's mark your verified
24    complaint as Exhibit 1. I'm sure you have a copy,

Page 21

1    but I'll give you a copy anyway.
2        (EXHIBIT 1 MARKED FOR IDENTIFICATION)
3  Q. I'm now showing you what's been marked as Exhibit 1
4    and I'm placing it before you. And just for purposes
5    of identification, I'll ask you, do you recognize
6    that complaint and your signature verifying the
7    complaint? I think it's four pages from the back.
8  A. (Witness perusing document) Yes, I do.
9        MR. ARMSTRONG: Off the record for a
10    moment.
11        (OFF THE RECORD)
12        MR. SILVERFINE: Back on the record.
13  Q. Mr. Kelley, I'm going to ask you some questions about
14    your verified complaint, which is now Exhibit 1.
15    Okay?
16  A. Yes.
17  Q. On page 2, paragraph 6, you said that on May 25th,
18    2003, Chief Pomeroy ordered members of the Plymouth
19    Police Department to participate in this drill. Can
20    you tell us, were all of the officers of the Plymouth
21    Police Department required to participate in this
22    drill?
23  A. As far as I know, when there's a standard order by
24    the Department, rules and regulations require you to

Page 22

1    go. And I believe everybody, to my knowledge, went.
2  Q. So, it's fair to say that all the officers were
3     required to attend this, correct?
4  A. If it's a written order like that, yes, they are or
5     they're subject to discipline if they don't.
6  Q. In paragraph 8 you mention that there had been a
7     substantial record of your physical impairment.
8     First of all, what was the physical impairment, the
9     substantial record of your physical impairment that
10    you're talking about?
11 A. Before that event, every year, on a regular basis, as
12    part of the contract or agreement, everybody in the
13    Department would get a letter indicating what their
14    sick time was for the previous year.
15       At that time in the letter, it's a standard
16    letter, it says if you have any -- they give you the
17    amount of sick days that you used in the previous
18    year. They then turn around --
19       And it says if you have any circumstances,
20    doctor's notes, various things that would
21    substantiate this, so it's not an abuse issue, that
22    you have bona fide reasons for being sick, you could
23    bring them in; and then they would look at them and
24    retract the letter, okay. And that's written in the

Page 23

1    contract.
2       At that point, I received the annual letter. I
3     produced two doctor's notes for Lyme disease, that I
4     was taking medication for, and I was being treated
5     for Meniere's disease. I gave those two doctor's
6     notes in hand to Captain Botieri.
7  Q. And when did you do that?
8  A. I don't have the exact dates, but I did it right
9     after I got the letter.
10 Q. Well, give me an approximate date of when you
11    received the letter?
12 A. It was before the May 25th event, I can say that.
13 Q. As far as in advance of the May 25th event --
14 A. I can't remember exactly when they come out. I know
15    they come out at some point on an annual basis,
16    that's about the best I can recall.
17 Q. The Lyme disease, first of all, how long had you been
18    suffering from Lyme disease?
19 A. I have no idea.
20 Q. When did you find out you had Lyme disease?
21 A. I went to my primary care doctor, Dr. Moore, and he
22    got me an appointment with Dr. Molloy. We did a
23    blood test and we discovered that there was, I guess,
24    indications of Lyme disease.

Page 24

1  Q. So, when did you become aware that you had
2     contracted Lyme disease?
3  A. I don't have the doctor's notes in front of me, but
4     if I had them, I could give you an exact date.
5  Q. You said here you had already contracted Lyme
6     disease. So, give me your best.
7  A. I don't know. I mean, you can have Lyme disease for
8     many years and not even know it.
9  Q. I understand. I'm asking you when you became aware
10    that you say you contracted Lyme disease?
11 A. Like I said, I don't have the records, but it was
12    around the time when I got that letter and I
13    substantiated the two of them.
14 Q. You were treating with Dr. Moore?
15 A. Dr. Moore is my primary physician.
16 Q. Anyone else for Lyme disease?
17 A. That would be it. Dr. Molloy, he's a specialist in
18    that.
19 Q. Do you recall when you saw Dr. Molloy prior to
20    May 25th, 2003?
21 A. I think it was like maybe a couple of months before
22    that.
23 Q. What was the effect on you from Lyme disease?
24 A. Well, I started to feel -- I was -- I had aches,

Page 25

1    pains, just generally lethargic. I just wasn't
2     right. I just didn't feel right and every joint in
3     my body ached, my shoulders. I was in constant pain
4     from various things. It was like a flu feeling that
5     you had all the time, but you didn't have the flu.
6  Q. How were you being treated for the Lyme disease?
7  A. At the time I was on antibiotics.
8  Q. Do you remember what kind of antibiotics?
9  A. I don't know.
10 Q. Do you remember when you received the antibiotics?
11 A. I used to take them every day.
12 Q. And you were taking it prior to May 25th, 2003?
13 A. I believe so, yes.
14 Q. Did that abate the effects of Lyme disease?
15 A. My understanding of Lyme disease is it's always in
16    your body.
17 Q. Right, but I'm asking you -- I understand it's in the
18    body. Did that abate the feeling that you said you
19    were effected by Lyme disease?
20 A. I don't think it totally took it away. It would come
21    and go, back and forth type of thing. And I kept up
22    the medication.
23 Q. What is Meniere's disease, M-E-N-I-E-R-E'S?
24 A. Meniere's disease.

THOMAS KELLEY                                                                                    FEBRUARY 9, 2006

Page 26

1  Q.  What is that?
2  A.  Meniere's disease is the inner ear.  It affects your
3      stability and it affects your -- like the brain waves
4      in your head is the way I understand it.
5  Q.  How long have you been suffering from Meniere's
6      disease?
7  A.  I think about three years now.
8  Q.  Three years now or three years back then?
9  A.  From now probably -- oh, you're talking back then?
10     I'm retired now.  I'd say at least five years.
11 Q.  So, at least two years prior to May 25th, 2003?
12 A.  About a year.  I'd say about a year, year and a half
13     at that point.  I went to Dr. Durante for that.
14 Q.  Where is Dr. Durante's office?
15 A.  He's in Plymouth.
16 Q.  What did Dr. Durante do for you in terms of Meniere's
17     disease?
18 A.  He put me on a dieretic and I also take another pill
19     from a neurologist related to that.
20 Q.  What doctor is that?
21 A.  That is Dr. -- a neurologist, Childress.
22 Q.  Spell it?
23 A.  Childress.  C-H-I-L-D -- Childress.
24 Q.  C-H-I-L-D-R-E-S-S?

Page 27

1  A.  Correct.
2  Q.  Where is Dr. Childress located?
3  A.  He's located in Duxbury.
4  Q.  Pursuant to that, have you, in your Answers to
5      Interrogatories, and we'll get to that in a second,
6      have you given us the names and addresses of all the
7      doctors and medical facilities that you've been
8      treating for both Lyme disease and Meniere's disease?
9  A.  I believe they're in my retirement file that the
10     Town would have had access to.  I believe that's how
11     we answered the question.
12 Q.  Try my question first.  My question is:  Did you
13     answer that in your interrogatories?
14         MR. SILVERFINE:  And just give me a
15     second, we'll mark that as Exhibit 2.
16         (EXHIBIT 2 MARKED FOR IDENTIFICATION)
17 Q.  Let me ask you this:  Are in fact those your Answers
18     to Interrogatories with your signature on the last
19     page?
20 A.  (Witness perusing document) What's the question?
21 Q.  Are those your Answers to Interrogatories I've just
22     placed before you, Exhibit 2?
23 A.  Yes, that's my signature.
24 Q.  And your signature is on the last page, right?

Page 28

1  A.  Yes, correct.
2  Q.  In Exhibit 2 have you given us all the -- listed all
3      the medical providers and facilities that you've
4      treated with as requested?
5  A.  Do you know exactly which one?
6  Q.  I believe it's Interrogatory Number 16 asks you to
7      provide us with all the medical providers and to list
8      their addresses and phone numbers.  I just want to
9      make sure that's a complete list.  Do you see your
10     answer there in the middle of the page?
11 A.  (Witness perusing document) I believe there was one
12     -- let me see.  Childress isn't there.  No, I believe
13     I left out Dr. Childress.
14 Q.  What's Dr. Childress' first name?
15 A.  I can't think of his first name.  I can't think of
16     his first name.
17 Q.  And his office is where, I'm sorry?
18 A.  On Tremont Street in Duxbury.
19 Q.  Anyone else that you can think of that you haven't
20     listed in your Answer to --
21 A.  No, everybody is there.
22 Q.  So, besides Dr. Childress, this is a complete list?
23 A.  Correct.
24 Q.  No other medical facility?

Page 29

1  A.  No.
2  Q.  And any other medications other than the ones you've
3      just described for us that you're on?
4  A.  I have medicine for my heart.
5  Q.  What other medications are you on?
6  A.  Can I read them off to you?  (Witness perusing
7      document) For my heart I'm on Metoprolol.
8  Q.  Can you spell that for the stenographer?
9          (WITNESS HANDS DOCUMENT TO ATTORNEY SILVERFINE)
10 Q.  M-E-T-O-P-R-O-L-O-L?
11 A.  Uh-huh.
12 Q.  And what does that do?
13 A.  I believe the first two are for blood pressure.
14 Q.  Let's just take them one at a time.
15 A.  I don't know exactly what it does.  I'm not a doctor,
16     but I know I have to take those in combination of
17     each other.
18 Q.  How often do you take Metoprolol?
19 A.  Every day.
20 Q.  Once a day?
21 A.  One once a day.
22 Q.  And that's for -- I'm sorry, you take that for
23     what?
24 A.  My heart.

THOMAS KELLEY

Page 30

1 Q. What does it do, do you know?
2 A. I don't know what it does exactly, but I know that
3    I'm required to take it.
4 Q. Dr. Childress prescribed this?
5 A. No.
6 Q. Who prescribed this?
7 A. Dr. Moore. He's a cardiologist.
8 Q. The second one you listed, I'll spell it.
9    L-I-S-I-N-O-P-R-I-L.
10 A. Lisinopril.
11 Q. Who prescribed that?
12 A. Dr. Moore.
13 Q. What is that for?
14 A. That's heart related, too.
15 Q. Do you know specifically what that is?
16 A. I couldn't tell you.
17 Q. Lipitor is listed as three, who prescribed that?
18 A. Dr. Moore.
19 Q. What does Lipitor do?
20 A. Lipitor, I believe, is for cholesterol.
21 Q. The fourth one is -- I can't read your handwriting.
22 A. Plavix.
23 Q. P-L-A-V-I-X?
24 A. Right.

Page 31

1 Q. Who prescribed that?
2 A. Dr. Moore.
3 Q. What is that?
4 A. Blood thinner.
5 Q. The next is Lexapro?
6 A. Lexapro.
7 Q. L-E-X-A-P-R-O?
8 A. Right.
9 Q. Who prescribed that?
10 A. Dr. Moore.
11 Q. What's that for?
12 A. I believe that keeps your blood pressure down or
13    something to that effect.
14 Q. And the last one listed here is Nortriptyline,
15    N-O-R-T-R-I-P-T-Y-L-I-N-E?
16 A. Right.
17 Q. And who prescribed that?
18 A. Dr. Childress.
19 Q. And what does that do?
20 A. With all the complications of the different things, I
21    started to get these tremendous -- when I get these
22    dizzy spells from the Meniere's, I would get these --
23    what do you call them? -- migraine headaches. I'd
24    get ringing in my ear when I get these attacks, like

Page 32

1    a zing, you get these zinging sounds in your head
2    like you're going to pass out; and that mitigates
3    that.
4 Q. These six prescription drugs which you've listed, are
5    these all prescriptions you've gotten since May 25th,
6    2003, or were you on some of them prior to May --
7 A. No, I was not on anything.
8 Q. Well, you said you were on medication for --
9 A. Right, I was on that.
10 Q. Well, you said you were on at least two of the
11    medications, right?
12 A. Right, that's for the Lyme disease. You know, it was
13    a -- what do you call it? An antibiotic.
14 Q. Do you still take the medication for Lyme disease?
15 A. No, not now.
16 Q. When did you cease taking that?
17 A. Probably sometime after that because of all the other
18    pills I was taking.
19 Q. Do you remember when?
20 A. I couldn't tell you.
21 Q. You say after May 25th, 2003 you ceased taking the
22    Lyme disease medication?
23 A. Correct.
24 Q. How about the Meniere's disease?

Page 33

1 A. Meniere's, I was taking a dieretic, which I have
2    recently stopped, because it was interacting with my
3    heart pill.
4 Q. You were taking that prior to May 25th, 2003. When
5    did you stop taking that?
6 A. Just maybe six months ago.
7 Q. Is Meniere's affected by weight? Is that why you're
8    taking the dieretic?
9 A. No. Meniere's, they don't really have an answer for
10    that. You get a ringing in your ear, you lose
11    hearing. I don't really have a -- the doctor doesn't
12    have a -- they don't have a real solid way of knowing
13    how it comes about. You get the vertigo, you get the
14    headaches, you get ringing in your ear. You lose a
15    percentage of your hearing and it just goes and
16    comes. They don't have any real handle on it.
17 Q. Now, again, directing your attention to Exhibit 1,
18    paragraph 8, when you say you have a substantial
19    record of physical impairment prior to May 25th,
20    2003, were you out sick often prior to May 25th,
21    2003?
22 A. Yes. That's why I got the letter from the Chief,
23    that I had used sick time.
24 Q. How much sick time were you allowed back in your last

THOMAS KELLEY

Page 34

1    year of the job?
2    A. Well, if I can explain how -- what we do is you're
3      given 15 days to a bank every year.
4    Q. 15 sick days?
5    A. 15 sick days. And in the contract it stipulates, I
6      don't know the exact numbers, but if you use over so
7      many, I think it's 15, and you're dipping into your
8      bank -- I had a reserve bank of -- I don't know how
9      many I had at the time, but I had a reserve bank.
10       By contract, they send you a letter -- they send
11      everybody a letter. If you use 2 sick days, that's
12      fine. If you use 23 or 21 -- I think I might have
13      used 22, you get a standard letter. It was the first
14      time I had ever submitted anything like this in my
15      career.
16       I got the doctor's notes indicating that. I
17      gave them to Captain Botieri. I notified the Chief
18      via e-mail that I gave him those doctor's notes at
19      that time.
20    Q. And so at least -- I'm talking up until May 25th,
21      2003, you had already used over 15 sick days
22      based on your Lyme disease and Meniere's disease?
23    A. I had used time before that, okay. And what
24      happened was -- like I said, I documented that it

Page 35

1      wasn't an abuse of sick time. I never had an abuse
2      of sick time letter given to me, but I documented the
3      Lyme disease and I went for treatments.
4    Q. Right. That's what I'm asking. In prior years, had
5      you used up your maximum sick days each and every
6      year?
7    A. No. No. You have a bank and you're given 15 every
8      year. It's just a number that they say every year
9      we'll give everybody. It's like a starting point and
10      they say you're using too much sick time.
11    Q. In the year before had you used at least 15 days?
12    A. No, I used less.
13    Q. Do you have a memory in the past five years, prior to
14      May 25th, 2003, of how many sick days you used per
15      year?
16    A. No. I couldn't do that for you.
17    Q. You have a recollection of being out, though, at
18      least based on your Lyme disease and Meniere's
19      disease?
20    A. I remember numerous times that I would come to work
21      not feeling right. I'd have dizzy spells and have to
22      go home. I'd notify the Lieutenant. I'd come in and
23      I'd say something's wrong and I'd have to go home.
24      In fact, I had Officer Hassan drive me home several

Page 36

1      times and I couldn't finish the shift. He'd drive me
2      home and someone would pick him up. I was so bad, I
3      couldn't drive my car.
4    Q. In paragraph 9 of Exhibit 1 you say Chief Pomeroy and
5      Plymouth, I'm assuming you mean the Town of Plymouth,
6      were well aware of your medical condition at the time
7      you were ordered to participate in the drill. Could
8      you explain to me what you mean by that and how you
9      believe they were well aware of your condition?
10    A. As I previously stated in my last answer, I e-mailed
11      the Chief. I informed him that I put the -- gave the
12      doctor's notes to Captain Botieri in hand. I
13      requested him to look at my sick time again and
14      relinquish the letter that I was given. All letters
15      and doctor's notes are placed in your personnel file
16      and are kept over at the Town Hall. So, they would
17      have had knowledge of that because they would have
18      had to place it in the file.
19    Q. Is someone required, as far as you know, to review
20      those records you submit?
21    A. I don't know the administrative process that handles
22      it once we give it to them.
23    Q. In other words, besides just submitting them and
24      putting them in your personnel file, is there

Page 37

1      somebody in Town, the Police Department, that's
2      required to look at each of those?
3    A. Yes.
4    Q. Who was that?
5    A. That would have been the Captain and the Chief.
6    Q. And you're saying Captain Botieri?
7    A. I handed him that letter and it's ultimately the
8      Chief's decision, because the letter you get annually
9      is signed by the Chief.
10    Q. What did these letters or notices state, that you
11      recall, to both Captain Botieri and Chief Pomeroy,
12      prior to May 25th, 2003 relative to your medical
13      condition at the time?
14    A. I believe the Lyme disease from Dr. Molloy stated
15      that I could be out as a result of Lyme disease
16      several times and I was under his care for it.
17       Dr. Durante stated basically the same thing;
18      that I was under his care for Meniere's disease. I
19      would get these attacks and sometimes you can't come
20      to work and sometimes you have them at work.
21       It's a known -- it's a documented illness, that
22      sometimes they come on at work, sometimes they're
23      symptoms of stress, in stressful situations.
24      Sometimes these things happen, they come on. And

Page 38

```
 1    that was one of the problems, there were a number of
 2    shifts I had to go home and have to be driven home
 3    because I couldn't drive my car.  I had to come into
 4    the station and physically, people had to help me go
 5    home.
 6  Q.  Paragraph number 11, the last line, you said you were
 7    forced to accept a disability retirement.  Do you see
 8    that on page 3, at the top?
 9  A.  Yes.
10  Q.  Are you saying you did not want to accept the
11    disability retirement?
12  A.  Given the condition that I was in, there was no way I
13    could return to the job.
14  Q.  Right, that's what my question is.  In other words,
15    you would agree, even based on your complaint, as I
16    understand it, you're saying on May 25th, 2003 you
17    suffered some kind of cardiac incident; is that
18    right?
19  A.  That's correct.
20  Q.  So, you could not return to work as a full-time
21    officer; is that fair to say?
22  A.  Unless I wanted to die on the job.
23  Q.  Right.  So, when you say you were forced to accept
24    the disability retirement, you're saying that you
```

Page 39

```
 1    could not return based on the incident that happened
 2    to you; is that right?
 3  A.  That would be a fair statement.
 4  Q.  You're not saying you were entitled to some other
 5    type of retirement, are you, sir?
 6  A.  No.
 7  Q.  It wasn't clear for the record.  Mr. Kelley, in
 8    paragraph 14 of Exhibit 1 of your complaint, you
 9    indicate that prior to the date of May 25th, the
10    Union approached Chief Pomeroy and requested he
11    institute a protocol to review members of the force
12    who might not be physically able to participate in a
13    drill.  Do you see that?
14  A.  Uh-huh.
15  Q.  You just have to answer yes for the record.
16  A.  Yes, I'm sorry.  Excuse me.
17  Q.  First of all, who from the --
18         MR. ARMSTRONG:  I'm sorry, where are you on
19    the complaint?
20         MR. SILVERFINE:  Paragraph 14.
21         MR. ARMSTRONG:  Thank you.
22  Q.  Who approached Chief Pomeroy relative to this?
23  A.  I believe the president of the Union, Paul Boyle did
24    in negotiations.
```

Page 40

```
 1  Q.  Besides Mr. Boyle, who else?
 2  A.  I don't know who was at the meeting.  It would have
 3    been any of the Union officials who were there.  I
 4    know Paul talked with him.
 5  Q.  Were you present?
 6  A.  No.
 7  Q.  And what was your understanding of what was specifically
 8    said to the Chief relative to this meeting?
 9  A.  My understanding is that at that meeting they had a
10    discussion, some type of discussion on -- the Union
11    had concerns about injuries from this training; and
12    that's what was discussed at the meeting.
13  Q.  When you say "injuries," are you referring to the
14    injuries Mr. Boyle mentioned in his deposition the
15    other day, some kind of gas mask; is that right?
16  A.  I know at the time there were a number of concerns
17    that officers had heard about.  The intensiveness of
18    the training, the type of training, and that there
19    were injuries.  I believe that was what was brought
20    up at the meeting.
21  Q.  Were specific officers mentioned, to your knowledge?
22  A.  No.  I don't know exactly.  I wasn't at the meeting.
23  Q.  So, your name specifically did not come up; is that
24    correct?
```

Page 41

```
 1  A.  I couldn't tell you that.
 2  Q.  But you were sitting at the same deposition the other
 3    day and heard Mr. Boyle discuss this same topic,
 4    correct?
 5  A.  I didn't particularly hear -- I didn't hear
 6    anything.  I wasn't sitting at the table.  I was back
 7    in the other room, but I know it was brought up.
 8  Q.  You weren't sitting behind me the other day --
 9  A.  I was behind you, but not right on top of him.  I
10    didn't hear exactly what he said.
11  Q.  We were in the room together with Mr. Boyle, these
12    two counsel and yourself, and we all listened to
13    Mr. Boyle talking.  You're saying you didn't hear
14    that?
15  A.  I heard it, yes.
16  Q.  And Mr. Boyle mentioned something to do with a gas
17    mask, but he also did not mention any officers,
18    including you, having been brought up to Chief
19    Pomeroy; is that right?
20  A.  If that's what he said, I guess that must be
21    correct.
22  Q.  You say in paragraph 15 of this Exhibit 1 that the
23    Union advised Chief Pomeroy there were officers with
24    existing medical conditions, do you see that?
```

DUNN & GOUDREAU

Page 42

1    A.  Uh-huh.
2    Q.  You have to say yes for the record, sir.
3    A.  Yes, I'm sorry.  Yes.
4    Q.  Were any specific officers mentioned to Chief Pomeroy
5         by the Union?
6    A.  I don't know.
7    Q.  Was your name mentioned specifically to Chief
8         Pomeroy?
9    A.  I don't know.
10   Q.  When did this discussion as far as you understand
11        take place?
12   A.  What was the question now?
13   Q.  When did this meeting take place between the Union,
14        Mr. Boyle, and Chief Pomeroy?
15   A.  I believe they had scheduled negotiations and they
16        brought it up during that.  I don't know the exact
17        date.
18   Q.  How far in advance of May 25th was this meeting?
19   A.  I couldn't tell you.
20   Q.  Was this drill specifically discussed at this
21        meeting?
22   A.  I couldn't tell you.  I wasn't at the meeting.
23   Q.  Well, I'm asking you because you put this in as part
24        of your allegations in your complaint, what you know

Page 43

1         about it and who would have information about that.
2         So, since you listed it here, and this is a verified
3         complaint, I'm just asking you what information you
4         have about it?
5    A.  Paul Boyle would -- he was at the meeting.  He would
6         have more specifics than I would.  I know he did tell
7         me they did discuss it at a meeting with the Chief.
8    Q.  So, you don't know whether or not this drill was
9         specifically discussed?
10   A.  I believe it was.
11   Q.  And you don't know when it was?
12   A.  I don't know when the negotiations were.
13   Q.  This was a regularly scheduled negotiation between
14        the Union and the Chief?
15   A.  I believe they were impact bargaining about the
16        AR-15s, the new weapons that they were putting out.
17   Q.  But there wasn't a specific meeting about the drill
18        that was upcoming?  This meeting was a regularly
19        scheduled negotiation, would that be fair to say?
20   A.  I would say that would be fair to say.
21   Q.  In paragraph 16 you wrote that Chief Pomeroy refused
22        to establish or institute any type of protocol, do
23        you see that?
24   A.  Yes, I do.

Page 44

1    Q.  What's the basis of your knowledge about that?
2    A.  From hearing it through the grapevine and we heard
3         that the issue was brought up by the Union.  And
4         basically, from the way I understand it, they said
5         there was no concern on the Department's side.  They
6         said that the State Police had everything; and that
7         was the end of it.
8    Q.  And just so I'm clear.  Is this again information you
9         received from Mr. Boyle or anyone else?
10   A.  I don't know exactly if it was from Paul.  I heard it
11        through the -- you know, like at roll call.  There's
12        always discussions of various current matters going
13        on.  It was through the grapevine.  I can't
14        specifically pull a name out of a hat.
15   Q.  That's what I'm asking you.  Because, again, you've
16        indicated that the Chief refused to establish any
17        type of protocol.  So, where did you get that
18        information from?
19   A.  I got that from the general consensus of the officers
20        at the station.
21   Q.  But the only officer you understood to be present was
22        Paul Boyle?
23   A.  Correct.  He was at the meeting when this issue was
24        discussed.

Page 45

1    Q.  So, the rest of the information would have been, fair
2         to say, hearsay, because Mr. Boyle was the only one
3         present with Chief Pomeroy?
4    A.  I can't categorize it in any category.
5    Q.  You tell me what direct information you have other
6         than hearsay?
7    A.  Other than hearing it from the grapevine, that's all
8         I have.
9    Q.  In paragraph 17 of Exhibit 1 you said you submitted a
10        request for reimbursement.  To whom did you request
11        reimbursement from?
12   A.  I contacted the Union steward at the time, Larry
13        Rooney.
14   Q.  Larry Rooney?
15   A.  Uh-huh.
16   Q.  Can you spell the last name?
17   A.  R-O-O -- Rooney, R-O-O-N-E-Y.
18   Q.  He is a police officer?
19   A.  Yes, he is.
20   Q.  He's also the Union steward?
21   A.  Uh-huh.
22   Q.  Just answer for the record.
23   A.  Yes, I'm sorry.
24   Q.  What did you do through Larry Rooney?

THOMAS KELLEY                                                          FEBRUARY 9, 2006

---

Page 46

1   A.  I gave Larry Rooney the finding of fact from the
2       Board, because I had already been retired at the
3       time. I gave him the doctor's certificate. I gave
4       him the doctor's narrative.
5   Q.  When you say "doctor's certificate," which doctor are
6       you referring to?
7   A.  The medical panel's certificate.
8   Q.  That's the three-panel --
9   A.  Correct.
10  Q.  You gave him that certificate?
11  A.  Yes.
12  Q.  And what else?
13  A.  I gave him the physician's narrative statement that
14      would go with that certificate.
15  Q.  And again, that's the three-member panel?
16  A.  Correct.
17  Q.  What else?
18  A.  I gave him the finding of fact that the Board had
19      found.
20  Q.  Okay. Anything else?
21  A.  That was entered into my record for retirement. I
22      gave him those and asked him to speak to the Chief
23      about my 111F benefits.
24  Q.  This is the complaint you have, that you were

Page 47

1       entitled to some $2,000 reimbursement for vacation
2       time that you had to use for sick leave as far as
3       after May 25th, 2003?
4   A.  Correct.
5   Q.  And this essentially is the genesis of your
6       complaint, is it not, sir?
7   A.  It's part of my complaint.
8   Q.  This is where it all began, isn't it, sir?
9   A.  I wouldn't say exactly to that effect, but it's part
10      of my complaint.
11  Q.  You're saying the $2,000 disagreement is not the
12      beginning of your complaint; is that right?
13  A.  It's part of my complaint.
14  Q.  Well, what is the -- what's the initial -- what do
15      you say is the beginning of your complaint, if it's
16      not the disagreement over the $2,000?
17  A.  Well, if you're taking it in that respect, yes, it
18      would be the beginning, okay. It's fair to say.
19  Q.  I'm just reading your complaint. So, the
20      disagreement about whether or not you're entitled to
21      reimbursement for $2,000 is the beginning of your
22      complaint; is that fair to say?
23  A.  Following that logic, that's correct.
24  Q.  When you first had this disagreement come up, were

Page 48

1       you already now officially retired?
2   A.  That's correct.
3   Q.  So, you were retired as of September 8, 2003?
4   A.  That's correct.
5   Q.  The grievance procedure was no longer available to
6       you?
7   A.  That's correct.
8   Q.  And that's because you were now officially retired?
9   A.  That was a discussion that we had with the Union and
10      there was a problem with that, correct.
11  Q.  But you did attempt to gain back your $2,000 through
12      the Union subsequent to your retirement?
13  A.  I asked them to request it from the Department
14      and...
15  Q.  And they did that for you, did they not, sir?
16  A.  They did. There's an e-mail, I believe, from Larry
17      Rooney that indicates that he spoke to the Chief
18      about it, to Paul Boyle.
19  Q.  They actually, I think, on one or two occasions
20      presented the facts for you, your case to Chief
21      Pomeroy, right?
22  A.  That's correct.
23  Q.  And I think they did it on two occasions,
24      November 24th and December 1st, 2003?

Page 49

1   A.  Correct.
2   Q.  Is that right?
3   A.  That would be fair, yes.
4   Q.  And the Chief then denied your claim, correct? Is
5       that my understanding?
6   A.  A copy of the e-mail that I received from
7       Dana Goodwin, which was from Dana -- which was from
8       Larry Rooney, who went to the meeting, as you can see
9       there, Larry Rooney and Dana Goodwin, he sent it to
10      Paul Boyle. That indicated that the Chief disagreed
11      with the medical panel and refused to pay me.
12  Q.  Now, the Chief, as I understand it, had a
13      disagreement that the Heart Law was applicable to
14      111F; is that fair to say?
15  A.  I don't know what his thinking was. I don't know
16      what his thinking was of how he made a decision.
17  Q.  Well, you have seen all the correspondence back and
18      forth between the Chief and the Retirement Board,
19      have you not?
20  A.  Yes, I have.
21  Q.  And you're aware that he's -- his position has been
22      that he is essentially saying that the 111F benefits,
23      under the Heart Law, is inapplicable; you understand
24      that, right?

---

DUNN & GOUDREAU

Page 50

1    A.  I don't follow you logically there.
2    Q.  I'm asking if that's what the Chief claimed,
3        right?
4    A.  I don't think that's correct.
5    Q.  You were sitting in on the Michael Sacco deposition
6        as well the other day, correct?
7    A.  Yes, I was.
8    Q.  You were in the same room as your counsel, myself --
9    A.  Correct.
10   Q.  -- when Mr. Sacco testified?
11   A.  Correct.
12   Q.  Do you recall Mr. Sacco saying, even in his letter
13       that he wrote on your behalf, that there was a
14       question about whether or not the Heart Law did or
15       did not apply to 111F benefits?  Do you remember
16       that, sir?
17   A.  In some incidents, that's correct, sir.
18   Q.  And that's the same concern that the Chief had at
19       that point in time relative to the application of the
20       111F benefits for that period of time?
21   A.  I disagree with that statement.
22   Q.  Well, tell me what's wrong with that statement.
23   A.  Because I suffered an injury that day and I should
24       have been -- my feeling is I should have been awarded

Page 51

1        111F benefits.  I went to the hospital via ambulance,
2        semiconscious, under oxygen.  I went from there to
3        the -- from the high school to the hospital.  I was
4        treated there.  I left the hospital via ambulance to
5        Boston.  I had a cardio catheterization done; and
6        subsequently, after that, I had to retire.
7            I was at the training program with Captain
8        Chandler, who physically aided me and dragged me out
9        of the room as I collapsed against the wall on top of
10       two other officers.  I have no understanding of how
11       someone couldn't say that that event was not in
12       the performance of my duty and I didn't suffer an
13       injury.
14   Q.  As part of your obligation, when you suffer an
15       injury, you had to submit a couple of notes from your
16       doctors back at the time, right?
17   A.  Yes, I did.
18   Q.  And I'm going to show you --
19           MR. SILVERFINE:  First of all, we'll mark
20       this as Exhibit 3.
21           (EXHIBIT 3 MARKED FOR IDENTIFICATION)
22   Q.  Exhibit 3, which I'm placing before you, do you
23       recognize that?
24   A.  (Witness perusing document) Yes, I do.

Page 52

1    Q.  This was the initial note that you submitted for your
2        medical treatment, is that right, after May 25th,
3        2003?
4    A.  That was after my cardio cath the next day.  The
5        doctor that performed the cath was not available.
6        The report of the catheterization was not available
7        and I said to this attending physician that was on
8        staff, can you just give me something so I can bring
9        it -- knowing that the requirement of the IOD policy
10       is to have something.  I asked her to give me
11       something.
12           She wrote that as a courtesy.  There was no --
13       she had not done the catheterization.  She had not
14       reviewed the files.  I wasn't in her estimate -- I
15       didn't know what I had myself.  So, I just asked her
16       for something so I could give it to my employer.
17   Q.  My question was:  Is this what you submitted to your
18       employer?
19   A.  It was a very preliminary report until I got all the
20       reports back.
21   Q.  I'm not debating that.  My question simply is --
22   A.  Yes, okay.
23   Q.  -- is this what you submitted to your employer?
24   A.  On a preliminary basis, correct.

Page 53

1    Q.  Whether you're submitting 400 pages later, I'm not
2        asking that.  This is what you first submitted,
3        right?
4    A.  Uh-huh.
5    Q.  Is that correct?
6    A.  Yes.
7    Q.  You'll agree with me, at least in Exhibit 3, the
8        second line says, from Dr. Bazzano, B-A-Z-Z-A-N-O,
9        "He may return to work two weeks from his hospital
10       discharge date."  That's what it said here; is that
11       fair to say?
12   A.  Correct.
13   Q.  Now, later you submitted an additional document to
14       the Chief relative to your care and I'm going to show
15       you another letter.
16           MR. SILVERFINE:  We'll mark this as
17       Exhibit 4.
18           (EXHIBIT 4 MARKED FOR IDENTIFICATION)
19   Q.  I'm showing you, Mr. Kelley, what's been marked as
20       Exhibit 4, and I'm just asking you if you recognize
21       that as the next document you submitted to your
22       employer relative to your care?
23   A.  (Witness perusing document) Yes, I do.
24   Q.  Again, I'm just asking you.  This second document

# EXHIBIT A CONTINUED

Page 54

1    that you submitted to the Town, Exhibit 4, in part,
2    says that you would be best served medically by
3    staying out of work for the rest of his vacation
4    time, about a month. We will be adjusting his meds
5    during that period of time. I think his overall
6    prognosis for the future is good. He should be able
7    to return to work and it's signed Donald M. Moore,
8    M.D. Is what I read accurate?
9  A. That's what the letter says, correct.
10  Q. You indicate in paragraph 18 of Exhibit 1 that the
11    Chief refused to reimburse your request for vacation
12    time, right?
13  A. That's correct.
14  Q. And that's the $2,000 disagreement that we just
15    talked about a couple of minutes ago, right?
16  A. That's correct.
17  Q. And you additionally say in paragraph 18, "The
18    Personnel Board of the Town of Plymouth refused to
19    authorize reimbursement." Do you see that?
20  A. Uh-huh.
21  Q. You have to state it for the record.
22  A. I'm sorry, yes. I see that.
23  Q. Was there a written decision that was given to you
24    from the Personnel Board?

Page 55

1  A. I never received a decision from anybody other than
2    the Town Manager a year later.
3  Q. So, how did you become aware that the Personnel Board
4    refused to authorize the reimbursement?
5  A. I requested from the Town, the Town Manager, in
6    writing, an explanation of this matter.
7  Q. Did you receive anything in writing?
8  A. Nothing. It took me over a year.
9  Q. And that document that you say you got was from the
10    Town Manager, or the Personnel Board?
11  A. I got it from the Town Manager.
12  Q. Did you ever get anything from the Personnel Board?
13  A. Personnel? I think it might have been from
14    Mrs. Flynn, who is in charge of the Personnel Board.
15  Q. Is that Pat Flynn?
16  A. That's Pat Flynn, correct.
17  Q. Is she the only person on the Personnel Board?
18  A. Well, she's in charge of it and in charge of benefits
19    and all those issues.
20  Q. Who was on the Personnel Board back in September
21    2003?
22  A. I don't remember. I think it would have went to the
23    Personnel Board. It would have went to her. I
24    contacted her several times.

Page 56

1  Q. The reason why I'm asking you again is because in
2    your complaint you wrote, "The Personnel Board
3    refused to authorize reimbursement." So, who are you
4    referring to?
5  A. It would have been Mrs. Flynn. She is in charge of
6    the Personnel Board.
7  Q. So, besides the verbal conversation -- when did that
8    conversation take place?
9  A. What conversation?
10  Q. You said she denied your --
11  A. I asked Mrs. Flynn for the money and I asked her to
12    look into this matter, and she never gave me anything
13    in writing.
14  Q. When did you have a conversation with her?
15  A. Oh, on and off for -- right after the incident, after
16    I got all the documentation. I requested it from
17    her several times in phone calls and finally -- I
18    never got an answer from her.
19  Q. Did you eventually say you got something in writing
20    from her?
21  A. I got an answer from Pam Nolan in writing. It stated
22    I agree with the Chief. There's nothing here to
23    overturn his decision. That was all I ever got.
24  Q. You did eventually get something, I believe, from the

Page 57

1    Chief, though, did you not, in -- well, actually,
2    before you even retired. In June 2003 you got a
3    letter from the Chief, right?
4  A. I got a letter from the Chief about medical bills.
5    (EXHIBIT 5 MARKED FOR IDENTIFICATION)
6  Q. Just so we're clear. I'm going to show you a letter
7    we've marked as Exhibit 5. On June 24, 2003, did
8    you --
9  A. (Witness perusing document) Yes, I did.
10  Q. You got the copy of this that I'm showing you as
11    Exhibit 5?
12  A. I did.
13  Q. And in his letter of June 24th, 2003 -- which he
14    wrote to you at home, right?
15  A. Yes. I was at home.
16  Q. He discusses 111F benefits, does he not, in terms of
17    his understanding of what is required, right? As far
18    as his explanation of why he was doing what he did,
19    right?
20  A. That's what he wrote in the letter.
21  Q. Right. In paragraph 3, for instance, he wrote, "To
22    be approved as an 'Injury on Duty,' a police officer
23    must be 'incapacitated for duty because of injury
24    sustained in the performance of his duty without

Page 58

1     fault of his own.'"  Do you see that?
2   A.  Yes, I do.
3   Q.  And he indicated just below that the only medical
4     reports the Police Department received was the letter
5     from Dr. Bazzano, which is now Exhibit 3 in this
6     deposition, right?  And a note from Dr. Moore, which
7     is now Exhibit 4 in this deposition, correct?
8   A.  Correct.
9   Q.  And he also wrote on the second page, two paragraphs
10     up from your signature, that the Heart Law does not
11     necessarily apply to injured-on-duty leave under
12     111F, correct?
13   A.  That would be correct.
14   Q.  So, at least back in June of 2003, the Chief was
15     explaining to you why, based upon the submissions of
16     the documents you provided, he was at that point not
17     approving 111F benefits as they applied at that time;
18     is that fair to say?
19   A.  That was what he decided.
20   Q.  Well, I'm just asking you.  Is it fair to say that's
21     what he wrote to you in the letter and that was his
22     concerns based upon the documents that you provided
23     to him?
24   A.  I can't make a judgment on how he -- I'm just saying

Page 59

1     that's what he sent me, this letter, and that's what
2     it was.
3   Q.  And you'll agree with me, back in June 2003,
4     Exhibit 3, he had before him Exhibit 3 and Exhibit 4
5     in this deposition, those are the two documents that
6     were submitted to him, correct, by you at that
7     point?
8   A.  Correct.  He also had my injury reports, Captain
9     Chandler's report, several officers' reports.
10     Officer Chandler -- Captain Chandler went to the
11     hospital when I was at the hospital.  When I woke up,
12     he was there.  He had all the verification he needed
13     that something must have happened.
14   Q.  I understand.  I'm just asking you -- what I'm
15     asking you in terms of your medicals is that's what
16     he had at that point?
17   A.  Yes.
18   Q.  In paragraph 21 you said, "The year before this
19     drill, in your capacity as a Town meeting member,"
20     how long had you been a Town meeting member?
21   A.  I believe since 1992.
22   Q.  What does a Town meeting member do in the Town of
23     Plymouth?
24   A.  The Town of Plymouth has elected Town meeting members

Page 60

1     from each precinct.  It's a Town meeting form of
2     government.  We're elected from each precinct.
3     There's eight members from each precinct and we're
4     the legislative body of the Town.  We raise and
5     appropriate funds.  We adopt statutes and pass
6     bylaws, that type of thing.
7   Q.  And you also wrote you were a member of the Plymouth
8     Retirement Board.  How long had you been a member of
9     the Plymouth Retirement Board?
10   A.  Since 1996.
11   Q.  Is that an appointed or elected position?
12   A.  By statute that's an elected position.  I represent
13     the employees of the Town.
14   Q.  And the employees -- all the employees?
15   A.  All the employees.
16   Q.  Are there any other Town employees who also serve on
17     the Retirement Board?
18   A.  Yes, there is.
19   Q.  Who is that?
20   A.  By statute you would have the treasurer, or his
21     designee.  You would have an independent pick by the
22     Board.  You would have another re-elected member.
23     You would also have a Selectmen's -- the Board of
24     Selectmen have a pick.  They put on someone that they

Page 61

1     appoint to be on the Board of Selectmen.
2   Q.  How many members are on the Plymouth Retirement
3     Board?
4   A.  Five.
5   Q.  Are there any other police officers besides yourself
6     who have served in your time there?
7   A.  No.
8   Q.  Now, you indicate that you raise an issue regarding
9     Chief Pomeroy's use of funds, do you see that?
10   A.  Uh-huh.
11   Q.  You have to answer for the record.
12   A.  Yes.  I'm sorry, yes.
13   Q.  How did you raise that issue?
14   A.  Well, that issue started a number of years prior to
15     that.
16   Q.  Tell me when it first began.
17   A.  Around 1998.
18   Q.  How was that issue raised?
19   A.  There was an overpayment in Needham of funds and we
20     received several memos from PAREC, our regulatory
21     agency, to be aware of all your compensation, all
22     your -- what do you call it? -- appropriate coverages
23     for what they call regular compensation under
24     Chapter 32.  Be aware of it.  Check it to make sure

THOMAS KELLEY

FEBRUARY 9, 2006

Page 62

1     that it meets the requirements of regular
2     compensation, because of what happened in Needham.
3     There was an overpayment made and it created a lot of
4     problems.
5   Q. My question was: How did you first raise this
6     issue?
7   A. I first raised the issue when we had that happen, as
8     well as there was a -- I read in the newspaper there
9     was a lawsuit in Duxbury involving the Quinn bill
10    with the Chief over there. Chief -- his name was
11    Showstead at the time and it was in front of Judge
12    DelVecchio in Plymouth, which indicated, I believe,
13    he took -- he was suing for back pay. The judge's
14    finding said he was -- he got those benefits pursuant
15    to a Collective Bargaining Agreement, but as a Chief,
16    he was covered by the personnel bylaw and there was
17    no provision for that in the bylaw.
18   Q. So, I'm still not sure how you raised it. To whom
19    did you raise this issue to, as you say, back in
20    1998?
21   A. I mentioned it, I know, to the Chief Financial
22    Officer, Patrick DellaRusso.
23   Q. Was this an open meeting, or was this a meeting
24    between you and Mr. DellaRusso?

Page 63

1   A. Just a meeting between me and him.
2   Q. You casually mentioned it. How did you mention it?
3   A. I mentioned to him I looked at the personnel bylaw
4    and given the Needham decision and the issues there,
5    I had a concern that there was no governing document
6    for salaries being paid.
7   Q. When you say salary -- your limitation at that point
8    was just as to his salary, as to the Chief's salary?
9   A. It was salaries paid to the Police Chief and the
10    Police Captains. The additional monies was not in
11    the personnel bylaw.
12   Q. What additional monies are you talking about?
13   A. They were getting paid 30 percent more for the Quinn
14    bill benefits and they were getting paid holiday
15    money and uniform allowances, which were not in the
16    personnel bylaw.
17   Q. So, these were the Quinn bill, holiday money, uniform
18    allowances. Were those all benefits that other
19    patrolmen such as yourself were receiving?
20   A. Those were collective bargaining benefits.
21   Q. Those were benefits you and other patrolmen were
22    receiving back in 1998?
23   A. Patrolmen and Sergeants.
24   Q. Which you were one of them?

Page 64

1   A. Yes.
2   Q. So, you had an issue with the Captains and the Chief
3    at that time also receiving that benefit?
4   A. I had an issue there, but I had a concern given I
5    spoke to our attorney, Mike Sacco about it, and the
6    problem is that in the event of an audit, we had
7    people out retired under those conditions that we
8    would not be able to substantiate their pay.
9   Q. What did Mr. Sacco tell you when you brought up this
10    issue?
11   A. He spoke to Patrick DellaRusso and indicated to
12    Patrick the best thing would be to have the Town
13    amend the bylaw to cover the compensation paid. And
14    Patrick DellaRusso in a casual, quiet form attempted
15    to talk to Mrs. Beth about that and get the matter
16    resolved by adjusting the personnel bylaw to cover
17    these monies.
18   Q. Well, I'm a little confused here. Are you saying
19    that they went forward in an attempt to amend the
20    bylaws so that the ranking officers would be
21    compensated under the Quinn bill, holiday, and
22    uniform allowance?
23   A. That was our recommendation.
24   Q. You recommended that?

Page 65

1   A. Patrick recommended that they do that.
2   Q. Was that your recommendation?
3   A. That was the recommendation we had from our counsel.
4   Q. When you say "we," you're saying you in terms of the
5    Union, your counsel --
6   A. No, Patrick. The Board, the Retirement Board. We
7    had concerns.
8   Q. You're saying the Retirement Board was in agreement
9    with this; that officers, superior officers should
10    get it?
11   A. The issue was never who should get it or not. The
12    issue was --
13   Q. I'm a little confused. I'm not understanding.
14    You're saying you raised the issue relative to the
15    Chiefs and the Captains receiving these benefits,
16    right, the 30 percent under the Quinn bill, the
17    holiday, and uniform allowance?
18   A. I raised it in the context that there was no written
19    document. In their case, it would have been the
20    personnel bylaw, that did not address these
21    additional monies.
22   Q. And you're saying that your lawyer said they should
23    address it, it was brought to Eleanor Beth, and she
24    tried to get it passed through --

Page 66

1  A.  No, I'm not saying that.
2  Q.  You tell me. I'm a little confused here.
3  A.  What happened is that once I established that there
4      was a problem, I spoke to Mike Sacco about it. Mike
5      said the best thing to do would be to ask the Town to
6      amend the bylaw covering the document, which would
7      have documented the compensation paid, which would
8      then, when the compensation that is paid is delivered
9      to us, it would be put into the retirement formula.
10     We would have a backup document that would indicate
11     that all the monies were properly -- had a supported
12     document in the event of an audit. That was our
13     recommendation to the Town.
14 Q.  What happened after that?
15 A.  The Town took no action.
16 Q.  Eventually, did the Town take action?
17 A.  The Town took action after it ended up in the
18     Inspector General's Office.
19 Q.  I'm a little confused here. You're saying you're all
20     in favor of this? You're all in favor of it?
21 A.  I wasn't trying to gyp anybody out of anything.
22 Q.  So, you're in favor of this for the superior
23     officers, the same thing the patrol officers are
24     getting, including yourself?

Page 67

1  A.  Absolutely.
2  Q.  You take it to Eleanor Beth, she says I'm going to
3      try to do something, nothing happens, and then you
4      went to the Inspector General's Office.
5  A.  What happened was the problem we were having is -- I
6      was advised by Mike, unless the Town takes action,
7      Tom, in the event of an audit, someone could say that
8      you knew about the situation. You have a fiduciary
9      responsibility to the fund; you have personal
10     knowledge of a mistake out there. You need to
11     correct it and take the appropriate action, or they
12     can accuse you of being in collusion or looking the
13     other way. And I was not going to put myself in that
14     position.
15 Q.  All right. Again, bear with me, because I'm looking
16     at your complaint. In paragraph 21 you wrote -- you
17     alleged the Captain was accepting compensation and
18     not showing it on the budget which was prohibited by
19     statute?
20 A.  That's correct.
21 Q.  So, you were saying -- but you're saying you're all
22     in agreement now today under oath that he should be
23     entitled to the 30 percent Quinn bill, holiday pay,
24     and uniform allowance?

Page 68

1  A.  That's not what I said.
2  Q.  That's not what you said?
3  A.  That's correct.
4  Q.  So, you were concerned that someone would accuse you
5      of not following the bylaws and allowing this money
6      to go out to him without some kind of provision?
7  A.  What I said was very simple. In municipal finance
8      there is always a governing document, meaning, when
9      you follow the money trail back as an auditor, or an
10     auditor would do, he would follow back the benefit
11     paid by us into the formula process. He would then
12     back it back down to the money received by the Town;
13     and then he would back it to the governing document.
14     In this case, the governing document did not
15     address the compensation that was being paid pursuant
16     to verbal agreements. It would be -- you would have
17     no way of auditing that number from the governing
18     document to payroll. There was a substantial
19     difference in funds.
20     We requested that the Town address this in the
21     event of an audit. We had officers out there that
22     were retired under these conditions; and given the
23     Needham situation, if an auditor walked in from the
24     State, which they could at any time, they could turn

Page 69

1      around and pull the file and ask for all the
2      governing documents and we would not be able to
3      substantiate the funds that they were being paid for
4      those conditions.
5      Our request was to turn around and properly put
6      the appropriate documentation and governing document
7      in and lines in place for those funds that were
8      covered, which would allow us to justify the pensions
9      that these people would receive. That was my
10     obligation and that was my advice.
11 Q.  Besides Eleanor Beth, who else did you talk to from
12     the Town?
13 A.  Patrick DellaRusso wanted -- he was the Chairman at
14     the time. He said he would approach the Town and
15     attempt to clear up this matter.
16 Q.  So, besides Patrick DellaRusso and Eleanor Beth,
17     anyone else that you spoke to from the Town?
18 A.  They were the two people there that were in charge of
19     it.
20 Q.  You also said we?
21 A.  That was a mistake. I spoke to Patrick.
22 Q.  So, you're the one who spoke to them about this?
23 A.  I didn't speak to them directly. Patrick did.
24 Q.  You spoke to Patrick and you did not talk to

THOMAS KELLEY                                                    FEBRUARY 9, 2006

Page 70

1       Eleanor Beth directly?
2   A.  Not at this point, no. He then spoke to her about
3       the concern that we had.
4   Q.  You also mentioned other officers. What other
5       officers would be effected by this?
6           THE WITNESS: In my complaint here?
7           MR. SILVERFINE: No. You just said it two
8       seconds ago.
9   A.  What would happen -- what happened was this, we had
10      other officers -- I could give you an example. We
11      had previous Chiefs that were receiving benefits
12      under these conditions that were into their
13      retirement tabulation, we had previous Captains that
14      were out under these conditions. And my fear was
15      that if there was an audit, their pensions could
16      conceivably be adjusted until this situation was
17      cleared up with the Town.
18          So, we took the proactive approach to say that
19      these people did nothing wrong; that the Town should
20      correct the situation, so that all the governing
21      documents and proper appropriations and proper
22      documentation is in place.
23              (BRIEF RECESS)
24  Q.  When you said you were suffering from Lyme disease

Page 71

1       and Meniere's disease prior to May 25th, 2003, you
2       would agree that those aren't life-threatening
3       diseases, correct?
4   A.  I'm not a doctor. I can't agree to that at all.
5   Q.  Did you retire -- did you put in for retirement
6       prior to May 25th, 2003?
7   A.  No.
8   Q.  Were you suffering from a life threatening -- because
9       if you're saying they were life threatening, did you
10      apply for disability retirement due to those diseases
11      prior to May 25th, 2003?
12  A.  No.
13  Q.  Right. So, my question is: You were able to go to
14      work?
15  A.  I was working. That's correct.
16  Q.  And you were living with these diseases under
17      medication prior to May 25th, 2003; is that fair to
18      say?
19  A.  That's correct.
20  Q.  You were on medication and you were seeing a
21      doctor?
22  A.  Yes.
23  Q.  And if you could, I'm assuming most of the time, like
24      some of us, you would go to work; and when you can't,

Page 72

1       you wouldn't?
2   A.  That's correct.
3   Q.  Back to Exhibit 1, which is again your complaint, we
4       were on paragraph 21. When you said you had this
5       discussion with Patrick DellaRusso, did you ever send
6       anything to him in writing on this subject?
7   A.  No. We just discussed it verbally.
8   Q.  How about Eleanor Beth, did you send anything to her
9       in writing?
10  A.  No. He wanted to approach her and handle the matter.
11  Q.  Did you send it to anyone in writing about this issue
12      back in 1998?
13  A.  No.
14  Q.  In your complaint you wrote -- and again, I'm
15      focusing on your complaint. In paragraph 21, the
16      last sentence, you wrote -- you allege Chief Pomeroy
17      was accepting compensation and not showing it in his
18      budget. You also mentioned a few minutes ago under
19      oath that there are other officers who had accepted
20      or were accepting compensation. Are you now stating
21      there were other officers who were on his budget that
22      were not showing it, or just Chief Pomeroy?
23  A.  There were two Captains and himself.
24  Q.  But you said here just Chief Pomeroy in your

Page 73

1       complaint?
2   A.  That's what it says.
3   Q.  Again, this is your complaint. That's why I'm
4       asking. Did you complain about the other Captains?
5   A.  By the word "complain," what do you mean by
6       "complain"?
7   Q.  Well, you made certain -- again, they're your words.
8       You allege allegations Chief Pomeroy was accepting
9       compensation. Were your allegations strictly with
10      Chief Pomeroy?
11  A.  My intention was --
12  Q.  No, not your intention. What did you discuss back in
13      1998 with Patrick DellaRusso?
14  A.  We discussed the concern that we had for not having
15      justification for the compensation that they were
16      receiving, which was then put into formulas for
17      retirement.
18  Q.  My question then is: Did you complain just about
19      Chief Pomeroy, or did you complain about others as
20      well?
21  A.  We spoke about -- we found out the Captains were
22      doing the same thing and the bylaw didn't address
23      them as well.
24  Q.  So, is your testimony today that you spoke -- when

| Page 74 | Page 76 |
|---|---|
| 1    you say "we," are you referring to you and others? | 1  Q.  And was it approved? |
| 2  A.  I mean, me and Patrick had spoke. | 2  A.  Subsequently, they approved the monies.  They amended |
| 3  Q.  I don't know if it's a royal we. | 3      the bylaw to cover all the monies that were -- you |
| 4  A.  No, I agree. | 4      know, the bylaw then clearly indicated what was being |
| 5  Q.  You and Mr. DellaRusso had a conversation about Chief | 5      paid; and that was placed into the bylaw and approved |
| 6      Pomeroy, right? | 6      by a Town meeting. |
| 7  A.  We had a conversation about the compensation being | 7  Q.  And you are a Town meeting member? |
| 8      received from the various people in the Police | 8  A.  Yes, I am. |
| 9      Department and Chief Pomeroy. | 9  Q.  And you voted in favor? |
| 10  Q.  Are you saying there were other officers you were | 10  A.  Yes, I did. |
| 11      complaining about as well back in 1998? | 11  Q.  And this was in 2001 -- |
| 12  A.  I wasn't complaining.  I was concerned about the | 12  A.  No, this was in 2003 -- 2001, you're right. |
| 13      ability to justify the compensation in the event of | 13  Q.  I'm saying what you're telling me.  I don't want to |
| 14      an audit and we had officers like them in the same | 14      put words in your mouth. |
| 15      condition and capacity that had already retired. | 15  A.  No.  It was in 2001, September.  I'm getting a little |
| 16  Q.  Which officers do you recall talking to Patrick | 16      confused. |
| 17      DellaRusso back in 1998? | 17  Q.  Let me just ask you this then:  In paragraph 21 you |
| 18  A.  I told him that from my memory, we had -- Captain | 18      wrote about a year before the drill, which would be |
| 19      O'Meara had just retired, we had a previous Chief, | 19      roughly May 2002, you raised these issues; that |
| 20      Chief Bill Murphy, we had Captain Ireland, all in the | 20      would be inaccurate then based on what you just told |
| 21      same category of these people; that their | 21      us? |
| 22      compensation was not spelled out in the personnel | 22  A.  That would be inaccurate.  That's correct. |
| 23      bylaw.  So, we needed to take corrective action so | 23  Q.  Again, just basing it on what you told us? |
| 24      that in the event of an audit -- Patrick was a | 24  A.  Yes. |

| Page 75 | Page 77 |
|---|---|
| 1      previous auditor -- you needed to have the | 1  Q.  Because you told me in 1998 it took a while to get it |
| 2      appropriate governing document in place so that our | 2      on the warrant and at the Town meeting in 2001 this |
| 3      justification for paying them the funds in their | 3      was voted on and approved? |
| 4      retirement computation would be backed up by the | 4  A.  Correct. |
| 5      appropriate governing document. | 5  Q.  And you approved it.  You raised your hand and you |
| 6  Q.  Now, you told us this took place in 1998, right? | 6      approved it as well? |
| 7  A.  We started in 1998.  I became aware of it probably, I | 7  A.  Yes. |
| 8      want to say, May, June of '98.  Patrick was going to | 8  Q.  And this included the officers you mentioned, the |
| 9      take steps to take the -- because you only have one | 9      Captains, plus Chief Pomeroy, plus some retired |
| 10      or two Town meetings and then there is what they call | 10      officers? |
| 11      cutoff dates for the warrant.  So, you have to -- if | 11  A.  Correct.  It would have put the appropriate governing |
| 12      you were going to have a fall Town meeting, you would | 12      documents in place.  And in the event of an audit, we |
| 13      have to have -- the warrant might be closed, I think, | 13      would have been clearly able to justify and protect |
| 14      in June.  The Town meeting would be in the fall, so | 14      the members; that was one of my biggest concerns is |
| 15      you had to basically strategize when you could put | 15      somebody has their pension adjusted. |
| 16      something on the warrant and have it approved and | 16  Q.  Do you remember what month it was approved in the |
| 17      amend the bylaw at that time. | 17      Town meeting of 2001? |
| 18  Q.  Did you bring this up, to have it on the warrant? | 18  A.  I want to say September 2001. |
| 19  A.  It was not my prerogative to do that.  Patrick said | 19  Q.  So, as of September 2001, this was no longer an issue |
| 20      he would handle it. | 20      for you and the Retirement Board? |
| 21  Q.  Was this issue brought to a Town meeting? | 21  A.  It was then clarified, so then it was there. |
| 22  A.  Pardon me?  Yes, it was.  That's correct. | 22  Q.  Let's go down now to paragraph 22.  You indicated you |
| 23  Q.  When was that? | 23      reported this to the IG's Office, the Inspector |
| 24  A.  I believe it was in the fall of 2001. | 24      General's Office, do you see that? |

Page 78

| 1 | A. | Yes. |

1  A.  Yes.
2  Q.  First of all, who did you go with to the Inspector
3      General's Office?
4  A.  I went with Dana Goodwin, Paul Boyle, and myself.
5  Q.  Dana Goodwin and Paul Boyle are both police
6      officers?
7  A.  Yes, they are.
8  Q.  And they're both Union representatives?
9  A.  Uh-huh.  Yes, I'm sorry.
10 Q.  Your counsel will tell you, so the record is clear,
11     the stenographer can't take down uh-huh.  I don't
12     mean to keep reminding you, it's just so the record
13     is clear.  I don't mean to keep tweaking you.
14 A.  I apologize.  I understand.
15 Q.  When did you go to the Inspector General's Office?
16 A.  I believe it was January 22nd of 2001.
17 Q.  Who did you meet with at the Inspector General's
18     Office?
19 A.  I met with an Inspector Quinn and an Inspector
20     O'Neil.
21 Q.  How long was the meeting?
22 A.  About four hours.
23 Q.  What documents did you present to the Inspector
24     General's Office?

Page 79

1  A.  I brought five years' budgets from the Police
2      Department.  I brought the Town bylaws back to
3      1975.
4  Q.  Anything else?
5  A.  That's all that I brought.
6  Q.  For what purpose did you go to the Inspector
7      General's Office?
8  A.  Given there was no action being taken by the Town, I
9      then spoke to counsel.  Patrick had spoke to the Town
10     Manager, no action was being taken.  I believe he
11     even wrote her an e-mail of his concerns on the issue
12     as being a former auditor.
13         At that point, the harassment at my workplace
14     was continuing at a fever pitch.  I didn't want
15     anybody to accuse me of collusion.  I didn't want
16     anybody to say that we looked the other way.  And I
17     didn't want people that were retired to have their
18     pensions adjusted because the Town was not taking the
19     appropriate steps.
20 Q.  Is it fair to say you went to the Inspector General
21     for them to investigate a possible criminal
22     complaint?
23 A.  I don't have that -- that's not my prerogative to
24     discuss.

Page 80

1  Q.  Well, you were a police officer, right?  You've been
2      one -- you were one for many years?
3  A.  Yes.
4  Q.  For what purpose did you go to the Inspector
5      General's Office?
6          MR. ARMSTRONG:  He answered that question.
7          MR. SILVERFINE:  He can answer again.
8  A.  I spoke to Mr. Quinn on the phone one day, just an
9      inquiry, and I placed some facts in front of him.  He
10     told me you must come in here and speak to us,
11     because there are some serious issues here.  He then
12     explained to us what the process is and what they
13     were going to do when I went in to Boston.
14 Q.  After you made your presentation, did anything happen
15     vis-a-vis the IG's Office?
16 A.  Before we left the Inspector General's Office,
17     Mr. Quinn asked myself, Dana Goodwin, and Paul Boyle
18     if we were willing to testify in front of a Grand
19     Jury.  We all answered in the affirmative.  He
20     indicated there was enough here to put a Grand Jury
21     together and he was going to contact Plymouth, get a
22     Grand Jury together, and then contact us to come in
23     and testify.
24 Q.  Are you aware that the IG's Office has no ability to

Page 81

1      put a Grand Jury together?
2  A.  Alls I can say is that's what Mr. Quinn told me.
3  Q.  You had been a police officer for how many years?
4  A.  Twenty-seven.
5  Q.  And you're unaware that the IG's Office has no
6      ability to put a Grand Jury together?
7  A.  I have never dealt with the Inspector General's
8      Office in my life.
9  Q.  Are you aware that they're not a prosecuting agency?
10 A.  Like I said, I did not know.  I knew when I spoke to
11     him on the phone, he made it clear to me that I
12     needed to speak to him.  I then made an appointment
13     and I spoke with him.
14 Q.  After speaking with him, did you have any further
15     contact with him?
16 A.  Yes, I did.
17 Q.  When was that?
18 A.  I waited a couple of months and I never heard from
19     him.  I then contacted him via the phone and asked
20     him what was the status of the situation.  He then
21     said to me that we are investigating it.  We have
22     spoken to people and we'll be handling it civilly.  I
23     said, what does that mean?  I said, you told us three
24     police officers that you were going to put a Grand

THOMAS KELLEY                                                              FEBRUARY 9, 2006

**Page 82**

1    Jury together.  I said, you know, that's a far cry
2    from what you're saying now.  It was a complete
3    change of attitude towards it.
4        I also indicated to him that he put us in a
5    position for serious retribution in the Department.
6    He didn't have a good answer for that.
7  Q.  Did you hear anything further from Mr. Quinn or
8    anyone else from the IG's Office?
9  A.  About a year later I asked -- I called up again.
10    Mr. Quinn had retired.  I asked Mr. O'Neil for a copy
11    of the report that's required by statute.  He called
12    me back two days later and said he couldn't find a
13    copy of the report.  I explained (sic) to him that
14    there was never a report written of over $520,000 of
15    public funds?  And he said there wasn't a report
16    written.
17  Q.  I'm sorry, the figure of $520,000, what's that from?
18  A.  That was the figure that the Finance Chairman gave at
19    the Town meeting when someone asked how much money
20    has been paid for these conditions for over a 15-year
21    period.
22  Q.  So, you are alleging, at least to the IG, that there
23    had been some type of an illegal payment to the Chief
24    and other officers, fair to say?

**Page 83**

1  A.  I wasn't alleging anything.  I was alleging that
2    there was a question of how these payments were being
3    made, the appropriateness of them without the
4    governing document, and the Town's action.
5  Q.  Well, you're now saying you met in January of 2001?
6  A.  Correct.
7  Q.  You're saying also by sometime -- I think you said
8    September 2001, the Town meeting had already approved
9    of the practice and amended its bylaw?
10  A.  Correct.  I believe when the Inspector General spoke
11    with -- I believe it came out in the newspaper that
12    there was an investigation going on.  The "Brockton
13    Enterprise" reported it sometime in August.
14  Q.  How would the "Brockton Enterprise" learn of this?
15  A.  I don't know.  I know they contacted Mr. Griffin, who
16    was the former Town Manager, who allowed these verbal
17    agreements to go forward.
18  Q.  How is it that anybody in the press would learn about
19    this?
20  A.  I don't know how anybody learnt about it.
21  Q.  Did you talk to the press?
22  A.  No, I didn't.
23  Q.  Did Mr. Boyle or Mr. Goodwin talk to the press?
24  A.  I can't speak for them.

**Page 84**

1  Q.  Did you guys want to go to the press to put pressure
2    on the Town?
3  A.  No.
4  Q.  So, it's your testimony neither -- any of you three
5    went to the press?
6  A.  I don't know if they -- I know I didn't go to the
7    press.  That's my response.
8  Q.  Well, it's my understanding that at the IG's Office
9    the investigations are pretty closed and they don't
10    share anything.  How is it that the newspaper found
11    out about some, quote/unquote, "investigation" in
12    August of 2001?
13  A.  It was put out by a reporter named Elaine Allegrini
14    who lives in Plymouth.  She spoke to Mr. Griffin, who
15    is in Dedham, who was the Town Manager that allowed
16    this to happen 15 years ago,  and he spoke about the
17    Inspector General.
18  Q.  How would he know that the Inspector General's
19    Office --
20  A.  Because they came down and spoke to him in his
21    office.
22  Q.  But you're saying a month later, after the August
23    2001 article, the Town approved of this, right?
24  A.  Correct.

**Page 85**

1  Q.  Including yourself voting?
2  A.  That's correct.
3  Q.  So, even though you went to the IG's Office in
4    January 2001, you're saying you voted in September
5    2001 to pass this bylaw?
6  A.  I voted to pass it.  And my personal feelings are,
7    that's all I can conjecture -- put together from what
8    happened, is that probably -- what I was told is that
9    the Inspector General indicated to the Town that they
10    needed to take corrective action, and they did.
11  Q.  I'm a little confused.  Because you say in your
12    complaint, paragraph 21 and 22 in Exhibit 1, that you
13    complained about Chief Pomeroy.  Do you see that?
14    Take your time and read it.
15  A.  (Witness perusing document) Yes.
16  Q.  Am I reading that correctly?
17  A.  Yes.
18  Q.  You're now telling us that you not only complained
19    about Chief Pomeroy, but its effect on several other
20    officers, including Captains and retired officers; is
21    that your testimony today?
22  A.  What happened -- I wasn't complaining about other
23    officers.  What I was complaining about was as a
24    Department head, when he formulates a budget, okay,

THOMAS KELLEY                                                      FEBRUARY 9, 2006

Page 86

1    under our former government and our budgeting
2    process, the personnel bylaw did not address the
3    compensation that he was paying his Department -- him
4    and his Captains.
5  Q.  But your complaint, at least back in January 2001,
6    was about Chief Pomeroy; it had nothing to do with
7    the other officers?
8  A.  It was about the Department as a whole, as well as
9    Captain Botieri at that time, who had received $15,000 in
10    overtime monies and the personnel bylaw states
11    emphatically Captains do not receive overtime.
12  Q.  You also -- when I asked you about whether or not you
13    wanted a criminal complaint issued, you said no; and
14    yet, in paragraph 22, you specifically say you were
15    concerned about inappropriate violation of State law,
16    do you see that?
17  A.  Correct.
18  Q.  And you were asking them to look into filing a
19    criminal complaint --
20  A.  No.
21  Q.  -- isn't that right?
22  A.  Verbal agreements under Chapter 41, municipal
23    finance, are illegal.  There are no such things as
24    verbal agreements for public employee compensation.

Page 87

1  Q.  So, you're telling us today that your only concern
2    was that somebody would accuse you of improperly
3    dispensing Town funds; is that right?
4  A.  I'm telling you that as a member of the Board, on
5    advice of counsel, and as a fiduciary responsibility,
6    as well as fairness to the individuals that were
7    retired under these conditions, the Town had an
8    obligation to correct the bylaw, to properly
9    facilitate and justify those compensations that were
10    given; and verbal agreements for public employee
11    compensation are not legal in Massachusetts.
12  Q.  When you voted in favor of the amended bylaw, you
13    knew that in a sense you were wiping the whole slate
14    clean in September of 2001?
15  A.  That's not true.
16  Q.  Well, you tell me what you understood when you were
17    voting in September of 2001 to allow the Chief, the
18    Captains, the officers who were retired, to collect
19    under what you believed you were voting for?
20  A.  They amended the bylaw to cover the appropriateness
21    in covering the monies.  If the Town did not want to
22    recover monies, that was their prerogative.
23  Q.  When you say "they," it included you, though?
24  A.  No.

Page 88

1  Q.  You didn't raise your right hand and vote aye?
2  A.  That's not what I said.
3  Q.  Well, you tell me what you voted for?
4  A.  I voted for the amendment, for the bylaw, which would
5    have then properly put the appropriate governing
6    documents in place.
7  Q.  Which included compensating the officers for the
8    things we've been discussing, the 30 percent Quinn
9    bill, the allowances, and the other items you
10    mentioned earlier today?
11  A.  That's correct.
12  Q.  So, in effect you were ratifying the monies you
13    received, you knew that?
14  A.  Going forward.
15  Q.  Right.  And you knew that it filled in a gap and a
16    hole for prior officers, both retired and present,
17    who were receiving monies in good faith, because they
18    believed they were entitled to it; is that right?
19  A.  That's a fair statement, yes.
20  Q.  Now, you also told us just a few minutes ago
21    something about you had continual harassment up until
22    that point.  Do you remember that, just a couple of
23    minutes ago?
24  A.  Yes.

Page 89

1  Q.  Who was harassing you up until January 22, 2001?
2  A.  I was harassed on a regular basis.  I was told by my
3    day Lieutenant, Kevin Fahy, and I was told by various
4    members, that they were out to get me.
5  Q.  Who was out to get you?
6  A.  The Chief and Captain Botieri.
7  Q.  The Chief and Captain Botieri were out to get you?
8  A.  Uh-huh.  Yes.  Yes, sorry.
9  Q.  And who told you this?  You said Kevin Fahy?
10  A.  Kevin Fahy.
11  Q.  He's one of the gentleman whose affidavit is next to
12    your complaint, Exhibit 1?
13  A.  That's correct.
14  Q.  He is a friend of yours?
15  A.  He's a Lieutenant.  I worked with him on the day
16    shift.
17  Q.  He's a friend of yours?
18  A.  Correct.  I worked with him for 25 years.
19  Q.  He told you that the day Lieutenant -- who was
20    that?
21  A.  Kevin Fahy.
22  Q.  That's not a separate individual, it's the same
23    guy?
24  A.  The same guy.

Page 90

1    Q.   Who else told you that?
2    A.   I had various Sergeants tell me that, the grapevine,
3         everybody was saying you better watch your back.
4         They're out to get you.
5    Q.   Why were they out to get you?  Did you understand why
6         they were out to get you?
7    A.   I believe they were out to get me because of this
8         issue and where it ended up in the Inspector
9         General's Office.
10   Q.   So, let me understand this.  You say the gentlemen --
11        Botieri, you said Chief Pomeroy, who else were out to
12        get you because of this issue that you went to the
13        IG's Office?  Who else?
14   A.   Well, I believe given Captain Botieri and the Chief's
15        position, they could -- they made it clear to other
16        people that, you know, we want to know everything,
17        anytime -- anything that I ever did.
18   Q.   You had supervisors, correct?
19   A.   Sure.
20   Q.   Throughout your career?
21   A.   Yup.
22   Q.   And part of their duties were to make sure you were
23        doing your job?
24   A.   That's true.

Page 91

1    Q.   Whether that means covering a certain sector or
2         responding to calls, that was part of their
3         obligation, correct?
4    A.   That's true.
5    Q.   If you didn't do that, they were supposed to call you
6         on it; is that fair to say?
7    A.   That's true.
8    Q.   On a few occasions they did call you on it; is that
9         fair to say?
10   A.   I would say that, yeah.
11   Q.   So, what in particular besides these -- you said the
12        day Lieutenant, Kevin Fahy.  What particular thing
13        happened to you that you say was a part of this
14        continual harassment?
15   A.   Well, for example, they would -- I'll give you an
16        example.  I put in for a vacation and I was off a
17        month before the 4th of July and I was off a month
18        after the 4th of July and the 4th of July was one of
19        my days off.  I was away from my home and I had a
20        Sergeant show up at my front door and tell my wife
21        you have to call the station right away and then
22        leave.  My wife was upset.  She didn't know what
23        happened.  She called me on the cell phone.
24             I called the station.  Sergeant Rogers told me,

Page 92

1    the Chief ordered you in for the 4th of July.  I
2    said, I'm already on vacation.  I've been on vacation
3    for 30 days.  I put it in 30 days before that.  I'm a
4    senior man.  He said you have to come in.  I couldn't
5    disobey an order because I knew they would suspend
6    me.  So, I had to go in.
7         I had plans for the 4th of July.  I bought
8    tickets for a banquet on the 4th of July at the
9    Plymouth Yacht Club that I'm a member of.  I spent
10   hundreds of dollars and I was unable to go.  I had to
11   go into work at 5:00 on the 4th; otherwise, get
12   suspended.  I went to work.
13   Q.   Were you scheduled to work that day --
14   A.   No.
15   Q.   Just let me finish.  And forgot to put in for that
16        day off?
17   A.   No.  It was my day off on my four and two schedule.
18   Q.   Are you telling us today that you were not scheduled,
19        as part of your job, and just by some circumstances
20        forgot to coordinate that as a day off for
21        yourself?
22   A.   I was not scheduled to work that day.
23   Q.   And did you advise any of your supervisors of that?
24   A.   I'll explain to you what I just said.

Page 93

1    Q.   I understand what you said.  My question was:  Did
2         you advise any of your supervisors of this, that you
3         were not scheduled to work that day?
4    A.   I was off a month before.  I had put the time in.  It
5         was approved.  On my four to two schedule, the 4th of
6         July fell on one of my days off.  I had vacation for
7         the month after the 4th of July.  So, I was out for
8         basically almost two months.
9    Q.   What year was this, by the way?
10   A.   It was 2001.
11   Q.   Okay.  When you went into the office, did you talk to
12        anybody about this, any of your supervisors?
13   A.   I never went to the office.  I just went to work.
14   Q.   Did you grieve this?
15   A.   At that time what happened is that situation we
16        turned around and the Union realized how egregious a
17        situation it was.  The Chief and the Union got
18        together, before the 4th of July, that I had to come
19        in and turned around and worked out a new formula and
20        policy.  All that was contingent upon that he would
21        approve a different type of -- we went to what
22        they call a mandatory list, where they kept a tab on
23        it.
24             And after that, he said I'll go to this and I'll

Page 94

1    allow you to do this, okay, because of a situation
2    like this, but I had to come in.  The deal was off
3    unless I came in.
4  Q.  I'm not understanding you, because I think you've
5    now said two different things.  You were an active
6    Union member?
7  A.  I was not a representative.  I was a Union member.
8  Q.  You were well aware -- it sounds like from today you
9    were well aware of all your rights?
10  A.  Correct.
11  Q.  And you knew when to grieve something, right?
12  A.  I made my point to the Union, the Union brought it to
13    the Chief's attention.
14  Q.  Did you --
15  A.  Let me finish.
16  Q.  Go right ahead.
17  A.  I brought it to the Union's attention.  I came in to
18    work.  The Union then brought it to the Chief's
19    attention to say this is something that we have to
20    address and the Chief addressed it with them.  We
21    came up with a new way for this type of coverage, but
22    said that clearly, the whole deal is off unless
23    Kelley comes in.  I had to come in for my day.  So, I
24    did.

Page 95

1  Q.  You knew about this before you went in?
2  A.  No.
3  Q.  Did you grieve this -- my question was:  Did you
4    grieve this with the Union, that coming in between
5    your vacation months?
6  A.  I was told, Tom, if you grieve it, we'll lose this
7    opportunity to do something good, to make this work
8    in the future.  So, I said, I'll come in.  I wasn't
9    going to put the Union in that position.
10  Q.  Eventually, for whatever reason, you agreed to go in
11    and you did?
12  A.  I went to work.
13  Q.  And then you took the rest of the month off after
14    that?
15  A.  That's correct.
16  Q.  What else besides this incident do you say was an
17    example of the harassment that you said you were
18    suffering prior to January 2001?  And that's, by the
19    way --
20            (OFF THE RECORD)
21        MR. SILVERFINE:  Back on the record.
22  Q.  Mr. Kelley, you'll agree, by the way, that that
23    example, which we just discussed about the vacation,
24    was postJanuary 2001, what you just described,

Page 96

1    correct?
2  A.  It was July 4th, 2001.
3  Q.  And you'll agree with me that's after January,
4    2001?
5  A.  Correct.
6  Q.  If I could just go back to what you said earlier.
7    You said you had suffered from harassment previous to
8    January 2001.  Could you tell me what harassment you
9    say you suffered prior to January 2001 when you went
10    on your visit to the IG's Office?
11  A.  Prior to?
12  Q.  Right.  I'm just taking again -- what you told us
13    earlier, you said because of -- and I'm paraphrasing
14    now -- the harassment you suffered when you went to
15    the IG's Office with Dana and Paul.  So, I'm asking
16    you what harassment you say you suffered prior to
17    your January visit of 2001 to the IG's Office?
18  A.  Well, there was constant examples of when I had to
19    go to -- like when I had meetings.  I had to log in,
20    log out.  If I was -- Botieri would ask, if he saw
21    the car here or there, he was constantly calling
22    Kevin saying, why's Kelley doing this, why's Kelley
23    doing that.  And I had legitimate questions -- or
24    legitimate areas to be.

Page 97

1        My reports, simple reports, stuff that --
2    something that was a minor mistake, I was constantly
3    pulled on the carpet for it.  I was constantly -- a
4    lunch break.  If I was five minutes over -- you were
5    on the air all the time anyway, I was always on
6    portable.  It was why didn't he answer the radio or
7    something like that.  I constantly would get e-mails
8    on stuff and I would then justify it or have already
9    done that and not hear nothing from it.  They were
10    waiting for me -- anything.  They were biting at the
11    lip to grab anything that I did wrong.
12  Q.  In terms of you said, quote, "pulled on the carpet,"
13    who would do that?
14  A.  Kevin would get a call from Botieri, find out this,
15    find out that type of thing.  And Kevin would call me
16    and say -- and then I would have a legitimate answer
17    for it, and then that would be the end of it.  It
18    wouldn't materialize into anything.
19  Q.  So, you weren't actually called into the office, your
20    supervisor took care of it with you?
21  A.  It would be -- like I said, it would be the simplest
22    little things.  He might have the -- or like the
23    computers in the car, when they first got them, would
24    shut off and they wouldn't go back on, they had

Page 98

1    trouble with that.  He would call down to Kevin and
2    say, Kevin, Kelley doesn't have his computer on.  And
3    he would say, well, the computer doesn't work today,
4    or there's something wrong with it.  I'd bring the
5    car in and they'd fix it.  We had trouble with them,
6    the way they were put into the cars.
7  Q.  My understanding of the term "pulled on the carpet,"
8    is actually somebody comes into the office and you
9    have a discussion with the officer about an event.
10    You weren't actually called on the carpet, you're
11    saying your supervisor had a complaint from his
12    supervisor about check with Kelley on why he wasn't
13    answering the radio, words to that effect?
14  A.  Every minor little thing.
15  Q.  I understand what you're saying, but you're actually
16    not being pulled on the carpet.  You're saying --
17  A.  I was never disciplined, or reprimanded, or written
18    up.
19  Q.  You're saying your supervisor called up and said the
20    Captain, for lack of a better term, is checking on
21    you to see why you weren't answering the radio?
22  A.  The Captain called down and said.
23  Q.  Right.  And you said --
24  A.  Correct.

Page 99

1  Q.  -- you weren't actually called into the Captain's
2    office or the Chief's office and they said,
3    Mr. Kelley, you know, you're not answering your
4    radio, right?
5  A.  No.
6  Q.  In terms of logging in and logging out, were you
7    under an obligation to log in and log out at certain
8    times?
9  A.  Well, when I first got -- logging in and logging out,
10    what do you mean by that?
11  Q.  Again, I'm just going by what you told us a few
12    minutes ago.  You said I had to attend meetings and I
13    was obligated to log in and log out.
14  A.  Correct.  I had no control over the meetings; plus,
15    we had seminars and various responsibilities with the
16    retirement system.  If I had to work, I'd go to a
17    meeting, they would log my time, log me coming back
18    into the building.  They would call over to the
19    office and say what time did the meeting end.  I
20    would go from the meeting right to the police
21    station, but they would have called over and said
22    what time did he leave that building to the police
23    station, which is probably, depending on traffic,
24    maybe a ten-minute ride, that type of stuff, which I

Page 100

1    would hear from people saying they're calling on you
2    again.
3  Q.  My question, I guess, was:  Were you obligated as an
4    officer when you were off duty and going to
5    retirement meetings, for instance, to log out?
6  A.  I did tell them where I was, yes.
7  Q.  I'm saying, in other words, you were no longer an
8    active police officer?
9  A.  Oh, yeah.
10  Q.  I'm in a meeting, I'm no longer patrolling the
11    streets of Plymouth?
12  A.  Correct.
13  Q.  Would you agree with me you had an obligation to log
14    out, so they would know you were at a retirement
15    meeting and not on duty?
16  A.  That's correct.
17  Q.  How big a Department manwise was Plymouth, let's say,
18    for instance, in 2001?  How many members were there?
19  A.  I think about a hundred.
20  Q.  And at any single shift that you would serve on,
21    about how many officers were on duty?
22  A.  Well, there were two manning postures.  By that I
23    mean, they had a summer manning posture and a winter
24    manning posture, because of the seasonal work and the

Page 101

1    Town's size.  I don't know what the posture is now,
2    but it went down to a certain level of manpower that
3    you needed to be on.
4  Q.  Would you agree with me that the Police Department
5    ought to know how many officers are on duty in case
6    they have staffing issues; is that fair to say?
7  A.  That's true.
8  Q.  So if, for instance, an officer has to log off to do
9    "X," they ought to know if they need to fill a
10    sector; is that fair to say?
11  A.  That's fair to say.
12  Q.  So, in this case -- and, again, I understand you were
13    a Retirement Board member at the same time you were a
14    police officer for a period of time, right?
15  A.  Yes.
16  Q.  And they just asked you if you're going to go to a
17    meeting, log out and then log back in when you're
18    done?
19  A.  Correct.  They also instituted a chargeback from the
20    Department to the retirement system.
21  Q.  We'll get to that in a minute.  For right now I'm
22    just asking about logging in and logging out.
23  A.  Yes.
24  Q.  And again, in your complaint, Exhibit 1, paragraph

THOMAS KELLEY

Page 102

1    23, page 5, if you turn it over. You wrote, "Town
2    meeting voted to ratify the past inappropriate
3    compensation and authorization of funds to Pomeroy."
4    Do you see that?
5  A.  Uh-huh. Yes.
6  Q.  And your focus in your complaint is on Chief Pomeroy,
7    do you see that?
8  A.  Yes.
9  Q.  You're telling us now, under oath, that you voted to
10    ratify compensation and funds to not only Chief
11    Pomeroy, but to certain Captains and retired officers
12    as well?
13  A.  That's correct.
14  Q.  During the Town meeting in which you participated,
15    you also voted to ratify, as you say in paragraph 23,
16    the past inappropriate compensation and authorization
17    of funds to Chief Pomeroy?
18  A.  No, I didn't say that. I said what we did at the
19    Town meeting is we voted to amend the bylaw.
20  Q.  I'm just reading what you wrote here. You say
21    subsequently, in paragraph 23, "Town meeting voted to
22    ratify the past inappropriate compensation and
23    authorization of funds to Pomeroy." I'm assuming
24    that's Chief Pomeroy, right?

Page 103

1  A.  Yes.
2  Q.  And you yourself voted to ratify the past
3    inappropriate compensation and authorization of funds
4    to Chief Pomeroy?
5  A.  That's what it says.
6  Q.  Again, I'm reading your complaint. Right?
7  A.  Very simply, we voted to amend the bylaw. Now, if it
8    covered past performances, past appropriations, then
9    I guess it must have. I wasn't --
10  Q.  Well, you know it does. As you sit here today, you
11    knew it did then and you know it does today?
12        MR. ARMSTRONG: Objection. Don't be
13    argumentative to my witness.
14        MR. SILVERFINE: Now you're being
15    argumentative with me. If he understands the
16    question, he can answer it.
17        MR. ARMSTRONG: Don't tell him what he
18    understands.
19        MR. SILVERFINE: Don't point your finger at
20    me.
21        MR. ARMSTRONG: Ask a question.
22        MR. SILVERFINE: I did ask a question.
23        MR. ARMSTRONG: Okay.
24        MR. SILVERFINE: Don't point your finger at

Page 104

1    me. If you have an objection, you can state it.
2        MR. ARMSTRONG: Maybe we should take a
3    break.
4        MR. SILVERFINE: If you want a break, we
5    can come back in a half-hour and continue.
6        MR. ARMSTRONG: I don't think you're being
7    courteous to this witness.
8        MR. SILVERFINE: Oh, sir, that's absolutely
9    untrue, and you know that's untrue. Just because
10    I've phrased a question that you don't like the
11    answer to, doesn't mean I've been discourteous.
12  Q.  Mr. Kelley, have I been discourteous to you at
13    all?
14        MR. SILVERFINE: Well, let's stay on the
15    record because I haven't been discourteous to your
16    witness whatsoever, sir.
17        MR. GALLITANO: In all fairness, your last
18    comment, you said, you know what you're saying. And
19    he didn't --
20        MR. SILVERFINE: Excuse me.
21        MR. GALLITANO: That's all it was, the tone
22    that you took.
23        MR. SILVERFINE: You guys are, first of
24    all, double teaming me now.

Page 105

1        MR. GALLITANO: I'm not double teaming
2    you.
3        MR. SILVERFINE: You are double teaming.
4        MR. GALLITANO: You said you want to talk
5    about it, so we'll talk about it.
6        MR. SILVERFINE: And he can object to the
7    form of the question, which is perfectly within his
8    rights, but he's being argumentative to me.
9        MR. GALLITANO: But that wasn't a question.
10        MR. SILVERFINE: If Mr. Kelley can't answer
11    the answer, and he's doing a terrific job, he's going
12    to let me know.
13        MR. GALLITANO: Jeremy, that wasn't a
14    question. If you read it back, you say you know what
15    you're saying. That wasn't a question. That looks
16    like an accusation.
17        MR. SILVERFINE: Let me finish the question
18    before we break.
19  Q.  Back in September of 2001, did you know you were
20    voting to ratify, as you say in your complaint, past
21    inappropriate compensation and authorization of funds
22    to Chief Pomeroy?
23  A.  I voted at a Town meeting to amend the personnel
24    bylaw to cover the compensation paid; and if that was

Page 106

1    the net result, I guess that's what it was. I didn't
2    really go sit back with the Town Clerk and say what
3    did we do? We amended the bylaw, which was my
4    intention, so that it would be clearly laid out in a
5    paper trail for the funds being paid.
6    Q.  And that included whatever you want to call it,
7    appropriate or inappropriate, past compensation and
8    authorization of funds to Chief Pomeroy, the
9    Captains, and the retired officers?
10   A.  If that's what it meant, I guess that's what it
11   meant. I didn't --
12   Q.  Did you know back in September 2001 what that
13   meant?
14   A.  You know, I really don't know if it was -- that was
15   the net result, but I know it amended the bylaw and
16   that's what we did.
17   Q.  And you knew it covered past compensation for the
18   monies that they --
19   A.  I honestly can't take the position of knowing
20   exactly what that vote would have -- I know we
21   amended the bylaw to cover the monies that were being
22   paid; and that was my intent.
23   Q.  Are you saying you did not know, when you were voting
24   at the Town meeting, what you were voting for in

Page 107

1    terms of compensation of funds to Chief Pomeroy, the
2    Captains, and other retired officers?
3    A.  I knew what I was voting for. I just didn't know if
4    it had any retroactivity to it and what that result
5    would be with, say, the Clerk's Office and how he
6    would present it. That wasn't my intention. I
7    didn't even think about it. I know what I was voting
8    for.
9         (LUNCH BREAK FROM 1:20 TO 2:15 P.M.)
10        MR. SILVERFINE:  Back on the record.
11   Q.  Mr. Kelley, would you agree with me that by
12   September 2001, when you voted at the Town meeting
13   relative to the compensation that we've been talking
14   about earlier today, that that was the very thing you
15   had gone in and complained to the IG's Office about
16   in January of 2001?
17   A.  When we went into the Inspector General's Office in
18   2001 January, my concern was that the monies that
19   were being paid were not in the governing document,
20   which in this case would have been the personnel
21   bylaw.
22   Q.  No. What I'm asking you is, at least by September
23   2001, everything that you had gone and complained
24   about to the IG had been ratified by the Town?

Page 108

1    A.  In September 2001 there was a Town meeting -- yeah,
2    it was in the fall, I'd say. There was a fall Town
3    meeting, which made the appropriate changes in the
4    bylaw.
5    Q.  So, again --
6    A.  That's my statement.
7    Q.  Right. I'm just saying -- I'm just following your
8    complaint along. And so, I'm just asking you, by
9    September what you had complained about initially --
10   A.  The bylaw was corrected.
11   Q.  Right. And as part of the Town meeting, you had
12   voted to ratify it?
13   A.  Yes.
14   Q.  Let's go on to Exhibit 1, paragraph 24. You wrote
15   that Chief Pomeroy was well aware that you had
16   reported him to the IG's Office. On what basis do
17   you make that statement?
18   A.  I had a discussion with Eleanor Beth. I wrote her a
19   letter specifically outlining -- I wanted to sit down
20   and have a meeting with her and discuss the
21   harassment that I received on the job. This was
22   around May -- I mean, around July. I then gave her a
23   letter and she said she didn't have time or she
24   didn't want to discuss issues. I then reduced my

Page 109

1    concern to writing and I presented that to her at her
2    office. And in that letter, I indicated that I had
3    gone to the Inspector General's Office on these
4    matters.
5    Q.  Do you have a copy of that letter somewhere in your
6    files?
7    A.  I believe it's in the documents that we produced to
8    you.
9    Q.  I'll double check, but you think the letter -- you're
10   referring to the one letter telling Eleanor Beth,
11   referring to the IG's Office, is in the production?
12   A.  I believe it's in the production.
13        MR. SILVERFINE:  And if it's not, we'll
14   make arrangements to get it.
15        MR. GALLITANO:  We'll get you a copy.
16        MR. SILVERFINE:  Fair enough.
17   Q.  Do you have any independent understanding of how it
18   is that Chief Pomeroy would know that you went to the
19   Inspector General's Office? I understand you're
20   saying you sent a letter to Eleanor Beth, but did you
21   cc the Chief or anything like that?
22   A.  No, but I did in e-mails that I have to the Union.
23   And, I believe I sent one to Captain Botieri
24   indicating that one of them was my treatment of being

# EXHIBIT A CONTINUED

THOMAS KELLEY

Page 110

1    ordered in on the 4th of July in '01. I wrote an
2    e-mail, I believe, to that effect, indicating to
3    Captain Botieri that this was an example of the
4    harassment that I have been receiving as a result of
5    going to the Inspector General's Office on this
6    issue.
7  Q.  And Exhibit 1, again, we're going through the
8    paragraph, paragraph 25. You said in this that
9    Pomeroy knew your medical conditions were preexisting
10   and would place you in harm. Are those the same
11   medical conditions you mentioned earlier, Lyme
12   disease and Meniere's disease?
13  A.  I had those sicknesses documented in the doctor's
14   notes that I had previously given to him.
15  Q.  You were still on the job at that point in time?
16  A.  Yes.
17  Q.  How is it that Chief Pomeroy would know that you
18   would be placed in harm with whatever medical
19   conditions you've now told us about?
20  A.  Well, one of the symptoms of both of those particular
21   illnesses is dizziness. It can affect blood
22   pressure. You can have fainting spells, that type of
23   thing, where you lose your ability to function. As
24   far as I know, you have a tough time breathing, you

Page 111

1    know, because some people I've been told, and the
2    doctors said, it's because of the Meniere's, how they
3    really don't know how it really effects people, but
4    he has found out that fresh air, people outside, it
5    has a big change.
6        He asked me about my -- my doctor asked me
7    about -- you know, salt is issue, but he also said
8    about, you know, conditions as far as fresh air has
9    sometimes a way of mitigating the symptoms and I've
10   found that to be true. That, if I was able to get
11   fresh air and able to --
12       I mean, I used to run the air conditioners
13   sometimes in the police car in the summertime because
14   it would get hot and I would feel better. At times I
15   would get the dizzy spells so bad, I'd have to go
16   home. And like I said, that was documented in that
17   doctor's note.
18       The sick letter that I got from the Chief. It
19   said you didn't complete your shifts several times,
20   I think it was seven or eight in that period, and I
21   attributed it to those times I had been taken home by
22   another officer, literally driven home, and then
23   another car would pick him up because I had these
24   attacks and I didn't know what -- then I would call

Page 112

1    the doctor and make an appointment and he'd look at
2    my medication and look at -- it's a very difficult
3    disease to get your arms around.
4  Q.  But you were still prior to May 25th, 2003 on the job
5    as a full-time officer?
6  A.  Correct.
7  Q.  You hadn't put in for any disability retirement or
8    other type of retirement prior to May 25th, 2003?
9  A.  No. I was just trying to make a living. I have two
10   kids going to college.
11  Q.  I'm not debating that. I'm just asking.
12  A.  No, I didn't.
13  Q.  In other words, as of May 25th, whatever you were
14   suffering from didn't prevent you from going to work
15   and serving as a police officer with all the
16   requisite functions of a police officer?
17  A.  I went to work, yes, I did.
18  Q.  Are you saying you didn't perform the essential
19   functions of the job?
20  A.  I did.
21  Q.  That's what I'm asking. So, at least up until
22   May 25th, 2003, you performed the essential
23   functions, your duties as a police officer for the
24   Town of Plymouth?

Page 113

1  A.  Correct.
2  Q.  Don't take offense to this. Were you overweight at
3    the time on May 25th?
4  A.  I've always been between -- I started the job
5    probably at 250 and I was probably about 265, 270.
6    I've always been that size my whole life.
7  Q.  Occasionally, it fluctuates a little heavier? I
8    noticed one of your reports mentioned by your lawyer
9    the other day, he said something about 275 pounds?
10  A.  No. The doctor put me down as five-four instead of
11   six-four.
12  Q.  Right. The weight said something like 275 pounds and
13   I think your lawyer made a reference to, you're not
14   five-four.
15       MR. GALLITANO: Just for the record, that
16   wasn't me that said that, that was Michael Sacco's
17   testimony.
18       MR. SILVERFINE: Right.
19  A.  It's in the record. I don't know exactly what it
20   was. It might have been an approximate. I know they
21   didn't weigh me at the medical panel.
22  Q.  Let's turn to page 6 on Exhibit 1, paragraph 30. You
23   indicate in paragraph 30, the failure to screen
24   members of the police force and prevent you in

DUNN & GOUDREAU

Page 114

1    particular from participating in what's called the
2    Columbine drill was retaliatory in nature. Could you
3    tell me what you mean by that?
4  A.  Well, I believe the Chief had enough documentation in
5    the files and he had an obligation, given the
6    intensity that he knew about these drills, and the
7    other potential injuries and the intensity of this
8    drill, that he should have at least taken those into
9    consideration before he ordered everybody carte
10    blanche to appear.
11  Q.  I think I asked you this earlier. You said the
12    entire Police Department had an order to --
13  A.  Correct. The way orders are put out, if I can
14    clarify that for you. They're put out -- it doesn't
15    check off this guy can't go. It said these are the
16    following dates you will go. It's put in a glass
17    case and that's what we operate from.
18    My understanding is that everybody participated,
19    maybe other people didn't, but I don't know. I don't
20    know that.
21  Q.  And this was a -- I think we heard mentioned, this
22    was a drill put on by the State Police?
23  A.  This was a drill put on by the State Police, correct.
24  Q.  And other departments also participated in it besides

Page 115

1    Plymouth?
2  A.  Not this particular drill. This particular drill was
3    just Plymouth.
4  Q.  When you say he knew about the intensity of the
5    drill. How do you know the Chief knew about what you
6    describe as the intensity of the drill?
7  A.  From what I picked up from talking to Paul Boyle,
8    the Chief was well aware of all the circumstances
9    surrounding it. He's a member of the Mass. Police
10    Chiefs' Association. I think he's the Southeastern
11    Massachusetts president. So, I'm sure he was well
12    aware of what the program was and what it entailed
13    before he authorized everyone to go.
14  Q.  When you say "the intensity," you're referring to the
15    injuries that Mr. Boyle had raised with him earlier,
16    including the thing with the gas mask?
17  A.  By the intensity of the drill I'm referring to the
18    running, firing, wearing a gas mask. It was a
19    live -- as live as you can get in a manner where we
20    could physically -- the State Police were considered
21    the bad guys and we had to hunt them down in the
22    building.
23    You could physically grab them, put them down,
24    other than short of, you know -- you were given the

Page 116

1    latitude to make it as real as possible without
2    trying to get somebody hurt, which I don't know how
3    you do that, it does hurt, but that was the intent.
4    We had masks on, we had fire alarms going, we
5    had radios blaring, we had our radios blaring. We
6    had five people on a team. They had live fire to
7    shoot at us. We had live fire to shoot at them.
8  Q.  This was something to recreate an event that could
9    happen on the job, right, that's the purpose of the
10    drill?
11  A.  This was a drill to coordinate agencies in the event
12    that there was a hostage situation. If you were the
13    first responder, you would know as a result of the
14    Columbine incident in the western part of the
15    country. They came up with a -- they wanted to teach
16    all your first responders, then your different
17    specialized teams might come in after that, but that
18    first initial response, they didn't have to have
19    people in positions that the other people didn't know
20    where they were or weren't on the same plane when it
21    came to coordinating efforts, clearing buildings.
22    They wanted to try to develop a protocol where we're
23    all on the same plane.
24  Q.  You wrote this was retaliatory in nature. And then,

Page 117

1    you indicate in the next paragraph, paragraph 31,
2    it's because you reported Pomeroy to the Inspector
3    General's Office, do you see that?
4  A.  Yes.
5  Q.  So, you're alleging now because you reported Pomeroy
6    to the IG's Office, that he made you go through the
7    drill; is that right?
8  A.  That's right.
9  Q.  But you said to us earlier that you weren't only
10    reporting on Pomeroy, you were reporting on all the
11    other officers, Captains, retired officers where this
12    applied to, correct?
13  A.  That's not correct.
14  Q.  So, you were only reporting on Pomeroy's use of the
15    funds; is that right?
16  A.  The Department head is ultimately responsible for the
17    payroll.
18  Q.  And you're saying as a result of you complaining
19    about just Pomeroy, he made you go through these
20    drills?
21  A.  I believe that's exactly what he had in mind.
22  Q.  And that's specifically, as your say in your
23    complaint, because you went to report him to his IG's
24    Office; is that right?

Page 118

1   A.  That's correct.
2   Q.  And that's even though you voted about nine months
3       later to ratify the very thing you went to complain
4       on?
5   A.  No, I didn't.  Nine months later?  You've got the
6       wrong year.
7   Q.  Well, okay.  You told me earlier today, you said
8       January 22nd, 2001 you went to IG's Office?
9   A.  That's correct.
10  Q.  You then told us under oath that in September 2001
11      you voted to ratify the funds that were previously
12      not apportioned to the Quinn bill allowances, that's
13      approximately nine months later?
14  A.  No, it isn't.  This incident happened in 2003.
15  Q.  Listen to my question.  I'll get there in one
16      second.  I'm not tricking anyone.  I'm going through
17      what you're telling me.  You said -- I'll walk
18      through it again -- on January 22nd, 2001 you went to
19      the IG's Office to complain about Chief Pomeroy?
20  A.  That's correct.
21  Q.  You then told us under oath that in September of 2001
22      at a Town meeting, you voted to ratify the very thing
23      you had gone to the --
24  A.  Correct.

Page 119

1   Q.  So, just to stop right there.  January to September
2       is roughly eight, nine months?
3   A.  I misunderstood the question, I'm sorry.
4   Q.  That's why I'm walking you through it, so there's no
5       misunderstanding.
6   A.  Okay.
7   Q.  You're then saying, just so I understand this,
8       roughly almost two years later, a little under two
9       years later, he's retaliating against you for
10      reporting him in January 2001 to the IG's Office; is
11      that right?
12  A.  That's correct.  All during that period after that
13      and through all that area there, he was -- I was
14      constantly being harassed by various people in the
15      Department.  I was told -- they were saying the Chief
16      told them to do this, or Botieri told them to do
17      this, and they would say to me, you know, they're
18      just picking on you.  They're just going off on you
19      because of what you did.
20  Q.  Let's break that down.  You said various people,
21      which people harassed you and which people told
22      you?
23  A.  I had Lieutenant Fahy tell me that.
24  Q.  What did Fahy tell you?

Page 120

1   A.  Exactly that.  He wrote me an e-mail.
2   Q.  Saying what?
3   A.  Saying they're after you.  I've had Botieri in my
4       office screaming and hollering about you.  They want
5       to find out anything and everything.  In his
6       affidavit he states --
7   Q.  Is that the e-mails, have you produced that as part
8       of your package?
9   A.  I think you could have a few of them in the discovery
10      there.
11  Q.  You've produced all the e-mails relative to this?
12  A.  All that I could possibly have.
13  Q.  Who else besides Lieutenant Fahy?
14  A.  I was told by other officers.
15  Q.  I need names.
16  A.  I was told by Officer Boyle, Goodwin.  You could put
17      anybody that worked on the day -- okay, put all the
18      men on the day shift.
19  Q.  I'm asking you.  I don't want to put words in your
20      mouth.  You tell me who told you and what they told
21      you?  For instance, what did Boyle tell you?
22  A.  He told me they were after you, to watch your back at
23      any point in time.
24  Q.  What did Goodwin tell you?

Page 121

1   A.  The same thing.
2   Q.  But you say they harassed you, who harassed you and
3       what did they do?  When someone says to watch your
4       back, that's a caution.  That's not harassment, do
5       you agree?
6   A.  It was a threat is what I was told.
7   Q.  When Officer Boyle told you watch your back, he
8       wasn't threatening you?
9   A.  No, that he was hearing it from various sources.
10  Q.  Who actually harassed you?
11  A.  The harassment was nitpicking every small little
12      item.  I believe one time -- I'll give you an
13      example.  I wasn't on a lunch break and Chief Pomeroy
14      called down to Mike Burke, who was on the desk at the
15      time, told somebody else to -- I don't know who.
16      They had to relieve the desk.  They drove down to the
17      Cedarville Fire Station and somebody -- or somehow
18      they thought there were two police cars there and one
19      of them was mine and I was eating lunch when I
20      shouldn't have been.  And it wasn't me at all.  It
21      was another officer with the Fire Department, because
22      they use our old police cars for inspectional
23      services.
24          And in fact, when Sergeant Burke pulled in, I

Page 122

```
 1    was on the road.  And then, I met him there and I
 2    said, what are you here for?  He goes, well, the
 3    Chief got a call, ordered me down here to get you.
 4    And I said, well, I'm not here.  That's a fire car.
 5    That second car was a fire car.  They used the white
 6    and red lights.  And I said, hey, it wasn't me.  It
 7    wasn't me.
 8  Q.  So, what happened as a result of that?
 9  A.  Nothing.
10  Q.  What other incidents are you referring to?
11  A.  There was one time where Captain Botieri called and I
12    had to write a little report about it.  It was an
13    incident where I was off -- I was just finishing
14    lunch and there was a call that Dennis Hassan went on
15    where it was a violent fight of a husband and a wife
16    on a road up in the northern section of Town, in
17    Manomet, and we were the only two cars.  I heard the
18    call, I started making my way to the car.  I got on
19    the -- when I got in the car, I took off.  I was
20    heading up there, because I knew I'd be his only
21    backup, because he jumped out of the car and said
22    send me a backup right away.  I immediately,
23    instinctively, being on the job almost 25 years,
24    jumped in the car and started that way.  And when
```

Page 123

```
 1    they say Car 5, I said, I'm on the way, because
 2    there's been many times where people talk minutia
 3    on the radio and an officer will be calling for help
 4    because he's either been hurt or something disastrous
 5    was happening.
 6        I drove all the way up there, got there,
 7    assisted Officer Hassan.  We made an arrest of a
 8    violent individual and I was called on the carpet for
 9    saying I'm on my way by Botieri.
10  Q.  So, you were called into his office this time?
11  A.  I was called into Kevin's office and he said you
12    didn't give your location.
13  Q.  Who is Kevin?
14  A.  Kevin Fahy.
15  Q.  Lieutenant Kevin Fahy?
16  A.  Yes.
17  Q.  He's a friend?
18  A.  He was the Lieutenant.
19  Q.  He was your shift commander?
20  A.  That is correct.
21  Q.  Are you supposed to give your location?
22  A.  Yes, you are, but in a situation like that, time and
23    air travel, okay, when a situation is happening
24    like that, okay, you don't tie up the air with talk.
```

Page 124

```
 1    When you're on the way to the scene, you're on the
 2    way.  It's assumed you're on the way and you're
 3    there.
 4  Q.  But my question is:  Did Lieutenant Fahy chastise you
 5    for just not reporting your location?
 6  A.  No, he didn't chastise me.
 7  Q.  What did he do?
 8  A.  He said, Tom, you've got to give your location.  I
 9    know it's baloney.  You were on the way and you've
10    been doing what you've been doing for many years.
11    It's just they're picking on you.  They're going for
12    anything they can get.
13  Q.  Is there a requirement in the policies and procedures
14    you're supposed to give location?
15  A.  Yes.  Again, I emphasize, when you have a situation
16    like that --
17  Q.  I'm just asking if there is a policy and procedure?
18  A.  Yes, there is.
19  Q.  And you didn't follow that?
20  A.  At that time I was more concerned with keeping the
21    air clear for Officer Hassan to give other
22    information.
23  Q.  So, it's fair to say you didn't follow that in that
24    particular situation?
```

Page 125

```
 1  A.  It's not fair to say.
 2  Q.  So, you gave your location?
 3        MR. ARMSTRONG:  I want to object because I
 4    think the deposition is getting argumentative now.
 5  Q.  Did you understand my question, sir?
 6  A.  I understood your question.
 7  Q.  So, did you give your location?
 8  A.  I didn't give my location.
 9  Q.  What other incidents of harassment can you cite?
10  A.  Kevin called me into the office one day and said --
11  Q.  Forgive me?
12  A.  Kevin Fahy, Lieutenant Fahy.
13  Q.  Thank you.
14  A.  He called me in and said you were out the other day,
15    I think I was doing radar for a while, and in one of
16    my citations I didn't put down the date even though
17    it was a warning.
18  Q.  It was a what?
19  A.  It was a warning.  And I said, okay, Kevin.  I'll
20    make sure I do that the next time.  And he said that
21    Botieri called him on that.
22  Q.  I'm sorry, who did?
23  A.  Botieri.
24  Q.  That is the Captain?
```

THOMAS KELLEY                                                    FEBRUARY 9, 2006

Page 126

1   A.  Yes.
2   Q.  Is there a requirement that you're supposed to put a
3       date on the citation?
4   A.  Yes, there is.
5   Q.  Is it fair to say that not putting the date on the
6       citation can be a fatal flaw in the citation if --
7   A.  Not on a warning, because warnings don't have any --
8       they don't have any -- they're not -- you don't go to
9       court on a warning.  A warning is exactly what it is.
10      It's a written account of me stopping you, saying you
11      were going too fast, or you took a left turn and you
12      write it out for the protection of you and me, so
13      someone doesn't say that we're stopping you for no
14      reason at all.  You write out the person's name,
15      address.  You give them a warning for going, say,
16      like five miles over the speed limit.
17  Q.  Can't a warning be brought back up if something else
18      happens, though?
19  A.  No.  Not that I'm aware of.
20  Q.  It's your testimony you're not aware of that?
21  A.  No.
22  Q.  And you're not aware of any citation that doesn't
23      have a date, it can be a fatal flaw if the citation
24      goes to court?

Page 127

1   A.  I don't think -- depending on the case, I don't think
2       that would be true.
3   Q.  You wrote in paragraph number 32 that Pamela Nolan's
4       denial of your 111F benefits was also retaliatory.
5       What's the basis of fact for that?
6   A.  I had waited for almost a year talking with
7       Mrs. Flynn and trying to get an explanation of why
8       they didn't pay me as well as a full explanation.
9       Alls I got from her was two lines, I agree with --
10      there's nothing in -- I agree with the Chief's
11      decision.  There's nothing here to make me overturn
12      it; and that's all I got.
13  Q.  In Section 33, paragraph 33, again, the retaliation
14      you're referring to is the denial of your vacation
15      time instead of sick time; is that fair to say?
16  A.  No, it's not fair to say.
17  Q.  Tell me what is the --
18  A.  It encompasses the entire number of years of
19      harassment that I put in after reporting him to the
20      Inspector General's Office.
21  Q.  So, what else, after January 22nd, 2001, do you say
22      happened that you haven't told us about already?
23  A.  Like I said, the constant nitpicking went on.
24      Constantly, I'd have -- if I had vacations, they

Page 128

1       would be with coverage.  No matter what it was, I'd
2       have those slips put in there.  Even though I was a
3       senior man, I wouldn't get them back, or -- I
4       couldn't make plans.  Constantly, you know, if there
5       was something wrong with the computer in the car, I
6       would have somebody say go put your computer on.
7       Then, I'd say the computer was on and there's a
8       problem with it, and then they'd find a slip and say,
9       oh, yeah, it needs to be fixed.
10  Q.  What else?
11  A.  Things of that nature.
12  Q.  Anything else?
13  A.  No.
14  Q.  You wrote in Section 35 something about benefits for
15      the 16 years he would have served.  How did you
16      arrive at that number, 16 years?
17  A.  Well, as it stands, I don't -- I left the job when I
18      was 48-and-a-half, I believe, or just 49.  I could
19      have worked until I was 65.  I only receive 72
20      percent or 73 percent of my salary and I believe the
21      math adding that up came to $220,000.
22  Q.  So, what you're saying is, just so -- I'll paraphrase
23      it.  You're saying absent that incident, you would
24      have served 16 more years?

Page 129

1   A.  I could have potentially stayed on the Department
2       until I was 65 years old.
3   Q.  And you'll agree with me that's a speculative number;
4       we don't know what would happen God willing?
5   A.  What other way do you phrase it?
6   Q.  I'm just asking how you get that number?
7   A.  I can't predict.
8   Q.  You're basing the number on the difference between
9       what you are receiving and would have received; is
10      that fair to say?
11  A.  That's fair to say, yes.
12  Q.  In paragraph 37 on page 7 you indicate there's a
13      failure to screen.  What do you say that the Chief in
14      the Town of Plymouth should have done in this
15      situation?
16  A.  Well, I believe that given the intensity of the drill
17      and the knowledge that he had of it, he could have
18      taken the time to put together some type of screening
19      program, because he had all the information on my
20      case and anybody else's, to look at how this would
21      affect the officers ourselves.
22          The reason I make that comment is that in some
23      Departments, not some Departments -- like in the
24      State Police, they have specific or different

DUNN & GOUDREAU

Page 130

1    departments, they have a specific team that goes into
2    these hostage things, they're specifically training
3    constantly. They physically train all the time;
4    that's all they do. That's in particular in the
5    State Police.
6        They have a strike team that comes out. Some
7    bigger, bigger departments have it and it's a
8    specialized unit. They do physical training, they do
9    tactical training, and then they do mental training.
10   We never get any of that.
11  Q.  Wasn't this part of that training that you're
12   referring to, isn't this drill part of that training
13   that you say you didn't get?
14  A.  What I'm saying is that the preconditioning of it to
15   compete at that level, it would be like me and you
16   trying to go against the NFL and play inline.
17  Q.  Did you have to meet any kind of minimum standard,
18   physical requirement for the job?
19  A.  30 years ago.
20  Q.  And you didn't get re-examined every year by a
21   physician?
22  A.  Never.
23  Q.  So, the first time you have to meet a minimum
24   physical exam is at the time you entered the job?

Page 131

1   A.  That's correct.
2   Q.  And after that, you didn't have to pass an annual
3    physical exam or an okay by a doctor?
4   A.  Absolutely not.
5   Q.  In paragraph 38, reading this, why would you not
6    participate in any training program that is Police
7    Department-wide?
8   A.  I don't think it would be why not. It was that in
9    this case, given this type of position that was
10   predetermined, I feel that by at least looking
11   through the files, to say where could there be some
12   potential injuries here, because of the age of
13   individuals, and the time, and maybe different
14   illnesses, that you would have been able to say, you
15   know, these people might have problems with this type
16   of conditioning.
17  Q.  Now, back in May 2003 -- prior to the drill, did you
18   grieve this at all prior to May 25th?
19  A.  No.
20  Q.  There is a grievance procedure, right, through the
21   Union?
22  A.  That's correct.
23  Q.  You were aware of the grievance procedure back in
24   May 2003?

Page 132

1   A.  Yes.
2   Q.  Did you grieve any part of this incident up until the
3    time of your disability retirement on September 8th,
4    2003? Did you file any kind of grievance?
5   A.  No.
6   Q.  And just so I understand, in this count, which on
7    pages 7 and 8, Count II of your complaint, again, you
8    allege that the acts done in having you participate
9    in this drill were intentional based on the fact that
10   you went to the IG's Office; is that right?
11  A.  That's correct. What page are you on now? Are you
12   on 8 or 7?
13  Q.  Page 8, the bottom of Count II, I'm just reading
14   along.
15  A.  Yes.
16  Q.  And again, on page -- I'm still on page 8. On Count
17   III, paragraph 46, you indicate your rights were
18   violated and no other member in a similar position of
19   the Department had been treated in such a fashion.
20   Could you explain to me what you mean by that?
21  A.  Well --
22       MR. ARMSTRONG: I'm sorry, where are you
23   right now?
24       THE WITNESS: On page 8, paragraph 46.

Page 133

1        MR. SILVERFINE: Paragraph 46.
2        MR. ARMSTRONG: Thank you.
3   A.  On the denial of my IOD status, not being an
4    attorney, but having some experience with how the
5    injured on duty process works and how it's been on
6    the books for over 25 years, I believe I clearly
7    satisfied all the requirements of injured on duty. I
8    retired under Chapter 32, Section 7, which is an
9    incident and hazard undergone.
10       The medical panel found that -- they also found
11   on Chapter 32, Section 94 I retired under the Heart
12   Law. To retire under Chapter 32, Section 7, you must
13   have undergone an injury in the performance of your
14   duty. I was clearly injured by collapsing on top of
15   a Captain, being taken -- dragged to an area, given
16   oxygen, then transported via ambulance to a hospital
17   where the same Captain was there to observe all
18   that.
19       I then went from there to Boston Medical Center
20   and had a procedure, cardio cath procedure performed
21   on me, which then I discovered two weeks later, after
22   I got the results, it made my return to the job
23   impossible; that was one of the reasons. Other
24   people had been given IOD for not even a third of

Page 134

1    that threshold.
2    Q.  Let me stop you there.
3    A.  Please.  Excuse me.  I will stop when I'm finished.
4    Q.  I just want to ask you who else are the names of the
5        people --
6            MR. ARMSTRONG:  Let him answer, will you,
7        please?
8    A.  I gave you the courtesy earlier not to interrupt you
9        and I apologize.  I'd appreciate it if you'd just
10       give me that courtesy.
11   Q.  Absolutely.  I think I've done that throughout here.
12   A.  Number two, I was constantly monitored in such a
13       fashion for every little thing possible.  When I
14       found out that this issue was a problem -- I never
15       knew the magnitude of the problem.  I never knew the
16       amount of the problem.  My concern was not to have
17       somebody get hurt.  I came from the position and
18       always did from the start, to do what was right to
19       make sure everyone was protected.  That was turned
20       around on me and I was harassed on the job for every
21       little thing humanly possible.  And in the police
22       business where you can be subject to any type of
23       scrutiny, that's a very difficult work environment to
24       be under.

Page 135

1            I was then harassed with vacation.  I'm out a
2        month, I'm called in, ordered in.  My wife is in
3        hysterics when an officer comes to the door and says
4        call the station right away.  No explanation, just
5        call.  I call, and I'm confronted with that after
6        I've been out a month, and then the month after.
7            I wasn't too happy, but I knew if I didn't go
8        in, I'd be suspended; and that's exactly what they
9        were looking to do, get a reaction.
10           They used every tactic that they could to make
11       my life miserable.  I found out that they had been
12       doing things for many, many years, 15 years and over
13       $500,000 in public funds.  That's what I was
14       subjected to every day of the week.
15   Q.  But those are the same funds you then voted to ratify
16       in September of 2001?
17   A.  That's what we wanted to do -- excuse me, is that a
18       question?
19   Q.  Yes.
20   A.  That was our original intention from the beginning,
21       to handle this matter in a private matter and do it.
22       The Town took no opportunity to correct it.  The
23       harassment started and nobody, from the Town Manager
24       -- from Mr. Pomeroy up, or any one of those people

Page 136

1    took any interest in doing it, but I was subject to
2    the harassment and I was told by people it's because
3    of that.
4        I never knew the magnitude of this.  It extended
5    into the Fire Department.  I never knew that from the
6    beginning.
7    Q.  Paragraph 46, who else is in a similar position that
8        you state here in paragraph 46?
9    A.  When I was on the Retirement Board, my times were
10       logged in, logged out and there was a chargeback to
11       the system for my time and service.  That has never
12       happened to any other person in the Town of Plymouth
13       that has served on the retirement system that is an
14       employee.
15   Q.  Were there any other police officers that served?
16   A.  I don't know.  I don't know the total history of
17       everybody before me.  I've been there close to ten
18       years now.
19   Q.  During the time period you were there, were you the
20       only police officer?
21   A.  There was a Department head and the Chief Financial
22       Officer was on the Board, too.  So, there would have
23       been three Town employees on the Board.
24   Q.  Any other police officers, public safety officers?

Page 137

1    A.  No.
2    Q.  On page 9, paragraph 48, you discuss the
3        reimbursement issue.  Did the Retirement Board
4        meetings interfere with your shift or at the same
5        time as your shift as a police officer?
6    A.  What would happen is that by statute, the Retirement
7        Board has to meet once a meeting -- I mean, once a
8        month.  We have to disburse funds, we have to sign
9        for disbursement of funds.
10           But other times you could almost -- you could
11       find that we would set that date, so we'd have it in
12       advance, but then we'd have emergencies.  We had
13       investments.  We were presently running a hundred
14       million dollars.
15           Sometimes there would be a change in investment
16       managers, things would come up where we would have to
17       have a meeting to discuss that; or, to discuss the
18       performance of the funds, it might take three hours
19       to get through the eight managers that we had in
20       doing our due diligence.
21           So, with that, we would probably schedule an
22       investment meeting separate from the regular meeting,
23       because then you had a meeting that might go seven
24       hours long.  And then, we had meetings on

Page 138

1    disabilities as well. So, there were a number of
2    times possibly a month that I would have to meet.
3        I would then go to the meetings. If I was
4    working 8 to 4 and if the meeting was at 8, I'd go to
5    the meeting at 8, and then go back to the station and
6    go right to work.
7    Q. So, it's fair to say there were occasions when the
8        meetings that you attended did interfere or coincide
9        with your work as a police officer?
10   A. Oh, yes. Yes.
11   Q. That was the question. And would that be often on
12       these meetings you're mentioning?
13   A. When we coordinated a meeting there, you know, I had
14       to look at Patrick DellaRusso's time, Dick Manfredi's
15       time, who is the Building Commissioner. And who --
16       like any meeting that you would set up with a group
17       of people, whose schedule can meet what in the best
18       convenience of time. You know, we'd set them up that
19       way.
20   Q. So, taking into consideration the entire Board, by
21       necessity, there would be times when your shift was
22       overlapping with these meetings?
23   A. Correct. Many times they would be on my days off, so
24       there wouldn't be any problem at all.

Page 139

1    Q. In paragraph 49, you indicate you were subjected to
2        different treatment. Which officers were under
3        similar circumstances that you're referring to in
4        paragraph 49?
5    A. Well, we had a case where we had Officer Ditmairs who
6        recently -- who suffered a back injury, who was given
7        IOD. We had a fire fighter that retired after having
8        a stroke at his house. He was retroactively given
9        his benefits by Pam Nolan all the way back to his
10       last day of work when he retired. So, I've seen
11       those opportunities.
12       When I applied for my benefits to Mrs. Nolan,
13       she had just signed an agreement with the Fire
14       Department retroactively giving Captain Al Thom his
15       benefits back and refused mine.
16   Q. In paragraph 50, likewise, could you tell me which
17       officers you're referring to that you were treated
18       differently in this particular paragraph?
19   A. I'm trying to -- I'm reading it here (Witness
20       perusing document). I don't see -- we've already
21       discussed that.
22   Q. I'm just asking.
23   A. Can you ask a different question?
24   Q. Sure. I'll try. You say by denying you the funds --

Page 140

1    A. Well, 50 is different.
2    Q. That's what I'm reading.
3    A. You're reading something different.
4    Q. 50.
5        MR. GALLITANO: "Further, by denying."
6    A. Okay. You're right. I'm sorry.
7    Q. I'm trying to get to the important stuff. It says,
8        "More importantly knowingly and intentionally forcing
9        you to take part in a drill," and then it says,
10       "later on exposing you to treatment different from
11       other officers on the force with the intent to cause
12       you harm." What officers are you referring to in
13       terms of treating you differently?
14   A. Well, I can categorically say from speaking with
15       Kevin Fahy and various Sergeants, that there was
16       nobody else that they went after, or were told to
17       scrutinize, more than me. That's the best I can
18       answer that.
19   Q. That's fine. In paragraph 51, what is the basis of
20       your allegation that the Chief intentionally set out
21       to harm you? That's what this says.
22   A. Well, I believe he was negligent in not taking into
23       consideration the conditions that I had at the time.
24       They were documented and he could have easily looked

Page 141

1    at that as a protocol to look at to say, you know,
2    could there be a potential harm in this type of
3    training given the fact that this wasn't an everyday
4    occurrence for everybody in the Department.
5    Q. Is it true, as a police officer you faced everyday
6        harms just being on the job?
7    A. That is correct. Inherently, that is the job. That
8        is correct.
9    Q. What do you say -- how does this differ from any
10       other assignment, drill, that you receive as part of
11       your job as a police officer?
12   A. Well, it's just a -- it's a matter of common sense to
13       realize that if you've got 25 or 26 years in, when
14       you're in your late 40s. You surely can't do what
15       someone that's 24 years old can. You know, no one in
16       this room can say that they can do what they did when
17       they were 21 years old, or 22.
18       Common sense would dictate, given the intensity
19       of this drill -- and the prerequisite of the
20       individuals that were running this from the State
21       Police are in physical condition, where, like I said,
22       they work out during the day as part of their
23       protocol to the job; that's all they do. This was a
24       physically demanding drill for the best of people

Page 142

1      that were in physical condition like they were.
2  Q.  On page 10 of Exhibit 1, paragraph 54, just so we're
3      clear, the $2,000 figure that you mention in that
4      paragraph 54, how did you arrive at that figure?
5  A.  That's actually low. I get -- I think I get 11 -- at
6      the time I was getting like 1,154 a week. I mean,
7      give or take. So, we're talking $2,100. It came to
8      $2,000, roughly. I get 1,150 -- I get 100 a week --
9  Q.  1,050?
10 A.  Yes. At the time that's what I was getting, that
11     times two weeks.
12 Q.  Work it out for me. So, how did the 2,000 figure --
13 A.  When we did the complaint, I looked at that time and
14     I said I get about a thousand. And actually, when I
15     went back and looked at that time, it's actually
16     1,050 okay. I wasn't going to amend the complaint
17     for $50.
18 Q.  So, this is time you say you were entitled to as
19     vacation time used instead of sick time?
20 A.  Correct. What happened is, when I came out of the
21     hospital, after having the cardio cath, and I had
22     spoke to the doctor that we referred to in this
23     earlier section here -- what number is that one?
24 Q.  That's 3.

Page 143

1  A.  Exhibit 3. When I spoke with her and got that
2      letter, she told me that it takes about two weeks for
3      the cardio caths to be reduced to writing. I don't
4      know if you're following me on that.
5  Q.  I am.
6  A.  What they do is the doctor recites it. As they
7      speak, they make these -- I heard them do it because
8      you're half awake. They take a tape and they reduce
9      that into report form. So, she said in two weeks I'd
10     get that. So, I went home. I was on sick for a
11     while. I had a lot of medication. I had a lot of
12     things to think about. I talked to my brother-in-law
13     and various people, my wife.
14         I just told the Department put me in for
15     vacation time. I've got to sort this all out and see
16     what's going on. I then got the cardio cath from
17     Boston, which was after those two letters, okay. I
18     didn't have them at the time.
19         I had an appointment with Dr. Moore, we went
20     over the cardio cath results, and he said I can't let
21     you go back. And then, I realized how serious it was
22     and I put my retirement papers in around, I think it
23     was, the 28th of June; and that's how I came to the
24     2,000. It's about two weeks' work. It was two --

Page 144

1      our calendars are 4 and 2, then it goes 4 and 2
2      again. It comes out to two weeks' pay.
3  Q.  The demands you indicate you made upon the Town, to
4      whom did you first make it to, if you remember?
5  A.  I first gave all the document -- after I got the
6      documentation from the Retirement Board and it was
7      completed, I gave all the documentation to Larry
8      Rooney, who was the vice president -- steward at the
9      time. I gave Larry Rooney the certificate from the
10     State medical panel. I gave Larry Rooney the
11     doctor's narrative from the medical panel. I gave
12     the finding of fact from the medical panel, the
13     finding of fact that the Board sent up.
14         I indicated to Larry Rooney that the doctors
15     retired me on Chapter 32, Section 7. It was clearly
16     stated by the medical panel and the narrative report
17     that I retired under 94, Chapter 32, Section 94. All
18     those were given to Larry. He had two meetings with
19     the Chief. And the Chief still said to him in an
20     e-mail, and I believe you have that, too, in
21     discovery, I'm not paying him because I disagree with
22     the medical panel.
23 Q.  And you submitted that again where?
24 A.  I then talked to Mrs. Flynn and I asked her for a

Page 145

1      written explanation from the Chief and I never got
2      one from him or her. The only thing I got was when I
3      made -- I called Pam Nolan and I asked her for a
4      written explanation. I got a two-line explanation
5      and that was about nine months later.
6  Q.  And those are words to the effect that --
7  A.  It's on her stationery. She said I find nothing
8      compelling to override the Chief's decision. We have
9      it somewhere. It's in the discovery.
10 Q.  And then you made further demand somewhere else?
11 A.  No, that was it.
12 Q.  Then your lawyers made a demand to the Town?
13 A.  Then after waiting nine months, I did that. Patrick
14     DellaRusso had asked me to wait and see if we can
15     work this out and I said, sure. I waited and waited
16     and waited.
17 Q.  What is your -- let's start off presently. What is
18     your present relationship with the named defendant,
19     Chief Robert Pomeroy?
20 A.  I mean, I haven't seen Bob in years. I never had a
21     controversial relationship with him. We never had
22     any arguments or anything.
23 Q.  During the time period you worked for the Plymouth
24     Police Department, what was your relationship with

THOMAS KELLEY                                                    FEBRUARY 9, 2006

Page 146

1    Chief Robert Pomeroy?
2    A.  It was a professional relationship.  I didn't work
3    with him that much.  He was in different positions on
4    the job.  When I worked nights, he was working days.
5    So, we were far apart.  I never had any -- I didn't
6    work with him as a partner.  He wasn't a shift
7    commander -- maybe earlier, when he was a Sergeant,
8    I might have worked -- you know, I think he might
9    have worked 4 to 12 when I was there.  I never had a
10   problem.
11   Q.  You never had any animosity towards him?
12   A.  No.
13   Q.  Were you out to get him when you went to the IG's
14   Office?
15   A.  No, I wasn't.
16   Q.  Now, Lieutenant Kevin Fahy, who you indicated was a
17   friend of yours and he signed the affidavits that's
18   attached to your complaint, how long have you been
19   friends with him?
20   A.  Kevin was on the job prior to me getting there.  He's
21   older than I am.  He was about five years on the job
22   when I came there.  Kevin was a Sergeant, then he
23   took the Lieutenant's test.  I worked with him on
24   various shifts for 25 years.

Page 147

1    Q.  Do you socialize with him?
2    A.  I was the Treasurer of the Police Association.  So, I
3    ran functions that Kevin and different officers went
4    to.  I haven't seen Kevin in years now.  He's -- he
5    works over at the Federal Courthouse.
6    Q.  I forgot to ask you this a couple of minutes ago.
7    The Retirement Board duties that you had while you
8    were a police officer, approximately how many hours a
9    week or a month did that require of your time?
10   A.  Like I said, it was very simple.  Some months you
11   have your standard meeting.  There wouldn't be any
12   disabilities or various things that would take up
13   more time, because Patrick and Dick said they don't
14   want -- they want to be able to schedule the meetings
15   where we could have maybe a couple of hours, but if
16   we had an investment meeting and then a regular
17   meeting, it sometimes would go six hours and it was
18   just too much.  And we didn't want to -- obviously,
19   we wanted to put our best efforts into the investment
20   side of it and give it our best effort.
21   So, if we had a quarterly report coming in
22   April, say, we might have to schedule two meetings.
23   Sometimes something comes up where a fund company
24   might be taken over by another company.  It happens

Page 148

1    all the time in the financial world.  That's a
2    violation of our contract with each individual
3    manager.  So, what we have to do -- not a violation.
4    They have to immediately tell us what's going on and
5    we would sit down and bring the managers in and
6    discuss any changes in the portfolio, any changes in
7    the structure of the company.  All those things that
8    we could do as part of due diligence and then make a
9    decision either to stay with them or to find another
10   vendor.
11   Q.  Your best guess, how many hours a week, hours a
12   month?
13   A.  You know, the meetings would go three hours, so it
14   might be sometimes -- one month might be three hours,
15   some nights you had a seminar, you had to go to
16   different conferences.  So, it could be, you know, it
17   could be three or four days a month or it could be
18   one.
19   Q.  What was the maximum number you put in in a month?
20   A.  You know, like I'll give you an example where there
21   are conferences, it might be Saturday or Sunday.  It
22   was nothing to do with time.  I was on my own time.
23   We weren't compensated.  It was a volunteer job.
24   Q.  Did you ever work the weekend shift 4 to --

Page 149

1    A.  Right.  If I was on, that's right, but sometimes
2    you'd be off.  I can't really put a hard number on
3    it.  We have the records that can be easily checked
4    if you wanted to.  I think you could back it out that
5    way from the chargeback.
6    Q.  Was the Police Department -- back when you worked
7    there, was the Town itself having financial
8    difficulties?
9    A.  Not that I know of.
10   Q.  I don't know if it's different than any other Town.
11   I'm just asking.  I guess a better question is:  Did
12   they have any particular financial problems that
13   you're aware?
14   A.  No.  I know the fund is doing well and has done well.
15   We did 17 percent last year.  I don't see -- I mean,
16   that could be a matter of, you know, who thinks
17   you're doing good and who thinks you're doing bad,
18   but it wasn't anything pressing that would make, you
19   know...  My attendance wouldn't have bankrupt the
20   Town, I don't think.
21       MR. GALLITANO:  Off the record.
22       (OFF THE RECORD)
23   Q.  I just want to direct your attention, if we could, to
24   your Answers to Interrogatories, which I believe are

DUNN & GOUDREAU

**Page 150**

1      Exhibit 2, and that's before you. And if I could
2      direct you to page 4, your answer to Number 6. I'm
3      just going to ask you a few questions following up on
4      this, let me know when you're there.
5  A.  (Witness perusing document) Is your question 6?
6  Q.  Interrogatory Number 6 and below that is your answer,
7      do you see that?
8  A.  Yes. Uh-huh.
9  Q.  You indicate in paragraph 2, "It was well known by
10     Pomeroy and well documented in my personnel file that
11     I had several physical illnesses for which I was
12     being treated and medicated." Are those all the
13     illnesses and medication you've referenced earlier
14     today?
15 A.  Yes.
16 Q.  Is there anything else you haven't mentioned?
17 A.  No.
18 Q.  Is there any other documents that you say the Chief
19     had which you haven't referenced for us today
20     relative to your medical history in your personal
21     file?
22 A.  No.
23 Q.  You also say, I think in this answer that you raise,
24     you raise the issue of your participation at the

**Page 151**

1      bottom of the second paragraph in your answer to
2      Number 6. It says, "The issue of my participation
3      was raised." When was that raised? Do you see that?
4      Page 4, the second paragraph of your answer. I'll do
5      the whole line. "Even if he didn't know" --
6  A.  Okay.
7  Q.  Do you see that?
8  A.  Yes.
9  Q.  At the bottom it says, "Especially since the issue of
10     my participation was raised"?
11 A.  I don't follow that in that respect. I just follow
12     it that I think participation by the group as a
13     whole, everybody was as a whole. It was raised by
14     Paul Boyle that there were concerns about the
15     intensity of the drill.
16 Q.  So, my question at this point is: Was your
17     individual participation raised by you or anyone else
18     that you know of prior to May 25th, 2003?
19 A.  I don't know if it was raised specifically for me.
20 Q.  Did you yourself raise it with the Chief?
21 A.  No.
22 Q.  Do you know if Paul Boyle specifically raised the
23     issue with the Chief?
24 A.  I don't think -- I don't know.

**Page 152**

1  Q.  Besides the general issue of all officers
2      participating in this May 25th drill raised by
3      Officer Boyle, are you aware of any other document in
4      writing that presented that issue to the Chief prior
5      to May 25th, 2003?
6  A.  I don't know exactly what transpired. I know there
7      was a discussion about it at a meeting.
8  Q.  Again, I'm just asking, are you aware of any
9      document, piece of paper, that raises that issue
10     relative to your participation?
11 A.  No. I don't know if there's any.
12 Q.  In the next paragraph you wrote -- and again, I'm
13     kind of jumping to the pertinent point -- "The Town,
14     through Pomeroy, was negligent by failing to
15     institute a protocol to screen members"?
16 A.  Okay, I see that.
17 Q.  Was that issue raised by you or anyone else that you
18     know of to the Chief prior to May 25th, 2003?
19 A.  I don't know exactly what transpired at that meeting
20     with Paul, and the Union officials, and the Chief. I
21     don't know what happened, specifically wording, I
22     wasn't there. I don't know what was exactly said,
23     but I know that Paul had told me concerns he raised
24     about the training, the intensity of the training and

**Page 153**

1      how we would handle it.
2  Q.  Are you aware either yourself or through anyone else
3      specifically whether or not the issue of instituting
4      a protocol to screen members was raised?
5  A.  I don't know. Like I said, I wasn't at that meeting.
6  Q.  Are you aware of any documentation which would
7      indicate that this issue about instituting a protocol
8      to screen members was raised prior to May 25th, 2003?
9  A.  I don't have any firsthand knowledge.
10 Q.  Is it fair to say the basis of this answer is what
11     Paul Boyle related to you in his conversation with
12     the Chief?
13 A.  Yes.
14 Q.  Anyone else?
15 A.  No.
16 Q.  I'm not looking to go over anything else, but I just
17     want to know, in Answer Number 7, on the next page,
18     there's a reference. I think in the first paragraph
19     you indicate that you were constantly being told by
20     supervisors that, you know, they are after you
21     because of the Quinn bill issue. Do you see that?
22 A.  Yes.
23 Q.  It's the first line going into the second line. Who
24     told you specifically that they are after you because

Page 154

```
 1    of the Quinn bill issue?
 2  A.  Well, I can -- if you want to put it that broadly.  I
 3    can say that Captain Botieri told me that the Chief
 4    wasn't too happy about it.
 5  Q.  What did Captain Botieri tell you?
 6  A.  Way back, when we first discovered it, I spoke to
 7    Larry Rooney about it.  I had some concerns about if
 8    someone was injured, there would be a real problem,
 9    because when a police officer is killed in the line
10    of duty, I know by regulations, five people check
11    off -- sign off at PAREC because of the amounts of
12    monies that are disbursed.
13      With that, my concern was, if something tragic
14    were to happen, and his cousin is Mike Botieri, it
15    could be a problem for his widow.  And I said I don't
16    want to be in that position given the fact that we
17    couldn't justify the amounts that were being paid.
18    So, with that, Larry Rooney told me, well, we ought
19    to go up and tell Mike right now.  And I said --
20  Q.  I'm sorry, I don't know who Mike is.
21  A.  Mike Botieri.  I said, okay, let's go.  My intent was
22    not to go after anybody.  My genuine intent, and
23    still is, if something tragic happened like that,
24    we'd be faced with a situation where legally we could
```

Page 155

```
 1    not pay a death benefit in the proper amount until
 2    the proper paperwork and documents were squared away;
 3    and that's what Mike Sacco told me; that it would be
 4    very difficult, if not, impossible to pay it.  We
 5    could pay it after they were corrected, but we
 6    wouldn't have to pay it to begin with.
 7      So, I went up to Mike with Larry Rooney with me,
 8    and I explained the entire situation to him.  He was
 9    very helpful.  He was very thankful that I did it.  I
10    even called him back the next day with the wording
11    from talking to Mike Sacco, to put into the personnel
12    bylaw.  And I told him the deadline for the Town
13    meeting, that they could put in the fall Town
14    meeting, they could amend the personnel bylaw to
15    cover these things and this was way back in the
16    game.
17      A short time later, a week later, I ran across
18    Captain Botieri and he wasn't a happy man.  He said
19    the Chief said I don't know what the hell I'm talking
20    about.  Don't listen to him and just do your job,
21    type of thing.  So, he wasn't happy about what he
22    must have heard from someone else, and that's when
23    everything went downhill.
24  Q.  Two follow-up questions to that.  What time period do
```

Page 156

```
 1    you say Captain Mike Botieri made this statement to
 2    you?
 3  A.  This was before we -- this had to be in, I would say,
 4    early 2000.  Somewhere in around the year 2000.
 5  Q.  Was anyone else present?
 6  A.  No.  Me and Larry Rooney went up and we sat in Mike's
 7    office after work.  We sat there for a good hour.  I
 8    don't know the exact date, but Larry Rooney was the
 9    steward at the time and he came with me.
10  Q.  And just so I'm also clear, are you saying that
11    Captain Botieri told you that they are after you
12    because of the Quinn bill issue?
13  A.  He told me that the Chief was not happy with what I
14    had -- he had discussed it with him and the Chief
15    basically told him not to worry about it, don't worry
16    it; and in fact, after that meeting I had with Mike
17    Botieri and Larry Rooney, after he spoke to the
18    Chief, he then himself went over and spoke to Mrs.
19    Flynn about the matter and wanted to have the Town
20    meeting take some type of action and nothing was
21    done.
22  Q.  It looks like two paragraphs down, on page 5,
23    Interrogatory Answer Number 7, you wrote, again, "I
24    was routinely harassed by Pomeroy."  Is this the same
```

Page 157

```
 1    harassment you were mentioning to us earlier, or was
 2    it any different in this answer?
 3  A.  The same type as before.
 4  Q.  Did you file any grievance relative to any perceived
 5    harassment that you say happened to you with Chief
 6    Pomeroy?
 7  A.  No.  I mean, there isn't a provision in the contract
 8    for nitpicking.  You can bend -- no.
 9      MR. SILVERFINE:  We'll suspend now.
10      THE REPORTER:  For the record, would you
11    like a copy of the transcript, Mr. Gallitano?
12      MR. GALLITANO:  Yes, I want a copy.  A
13    regular transcript and a mini.
14      (DEPOSITION SUSPENDED AT 3:30 P.M.)
15
16
17
18
19
20
21
22
23
24
```

Page 158

```
 1              C E R T I F I C A T E
 2      I, the undersigned, THOMAS KELLEY, do hereby
 3   certify that I have read the foregoing deposition
 4   taken on February 9, 2006, and that it is true and
 5   correct to the best of my knowledge, information, and
 6   belief (with the exception of the following
 7   corrections listed below):
 8   Page   Line          Correction
 9   ____   ____   _____
10   ____   ____   _____
11   ____   ____   _____
12   ____   ____   _____
13   ____   ____   _____
14
15
16   Signed under the pains and penalties of perjury this
17   _____ day of _____, 2006.
18
19
20   _____
           THOMAS KELLEY
21
22
23
24
```

Page 159

```
 1   COMMONWEALTH OF MASSACHUSETTS
 2   BRISTOL, ss.
 3
 4      I, BARBARA M. MONTIJO, a Registered Professional
 5   Reporter and Notary Public, duly commissioned and
 6   qualified within and for the Commonwealth of
 7   Massachusetts, do hereby certify:
 8
 9      That THOMAS KELLEY, the witness whose deposition
10   is hereinbefore set forth, was duly sworn by me, and
11   that such deposition is a true record of the
12   testimony given by the witness to the best of my
13   skill, knowledge, and ability.
14
15      IN WITNESS WHEREOF, I have hereunto set my hand
16   and my affixed notarial seal this _____ day of
17   _____, 2006.
18
19
20   _____
21       Registered Professional Reporter
22             Notary Public
23   My commission expires: 1-12-2007.
24
```

# EXHIBIT A CONTINUED

Page 3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. 1:05-cv-10596-NMG

-------------------------)
THOMAS M. KELLEY,              )
        Plaintiff            )
VS.                           )
                              )
TOWN OF PLYMOUTH, ET AL,     )
        Defendant            )
-------------------------)


CONTINUED DEPOSITION OF THOMAS M. KELLEY, a

witness called for examination by counsel for the

Defendant, taken pursuant to the applicable provisions of

the Massachusetts Rules of Civil Procedure, before

LINDA M. CORCORAN, a Court Reporter-Notary Public in and

for the Commonwealth of Massachusetts, at the Law Offices

of Joseph R. Gallitano & Associates, 34 Main Street

Extension, Suite 202, Plymouth, Massachusetts, on

Wednesday, June 21, 2006, commencing at 2:07 p.m.


LINDA M. CORCORAN
CERTIFIED COURT REPORTER
P. O. Box 4
Kingston, Massachusetts  02364
(781) 585-8172

I N D E X

TESTIMONY OF:  THOMAS M. KELLEY                          Page

Direct examination by Attorney Silverfine                    4


E X H I B I T S

| Defendant's | | Page |
| --- | --- | --- |
| Exhibit No. 6 | Letter dated May 10, 2001 | 18 |
| Exhibit No. 7 | E-mail dated September 2, 2000 | 23 |
| Exhibit No. 8 | E-mail dated May 8, 2001 | 23 |
| Exhibit No. 9 | E-mail dated May 30, 2001 | 39 |
| Exhibit No. 10 | E-mail dated July 3, 2003 | 45 |
| Exhibit No. 11 | Letter dated September 9, 2003 | 51 |
| Exhibit No. 12 | Findings of fact | 52 |
| Exhibit No. 13 | Letter dated January 14, 2004 | 61 |
| Exhibit No. 14 | Letter dated January 29, 2004 | 70 |
| Exhibit No. 15 | Letter dated May 26, 2004 | 72 |
| Exhibit No. 16 | Executive session minutes dated May 27, 2004 | 83 |
| Exhibit No. 17 | Letter dated June 1, 2004 | 85 |
| Exhibit No. 18 | Letter dated June 3, 2004 | 89 |

Page 2

A P P E A R A N C E S

On behalf of the plaintiff:

JOSEPH R. GALLITANO, ESQUIRE (partial)
JOSEPH R. GALLITANO & ASSOCIATES
34 Main Street Extension, Suite 202
Plymouth, MA  02360
(508) 746-1500; FAX (508) 747-1150

RICHARD D. ARMSTRONG, JR., P.C.
1400 Hancock Street
Third Floor
Quincy, MA  02169
(617) 471-4400; (617) 471-4404


On behalf of the defendant:

JEREMY I. SILVERFINE, ESQUIRE
BRODY HARDOON PERKINS & KESTEN, LLP
One Exeter Plaza
Boston, MA  02116
(617) 880-7100; FAX (617) 880-7171

Page 4

1          S T I P U L A T I O N S

2          IT WAS STIPULATED AND AGREED by and between

3     counsel for the respective parties that all objections,

4     except as to the form of the question, shall be reserved

5     until time of trial; that motions to strike shall be

6     reserved until time of trial; that the witness shall read

7     and sign the transcript of this deposition within 30

8     days; however, reading and signing of the deposition

9     transcript before a notary shall be waived.

10          P R O C E E D I N G S

11          THOMAS M. KELLEY, a witness called for

12     examination by counsel for the defendant, having been

13     satisfactorily identified and having been duly sworn, on

14     oath deposes and continues to testify as follows:

15     DIRECT EXAMINATION BY ATTORNEY SILVERFINE

16          Q.  Good afternoon, Mr. Kelley.  This is a

17     continuation of the deposition we started on February 9,

18     2006, in my office, and as a courtesy to you, we're

19     continuing your deposition this afternoon.  Hopefully

20     we'll be able to finish.  If not, we'll finish on some

21     other portion of the afternoon.  I'm hoping to finish in

22     the next couple of hours.

23          Continuing on where we left off, same ground

24     rules apply.  If you don't understand a question, you

Page 5

1  have to let me know. If you need me to repeat something
2  again, please let me know. If there's any reason you
3  need a break, also let me know. If you need to speak to
4  your counsel, also please let me know, and of course,
5  we'll provide it.
6      (Mr. Gallitano enters the room.)
7      MR. SILVERFINE: Mr. Gallitano has just joined
8  us.
9      MR. GALLITANO: You just keep going, and I'm
10  going to be in in a few minutes.
11      MR. SILVERFINE: Fair enough.
12  BY MR. SILVERFINE
13      Q.  Mr. Kelley, what I'm going to do is basically
14  jump in from where we left off last time. Right before
15  we get there, are you on any medication today?
16      A.  Just my regular heart medicine. I take those
17  five medications.
18      Q.  The same ones you mentioned last time?
19      A.  Yes, yes. I take those daily.
20      Q.  Anything new?
21      A.  No.
22      Q.  Any change in your job status from the last
23  time we were there?
24      A.  No.

Page 6

1      Q.  Anything new?
2      A.  No, I'm still retired.
3      Q.  What I'm going to do is we had marked a number
4  of exhibits last time. And I'm going to start off as to
5  where we were in our last deposition, where we ended,
6  which was we were referring to your answers to
7  interrogatories, which is marked as Exhibit 2. So I'm
8  going to again -- I'm going to show you Exhibit 2, which
9  we've already marked on February 9, and refer you
10  specifically as to some of your answers. And we left off
11  on Answer No. 7.
12      Do you see where I'm referring to?
13      (Hands to witness.)
14      A.  Yeah, yes.
15      MR. SILVERFINE: Just give me a second. One
16  second. Just a moment.
17      (Pause.)
18      Q.  As far as your days as a police officer, is it
19  a supervisor's duty to monitor a particular shift?
20      A.  Well, the makeup of the department when I left
21  was you have a patrol supervisor possibly that worked
22  either in your area or there were two, depending on the
23  manning posture. Then you would have a shift commander
24  who could be a sergeant or a lieutenant.

Page 7

1      Q.  And who was your shift supervisor, or who
2  monitored your duties as a patrol officer?
3      A.  Most of the time Kevin Fahy was there and
4  Lieutenant Budge was the shift commander.
5      Q.  What were their duties as shift commanders as
6  it related to a patrol officer such as yourself?
7      A.  Well, they would make up the daily schedule.
8  They would bring any new directives or any new
9  information most of the time to the attention of the
10  officers or any new concerns, extra checks in various
11  areas for one reason. Vandalism, public drinking, those
12  types of things would be brought to the attention
13  sometimes by the lieutenant, sometimes by the sergeant.
14  It depended on the activity of the day.
15      Q.  Are the supervisors, your supervisor also, in a
16  sense supposed to monitor not only yourself but other
17  patrol officers in their command? Is that fair to say?
18      A.  Yes, they did.
19      Q.  What other police officers have served on the
20  Plymouth Retirement Board that you know of since you've
21  been on it?
22      A.  There's none.
23      Q.  During the past few years, have you heard of
24  any police officer who ever served on the Plymouth

Page 8

1  Retirement Board? Are you aware of any?
2      A.  Not in the last ten years that I was there. I
3  mean, it was just myself. I don't remember anybody prior
4  to that.
5      Q.  You have heard discussion about other town
6  employees. What other town employees who worked for
7  Plymouth also serve on the retirement board while you've
8  been serving there?
9      A.  You had the building commissioner, and he's
10  been the building inspector --
11      Q.  His name?
12      A.  Dick Manfredi. He was from the inspection
13  services division. By statute you have the treasurer as
14  designee, and then in the case of us, it's the chief
15  financial officer.
16      Q.  And who was that?
17      A.  At the time it was Mr. Dello Russo. There was
18  a John Madden there temporarily for a couple of months.
19      Q.  What's John Madden's position with the town?
20      A.  He was an accountant at the time. They were in
21  between two financial directors, and he took over while
22  they hired another guy temporarily. So he had to sit up
23  there, come to the board.
24      Q.  Was he actually part of -- what department is

Page 9

```
 1  he part of?
 2      A.   He would have been a part of the department of
 3  -- the finance department.
 4      Q.   Anyone else you can think of?
 5      A.   Right now presently a Bruce Miller, who's now
 6  there.
 7      Q.   Where's he from?
 8      A.   He's now the finance director.  He replaced
 9  Dello Russo.
10      Q.   Do you know when that was?
11      A.   Let's see.  Geez, I don't remember.  Maybe
12  around 2003, 2004, somewhere in that area.
13      Q.   Relative to the Columbine-like drill back on
14  May 25, 2003, prior to the drill itself, did you object
15  to participation in that drill?
16      A.   I was never made aware that an objection would
17  be entertained.
18      Q.   But the question is, did you?
19      A.   No, I didn't.
20      Q.   In other words, did you verbalize that you
21  yourself had an objection to participate for any reason?
22      A.   No, prior to that I --
23      Q.   All right.
24      A.   Excuse me.
```

Page 10

```
 1      Q.   I'm sorry.  I thought you were finished.
 2      A.   No, I wasn't.
 3      Q.   Okay.
 4      A.   Prior to that I did notify the town as a result
 5  of receiving a letter from the chief regarding sick time
 6  of two illnesses that I had been treated for with
 7  doctors' notes.  I gave them to Botieri.  And one was for
 8  Meniere's disease.  I was under Dr. Durante's care for
 9  that as well as Lyme disease, and I was under the care of
10  Dr. Molloy for that.  And I brought in those doctors'
11  notes and gave them to Mr. Botieri in hand.
12      Q.   First of all, when did you do that?
13      A.   I would say that might have been -- I think the
14  letters come out like in March/April, in that area.
15  Around the April area.
16      Q.   And did you specifically object or make
17  reference to your not wanting to participate in that
18  drill?
19      A.   No, I never made any.
20      Q.   Either in writing or verbally?
21      A.   Never was aware of it.
22      Q.   Did you make any grievance as to participation
23  in the drill of May 25, 2003, prior to the drill?
24      A.   We were told it was mandatory.  We were subject
```

Page 11

```
 1  to discipline if we didn't participate.
 2      Q.   So the question is, did you file a grievance?
 3      A.   No.
 4      Q.   And just so I understand -- and I think you may
 5  have testified to this before and just briefly mentioned
 6  -- what were your preexisting medical conditions as they
 7  were right prior to May 25, 2003?
 8      A.   As I just answered, they were Meniere's
 9  disease.  I was under the care for Meniere's disease as
10  well as I was on -- I was under Dr. Molloy's care for
11  Lyme disease.
12      Q.   And you said you were taking medication for
13  both of them?
14      A.   Yes.
15      Q.   And you were able to perform the essential
16  functions of your job as a police officer in your daily
17  duties?
18      A.   There were times prior to the drill there that
19  I went home from work.  I was going to say home from
20  school.  Jesus, home from work because of symptoms that
21  were attributed to those two things.  I couldn't complete
22  my shift.  I had to be driven home several times.  I got
23  dizzy spells.  And the symptoms of those two type of
24  things -- you get dizzy spells.  Sometimes I would be so
```

Page 12

```
 1  dizzy I couldn't even drive home, and I would have to
 2  take the medication and lay down.  A couple of times I
 3  called Dr. Durante and met him.  My wife would drive me
 4  to his office, and he would examine me.  He could tell
 5  that you were having a Meniere's attack.
 6      Q.   Referring to Exhibit 2, Interrogatory No. 10,
 7  which states:  (Reading)  Please set forth all the facts
 8  which rely on the alleged defendants were aware of your
 9  preexisting medical condition and that the May 25, 2003,
10  drill would aggravate that medical condition (end
11  reading), you answered:  (Reading)  Based on the medical
12  notes on record in my personnel file (end reading).
13           Do you see that?
14      A.   Uh-huh.  Yes, I'm sorry.  Yes.
15      Q.   Besides what you've just referenced, are there
16  any medical notes that you say on record in your
17  personnel file that were present prior to May 25, 2003?
18      A.   Not that I'm aware of.
19      Q.   Are you aware of any obligation anyone from the
20  police department has to review medical notes in your
21  personnel file?
22      A.   Well, going back to my previous answer and your
23  question, I explained I believe earlier in the deposition
24  that on a yearly basis we are given a letter from the
```

Page 13

1  chief who reviews everyone's file about the use of sick
2  time. And at that point everybody gets a generic letter,
3  and it states you might have used five days, twelve days.
4  This particular year I believe I used twenty-three days.
5  Or it indicates how many full days you used and how many
6  half days you used, like if you got sick at 12 o'clock
7  and you went home sick type of thing. And that was
8  signed by the chief. That was a contractual item that
9  the chief was required to do on an annual basis, and it
10 was for the protection of both sides.
11       If you felt that the letter was not
12 representative of your sick time, you could produce
13 medical records that would say you have a legitimate
14 reason for these times, and I exercised that right. And
15 I also then e-mailed the chief indicating that I gave him
16 -- and we have that, I believe, in the production of
17 documents. I e-mailed him indicating that I gave those
18 medical records, those medical notes to Mr. Botieri, and
19 I was requesting him to review that and then retract his
20 letter from me because I felt that it was a legitimate
21 use of sick time. I did that twice, and I never received
22 an answer back from him, and he never retracted his
23 letter. He never responded to my request.
24       Q.   This amount of sick time you used, was that

Page 14

1  twelve days prior to May 25, 2003?
2       A.   No, it would have been a cumulative of a year,
3  say, from, oh, April 30 to the previous April 30. It's
4  like a calendar annual basis. At some point they stop
5  and they say, okay, from this point back a year, use the
6  following days. We had -- I believe there's a copy of it
7  in their documents as well.
8       Q.   Do you know what the date, that anniversary
9  date you were referring to is?
10      A.   I don't know, but it's in the documents that I
11 think you produced or we produced. It is in there.
12      Q.   Other than what you've now testified, did you
13 do anything else to notify the chief or the town of your
14 medical condition prior to May 25, 2003?
15      A.   No, those -- like I said, the letter is signed
16 by the chief. It is part of a contractual obligation
17 that he has to review, so he would have had knowledge of
18 it being there. And I never received a response after I
19 justified my days.
20      Q.   Again, in Exhibit 2, your answer to
21 Interrogatory 11 says: (Reading) Please set forth all
22 communications you had with any union representative
23 prior to May 25, 2003, drill regarding your inability to
24 participate due to your preexisting medical condition

Page 15

1  (end reading). And your answer was: (Reading) The
2  union president was to hold a membership meeting with the
3  chief on the issues and concerns about my preexisting
4  medical condition and inability to participate in the
5  drill (end reading).
6            Is that correct?
7       A.   I don't particularly remember it being written
8  like that, but I remember there was a question about
9  individuals that have had issues. And I believe we just
10 found out this morning that there were two individuals
11 that were excused through some process that I don't know.
12      Q.   My first question is, that's what you wrote
13 back in Exhibit 2 on August 25, 2005, under oath?
14      A.   Right, right.
15      Q.   And my question is, if I could have it, do you
16 recall when that meeting you say with the chief was?
17      A.   I believe they had a discussion on the
18 Columbine issue and all the training program and some of
19 their concerns in their impact bargaining session with
20 the AR-15s prior to that. It was maybe a month or month
21 and a half before.
22      Q.   And who was present at that meeting?
23      A.   I believe Paul Boyle was, Dana. I believe the
24 chief was.

Page 16

1       Q.   Dana?
2       A.   Dana Goodwin.
3            And I believe the chief and Captain Botieri
4  were there.
5       Q.   And do you know what was discussed?
6       A.   I know they discussed that, and they discussed
7  the impact bargaining, I believe, on the use of the
8  AR-15s.
9       Q.   What information are you aware of that they
10 discussed your preexisting medical condition and your
11 inability to participate in the drill?
12      A.   I'm not aware of any -- I'm not aware of any
13 exact language. I wasn't there.
14      Q.   I'm just trying to follow up on -- because what
15 you wrote in your answer was you were to bring up a
16 meeting -- concerns about preexisting medical condition
17 and inability to participate in the drill.
18           So what information, if any, are you aware of
19 that was brought up?
20      A.   I don't have any information of what
21 specifically because I don't have any notes of that
22 meeting or anything like that. I just know that they did
23 discuss. They had concerns as the union for individuals.
24      Q.   Do you know in your conversations with Paul

**Page 9**

1    he part of?

2    A.    He would have been a part of the department of

3    -- the finance department.

4    Q.    Anyone else you can think of?

5    A.    Right now presently a Bruce Miller, who's now

6    there.

7    Q.    Where's he from?

8    A.    He's now the finance director.  He replaced

9    Dello Russo.

10   Q.    Do you know when that was?

11   A.    Let's see.  Geez, I don't remember.  Maybe

12   around 2003, 2004, somewhere in that area.

13   Q.    Relative to the Columbine-like drill back on

14   May 25, 2003, prior to the drill itself, did you object

15   to participation in that drill?

16   A.    I was never made aware that an objection would

17   be entertained.

18   Q.    But the question is, did you?

19   A.    No, I didn't.

20   Q.    In other words, did you verbalize that you

21   yourself had an objection to participate for any reason?

22   A.    No, prior to that I --

23   Q.    All right.

24   A.    Excuse me.

**Page 10**

1    Q.    I'm sorry.  I thought you were finished.

2    A.    No, I wasn't.

3    Q.    Okay.

4    A.    Prior to that I did notify the town as a result

5    of receiving a letter from the chief regarding sick time

6    of two illnesses that I had been treated for with

7    doctors' notes.  I gave them to Botieri.  And one was for

8    Meniere's disease.  I was under Dr. Durante's care for

9    that as well as Lyme disease, and I was under the care of

10   Dr. Molloy for that.  And I brought in those doctors'

11   notes and gave them to Mr. Botieri in hand.

12   Q.    First of all, when did you do that?

13   A.    I would say that might have been -- I think the

14   letters come out like in March/April, in that area.

15   Around the April area.

16   Q.    And did you specifically object or make

17   reference to your not wanting to participate in that

18   drill?

19   A.    No, I never made any.

20   Q.    Either in writing or verbally?

21   A.    Never was aware of it.

22   Q.    Did you make any grievance as to participation

23   in the drill of May 25, 2003, prior to the drill?

24   A.    We were told it was mandatory.  We were subject

**Page 11**

1    to discipline if we didn't participate.

2    Q.    So the question is, did you file a grievance?

3    A.    No.

4    Q.    And just so I understand -- and I think you may

5    have testified to this before and just briefly mentioned

6    -- what were your preexisting medical conditions as they

7    were right prior to May 25, 2003?

8    A.    As I just answered, they were Meniere's

9    disease.  I was under the care for Meniere's disease as

10   well as I was on -- I was under Dr. Molloy's care for

11   Lyme disease.

12   Q.    And you said you were taking medication for

13   both of them?

14   A.    Yes.

15   Q.    And you were able to perform the essential

16   functions of your job as a police officer in your daily

17   duties?

18   A.    There were times prior to the drill there that

19   I went home from work.  I was going to say home from

20   school.  Jesus, home from work because of symptoms that

21   were attributed to those two things.  I couldn't complete

22   my shift.  I had to be driven home several times.  I got

23   dizzy spells.  And the symptoms of those two type of

24   things -- you get dizzy spells.  Sometimes I would be so

**Page 12**

1    dizzy I couldn't even drive home, and I would have to

2    take the medication and lay down.  A couple of times I

3    called Dr. Durante and met him.  My wife would drive me

4    to his office, and he would examine me.  He could tell

5    that you were having a Meniere's attack.

6    Q.    Referring to Exhibit 2, Interrogatory No. 10,

7    which states:  (Reading)  Please set forth all the facts

8    which rely on the alleged defendants were aware of your

9    preexisting medical condition and that the May 25, 2003,

10   drill would aggravate that medical condition (end

11   reading), you answered:  (Reading)  Based on the medical

12   notes on record in my personnel file (end reading).

13         Do you see that?

14   A.    Uh-huh.  Yes, I'm sorry.  Yes.

15   Q.    Besides what you've just referenced, are there

16   any medical notes that you say on record in your

17   personnel file that were present prior to May 25, 2003?

18   A.    Not that I'm aware of.

19   Q.    Are you aware of any obligation anyone from the

20   police department has to review medical notes in your

21   personnel file?

22   A.    Well, going back to my previous answer and your

23   question, I explained I believe earlier in the deposition

24   that on a yearly basis we are given a letter from the

Page 17

1    Boyle and Dana Goodwin whether they mentioned
2    specifically that they brought up concerns about you and
3    any preexisting medical condition?
4        A.   I don't know if they brought -- I don't recall
5    if they said specifically, you know, but they did say
6    that they did speak with him or tried to speak with him
7    about the concerns that they had from other drills and
8    other towns, and they tried to address some of those
9    concerns.
10       Q.   In Interrogatory No. 15 on Exhibit 2, it
11   states:  (Reading)  Please set forth all facts on which
12   you rely where you allege Chief Pomeroy was aware that
13   you reported him to the Inspector General's office
14   regarding his compensation for educational benefits (end
15   reading), and you answered:  (Reading)  Town manager
16   Eleanor Beth told me in her office that Pomeroy was aware
17   of the Inspector General office investigator.  I wrote of
18   the harassment on the job (end reading).
19            Where did you write of the harassment on the
20   job?
21       A.   It's in the documents that we produced to you.
22       Q.   Do you know which documents particularly you're
23   referring to?
24       A.   If you want to go off the record, I can get it.

Page 18

1        Q.   Can you remember --
2        A.   It's in the minutes.  I'd have -- you'd have to
3    go through the --
4        Q.   All right, that's fine.
5            MR. SILVERFINE:  We'll go off the record.
6            (Discussion off the record.)
7            MR. SILVERFINE:  Back on the record.
8            Mr. Kelley is just showing me a letter that
9    appears to be provided, Exhibit 3 of document
10   production and voluntary disclosure.  It's a letter
11   from -- it looks like from Mr. Kelley to Mrs. Beth
12   dated May 10, 2001.
13            And perhaps -- could I get a copy of this and
14   just mark it so it's clear on the record?
15            MR. GALLITANO:  Sure.  Do you want three
16   copies, you think?
17            MR. SILVERFINE:  That would be great.  Just so
18   it's clear on the record.
19            (Pause off the record.)
20            MR. SILVERFINE:  Why don't we mark this as
21   Exhibit 6.
22                        (Whereupon, a letter dated
23                        May 10, 2001, was marked as
24                        Exhibit No. 6 for the

Page 19

1                        defendant.)
2            MR. SILVERFINE:  Okay, we'll continue while Joe
3    is making copies.
4    BY MR. SILVERFINE:
5        Q.   On Exhibit 6 this is a letter you wrote to
6    Eleanor Beth, who was then town administrator?
7        A.   She was the town manager.
8        Q.   Town manager.  And your complaints had to do
9    with harassment as it related to the discrepancy in pay
10   records as you saw it?
11       A.   What it was, as you can see from the letter --
12       Q.   Yeah.
13       A.   If you want to follow it down with me, we can
14   --
15       Q.   Yeah, go ahead.
16       A.   Follow this one right here.
17       Q.   Okay.
18       A.   I went to go see her prior to this letter being
19   written, discussing as being a member of the board
20   elected to the position in the fund as well as a town
21   meeting member.  There were some serious questions of the
22   personnel bylaw and how it relates in being employed in
23   the police department.  There was no provision for Quinn
24   Bill or holiday money or vacation money or overtime,

Page 20

1    which was an ongoing practice in it.  And having
2    experience in municipal finance and having experience
3    with collective bargaining, employees are paid in three
4    criteria.  They're paid pursuant to a personnel bylaw, if
5    they're a member of it; a collective bargaining
6    agreement; or a contractor relationship which they're
7    eligible.
8            In the case that I was bringing to her
9    attention, which involved town meeting monies and
10   retirement monies and disbursement of funds, there was no
11   mention of Quinn Bill, holiday money, vacation money, and
12   overtime that was being paid on an ongoing basis at the
13   police station in the bylaw that governed the employment
14   of the police captains and the police chief.  The bylaw
15   by the Town of Plymouth's adoption, the way they
16   establish their own bylaw, is pursuant to Chapter 41,
17   108A, which says in a city or town -- in a town by a vote
18   of the town meeting, they can establish a personnel
19   bylaw.  Town meeting had never seen these numbers, had
20   never seen these benefits.  It never went through the
21   personnel bylaw.  And come to find out it was ongoing for
22   over 15 years, and benefits were also being given without
23   authorization of the bylaw to members of the fire
24   department.  Those benefits and payroll numbers were

Page 21

```
 1   given to the retirement board, which would then formulate
 2   a benefit and calculation pursuant to the individual
 3   member's group, age, and salary.  Pursuant to the
 4   regulations generated by Chapter 32 CMRs specifically
 5   indicate as well as the board policy that we will check
 6   and back up every number that's in a computation with the
 7   governing document.  And from the governing document in
 8   this case, it would have been the personnel bylaw.  To
 9   the payroll there was a 30 to 35 percent discrepancy.
10            At that point I spoke to Mr. Botieri with Mr.
11   Rooney present in his office and explained to him the
12   severity of this issue in the event that something
13   happened to one of them or anybody in that category.  I
14   had spoke to board counsel from the retirement board, and
15   he said, "Tom, you have to bring it to the attention of
16   the town in some form or fashion, but get it done"
17   because of the Needham issue where an auditor walked in
18   to the Needham Retirement Board.  There were mistakes
19   made by the Needham board for internal tabulations of
20   monies.  An auditor ordered the people to pay the money
21   back over -- it was like a 20-year period that this went
22   on for.  And the individuals that were out, the members,
23   didn't even realize this happened.  It wasn't their
24   mistake.
```

Page 22

```
 1       Q.   Now, did you also file complaints about the
 2   fire department to anyone?
 3       A.   No, I didn't even know it was going on till we
 4   went -- we dug into it deeper.
 5       Q.   When was that?
 6       A.   When Eleanor Beth looked into or -- when
 7   Eleanor Beth finally -- how do I say this?  When Eleanor
 8   Beth looked into it, she found that this practice was
 9   going on in the fire department as well.
10       Q.   Do you remember when that was?
11       A.   That was just around the time that I wrote this
12   letter to her she started.
13       Q.   This was around May 10, 2001?
14       A.   This letter here.  After that she started to
15   look into it.
16       Q.   When you complained about the police
17   department, were you complaining about all the police
18   department or just about Chief Pomeroy?
19       A.   I was complaining about the actions of Captain
20   Botieri and Chief Pomeroy.
21       Q.   Anyone else?
22       A.   No.
23       Q.   Besides -- you were kind enough to give me
24   copies of --
```

Page 23

```
 1       A.   We have other e-mails here as well.
 2       Q.   The other e-mails in your production are the
 3   examples of what you say you wrote about the harassment;
 4   is that correct?
 5       A.   Right, correct.
 6       Q.   And just for the record, why don't we mark
 7   these as Exhibit Nos. 7 and 8, which are -- looks like
 8   an e-mail from you on September 2, 2000.  We'll mark that
 9   as Exhibit 7.  And then an e-mail of May 8, 2001, from
10   you we'll mark as Exhibit 8.
11                 (Whereupon, e-mails dated
12                 September 2, 2000, and May
13                 8, 2001, were marked as
14                 Exhibit Nos. 7 and 8 for
15                 the defendant.)
16   BY MR. SILVERFINE
17       Q.   And when you were forwarding, for instance,
18   this e-mail in Exhibit 7, which is your September 2,
19   2000, e-mail --
20       A.   Which one are you on?  I'm on the second one.
21       Q.   This says meeting September 1, 9-month --
22       A.   Okay, I have that one.
23       Q.   Who did you send that to?  It says Kelley and
24   Goodwin.
```

Page 24

```
 1       A.   I sent that to -- Dana Goodwin was present at
 2   the meeting on the 1st.
 3       Q.   Did you send that to Captain Botieri or Chief
 4   Pomeroy or anyone else?
 5       A.   No, but they have access to -- it's what they
 6   call systems manager.  They can look into any e-mail at
 7   any time.
 8       Q.   My question is, did you send this -- did you
 9   forward this to Botieri or Pomeroy or to Eleanor Beth?
10       A.   According to that format, no, I didn't.  I kept
11   it in my documentation.
12       Q.   And Exhibit 8, which looks like an e-mail from
13   you to -- it looks like yourself, Boyle, and Botieri, did
14   this have to do with the vacation time you were referring
15   to?  Is that right?  Why don't you take the original.
16            (Hands to witness.)
17       A.   Yes.
18       Q.   And that's what you were referring to when we
19   discussed a few minutes earlier about your decision with
20   the vacation time?
21       A.   In the e-mail I indicate that I had put in for
22   a month's vacation in June and a month's vacation for
23   July.  I had accrued time towards the end of the fiscal
24   year, which would be June, and accrued time starting in
```

Page 25

1  July 1. And I had put in time for that over 60 days
2  prior to it. I believe the date -- what's the date on
3  there?
4  Q. May 8, 2001.
5  A. Yeah, right.
6  Q. Just so I'm clear, besides what we've marked
7  here, you've also indicated in your production would
8  include any and all notices or letters, e-mails you sent
9  as to any harassment that you thought you were
10  undergoing, right?
11  A. To the best of my knowledge, that I had. What
12  was available.
13  Q. In other words, there's no other documents
14  other than --
15  A. Not that I can think of.
16  Q. -- what you've already produced to us?
17  A. If I could find -- if I have something, I'd
18  gladly give you a copy of it.
19  Q. In Interrogatory No. 16 on Exhibit 2, you make
20  a listing of all your treating physicians. Is there
21  anyone else that's not --
22  A. No.
23  Q. -- listed there?
24  A. No. We went over this, believe me, before.

Page 26

1  MR. ARMSTRONG: Well, there is. I mean, I
2  corrected in the first --
3  THE WITNESS: I did correct that.
4  Q. I'm just asking if there's anybody else.
5  A. No more since then. No more since then.
6  Q. That's what I'm asking. I just want to make
7  sure that we have all the medical providers. Thank you.
8  A. We do, right.
9  Q. I don't know if I asked you this last time, and
10  if I did, forgive me, but I just want to understand.
11  Did the town have to hire or pay any other
12  police officer to cover your shift when you went to the
13  retirement board meeting?
14  A. They never did.
15  Q. To your understanding, how would they cover
16  your sector when you went to a retirement board meeting?
17  To your understanding.
18  A. Another officer would be assigned my position
19  and have to cover two areas. They would run short on the
20  shift. I believe Captain -- I believe Lieutenant Fahy
21  indicated that as well the other day.
22  Q. To your knowledge, did that ever create any
23  problems as far as coverage to your understanding?
24  A. I can tell you that officers would have to

Page 27

1  cover two areas, and if it was a long meeting, they'd be
2  pretty upset that they'd have to cover my area. Some of
3  them were sympathetic. They realized that I was doing a
4  volunteer job for their best interest and elected to the
5  position. Some of them really didn't care about
6  anything. They were just upset, and it was difficult
7  sometimes reasoning with them, that I can't help it if
8  they're not going to hire somebody to cover the extra
9  position because I'm out. They are getting a charge back
10  for it.
11  Q. What's a charge back?
12  A. They were charging back money from the
13  retirement system, and they indicated to people that they
14  did that for the purposes of coverage, but they never
15  covered me.
16  Q. Did any of the officers express their, for lack
17  of a better word, anger or --
18  A. Yes.
19  Q. -- disappointment to you?
20  A. Absolutely. All the time.
21  Q. Which officers?
22  A. Anybody that was -- I mean, you could go back.
23  They'd have a multiple car accident and then have to go
24  to another one, and they'd be going all the time. They

Page 28

1  never covered me, so it put the pressure on all the other
2  people.
3  Q. Name some of the officers that you recall that
4  --
5  A. It was day shift. It would be the day shift.
6  I mean, I can't name specific names. It's almost four
7  years ago or so or better, but it happened all the time
8  over my career there on the time.
9  Q. Do you know if those complaints went up the
10  chain of command to --
11  A. I remember Lieutenant Fahy and Captain Skip
12  Budge indicating to people that they never covered me and
13  "They should be covering you." And that was a decision
14  made by the second floor, and they couldn't do anything
15  about it.
16  Q. You had produced a note to the town after May
17  25, 2003, relative to your condition -- and I'm sure I'm
18  going to mispronounce this -- cardiomyopathy. Do you
19  remember that?
20  A. If you have the document, I'll look at it. I
21  don't mean to be --
22  Q. I have it somewhere.
23  A. There are numbers of them.
24  Q. Do you remember if the note indicated that the

Page 29

1   condition that you were suffering was caused by the job
2   relative to cardiomyopathy?
3       A.   No.  If you'd show me a document, I'd be able
4   to specify exactly what you're talking about.
5       Q.   But do you have any independent recollection?
6       A.   No, I don't.  I'd have to see it in front of
7   me.  We've got 5-inch stacks of paper here.  I'm not
8   trying to be argumentative.  I just...
9       Q.   All right, I understand.
10           Were you angry that Chief Pomeroy was
11  scrutinizing your absence from work due to the retirement
12  board participation?
13      A.   I was annoyed because of -- no one else was
14  scrutinized like that.  I was constantly, you know --
15  people at work were saying, "They're out to get you.
16  They're out to get you."  I had other people on the board
17  that turned around and ridiculed and were saying, "Oh,
18  you better get over there quick.  They're counting the
19  minutes."
20           I felt the whole thing was unnecessary because
21  they gave us a bill for those hours, and we wouldn't have
22  paid it if I wasn't there.  Number two is our minutes of
23  the meeting indicate when the meeting starts and when it
24  ends.  That charge back was handled by the administrator

Page 30

1   who would be at the meeting.  So if they charged me -- if
2   they charged the retirement system for time that I wasn't
3   there or too much or too little, she would make that
4   change or she would object to paying it and bring it to
5   the board's attention.  That never happened.  I was at
6   every meeting that I was supposed to be at.
7       Q.   Were you angry that Captain Botieri --
8       A.   I wouldn't justify it as angry.  I justify it
9   as harassment in a sense.  No, not angry where it's
10  anger, a different meaning of the word.
11      Q.   Were you angry at Captain Botieri for
12  scrutinizing your absence from work due to retirement
13  board participation?
14      A.   I was annoyed by it.  I was embarrassed by it.
15  It was as if I was trying to put something over on them
16  when they had all the checks and balances already there.
17  I believe they did that purposely so that if I was ten
18  minutes late, they would say, "Oh, you must have been
19  doing this.  You must have been doing something else" and
20  try to...
21      Q.   While you were or have been on the retirement
22  board, has there ever been any allegations against you
23  that you misused funds in your position on the retirement
24  board?

Page 31

1       A.   Absolutely not.
2       Q.   Did you as part of your retirement board work
3   take trips?
4       A.   We have conferences that we have to go to and
5   are required to.  I run over $100 million and nine
6   managers.
7       Q.   And approximately how many seminars do you
8   attend a year as a retirement board member?
9       A.   It varies.  It depends on -- it depends if
10  we're looking for a new manager for an international
11  fund.  It depends on market conditions.  It depends on a
12  number of factors.  I mean, if markets are good,
13  everybody's pretty happy just trying to make what you're
14  making.  If markets are bad, everybody's scrutinizing
15  things.  You know, there are new instruments financially
16  coming out every day.  There are new companies.
17  Companies change hands.  Individuals change hands.  All
18  our contracts on the board are manager specific.  They
19  have specific articulate conditions that have to be met
20  to meet a certain asset class.  Every one of those
21  conditions and contract is articulate.  There's nothing
22  ambiguous.  So if there's a change, we bring that manager
23  in.  We meet with them, or we go somewhere to meet with
24  them because each one of them have a substantial amount

Page 32

1   of money.  And one change in an asset class can affect
2   our whole portfolio.
3       Q.   During the time period you've been on the
4   retirement board, how many seminars do you attend a year?
5       A.   Again, I said we have a state conference one
6   that we attend spring and fall.  Sometimes, depending on
7   -- one of the big issues lately has been the GASB 45
8   issue, which in this state the way the legislation is
9   being worked through the statehouse is going to end up
10  the responsibility of the retirement system.  I have been
11  following that issue for almost ten years now.  It's
12  going to be a major financial undertaking for our
13  retirement system.  I have attended seminars indicating
14  the impacts of GASB 45, which is your unfunded medical
15  for retirees, how it's being funded, how it's being
16  handled in different states so that we can be ahead of
17  the curve when this number comes into the -- when we have
18  to declare it, and it's in 2007.  There's a lot of work
19  to put that together.
20      Q.   What happened to your duties as a police
21  officer when you attended a trip on behalf of the
22  retirement --
23      A.   I would notify Mr. Botieri in an e-mail
24  indicating that I'd be on board business and I'd be at a

Page 33

1  conference via e-mail.

2      Q.   And would they have to cover for you during

3  those periods?

4      A.   I don't know what they did.  I know it from

5  speaking to Kevin and speaking to Lieutenant Budge when I

6  was working.  They would say specifically -- and I asked

7  them many a time because I would hear guys saying that at

8  work.  I would say to them, "Did they cover me on that

9  day when I was at this conference or here for the day in

10 Boston or doing this, meeting managers?" and they would

11 say, "No, never did."  I believe Kevin put that on the

12 record the other day.

13     Q.   Are you still chairman of the retirement board?

14     A.   Yes, I am.

15     Q.   How long have you been chairman?

16     A.   I believe since 2003.

17     Q.   For instance, while you were chairman in 2004,

18 is it fair to say you attended trips for the retirement

19 board to Washington, D.C., Puerto Rico, Anaheim, Hyannis,

20 Danvers, and Florida?

21     A.   I can't remember exactly.  Did you get that out

22 of the Boston Globe?

23     Q.   Well, I can look for it, but is that accurate?

24     A.   I attended conferences, yes.  I don't know

Page 34

1  exactly what years you're looking at there.

2      Q.   I said 2004.

3      A.   No, I don't think that would have been 2004.

4  It would have been over a number of three years, I

5  believe that was.  I believe that was two or three years.

6      Q.   We'll come back to that in a minute.

7           Last time when we had talked -- and I'm not

8  meaning to jump around.  I'm just looking at some notes

9  from talking to you last time.  We had discussed this

10 odometer where you had been disciplined for an odometer

11 abuse.  Do you recall that?

12     A.   I believe that was over 25 years ago.

13     Q.   I was going to ask you, do you remember what

14 year it was?

15     A.   I don't remember exactly when it was.  It was

16 supposed to be the present contract, the contract I was

17 under -- that information wasn't even supposed to be in

18 my personnel file.  It was supposed to be removed.

19     Q.   Was it removed from your file?

20     A.   Never.

21     Q.   It was never removed from your file?

22     A.   No, I don't know how it got there.  I don't

23 know how you would have got your hand into that lawfully.

24     Q.   Well, I think you told me about.

Page 35

1      A.   You had a piece of paper you put in front of

2  me.

3      Q.   I thought I had -- I thought I --

4      A.   No, it was in the production of documents, and

5  it was a clear violation of the contract.  I don't know

6  how you would have got that information lawfully.

7  Somebody had to keep a secret file and throw it in there

8  after we filed suit.

9      Q.   Okay, but you're not denying that you were

10 disciplined for it, right?

11     A.   I believe it was something that happened in --

12 oh, it must have been '79 or '80, and I believe I did an

13 extra shift for it.

14     Q.   Now, during the active shooting drill of May

15 25, 2003, there were several departments present besides

16 yours?

17     A.   No, just Plymouth.

18     Q.   Just your department?

19     A.   Just Plymouth alone.

20     Q.   Along with the state police?

21     A.   State police.

22     Q.   And is it fair to say there were safety EMT

23 officers?

24     A.   I don't know exactly what their certification

Page 36

1  was.  I never had first aid equipment.  They had oxygen.

2  I remember being dragged out and then placed under

3  oxygen, and then the ambulance came.

4      Q.   Do you remember that there were some 12 to 15

5  EMT or safety officers there?

6      A.   No, there wasn't no 12 or 15 EMTs there.

7      Q.   How many do you say there were?

8      A.   There were only, I believe, six instructors.

9      Q.   Were there separate EMT or safety officers

10 there that you know?

11     A.   No.  No, there wasn't.

12     Q.   You're saying there were none?

13     A.   There was not -- it was not a separate unit.

14 If you're saying there was a separate unit standing by,

15 that's not the case.

16     Q.   I'm not asking -- I'm asking, are you aware of

17 any other safety EMT officers present besides --

18     A.   The officers that were there were uniformed --

19 not uniformed, but they had the -- the overalls of the

20 state police strike team that they wear.  It's like a --

21 how do you want to say?  You see it on TV all the time.

22 They have that -- you know, I've seen them all the time.

23 It's like an overall.  It's like a suit that they wear.

24 It's like a work suit.  You know what I'm trying to say?

Page 37

1  How do I explain it other than --

2       MR. GALLITANO:  SWAT team.

3       A.  It was a SWAT team suit that they all wear, and

4  it's a standard.  They were all dressed in that.  It's

5  like a one-piece thing that they zip up, and it's heavy

6  material, and maybe it's fireproof.  I don't know.  I

7  never wore one.

8       Q.  In terms of the active shooter drill, that

9  Columbine drill, is it fair to say the department gave

10  you and the members at least a month's notice that the

11  drill was coming up?

12      A.  Not at all.

13      Q.  How much notice do you say you got?

14      A.  I came into work one day, and they said, "You

15  have to do it in a week."

16      Q.  Are you saying you got a week's notice?

17      A.  We got it on the board.  We don't get notices

18  like, "Come and talk to us."  We just get a piece of

19  paper stuck on the wall by Botieri, signed by Botieri

20  saying, "You have to go.  If you don't go -- you're

21  assigned this day -- you're subject to discipline."

22  That's in the rules and regulations.

23      Q.  Are you aware that there were several other

24  officers who were excused for participation for health

Page 38

1  reasons?

2       A.  I was never aware of that till today, till I

3  heard him testify.

4       Q.  Forgive me.  John Abbott, is that his name?

5       A.  Right.  I never knew that.

6       Q.  Dennis Govoni?

7       A.  Govoni.  Portuguese.  You've got to say it like

8  Govoni.

9       Q.  Fair enough.

10      Were you aware that he was excused?

11      A.  I never knew that till this morning.

12      MR. SILVERFINE:  Give me a second here.

13      (Pause.)

14      Q.  I'm going to ask you some questions about some

15  documents, some of which I believe you --

16      A.  What do we do with -- are these all -- okay,

17  I'm sorry.  Go ahead.

18      Q.  Just procedurally we take these.

19      A.  I thought you were --

20      Q.  No, no.  That's okay.  You're welcome to look

21  at them, but they're just documents that we mark that

22  become part of your deposition exhibits.  Your counsel

23  will have copies.

24      Back in May 30 of 2001, did you send an e-mail

Page 39

1  -- and I'm going to show you a copy and give a copy to

2  your counsel -- to yourself, Officers Boyle, Budge, and

3  Botieri relating to a surgery that was scheduled for June

4  11, 2001?

5       (Hands to witness.)

6       A.  Yeah, I was injured.  I had -- this was -- I

7  remember this was Mother's Day.  As a matter of fact, the

8  injury report is in the file as well.  We arrested an

9  individual for assaulting his wife.  And myself and

10  Officer Kennedy went to the house, and we had a struggle

11  with him down a flight of stairs, and I got a hernia in

12  my stomach from it.

13      Q.  And when you say surgery, is this the surgery

14  you're referring to in this e-mail?

15      A.  Yeah, I went to the hospital that day, and then

16  I spoke to -- I contacted a surgeon, Dr. Zazzarino, who I

17  know, and he did the surgery, which was scheduled for the

18  11th.  I was working with a brace around me on my

19  stomach.

20      MR. SILVERFINE:  Let's just for the record mark

21      this as Exhibit 9.

22              (Whereupon, the e-mail

23              dated May 30, 2001, was

24              marked as Exhibit No. 9 for

Page 40

1              the defendant.)

2  BY MR. SILVERFINE

3       Q.  And relative to Exhibit 9, second paragraph,

4  you indicated that you would be attending a retirement

5  conference?

6       A.  Uh-huh.

7       Q.  Do you see that?

8       A.  Yeah.

9       Q.  Where is that, do you recall?

10      A.  That would have been what they call the MACRS

11  conference, Massachusetts Association of Contributory

12  Retirement Systems.  That was an advocacy group that

13  represents all 106 retirement systems in the

14  Commonwealth, which I am a member of the executive board

15  from that.

16      Q.  Now, did you attend a conference for the

17  retirement board sometime in the fall of 2002?

18      A.  I could have.

19      Q.  Was there some discussion about filing or

20  preventing people from receiving their retirement

21  benefits if there was a criminal complaint or action

22  against them?

23      A.  I couldn't tell you the agendas of those.  I'd

24  have to look at the agendas.  There are all kinds of

Page 41

1  decisions.

2          Are you familiar with DALA, Division of

3  Administrative Law Appeals?  Are you familiar with that

4  agency?  Are you familiar with that?  I just want to

5  clarify my question.  If I can't --

6      Q.  I'm not familiar with it.

7      A.  Okay, what it is, it's -- in the administrative

8  process to retirement, okay, there is -- we make a

9  decision as a board.  If you're an aggrieved party and

10 you're a member, you can go and you appeal it to the

11 Division of Administrative Law Appeals.  It's your

12 administrative relief.  Then there is what they call --

13 after DALA there is CRAB, Contributory Appeals Board.

14 And then from that point we go into superior court on a

15 point of law, and then if you have another point of law,

16 you appeal to the appellate courts up the ladder.

17         Every time that we have a conference with

18 MACRS, spring and fall, we have the DALA magistrates

19 come.  Okay, we have Chris Connolly (phonetic), who's the

20 chief magistrate, as well as Kimberly Fletcher.  They

21 come and they discuss the recent decisions, the

22 precedent-setting decisions with all the boards, and they

23 bring everybody up to speed on how things are

24 interpreted, how new decisions are interpreted from the

Page 42

1  SJC and all those things that affect the administration

2  of the board from a trustee point of view down to your

3  administrators.  It's a scheduled conference time.  I

4  don't know what the agenda is, to be honest with you.

5      Q.  So my question is, sometime in the fall of

6  2002, did you attend some kind of seminar where you heard

7  about denying people their retirement benefits if they

8  had a conviction or a criminal complaint against them?

9      A.  I couldn't -- I couldn't qualify the exact date

10 or time.  I know those issues have been brought up in the

11 courts.  We've just recently done one just last week

12 where they put no statute of limitations on that statute.

13 It was actually ten years old.  That was just last week.

14     Q.  And that's something if someone commits some

15 on-the-job fraud you can deny them retirement, words to

16 that effect?

17     A.  The way that statute's been -- I want to just

18 say interpreted through the SJC in this state the last

19 five years has been very broad-based.  It's very -- just

20 the limitations -- just the other day we had a meeting, a

21 week ago, last week, where our counsel, Mike Sacco,

22 brought to the attention a recent SJ decision that was

23 just passed down on the 10th of June that indicated that

24 there's no statute of limitations on that particular

Page 43

1  statute.  And it was involving a case where an individual

2  -- he forfeits his pension, and it was over ten years ago

3  the incident happened, but they were able to somehow

4  adjudicate it.  And I didn't read it totally, but it

5  basically said there is no statute of limitations for

6  this statute where some people thought it was five years.

7  And the SJC said no, it's wide open.

8      Q.  Did you ever yourself bring this to the

9  retirement board that we have to crack down on these

10 kinds of cases where there's been --

11     A.  No.

12     Q.  -- a criminal complaint or --

13     A.  No, no.  We have an obligation.  For an

14 example, we had some individuals -- excuse me -- I have

15 to go off record for a minute.  I can answer that in a

16 minute because it involves two things.  There's a

17 conflict.

18     Q.  Well, there's a standing question in front of

19 you.

20     A.  Well, it's a conflict.  I don't want a conflict

21 on a question.

22     Q.  Well, if you have a standing question, you're

23 obligated to finish it.  Then if you need to talk to

24 counsel --

Page 44

1      A.  There was a case before us on a forfeiture

2  issue, okay, that we had to hold a hearing regarding the

3  forfeiture issue, and we found that there was no crime

4  committed that was applicable to the individual's office,

5  and the individual was able to retire.

6          THE WITNESS:  Now I need to go off the record,

7  okay?

8          MR. SILVERFINE:  Okay.

9          (Short recess was taken.)

10 BY MR. SILVERFINE

11     Q.  Right before we broke I had asked you if you

12 had supplied any information.  How about do you know a

13 former officer named Furtado?

14     A.  Police officer now?

15     Q.  Yeah.

16     A.  Yeah, Daryl -- Daryl's dead.

17          MR. GALLITANO:  Daryl's dead.

18     A.  Kevin, Kevin Furtado.

19     Q.  Did you ever supply him with any information as

20 to crackdown on retirement benefits as they pertained to

21 applications for criminal complaints or convictions?

22     A.  No.

23     Q.  And in particular as it related to former town

24 manager Eleanor Beth?

Page 45

1     A.   No.

2     Q.   I'm going to show you another e-mail which I

3   ask you if you recognize.

4          (Hands to witness.)

5     Q.   Do you recognize that?

6     A.   Yes.

7     Q.   And is that an e-mail that you authored?

8     A.   Yes, I did.

9          MR. SILVERFINE:  Let's mark as Exhibit No. 10.

10         (Whereupon, an e-mail dated

11         July 3, 2003, was marked as

12         Exhibit No. 10 for the

13         defendant.)

14  BY MR. SILVERFINE

15    Q.   Showing you what's been marked as Exhibit 10,

16  you sent this on -- it looks like July 3, 2003?

17         (Hands to witness.)

18    A.   Yes, that's the day that I used -- I had to use

19  Skippy Budge's -- Lieutenant Budge's computer because

20  mine for some reason wasn't working.  My access to it

21  wasn't working.

22    Q.   Just help me on this, if you would.  In the

23  e-mail itself, it says you requested -- I'm reading about

24  halfway down -- that vacation time that was scheduled on

Page 46

1   July 1, 2003, should be changed to sick time.  Do you see

2   that in the middle of the second paragraph?

3     A.   Right, I had sick time -- I had vacation time

4   starting July 1, and I filed the application, and I put

5   in change that to sick time, correct.  I had a sick bank.

6     Q.   Up until that time from the point you went out

7   on May 25, 2003, were you using sick time?

8     A.   I went in one day, and I was just out of the

9   hospital.  I wasn't feeling well, and I said to Captain

10  Botieri or somebody up there -- I remember saying, "Just

11  put me on for vacation right now," and then I left the

12  place.

13    Q.   So as of May 25 when you left, you were on

14  vacation time?

15    A.   I believe that day there I was -- they charged

16  -- I don't know if they could charge me sick time -- or

17  they didn't pay me.  They actually didn't pay me the full

18  day.  They only paid me half a day, and then I was off,

19  and then I went in -- I think I spoke to someone on the

20  phone or I did something after.  I don't exactly

21  remember.

22    Q.   Help me clarify this.  When you went out on May

23  25, 2003, were you on sick time or vacation time?

24    A.   I was working.  I wasn't out.  I was working.

Page 47

1     Q.   No, May 25.  I'm assuming you --

2     A.   Oh, yeah, two days later.

3     Q.   I'm assuming you're sick.  You went to the

4   hospital, right?  That's your heart, right?

5     A.   Oh, yeah, yeah.

6     Q.   Right?

7     A.   Yes, yes, yes.  Okay, I'm getting -- you're

8   right.

9     Q.   May 25 you have the Columbine incident, right?

10    A.   Uh-huh.

11    Q.   When you went out May 25 from there, were you

12  on sick time at that point?

13    A.   Sick time, I believe -- I mean, vacation time,

14  I believe.

15    Q.   Vacation time?

16    A.   Right.

17    Q.   Did you ask to be put on vacation time so that

18  nobody would, you know, bother you, so to speak?

19    A.   No, when I came home from the hospital, I had

20  only preliminary reports from the doctors from there,

21  which were not anything that -- they were only attending

22  physicians.  I had made an appointment with my doctor.  I

23  believe I wrote a preliminary report that I gave to the

24  chief via fax from my house and my own computer

Page 48

1   indicating to him that I would be seeing my doctor prior

2   to -- I think it was the 21st I saw my doctor of June.

3   And we had the complete file and the results of the

4   cardiac catheterization.  At that point I then determined

5   from talking in counsel with my doctor and my personal

6   friends and stuff that I have to put my papers in to

7   retire.

8     Q.   Back in June 25, 2003, did you speak to Captain

9   Botieri about this sick time and vacation time?

10    A.   All I said to him at that -- I saw him at the

11  town hall, like it says, and I said I just put in my

12  papers that day -- I believe a couple of days before

13  that, and then I wrote this to the chief.  I said, "Put

14  me in for sick time because I put my papers in as of this

15  date."

16    Q.   Back on June 25, 2003, did you request that

17  your use of sick time be changed to vacation time so you

18  would not be restricted in your activities?

19    A.   Not at that point, no.  I put in for sick time

20  then because I had additional time and I knew I'd have to

21  retire and I was putting my application in.

22    Q.   On June 25, 2003, did you speak to Captain

23  Botieri and state that you wanted to be able to be out

24  and about and be able to drink on your boat without

# EXHIBIT A CONTINUED

Page 49

1   repercussions or allegations of sick leave abuse?

2       A.   Absolutely not.  Emphatically not.

3       Q.   All right, I'm just asking.

4       A.   I never questioned -- I never received that

5   letter that you have in there ever till the production of

6   documents.

7       Q.   I'm not asking you if -- I'm asking you if you

8   --

9       A.   Well, I consider it a personal insult from that

10  department and that individual to say those things after

11  the event that I went through.

12      Q.   All right, I'm just asking you if you said

13  something.  Do you understand the question?

14      A.   I understand the question.  I never made that

15  remark to him.

16      Q.   That's what I'm asking.

17      A.   Okay.

18      Q.   And just so I'm clear, you did, however, change

19  in Exhibit 10 your request for vacation time be changed

20  to sick time, and then ultimately you put in your

21  retirement application, right?

22      A.   I put my retirement page in on the 25th, as it

23  states, okay, and after when I put my retirement in, it's

24  always been the policy of the town to use accrued sick

Page 50

1   time for this type of retirement application till the

2   medical panel comes back with the appropriate language,

3   okay, because of a court decision in Brookline that they

4   could wait for a 111F.  There have been numerous

5   decisions in the court that say that's perfectly legal

6   for the town but then IOD is retroactively given as a

7   result of the medical panel's decision, and that's been

8   in statute law as well as case law.

9       Q.   Let's move on for a moment to the next

10  document, if we can.  I'm going to show you another piece

11  of paper which is dated September 9, 2003, and I believe

12  it's cc'd to you.

13      (Hands to witness.)

14      A.   Yeah.

15      Q.   Do you recognize this?

16      A.   Absolutely.

17      Q.   And this is a letter that Debra Sullivan, the

18  director of the Town of Plymouth's Contributory

19  Retirement Board, sent to the chief of police?

20      A.   Yeah, this is a standard letter sent by the

21  retirement board to the employer department head.  It is

22  required -- that letter is required by CMR under Chapter

23  32.

24      MR. SILVERFINE:  Let's mark this as Exhibit 11.

Page 51

1                    (Whereupon, the letter

2                    dated September 9, 2003,

3                    was marked as Exhibit No.

4                    11 for the defendant.)

5       MR. GALLITANO:  Can we go off the record for a

6   minute?

7       MR. SILVERFINE:  Absolutely.

8       (Discussion off the record.)

9   BY MR. SILVERFINE

10      Q.   Just showing you Exhibit 11, just help me on

11  this, if you would.  The first paragraph says:  (Reading)

12  Please be advised that on September 8, 2003, the

13  Commission of the Division of Public Employee Retirement

14  Administration granted accidental disability (end

15  reading).

16      Do you see that?

17      A.   Uh-huh.

18      Q.   You have to say for the record --

19      A.   Oh, yes.  I'm sorry.

20      Q.   This letter was written on September 9.  Was

21  this a particularly quick turnaround in your experience?

22      A.   No, no.

23      Q.   Why was this letter sent the next day, if you

24  know?

Page 52

1       A.   All I can figure is, number one, when you have

2   a -- I mean, I had a unanimous medical panel in my case.

3   I had three cardiologists indicate that it was -- four

4   questions on the certificate were answered in the

5   affirmative.  I was on the job when it happened.  There

6   were no questions on the board.  The board sent it up

7   to the state.  The state looks at it.  Their final under

8   -- they're required to look at it under Chapter 32.  They

9   make the final determination if there are any

10  inadequacies, address any issues.  They can remand it

11  back to the board.  They look at it, and then they just

12  say okay.

13      Q.   And were you treated any differently than any

14  other retiree to your knowledge?

15      A.   No, I precluded myself entirely from the

16  procedure just so that that allegation that you just

17  stated would not be relevant.

18      Q.   Let's show you another document which is -- I

19  think you just referenced.

20      MR. SILVERFINE:  And it's been previously

21      marked as Exhibit 3 in the Attorney Sacco

22      deposition, but we'll mark it as Exhibit No. 12.

23                    (Whereupon, the findings

24                    of fact were marked as

Page 53

1                    Exhibit No. 12 for the
2                    defendant.)
3          MR. GALLITANO:  Revisiting.
4          MR. SILVERFINE:  What's that?
5          THE WITNESS:  We already went over this.
6          MR. GALLITANO:  I think this is an old ground.
7          THE WITNESS:  We went over this.
8          MR. SILVERFINE:  I need to just ask a few
9    questions.
10         MR. GALLITANO:  Last time we went all through
11   this, though.
12         MR. SILVERFINE:  But I'm not going to be that
13   long.  You'll forgive me.  I'm just trying to be
14   thorough.  I'm not looking to bang him up more.
15         THE WITNESS:  You're not banging me up, believe
16   me.
17   BY MR. SILVERFINE
18   Q.   Showing you what's been marked as Exhibit 11 --
19         MR. GALLITANO:  12.
20         MR. SILVERFINE:  Is it 12?
21         MR. GALLITANO:  It's 12.
22         MR. SILVERFINE:  Sorry, I don't have my glasses
23   on.  Thank you.
24   Q.   -- Exhibit 12 -- and if I asked you this

Page 54

1    already, forgive me, but in Section 5 where it says
2    "Findings of Fact," the first day on July -- paragraph
3    numbered 5 on July 29, 2003, do you see that?
4          (Hands to witness.)
5    A.   Yes.
6    Q.   To your knowledge, did they review your entire
7    medical and nonmedical history or just as it related to
8    the May 25, 2003, incident?
9    A.   As part of the application to retire, which I
10   believe Debra explained that to you yesterday -- the
11   other day -- Debra Sullivan, you are required in the
12   application, which is quite extensive, to name all the
13   doctors that you've had and all your medical conditions
14   prior to this incident on the date of application.  Okay,
15   all those facts are given, reviewed by the board, the
16   board's attorney.  Then a medical panel gets the exact
17   same stuff.  They review it as well as the incident
18   involved and answer the four questions on the
19   certificate, which they did in my case in the
20   affirmative, all four questions.
21   Q.   Now, right below that in Section A it says you
22   passed a preemployment physical.  Do you see that?
23   A.   Yes, I did.
24   Q.   Did you have to at any time subsequent to that

Page 55

1    take a physical?
2    A.   No.  You asked that question before.
3    Q.   Just bear with me.
4    A.   Okay.
5    Q.   And was there any evidence of hypertension or
6    heart disease once you began your employment with the
7    Town of Plymouth that you notified the town about?
8    A.   None.
9    Q.   Put that down.
10   A.   I just didn't know if you wanted to read the
11   rest of it.  That's all.  Part D is pretty pertinent.
12   Q.   No, no.  These guys are just making fun of me
13   for asking follow-up questions.
14   A.   Yeah, yeah.
15   Q.   As long as you want me to ask a question, on
16   Exhibit 12, just so I understand -- and just help me
17   on this -- Paragraph 12, when it says the board conducted an
18   evidentiary hearing, is that the same board that you
19   serve on?
20   A.   I precluded myself from that.  I wasn't a part
21   of that decision.
22   Q.   I'm just asking if it was the same board.
23   A.   Yes, it was the same board.
24   Q.   The same individuals who sit on the board with

Page 56

1    you, right?
2    A.   Yes, the Town of Plymouth -- as a member of the
3    Town of Plymouth's retirement system, my application must
4    be submitted by statute to the Town of Plymouth
5    Retirement Board.  I cannot submit it to anybody else by
6    the town.  There are specific regulations in the
7    procedures in the CMRs that indicate if a board member is
8    in front of them for these type of reasons, they preclude
9    themselves from it, and those procedures were followed to
10   the T on advice of counsel.
11   Q.   And you're the director of the board?  Is that
12   the right term?
13   A.   I am the chairman.
14   Q.   The chairman, okay.  How long had you --
15   A.   I wasn't the chairman at this time.
16   Dello Russo was.
17   Q.   Back in 2003?
18   A.   No, Dello Russo was.
19   Q.   What years did you serve as chairman?
20   A.   When he left.  He left right after that.  I
21   think in August, September.
22   Q.   And you served as chairman ever since?
23   A.   Yes, I have.
24   Q.   We had talked a few minutes ago about the

Page 57

1     on/sick time that you had changed after you had
2     gone out with your heart injury on May 25, 2003. Okay,
3     remember that?
4        A.   We talked about it, yes.
5        Q.   Did you also send the captain an e-mail on --
6             MR. SILVERFINE:  Strike that.  Strike that
7     whole line of questioning.
8        Q.   Prior to this injury, had you raised the issue
9     during your employ both at the retirement board and a
10    police officer trying to persuade the town to adopt a
11    policy that if an employee used sick time while waiting
12    for the "Heart Law" retirement and the retirement was
13    approved, that the town would retroactively restore the
14    employee's sick time?
15       A.   I'm going to explain the statute now.  I
16    believe I answered this earlier in the deposition.  I can
17    actually point to the page.  It's in there.
18       Q.   Okay.
19       A.   What happens is there was a decision in 1987,
20    Brookline versus -- a Brookline decision.  I don't know
21    the exact officer's name.  Blair, Blair.  Brookline
22    versus Sergeant Blair.  In that case what they said is
23    that there was not an automatic triggering of 111F
24    benefits when it comes to issues around the heart bill.

Page 58

1             At any point in time in an injury, the
2     department head -- in this case the police chief or the
3     town manager can issue someone 111F benefits.  It's at
4     their prerogative.  But in a heart application, what
5     happens is this.  And specifically there's a procedure.
6     The board -- if you were sent to a panel, there was only
7     so many heart physicians and panels in the state.  So we
8     were tracking the time it takes for an individual that
9     has an event, turns around and files an application, and
10    by the time you get all the paperwork together and he
11    gets in front of a medical panel because there might be a
12    backlog or where he lives and all that and getting
13    people, a panel to sit down in scheduling, we found as a
14    board a number of years it was taking 120 days.  And what
15    was happening is that individuals were using up accrued
16    benefits and then running out of them.  If they didn't
17    have enough sick time to cover 120 days, they would go
18    without a paycheck.  Now, some communities in an effort
19    not to financially destroy their police and firefighters
20    have adopted a policy to say if there's an application in
21    front of a board and the person uses up accrued time and
22    they're going to go without a paycheck, they have a
23    certain amount of -- the town will give them 111F till
24    the medical panel comes back with a contrary evidence or

Page 59

1     the medical panel affirms that it's job related.  This
2     was something that we did as five individuals trying to
3     be decent because the town's policy was there were people
4     who would use up accrued sick time and run out.  And I
5     had firefighters and police/firefighters come to me and
6     say, "Kelley, I'm losing my house as well as losing my
7     job because I ran out of sick time and I haven't got an
8     answer from the state yet on the medical panels."
9             And the medical panel would come back -- and I
10    haven't had one rejected -- where it was job related, and
11    they retroactively would back pay them all their accrued
12    sick time and monies from the day that they filed
13    application or the date of the event.  We were trying to
14    show Mrs. Beth how they were hurting police and
15    firefighters and that simply by adopting a change till
16    there was contrary evidence that you wouldn't be
17    penalizing guys for risking their lives, and they took no
18    interest in it.
19       Q.   How long had you attempted to push this?
20       A.   I didn't push anything.  We just tried to point
21    it out in a matter of exchanging ideas from employer to a
22    retirement board that is faced with the problem that the
23    employer is hurting its own employees, and they just
24    didn't want to recognize what they were doing in their

Page 60

1     practice.
2        Q.   How long did you attempt to discuss this with
3     the town?
4        A.   Oh, we discussed it a number of times over the
5     years.  I don't know how many times.
6        Q.   About how many?
7        A.   I couldn't put a number on it.  Five or six.  I
8     had cases.
9        Q.   You mean five or six years did you talk about
10    it?
11       A.   No, I had cases.  And I would show them -- we
12    have a case right now.  I had a number of cases tracked
13    by the administrators to say, "This is the date it
14    started, and this is the date we finally adjudicated."
15    On average it was 121 days.
16       Q.   Back in September of 2003, do you remember who
17    later counsel for the town was, by any chance?
18       A.   I don't know.  It could have been Hesse, Toomey
19    & Lehane.  It could have been what's his name there.
20    Harold Kowal.  I think it might have -- I don't know.  I
21    don't know.  They use different ones for different
22    people.  Then they use Kopelman and Paige for different
23    things too.
24       Q.   Were you aware at the time back in September of

Page 61

1  2003 at least when you were putting in for this that
2  labor counsel recommended the town not adopt this policy
3  that you're referring to? Are you aware of that?
4      A.  I was aware that they spoke in on it. And what
5  was kind of interesting because I believe the department
6  head at the time said there was a financial -- it was the
7  end of the world, and the financial director said, "Where
8  is it the end of the world? We're going to retroactively
9  pay these people back anyway."
10     So I didn't see anything in labor counsel
11  recommending anything.
12     Q.  Let me show you another letter which is dated
13  January 14, 2004. Do you recognize that?
14         (Hands to witness.)
15     A.  Yes, I do.
16     Q.  And that's a letter to you from Paul Boyle, the
17  president of --
18     A.  That's correct.
19     Q.  -- the Plymouth Brotherhood?
20     A.  Uh-huh.
21     Q.  Dated January 14, 2004?
22     A.  Yes, it is.
23         MR. SILVERFINE: Let's mark this as Exhibit 13.
24             (Whereupon, the letter

Page 62

1             dated January 14, 2004, was
2             marked as Exhibit No. 13
3             for the defendant.)
4  BY MR. SILVERFINE
5      Q.  Showing you now what's been marked as 13, did
6  you have conversations with Paul Boyle, the Brotherhood
7  president prior to him going in to speak to Chief Pomeroy
8  relative to your injury-on-duty loss compensation?
9      A.  Right, what I do is after -- after I got
10  everything back from the state and it was approved, I had
11  all the documentation from the medical panel, all the
12  documentation from the retirement board. The
13  certificate, which is evidenced from the doctors' panel,
14  unanimous. I gave those to Dana Goodwin, okay, and
15  Rooney, and I asked them to look at these, sit down with
16  the chief and explain -- and show him what I had for
17  evidence. I documented everything that we are required
18  to do for injury-on-duty status and would he reconsider
19  his claim.
20     Q.  And did Mr. Goodwin talk to you after he talked
21  to the chief?
22     A.  I spoke to him on the phone, and he also gave
23  me an e-mail of a conversation that Larry Rooney had with
24  the chief indicating the chief said, "I disagree with the

Page 63

1  medical panel. I'm not paying him." We had that
2  evidence. I believe that's in the documents we produced
3  to you as well.
4      Q.  Was there some discussion about the fact that
5  -- with Officer Goodwin that you had never provided the
6  information requested by the chief earlier as to certain
7  medical records --
8      A.  Prior -- excuse me. I'm sorry. Go ahead.
9      Q.  -- that he had asked from you back when you
10  first were submitting this stuff?
11     A.  When we first had it, I had the preliminary
12  stuff, which I believe I showed you before the last time
13  we were speaking. I only had those two things. I mean,
14  part of the injury-on-duty statute clearly says on a
15  specific date and time an individual suffers an injury.
16  Well, let's take the facts in front of us. I was at a
17  mandated training program. 111F says you must be on
18  duty. Well, I was on duty. There's no argument there.
19  If anybody thinks I wasn't, then the chairman's a liar
20  and everybody else is a liar. I collapsed onto Mr.
21  Chandler. He and two other officers dragged me out. I
22  must have been faking then because they dragged me out
23  unconscious. I was taken there to the hospital.
24     I'm trying to explain something to you.

Page 64

1      Q.  No, no. I'm just trying to ask you a question.
2  Nobody here is disputing --
3      A.  Let me finish then.
4      Q.  Fine, okay.
5         MR. GALLITANO: Wait a minute. Let's go off
6  the record.
7         (Discussion off the record.)
8         MR. SILVERFINE: Back on the record.
9  BY MR. SILVERFINE
10     Q.  My question -- and if you don't understand my
11  question, please let me know. Just my question -- and if
12  you don't understand, I'll rephrase it. My question is,
13  when you talked to Dana Goodwin sometime in October of
14  2003, did he say to you words to the effect "The chief
15  asked for some supplemental records, medical records,
16  which he says he never got"?
17     A.  That's not incorrect (sic). Dana never said
18  that. What I did is that when I got my information and
19  he went into that meeting and Rooney went into that
20  meeting in November in there, he had all the records that
21  you just produced in front of us. He had -- and the
22  certificate from the hospital and the certificate from
23  the medical panel. He had all those records to make his
24  determination.

Page 65

1    Q.  All right, let me just follow up.  So Goodwin
2    did not tell you "The chief says you didn't supplement
3    the earlier records," which we indicated through your
4    deposition Exhibits 3 and 4 that he never received
5    supplementation on the medical records you initially
6    provided?
7    A.  That's not correct.  He did.  Larry Rooney gave
8    it to him, and he had those in his possession.  I gave
9    them to Larry Rooney prior to his meeting with the chief.
10   Q.  But my question was, did Dana Goodwin come back
11   to you --
12   A.  He never said that to me, no.
13   Q.  -- and say, "The chief says he never got
14   supplementation?
15   A.  No.  No, he didn't.
16   Q.  Did you yourself outside of Goodwin, Rooney
17   ever send to the chief supplementation of Exhibits 3 and
18   4 that we've already marked and talked about?
19   A.  What I did is, when I got my paperwork back, I
20   spoke to Larry Rooney at the station.  I gave him a copy
21   of everything and requested him to go up to the chief.
22   The chief also, as the employer, has a complete copy or
23   has access at the town hall to my personnel file, a
24   complete copy of my personnel file, which would have the

Page 66

1    same documentation that I have that I gave to Larry
2    Rooney.  He would have had access to the day I retired,
3    and it was certified because all that information is
4    given to them, hand-delivered up there.
5    Q.  Who does that, do you know?
6    A.  The administrators, the town -- Mrs. Flynn, Sue
7    Turner when they were there.  That letter that you showed
8    me earlier is a notification, and all records are
9    exchanged back and forth from personnel.
10   Q.  So let me stop you right here.  We talked about
11   this last time, Exhibit 5, which was a letter back in --
12   A.  June of 2003.
13   Q.  Okay, just bear with me.
14   And he had requested -- "he," meaning the chief
15   -- additional documentation.  Is there any other
16   additional documentation that you say you submitted
17   besides Exhibits 3 and 4 other than the application for
18   retirement that was approved in early September?  Do you
19   see what I'm saying?
20   A.  Okay, these documents here I gave him on a
21   preliminary level.  I would not have had the other
22   documents which I gave to him before the request was
23   made, as you see in Exhibit 13, on this date.  On this
24   date and on this date, the chief had the entire package,

Page 67

1    and I gave Larry Rooney in his hand all the documents
2    that I just spoke to.  He had those documents in his
3    possession given to him by Larry Rooney on this date and
4    that date.
5    Q.  And how do you know that?
6    A.  Because they told me they did it.
7    Q.  So are you saying --
8    A.  Larry Rooney told me he gave the documents to
9    him because I spoke to him on the phone.  He called me
10   after the meeting, and he said, "The chief said --" -- I
11   told him, "Did you give him all those documents I gave
12   you?"  He said, "Yes, I did," and Larry Rooney told me
13   emphatically the chief said, "I'm not paying him because
14   I disagree with the medical panel."
15   Q.  And do you recall when the conversation you had
16   with Rooney which you've just related took place?
17   A.  It was probably about 5:30 in the afternoon.
18   Q.  What date?
19   A.  Oh, I don't remember exactly the date.  It was
20   in the fall sometime.
21   Q.  The fall of 2003?
22   A.  Yes.
23   Q.  In the fall of 2003, November 25, 2003, did you
24   come into the police station and have a conversation with

Page 68

1    Captain Botieri where you gave him this package of
2    material and said, "Give this to the chief if he wants to
3    stay out of superior court"?
4    A.  Never did.  Never did.  That's a bonafide lie,
5    L-I-E.
6    Q.  Just bear with me for a second.
7    A.  Okay, I agree.  Go ahead.  I'm bearing with
8    you.
9    Q.  Did you say that to anyone else on the police
10   department or the town?
11   A.  The only time I went into the station is I
12   spoke to Larry Rooney because he was the assistant
13   prosecutor.  I called him.  I met him at the station.  I
14   went in there at the end of the day.  I believe it was
15   like 3:30 for him.  He was up from court.  I gave him all
16   the documentation because he was scheduled to sit down
17   with the chief and have a meeting and discuss my issue.
18   I never spoke to Captain Botieri.
19   Q.  Did you speak to anyone else and say something
20   like that --
21   A.  No.
22   Q.  -- similar back in November of 2003?
23   A.  No, I didn't.
24   Q.  Whether it be Chief Pomeroy or anyone else?

Page 69

1    A.    No.

2    Q.    A secretary?  Anyone?

3    A.    (Shakes head.)

4    Q.    You just have to answer for the record.

5    A.    No, never did.

6    Q.    Did you ever in your position as chairman of

7    the retirement board threaten to halt someone's

8    retirement process because of your position on the

9    retirement board?

10    A.    Absolutely not.

11    Q.    And did that include Captain Botieri?

12    A.    Absolutely never made that statement to Captain

13    Botieri.

14    Q.    Now, prior to May 25, 2003, had you been

15    suffering from tension and stress and being medically

16    treated for it?

17    A.    No, I wasn't.

18    Q.    Were you suffering from any physical or

19    emotional distress or stress since December 2002?

20    A.    I was on -- like I said, I indicated with the

21    doctors' notes that I gave them in the spring of 2003 --

22    I was under the care for Meniere's disease as well as

23    Lyme disease.

24    Q.    Were you under care with a Dr. Moore prior to

Page 70

1    December -- May 25, 2003, for stress?

2    A.    No.

3    Q.    Let me show you another page.

4    MR. SILVERFINE:  And let's mark this Exhibit

5    14.

6                    (Whereupon, a letter dated

7                    January 29, 2004, was

8                    marked as Exhibit No. 14

9                    for the defendant.)

10    BY MR. SILVERFINE:

11    Q.    I ask you if you recognize that letter, Mr.

12    Kelley.

13    (Hands to witness.)

14    A.    Yes, I remember this letter.  Yes.

15    Q.    What's been marked as Exhibit 14, why did you

16    request this letter?  It says in the first paragraph at

17    your request.

18    A.    I just wanted documentation of what had

19    transpired in the -- on the board.

20    Q.    Were you already looking to file suit in this

21    action as of January 29, 2004?

22    A.    No.

23    Q.    So what purpose did you request this letter

24    from Debra Sullivan, the director of the retirement board

Page 71

1    of Plymouth?

2    A.    I wanted it for my files.

3    Q.    And when had you requested this, if you recall?

4    A.    I don't remember the date when I requested it.

5    Q.    What is your relationship with Debra Sullivan?

6    A.    She's been the administrator and works there

7    for the ten years I've been on the board.

8    Q.    Were you the boss of Ms. Sullivan under the --

9    A.    The board is the boss.  The chairman just

10    facilitates some of the day-to-day operations, but all

11    decisions are brought back to the board.

12    Q.    You have no direction over Ms. Sullivan?

13    A.    No, the board does, the board as a whole.

14    Q.    But you as a member of the board also do?

15    A.    Yes.

16    Q.    And how long have you directed Ms. Sullivan?

17    Is that since you've been on the board itself or since

18    you've been as director -- chairman?

19    A.    I've been on the board for ten years, and I've

20    worked with her.

21    Q.    For those ten years?

22    A.    Yes, right.

23    Q.    Let's go to the next letter.

24    MR. SILVERFINE:  We'll mark this Exhibit 15.

Page 72

1                    (Whereupon, a letter dated

2                    May 26, 2004, was marked as

3                    Exhibit No. 15 for the

4                    defendant.)

5    BY MR. SILVERFINE:

6    Q.    Showing you what's been marked Exhibit 15, do

7    you recognize that?

8    (Hands to witness.)

9    A.    I recognize that.

10    Q.    Okay, I think this was referred earlier today

11    as a three-page letter, but you'll agree with me it's a

12    two-page letter from Michael Botieri?

13    A.    Uh-huh.

14    Q.    You have to answer for the record.

15    A.    Yes.  Yes, yes.

16    Q.    And this is dated May 26, 2004?

17    A.    Uh-huh, yes.

18    Q.    Did you, in fact, have an interaction with

19    Michael Botieri on May 22, 2004?

20    A.    May 26.  May 26 was the retirement meeting -- I

21    mean, retirement party at the Pinehills.

22    Q.    And was that for you?

23    A.    That was for myself and two other individuals.

24    Q.    All right, tell me in your own words what

1  happened between you and Michael Botieri on -- you said
2  May 26, 2004.
3      A.  Well, it's on the date of the letter.
4      Q.  I'm sorry.  It's --
5      A.  Oh, yeah, the 22nd.  You're right.  Forgive me.
6  You're right.  You're right.  I was just looking at the
7  letter here.  I thought you were saying the letter date,
8  okay.
9          At the end of the night, I was leaving with my
10 wife and Bobby Hicks, and Chuckie Warnock called me over
11 and said -- from a distance he said Captain Botieri
12 wanted to speak to me.  So I said in jest, "Oh, Mike
13 wants to speak to little old me."  I said, "Okay," and I
14 walked over with that, and he turned around, and he told
15 me to go fuck myself.
16     Q.  I'm sorry.  Who did?
17     A.  Mike Botieri.
18     Q.  That's the first thing he said?
19     A.  The first thing he said.  He turned around and
20 told me to go fuck myself.
21     Q.  Okay, what happened next?
22     A.  I told him -- I said, "No, Mike, you go fuck
23 yourself."  And at that point he had a coffee cup in his
24 hand, and he had a little coffee in it.  And he was ready

1  to throw it in my face, and Officer Warnock stopped him
2  from doing that.  And then I left.  My wife, myself, and
3  Bobby Hicks, we left the place.
4      Q.  Prior to you say him saying those words to you,
5  had you said or done anything to him?
6      A.  Nothing.  Never spoke to him the whole night
7  before.  I hadn't spoke to him in months.
8      Q.  Had he approached you and extended his hand to
9  shake your hand?
10     A.  No, he didn't.
11     Q.  Did you discuss with him your opposition in an
12 upcoming election?
13     A.  No, I didn't.  Not that night.  I never did.
14     Q.  Never did?
15     A.  Never did.
16     Q.  You never discussed with Mr. Botieri any
17 discussion relative to an election you were undergoing at
18 that point?
19     A.  Didn't.  I wasn't working.  Remember, I was out
20 of the station.  I was not working anymore.
21     Q.  I understand.
22     A.  Well, I wasn't in the station to see him.  I
23 was home.  That's all.
24     Q.  But you live in Plymouth?

1      A.  Yes, I never discussed it.
2      Q.  So just follow along with me, and if the answer
3  is --
4      A.  Okay.
5      Q.  Whatever it is, just tell me.  I'm not assuming
6  anything.  I need your answers.
7      A.  Okay, I never discussed it.
8      Q.  So my question is, whether it be this night or
9  any prior incident, had you had any discussion with Mr.
10 Botieri relative to some opposition in an election you
11 were facing at that time?
12     A.  Never.
13     Q.  Were you running for retirement board again at
14 that time?
15     A.  That was a reelection year.  Yes, it was.
16     Q.  And when was the election coming up?
17     A.  I don't know if it was the end of the month or
18 something like that.  Maybe it might have been the end of
19 June or beginning of -- maybe the middle of June
20 sometime.
21     Q.  And who was your opposition running for one of
22 the seats, if you remember?
23     A.  I believe it was the chief's secretary, Lynn
24 Fortini.

1      Q.  And what was your relationship with Lynn
2  Fortini?
3      A.  I had no problem with Lynn.
4      Q.  And she was directly contesting your seat
5  against you?
6      A.  No, she was contesting -- there were two seats,
7  and she was contesting one of the two seats.
8      Q.  Who else was running for that seat?
9      A.  Mr. Manfredi.
10     Q.  Mr. Manfredi is the same gentleman you
11 mentioned earlier today?
12     A.  Yes, yes.
13     Q.  Were you angry that you were facing opposition
14 in the election?
15     A.  I wasn't angry.  I just -- from what I had
16 heard because I was out of the station, that the chief
17 instructed her to run against me and Dick and that --
18     Q.  I'm sorry.  Who's Dick?
19     A.  Dick Manfredi.
20     Q.  Okay.
21     A.  And that basically I had heard through the
22 grapevine of different individuals that the chief went
23 around telling people to sign her papers and that she
24 went around telling people, "I'm not running against

**Page 77**

1  those guys. There are five positions."

2       So she misrepresented herself to a lot of

3  people, and a lot of people were angry with her for doing

4  that because they didn't realize that the makeup of the

5  board is not just five members. It's only two elected

6  from the membership. And they were angry that she did

7  that.

8    Q.  Did you have discussion with Mr. Botieri

9  relative to his signing Ms. Fortini's nomination papers

10  --

11   A.  No, I didn't.

12   Q.  Let me just finish.

13       -- for a position on the Plymouth Retirement

14  Board on that night?

15   A.  No.

16   Q.  At any time did you have discussion with Mr.

17  Botieri about his signing nomination papers?

18   A.  No.

19   Q.  How about with anyone else that was involved in

20  the Town of Plymouth or the Plymouth Police Department?

21   A.  Well, if you mention Viella here in the letter

22  here, I was down the town hall looking to check on my

23  nomination papers for town meeting member at the time to

24  see when I was up. And I ran into Steve, and I said,

**Page 78**

1  "Jesus, I'm glad that you're supporting me" in all of the

2  things that I did for Steve, helping him out with

3  different retirement issues and different issues that he

4  personally needed help with. And he -- you know, he

5  basically said, "The chief told me to sign it," and I

6  said, "Well, you're under one of the -- you're appointed

7  by the chief to the detective division, so if you don't

8  sign it, I guess they throw you out on the street because

9  you're not one of the boys." And I said, "Well, Steve, I

10  thought you had -- I thought you were a little bit more

11  loyal than that to be intimidated to doing something like

12  that," but that's Mr. Viella.

13   Q.  Did you swear at Mr. Viella?

14   A.  No, I didn't swear at him. I was in a public

15  building, and I left.

16   Q.  Did Mr. Viella indicate he was signing Ms.

17  Fortini's nomination papers?

18   A.  No, he had already done it.

19   Q.  But it's fair to say you were angry and upset

20  at him for --

21   A.  I wasn't angry and upset with him. I was

22  disappointed at him and disappointed at his lack of --

23  how would you want to say it? -- credibility and lack of

24  -- you know, in one breath he's throwing the chief under

**Page 79**

1  the bus. In the next breath, he's his best boy, kissing

2  his fanny.

3    Q.  Did you ever tell Mr. Viella words to the

4  effect "I hope you don't need the retirement board's help

5  someday"?

6    A.  No, Steve has a -- Steve has a real problem of

7  telling the truth or telling, you know, in times --

8  lacking in what they call intestinal fortitude.

9    Q.  Did you ever say that to anyone?

10   A.  To him?

11   Q.  To anyone.

12   A.  No, everybody knows that. I didn't say that to

13  him. I just left.

14   Q.  Try my -- I'm not trying to trick you.

15   A.  No, I know you're not. I know you're not.

16   Q.  Just try my question. My question is, did you

17  ever say that to any town employee, police officer, or

18  otherwise --

19   A.  Oh, no.

20   Q.  -- words to the effect "I hope you don't need

21  the retirement board's --" --

22   A.  No, no.

23   Q.  -- "-- help someday"?

24   A.  I've got a volume of people that I've helped.

**Page 80**

1       MR. GALLITANO: Excuse me. You've got to let

2  him finish the whole question --

3       THE WITNESS: Okay, okay.

4       MR. GALLITANO: -- so that you answer the

5  question completely.

6       THE WITNESS: Okay.

7       MR. SILVERFINE: And also so the stenographer

8  --

9       MR. GALLITANO: Right. I mean, you've cut him

10  off --

11      THE WITNESS: Okay, well, I --

12      MR. GALLITANO: I'm trying to finish --

13      THE WITNESS: I know. I know. I appreciate

14  it. I'm sorry.

15      MR. SILVERFINE: Just off the record for one

16  second.

17      (Discussion off the record.)

18      MR. SILVERFINE: Back on the record.

19  BY MR. SILVERFINE:

20   Q.  Did Officer Viella have to order you to leave

21  the polling place when he saw you on May 8, 2004?

22   A.  No.

23   Q.  Did anyone have to order you to leave the

24  polling place on or about May 8, 2004?

Page 81

1    A.    No.

2    Q.    Relative to -- I think you mentioned his

3 name earlier -- or somebody did mention his name --

4 Sergeant Michael Peddell, was he your supervisor at one

5 point?

6    A.    Sometimes he was the day shift supervisor.

7    Q.    At one point in time, did he have to admonish

8 you on some issue?

9    A.    Never.

10    Q.    Did you ever tell him, "Sergeant Peddell, I

11 hope you never have to come in front of the retirement

12 board" or words to that effect?

13    A.    Never did.  If I had done anything that this

14 letter indicates, I would have had a reprimand or a

15 suspension in my file.

16    Q.    Okay.

17    A.    Mike Peddell is in the same position, under the

18 thumb and the appointment of Botieri and Mr. Pomeroy.

19 His job and his duties, where he sits can be changed in a

20 minute.

21    Q.    Did you ever make public statements before the

22 Insurance Advisory Committee meeting wherein you stated,

23 "We don't need a woman on the retirement board"?

24    A.    Absolutely did not.  I believe there's a record

Page 82

1 and a letter there to Mr. Botieri from the chairman of

2 the Insurance Advisory Committee, Dale Webber, who

3 clearly refutes that argument, who was present at a

4 meeting, and that I believe you were -- that letter was

5 given to Mr. Botieri, and I believe he has a copy of that

6 in his possession.  They checked the minutes of the

7 meeting, and the minutes of the meeting, any of those are

8 all taped.

9    Q.    Let me get back to the night of May 22, 2004,

10 this retirement ceremony.

11        Did you at all physically touch Mr. Botieri

12 during that night?

13    A.    No, I didn't.

14    Q.    Did you grab him by his left arm?

15    A.    I only spoke to him briefly at the end of the

16 night.  Never said a word to him the whole night, never

17 went near him.

18    Q.    Did you ever say to him, "I hope you never have

19 a heart attack and come before the retirement board" or

20 words to that effect?

21    A.    As I previously stated, I never made that

22 statement.

23    Q.    Did you say that to anyone that night or any

24 other night?

Page 83

1    A.    No.

2    Q.    Any other police officer that night?

3    A.    No.

4    Q.    Did you use any profanity as it related to Mr.

5 Botieri -- to Mr. Botieri on the night of May 22, 2004?

6    A.    We both exchanged niceties.

7    Q.    So that's the words you told us earlier?

8    A.    Yes.

9    Q.    Anything else that you recall saying to him?

10    A.    No.

11    Q.    I'm trying to move along here.  I'm going to

12 show you another document.

13        MR. SILVERFINE:  We'll mark it.  I believe

14    these are Plymouth Retirement Board executive

15    session minute meetings, and we'll mark this as

16    Exhibit 16.

17             (Whereupon, executive

18              session minutes were marked

19              as Exhibit No. 16 for the

20              defendant.)

21        MR. GALLITANO:  Can we go off the record for a

22    minute?

23        MR. SILVERFINE:  Go ahead.

24        (Discussion off the record.)

Page 84

1        MR. SILVERFINE:  The Plymouth Retirement Board

2    executive session -- I'll just identify it by date

3    presently -- May 27, 2004, it's Exhibit 16.

4    Counsel would like to note an objection, and then

5    I'll come back.

6        MR. GALLITANO:  As counsel for the deponent,

7    Mr. Kelley, I'm objecting to any questioning

8    regarding these minutes because they are executive

9    session minutes from the retirement board upon which

10    he is a member, and under the terms of his oath of

11    office, he's not supposed to disclose anything

12    that's in executive session.  This is an unsigned

13    copy, undated copy of an executive session.  There's

14    been no presentation of any vote authorizing the

15    release of these minutes.  Therefore, we object to

16    any line of questioning relating thereto, and my

17    client is instructed not to respond to any questions

18    should they be posed.

19        MR. SILVERFINE:  For the record, I'm going to

20    reserve on this and both check on whether or not

21    there has been a release, to see if they are

22    released.  That's one.  And two, based upon the

23    subject matter of this particular case and

24    specifically the relevancy as based upon Mr.

Page 85

1    Kelley's claims, I may move to have this -- for the
2    defendants to be able to use this.  So I'm going to
3    reserve on this at the end of this deposition, but
4    we'll move on for the moment.
5        All right, let's move on and mark this as the
6    next exhibit, No. 17.
7                        (Whereupon, a letter dated
8                        June 1, 2004, was marked as
9                        Exhibit No. 17 for the
10                       defendant.)
11   BY MR. SILVERFINE
12   Q.   I'm showing you that.  Do you recognize that?
13        (Hands to witness.)
14   A.   Yes, I do.
15   Q.   Fair to say this was a letter from Debra
16   Sullivan, the director of the retirement board, to
17   Captain Botieri, cc'd to the retirement board of which
18   you were a member back on June 1, 2004?
19   A.   Yes, it is.
20   Q.   And this related to a complaint that he had
21   filed as it related to you?
22   A.   That previous letter that we discussed, Exhibit
23   -- I don't know if it's 13 or -- one of them was.
24   Q.   Relative to acknowledging the complaint -- and

Page 86

1    we'll get to it in a minute -- what is your understanding
2    of what, if anything, the retirement board once they
3    received the complaint as we've now marked as Exhibit 15?
4    A.   The complaint was an issue that was nonboard
5    business.  It was a personal exchange of words, and Mr.
6    Botieri took the opportunity to trump it up to make it
7    more than it ever was.
8    Q.   Is it fair to say, at least from the
9    allegations that Mr. Botieri made, they may have related
10   to the board because of his allegation that you were
11   going to somehow influence any retirement decision that
12   may be made on his application?
13   A.   Well, I look at in the respect of if I -- in
14   Exhibit 13 there you state that he states that I
15   assaulted him -- I believe he said that this morning --
16   and I grabbed him.  If I had assaulted a captain of the
17   police department, I can assure you he would have taken
18   out complaints against me.  And with that, that's the
19   credibility I give his -- this issue.
20   Q.   Let me ask you this.  Relative to the
21   retirement board, did they undertake any investigation as
22   to the allegation as Captain Botieri described in Exhibit
23   15?
24        MR. GALLITANO:  Objection.  I'm also going to

Page 87

1    advise my client that considering his position on
2    the board, he should really -- before he answers
3    that, he should have advice of the retirement board
4    counsel as to whether he would be disclosing
5    something, again, that would be part of an executive
6    session.
7        MR. SILVERFINE:  Well, I think I hear your
8    objection, but I believe -- I believe there is
9    public information that indicates that -- and we can
10   get to it in a minute.
11       MR. GALLITANO:  Well, there may be indications
12   that there was an investigation.  What I'm saying is
13   you're asking him what the outcome of that
14   investigation is.
15       MR. SILVERFINE:  No, no.  I asked him if they
16   undertook an investigation.  That's my first
17   question.
18   BY MR. SILVERFINE
19   Q.   My first question is, do you know whether or
20   not an investigation was undertaken?
21   A.   The issue that you're addressing is an
22   executive session issue, number one.  Number two, I have
23   very severe reservations on the fact of how you lawfully
24   got that information.  That information is in our

Page 88

1    lockbox.  There is a procedure for people to get it.  And
2    how you got a copy of that and place it in evidence
3    lawfully is that, but I'm not going to speak to an
4    executive session minutes or the surrounding issue other
5    than the fact an executive session was issued on the unit
6    on that issue.
7        MR. GALLITANO:  But in answer to his question
8        of whether an investigation took place and you --
9    A.   The board looked into the matter.
10       MR. GALLITANO:  You can answer the question, is
11   what I'm saying.
12   Q.   Did you participate in the matter that was
13   brought before the board?
14   A.   I'm not going to speak to executive session.
15       MR. SILVERFINE:  Okay, I'm going to reserve on
16   all these because -- I'm reserving on these.  Any
17   question relative to what the retirement board did
18   or did not do as to certain allegations that Captain
19   Botieri brought I believe directly related to this
20   lawsuit.  So I'm going to reserve on that.
21       MR. GALLITANO:  And for the record, I request
22   that you give notice to counsel for the retirement
23   board regarding that so they may be present at any
24   -- if it goes to a motion before the superior court,

1     they can represent their point of view.

2  BY MR. SILVERFINE

3     Q.  You're aware, Mr. Kelley, that this allegation

4  as described in Exhibit 15 was at least brought before or

5  addressed to PERAC, are you not, sir?

6     A.  I believe there was a written -- a letter

7  written there to PERAC by Mr. Botieri.

8     Q.  And you're aware that PERAC then ordered the

9  retirement board which you were participating to do

10  something about it?

11     A.  They didn't order us to do anything.

12     Q.  What is your memory of what PERAC did in

13  relation to Mr. Botieri's complaint as evidence in

14  Exhibit 15?

15     A.  We had already held an executive session and

16  discussed the matter prior, and it was resolved.  And

17  PERAC was given a copy of the formal letter that Mr.

18  Botieri wrote.

19     MR. SILVERFINE:  Well, let me -- so I'm not

20     misstating something, we'll mark this as the next

21     exhibit.

22             (Whereupon, a letter dated

23             June 3, 2004, was marked as

24             Exhibit No. 18 for the

1             defendant.)

2     MR. SILVERFINE:  Just off the record for one

3     second.

4             (Discussion off the record.)

5  BY MR. SILVERFINE

6     Q.  I'm going to show you what's been marked as

7  Exhibit 18.  Is it fair to say you've seen this letter

8  before?

9             (Hands to witness.)

10     A.  Oh, yeah, yeah.

11     Q.  It was addressed to the retirement board of

12  which you were a member back in June of 2004?

13     A.  I have seen this letter.

14     Q.  Would you agree with me that this letter,

15  Exhibit 18, the second paragraph, Joseph Connarton, the

16  executive director of PERAC says, "We expect the board

17  will immediately investigate the matters discussed in

18  this letter and advise the commission within 30 days"?

19     A.  I believe we did that, and I was very

20  forthcoming and told --

21     Q.  All right.  I'm sorry.  I interrupted you.

22     A.  I had no problem with it.  Put it up there and

23  we fulfilled every obligation that we felt was necessary,

24  the board did.

1     Q.  But up until that day when he wrote this

2  letter, you had not investigated this matter and reported

3  back to the board at least as far as PERAC, correct?

4     A.  The dates -- when was the executive session?

5  Let's look at the executive session for a minute.

6     MR. GALLITANO:  It's not dated.

7     A.  It's not dated.

8     MR. GALLITANO:  May 27 is the date on the top

9     of this document that's in question.

10     A.  The one here, is that it?  Oh, yeah, yeah.

11  Okay, it was the next day.  We had already addressed it.

12  I volunteered that.  I said we need to address something,

13  and we did.  And this letter is dated after it.

14     Q.  All right.  And just --

15     A.  And then we responded back to them, which I

16  believe Botieri got.  And you have a copy of that.

17     Q.  And that's a letter that you referenced earlier

18  today, which was a letter written on July 28, 2004 --

19     A.  Yes, I believe --

20     Q.  -- signed by three members of the board?

21     A.  Right.

22     Q.  And cc'd to Michael Botieri?

23     A.  Yeah.

24     MR. SILVERFINE:  I'm going to just suspend for

1  today based on our conversation.  We're going to

2  revisit some of these issues, and I'm going to

3  finish hopefully my deposition next time.

4     MR. GALLITANO:  That's agreed.  That's fine.

5     (Whereupon, at 4:01 p.m. the taking of the

6  deposition was suspended.)

Page 93

ACKNOWLEDGMENT OF DEPONENT

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. 1:05-cv-10596-NMG

I, Thomas M. Kelley, do hereby acknowledge that

I have read and examined pages 1 through 92, inclusive,

of the transcript of my deposition, as taken in Plymouth,

Massachusetts, on Wednesday, June 21, 2006, and that:

_____ the same is a true, correct, and complete
transcription of the answers given by me to the questions
therein recorded.

_____ except for the changes noted in the
attached errata sheet, the same is a true, correct, and
complete transcription of the answers given by me to the
questions therein recorded.

_____
Signature

---

Page 94

ERRATA SHEET

Page:_____ Line:_____ Reads:_____
Should Read:_____

Page:_____ Line:_____ Reads:_____
Should Read:_____

Page:_____ Line:_____ Reads:_____
Should Read:_____

Page:_____ Line:_____ Reads:_____
Should Read:_____

Page:_____ Line:_____ Reads:_____
Should Read:_____

Page:_____ Line:_____ Reads:_____
Should Read:_____

Page:_____ Line:_____ Reads:_____
Should Read:_____

Page:_____ Line:_____ Reads:_____
Should Read:_____

Page:_____ Line:_____ Reads:_____
Should Read:_____

Page:_____ Line:_____ Reads:_____
Should Read:_____

Page:_____ Line:_____ Reads:_____
Should Read:_____

Page:_____ Line:_____ Reads:_____
Should Read:_____

Page:_____ Line:_____ Reads:_____
Should Read:_____

---

Page 95

C E R T I F I C A T E

PLYMOUTH, SS

I, Linda M. Corcoran, a Court Reporter and

Notary Public, in and for the Commonwealth of

Massachusetts, do hereby certify that:

Thomas M. Kelley, having been satisfactorily

identified and having been duly sworn by me to testify

upon his oath, did so testify, and that this transcript

is a full, true, and accurate record to the best of my

knowledge, skill, and ability of the testimony taken at

the Law Offices of Joseph R. Gallitano & Associates, 34

Main Street Extension, Suite 202, Plymouth,

Massachusetts, on Wednesday, June 21, 2006, commencing at

2:07 p.m.

I further certify that I am a disinterested

person to the action in which this deposition is taken.

IN WITNESS WHEREOF, I have hereunto set my hand

and notarial seal this 31st day of July, 2006.

_____
Linda M. Corcoran - Court Reporter
My commission expires:
October 6, 2006

# **<u>EXHIBIT B</u>**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

THOMAS M. KELLEY,
     Plaintiff,

v.                                Civil Action No. 05-10596-NMG

TOWN OF PLYMOUTH, et al
     Defendants.

## CONFIRMATORY AFFIDAVIT OF DENNIS M. GOVONI

I, Dennis M. Govoni, being first duly sworn, state that I am a witness in the above-entitled action, I am over the age of 18 and competent to testify. Further, I have read my Affidavit and know the contents thereof, and the same is true to my own knowledge and belief.

1.     My names is Dennis M. Govoni and I reside at 9 Chestnut Street, Kingston, MA 02364.

2.     I am a retired Plymouth Police Officer as of April 28, 2004.

3.     I was an acting patrolman on the Plymouth Police force in May through August, 2003.

4.     During said period I was ordered to participate in so-called Columbine Shooting Drill in Plymouth conducted by a State Police training force.

5.     At the time I was experiencing symptoms indicative of a potential heart problem.

6.     After May 25, 2003, when I learned of Officer Kelley's heart incident during the aforesaid drill conducted on that day I no longer believed it was safe for me to

1

participate in the Columbine Shooting training for which I was scheduled for at a later date.

7.    It was after Officer Kelley's injury that I refused to participate in said drill.

8.    I was required then to produce a medical statement from my general practitioner physician concerning my health and that I was only fit for desk duty.

9.    I was then excused from participating in said drill.

Subscribed and sworn to under the pains and penalties of perjury this 10TH day of November, 2007.

Dennis M. Govoni