UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

THOMAS M. KELLEY,
     Plaintiff,

v.                             <u>Civil Action No. 05-10596-NMG</u>

TOWN OF PLYMOUTH, et al
     Defendants.

<u>**PLAINTIFF, THOMAS M. KELLEY'S,
REBUTTAL TO DEFENDANTS' REPLY
MEMORANDUM TO PLAINTIFF'S OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**</u>

     The Defendants in their Reply Memorandum continue to misstate the material facts, relying on confusion and misinterpretation of the law in a desperate attempt to avoid a trial on the issues of fact that must go to a jury to render a decision. Besides this rebuttal, the Plaintiff relies primarily upon his Memorandum in Opposition to Summary Judgment and his Statement of Disputed Facts, supported by the testimony of numerous witnesses other than himself. The Plaintiff, hereinafter referred to as Kelley, will demonstrate that the Defendants are unaware of their own pleadings as well as mistaken in the application of the law, relating to each of the Plaintiff's counts of his complaint.

<u>**Count I. Violation of the M.G.L. Chap149, §185**</u>

     The Defendants raise some disingenuous arguments in their Reply Memorandum in Support of their Motion for Summary Judgment. They start with how the Chief said that he spoke with the former Town Manager, William Griffin, (hereinafter "former Town Manager") about Kelly's complaints. The Defendants would have the Court believe that the Chief was disinterested in the fact a Town Meeting Member, Retirement Board Member and police officer,

one Thomas Kelly, was claiming that the Chief and two captains had received over $500,000.00 in unauthorized pay.  So disinterested that the Chief wouldn't be bothered with practicing reprisals on Officer Kelly.  The Defendants cite two places in the Chief's deposition where the Chief says he spoke later to the former Town Manager about the issue. What the Defendants are attempting to hide is that the Chief clearly left the deposition saying that he did not speak immediately with the former Town Manager, but did so later. While the former Town Manager remembers that the Chief was upset and spoke to the former Town Manager soon after he heard about the issue, (Griffin TR:11, attached hereto as Exhibit A).  The Chief says on page 90 of his deposition (Pomeroy TR:90, attached hereto as Exhibit B) that he was told by the former Town Manager that the former Town Manger was contacted by the IG's office. "…but it was along time afterwards. He mentioned it in passing."

The Chief was questioned extensively during his deposition about a lengthy and explosive newspaper article claiming that over $500,000.00 was given in compensation to the Chief and two captains since the mid 1980's but the Chief says he did not see the article and he says so on page 94 of his deposition (Pomeroy TR:94, Exhibit B).

The Chief does admit that the raising of the issue was a personal attack on him, see, page 98.  Later the Chief says on page 105 and 107…"I wasn't the least bit concerned about it" referring to the Inspector General's probe.  (Pomeroy TR:108-107, Exhibit B). The Chief talked to the former Town Manager about it …."But not for quite awhile after I first heard about it. Sometime afterwards." page 87.  (Pomeroy TR:87, Exhibit B).

The Defendants argue that this really didn't amount to much except that the newspapers were writing that he and two others had received in excess of $500,000.00 dollars in unauthorized payments and that no one was bothered by it.  That is not how other people saw the

situation. The former Town Manager said the Chief called him and he was "upset", (Griffin TR:11, Exhibit A), and cannot remember but may have called him more than once, a call, the Court should take particular note of, that the Chief does not remember. Other police officers saw the Chief engaged in a vendetta against the Plaintiff. (Fahy TR:20-21, attached as Exhibit C). The evidence is that one, of the only two Captains on the force, is quoted as saying that "Pomeroy doesn't want him fucking with his money." (Fahy TR:24, Exhibit C). Despite what Defendants' counsel now says in the Reply Memorandum, Fahy, Kelly's shift supervisor, said that it was not just Kelly's Retirement Board work that caused the problems for him. "…but after he questioned Pomeroy's incentive pay, that's when Botieri came down…" (Fahy TR:21, Exhibit C).

The Defendant would have the Court believe that Lieutenant Fahy's deposition supports the finding that Kelly was not treated differently than anyone else and that is a far cry from what is accurate. Fahy clearly says that the monitoring of Kelly even for his Retirement Board work during regular shifts began only after the $500,000.00 dollars of unauthorized payments was raised by the Plaintiff.

Fahy testifies that Botieri made it clear that he wanted him monitored because he raised the issue of unauthorized compensation, (Fahy, TR:23-24, Exhibit C). Later in his deposition Fahy testifies, "Well, they just scrutinized every move he made."(Fahy, TR:24, Exhibit C). "He was the only one I was ordered to log out." (Fahy, TR:20, Exhibit C)."…it was obvious that they were after him", (Fahy, TR:39, Exhibit C). "It was obvious in the station. I wasn't the only one who knew about this, I believe", (Fahy, TR:39, Exhibit C). "No, just the thing from Botieri, when he said he—the Chief didn't want Kelly fucking with his money", (Fahy TR:43-44, Exhibit C). Fahy also testified that as Lieutenant he had no problem with Kelly's work, (Fahy:TR:33,

36, Exhibit C).  Kelly was followed around by Botieri (Fahy, TR:23-24, Exhibit C), called in from vacation to work the 4th of July, had his work monitored, was cited for not filling out a motor vehicle warning out completely.  Captain Botieri says that he, Botieri, was not aggravated by Kelly's conduct, (Botieri TR:44, Exhibit D).  In addition, Kelley was called on the carpet for not giving his location when he was responding to a call involving a police officer at a violent scene and his time at the Retirement Board meetings had to be charged back to the police budget and his time at those meetings was closely scrutinized.

In addition he was denied certain benefits after being injured in the line of duty, benefits that had been provided to other injured officers and should have been provided to Kelly as required by law. The Chief had his own view as to causation and ignored the view of the panel of medical doctors that made the finding that after collapsing at the Columbine like training and he was removed by ambulance and then removed to a Boston cardiac care unit that Kelly's injury constituted a compensable event .

The Defendants emphasize that the Defendants did nothing illegal.  But the measure of violation of the statue at issue is not whether the Defendants did anything illegal, but whether the Plaintiff, Kelley, reasonably believed the Defendants were doing something illegal.  Apparently Kelley did as evidenced by the fact that he reported the activity to the Inspector General of Massachusetts, who believed his complaint was reasonable enough to conduct an investigation. See affidavit of the Barbara J. Hansberry, General counsel at the Office of the Massachusetts Inspector General, marked as Exhibit E and annexed hereto and made a part hereof.

Further the Plaintiff as a member of the Plymouth retirement board was made aware of the manner in which the Defendant Pomeroy and other ranking Police and Fire Department officers were receiving compensation under the so called Quinn Bill Incentive program, was in

violation of Massachusetts regulations and would have an impact upon the calculation of

retirement benefits for those individuals, resulting in them receiving less money in retirement

benefits than they would be anticipating.  Kelley had been advised by Retirement board counsel

that there was a definite problem since the Defendant Pomeroy and others were receiving

compensation with out the benefit of a written policy, a by-law, or a contract, authorizing such

payment to him and others. See Exhibit F, a true Copy of 840 CMR 15.03 Regular

Compensation, a true copy of which is annexed hereto and made a part hereof.

This court ruled in <u>Christopher Mailloux, Plaintiff v. Town of Littleleton and Alexander</u>

<u>McCurdy, Defendants</u>, 473 F. Supp. 2d 177; 2007 U. S. Dist. LEXIS 3750:

> But the relevant test is not whether the request or order is illegal, but
> rather whether Plaintiff 'reasonably believed' it to be illegal.  Here, Plaintiff
> alleges that the journal was a part of a scheme by McCurdy to have firefighter
> Dunn fired so that McCurdy's son, Steele, could obtain a salary increase.
> Whether Plaintiff reasonably believed that the requested activity was illegal is a
> genuine issue of material fact to be resolved by the trier of fact.

Kelley obviously believed the actions of Pomeroy to be illegal and when Pomeroy

refused to take remedial action, which eventually Town Meeting did, Kelley felt compelled to

report it  to protect his own integrity as well as the integrity of the Retirement Board. See Kelley

Deposition Transcript, Dated:  February 9, 2006, Volume 1, pages 87 lines 4-11 (annexed hereto

as Exhibit G).

After Kelley filed his Complaint with the Inspector General, the Town of Plymouth

through Town Meeting voted to ratify the previous unauthorized payments to Chief Pomeroy and

others.  A true copy of the Vote of Town Meeting of October 22, 2001, is annexed hereto and

made part hereof as Exhibit H.

Again the retaliation issue, as set forth in Plaintiff's opposition Memorandum, is clearly

disputed and substantial evidence of retaliation as set forth is said Memorandum and Statement

of Disputed Facts warrants this matter go to a jury.  Defendants are not entitled to Summary

Judgment on Count I of Plaintiff's Complaint.


## Count II. Defendant's Negligence; Willful, Wanton, and Reckless Conduct

Chief Pomeroy by his own admission employed of management style based upon

ignorance and omission.   Throughout his testimony at his deposition he painted himself as the

master of delegation and oblivion.  Unfortunately his oblivious conduct prevented him from

being aware that to those he delegated tasks also did nothing.  Further at every opportunity, he

failed to educate himself regarding his officers' conditions, even when repeatedly furnished with

information.

The Defendants argue that the Chief's testimony is being mischaracterized in that the

Chief of Police of the 145 person department (Pomeroy, TR:14, Exhibit B) had not read anything

about safety in training models because nothing is written about the subject.  The fact is that the

Chief says that he had never read anything on the subject and yet he agrees that he has the

responsibility to provide a safe work environment (Pomeroy, TR:29, Exhibit B).

The Defendant goes on to argue that the Chief did not read anything about safety and

screening of police officers because there is nothing written about it, but that is not so.  The

Chief says that the six professional police law enforcement organizations to which he belongs, in

fact, provide information on training, but that he had never seen anything on the subject of

screening and safety, which is a far cry from the Plaintiff's incredulous comment that it doesn't

exist. And why would he read anything on the subject in any event; he doesn't see it as his area

of responsibility.  The Chief has never written any protocols, rules, or regulations regarding

screening of police officers, concerning physical capacity or ability to do training. (Pomeroy,

TR:22, 23, Exhibit B).  The Chief has never seen anything on issue of who is physically capable

to train in his years as a member of the Massachusetts Chiefs of Police Association. The Chief

belongs to six professional law enforcement organizations (Pomeroy, TR:25, Exhibit B) made up

of police officers or Chiefs and has never seen anything from any of them regarding training, yet

the Chief admits that he has an obligation to provide a safe work environment (Pomeroy, TR:29,

Exhibit B).

The Chief is not accurate when he testifies in his deposition that two officers were

excused from the training prior to the Plaintiff being injured (Pomeroy, TR:32, Exhibit B).  The

Chief says that he never knew whether the Plaintiff's condition should have excluded him from

training. (Pomeroy, TR:37, Exhibit B). And that he has never told other officers to make sure the

personnel under their command were fit to be trained (Pomeroy, TR:40, Exhibit B).  The Chief

never spoke to the State Police Colonel about issues of fitness and the rigors of the training

program (Pomeroy, TR:42, Exhibit B).  The Chief never read anything on the subject of the

rigors of the training and never asked anyone about the rigors of the training and never saw any

printed documents on the subject of the rigors of the training (Pomeroy, TR:53, Exhibit B).  The

Chief would have staff meetings, but in these meetings they never discussed Kelly or the rigors

of the training.  (Pomeroy, TR:51-52, Exhibit B).

Captain Botieri says he doesn't understand the question when asked if there is any rule or

protocol that would if considered cause a police officer in his command to be excluded from

training, (Botieri TR:20,25,26, and 28, Exhibit D).  In Botieri's view if an officer shows up for

work then he is physically capable of performing all training.  Neither Botieri nor the Chief knew

of the training specifics or the physical demands of the training exercise and both admitted as

such in their depositions, (Botieri TR:14, Exhibit D).  Botieri goes on to say that after being a

Captain and second in command in the department he knows of no obligation of the Chief to

insure that personnel with health conditions are safe in the training that they are assigned to

complete, (BotieriTR:31, Exhibit D).

      The Defendants go on to discuss Officers Abbot and Govoni and how they were excluded

from the training.  The Defendants argue that these two men asked to be excused…"Abbot had

approached a captain ahead of time and asked if he could be excused from training"  Defendants'

Memo page 6; but that is not what the record says by way of the Chief's testimony. To be clear,

the Chief testified in his deposition that:


ANSWER: In Abbot's case, his direct supervisor was Captain Botieri, so I'm assuming

(emphasis added) he went to Captain Botieri. (Pomeroy, TR:33, Exhibit B)


ANSWER: I believe Abbot asked. I don't think Govoni asked because he was already on light

duty (emphasis added) (Pomeroy, TR:34, Exhibit B).

      In simple terms the Chief's deposition testimony does not support what the Defendants'

Reply Memo in Support of Their Motion for Summary Judgment claims. There is no evidence

that they asked to be excused from training.

      Notwithstanding how one would characterize Captain Botieri's testimony as a Captain in

the Police Department and as a sworn officer, he did not understand a simple set of questions.

The Chief was sitting beside him at his deposition and the Chief attended no other depositions

other than his own.  The Captain was more than clear in some of his answers where he stated that

he and the Chief had no responsibility to ensure that the uniformed personnel of the town were

safe in the training modules to which they were being assigned to complete.  There is no

explanation for how the police department command staff can rely on the individual police offices evaluation of their own personnel health of whether the officer can or should participate in certain training when no one even in the command staff knows of the physical challenges that are facing the trainees.

Whether the actions of the defendants are negligence and were willful, wanton and reckless is a jury issue. Again the Plaintiff in his Statement of Disputed Facts and in his Memorandum in Opposition to Summary Judgment has set for substantial evidence of the Defendants' actions and flagrant omissions to warrant a jury's consideration. After all, Plaintiff Kelley could have died during his participation in the Columbine Training exercise. Certainly the quick action of his brother officers contributed to his survival.

But the Massachusetts Court of Appeals set the standard for a jury to consider and not a judge on a motion for summary judgment in Ann S. Inferrera, administratrix v. Town of Sudbury & Others, 31 Mass. App. Ct. 96; 575 N.E.2d 82; 1991 Mass. App. LEXIS 507, when the court ruled:

> The genuine issue is whether, on the facts that have been recited, a reasonable person in the position of the defendants, and knowing those facts, would realize that the conduct of the defendants created an easily perceptible danger of death or substantial physical harm. That issue of fact is for the jury to decide, not for the judge on a motion for summary judgment. See Attorney Gen. v. Bailey, supra at 370. The 'application of the reasonable person standard is uniquely within the competence of the jury.' DeVaux v. American Home Assur. Co. 387 Mass. 814, 819 (1983). It is for this reason that 'summary judgment is seldom sought or granted in negligence actions.' Foley v. Matulewicz, 17 Mass. App. Ct. 1004, 1005 (1984); 10A Wright, Miller & Kane, Federal Practice and Procedure § 2729, at 194 (1983); Moriarty, The Law of Summary Judgment in Massachusetts, 43 (Flaschner Judicial Institute 1990), and the rule is equally applicable to actions involving allegedly reckless conduct. See Saaybe v. Penn Cent. Transp. Co., 438 F. Supp. 65, 69 (E.D.Pa. 1977) (the issue of recklessness 'must be preserved for the jury').

As a result, Defendants' Motion for Summary Judgment on Count II. Negligence; Willful, Wanton, and Reckless Conduct must be denied and allow a jury to render a decision regarding this disputed factual matter.

## Count III. Equal Protection Claims under the 14th Amendment and 42 USC § 1983

In another act of desperation, the Defendants under their Reply attempt to plead a completely new defense by invoking the Statue of Limitations, despite the fact the Defendants never pleaded the action was barred by the statue of limitations in their answer, a true copy of which is annexed here to as Exhibit I. Further, the Defendants never raised the issue of the Statute of Limitations in their Motion or Memorandum in Support of their Motion for Summary Judgment. Therefore since their reply is supposed to be in response to the Plaintiff's Opposition to their Summary Judgment Motion, and there being no mention of the Statue of Limitations in Plaintiff's Opposition, the issue should be barred from any consideration whatsoever.

In any event all the acts of retaliation were a continuing event from January of 2001 to August of 2003, culminating in the inclusion of the plaintiff in the Columbine drill and Defendants' subsequent denial of Plaintiff's Chap .41, §111F benefits well within a three year period. The Plaintiff relies upon his extensive brief of that issue of violation of his equal protection claims in Count III in his Memorandum of opposition to the Motion for summary Judgment and respectfully submits as set forth in his Memorandum and Statement of Disputed Facts that this issue warrants the consideration of a Jury and the Defendants' Motion for Summary Judgment must be denied. The Plaintiff in his Memo has provided substantial case law that this issue is a jury issue not subject to Summary Judgment based upon the evidence Plaintiff has produced.

## Count IV. Denial of Benefits under M.G.L. c.41, § 111F

Persistence, determination and steadfastness are all admirable traits. Stubborn ignorance is not.  The Defendants persist in claiming the plaintiff was not injured on duty and that his retirement was based upon the so called Heart Law, M.G.L. Ch. 32 § 94.  While it is true the Plaintiff had the benefit of said statute, he was also retired under M.G.L. Ch. 32 § 7, **WHICH IS FOR AN INJURY ON DUTY.**   The Defendants had the benefit prior to this action and during this action to all the retirement records including Exhibit E to Plaintiff's Statement of Disputed Facts and Memorandum in Opposition to Summary Judgment, the Retirement Board's findings of Fact, which like the independent medical panel  report and the Review report of Public Employee Retirement Administration Commission, all of said records provided to the court with Plaintiff's opposition, clearly state the Plaintiff was injured on duty on May 25, 2003, during the Plymouth Police training exercise referred to as the Columbine Drill.

While the Defendant Pomeroy is entitled to an opinion, even an erroneous one, it does not afford him a right to refute findings of the state and local agencies and declare an officer's injury to be something that not only defies logic, but has no factual basis whatsoever.  To continue to proffer such a defense is either intentional misrepresentation or completely idiotic. Hopefully it is the latter, but in no event are the Defendants entitled to summary judgment on Count IV, the Denial of Benefits under M.G.L. Ch. 41 § 111F.  The Plaintiff relies upon his extensive briefing of this issue in his Memorandum in Opposition, which clearly establishes the Plaintiff was injured on duty and is entitled to the benefits sought under Count IV of his Complaint.

Respectfully submitted,
Thomas M. Kelley, Plaintiff
by his attorneys,

*/s/ Joseph R. Gallitano*
Joseph R. Gallitano, Esq.
 BBO # 183700
34 Main Street Ext., Suite 202
Plymouth MA  02360
(508) 746-1500

*/s/ Richard D. Armstrong*
Richard D. Armstrong, Jr., PC
BBO # 021580
1400 Hancock Street
3rd Floor
Quincy, MA  02169
(617) 471-4400

Dated: November 15, 2007

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

THOMAS M. KELLEY,
         Plaintiff,

v.                                                    Civil Action No. 05-10596-NMG

TOWN OF PLYMOUTH, et al
         Defendants.

**AFFIDAVIT OF JOSEPH R. GALLITANO
RE:  REBUTTAL TO DEFENDANTS' REPLY MEMORANDUM**

        I, Joseph R. Gallitano, hereby depose and state that the following is true and

accurate to the best of my belief as follows:

        1.        I am an Attorney in good standing and represent the Plaintiff in the

above-captioned matter.

        2.        Exhibit A attached hereto is a true and accurate copy of excerpts from the

Deposition of William R. Griffin taken on July 13, 2007.

        3.        Exhibit B attached hereto is a true and accurate copy of excerpts from the

Deposition of Robert J Pomeroy taken on September 25, 2006.

        4.        Exhibit C attached hereto is a true and accurate copy of excerpts from the

Deposition of Kevin P. Fahy taken on June 9, 2006.

        5.        Exhibit D attached hereto is a true and accurate copy of excerpts from the

Deposition of Michael E. Botieri taken on June 21, 2006.

        6.        Exhibit E attached hereto is a true and accurate copy of the Affidavit of

Barbara J. Hansberry.

        7.        Exhibit F attached hereto is a true and accurate copy of 840 CMR 15:03.

1

8.      Exhibit G attached hereto is a true and accurate copy of excerpts from the Deposition of Thomas M. Kelley taken on February 9, 2006.

9.      Exhibit H attached hereto is a true and accurate copy of the Vote of the Annual Town Meeting of the town of Plymouth on October 22, 2001.

10.     Exhibit I attached hereto is a true and accurate copy of the Defendants' Answer to Plaintiff's Verified Complaint.


Signed and sworn to under the pains and penalties of perjury this 15th day of November, 2007.


/s/ Joseph R. Gallitano
Joseph R. Gallitano

# **<u>EXHIBIT A</u>**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


```
-------------------------- )
THOMAS M.  KELLEY                 )
        Plaintiff,                )
VS.                               ) C.A. 1:05-cv-10596-NMG
                                  )
TOWN OF PLYMOUTH, ET AL.          )
        Defendant.                )
--------------------------)
```


DEPOSITION OF WILLIAM R.  GRIFFIN, a witness
called for examination by counsel for the Plaintiff, taken
pursuant to the applicable provisions of the Federal Rules
of Civil Procedure, before JO-ANNE M. GOLDEN, a Court
Reporter-Notary Public in and for the Commonwealth of
Massachusetts, at JOSEPH R. GALLITANO & ASSOCIATES, 34 Main
Street Ext., Suite 202, Plymouth, Massachusetts, on Friday,
July 13, 2007, commencing at 1:02 p.m.


**LINDA M. CORCORAN**
**CERTIFIED COURT REPORTER**
**P. O. Box 4**
**Kingston, Massachusetts   02364**
**(781) 585-8172**

1    classification and compensation plan.

2  Q.  So was there then to include your agreement of his

3      receiving incentive pay under the Quinn Bill, was there

4      an amendment to the by law then to included that

5      incentive pay?

6  A.  I don't believe there was.  I don't believe it was

7      required.

8  Q.  Then the -- so there was no written contract and there

9      was no written by law that specifically allowed for or

10     stated that he was getting the incentive pay?

11 A.  There are two parts to that question.  There was no

12     written contract.

13 Q.  Right.

14 A.  And I do not recall that the personnel by law addressed

15     the issue of Quinn Bill benefits for a police officer.

16 Q.  When the Chief called you, when did he call you; do you

17     recall, roughly?

18 A.  Well, I wrote this letter in March of 2000, must have

19     been -- I'm usually prompt in responding to any request

20     I get, so probably late in February of 2000.

21 Q.  Did you have just one conversation with him regarding

22     this issue?

23 A.  I don't recall.

24 Q.  Do you recall -- you said he mentioned Mr.  Kelley, do

# EXHIBIT B

VOLUME:  I
PAGES:  1-143
EXHIBITS:  8

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
*******************************
THOMAS M. KELLEY,               *
                                *
              Plaintiff,        *
                                *
v.                              *   C.A. 1:05-CV-10596-NMG
                                *
TOWN OF PLYMOUTH, ET AL.,       *
                                *
              Defendants.       *
                                *
*******************************
```

**DEPOSITION OF ROBERT J. POMEROY, A WITNESS**

called by and on behalf of the Defendants, pursuant to the

applicable provisions of the Federal Rules of Civil Procedure,

before Patrice C. Lucero, Certified Verbatim Reporter and

Notary Public in and for the Commonwealth of Massachusetts, at

the Law Office of Joseph R. Gallitano, 34 Main Street

Extension, Suite 202, Plymouth, Massachusetts, on Monday,

September 25, 2006, to be commenced at 10:30 a.m.

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***
**LINDA M. CORCORAN**
**COURT REPORTING SERVICES**
**P.O. BOX 4**
**KINGSTON, MA 02364**
**(781) 585-8172**

14

1    Q    What is that?

2    A    I think the only employees in that is the animal control

3         officers.  I don't remember what the acronym is.

4    Q    You don't remember?

5    A    No.  OPEIU, I believe, but I don't remember what it

6         stands for.

7    Q    That's six units.

8    A    Yes.  And the superior officers.

9    Q    That includes the lieutenants and the sergeants?

10   A    Yes.

11   Q    Not the captains?

12   A    Correct.

13   Q    How many lieutenants and captains?

14   A    There's two captains, six lieutenants, and ten or eleven

15        sergeants in that group.

16   Q    That's seven bargaining units in your department.

17   A    Yes.  I think that's all of them.

18   Q    How many people in total in the police department?

19   A    Including some on-call people, part-timers, between 130

20        and 145.

21   Q    You're familiar with the term "FTE"?

22   A    Full time equivalents?

23   Q    Yes.

24   A    Yes.

1          regarding screening of police officers based upon

2          concerns of their physical abilities to perform training?

3                    MR. SILVERFINE:  Objection as to form.  You can

4          answer.

5     A    No.

6     Q    Are you familiar with any rules, protocols, anything

7          written regarding who should and should not be involved

8          in certain levels of training?

9                    MR. SILVERFINE:  Objection as to the form.  You

10         can answer.

11    A    Specifically training, no.

12    Q    Are there any rules now that would be accessible to a

13         sergeant involved in the training of personnel that would

14         guide that person with regard to making judgments about

15         police officers and their physical capacity to endure

16         training?

17    A    Yes.

18    Q    Were they available when you were a sergeant?

19    A    No.

20    Q    Where are these rules?

21    A    There's a general rule that talks in the rules and

22         regulations manual.  It's 13 point something.  I don't

23         remember the exact rule.

24    Q    Can you remember what the rule says?

1  A   Generally.

2  Q   Yes.

3  A   Something to the effect that if an officer finds that he

4      is mentally or physically incapable of performing the

5      duties of a police officer, he's to report that to his

6      shift commander.

7  Q   Is there any rule that imposes on the shift commander or

8      the sergeant in charge of training responsibilities for

9      determining whether or not the police officers being

10      trained are physically capable of being physically

11      trained?

12            MR. SILVERFINE:  Objection as to form.  You can

13      answer.

14  A   Not specifically in writing.  But, obviously, if a

15      supervisor saw some physical or mental infirmity that was

16      obvious to him, he'd make some comment about it.

17  Q   You would say that that's an obligation of a sergeant

18      who's involved in training personnel?

19  A   All supervision.

20  Q   So it would be an obligation of all the superior officers

21      including the chief?

22  A   Yes.

23  Q   This rule is not written?

24  A   Correct.

1    A    Sure.

2    Q    But in those discussions about trainings, they never talk

3         about looking at the limitations involving a police

4         officer's physical or mental capacity?

5              MR. SILVERFINE:  Objection as to form.  You can

6         answer.

7    A    Not for training exclusively, no.

8    Q    There are other associations that you're affiliated with

9         or the department is affiliated with beyond collective

10        bargaining organizations and the Police Chiefs

11        Association?

12   A    Yes.

13   Q    What are they?

14   A    I'm a member of the Plymouth County Police Chiefs

15        Association.

16   Q    I assume that's all the chiefs in the county?

17   A    Yes.

18   Q    Any others?

19   A    The Southeast Massachusetts Chiefs of Police Association,

20        the New England Chiefs Association, the International

21        Association of Chiefs of Police, the FBI National Academy

22        Associates, the FBI LEEDA organization, Law Enforcement

23        Executive Development Associates.  That's all of them.

24   Q    And you maintain membership in each of these?

29

1   Q   But would you agree with me that you have that obligation

2       as chief of police?

3   A   To the best of my ability on things that I can control,

4       yes.

5   Q   Do you have any idea as to where that obligation is

6       imposed upon you from?

7   A   Well, there may be various applicable statutes.

8   Q   You mean federal or state?

9   A   Maybe both.  I don't know.

10  Q   Is it possible that each of the collective bargaining

11      agreements imposes upon you an obligation --

12          MR. SILVERFINE:  Objection.  I'm sorry.

13  Q   -- each of the collective bargaining agreements imposes

14      upon you as chief of police the obligation to ensure a

15      safe working environment for police officers?

16          MR. SILVERFINE:  Objection as to form.

17  A   Not that I can recall.

18  Q   Do you recall any circumstance while you were a sergeant

19      in which you decided that a particular police officer

20      should not engage in planned training?

21  A   No.

22  Q   Do you recall any circumstance when you were a lieutenant

23      -- I'm sorry -- when you were captain where you made the

24      decision that a particular police officer should not be

LINDA M. CORCORAN COURT REPORTING SERVICES (781) 585-8172

1          can answer.

2     A    Yes.   They could postpone the training.

3     Q    Well, I mean in Abbott's case and Govoni's case, was it

4          postponed or just cancelled?

5     A    Govoni retired, and Abbott just put in his papers to

6          retire.

7     Q    Just, what, recently?

8     A    '06.

9     Q    But we're talking about Govoni and Abbott being excused

10         from training in 2003; right?

11    A    That's right.

12    Q    In fact, they were actually excused from the Columbine-

13         like training that is involved in this case; is that

14         right?

15    A    Yes, they were.

16    Q    Were they excused prior to the injuries sustained by

17         Patrolman Kelley?

18    A    Yes.

19    Q    Am I to understand a captain was involved in each of the

20         decisions to excuse these two police officers; right?

21    A    Yes.

22    Q    So that it is fair to say, therefore, that if a police

23         officer is going to be excused from training, it requires

24         an approval from the captain?

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | A lieutenant can excuse them? |
| 3 | A | It would depend on the circumstances. |
| 4 | Q | Under any circumstances a lieutenant could excuse them? |
| 5 | A | It would depend on the circumstance. |
| 6 | Q | A sergeant could excuse them? |
| 7 | A | It would depend on the circumstance.  Yes. |
| 8 | Q | But it is true that in Abbott's and Govoni's case, in |
| 9 | | both of these cases that you can recall clearly in 2003 |
| 10 | | it involved a decision made by a captain? |
| 11 | A | That's correct. |
| 12 | Q | Do you know which captain it was? |
| 13 | A | No. |
| 14 | Q | Any reason why you can recall that a captain made the |
| 15 | | decision? |
| 16 | A | Govoni's case was easy.  He was already on light duty. |
| 17 | | The captain had put out a directive saying he was on |
| 18 | | light duty, and it specified what his limitations were, |
| 19 | | so it was obvious that he couldn't participate in the |
| 20 | | training per the captain's directive.  That was obvious. |
| 21 | | In Abbott's case, his direct supervisor was |
| 22 | | Captain Botieri, so I'm assuming he went to Captain |
| 23 | | Botieri.  He may have gone to the training captain.  I |
| 24 | | don't know. |

34

| | | |
|---|---|---|
| 1 | Q | Do you know of any reason why Officer Kelley was not |
| 2 | | excluded from the training of the Columbine-like 2003 |
| 3 | | training program? |
| 4 | A | He never asked. |
| 5 | Q | So, in the case of Abbott and Govoni, they asked? |
| 6 | A | I believe Abbott asked. I don't think Govoni asked |
| 7 | | because he was already on light duty. |
| 8 | Q | So the captain, in fact, took the initiative to exclude |
| 9 | | him from training, in your memory? |
| 10 | A | He was excluded from a lot of things. |
| 11 | Q | Right. But I'm talking only about the training, the |
| 12 | | Columbine-like training in 2003 right now. It was the |
| 13 | | captain who took the initiative to exclude them? |
| 14 | | MR. SILVERFINE: Objection to form. |
| 15 | A | I don't know. |
| 16 | Q | You don't know. But you do know that Officer Kelley did |
| 17 | | not ask? |
| 18 | A | He didn't ask me, and no one told me if he asked them. |
| 19 | Q | Were you aware at the time of the Columbine-like training |
| 20 | | that Patrolman Kelley suffered from any health |
| 21 | | conditions? |
| 22 | A | Not that I remember. |
| 23 | Q | Do you recall at any time prior to the Columbine-like |
| 24 | | training in May of 2003, being aware of the fact that |

```
 1   Q   But, in fact, the department was aware in May of 2003,

 2       Chief, that he had Lyme disease and Meniere's disease; is

 3       that true?

 4           MR. SILVERFINE:  Objection as to form.  You can

 5       answer.

 6   A   My answer did not refer to the Lyme disease or Meniere's

 7       disease.

 8   Q   Well, I'm asking you about those two conditions in May of

 9       2003.

10   A   I don't know enough about either one of them to make a

11       determination.

12   Q   So you would say that knowing what you do now about his

13       Meniere's disease and his Lyme disease and that he had it

14       prior to May of 2003, prior to the Columbine-like

15       training, and he had these conditions, you're saying you

16       can't make a judgment as to whether or not he should have

17       participated in that training?

18           MR. SILVERFINE:  Objection as to form.

19   A   That's right.

20   Q   Have you ever issued while you were chief any type of

21       directive to police officers to ensure the fact that they

22       are physically capable and mentally capable of performing

23       in training or performing in their police duties in

24       general?
```

| 1 | Q | Do you remember at any specific meeting prior to |
| 2 | | conducting the Columbine-like training in May of 2003 |
| 3 | | where you inquired as to the health, mental and physical |
| 4 | | of each officer to be trained? |
| 5 | A | No. |
| 6 | Q | Was that subject at all a point of discussion in any of |
| 7 | | the meetings that you held with your command staff prior |
| 8 | | to the training in May of 2003? |
| 9 | A | No. |
| 10 | Q | You would agree with me that you did have meetings with |
| 11 | | your command staff prior to the training in 2003? |
| 12 | A | Very brief meetings. |
| 13 | Q | Did you have any planning meetings at all in May or prior |
| 14 | | to May of 2003 regarding the planning, execution, or the |
| 15 | | conduct of training by the Massachusetts State Police of |
| 16 | | Plymouth police officers? |
| 17 | A | No, I didn't. |
| 18 | Q | None at all? |
| 19 | A | No.  None. |
| 20 | Q | When did you first find out that your department was |
| 21 | | going to be 100 percent trained, your patrol uniformed |
| 22 | | department was going to be trained, in a Columbine-like |
| 23 | | exercise? |
| 24 | | MR. SILVERFINE:  Objection as to the form.  You |

42

```
 1        training officer?

 2   A    No.

 3   Q    In your discussions with the colonel, did you discuss

 4        with him any limitations with regard to physical or

 5        mental capacity of prospective trainees?

 6   A    I never spoke to the colonel about it.

 7   Q    Well, you spoke to him at the association meeting; right?

 8   A    No, I did not.

 9   Q    He made the presentation at the meeting?

10   A    Yes, he did.

11   Q    And then what did you do -- return to your office and

12        tell the training officer?

13   A    No.  No.  I said I wrote him a letter.  I wrote the

14        colonel a letter.

15   Q    You wrote him a letter?

16   A    Yes.

17   Q    Did he write back to you?

18   A    I don't remember whether he wrote or one of his staff

19        people called one of my people.

20   Q    Did this training cost the Town of Plymouth any money;

21        did you have to pay the Massachusetts State Police for

22        it?

23   A    No, we did not have to pay the Massachusetts State

24        Police.
```

51

| 1  | Q | Every day. |
| 2  | A | If they're available.  They may not be then.  If there's |
| 3  |   | something going on that I need to be briefed on, then |
| 4  |   | either the captain or the detective lieutenant will come |
| 5  |   | in, and we'll talk about it.  Sometimes it takes a few |
| 6  |   | minutes.  Sometimes it can take several hours. |
| 7  |   | Periodically, we'll do a staff meeting, a |
| 8  |   | command staff meeting, where it will be the captains, the |
| 9  |   | prosecutor, the training officer and all of the |
| 10 |   | lieutenants, and we'll all meet together. |
| 11 | Q | No particular schedule? |
| 12 | A | No. |
| 13 | Q | Driven by subject and need? |
| 14 | A | It depends what's happening. |
| 15 | Q | Any other set meetings in the way in which you manage? |
| 16 | A | Not that I can think of, no. |
| 17 | Q | Is any time reserved in the morning meetings to discuss |
| 18 |   | the health status of police officers? |
| 19 | A | Not reserved, no. |
| 20 | Q | Is it discussed? |
| 21 | A | Yes. |
| 22 | Q | These are the meetings that take place at eight or 8:30 |
| 23 |   | if the captains are available? |
| 24 | A | Yes. |

52

| | | |
|---|---|---|
| 1 | Q | Were those meetings taking place in May of 2003? |
| 2 | A | I think so. |
| 3 | Q | You don't recall? |
| 4 | A | I don't remember. |
| 5 | Q | You wouldn't recall, then, I gather, whether or not |
| 6 | | Officer Kelley's health status was discussed in one of |
| 7 | | those meetings? |
| 8 | A | I already answered that previously. I said his health |
| 9 | | status was not discussed. |
| 10 | Q | In the staff meetings, is any time reserved for health |
| 11 | | status or physical or mental status of police officers, |
| 12 | | uniformed personnel; in those staff meetings, any time |
| 13 | | reserved for that subject? |
| 14 | A | Not reserved, no. |
| 15 | Q | But it comes up? |
| 16 | A | Not that I can recall. |
| 17 | Q | Those staff meetings were being held in May 2003? |
| 18 | A | I don't remember. |
| 19 | Q | Then I gather the same answer would apply if I were to |
| 20 | | ask you about Officer Kelley's health condition being |
| 21 | | discussed in the staff meetings; you would say as you |
| 22 | | said earlier? |
| 23 | A | Never to my recollection was his health ever brought up. |
| 24 | Q | Are you aware of any waivers that were signed prior to |

| | | |
|---|---|---|
| 1 | | training in 2003 in the Columbine-like training? |
| 2 | A | I don't remember. |
| 3 | Q | Do you know if any police officers signed any documents |
| 4 | | prior to engaging in training? |
| 5 | A | I don't know. |
| 6 | Q | Just so I can be clear, you never saw any printed |
| 7 | | documents that described the 2003 Columbine-like |
| 8 | | training? |
| 9 | A | Correct. |
| 10 | Q | You made a determination that Officer Kelley would not |
| 11 | | get reimbursed for time after his injury in the |
| 12 | | Columbine-like training, a period, I gather, of about two |
| 13 | | weeks; is that right? |
| 14 | | MR. SILVERFINE:  Objection as to form. |
| 15 | A | I don't understand what you mean. |
| 16 | Q | Well, do you know what Section 111 benefits are? |
| 17 | A | Yes. |
| 18 | Q | Did you write the decision he would not get those |
| 19 | | benefits? |
| 20 | A | Yes, but originally you said reimbursed.  He was paid. |
| 21 | | He didn't receive 111F benefits, but he was paid. |
| 22 | Q | Using his earned time? |
| 23 | A | Sick time or vacation time, yes. |
| 24 | Q | Right.  So when I said reimbursed, I confused you as to |

1          the time you first discovered that he was raising that

2          issue?

3     A    I never talked to Kelley about it.

4     Q    Never?

5     A    Never.

6     Q    Did you talk to the town manager about it?

7     A    Yes.  But not for quite awhile after I first heard about

8          it.  Sometime afterwards.

9     Q    There were newspaper articles regarding the payment of

10         these monies; right?

11    A    At some point there was.  He started first complaining in

12         1999, and I think the newspaper articles maybe weren't

13         until 2000, 2001.

14    Q    At the time when he was complaining in 1999, do you know

15         whether or not he was a town meeting member in the town

16         of Plymouth?

17    A    I don't remember.

18    Q    Do you know if the town meeting in the town of Plymouth

19         has an obligation to pass the town budget?

20    A    Yes.  They vote on it.  They're the legislative body for

21         the town.

22    Q    Right.  So they have a great responsibility invested in

23         them by the town's people over the financial affairs of

24         the town; correct?

1   Q    Later it says that Beth said that her actions were not

2         related to the inspector general's probe; and she goes on

3         to say, "'I have not heard from the inspector general's

4         office.'"  This article appears on June 20, 2001.  Were

5         you aware there was a probe by the inspector general's

6         office?

7   A    No.

8   Q    Were you ever contacted by the inspector general's

9         office?

10   A    No.

11   Q    Do you know anybody that was?

12   A    Bill Griffin told me he was, but it was a long time

13         afterwards.  He mentioned it in passing.  He was the town

14         manager when I was hired.

15   Q    The next paragraph says, "However, former town manager

16         William Griffin confirmed Tuesday" -- I assume it's the

17         day before this newspaper is printed on Wednesday, June

18         20 -- "confirmed Tuesday that he met with investigators

19         from the state inspector general's office earlier this

20         year to discuss the probe into the payments under the

21         Quinn Bill, which was adopted in Plymouth in 1972."  Do

22         you know if that's an accurate statement or report?

23   A    I have no idea.

24   Q    You do know that the Quinn Bill was actually adopted in

94

1  Q  So, when you look at a captain's base pay and not at his

2     base pay plus overtime, you look at the captain's base,

3     that's what the 30 percent comes on?

4  A  The percentage changes their base pay, so it therefore

5     changes their overtime rate.

6  Q  So 30 percent of total income or 30 percent of just the

7     base pay excluding overtime?

8  A  They get 30 percent on top of their base pay, which

9     creates a new base pay.  Then you divide it out, and it

10    creates a new overtime rate.

11 Q  Right.  The reporter says that Boyle, who is identified

12    here in the article as president of the Plymouth Police

13    Brotherhood -- and I gather that's the patrolmen's union?

14 A  Mm-hm.

15 Q  She quotes him as saying, "'If it's not contractual and

16    not in the personnel bylaw, they're not entitled to it.'"

17    I assume you would disagree with that?

18 A  Yes.

19 Q  So you didn't see the June 20, 2001 article?

20 A  No.

21 Q  Let me move on.

22             MR. ARMSTRONG:  Mark that as four.  Right?

23             THE COURT REPORTER:  Exhibit 5.

24

**LINDA M. CORCORAN COURT REPORTING SERVICES (781) 585-8172**

98

1   A   I don't know what they were aware of or what they weren't

2       aware of.

3   Q   The article says later on that when the selectmen

4       considered the article Tuesday night, Chairman Ken

5       Tavares went into a tirade, claiming the issue had turned

6       into a personal attack on Pomeroy; he didn't mention

7       Kelley's name.  Was it a personal attack on you, Chief?

8   A   Oh, I think it was, yes.

9   Q   Do you disagree with the report and the document that

10      says that in 1995 the town paid a consultant -- in

11      1997 --

12  A   I'm sorry.  Where are you in this document?

13  Q   It's one, two, three, four, five -- six paragraphs from

14      the very bottom of page two.  It starts with the words,

15      "The personnel bylaw was revised."

16  A   Okay.  I've got it.  Now I understand.

17  Q   Do you know if, in fact, there was action reclassifying

18      all non-union town positions and to rewrite the bylaw?

19  A   I don't remember.

20  Q   So you have never seen this, either, six -- five, rather?

21  A   I don't recall it.

22  Q   You do believe that this was a personal attack on you?

23  A   Yes.  Well, not just on me.

24  Q   On you and who else?

1  A    I know that they were contacted because Mr. Griffin told

2       me so.  There was rumors back in the beginning of 2001

3       that Kelley went to the inspector general's office.  That

4       was up to him.  I wasn't the least bit concerned about

5       it.  They never contacted me.

6  Q    Did you contact anyone because Kelly went to the

7       inspector general's office?

8  A    No.  I only heard rumors that he went.  I didn't know for

9       a fact that he went.  I didn't know if he complained

10      about me or the finance director or the town manager.  I

11      have no idea.

12 Q    You never talked to Griffin about the subject?  Griffin,

13      apparently, according to the newspapers, was talking to

14      the newspapers, at least, and was talking to the

15      inspector general.  You said that he mentioned it in

16      passing?

17 A    Quite awhile later he mentioned to me, "Oh, by the way,"

18      and that's how he said it, "Oh, by the way, I never told

19      you that they came down."  He says, "There was nothing to

20      it, and they left."

21 Q    The manager at the time in the town was Eleanor Beth.

22      Did she talk to you --

23 A    No.  She never talked to be me about the inspector

24      general's office, and I don't think that she ever talked

| 1 | | to anybody from the inspector general's office, but I |
|---|---|---|
| 2 | | could be wrong. |
| 3 | Q | Do you meet with her frequently as town manager when |
| 4 | | she -- is she now the town manager? |
| 5 | A | No.  She's retired. |
| 6 | Q | When she was the town manager, did you meet with her |
| 7 | | frequently? |
| 8 | A | All the department heads.  We had usually a once-a-week |
| 9 | | meeting. |
| 10 | Q | Do you meet individually or as a group? |
| 11 | A | As a group. |
| 12 | Q | There is an opportunity if you wish it that you would |
| 13 | | meet individually with her; right? |
| 14 | A | Sure. |
| 15 | Q | And there are occasions when she initiates the meeting? |
| 16 | A | Yes. |
| 17 | Q | Invites you in to talk about something; right? |
| 18 | A | Sure. |
| 19 | Q | Do you have any knowledge as to how many times the |
| 20 | | inspector general has been contacting Town of Plymouth |
| 21 | | officials, government officials, since you became chief |
| 22 | | of police? |
| 23 | A | The only incident that I remember I've already stated |
| 24 | | twice now is that when Bill Griffin told me.  He said he |

1 was contacted once, and that's all I know.

2 Q So the town manager did not speak to you as chief of

3  police about the inspector general asking questions?

4 A Correct.

5 Q When did you first learn of the fact that the inspector

6  general had been contacted by Officer Kelley?

7 A There was a rumor -- and that's all it was was a rumor --

8  around February of 2001.  There was a rumor going around

9  that Kelley went to the inspector general's office.

10 Q Do you know how you shared in that rumor?

11 A I remember it was gossip at the station.  I didn't know

12  if it was true or not.

13 Q Do you know if the inspector general in the contacts that

14  were being made with Eleanor or the former town manager

15  ever suggested, made a recommendation as to what the town

16  might do in the circumstances that they were discussing

17  with the town, like pass a new bylaw?

18 A No idea.

19 Q Eventually a bylaw was passed?

20 A A bylaw was passed, yes.

21 Q Were you relieved that the bylaw was passed?

22 A I told you earlier I wasn't the least bit concerned about

23  the arrangement that was in existence before the bylaw.

24 Q The collective bargaining agreement has certain

# **EXHIBIT C**

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

CA No.   05 10596 NMG

- - - - - - - - - - - - - - - - - - - - - - - - x

THOMAS KELLEY,

Plaintiff,


vs.


TOWN OF PLYMOUTH and ROBERT J. POMEROY,

as Chief of the Plymouth Police Department

and Individually,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - x

VOLUME I                          Pages 1 - 50



DEPOSITION OF KEVIN P. FAHY, a witness

called by counsel for the Defendants, taken before

Suzanne M. Hebert, Professional Shorthand Reporter

and Notary Public in and for the Commonwealth of

Massachusetts, at Brody, Hardoon, Perkins & Kesten,

LLP, One Exeter Plaza, Boston, MA, on Friday, June 9,

2006, commencing at 12:58 p.m.

Page 20

1   department, all the stuff that went on, not

2   specifically this.  I may have asked him what he was

3   doing in reference to it and really didn't get into

4   it with him.

5        Q.   Do you remember what he said?

6        A.   No.

7        Q.   You wrote after this in Exhibit 1, "This

8   signaled the beginning of Tom's every move being

9   scrutinized by Pomeroy and Captain Botieri."  What do

10  you mean by that?

11       A.   Tom was singled out.  If he went out, for

12  instance, if he went out at the Town Hall at 3:00 on

13  a Tuesday, Wednesday, whatever, the Retirement Board

14  was meeting, I was ordered to log, "Came in and out,"

15  every place he went.

16                 At times Botieri would come down and

17  ask me where Kelley was, "Why is he here?  Why is he

18  there?"  I said, "Well" -- I had to have an answer.

19  I asked Tom to let me know when he went out, and he

20  let me know when he went out.  He called me on the

21  telephone or put himself out at the Town Hall so I

22  knew it, and I went out and logged him to my

23  supervisor's log.

24       Q.   Is that part of your duties as a

Page 21

1    supervisor?

2        A.    Well, I knew where he was going before

3    that, but this was just -- normally I did not log an

4    individual officer out.

5        Q.    When you say "logged out," this is for the

6    Retirement Board meetings?

7        A.    Yes.

8        Q.    Any other officer that you supervised who

9    was a Retirement Board member you supervised?

10        A.    No.

11        Q.    So Mr. Kelley was the only one, a member of

12    the Retirement Board?

13        A.    That's correct.

14        Q.    Do you remember when it began roughly?

15        A.    After he was elected to the Retirement

16    Board and then I never logged him out up to that

17    point, in other words, when he became a Retirement

18    Board member, that went on for a while, but after he

19    questioned Pomeroy's incentive pay, that's when

20    Botieri came down, and I believe in my affidavit,

21    came into my office.

22        Q.    Besides logging him out, anything else?

23    When you say "scrutinize," anything else you had to

24    do?

Page 23

1   by the Sergeant and he was singled out in reference

2   to that.

3        Q.   Who was the sergeant?

4        A.   At the time it was Richard Dorman.

5        Q.   When did this happen, the incident with

6   Sergeant Richard Dorman?

7        A.   I couldn't tell you when it happened.

8        Q.   Could you give me the year?

9        A.   I couldn't give you an exact date.

10       Q.   Mid-'90s?

11       A.   Could be, yeah.  I couldn't tell you.

12       Q.   Anything else that you recall relative to

13  Paragraph 4, where you say he was scrutinized by

14  Pomeroy and Botieri, anything else you recall?

15       A.   If he went over to the Town Hall, Botieri

16  would show up there or follow him.

17       Q.   How do you know that?

18       A.   He came in and asked me.  I got a call one

19  day --

20       Q.   When you say "he," you mean Botieri?

21       A.   Botieri.  I got a call one day just about

22  2:55, and it was Tom Kelley telling me that he was

23  off at the Town Hall for his Retirement Board

24  meeting, and he said Botieri was outside, "Why was he

Page 24

1    following me?"  And I said, "I don't know, but I'll

2    ask."  And I didn't get the phone down, and in came

3    my office was Botieri wanting to know what Tom Kelley

4    was doing at the Town Hall.  I told him, I said, "Why

5    didn't you go over and ask him?  You were just

6    there."  He didn't like that.

7        Q.    When was this?

8        A.    Mid-'90s.

9        Q.    Anything else that you remember?

10       A.    Then he said to me, "We want him logged out

11   every place he goes, everything he does," and

12   Pomeroy, excuse my French, "Pomeroy doesn't want him

13   fucking with his money."

14       Q.    And, again, just trying to encapsulate

15   this, when did this happen, as far as you remember?

16       A.    In the mid-'90s.

17       Q.    And what did you say back to Mr. Botieri?

18       A.    I said I would log him out.

19       Q.    What else do you recall about the scrutiny

20   you describe in Paragraph 4?

21       A.    Well, they just scrutinized every move he

22   made.

23       Q.    Again, looking to your memory, as to what

24   other activity you recall.

Page 33

1    Pomeroy?

2         A.    No.

3         Q.    Did he ever talk about any grievances

4    besides the one we have talked about he filed against

5    the Police Department?

6         A.    No.

7         Q.    Did you have any problems with any of

8    Thomas Kelley's work performance during the year?

9         A.    No.

10        Q.    Did you ever reprimand him?

11        A.    No.

12        Q.    Did you ever write him up for anything?

13        A.    No.

14        Q.    Are you aware of any reprimands or

15   write-ups he received?

16        A.    The one with Abbott.

17        Q.    Anything else that you know?

18        A.    Not that I know of.  It's been seven years.

19        Q.    Just asking for your best memory.  I

20   appreciate it.  Did you ever tell Mr. Kelley words to

21   the effect, "They're out to get you"?

22        A.    Yes, I did.

23        Q.    What were you referring to?

24        A.    Botieri and Pomeroy.

Page 34

```
 1        Q.    When did you say that?
 2        A.    Right after they started scrutinizing his
 3   every move.  I said to, "Cover your ass."
 4        Q.    When did you say that?
 5        A.    After this incident happened.
 6        Q.    Just for the record, so we're clear, what
 7   incident are you referring to?
 8        A.    The Retirement Board, when he questioned
 9   Pomeroy's right and the day he went over to the --
10   right after that, Botieri came down and ordered me to
11   put him in the log.
12        Q.    And besides what you have told us, anything
13   else that you were referring to, when you say, "They
14   are out to get you," anything else you're referring
15   to?
16        A.    No.
17        Q.    Is it fair to say you don't remember when
18   that meeting or series of discussions you're
19   referring to took place?
20        A.    I can't give you a specific date.
21        Q.    At a certain point, I think you said,
22   "Watch your back" to him?  Did you say that to him?
23        A.    Watch your back or your ass.  I forget what
24   it was.
```

1     Q.   Is that during the same period we're

2   talking?

3     A.   Right.

4     Q.   This wasn't a separate episode, this was

5   during the same period?

6     A.   Right.

7     Q.   If I asked you this, again, forgive me,

8   just trying to, as lawyers do, ask all of the

9   questions.  Did you ever have any problems with

10  Mr. Kelley's work as it related to your shift?

11    A.   No.

12    Q.   Did you ever need to tell him to do certain

13  things which he wasn't doing you felt correctly as a

14  police officer?

15    A.   I would say the normal, in other words,

16  "Get the tickets going, write a couple of tickets,

17  citations."  I had to visit the whole shift, but...

18    Q.   Did you have any issues or concerns about

19  him covering his sector?

20    A.   No.

21    Q.   How about answering his radio?

22    A.   No.

23    Q.   Were there problems you were aware of with

24  Mr. Kelley your superior officers asked you to keep

Page 36

1    track of him?

2        A.    No.

3        Q.    In other words, somebody said, "We didn't

4    get a call back, a call we put out to Mr. Kelley.

5    Can you make sure he answers his page or phone call"?

6        A.    No.  They would report right -- in other

7    words, after every shift, every call the officers

8    went on, they would have to fill out a card or do a

9    report.

10       Q.    An incident report?

11       A.    An incident report.  And he was one of 25

12   on a shift that didn't have time to do it.  They

13   would have to do it the next day or two days later,

14   but there was always a long list going.

15       Q.    So he was one of several officers who

16   weren't filling out his reports on time, so to speak?

17       A.    They didn't have time to do it at times.

18       Q.    Did your supervisors tell you they were

19   having issues with Mr. Kelley besides what you have

20   told us?

21       A.    No.

22       Q.    Just if you could describe for us, you

23   talked about the log-in, log-out procedure.  How does

24   that work?

Page 39

1    police officer while he worked for you?

2        A.    Yes, he was.

3        Q.    And you weren't aware of anything that

4    prevented him during the time period he worked for

5    you performing the essential functions of the job of

6    a police officer?

7        A.    No.

8        Q.    Did Mr. Kelley ever express to you he was

9    being picked on by the Chief and the Captain?

10       A.    I don't know if he said "picked on," but it

11   was obvious that they were after him.

12       Q.    But I'm asking you, and maybe I didn't

13   phrase it right, did he ever express to you -- I'm

14   using that term -- any term that he was being picked

15   on by Captain Botieri or Chief Pomeroy?

16       A.    I would say, yes, but I can't give you a

17   specific time.  It was obvious in the station.  I

18   wasn't the only one who knew about this, I believe.

19       Q.    Who else knew about this?

20       A.    The whole shift.

21       Q.    Give me some names.

22       A.    Dana Goodwin.

23       Q.    Someone else?

24       A.    Paul Boyle, Jack Walsh, William Hedge.

1    A.    No.

2    Q.    Are you aware of any animosity Mr. Kelley

3    has toward Chief Pomeroy?

4    A.    No.

5    Q.    How about against Captain Botieri?

6    A.    Animosity?  I can't speak for Tom.

7    Q.    I'm asking if you ever heard him say

8    anything about Captain Botieri that would indicate

9    the animosity?

10    A.    I guess retirement, but I left.  I wasn't

11    there for the festivities.

12    Q.    There was the interaction between

13    Mr. Botieri and Mr. Kelley?

14    A.    Correct.

15    Q.    You heard about it later?

16    A.    I did.

17    Q.    Did Mr. Kelley tell you about it?

18    A.    No.  I heard other people and I was very

19    upset that I wasn't there.  My wife keeps me on a...

20    Q.    Did you hear from either Botieri or Pomeroy

21    that they were, as you say, after Mr. Kelley because

22    of his visit to the I.G.'s office?

23    A.    No, just the thing from Botieri, when he

24    said he -- the Chief didn't want Kelley fucking with

Page 44

1   his money.

2       Q.    And that's, you say, sometime in the

3   mid-'90s, as best you can remember?

4       A.    Right.

5       Q.    Were you aware, again, I know I asked part

6   of this question, were you aware of any medications

7   Mr. Kelley may have been taking while you were his

8   shift commander or supervisor?

9       A.    No.

10          MR. SILVERFINE:    That's all I have for

11  today.

12          MR. GALLITANO:    I have a few.

13                      EXAMINATION

14  BY MR. GALLITANO:

15      Q.    I have a few questions, and we'll get out

16  of here.    Just to clarify, when officers are on your

17  shift and were going to certain places, they would

18  call in to say where they were?

19      A.    Correct.

20      Q.    When they call in, you didn't necessarily

21  log that in, they were just notifying you where they

22  were?

23      A.    Would say, "Signal 3 at McDonald's," stuff

24  like that, just regular talk.

# EXHIBIT D

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. 1:05-cv-10596-NMG

```
-------------------------)
THOMAS M. KELLEY,        )
        Plaintiff        )
VS.                      )
                         )
TOWN OF PLYMOUTH, ET AL, )
        Defendant        )
-------------------------)
```

DEPOSITION OF MICHAEL E. BOTIERI, a witness called for examination by counsel for the Plaintiff, taken pursuant to the applicable provisions of the Massachusetts Rules of Civil Procedure, before LINDA M. CORCORAN, a Court Reporter-Notary Public in and for the Commonwealth of Massachusetts, at the Law Offices of Joseph R. Gallitano & Associates, 34 Main Street Extension, Plymouth, Massachusetts, on Wednesday, June 21, 2006, commencing at 10:21 a.m.

**LINDA M. CORCORAN**
**CERTIFIED COURT REPORTER**
**P. O. Box 4**
**Kingston, Massachusetts   02364**
**(781) 585-8172**

Page 14

1    with the state police with regard to that training

2    program?

3         A.    I don't understand the question.

4         Q.    Who conducted the training?

5         A.    The Mass. State Police.

6         Q.    And were you involved in any of the discussions

7    leading to the decision to have the Mass. State Police

8    conduct that training between the Town of Plymouth and

9    the Mass. State Police?

10        A.    No.

11        Q.    Who was involved in that, if you know?  That

12   discussion?

13        A.    I don't know.

14        Q.    At the time of the training in May of 2003, did

15   you see any documents that described the scope of the

16   training?

17        A.    At that time?

18        Q.    Yes.

19        A.    I don't recall.

20        Q.    In May of 2003, do you recall attending any

21   meetings during which the training conducted in May of

22   2003 was discussed?

23             MR. SILVERFINE:  Objection as to form.

24             You can answer.

Page 20

1      Q.   Are you aware of any protocols or standard

2  operating procedures or rules that are used by the

3  Plymouth Police Department regarding who participates in

4  training programs, those current training programs, the

5  ones that you've testified to, the four-day program?

6      A.   I don't understand the question.

7      Q.   Do you know of any -- any rules, any

8  regulations regarding the inclusion or exclusion of

9  police officers in training programs in the Town of

10 Plymouth?

11          MR. SILVERFINE:   Objection as to form.

12          You can answer.

13     A.   I still don't understand the question.

14     Q.   Do you know of any occasion when a patrolman in

15 the Town of Plymouth has been told he cannot for any

16 reason participate in a training program?

17     A.   Yes.

18     Q.   Can you give me an example?

19     A.   The specific Columbine-style training you're

20 speaking of, a couple of officers weren't able to

21 participate.

22     Q.   And who were they?

23     A.   My memory is John Abbott and Dennis Govoni, and

24 there could have been others.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

Page 25

1          A.   Either Captain Chandler or the training

2    supervisor at the time, which I believe was Sergeant John

3    Rogers.  I'm not 100 percent on that, but that's my

4    memory at this time.

5          Q.   Do you know if, in fact, Captain Chandler or

6    John Rogers, Sergeant John Rogers, or, for that matter,

7    the chief were -- if they were to tell a police officer

8    not to participate in the Columbine-like training

9    program, that they were following any particular rule,

10   regulation that the Plymouth Police Department has with

11   respect to training programs?

12              MR. SILVERFINE:  Objection as to form.

13              You can answer.

14         A.   I don't understand the question.

15         Q.   Do you know if there is any rule or regulation

16   regarding physical limitations, health issues that would

17   cause Captain Chandler, Sergeant Rogers, or the chief to

18   exclude a person from training in 2003?

19         A.   It's my memory that these officers requested

20   because of medical issues not to participate.

21         Q.   And how do you know that?

22         A.   That's my memory.

23         Q.   Do you recall who told you that they requested

24   that?

Page 26

1          MR. SILVERFINE:   Objection as to form.

2     A.   No.

3     Q.   Do you recall ever having a conversation with

4 John Abbott about his not participating in the May 2003

5 Columbine-like training program?

6     A.   I don't recall it specifically.

7     Q.   Do you recall having a conversation with Dennis

8 Govoni regarding he not participating in the

9 Columbine-like training program?

10     A.   I don't recall a specific conversation

11 regarding that, no.

12     Q.   Are you unaware of any current rules,

13 regulations, standard operating procedures that would

14 require a police officer to not under certain

15 circumstances to participate in current training

16 programs?

17     A.   I don't understand the question.

18     Q.   Are there any rules or regulations in the

19 police department currently that would exclude an officer

20 who was on the force from the training programs because

21 of a health reason?

22     A.   There's the possibility of an officer assigned

23 to light-duty status being omitted from training based on

24 his limitation.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

Page 28

1   require you to make sure that every patrolman

2   participating in training is fit and able and physically

3   capable of participating in that training?

4        A.    If an officer is fit and able to perform his

5   duties on a daily basis, he's fit and able to perform any

6   training.

7        Q.    That's your opinion as being --

8        A.    Yes, sir.

9        Q.    -- captain in charge of operations?

10       A.    Yes, sir.

11       Q.    That is different than being physically capable

12  of performing a certain training program; is that

13  correct?

14       A.    I don't understand.

15       Q.    Is there any rule or regulation regarding the

16  obligations of any captain or the chief or training

17  officer to make sure that all police officers

18  participating in training -- currently in training are

19  physically capable of participating in the training?

20       A.    I still don't understand the question.

21       Q.    Do you have any knowledge at all that inside

22  the operations of the Plymouth Police Department there is

23  any consideration given to physical abilities when

24  training programs are set up for police officers?

Page 31

1    or to the chief today?

2        A.    Could you repeat that, sir?

3        Q.    Do you know if there's any obligation of the

4    chief or the training officer or the captain in charge of

5    training to inquire of the police force as to whether or

6    not there are any men who are not able for health

7    considerations to participate in training?

8        A.    I don't know of any.

9        Q.    And your testimony is today that, as far as you

10   know, having been the captain of operations for -- how

11   many years?

12       A.    Six years.

13       Q.    -- six years in the police department, the only

14   way a health consideration is raised with respect to

15   training is if the police officer raises it to a training

16   officer, a captain, or the chief?

17       A.    There would be no other way of knowing.

18       Q.    Are you aware of any injuries sustained in

19   training programs -- has there been a training program in

20   2006?

21       A.    What kind of training, sir?

22       Q.    Police training.  You mentioned earlier the

23   four-day training program, plus the one-day that deals

24   with CPR.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

# EXHIBIT E

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| THOMAS M. KELLEY, )<br><br>Plaintiff, )<br><br>v. )<br><br>TOWN OF PLYMOUTH, et al., )<br><br>Defendants. ) | C.A. NO. 05-10596-NMG<br><br><br>Leave to file by hand<br>granted on 9/26/2007 |

## AFFIDAVIT

The undersigned affiant, BARBARA J. HANSBERRY, being first duly sworn, hereby deposes and says:

That she is employed as the General Counsel at Office of the Massachusetts Inspector General. As part of her duties, she has custody over the records of that Office.

THEREFORE, being solemnly sworn, and based on the records in my custody and control, I do hereby state and certify as follows:

1. That on January 24, 2001, the office of the Inspector General received a complaint from Thomas Kelley;

2. That the complainant alleged that the Town of Plymouth Chief of Police was illegally receiving compensation in violation of state law;

3. That the Office of the Inspector General investigated the complaint, which investigation included an interview with a former Town of Plymouth official;

4. That, based on its investigation, the Office of the Inspector General determined that the facts in the complaint were insufficient for a charge of criminal wrongdoing; and

5. That the Office of the Inspector General closed its file.

This I do state and certify this 20th day of December, 2006.

Barbara J. Hansberry
General Counsel

Sworn and subscribed before me this the 20th day of December, 2006.

Mary Beth Farrelly, Notary Public
My Commission expires: ___11/5/2010___

-2-

# **<u>EXHIBIT F</u>**

840 CMR 15.03

15.03: Regular Compensation

(1) During any period of active service subsequent to the effective date of 840 CMR 15.03(1) the term "regular compensation" as defined by M.G.L. c. 32, § 1, shall be determined subject to the following:

(a) To be considered regular compensation, any compensation to an employee must:
i) have been actually paid to or on behalf of a member:
ii) be made as remuneration for services actually rendered, for recurring payments for accrued sick leave, or for payments made pursuant to G.L. c. 41, § 111F in the year or part of a year to which the compensation is attributed;
iii) be ordinary, normal, recurrent, repeated, and of indefinite duration:
iv) be made pursuant to an official written policy of the employer or to a collective bargaining agreement;
v) be made on a non-discriminatory basis and be generally available for employees who are similarly situated relative to the purpose of the payment (e.g. a longevity payment made recurrently to all employees in a bargaining unit having attained a specific length of service) provided that the ability of a payment to be denied due to merit shall not exclude it for that reason from regular compensation.

(b) Regular compensation shall include any part of such salary, wages, or other compensation derived from federal grants, except as otherwise provided in M.G.L. c. 32, § 3(2)(a)(xi);

(c) Lump-sum or retroactive payments which would have been regular compensation if paid in the periods in which the services remunerated thereby were actually rendered will be allocated to said periods rather than being entirely attributed to the time of receipt for the purpose of determining a member's regular compensation.

(d) Provided they meet the general criteria in 840 CMR 15.03(1)(a)-(c), payments to be considered regular compensation shall include:
i) a member's annual rate of compensation as provided in an approved salary schedule;

ii)any non-cash maintenance allowances in the form of full or partial boarding and housing, as provided in M. G.L. c. 32, § 22(1)(c);

iii) (d) Any premiums paid by any governmental unit for the purchase of an individual or group annuity contract as authorized by M.G.L. c. 15, § 18A or by M.G.L. c. 71, § 37B;

iv)any amounts paid as educational incentives;

v)any amounts paid for length of service;

vi)any amounts paid as premiums for shift differentials; and

vii)any amounts paid as cost-of-living bonuses or cost-of-living pay adjustments.

(2) Any extraordinary or ad hoc payment amount shall be excluded from regular compensation. Exclusions shall include, but not be limited to:

(a) any amounts paid for hours worked beyond the member's normal work schedule;

(b) any amounts paid as premiums for working holidays, except as authorized by law;

(c) any amounts paid as bonuses other than cost-of-living bonuses, provided that any payment to an employee or group of employees which will not recur or which will recur for only a limited or definite term will be considered a bonus, and further provided that any payments to an employee or group of employees as part of a salary augmentation plan or salary enhancement program which is provided for in an individual contract in effect on or before January 25, 2006 or in a collective bargaining agreement in effect on or before January 25, 2006, including payments under such a plan or program which will not recur or which will recur for only a limited or definite term, shall be treated as regular compensation; and further provided, that any employee who is covered by such an agreement or contract on January 25, 2006 and who begins, at any time during the life of a collective bargaining agreement or individual employment contract in effect on or before January 25, 2006, to receive benefits and make retirement contributions pursuant to a salary augmentation plan or salary enhancement program under such a collective bargaining agreement or individual employment contract, may complete the plan or program under that agreement or contract or under a  successor collective bargaining agreement or individual employment contract, provided that the successor collective bargaining agreement or individual employment contract contains a salary augmentation plan or salary enhancement program; and further provided that the amount of the salary augmentation plan or salary enhancement program under a successor collective bargaining agreement or individual employment contract which shall be treated as regular compensation shall not exceed the amount of the salary augmentation plan

or salary enhancement program provided under the collective bargaining agreement or individual employment contract in effect on or before January 25, 2006, and further provided that the salary augmentation plan or salary enhancement program is otherwise consistent with the provisions of G.L. c. 32 and regulations promulgated by the Commission.

(d) any amounts paid in lieu of or for unused vacation, sick leave, or other leave;

(e) severance pay;

(f) any amounts paid as early retirement incentives; and

(g) Any other payments made as a result of the member giving notice of retirement.

# **EXHIBIT G**

THOMAS KELLEY

Page 1

1                                          Volume I
                                        Pages 1-159

2
                    UNITED STATES DISTRICT COURT
3              FOR THE DISTRICT OF MASSACHUSETTS
4                              C.A. NO. 05 10596 NMG
5
      THOMAS KELLEY,                     :
6                    Plaintiff,          :
                                         :
7      vs.                               :
                                         :
8      TOWN OF PLYMOUTH, et al,          :
                      Defendant.         :
9
10
11
12
                DEPOSITION of THOMAS KELLEY, taken on behalf of
13      the Defendants, pursuant to the applicable provisions
        of the Massachusetts Rules of Civil Procedure, before
14      Barbara M. Montijo, a Registered Professional
        Reporter and Notary Public within and for the
15      Commonwealth of Massachusetts, at the offices of
        Brody, Hardoon, Perkins & Kesten, One Exeter Plaza,
16      Boston, Massachusetts, on February 9, 2006,
        commencing at 11:00 a.m.
17
18
19
20
21                      DUNN & GOUDREAU
                 COURT REPORTING SERVICE, INC.
22                      One State Street
                      Boston, MA   02109
23                      (617) 742-6900
24

87

Q.   So, you're telling us today that your only concern
     was that somebody would accuse you of improperly
     dispensing Town funds; is that right?

A.   I'm telling you that as a member of the Board, on
     advice of counsel, and as a fiduciary responsibility,
     as well as fairness to the individuals that were
     retired under these conditions, the Town had an
     obligation to correct the bylaw, to properly
     facilitate and justify those compensations that were
     given; and verbal agreements for public employee
     compensation are not legal in Massachusetts.

Q.   When you voted in favor of the amended bylaw, you
     knew that in a sense you were wiping the whole slate
     clean in September of 2001?

A.   That's not true.

Q.   Well, you tell me what you understood when you were
     voting in September of 2001 to allow the Chief, the
     Captains, the officers who were retired, to collect
     under what you believed you were voting for?

A.   They amended the bylaw to cover the appropriateness
     in covering the monies.  If the Town did not want to
     recover monies, that was their prerogative.

Q.   When you say "they," it included you, though?

A.   No.

# EXHIBIT H



EXHIBIT
Beth
2/27/07
PENGAD 800-631-6989

At a legal meeting of the Annual Town Meeting of the Town of Plymouth held on 22 October 2001, the following business was transacted under Article Four, Section B.

ARTICLE 4: To see if the Town will vote to amend the Classification and Compensation Plans and the Personnel By-Law and Collective Bargaining Agreements contained therein, or take any other action relative thereto.

       PERSONNEL BOARD

Mr. Ricardi moved that the Town vote to amend the Classification and Compensation Plans and the Personnel By-law and Collective Bargaining Agreements contained therein, in accordance with the memorandum dated August 27, 2001 from Eleanor S. Beth, Town Manager, and M. Patricia Flynn, Director of Human Resources, entitled, "Possible Personnel Bylaw Additions."

Memo

To:     Board of Selectmen

From:   Eleanor S. Beth – Town Manager
         M. Patricia Flynn – Director of Human Resources

Date:   August 27, 2001

Re:    Possible Personnel Bylaw Additions

We hereby ask the Board to consider some amendments to the bylaw which would codify some long-standing past practices in Town.
These include benefits provided to the Police Chief, Fire Chief, Police Captains and Fire Deputy Chiefs who are not covered by collective bargaining agreements.
POLICE
When the position of Police Captain was taken out of the Police Superior Officers union in the 1980's, then Town Manager William Griffin agreed that the Captains would not lose any benefits formerly afforded to them as union members. These included holiday pay, clothing allowance, enhancements to the educational incentive pay (Quinn bill), and a small amount of overtime compensation. To my knowledge, former Police Chiefs have received holiday pay and education incentive pay. Mr. Griffin has stated (see attached memo) that when he appointed Chief Pomeroy, he informed him that he would continue to received holiday pay and enhanced Quinn Bill educational pay as he had been receiving prior to his promotion to the position of Chief of Police

FIRE

In further researching this issue, we were informed by Chief Fugazzi that the Fire Chief and the two Deputy Chiefs receive a clothing allowance and holiday pay. There is currently no Quinn bill payments for firefighters.

This issue was brought to our attention within the past year. We made a commitment to the Chiefs and Captains that we would address this when the Personnel Bylaw was amended. Now that the S-group contract is in place, it is appropriate to address this issue by amending the personnel bylaw to include these benefits to these officers.

Mr. Howe moved the previous question. The motion PASSED by greater than two-thirds.

The main motion PASSED.

I hereby certify that the foregoing is a true copy of the vote taken at the Annual Town Meeting held on 22 October 2001 in the Town of Plymouth, Massachusetts.

I hereby certify that there was a quorum present at the Annual Town Meeting at which this action was taken.

Witness my hand and seal of the Town of Plymouth this day, December 6, 2006.

Laurence R. Pizer
Town Clerk

# EXHIBIT I

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 05 10596 NMG

THOMAS KELLEY,                          )
    Plaintiff,                          )
                                 )
VS.                                     )
                                 )
TOWN OF PLYMOUTH and                    )
ROBERT J. POMEROY, as Chief of the      )
Plymouth Police Department and          )
Individually,                           )
    Defendants.                         )

## DEFENDANTS' ANSWER TO PLAINITFF'S VERIFIED COMPLAINT

### FIRST DEFENSE

The defendants state that the plaintiff's complaint fails to state a cause of action upon which relief can be granted.

### SECOND DEFENSE

The defendants hereby answer the plaintiff's Complaint, Paragraph by Paragraph, as follows:

1.    The defendants admit the allegations contained in this paragraph.

2.    The defendants admit the allegations contained in this paragraph.

3.    The defendants admit that Mark Sylvia is the Town Manager of the Town for Plymouth; the defendants admit that Eleanor Beth was the previous Town Manager for the Town of Plymouth; the defendants admit that Lawrence Pizer is the Town Clerk for the Town of Plymouth; the defendants admit that Kenneth Tavares is the Chairman of the Board of Selectmen for the Town of Plymouth; and further state that the remaining allegations state of conclusion of law to which the defendants need not respond.

4.    The defendants admit the allegations contained in this paragraph.

### FACTS

5.    The defendants admit the allegations contained in this paragraph.

6.    The defendants admit that on May 25, 2003, the Plymouth Police Department participated in a training exercise regarding a potential hostage taking.

7.    The defendants admit the allegations contained in this paragraph.

8.    The defendants deny the allegations contained in this paragraph.

9.    The defendants deny the allegations contained in this paragraph.

10.    The defendants lack knowledge sufficient to allow them to answer this paragraph.

11.    The defendants lack knowledge sufficient to allow them to answer this paragraph.

12.    The defendants lack knowledge sufficient to allow them to answer this paragraph.

13.    The defendants deny the allegations contained in this paragraph.

14.    The defendants deny the allegations contained in this paragraph.

15.    The defendants deny the allegations contained in this paragraph.

16.    The defendants deny the allegations contained in this paragraph.

17.    The defendants admit that Kelley submitted a request for reimbursement for vacation time.  The defendants deny the remaining allegations in this paragraph.

18.    The defendants admit that Chief Pomeroy denied the plaintiff's request to be reimbursed for vacation time.  The defendants further admit that the Personnel Board of the Town of Plymouth declined the plaintiff's request.

19.    The defendants deny the allegations contained in this paragraph.

20.    The defendants deny the allegations contained in this paragraph.

21.    The defendants admit that Kelley raised a question regarding Chief Pomeroy's compensation packets.  The defendants deny that this occurred "about a year before the drill".

22.    The defendants are not aware whether Kelley raised the situation to the Inspector General Office.

23.    The defendants state that Town meeting voted to ratify that Chief Pomeroy's compensation package was proper.

24.    The defendants deny the allegations contained in this paragraph.

25.    The defendants deny the allegations contained in this paragraph.

26.    The defendants deny the allegations contained in this paragraph.

27.     The defendants state that Chief Pomeroy properly denied the plaintiff's request for more vacation pay, as it was not properly documented.

## CAUSES OF ACTION

### COUNT I:  VIOLATION OF THE STATE WHISTLE BLOWER STATUTE
### M.G.L. CH. 149, § 185

28.     The defendants hereby repeat their responses to Paragraphs 1 through 27 of the plaintiff's complaint.

29.     The defendants deny the allegations contained in this paragraph.

30.     The defendants deny the allegations contained in this paragraph.

31.     The defendants deny the allegations contained in this paragraph.

32.     The defendants deny the allegations contained in this paragraph.

33.     The defendants deny the allegations contained in this paragraph.

34.     The defendants deny the allegations contained in this paragraph.

35.     The defendants lack knowledge sufficient to allow them to answer this paragraph.

        WHEREFORE, the defendants deny that the plaintiff is entitled to judgment in any amount against the defendants and, furthermore, the defendants ask this Honorable Court to enter judgment for the defendants and against the plaintiff along with interest, costs and attorneys fees.

### COUNT II:  GROSS NEGLIGENCE, WILLFUL,
### WANTON AND RECKLESS CONDUCT

36.     The defendants hereby repeat their responses to Paragraphs 1 through 35 of the plaintiff's complaint.

37.     The defendants deny the allegations contained in this paragraph.

38.     The defendants deny the allegations contained in this paragraph.

39.     The defendants deny the allegations contained in this paragraph.

40.     The defendants deny the allegations contained in this paragraph.

41.     The defendants deny the allegations contained in this paragraph.

42.     The defendants deny the allegations contained in this paragraph.

43.     The defendants deny the allegations contained in this paragraph.

44.     The defendants deny the allegations contained in this paragraph.

        WHEREFORE, the defendants deny that the plaintiff is entitled to judgment in any amount against the defendants and, furthermore, the defendants ask this Honorable Court to enter judgment for the defendants and against the plaintiff along with interest, costs and attorneys fees.

### COUNT III: VIOLATION OF PLAINTIFF'S RIGHTS UNDER THE 14TH AMENDMENT EQUAL PROTECTION UNDER THE LAW AND HIS RIGHTS UNDER 42 USC, §1983

45.     The defendants hereby repeat their responses to Paragraphs 1 through 44 of the plaintiff's complaint.

46.     The defendants deny the allegations contained in this paragraph.

47.     The defendants deny the allegations contained in this paragraph.

48.     The defendants admit that Kelley served on the Plymouth Retirement Board, as did other Town employees. The defendants deny there were any "standard operating procedures".

49.     The defendants deny the allegations contained in this paragraph.

50.     The defendants deny the allegations contained in this paragraph.

51.     The defendants deny the allegations contained in this paragraph.

52.     The defendants deny the allegations contained in this paragraph.

        WHEREFORE, the defendants deny that the plaintiff is entitled to judgment in any amount against the defendants and, furthermore, the defendants ask this Honorable Court to enter judgment for the defendants and against the plaintiff along with interest, costs and attorneys fees

### COUNT IV:  DENIAL OF PLAINTIFF'S RIGHTS UNDER M.G.L. CH. 41, §111F

53.     The defendants hereby repeat their responses to Paragraphs 1 through 52 of the plaintiff's complaint.

54.     The defendants deny the allegations contained in this paragraph.

55.     The defendants deny the allegations contained in this paragraph.

56.     The defendants deny the allegations contained in this paragraph.

WHEREFORE, the defendants deny that the plaintiff is entitled to judgment in any amount against the defendants and, furthermore, the defendants ask this Honorable Court to enter judgment for the defendants and against the plaintiff along with interest, costs and attorneys fees

## AFFIRMATIVE DEFENSES

### AFFIRMATIVE DEFENSE NO. 3

By way of affirmative defense, the defendants state that the defendants' actions are entitled to qualified good faith immunity.

### AFFIRMATIVE DEFENSE NO. 4

By way of affirmative defense, the defendants state that the defendants were privileged in the defendants' conduct and acts and that therefore the plaintiff cannot recover.

## JURY DEMAND

The defendants respectfully demand a trial by jury.

Respectfully submitted,
Defendants,
By their attorney,

_____/s/ Leonard H. Kesten_____
Leonard H. Kesten, BB0# 542042
BRODY, HARDOON, PERKINS & KESTEN, LLP
One Exeter, Plaza, 12th Floor
Boston, MA 02116
(617) 880-7100

Dated: 4/19/05