UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

THOMAS KELLEY,
      Plaintiff,


            v.                          CIVIL ACTION NO.
                                        05-10596-MBB

TOWN OF PLYMOUTH and
ROBERT J. POMEROY, as Chief of the
Plymouth Police Department and
Individually,
      Defendants.

**MEMORANDUM AND ORDER RE:**
**OFFICE OF THE INSPECTOR GENERAL'S MOTION TO QUASH**
**SUBPOENA DUCES TECUM OR FOR A PROTECTIVE ORDER**
**(DOCKET ENTRY # 62); DEFENDANTS' MOTION FOR SUMMARY**
**JUDGMENT (DOCKET ENTRY # 69); MOTION TO STRIKE**
**(DOCKET ENTRY # 85)**

**March 31, 2008**

**BOWLER, U.S.M.J.**

     Defendants Town of Plymouth and Robert J. Pomeroy, as Chief

of the Plymouth Police Department and Individually,

("defendants") move for summary judgment under Rule 56, Fed R.

Civ. P. ("Rule 56").  (Docket Entry # 69).  Defendants also move

to strike the affidavits of plaintiff Thomas M. Kelley

("plaintiff") and Dennis M. Govoni ("Govoni").  (Docket Entry #

85).  Plaintiff opposes the motion for summary judgment (Docket

Entry # 80) and the motion to strike (Docket Entry # 100).

Defendants filed a reply (Docket Entry # 87) and plaintiff filed

a rebuttal to the reply (Docket Entry # 102).

     Also pending before this court is a motion filed by the

Office of the Inspector General ("the IGO") to quash a keeper of

records subpoena duces tecum.  (Docket Entry # 62).  The subpoena commanded the IGO to appear at a March 14, 2007 deposition and to produce and permit inspection and copying of documents relating to a meeting between plaintiff and the IGO on or about January 24, 2001, and any subsequent investigation.

On November 20, 2007, this court held a hearing and took the motions (Docket Entry ## 62, 69 & 85) under advisement.

PROCEDURAL BACKGROUND

In Count One of the four count complaint, plaintiff alleges a violation of the Massachusetts Whistleblower Statute, section 185 of Massachusetts General Laws chapter 149 ("the Whistleblower Act"), and seeks damages in the amount of $220,000.  In Count Two, plaintiff brings a claim for gross negligence, willful, wanton and reckless conduct.  In Count Three, plaintiff seeks relief under 42 U.S.C. § 1983 ("section 1983") alleging a violation of the Equal Protection Clause under the Fourteenth Amendment.  In Count Four, plaintiff claims he was denied his rights under Massachusetts General Laws chapter 41, section 111F ("section 111F"), and seeks reimbursement for vacation time in the amount of $2,000 as well as punitive damages and attorney's fees.  (Docket Entry # 80, Ex. A).  Before addressing the summary judgment motion, this court turns, respectively, to the motion to quash and the motion to strike.

2

I.  OFFICE OF THE INSPECTOR GENERAL'S MOTION TO QUASH SUBPOENA
DUCES TECUM OR FOR A PROTECTIVE ORDER (DOCKET ENTRY # 62)

On January 24, 2001, the IGO received a complaint by
plaintiff concerning the alleged receipt of illegal compensation
on the part of defendant Robert J. Pomeroy ("Pomeroy").  After
conducting an investigation, the IGO concluded that the facts in
the complaint were insufficient to support a criminal charge.
(Docket Entry # 75).[1]

Defendants urge that the subpoena seeks relevant information
critical to their defense in the case at bar.  They accurately
point out that plaintiff alleges that Pomeroy retaliated against
plaintiff after he filed the complaint with the IGO.  The
information sought, identified in a privilege log (Docket Entry #
68, Ex. 2), is materially relevant to the substantive issue of
whether Pomeroy retaliated against plaintiff because of the
filing with the IGO.

_____

[1]  The above facts are taken from the affidavit of an
official at the IGO.  In the June 14, 2007 motion to quash the
subpoena, the IGO alternatively asks to file an affidavit in lieu
of complying with the subpoena.  The IGO identifies the affidavit
as being "the subject of a joint motion by the IGO and
[plaintiff] that was granted by the Court on June 5, 2007."
(Docket Entry # 62, n. 2).  On June 4, 2007, the court allowed
the filing of the affidavit.  To preserve the confidentiality of
the affidavit, the court subsequently allowed the IGO leave to
file the affidavit by hand on September 26, 2007.  This court
therefore assumes that the affidavit referenced in the motion is
the one filed by hand on September 26, 2007.  Having reviewed the
affidavit, it does not excuse the IGO from complying with the
subpoena.

The IGO asserts that plaintiff's "description of his complaint to the IG[O] in the Complaint before this Court, however, does not materially differ from the IG[O]'s description of [plaintiff's] complaint in the Affidavit."  (Docket Entry # 62).  The IGO therefore argues there is no new information thereby reducing, if not eliminating, the relevance of the IGO documents to the case at bar.  The IGO also represents that it has no new information relative to the alleged retaliation.

Turning to the IGO's arguments, the IGO first maintains that the subpoena violates the Fair Information Practices Act, Massachusetts General laws chapter 66A, section one ("FIPA").  Subject to certain exceptions, FIPA protects "personal data" concerning an individual.  Mass. Gen. L. ch. 66A, § 1.  Absent the individual's consent or a court order, the statute bars disclosure of such personal data to third parties.

The IGO submits that the "documents reviewed by the [IGO] and sought pursuant to the Subpoena contain personal information about individuals other than Kelley" thereby contravening FIPA.  (Docket Entry # 62).  This may be true but defendants do not seek the personal data of third parties.  (Docket Entry # 68; "defendants do not seek any personal data and would readily agree to waive same").  Accordingly, any third party personal data within the meaning of FIPA that is subject to production in

4

response to any forthcoming subpoena shall be redacted.[2]

The IGO next contends that the information is privileged under section 13 of Massachusetts General Laws chapter 12A ("section 13").  The Massachusetts legislature created the IGO in 1980 to "prevent and detect fraud, waste and abuse in the expenditure of public funds whether state, federal or local."  Mass. Gen. L. ch. 12A, § 7.  In carrying out these investigatory duties, the IGO must "report to the attorney general, the United States attorney, or both, whenever the [IGO] has reasonable grounds to believe there has been a violation of federal or state criminal law."  Mass. Gen. L. ch. 12A, § 10.  The statutory privilege in section 13 mandates that, "All records of the office of inspector general shall be confidential . . .."  Mass. Gen. L. ch. 12A, § 13.

Where, as here, jurisdiction arises by virtue of the federal claim, federal common law applies to the determination of a privilege.  Martin v. Lamb, 122 F.R.D. 143, 145 (W.D.N.Y. 1988) (circuit courts "consistently" hold that the federal common law of privilege applies to cases involving a federal claim") (collecting cases); accord King v. Conde, 121 F.R.D. 180, 187 (E.D.N.Y. 1988) ("[q]uestions of privilege in federal civil rights cases are governed by federal law"); see, e.g., Association For Reduction of Violence v. Hall, 734 F.2d 63, 65

---

[2]  As permitted infra, defendants may prepare and serve a subpoena similar in form to the February 15, 2007 subpoena.

(1st Cir. 1984) (citing Rule 501, F.R.E., and applying federal law to privilege in case brought under section 1983).  Thus, even where there are pendent state law claims in a federal question case, federal common law supplies the privilege rule. Krolikowski v. University of Massachusetts, 150 F.Supp.2d 246, 248 (D.Mass. 2001) ("in a federal question case where the court is also hearing state law claims pursuant to supplemental jurisdiction, federal privilege law governs the claims"); accord Vanderbilt v. Town of Chilmark, 174 F.R.D. 225, 226 -227 (D.Mass. 1997) (noting that "[e]very circuit" to reach the issue holds that "federal law of privilege applies"); Rule 501, Advisory Committee Notes, 1974 Enactment (committee "intended that the Federal law of privileges should be applied with respect to pendent State law claims when they arise in a Federal question case").

In deciding whether to absorb the state law privilege in section 13 as a matter of federal common law, see Rule 501, Advisory Committee Notes, 1974 Enactment, "courts often weigh the competing interests by balancing the public's need for the full development of relevant facts in federal litigation against the countervailing demand for confidentiality in order to achieve the objectives underlying the privilege in issue." Krolikowski v. University of Massachusetts, 150 F.Supp.2d at 248 (internal quotation marks omitted); see also N.O. v. Callahan, 110 F.R.D.

637, 640 (D.Mass. 1986) (court "must balance the particular federal interest involved against the rational and comparative strength of the particular state evidentiary interest claimed"). The inquiry involves "weighing the importance of the disclosure sought" in the federal proceeding "against the potential injury" caused to Massachusetts "by disclosure." In re Hampers, 651 F.2d 19, 22 (1st Cir. 1981). The relevant two part test in the First Circuit entails assessing whether Massachusetts would recognize the privilege and whether the privilege asserted is "'intrinsically meritorious.'" In re Hampers, 651 F.2d at 22; Krolikowski v. University of Massachusetts, 150 F.Supp.2d at 248; N.O. v. Callahan, 110 F.R.D. at 640.

In light of the statute and the purpose it serves, Massachusetts would recognize the confidentiality of the IGO documents. The IGO notes pertaining to the interview with the former town official more than likely arose in confidence. Assurances of maintaining the confidentiality enable the IGO to obtain information about public corruption from potentially unwilling individuals. (Docket Entry # 62, Ex. B); see Unger v. Cohen, 125 F.R.D. 67, 70 (S.D.N.Y. 1989) (factors militating against disclosure of internal police file include chilling internal investigations or "citizen complainant candor"). Confidentiality ought to be fostered to enable the IGO to pursue the meritorious goal of investigating public corruption. On the

7

other hand, the "purpose behind section 1983 was to insure an independent federal forum for testing alleged constitutional violations by state officials," <u>In re Hampers</u>, 651 F.2d at 22 (discussing <u>American Civil Liberties Union of Miss. v. Finch</u>, 638 F.2d 1336 (5th Cir. 1981)), which would be hampered by foreclosing access to information directly relevant to the alleged constitutional violation.

Here, as in <u>Hampers</u>, "the injury that would inure to the relation by the disclosure of the communications" may at times be greater than or less than "the benefit thereby gained for the correct disposal of litigation." <u>In re Hampers</u>, 651 F.2d at 23. In certain instances, the relevancy of the internal IGO documents and the inability to obtain the equivalent elsewhere would override the meritorious and laudable purposes of the state statute. In other instances, the confidentiality needed to pursue an existing investigation or to encourage future individuals to provide accurate information by the promise of confidentiality would outweigh a federal interest in the correct disposal of the litigation. The existing federal common law investigative privilege serves many of the same purposes as the state statute. It also provides a proper and careful balancing of the relevant concerns.

In light of the strong and intrinsically meritorious privilege afforded confidential IGO material under the state

statute, this court will recognize a qualified privilege for such confidential information as a matter of federal common law.  In the case at bar, however, the privilege gives way to the need for an accurate resolution of this case and the need of defendants to access highly relevant information.  The interests of the state can be served with a protective order similar to the text in numerical paragraphs one, four, five, six (excluding the last sentence regarding electronic filing) and seven through 12 of the proposed protective order in the August 9, 2007 "joint" stipulation between plaintiff and the IGO.[3]  Limiting the reach of this opinion to apply only to the facts of this case and redacting any personal data of third parties will further lessen the impact on future investigations of allowing this disclosure.[4]

The IGO additionally seeks to bar disclosure on the basis of the investigatory privilege under federal common law.  The investigatory privilege applies to "documents that would tend to reveal law enforcement investigative techniques or sources." Association for Reduction of Violence v. Hall, 734 F.2d at 66; accord United State v. Lilly, 185 F.R.D. 113, 115 (D.Mass. 1999) (federal courts "recognize[d] a qualified common-law privilege for law enforcement investigatory information").  When

---

[3]  The court never approved or entered the stipulation.

[4]  Production of the material during discovery also does not equate with a decision to admit the material into evidence at trial.  Any such determination may be addressed at trial.

determining the scope of the investigatory privilege, a "Court must balance the public interest in nondisclosure against the need of the particular litigant for access to the privileged information." United State v. Lilly, 185 F.R.D. at 115.

Although the records at issue fall squarely within the scope of the privilege, see Association For Reduction of Violence v. Hall, 734 F.2d at 66, the public interest of safeguarding the IGO's ability to conduct a full and adequate investigation into any fraud in the expenditure of public funds and, with the approval of the Attorney General of the Commonwealth of Massachusetts, institute a civil proceeding, see Mass. Gen. L. ch. 12A, § 11, is adequately served by maintaining the confidentiality of the documents under a strict protective order similar to the text in numerical paragraphs one, four, five, six (excluding the last sentence regarding electronic filing) and seven through 12 of the proposed protective order in the August 9, 2007 joint stipulation between IGO and plaintiff. (Docket Entry # 76). The initial investigation closed in 2002 and the most recent document in the privilege log is dated April 2, 2002.

In contrast, defendants' need for the documents to defend against the claims in the case at bar is great. Morever, the interest of the parties "seeking disclosure tends to be the strongest when the information in question is highly relevant, helpful, and unavailable from other sources." Association For

10

Reduction of Violence v. Hall, 734 F.2d at 66.  The notes and memoranda to the IGO file are not available from any other source.  In the event that the interview with the former town official differs from plaintiff's description of the events, the information would provide forceful impeachment evidence against plaintiff.[5]

The IGO also relies on the deliberative process privilege. The deliberative process privilege protects "intragovernmental memoranda containing opinions or recommendations of policy-making rather than purely factual import."  Association for Reduction of Violence v. Hall, 734 F.2d at 66.  The privilege is "qualified rather than absolute and may be overborne by a showing that the information sought is relevant, helpful and unavailable from other sources."  Velazquez v. City of Chicopee, 226 F.R.D. 31, 34 (D.Mass. 2004) (internal quotation marks omitted).  It applies to "intragovernmental memoranda containing opinions or recommendations of policy-making rather than purely factual import."[6]  Id. at 34 (internal quotation marks omitted).  For

_____

[5]  The IGO's argument that plaintiff's description does not materially differ with the IGO's internal description of plaintiff's complaint is not convincing as a means to avoid disclosure.  Defendants are entitled to make that determination and even small or relatively minor discrepancies from plaintiff's descriptions are significant insofar as plaintiff's credibility is critical in the case at bar.  The material is also directly relevant on a substantive basis.

[6]  The privilege would therefore extend, if at all, only to the "memo[s] to file" or the "note[s] to file" identified in the privilege log.

11

previously stated reasons, the privilege gives way to the needs of defendants for the information and the need for an accurate resolution of this litigation.  A protective order adequately guards the confidentiality of the documents and mollifies, to a degree, the countervailing interests of maintaining confidentiality.

The IGO's additional argument based upon undue burden is not convincing.  Rule 45(c) provides for the quashing of a subpoena that "subjects a person to undue burden."  Rule 45(c)(3)(A)(iv), Fed. R. Civ. P.  The documents set forth in the privilege log, however, are few in number.  Although this court recognizes and considers the fact that the IGO is not a party to this litigation, see In re Public Offering PLE Antitrust Litigation, 427 F.3d 49, 52 (1st Cir. 2005) (fact that appellee is a nonparty "entitled to special weight in evaluating the balance of competing needs"), it is not overly burdensome to compile and produce the relatively small amount of information at issue.

The IGO also points out that the policy underlying the rationale for quashing depositions of high ranking government officials applies.  The IGO thus submits that it would be a drain on the time and resources of the IGO to proceed with a keeper of records deposition particularly where the IGO is not a party to the suit.  Absent extraordinary circumstances, "top executive department officials" are not "called to testify or deposed

regarding their reasons for taking official action." Bogan v.
City of Boston, 489 F.3d 417, 423 (1st Cir. 2007).  The "rule is
based on the notion that high ranking government officials have
greater duties and time constraints than other witnesses and
that, without appropriate limitations, such officials will spend
an inordinate amount of time tending to pending litigation."  Id.

First, a deposition of the keeper of records of the IGO is
not a deposition of a high ranking government official.  Second,
the time needed to respond to the subpoena duces tecum is minimal
and does not significantly detract from the IGO's public work
investigating public fraud.

In sum, a keeper of records deposition may take place.
Defendants should prepare and serve a subpoena similar in form to
the February 15, 2007 subpoena.[7]  (Docket Entry # 62, Ex. 1).
All records produced shall be subject to the terms of a
protective order similar to the text in numerical paragraphs one,
four, five, six (excluding the last sentence regarding electronic
filing) and seven through 12 of the proposed protective order in
the August 9, 2007 joint stipulation between IGO and plaintiff.
(Docket Entry # 76).  All personal data of third parties within
the meaning of FIPA shall be redacted.  This court expresses no
opinion as to the admission of such documents into evidence at
trial.

---

[7]  Accordingly, the IGO's alternative argument to modify the
subpoena is denied.

II.  <u>MOTION TO STRIKE (DOCKET ENTRY # 85)</u>

Before setting forth the summary judgment record, it is necessary to address the motion to strike the affidavit of plaintiff and Govoni under Rule 56(e).

Rule 56(e) provides that when affidavits are used to support or oppose a summary judgment motion, they "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Rule 56(e), Fed R. Civ. P.  Only evidence admissible at trial may be considered by the court on summary judgment.  <u>See</u> <u>Garside v.</u> <u>Osco Drug, Inc.</u>, 895 F.2d 46, 49-51 (1st Cir. 1990).  Affidavits based on conclusory language are therefore inadmissable.  <u>Wynne</u> <u>v. Tufts Univ. School of Medicine</u>, 976 F.2d 791, 796 (1st Cir. 1992).  Furthermore, in order to be admissible, the proffered statements must be "'supported with particularized factual information'" based on personal knowledge.  <u>Santiago-Ramos v.</u> <u>Centennial P.R. Wireless Corp.</u>, 217 F.3d 46, 53 (1st Cir. 2000) ("specific factual information based upon [affiant's] personal knowledge").

Turning to the Govoni affidavit, defendants argue that paragraph four "speaks in the third person and is therefore not based on personal knowledge." (Docket Entry # 85).  Defendants

14

further argue that a number of other paragraphs do not include specific dates.  The alleged deficiencies pointed out by defendants, however, have been cured by a subsequent "confirmatory" affidavit submitted with plaintiff's opposition to the motion to strike (Docket Entry # 100).  See Celta Agencies, Inc. v. Denizcilksanayi Ve Ticaaret, A.S., 396 F.Supp.2d 106 (D.P.R. 2005) (allowing affidavit presented with the plaintiff's opposition to cure a defective affidavit).

As to plaintiff's affidavit, defendants contend that plaintiff "reiterates allegations made in plaintiff's complaint, without providing specific factual information made on the basis of personal knowledge." (Docket Entry # 85).  Defendants are correct in their reasoning that testimony and affidavits that "'merely reiterate allegations made in the complaint, without providing specific factual information made on the basis of personal knowledge'" are insufficient.  Velazquez-Garcia v. Horizon Lines Of Puerto Rico, Inc., 473 F.3d 11, 14 (1st Cir. 2007) (citing Roslindale Coop. Bank v. Greenwald, 638 F.2d 258, 261 (1st Cir. 1981)).  Reviewing the affidavit with that principle in mind, this court excludes paragraphs four, five, seven through 46 and 48 of the affidavit from evidence.  See Petricca v. City of Gardner, 429 F.Supp.2d 216, 219 (D.Mass. 2006).

15

III.  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOCKET ENTRY # 69)

STANDARD OF REVIEW

"The role of summary judgment is to look behind the facade of the pleadings and assay the parties' proof in order to determine whether a trial is required." Plumley v. S. Container, Inc., 303 F.3d 364, 368 (1st Cir. 2002).  "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  Barbour v. Dynamics Research Corp., 63 F.3d 32, 36 (1st Cir. 1995).  "A genuine issue of fact is one that a reasonable jury, on the record before the court, could resolve in favor of either party." Putnam v. Town of Saugus, 365 F.Supp.2d 151, 165 (D.Mass. 2005) (internal quotation marks omitted).  A fact is material when "it is one that might affect the outcome of the suit under governing law." Velez-Rivera v. Agosto-Alicea, 437 F.3d 145, 150 (1st Cir. 2006).  Facts are viewed in the light most favorable to the nonmoving party with disputes resolved in favor of the nonmoving party.  Merchants Ins. Co. v. United States Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998); see Saenger Organization, Inc. v. Nationwide Insurance Licensing Associates, Inc., 119 F.3d 55, 56 (1st Cir. 1997).

The moving party must make the initial showing that no genuine issue as to any material fact exists and that he is entitled to summary judgment as a matter of law.  <u>Barbour v. Dynamics Research Corp.</u>, 63 F.3d at 37.  If the moving party makes a preliminary showing that no genuine issue of material fact exists, the nonmoving party must then "'produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue'" on each element of its claim.  <u>Clifford v. Barnhart</u>, 449 F.3d 276, 280 (1st Cir. 2006).  In other words, "As to issues on which the summary judgment target bears the ultimate burden of proof, she [or he] cannot rely on an absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute." <u>McCarthy v. Northwest Airlines, Inc.</u>, 56 F.3d 313, 315 (1st Cir. 1995).

"Material facts of record set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties."  LR. 56.1; <u>see also</u> <u>Cochran v. Quest Software, Inc.</u>, 328 F.3d 1, 12 (1st Cir. 2003) (the plaintiff's failure to contest date in LR. 56.1 statement of material facts caused date to be admitted on summary judgment); <u>Stonkus v. City of Brockton School Dept.</u>, 322 F.3d 97, 102 (1st Cir. 2003) (citing LR. 56.1 and deeming admitted undisputed

material facts that the plaintiff failed to controvert).

Viewed in plaintiff's favor as the nonmoving party, the summary judgment record is as follows.

<u>FACTUAL BACKGROUND</u>

Born on October 26, 1954, plaintiff, a resident of Plymouth, Massachusetts, was hired as a police officer with the Plymouth Police Department ("PPD") on September 19, 1977. (Docket Entry # 80, Ex. D). In 1996, plaintiff was elected to the Plymouth Retirement Board ("the retirement board"). (Docket Entry # 100, Ex. A; Docket Entry # 70, Ex. B). The retirement board reimbursed the Town of Plymouth ("the town") for times when plaintiff was "scheduled to work [his] position as a full time police officer, and those hours conflicting with [his] service to the Retirement System." (Docket Entry # 70, Ex. B). No other police officers have served on the retirement board in Plymouth. (Docket Entry # 100, Ex. A).

Several months prior to plaintiff's election to the retirement board, Pomeroy, PPD Police Chief, prohibited Sergeant John Abbott, a member of the PPD, from attending Pubic Employee Retirement Administration Commission ("PRAC") meetings. Pomeroy changed his position when a statute was passed allowing on duty police officers to attend such meetings. (Docket Entry # 70, Ex. 2A).

In or around 1998, plaintiff contacted Michael Sacco

18

("Sacco"), counsel for the retirement board, regarding the
overpayments of Pomeroy and various police captains.  (Docket
Entry # 100, Ex. A).  Plaintiff believed that Pomeroy and the
captains were over compensated without the proper documentation
for the compensation.  (Docket Entry # 100, Ex. A).  Plaintiff
believed that this was a violation of the town bylaws.  (Docket
Entry # 100, Ex. A).  Sacco then spoke to Eleanor Beth ("Beth"),
Town Manager, and Patrick Della Russo ("Russo"), Finance
Director.[8]

When the town took no action, plaintiff brought his
complaint to the IGO on January 22, 2001.  The IGO conducted an
investigation and determined that the facts were insufficient to
show criminal wrongdoing.  (Docket Entry # 102, Ex. E).  A
newspaper article nonetheless ran in the September 6, 2001
edition of the Old Colony Memorial newspaper regarding the
improper payment of benefits.  (Docket Entry # 70, Ex. 4).
Pomeroy telephoned William Griffin, former Town Manager,[9] and
inquired about the challenged benefits and plaintiff's role in
the challenge.  (Docket Entry # 80, Ex. I).[10]

---

[8]   Russo eventually determined that over a 15 year period
$520,000 had been paid improperly for holiday pay, uniform
allowances and educational incentive benefits.

[9]   Griffin, as Town Manager, promoted Pomeroy to the
position of Chief of Police in November of 1992.  (Docket Entry #
80, Ex. J).

[10]  This court considers these facts as evidence of knowledge
and not for the truth of the matter.  See U.S. v. Potter, 463

On October 22, 2001, the town voted and passed a motion to amend the bylaws and ratify the funds. Plaintiff, a member of the retirement board, voted to ratify the funds. (Docket Entry # 100, Ex. A).

After reporting the violation to the IGO, plaintiff was monitored "everywhere he went." (Docket Entry # 80, Ex. H). When plaintiff went to a retirement board hearing he was logged off duty. In various other instances plaintiff was reprimanded for not following police procedures. Plaintiff was targeted with "constant nitpicking." (Docket Entry # 100, Ex. A).

On July 4, 2001, plaintiff was scheduled to be on vacation but was required to come to work. (Docket Entry # 100, Ex. A). Six or seven other officers who were scheduled for vacation time also came into work. (Docket Entry # 87, Ex. 16). A PPD sergeant, however, came to plaintiff's residence when he was not at home. Fearing suspension, plaintiff returned to work as well. On May 10, 2001, plaintiff wrote a letter to Beth regarding workplace harassment and whistleblower retaliation. (Docket Entry # 80, Ex. M).

Every year police officers in the PPD assent to a certain number of sick days as part of a contract.[11] The contract stipulates that if an officer has a bona fide reason for being

---

F.3d 9, 25 (1st Cir. 2006).

[11] Plaintiff's deposition refers to the document as an agreement, letter and/or a contract.

20

absent due to a medical condition the agreed upon number of sick
days is waived.  (Docket Entry # 100, Ex. A).  Plaintiff
developed Lyme disease sometime prior to April 24, 2002, and
Ménière's disease sometime before March 27, 2003.  (Docket Entry
# 80, Ex. B).  Although plaintiff was treated for both ailments,
he continued experiencing pain and difficulty with stability and
"dizzy spells."  (Docket Entry # 100, Ex. A).

     On September 16, 2002, plaintiff received a letter from
Pomeroy regarding excessive absence.  Plaintiff replied to the
letter with two doctor's notes to Captain Michael E. Botieri
("Botieri") stipulating that he was being treated for both Lyme
disease and Meniere's disease.  (Docket Entry # 100).  Plaintiff
also sent an email to Pomeroy stating that he had sent doctor's
notes to Botieri.  (Docket Entry # 80, Ex. B).

     On May 25, 2003, Pomeroy ordered all Plymouth police
officers, including plaintiff, to participate in a rigorous and
physically demanding training drill ("the drill") at the Plymouth
North High School.  The drill simulated the Columbine hostage
incident in Colorado in which heavily armed students held parties
hostage in a high school.  (Docket Entry # 80, Ex. D).  Prior to
the drill at a union bargaining session Paul F. Boyle, Police
Union President, had a conversation with Pomeroy regarding
concerns about previous injuries that had occurred in other
Massachusetts towns during similar drills.  (Docket Entry # 70,

Ex. 11).

Plaintiff experienced a heart incident during the drill causing him to require hospitalization. (Docket Entry # 80, Ex. D). At the time of the drill there were no PPD rules or guidance in place regarding the physical capacity of police officers to endure training. The PPD does have rules in place that provide that officers who are unable to endure training should notify their superiors. (Docket Entry # 102, Ex. B). In subsequent Columbine simulated drills after plaintiff's heart incident, two PPD police officers were excused from participating in the drill due to medical reasons. (Docket Entry # 80, Ex. C).

Plaintiff made multiple requests to Pomeroy regarding reimbursement for vacation time he had used after his heart incident. (Docket Entry # 80, Ex. D). Plaintiff submitted two doctor's notes to Pomeroy. The first note from Dr. Lydia Bazzano, who treated plaintiff at Beth Israel Medical Center after the heart incident, stated that plaintiff was hospitalized from May 26 to May 27, 2003, and could return to work two weeks from the hospital discharge. (Docket Entry # 70, Ex. 7). The second note from Dr. Donald M. Moore stated that plaintiff would be best served medically by staying out of work for approximately one month. (Docket Entry # 70, Ex. 8).

By letter dated June 24, 2003, Pomeroy advised plaintiff that there was not sufficient evidence to show that he was

22

injured on duty.  The letter additionally stated that "the
statutory presumption contained in MGL C32, S94 . . . does not
necessarily apply to injured-on-duty leave under MGL C41, S111F."
(Docket Entry # 70, Ex. 9).  A letter from Pamela Nolan, Town
Manager,[12] stated that she agreed with Pomeroy's assessment.
(Docket Entry # 100, Ex. A).

     On June 25, 2003, plaintiff filed an application for
accidental disability retirement pursuant to sections seven and
94 of Massachusetts General Laws chapter 32.  (Docket Entry #
71).  A panel of doctors was assembled to determine if plaintiff
qualified for disability retirement under the applicable statute.
The panel concluded after examining plaintiff that there was no
evidence of heart disease at plaintiff's pre-employment physical,
and that "Kelley's permanent incapacity [was] the natural and
proximate result of the personal injury he sustained on May 25,
2003."  (Docket Entry # 80, Ex. F).  The panel also concluded
that "there is insufficient evidence to offset the statutory
presumption" that Kelly's disability was sustained in the line of
duty.[13]  (Docket Entry # 80, Ex. E).  The retirement board
adopted the panel's finding and awarded plaintiff accidental
disability retirement under sections seven and 94 of
Massachusetts General Laws chapter 32.  (Docket Entry # 80, Ex. E

---

     [12]  Pamela Nolan succeeded Beth as Town Manager.

     [13]  The statutory presumption applies to the sections seven
and 94 of Massachusetts General Laws chapter 32.

& F).

On September 9, 2003, plaintiff accepted disability retirement.  After retiring, plaintiff submitted a follow up request for reimbursement under section 111F to the Union Steward, Larry Rooney.  Plaintiff requested reimbursement for vacation time used after the heart incident.  Because he had retired, plaintiff was unable to officially appeal the decision through the town.  (Docket Entry # 100, Ex. A).

DISCUSSION

A.  <u>Whistleblower Act</u>

The Whistleblower Act gives an employee a private right of action against a public employer, including a municipality, if the employer takes retaliatory action against the employee for engaging in protected activities.  <u>Bennett v. City of Holyoke</u>, 362 F.3d 1, 5 (1st Cir. 2004).  In order to prevail on a Massachusetts whistleblower claim, the "'plaintiff must show that:  (1) he disclosed an activity, policy, or practice of the employer that he reasonably believed to be in violation of a law, rule, or regulation; (2) his disclosure played a substantial or motivating part in the retaliatory action; and (3) the retaliatory action caused him damages.'"  <u>Taylor v. Town of Freetown</u>, 479 F.Supp.2d 227, 241 (D.Mass. 2007).

Enough evidence exists regarding whether plaintiff's disclosure played a substantial or motivating part in the

24

retaliatory action.  Although the evidence of retaliation is thin, "Issues of reasonable belief and retaliatory intent are relatively fact-based determinations."  Walker v. City of Holoyoke, 523 F.Supp.2d 86, 113 (D.Mass. 2007).  The question of whether defendants' actions violate the Whistleblower Act should be left to the jury.[14]

B.  Gross Negligence, Willful, Wanton and Reckless Conduct

In order to establish negligence, the plaintiff must show the existence of a duty owed by the defendant to the plaintiff, the defendant's breach of that duty, actual and proximate causation, and damages.  See One Beacon Ins. Co. v. Electrolux, 436 F.Supp.2d 291, 297 (D.Mass. 2006).

"As the Supreme Judicial Court has stated, 'summary judgment is seldom sought or granted in . . . actions involving allegedly reckless conduct.'"  Beausoleil v. Massachusetts Bay Transp. Authority, 138 F.Supp.2d 189, 198 (D.Mass. 2001).  That said, however, summary judgment is "appropriate if there is no evidence from which a jury could reasonably infer that the defendant acted recklessly."  Id.

Wilful, wanton, or reckless conduct, in turn, is:

> intentional conduct, by way either of commission or of omission where there is a duty to act, which conduct involves a high degree of likelihood that substantial harm

---

[14] The law of the case doctrine does not prevent this court from addressing the merits of the whistleblower claim, including whether plaintiff provided proper written notice to the employer, in a post trial motion.

will result to another.  Two characteristics of wilful, wanton, or reckless conduct distinguish it from negligence.  First, the defendant must knowingly or intentionally disregard an unreasonable risk.  Second the risk, viewed prospectively, must entail a high degree of probability that substantial harm would result to the plaintiff.

Beausoleil v. Massachusetts Bay Transp. Authority, 138 F.Supp.2d at 203 (applying Massachusetts law).  "'The terms "wilful," "wanton" and "reckless" are often used interchangeably.'"  Beausoleil v. Massachusetts Bay Transp. Authority, 138 F.Supp.2d at 203.

In the case at bar, there is little evidence to suggest that defendants acted wilfully.  Rather, the issue is whether the "the evidence is sufficient to prove that defendants' conduct involved 'an intentional or unreasonable disregard of a risk that present[ed] a high degree of probability that substantial harm [would] result to another' and was, therefore, 'reckless.'"  Beausoleil v. Massachusetts Bay Transp. Authority, 138 F.Supp.2d at 203 (distinguishing between the terms willful and reckless).

"Whether a defendant owes a duty of care to a plaintiff is a question of law to be decided by the court."  Beausoleil v. Massachusetts Bay Transp. Authority, 138 F.Supp.2d at 197.  An employer has a special relationship with an employee under contract and owes to that employee various duties not limited to "the duty to provide and maintain a reasonably safe work environment . . . to warn employees of unusual or nonobvious hazards; and to make and enforce safety rules."  Kaya v.

Partington, 681 A.2d 256, 261 (R.I. 1996); see Porter v. Nutter, 913 F.2d 37, 38 (1st Cir. 1990); Haley v. Allied Chemical Corp., 231 N.E.2d 549, 553 (Mass. 1967).  In light of the employer/employee relationship, defendants have a duty of care to plaintiff.

Viewing the evidence in the light most favorable to the nonmoving party, plaintiff raises a genuine issue of material fact regarding defendants' purported recklessness thereby foreclosing summary judgment.

C.  Section 1983 and Equal Protection

"Section 1983 confers no substantive rights, but rather provides a venue for vindicating federal rights elsewhere conferred."  Correa-Ruiz v. Calderon-Serra, 411 F.Supp.2d 41, 50 (D.P.R. 2005).  Plaintiff must show that "'(1) the challenged conduct was attributable to a person acting under color of state law; and (2) the conduct deprived the plaintiff of rights secured by the Constitution or the laws of the United States.'"  Johnson v. Mahoney, 424 F.3d 83, 89 (1st Cir. 2005).  In the case at bar, plaintiff does not have an actionable section 1983 claim because the underlying substantive claim, based on the Equal Protection Clause, fails.

The Equal Protection Clause of the Fourteenth Amendment requires states to treat all similarly situated persons equally. Plyler v. Doe, 457 U.S. 202, 216 (1982).  Equal Protection Clause

27

claims are reviewed under a rational basis standard when the state action does not burden a suspect class.  Heller v. Doe, 509 U.S. 312, 319 (1993).  Under a rational basis review, plaintiff must show that there is no rational relationship between the disparity of treatment and any legitimate government purpose. Heller v. Doe, 509 U.S. at 320.

Police officers are not a suspect class and plaintiff does not cite to any case law that supports the contention that a higher standard of review should apply.  Indeed, it would be difficult to suggest that police officers are "'a class of persons characterized by some unpopular trait or affiliation . . . [that would] reflect any special likelihood of bias [against them] on the part of the ruling majority.'"  Mills v. State of Me., 118 F.3d 37, 47 (1st Cir. 1997) (declining to characterize probation officers as a suspect class).

Defendants may have treated plaintiff differently for any number of legitimate reasons.  For instance, plaintiff admits to not following police procedures on numerous occasions which in turn may have warranted "nitpicking."  See Gun Owners' Action League v. Swift, 284 F.3d 198, 213 (1st Cir. 2002) (state conduct will be upheld under "any reasonably conceivable set of facts" when applying a rationale basis analysis).

Plaintiff also attempts to argue that the "class-of-one" standard, based on novel and "seemingly antithetical [First

Circuit] case law," should apply. <u>Walsh v. Town of Lakeville</u>, 431 F.Supp.2d 134, 145 (D.Mass. 2006) (attempting to "harmonize seemingly antithetical case law").

"The First Circuit has stated that a malice/bad faith test, when applied to a defendant's conduct in the context of 'a class of one' equal protection claim, is 'an exceptionally deferential one.'" <u>Walsh v. Town of Lakeville</u>, 431 F.Supp.2d at 145 (citing <u>Wojcik v. Mass. State Lottery Comm'n</u>, 300 F.3d 92, 104 (1st Cir. 2002)). The First Circuit therefore "require[s] proponents of such an equal protection claim to establish a 'gross abuse of power, invidious discrimination or fundamentally unfair procedures.'" <u>Id.</u> Indeed, "even an arbitrary denial of a permit in violation of state law--even in bad faith--does not rise above the threshold for equal protection claims." <u>Walsh v. Town of Lakeville</u>, 431 F.Supp.2d at 145 (internal quotations omitted).

In the case at bar, the evidence is not sufficient under Rule 56 to raise a genuine issue of material fact regarding malice or bad faith. <u>See</u>, <u>e.g.</u>, <u>Walsh v. Town of Lakeville</u>, 431 F.Supp.2d at 146 (holding that the plaintiff failed to demonstrate a gross abuse of power or an extreme, malicious, orchestrated campaign against her by the defendants). Although defendants' actions may be considered "misjudgements" they are not "utterly unjustified, malignant, and extreme actions." <u>Baker v. Coxe</u>, 230 F.3d 470, 474 (1st Cir. 2000).

D.   Massachusetts General Laws chapter 41, section 111F

          According to section 111F:

          Whenever a police officer or fire fighter of a city, [or]
          town . . . is incapacitated for duty because of injury
          sustained in the performance of his duty without fault of
          his own . . . he shall be granted leave without loss of pay
          for the period of such incapacity; provided, that no such
          leave shall be granted for any period after such police
          officer or fire fighter has been retired or pensioned in
          accordance with law . . ..

Mass. Gen. L. ch. 41, § 111F.  "The purpose of Section 111F is to
prevent any deprivation of pay, either in time or value, during
the period of an officer's incapacity."  Todino v. Town of
Wellfleet, 860 N.E.2d 234, 237 (Mass. 2007).  The provision,
therefore, "reflects an intention that an incapacitated officer
receive leave 'without loss' of ordinary compensation."  Id.

          In order to prevail on a claim for section 111F benefits, a
plaintiff must show that the policeman's injury "occurred during
a period (1) for which he was being paid, (2) when he was on
call, and (3) while he was engaged in activities consistent with
and helpful to the accomplishment of police functions" to decide
whether the injury arose out of the performance of his duties.
Wormstead v. Town Manager of Saugus, 322 N.E.2d 171, 175 (Mass.
1975).  Once an employee retires, section 111F benefits cease.
Blair v. Board of Selectmen of Brookline, 526 N.E.2d 1317, 1319
(Mass.App.Ct. 1987).  In addition, "The town cannot substitute
vacation time for payments due police officers on IOD status."[15]

_____

          [15]  IOD is an acronym for injury on duty.

30

<u>Town of Reading v. Reading Patrolmen's Assn., Local 191</u>, 737
N.E.2d 1268, 1269 n. 2 (Mass.App.Ct. 2000).

A police officer who suffers a heart condition may be
awarded section 111F benefits.  <u>See</u> <u>Blair v. Board of Selectmen</u>
<u>of Brookline</u>, 526 N.E.2d 1317, 1318 (Mass.App.Ct. 1988)
(hypertension).  A police officer who suffers from a heart
condition, however, must show a specific occurrence, incident or
series of occurrences that caused the heart problem.  <u>See</u> <u>Vaughan</u>
<u>v. Auditor of Watertown</u> 473 N.E.2d 698, 699 (Mass.App.Ct. 1985)
(hypertension).  If it is found that section 111F benefits are
applicable and vacation time was wrongly substituted, the
employee may be compensated if he has not been granted the
vacation time to which he was entitled.  <u>See</u> <u>Town of Reading v.</u>
<u>Reading Patrolmen's Assn., Local 191</u>, 737 N.E.2d 1268, 1269
(Mass.App.Ct. 2000); <u>see</u> <u>also</u> <u>Carvalho v. Cambridge</u>, N.E.2d 522,
523 (Mass. 1977).

Plaintiff puts forth sufficient evidence to raise a genuine
issue of material fact regarding whether he is entitled to
section 111F benefits as reimbursement for vacation time.
Plaintiff points to a specific occurrence and the medical panel
decision as evidence.  Accordingly, a reasonable jury could find
him entitled to injury on duty status and reimbursement.  <u>See</u>
<u>Town of Reading v. Reading Patrolmen's Assn., Local 191</u>, 737
N.E.2d at 1269.

E.  Supplemental Jurisdiction

    The dismissal of the section 1983 claim raises the issue of whether to exercise supplemental jurisdiction over the remaining state law claims.  The decision of whether to exercise supplemental jurisdiction over the state law claims "is left to the broad discretion of the district court."  Vera-Lozano v. International Broadcasting, 50 F.3d 67, 70 (1st Cir. 1995) (finding no abuse of such broad discretion in court's refusal to dismiss state law claims under 28 U.S.C. § 1367(c)(1)); accord Penobscot Indian Nation v. Key Bank of Maine, 112 F.3d 538, 564 (1st Cir. 1997) ("decision to retain or disclaim jurisdiction . . . lies in the broad discretion of the district court").

    Section 1367(c)(1) of Title 28 of the United States Code ("section 1367(c)") allows the district court to refuse to exercise supplemental jurisdiction over a state claim that "raises a novel or complex issue of State law."  28 U.S.C. § 1367(c)(1).  Section 1367(c)(2) expressly permits the district court to refuse supplemental "jurisdiction if the state claim 'substantially predominates over the claim or claims over which the district court has original jurisdiction.'"  Vera-Lozano v. International Broadcasting, 50 F.3d at 70 (quoting section 1367(c)(2)).  This court's exercise of its discretion, however, must be informed in the sense that it must account for "the totality of the attendant circumstances."  Rodriquez v. Doral

Mortgage Company, 57 F.3d 1168, 1177 (1st Cir. 1995).

"[T]he interests of fairness, judicial economy, convenience, and comity" oftentimes require examination. Camelio v. American Federation, 137 F.3d 666, 672 (1st Cir. 1998). These concerns often apply when the district court views the state claim as predominant or novel or complex under subsections 1367(c)(1) and (2), see, e.g., Lopez-Soto v. Hawayek, 988 F.Supp. 41, 46-47 (D.P.R. 1997) (affirming district court's refusal to dismiss state claims under section 1367(c)(2) and noting that "joint adjudication serves interest of judicial economy and fairness"), as well as when the district court dismisses the federal claim and re-examines its jurisdiction over the remaining state law claims under section 1367(c)(3). See Grispino v. New England Mut. Life Ins. Co., 358 F.3d 16, 19 (1st Cir. 2004).

In addition, the "running of the statute of limitations on a pendent claim, precluding the filing of a separate suit in state court, is a salient factor" in "deciding whether to retain supplemental jurisdiction." Rodriquez v. Doral Mortgage Company, 57 F.3d at 1177. Section 1367(d), however, tolls the running of the statute of limitations on the state claims "while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period." 28 U.S.C. § 1367(d); Jinks v. Richland County, S.C., 538 U.S. 456 (2003); Raygor v. Regents of University of Minnesota, 534 U.S.

533 (2002); see Roden v. Wright, 611 So.2d 333, 333 (Ala. 1992);

Rothmeier v. Investment Advisors, Inc., 556 N.W.2d 590, 593

(Minn.Ct.App. 1996).

In the case at bar, with the exception of the keeper of

records deposition, "discovery ha[s] closed, the summary judgment

record [is] complete . . . and powerful interests in both

judicial economy and fairness tug[ ] in favor of retaining

jurisdiction." Roche v. John Hancock Mutual Life Ins. Co., 81

F.3d 249, 256-257 (1st Cir. 1996). It is in the interest of

fairness and judicial economy for this court to maintain

jurisdiction over the surviving state law claims. See Rodriguez

v. Doral Mortgage Corp., 57 F.3d at 1177 (court maintained

jurisdiction over surviving state law claims "notwithstanding the

early demise of all foundational federal claims").


CONCLUSION

In accordance with the foregoing discussion, the motion to

strike (Docket Entry # 85) is **ALLOWED** in part and **DENIED** in part

with respect to the Kelley affidavit and **DENIED** with respect to

the Govoni affidavit. The motion to quash (Docket Entry # 62) is

**DENIED** except to the extent set forth in Roman Numeral I. The

motion for summary judgment (Docket Entry # 69) is **DENIED** as to

counts one, two and four and **ALLOWED** as to Count Three. The

parties shall appear for a status conference at 2:30 p.m. on

April 21, 2008, to set a trial date.

　　/s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge